**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

COMMERZBANK AG,

                                  Plaintiff,

               -against-

DEUTSCHE BANK NATIONAL TRUST COMPANY,

                           Defendant.

---------------------------------------------------------------- x

Index No.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

**Page**

NATURE OF ACTION ...............................................................................................................1

PARTIES ...................................................................................................................................6

JURISDICTION AND VENUE ..................................................................................................9

FACTUAL ALLEGATIONS ......................................................................................................9

I.       THE SECURITIZATION PROCESS.................................................................................9

II.      DEUTSCHE BANK'S DUTIES AND OBLIGATIONS ...................................................12

         A.       Deutsche Bank's Duties Pertaining to the Delivery of Mortgage Files.................17

         B.       Deutsche Bank Had a Duty to Provide Notice of Defaults
                  and Enforce Repurchase Obligations Triggered by Such Notice .........................25

         C.       Deutsche Bank's Duty to Act Prudently
                  Upon the Occurrence of an Event of Default.......................................................26

         D.       Deutsche Bank Had a Duty to Address the Master Servicers'
                  and Servicers' Failure to Meet Prudent Servicing Standards ...............................27

         E.       Deutsche Bank Is Liable for Negligence in Performing Its Duties .......................29

III.     DEUTSCHE BANK BREACHED ITS
         CONTRACTUAL, FIDUCIARY, AND STATUTORY DUTIES ...................................30

         A.       Deutsche Bank Failed to Provide Notice of Defaults of the
                  Sponsors' and Originators' Pervasive Representation and Warranty Breaches ....30

                  1.       The Originators' and Sponsors' Pervasive
                           Breaches of Representations and Warranties............................................43

         B.       Deutsche Bank Failed to Act Prudently
                  Upon the Occurrence of an Event of Default.......................................................52

                  1.       Events of Default Under the PSAs Relating to
                           Document Delivery Failures in the Covered Trusts ..................................53

                  2.       Events of Default Under the Indentures
                           Relating to Document Delivery Failures in the Covered Trusts................56

3.      Deutsche Bank Received Written Notice of Representation
and Warranty Violations Which Ripened into Events of Default..............58

4.      Events of Default Concerning False Servicer Certifications .....................61

C.      Deutsche Bank Failed to Address the Master
Servicers' and Servicers' Looting of Trust Assets .................................................63

IV.     DEUTSCHE BANK SUFFERED FROM CONFLICTS OF INTEREST ........................70

V.      DEUTSCHE BANK'S CONDUCT INJURED COMMERZBANK  ..............................73

CAUSES OF ACTION ....................................................................................................................75

FIRST CAUSE OF ACTION (Violations of the TIA) ...................................................................75

SECOND CAUSE OF ACTION (Breach of Contract) ..................................................................77

THIRD CAUSE OF ACTION (Breach of Fiduciary Duty) ...........................................................78

FOURTH CAUSE OF ACTION (Negligence—
Failure to Avoid Conflict of Interest and Perform Ministerial Acts with Due Care) ...................79

FIFTH CAUSE OF ACTION (Violation of the Streit Act)............................................................80

SIXTH CAUSE OF ACTION (Breach of the Covenant of Good Faith) ......................................81

PRAYER FOR RELIEF ..................................................................................................................82

Plaintiff Commerzbank AG ("Commerzbank" or "Plaintiff"), by and through its attorneys, brings this action against Defendant Deutsche Bank National Trust Company ("Deutsche Bank", "Defendant", or "Trustee"), and alleges as follows:

<u>**NATURE OF ACTION**</u>

1. This action arises out of Deutsche Bank's role as trustee for 50 securitization trusts (the "Covered Trusts"), identified in Exhibit A, and asserts claims against Deutsche Bank for breaches of its contractual and fiduciary duties, and its duties under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa, *et seq.*, and New York's Streit Act, N.Y. Real Property Law § 124, *et seq.* (the "Streit Act").

2. The Covered Trusts were created to facilitate residential mortgage-backed securities ("RMBS") transactions introduced to investors from 2005 to 2007. Thirteen of the RMBS transactions were sponsored by Goldman Sachs Mortgage Company (the "Goldman Sachs Trusts"), eleven were sponsored by Morgan Stanley Mortgage Capital, Inc. (the "Morgan Stanley Trusts"), six were sponsored by HSBC Bank USA, National Association (the "HSBC Trusts"), five were sponsored by Greenwich Capital Financial Products, Inc. (the "Greenwich Trusts"), four were sponsored by IXIS Real Estate Capital Inc. (the "IXIS Trusts"), three were sponsored by Impac Mortgage Holdings, Inc. and Impac Funding Corporation (the "Impac Trusts"), three were sponsored by Option One Mortgage Corporation (the "Option One Trusts"), two were sponsored by NovaStar Mortgage, Inc. (the "NovaStar Trusts"), two were sponsored by Saxon Funding Management, Inc. (the "Saxon Trusts"), one was sponsored by ECC Capital Corporation (the "ECC Trust"), and one was sponsored by Washington Mutual Bank (the "WaMu Trust") (Goldman Sachs Mortgage Company, Morgan Stanley Mortgage Capital, Inc., HSBC Bank USA, National Association,

Greenwich Capital Financial Products, Inc., IXIS Real Estate Capital Inc., Impac Mortgage Holdings, Inc., Impac Funding Corporation, Option One Mortgage Corporation, NovaStar Mortgage, Inc., Saxon Funding Management, Inc., ECC Capital Corporation, and Washington Mutual Bank are referred to collectively as the "Sponsors").

3.    Commerzbank acquired RMBS certificates with a purchase value in excess of 640 million dollars issued by the Covered Trusts identified in Exhibit B ("the Certificates"). Exhibit B identifies Certificates Commerzbank still holds (the "Held Certificates") and the Certificates Commerzbank has sold (the "Sold Certificates").

4.    The Certificates represent interests in the cash flows associated with the mortgage loans deposited into the Covered Trusts by the Sponsors and their affiliates or business partners.  The certificateholders are the beneficiaries of the Covered Trusts.  The performance of the RMBS depended on the Sponsors depositing properly underwritten mortgage loans having complete documentation into the Covered Trusts.  The quality of the mortgage loans is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trusts.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to the Trustee.

5.    The certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected. Rather, such investors were dependent upon their trustee representative, Deutsche Bank, to police the deal and to protect their contractual and other legal rights.

6.    As trustee for the Covered Trusts, Deutsche Bank owes Commerzbank and

2

the other certificateholders certain contractual and common law duties, as well as duties under the TIA and the Streit Act with respect to the mortgage loans owned by the Covered Trusts.  Deutsche Bank and the relevant servicers (the "Servicers")[1] were required to provide notice of breaches of representations and warranties by the Sponsors and the parties who originated the mortgage loans underlying the Covered Trusts (the "Originators") concerning key attributes of the mortgage loans underlying the Covered Trusts, including the origination guidelines applicable to those loans and adherence to state laws regarding predatory lending.  Deutsche Bank had a duty to enforce the obligation of the responsible parties (typically the Sponsors and their affiliates that served as the depositors (the "Depositors"), or the Originators) to repurchase loans that breached representation and warranty provisions or were missing required documentation.  Deutsche Bank was also required to address defaults by the Servicers and Master Servicers who were required to engage in prudent loss mitigation practices.

7.      Deutsche Bank was actively involved in the origination and servicing of mortgage loans and typically had very close business relationships with the Sponsors, Originators, and Depositors.  Nevertheless, as trustee, Deutsche Bank was obligated to act against the financial interest of the Sponsors when demanded by the circumstances.  Deutsche Bank, however, abandoned its obligations to protect the rights of investors.

8.      Deutsche Bank's breaches of its contractual, fiduciary, and statutory duties give rise to six distinct legal claims.

9.      <u>Breach of Contract</u>.  Deutsche Bank's contractual duties are set forth in

---

[1] Some of the Covered Trusts employ a "Master Servicer" while others refer to the lead servicing entity as a Servicer.  References herein to the Servicer include the Master Servicer to the extent possible.

governing agreements, generally identified as pooling and servicing agreements ("PSAs").[2] Deutsche Bank breached the PSAs by failing to: (i) provide notice of representation and warranty violations by the Sponsors and Originators; (ii) provide notice of the Servicers' and Master Servicers' failure to give notice of those same representation and warranty violations; (iii) cause the responsible parties to repurchase or substitute loans that were subject to a breach of representation or warranty or missing documentation required to be delivered under the PSAs; and (iv) exercise all rights and remedies available to Deutsche Bank under the PSAs upon the occurrence of an Event of Default.

10.    <u>Breach of Fiduciary Duty</u>.  Under common law, after an Event of Default an indenture trustee has a duty to act as a prudent person would in the exercise of his own affairs to protect the rights of certificateholders.  This duty continues until the Event of Default is cured.  Deutsche Bank failed to meet its fiduciary duties because it was aware Events of Default had occurred, but failed to take action to force the responsible parties to repurchase loans with representation and warranty violations or missing documentation and failed to address breaches by the Servicers and Master Servicers.

11.    <u>Violations of the TIA</u>.  The TIA requires the trustee to provide certificateholders with notice of defaults under the operative indentures within 90 days of becoming aware of such defaults and to act prudently to protect the rights of certificateholders during the period in which the default remains uncured.  Deutsche Bank violated these provisions by failing to provide notice of defaults it was aware of and failing

---

[2] Four of the Covered Trusts (ECR 2005-3, SAST 2005-2, SAST 2006-3, and IMM 2007-A) were structured using indentures, servicing agreements, trust agreements, and mortgage loan purchase agreements ("MLPAs"), which together are the functional equivalent of a PSA.  Four of the Covered Trusts (GSAA 2006-15, GSAA 2006-16, GSAA 2006-17, and GSAA 2007-4) were structured using master servicing and trust agreements, which are the functional equivalent of a PSA.  One of the Covered Trusts (HVMLT 2006-3) was structured using a pooling agreement, which is also the functional equivalent of a PSA.  Unless expressly noted herein, when the term PSA is used, it is also referring to the aforementioned governing agreements executed in connection with those securitizations.

to act prudently to protect the certificateholders' interests by exercising all rights and remedies available to Deutsche Bank under the PSAs.

12.     Violation of the Streit Act.  Deutsche Bank violated the Streit Act by failing to "use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs" to protect the rights of certificateholders during the pendency of an "event of default."  The Streit Act applies to the extent a PSA is not "qualified" under the TIA.  Thus, to the extent the TIA is deemed to not apply to any particular "mortgage investments," the Streit Act provides a similar protection and remedy.

13.     Negligence.  Deutsche Bank had an extra-contractual duty to perform ministerial acts with due care and to avoid conflicts of interest.  Deutsche Bank negligently performed ministerial acts by failing to provide notices of the numerous defaults that it was aware of under the PSAs.  Deutsche Bank violated its duty of independence by failing to take action against the Sponsors, Originators, Depositors, Servicers, and Master Servicers because if Deutsche Bank acted, it would have exposed systemic origination and servicing misconduct by Deutsche Bank and would have jeopardized future lucrative engagements.

14.     Breach of Covenant of Good Faith.  Deutsche Bank violated the covenant of good faith and fair dealing by failing to give notice of defaults and failing to take action to cause the responsible parties to repurchase loans that violated representation and warranty provisions or were missing required documentation.

15.     By failing to perform its duties, Deutsche Bank has caused Commerzbank to suffer hundreds of millions of dollars in losses.

## **PARTIES**

16.     Plaintiff Commerzbank AG is an entity organized under the laws of Germany. Commerzbank AG is the legal successor to all of Dresdner Bank AG's ("Dresdner") interests by way of merger as of May 2009, effected by way of universal succession under the German Transformation Act, with Commerzbank AG as the entity resulting from such merger.  Plaintiff brings this action as a current and/or former holder of the Certificates. Commerzbank's acquisitions and other activities related to the Certificates were conducted at and through Commerzbank AG London Branch (the "London Branch").

17.     Commerzbank acquired certain of the Certificates through assignments from the following investors: (i) investor Barrington II CDO Ltd. ("Barrington 2"), which was a Cayman Islands limited company; (ii) investor Eurohypo AG New York Branch (now known as Hypothekenbank Frankfurt AG New York Branch) ("Eurohypo"), which is a wholly-owned subsidiary of Commerzbank and was the New York branch of a corporate entity organized under the laws of Germany; and (ii) investor Palmer Square 3 Limited ("Palmer 3"), which was a private limited liability company organized under the laws of Ireland ("Palmer 3," and together with Barrington 2 and Eurohypo, the "Assignors"). Exhibit B indicates which Certificates were acquired through assignment from Barrington 2 (the "Barrington 2 Certificates"), Eurohypo (the "Eurohypo Certificates"), and Palmer 3 (the "Palmer 3 Certificates").  Commerzbank brings both its own claims while it was a certificateholder and the claims that were assigned to it by the Assignors.

18.     The Barrington 2 Certificates were acquired as part of the collateral for Barrington 2.  In May 2012, London Branch and Dynamic Credit Partners, LLC ("DCP"), in its capacity as Collateral Manager for Barrington 2, agreed to unwind Barrington 2 whereby

6

DCP would sell the collateral assets and Commerzbank would be presented with the opportunity to purchase them.  In connection with this process, London Branch acquired the Barrington Certificates between May and July 2012.  On December 24, 2013, London Branch entered into an Assignment Agreement with various parties including Barrington 2 and the Bank of New York Mellon Trust Co., N.A. which provided:

> With respect to all assets of the Issuer and the Co-Issuer acquired since their respective formations (including, without limitation, any Collateral now owned or previously owned by the Issuer or Co-Issuer under the Indenture, the "Assets"), the Issuer and the Co-Issuer, effective as of the date hereof, hereby transfer and assign to Commerzbank, and the Trustee releases its lien against, any and all litigation rights, causes of action and claims arising out of, in connection with, and/or relating to (1) the Assets, whether known or unknown, whether arising before, on or after the date of this Agreement, including, without limitation, all claims related to and/or arising out of the initial purchase of the Assets, any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims and (2) to the extent not included in the foregoing, any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims arising under other contracts to which the Issuer and/or the Co-Issuer is a party (clauses (1) and (2), collectively, the "Transferred Rights") and all rights and powers necessary to invoke and enforce the Transferred Rights, including, without limitation, the right and authority to commence, prosecute and resolve any legal actions.

19.    On December 11, 2013, Eurohypo and London Branch entered into a Confirmation of Assignment with respect to the Eurohypo Certificates, which Eurohypo previously had transferred to London Branch.  The Confirmation of Assignment provided:

> In exchange for good and valuable consideration, at the time that Eurohypo transferred the Securities to Commerzbank, it was Eurohypo's intent to transfer all litigation rights, causes of action and claims arising out of, in connection with, and/or relating to (1) the Securities, whether known or unknown,

7

whether arising before, on or after the date of this Agreement, including, without limitation, all claims related to and/or arising out of the initial purchase of the Securities, any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims and (2) to the extent not include in the forgoing any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims arising under contracts to which Eurohypo is a party, and which concern the Securities and all rights and powers necessary to invoke and enforce the Transferred rights, including, without limitation, the right and authority to commence, prosecute and resolve any legal actions (altogether, the "Transferred Rights").

20.     On August 11, 2008, a Deed of Unwind for Palmer 3 effectuated the transfer of all of Palmer 3's collateral assets, including the Palmer 3 Certificates, to Dresdner, acting through its London branch.  The Palmer 3 Certificates were recorded on Dresdner's accounts in September 2008 (interests for which Commerzbank is legal successor).  By letter dated December 10, 2013, the liquidator of Palmer 3 provided Commerzbank a letter confirmation stating:

> With regard to the [unwinding of Palmer 3], this letter confirmation further memorializes the fact that is it my understanding that it was the Company's intent to effectuate the transfer of all assets of value, as provided in the Deed of Unwind, to the Sole Noteholder [Dresdner] on the terms set forth in the Deed of Unwind, and that such assets included the [Collateral Assets], and all legal rights and claims whether in tort or otherwise associated with the Collateral Assets.
>
> It is my understanding and belief that such legal rights, and claims include, but are not limited to, the Company's interest and control over any and all legal claims sounding in tort, contract, trust, or otherwise concerning any of the Collateral Assets, whether arising before or after the date of their acquisition or the date of this confirmation.

21.     Defendant Deutsche Bank is a national banking association organized and

8

existing under the laws of the United States.  Deutsche Bank does business throughout the United States, and its principal place of business is located in California.  It serves as the trustee for the Covered Trusts.  For each of the Covered Trusts, Deutsche Bank signed Certificates incorporating the PSAs.  As the trustee for the Covered Trusts, Deutsche Bank owed certificateholders certain statutory, contractual, and fiduciary duties with respect to the mortgage loans owned by the Covered Trusts, which it violated.

<b><u>JURISDICTION AND VENUE</u></b>

22.    This Court has jurisdiction over the TIA claims asserted in this matter under 15 U.S.C. § 77v.  This Court has jurisdiction over the other claims asserted under 28 U.S.C. § 1367.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

23.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v as Deutsche Bank resides in this District and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

24.    This Court has personal jurisdiction over Deutsche Bank because a substantial part of the administration of the Covered Trusts, out of which the claims asserted herein arise, is performed in New York.  Additionally, the majority of the Covered Trusts are New York trusts, with their governing agreements governed by New York law.

<b><u>FACTUAL ALLEGATIONS</u></b>

**I.    <u>THE SECURITIZATION PROCESS</u>**

25.    The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators

9

and pooled together in a trust, which issues securities representing interests in the cash flows from principal and interest payments on the pool of loans after certain costs and fees are deducted.

26.    The first step in each securitization is generally the acquisition of mortgage loans by a sponsor (or "seller"), such as Morgan Stanley Mortgage Capital, Inc. ("Morgan Stanley"), and the sale of a large pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

27.    The depositor then conveys the pool of loans to a trustee, such as Deutsche Bank, pursuant to a PSA that establishes various prioritized tranches of interests in payments made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.  Here, Deutsche Bank acted as the trustee in connection with the relevant RMBS transactions.

28.    Pursuant to the PSAs, a servicer is appointed to manage the collection of payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties.

29.    The trustee delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA.  The contents of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB.  *See* 17

10

C.F.R. § 229.1121. The servicer provides data to the trustee to include in these remittance reports.

30.     Each tranche in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's. The most senior tranches generally receive the highest ratings, AAA or AA. Junior tranches receive lower ratings, but offer higher potential returns. Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches. This division of cash flows and losses is referred to as the waterfall.

31.     Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the trust assets securing, the underlying loans, which often number in the thousands.

32.      Deutsche Bank earned fees in connection with its role as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS. Deutsche Bank also received significant benefits from the interest-free deposits maintained in its accounts when the servicing payments were remitted to its accounts. Deutsche Bank maintained accounts for thousands of trusts and earned enormous sums from the aggregate balances on these accounts. The RMBS trustee engagements further deepened Deutsche Bank's business relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future engagements.

## II.    DEUTSCHE BANK'S DUTIES AND OBLIGATIONS

33.    Deutsche Bank's duties and obligations as the trustee for the Covered Trusts are spelled out in the PSAs and under applicable state and federal laws.  These agreements govern the parties' respective rights and responsibilities in connection with the Covered Trusts.  Deutsche Bank entered into PSAs with:

(A) For the ECR Trust: (i) Indenture with the Trust, as Issuer; and (ii) CitiBank, N.A., as Securities Administrator;

(B) For one of the Goldman Sachs Trusts (FFML 2005-FF2): (i) GS Mortgage Securities Corporation, as Depositor; (ii) Countrywide Home Loans Servicing LP, as Servicer; and (iii) National City Home Loan Services, Inc., as Servicer;

(C) For one of the Goldman Sachs Trusts (FFML 2006-FF13): (i) GS Mortgage Securities Corporation, as Depositor; and (ii) National City Home Loan Services, Inc., as Servicer;

(D) For one of the Goldman Sachs Trusts (GSAA 2005-10): (i) GS Mortgage Securities Corporation, as Depositor; (ii) Countrywide Home Loans Servicing LP, as Servicer; and (iii) Ameriquest Mortgage Company, as Responsible Party;

(E) For one of the Goldman Sachs Trusts (GSAA 2006-15): (i) GS Mortgage Securities Corporation, as Depositor; (ii) Deutsche Bank National Association, as Custodian; (iii) JPMorgan Chase Bank, National Association, as Custodian; and (iv) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator;

(F) For one of the Goldman Sachs Trusts (GSAA 2006-16): (i) GS Mortgage Securities Corporation, as Depositor; (ii) U.S. Bank National Association, as Custodian; (iii) Deutsche Bank National Trust Company, as Custodian; (iv) JPMorgan Chase Bank, National Association, as Custodian; and (v) Wells Fargo Bank, N.A., as Custodian, Master Servicer, and Securities Administrator;

(G) For one of the Goldman Sachs Trusts (GSAA 2006-17): (i) GS Mortgage Securities Corporation, as Depositor; (ii) The Bank of New York, as Custodian; (iii) Deutsche Bank National Trust Company, as Custodian; (iv) U.S. Bank National Association, as Custodian; and (v) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator;

(H) For one of the Goldman Sachs Trusts (GSAA 2007-4): (i) GS Mortgage Securities Corporation, as Depositor; (ii) The Bank of New York Trust Company, National Association, as Custodian; (iii) Deutsche Bank National Association, as Custodian; and (iv) Wells Fargo Bank, N.A., as Custodian, Master Servicer, and Securities Administrator;

(I) For one of the Goldman Sachs Trusts (GSAMP 2005-HE4): (i) GS Mortgage Securities Corporation, as Depositor; (ii) JPMorgan Chase Bank, National Association, as Servicer; (iii) J.P. Morgan Trust Company, National Association, as Custodian; and (iv) Wells Fargo Bank, N.A., as Custodian;

(J) For three of the Goldman Sachs Trusts (GSAMP 2005-WMC1, GSAMP 2005-WMC2, and GSAMP 2005-WMC3): (i) GS Mortgage Securities Corporation, as Depositor; (ii) Litton Loan Servicing LP, as Servicer; and (iii) Wells Fargo Bank, N.A., as Custodian;

(K) For one of the Goldman Sachs Trusts (GSAMP 2006-FM3): (i) GS Mortgage Securities Corporation, as Depositor; (ii) Fremont Investment & Loan, as Responsible Party and Servicer; and (iii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator;

(L) For one of the Goldman Sachs Trusts (GSAMP 2006-S4): (i) GS Mortgage Securities Corporation, as Depositor; (ii) IndyMac Bank, F.S.B., as Servicer; (K) American Home Mortgage Servicing, Inc., as Servicer; (iv) Ocwen Loan Servicing, LLC, as Servicer; and (v) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator;

(M) For two of the Greenwich Trusts (FFML 2005-FFH3 and FFML 2006-FF8): (i) Financial Asset Securities Corporation, as Depositor; and (ii) National Home Loan Services, Inc., as Servicer;

(N) For one of the Greenwich Trusts (HVMLT 2006-3): (i) Greenwich Capital Acceptance, Inc., as Depositor; and (ii) Greenwich Capital Financial Products, Inc., as Seller;

(O) For one of the Greenwich Trusts (HVMLT 2007-2): (i) Greenwich Capital Acceptance, Inc., as Depositor; (ii) Greenwich Capital Financial Products, Inc., as Seller; (iii) Wells Fargo Bank, N.A., as Master Servicer and Securities Administrator; and (iv) Clayton Fixed Income Services Inc., as Credit Risk Manager;

(P) For one of the HSBC Trusts (FFML 2006-FF9): (i) HSI Asset Securitization Corporation, as Depositor; (ii) National City Home Loan Services, Inc., as Servicer; (iii) First Franklin Financial Corporation, as Mortgage Loan Seller; and (iv) Wells Fargo Bank, N.A., as Master Servicer, Securities Administrator, and Custodian;

13

(Q) For one of the HSBC Trusts (FFML 2006-FF11): (i) HSI Asset Securitization Corporation, as Depositor; (ii) First Franklin Financial Corporation, as Mortgage Loan Seller; (iii) Wells Fargo Bank, N.A., as Servicer, Master Servicer, Securities Administrator, and Custodian;

(R) For one of the HSBC Trusts (HASC 2006-HE1): (i) HSI Asset Securitization Corporation, as Depositor; (ii) Wells Fargo Bank, N.A., as Master Servicer, Securities Administrator, and Custodian; and (iii) Clayton Fixed Income Services Inc., as Credit Risk Manager;

(S) For one of the HSBC Trusts (HASC 2006-OPT4): (i) HSI Asset Securitization Corporation, as Depositor; (ii) Option One Mortgage Corporation, as Originator and Servicer; and (iii) Wells Fargo Bank, N.A., as Master Servicer, Securities Administrator, and Custodian;

(T) For one of the HSBC Trusts (HASC 2007-HE1): (i) HSI Asset Securitization Corporation, as Depositor; (ii) Wells Fargo Bank, N.A., as Master Servicer, Securities Administrator, and Custodian; and (iii) OfficeTiger Global Real Estate Services Inc., as Credit Risk Manager;

(U) For one of the HSBC Trusts (HASC 2007-OPT1): (i) HSI Asset Securitization Corporation, as Depositor; (ii) CitiMortgage, Inc., as Master Servicer; (iii) Citibank, N.A., as Securities Administrator; (iv) Wells Fargo Bank, N.A., as Custodian; (v) OfficeTiger Global Real Estate Services Inc., as Credit Risk Manager; and (vi) Option One Mortgage Corporation, as Originator and Servicer;

(V) For two of the Impac Trusts (IMSA 2006-3 and IMSA 2006-4)[3]: (i) Impac Secured Assets Corporation, as Depositor, and (ii) Impac Funding Corporation, as Master Servicer;

(W) For one of the IXIS Trusts (IXIS 2005-HE3): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) JPMorgan Chase Bank, National Association, as Master Servicer and Securities Administrator; (iii) Saxon Mortgage Services Inc., as Servicer; (iv) Countrywide Home Loans Servicing LP, as Servicer; and (v) IXIS Real Estate Capital Inc. (f/k/a CDC Mortgage Capital Inc.), as Unaffiliated Seller;

(X) For one of the IXIS Trusts (IXIS 2006-HE3): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) Wells Fargo Bank, N.A., as Master Servicer, Backup Servicer, and Securities Administrator; (iii) Saxon Mortgage Services Inc., as Servicer; (iv) Master Financial, Inc., as Servicer; and (v) IXIS Real Estate Capital Inc. (f/k/a CDC Mortgage Capital Inc.), as Unaffiliated Seller;

---

[3] The PSA for IMM 2007-A is not publically available.  Upon information and belief, the PSA for IMM 2007-A should contain substantially the same provisions as the PSAs for the other Covered Trusts.

(Y) For one of the IXIS Trusts (MSIX 2006-1) [4]: (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) Wells Fargo Bank, N.A., as Servicer, Master Servicer, and Securities Administrator; (iii) Saxon Mortgage Services, Inc., as Servicer; (iv) JPMorgan Chase Bank, National Association, as Servicer; (v) HomEq Servicing Corporation, as Servicer; (vi) First NLC Financial Services, LLC, as Responsible Party; (vii) Decision One Mortgage Company, LLC, as Responsible Party; (viii) WMC Mortgage Corporation, as Responsible Party; and (ix) IXIS Real Estate Capital Inc., as Sponsor;

(Z) For one of the IXIS Trusts (MSIX 2006-2): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) Saxon Mortgage Services, Inc., as Servicer; (iii) Countrywide Home Loans Servicing LP, as Servicer; (iv) First NLC Financial Services, LLC, as Responsible Party; and (v) IXIS Real Estate Capital Inc., as Sponsor;

(AA) For one of the Morgan Stanley Trusts (MSAC 2005-HE7): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) Countrywide Home Loans Servicing LP, as Servicer; (iii) JPMorgan Chase Bank, National Association, as Servicer; (iv) HomEq Servicing Corporation, as Servicer; (v) WMC Mortgage Corporation, as Responsible Party; (vi) NC Capital Corporation, as Responsible Party; (vii) Decision One Mortgage Company, as Responsible Party; (viii) Wells Fargo Bank, N.A., as Custodian; and (ix) LaSalle Bank, National Association, as Custodian;

(BB) For one of the Morgan Stanley Trusts (MSAC 2005-NC2): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) Countrywide Home Loans Servicing LP, as Servicer; (iii) HomEq Servicing Corporation, as Servicer; and (iv) NC Capital Corporation, as Responsible Party;

(CC) For one of the Morgan Stanley Trusts (MSAC 2006-HE5): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) Countrywide Home Loans Servicing LP, as Servicer; (iii) Wells Fargo Bank, N.A., as Servicer and Custodian; (iv) HomEq Servicing Corporation, as Servicer; (v) New Century Mortgage Corporation, as Servicer; (vi) NC Capital Corporation, as Responsible Party; (vii) WMC Mortgage Corporation, as Responsible Party; and (viii) Decision One Mortgage Company, LLC, as Responsible Party;

(DD) For one of the Morgan Stanley Trusts (MSAC 2006-HE6): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) Countrywide Home Loans Servicing LP, as Servicer; (iii) Wells Fargo Bank, N.A., as Servicer and Custodian; (iv) New Century Mortgage Corporation, as Servicer; (v) NC Capital Corporation, as Responsible Party; (vi) WMC Mortgage Corporation, as Responsible Party; (vii) Decision One Mortgage Company, LLC, as

---

[4] MSIX 2006-1 and MSIX 2006-2 were sponsored by both Morgan Stanley Mortgage Capital Inc. and IXIS Real Estate Capital Inc., and will be referred to herein as IXIS Trusts.

15

Responsible Party; and (viii) LaSalle Bank, National Association, as Custodian;

(EE) For one of the Morgan Stanley Trusts (MSAC 2006-HE7): (i) Morgan Stanley ABC Capital I Inc., as Depositor; (ii) Countrywide Home Loans Servicing LP, as Servicer; (iii) New Century Mortgage Corporation, as Servicer; (iv) NC Capital Corporation, as Responsible Party; (v) WMC Mortgage Corporation, as Responsible Party; (vi) Decision One Mortgage Company, LLC, as Responsible Party; (vii) Wells Fargo Bank, N.A., as Custodian; and (viii) LaSalle Bank, National Association, as Custodian;

(FF) For one of the Morgan Stanley Trusts (MSAC 2006-HE8): (i) Morgan Stanley ABC Capital I Inc., as Depositor; (ii) Wells Fargo Bank, N.A., as Securities Administrator, Master Servicer, and Custodian; (iii) New Century Mortgage Corporation, as Servicer; (iv) Countrywide Home Loans Servicing LP, as Servicer; (v) Saxon Mortgage Services, Inc., as Servicer; (vi) NC Capital Corporation, as Responsible Party; (vii) WMC Mortgage Corporation, as Responsible Party; (viii) Decision One Mortgage Company, LLC, as Responsible Party; and (ix) LaSalle Bank, National Association, as Custodian;

(GG) For one of the Morgan Stanley Trusts (MSAC 2006-NC3): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) HomEq Servicing Corporation, as Servicer; (iii) Wells Fargo Bank, N.A., as Servicer; and (iv) NC Capital Corporation, as Responsible Party;

(HH) For one of the Morgan Stanley Trusts (MSAC 2007-HE1): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) Saxon Mortgage Servicers, Inc., as Servicer; (iii) Countrywide Home Loans Servicing LP, as Servicer; (iii) NC Capital Corporation, as Responsible Party; (iv) Decision One Mortgage Company, LLC, as Responsible Party; and (v) LaSalle Bank National Association, as Custodian;

(II) For one of the Morgan Stanley Trusts (MSAC 2007-HE2): (i) Morgan Stanley ABS Capital I Inc.; (ii) Saxon Mortgage Services, Inc., as Servicer; (iii) Countrywide Home Loan Servicing LP, as Servicer; (iv) Wells Fargo Bank, N.A., as Servicer and Custodian; (iv) New Century Mortgage Corporation, as Servicer; (v) NC Capital Corporation, as Responsible Party; (vii) WMC Mortgage Corporation, as Responsible Party; (viii) Decision One Mortgage Company, LLC, as Responsible Party; and (ix) LaSalle Bank, National Association, as Custodian;

(JJ) For one of the Morgan Stanley Trusts (MSHEL 2005-4): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) HomEq Servicing Corporation, as Servicer; (iii) JPMorgan Chase Bank, National Association, as Servicer; (iv) First NLC Financial Services, LLC, as Responsible Party; and (v) LaSalle Bank, National Association;

16

(KK) For one of the Morgan Stanley Trusts (MSHEL 2007-2): (i) Morgan Stanley ABS Capital I Inc., as Depositor; (ii) Countrywide Home Loan Servicing LP, as Servicer; (iii) Saxon Mortgage Services, Inc., as Servicer; (iv) Wells Fargo Bank, N.A., as Master Servicer, Securities Administrator, and Servicer; and (v) First NLC Financial Services, LLC, as Responsible Party;

(LL) For one of the NovaStar Trusts (NHEL 2006-5): (i) NovaStar Mortgage Funding Corporation, as Depositor; (ii) NovaStar Mortgage, Inc., as Servicer and Sponsor; and (iii) Deutsche Bank National Association, as Custodian;

(MM) For one of the NovaStar Trusts (NHEL 2007-2): (i) Novastar Mortgage Funding Corporation, as Depositor; (ii) NovaStar Mortgage, Inc., as Servicer and Sponsor; and (iii) U.S. Bank National Association, as Custodian;

(NN) For the Saxon Trusts: Indentures with the Trust as Issuer;

(OO) For the Option One Trusts: (i) Financial Asset Securities Corporation, as Depositor; and (ii) Option One Mortgage Corporation, as Servicer; and

(PP) For the WaMu Trust: (i) WaMu Asset Acceptance Corporation, as Depositor; (ii) Washington Mutual Bank, as Servicer; and (iii) Deutsche Bank Trust Company Delaware, as Delaware Trustee.

**A.      Deutsche Bank's Duties Pertaining to the Delivery of Mortgage Files**

34.     Each PSA sets forth a process for conveying the mortgage loans to the Covered Trusts.  Typically, the Sponsors conveyed the loans to the Depositor for the Covered Trusts.  Then the Depositor conveyed the mortgage loans to Deutsche Bank in its capacity as trustee for the Covered Trusts to hold for the benefit of the certificateholders. This process is set forth in Section 2.01 ("Conveyance of Mortgage Loans") of the Morgan Stanley PSA,[5] which provides in relevant part:

> The Depositor, concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise

---

[5] Quotations to the Morgan Stanley PSA herein are to the PSA executed in connection with the MSHEL 2007-2 Trust.  The MSAC 3005-HE7, MSAC 2005-NC2, MSAC 2006-HE5, MSAC 2006-HE6, MSAC 2006-HE7, MSAC 2006-HE8, MSAC 2006-NC3, MSAC 2007-HE1, MSAC 2007-HE2, and MSHEL 2005-4 Trusts were issued pursuant to PSAs with substantially similar language and any differences are immaterial to the issues addressed in this Complaint.

17

> conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund, and the Trustee, on behalf of the Trust, hereby accepts the Trust Fund.

The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts set forth a substantially similar process.  *See* Ex. C § I.

35.     In addition, Section 2.02 of the Morgan Stanley PSA ("Acceptance by the Trustee of the Mortgage Loans") provides that Deutsche Bank is required to take physical possession of the mortgage loans and the accompanying mortgage files for the exclusive use and benefit of all current and future certificateholders.  It provides:

> The Trustee shall acknowledge, on the Closing Date, receipt of the documents identified in the Initial Certification in the form annexed hereto as Exhibit E, and declares that it holds and will hold such documents and the other documents delivered to it pursuant to Section 2.01, and that it holds or will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders. The Trustee shall maintain possession of the related Mortgage Notes in the State of California unless otherwise permitted by the Rating Agencies. Furthermore, the Trustee solely in its capacity as trustee hereunder, and on behalf of the Trust, hereby assumes the obligations of the Depositor under the Representations and Warranties Agreement from and after the Closing Date and solely insofar as they relate to the Mortgage Loans.

(emphasis added).  The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts set forth a substantially similar process.  *See* Ex. C § II.

36.     Section 2.01(b) of the Morgan Stanley PSA also specifically sets forth the operative documents that must be contained in the mortgage file for the mortgage loans.  It provides that the Depositor has delivered or caused to be delivered to Deutsche Bank for the benefit of the certificateholders:

18

(i) the original Mortgage Note bearing all intervening endorsements, endorsed "Pay to the order of _____, without recourse" and signed (which may be by facsimile signature) in the name of the last endorsee by an authorized officer. To the extent that there is no room on the face of the Mortgage Note for endorsements, the endorsement may be contained on an allonge, unless the Trustee is advised in writing by the applicable Originator (if required by the applicable Purchase Agreement) or the Depositor, as applicable, that state law does not so allow;

(ii) the original of any guaranty executed in connection with the Mortgage Note if any;

(iii) the original Mortgage with evidence of recording thereon or a certified true copy of such Mortgage submitted for recording. . . . ;

(iv) the originals of all assumption, modification, consolidation or extension agreements, with evidence of recording thereon or a certified true copy of such agreement submitted for recording;

(v) the original Assignment of Mortgage for each Mortgage Loan endorsed in blank, which may be included in a blanket assignment or assignments (except with respect to MERS Designated Mortgage Loans)

(vi) the originals of all intervening assignments of Mortgage (if any) evidencing a complete chain of assignment from the applicable originator (or MERS with respect to each MERS Designated Mortgage Loan) to the last endorsee with evidence of recording thereon or a certified true copy of such intervening assignments of Mortgage submitted for recording . . . ;

(vii) the original mortgagee title insurance policy, a photocopy of the mortgage title insurance policy, or attorney's opinion of title and abstract of title, or, in the event such title policy is unavailable, a copy of the related policy binder or commitment for title from the title insurance company; and

(viii) the original of any security agreement, chattel mortgage or equivalent document executed in connection with the Mortgage (if provided).

The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts set forth a substantially similar process. *See* Ex. C § III.

19

37.     Physical possession of these documents by Deutsche Bank was necessary to transfer the ownership rights to the mortgage loans from the Sponsors and Depositors to the Covered Trusts.

38.     After a designated period, Deutsche Bank, or a custodian on its behalf, was required to issue a final certification and exception report that identified mortgage files that were missing documentation required under the PSA.  *See* Ex. C § IV.  When a custodian fulfilled this role, it acted as an agent or on behalf of the Trustee.  For example, Section 2.02 of the Option One PSA provides that "the Trustee acknowledges receipt by it or the Custodian *on its behalf* of the documents referred to in Section 2.01."  (emphasis added). The PSAs for the ECR, Greenwich, NHEL, Saxon, Option One, and many of the IXIS, HSBC, and Goldman Sachs Trusts similarly provide that the custodian acts as an agent of or on behalf of the Trustee.  *See* Ex. C § XIII.[6]

39.     The final certification, called "Form of Document Certification and Exception," which was attached to the Morgan Stanley PSA as Exhibit F, provides:

> Ladies and Gentlemen:
>
> In accordance with Section 2.02 of the above captioned Pooling and Servicing Agreement (the "Pooling and Servicing Agreement"), the undersigned, as *Trustee, hereby certifies that as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or listed on the attached Document Exception Report) it has received*:
>
> (i) The *original Mortgage Note*, endorsed in the form provided in Section 2.01 of the Pooling and Servicing Agreement, with all

---

[6] The PSAs that provide that the custodian acts as an agent or on behalf of the Trustee include the ECR 2005-3, FFML 2005-FFH3, FFML 2006-FF8, FFML 2006-FF9, FFML 2006-FF11, GSAA 2006-15, GSAA 2006-16, GSAA 2006-17, GSAA 2007-4, GSAMP 2005-HE4, GSAMP 2005-WMC1, GSAMP 2005-WMC2, GSAMP 2005-WMC3, HASC 2006-HE1, HASC 2006-OPT4, HASC 2007-HE1, HVMLT 2007-2, IMSA 2006-3, IMSA 2006-4, IXIS 2005-HE3, IXIS 2006-HE3, MSAC 2005-HE7, MSAC 2006-HE5, MSAC 2006-HE6, MSAC 2006-HE7, MSAC 2006-HE8, MSAC 2007-HE1, MSAC 2007-HE2, MSHEL 2005-4, NHEL 2006-5, NHEL 2007-2, SAST 2005-2, SAST 2006-3, SVHE 2006-OPT5, and SVHE 2005-OPT3 Trusts.

20

intervening endorsements showing a complete chain of endorsement from the originator to the last endorsee.

(ii) The original or county certified *recorded Mortgage*.

(iii) Except with respect to MERS Designated Mortgage Loans, an executed assignment of the Mortgage endorsed in blank, which may be included in a blanket assignment or assignments in the form provided in Section 2.01 of the Pooling and Servicing Agreement; or, if the Responsible Party has certified that the related Mortgage has not been returned from the applicable recording office, a copy of the assignment of the Mortgage (excluding information to be provided by the recording office).

(iv) Except with respect to MERS Designated Mortgage Loans, the *original or county certified recorded assignment* or assignments of the Mortgage showing a complete chain of assignment from the originator to the last endorsee.

(v) The *original or copy of lender's title policy*, or any one of an original title binder, an original preliminary title report or an original title commitment.

Based on its review and examination and only as to the foregoing documents, (a) such documents appear regular on their face and related to such Mortgage Loan, and (b) the information set forth in items (1), (2), (7) and (9) of the Mortgage Loan Schedule and items (1), (9) and (17) of the Data Tape Information accurately reflects information set forth in the Custodial File. The Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review of the Custodial File specifically required in the Pooling and Servicing Agreement.

The Trustee makes no representations as to: (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage File of any of the Mortgage Loans identified on the Mortgage Loan Schedule, or (ii) the collectibility, insurability, effectiveness, suitability, perfection or priority of any such Mortgage Loan. Notwithstanding anything herein to the contrary, the Trustee has made no determination and makes no representations as to whether (i) any endorsement is sufficient to transfer all right, title and interest of the party so endorsing, as Noteholder or assignee thereof, in and to that Mortgage Note or (ii) any assignment is in recordable form or sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which the assignment relates.

21

> Capitalized words and phrases used herein shall have the respective meanings assigned to them in the Pooling and Servicing Agreement.
>
> DEUTSCHE BANK NATIONAL TRUST COMPANY,
> as Trustee

(emphasis added).  The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts contain a substantially similar form of final certification.  *See* Ex. C § V.

40.    The final certification is the key certification that Deutsche Bank (or a custodian on its behalf) was required to prepare for the Covered Trusts.  In this document, Deutsche Bank certified that (i) there was full and complete loan documentation in accordance with the requirements of the PSAs for those loans specifically identified on the mortgage loan schedule, and (ii) Deutsche Bank had not obtained complete required documentation for those loans identified on the document exception report.  If there was a defect with any mortgage file, then the Sponsor, relevant seller, or responsible party was obligated cure the defect leading to the exception (typically within 90 days) or repurchase or substitute the defective loans.  This is set forth in Sections 2.01 and 2.03(h) of the Morgan Stanley PSA.  Section 2.01 provides:

> In the event that any such Assignment of Mortgage is lost or returned unrecorded because of a defect therein, the Depositor (with respect to the Mortgage Loans (other than the First NLC Mortgage Loans) or the Responsible Party (with respect to the First NLC Mortgage Loans) shall promptly cause to be delivered a substitute Assignment of Mortgage to cure such defect and thereafter cause each such assignment to be duly recorded.
>
> If there is such a defect with respect to an Accredited Mortgage Loan or a Wilmington Mortgage Loan of which the Trustee has received written notice, the Trustee shall pursue all legal remedies available to the Trustee to enforce the rights of the Trust as "Sponsor" under the Accredited Agreements or the Wilmington

22

Agreements, as applicable, if the Trustee has received written notice from the Depositor to pursue such remedies. In the event that such original or copy of any document submitted for recordation to the appropriate public recording office is not so delivered to the Trustee within one year following the date such Mortgage Loan was sold by the applicable Originator to the Sponsor, and in the event that such Originator does not cure such failure within 30 days of discovery or receipt of written notification of such failure from the Depositor, the Depositor shall cause the such Originator (in the case of a Mortgage Loans other than the First NLC Mortgage Loan) to repurchase such Mortgage Loan or upon the request of the Depositor, the Responsible Party (in the case of a First NLC Mortgage Loans) shall repurchase such Mortgage Loan at the price and in the manner specified in Section 2.03. The foregoing repurchase obligation shall not apply in the event that the applicable Originator cannot deliver such original or copy of any document submitted for recordation to the appropriate public recording office within the specified period due to a delay caused by the recording office in the applicable jurisdiction; provided, that such Originator shall instead deliver a recording receipt of such recording office or, if such recording receipt is not available, an officer's certificate of an officer of the applicable Originator or the Depositor (in the case of a Mortgage Loan other than a First NLC Mortgage Loan) or the Responsible Party (in the case of a First NLC Mortgage Loan), confirming that such document has been accepted for recording.

Repurchases under Section 2.01 of the Morgan Stanley PSA are to occur "in the manner specified in Section 2.03." *See* Ex. C § VI.

41.    Section 2.03(h) provides:

In the event any Mortgage Loan does not conform to the requirements as determined in the Trustee's review of the related Custodial File, the Trustee shall notify the applicable Originator, the applicable Servicer and the Depositor by delivery of the certification of the Trustee required by Section 2.02 to such parties, which shall be a request that such Originator correct or cure such defect as required under this Agreement, the Accredited Agreements or the Wilmington Agreements, as applicable, and if such Originator or the Depositor, as applicable, fails or is unable to correct or cure the defect within the period set forth in this Agreement, the Accredited Agreements or the Wilmington Agreements, as applicable, the Trustee shall notify the Depositor of such failure to correct or cure. Unless otherwise directed by the

Depositor within five (5) Business Days after notifying the Depositor of such failure by the applicable Originator or the Depositor, as applicable, to correct or cure, the Trustee shall notify the applicable Originator to repurchase the Mortgage Loan at the Repurchase Price or, if permitted hereunder, substitute a Substitute Mortgage Loan for such Mortgage Loan, in each case, pursuant to the terms of this Agreement, as applicable. If, within ten (10) Business Days of receipt of such notice by the applicable Originator or the Depositor, as applicable, such Originator or the Depositor, as applicable, fails to repurchase such Mortgage Loan, the Trustee shall notify the Depositor of such failure. The Trustee shall pursue all legal remedies available to the Trustee against the applicable Originator or the Depositor, as applicable, under this Agreement, the Accredited Agreements, the Wilmington Agreements or the Representations and Warranties Agreement, as applicable, if the Trustee has received written notice from the Depositor directing the Trustee to pursue such remedies.

The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts set forth a substantially similar process. *See* Ex. C § VI.

42.    Various provisions of the Morgan Stanley PSA, including Sections 2.03 and 8.05 provide that Deutsche Bank and/or the Servicer were entitled to reimbursement of any expenses incurred enforcing this repurchase obligation. The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts contain substantially similar provisions. *See* Ex. C § VI.

43.    Under all of the PSAs, and applicable tax laws governing real estate mortgage investment conduits ("REMICs"), the responsible party could not cure a document defect by substitution after a specified period, typically 540 days to two years from the closing date. *See* Ex. C § VI.

**B.    Deutsche Bank Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice**

44.    Deutsche Bank had an obligation pursuant to the PSAs to provide notice to all parties of the Sponsors' or Originators' breaches of representations and warranties under the

24

PSAs or MLPAs.  For example, Section 2.03 of the Morgan Stanley PSA provides in relevant part:

> Upon discovery by any of the parties hereto of a breach of a representation or warranty made by the Depositor or the Responsible Party, as applicable, under this Agreement, that materially and adversely affects the value of any Mortgage Loan or the interests of the Trustee or the Certificateholders therein, the party discovering such breach shall give prompt written notice thereof to the other parties.

The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts contain substantially similar provisions.  *See* Ex. C § VI.

45.    In addition, after the occurrence of an Event of Default, the Trustee assumes the same duties as a common law trustee, which includes, among other things, providing beneficiaries notice of all defaults under the operative trust documents, which include the PSAs here.

46.    Congress also enacted the TIA to ensure, among other things, that investors in certificates, bonds, and similar instruments, have adequate rights against, and receive adequate performance from, the responsible trustee.  15 U.S.C. § 77bbb.

47.    Under Section 315(b) of the TIA, Deutsche Bank was required to give certificateholders notice of a default under the PSAs within 90 days of learning of such default.  15 U.S.C. § 77ooo(b).

48.    As set forth in Section III hereof, Deutsche Bank failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the PSAs, common law, and the TIA.

25

**C.    Deutsche Bank's Duty to Act Prudently
Upon the Occurrence of an Event of Default**

49.    Under the PSAs and applicable law, Deutsche Bank owed a fiduciary duty to certificateholders upon the occurrence of an Event of Default.  Deutsche Bank's post-default fiduciary duties are described in Section 8.01 of the Morgan Stanley PSA, which provides in relevant part, "the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."  The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts impose substantially similar obligations on Deutsche Bank.  *See* Ex. C § VII.

50.    The duty to act prudently to protect the interests of certificateholders is a continuing duty that remains in effect until the Event of Default is cured.

51.    In addition, Section 315(c) of the TIA provides that upon the occurrence of a default, the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  15 U.S.C. § 77ooo(c).

52.    The Streit Act provides that upon the occurrence of an event of default, an indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

53.    Upon the occurrence of an event of default, a prudent trustee would have exercised all of its rights under the PSAs to ensure that defaulted loans that were eligible for

repurchase or substitution due to representation and warranty violations or because they were missing required documentation were put back to the responsible parties. A prudent trustee would have also taken steps to remedy servicing breaches that increased the loss severities dramatically on the underlying mortgage loans.

54.    As set forth in Section III, Deutsche Bank failed to exercise its duties both prior to and after the occurrence of defaults and Events of Default.

**D.    Deutsche Bank Had a Duty to Address the Master Servicers' and Servicers' Failure to Meet Prudent Servicing Standards**

55.    Each PSA required the Master Servicers or Servicers to service the loans underlying the Covered Trusts prudently.

56.    For example, Section 3.03 of the Morgan Stanley PSA provides: "For and on behalf of the Certificateholders, each Servicer shall service and administer the Mortgage Loans for which it is acting as Servicer in accordance with the terms of this Agreement and the respective Mortgage Loans and, to the extent consistent with such terms, in the same manner in which it services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of mortgage lenders and loan servicers administering similar mortgage loans." The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts contain substantially similar requirements. *See* Ex. C § VIII.

57.    The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts provide that failure to meet prudent servicing standards is an Event of Default if left uncured for a designated period of time after notice of the default. For example, Section 9.04 of the Morgan Stanley PSA provides that an Event of Default is triggered by:

27

failure by the Master Servicer to duly observe or perform, in any material respect, any other covenants, obligations or agreements of the Master Servicer as set forth in this Agreement which failure continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Master Servicer by the Trustee or to the Master Servicer and Trustee by the holders of Certificates evidencing at least 25% of the Voting Rights; provided that the thirty (30) day cure period shall not apply so long as the Depositor is required to file any Forms 8-K, 10-D and 10-K required by the Exchange Act with respect to the Trust Fund, the failure to comply with the requirements set forth in Section 8.12, for which the grace period shall not exceed the lesser of ten (10) calendar days or such period in which any applicable Form 8-K, 10-D and 10-K required by the Exchange Act can be timely filed (without taking into account any extensions).

*See* Ex. C § IX.

58.    Further, the PSAs for the IXIS and Option One Trusts provide that the failure to follow prudent servicing standards is also an Event of Default after a servicing officer becomes aware of such breach after a specified period of days, without regard to whether notice is provided. *See* Ex. C § IX.

59.    Upon a Master Servicer or Servicer default or Event of Default, the Trustee was obligated to act. Deutsche Bank had a duty to provide notice when it became aware of breaches of the PSA by the Servicers or the Master Servicer. If the defaults were not cured within the grace period, or if the Trustee failed to give notice, the Trustee was required to take action to address the defaults. For example, the Morgan Stanley PSA provides that once a Master Servicer Event of Default occurred, the Trustee "shall terminate with cause all the rights and obligations of the Master Servicer under this Agreement," *see* Morgan Stanley PSA § 9.04 (*see also* Ex. C § VIII), and "shall have all of the rights and powers and be subject to all the responsibilities, duties and liabilities relating thereto," *see* Morgan Stanley PSA § 9.06. The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS,

28

NovaStar, Saxon, Option One, and WaMu Trusts impose substantially similar obligations on Deutsche Bank. *See* Ex. C §§ IX, X. More generally, Deutsche Bank, as trustee, had a duty to exercise all rights available under the PSAs to protect certificateholders' interests and do so with due care.

60.     As set forth in Section III, Deutsche Bank breached its statutory, fiduciary, and contractual duties by failing to take actions to address Master Servicers and Servicer defaults and Events of Default.

**E.     Deutsche Bank Is Liable for Negligence in Performing Its Duties**

61.     Section 8.01 of the Morgan Stanley PSA provides in relevant part, "No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct." The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts contain substantially similar provisions. *See* Ex. C § VII.

62.     Every trustee also has a non-waivable duty to exercise due care in the performance of ministerial acts required to be undertaken in the course of the administration of the trust. Deutsche Bank can be held liable for its own negligence in failing to perform its requisite ministerial acts, which includes, among other things, its responsibilities to: (i) give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' widespread practice of including in securitization trusts loans that breached such representations and warranties; and (ii) provide notices of servicing related breaches known to the Trustee.

63.     Every trustee—including Deutsche Bank—has an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors. This duty is non-

29

waivable and arises independently of the PSAs.

### III.   DEUTSCHE BANK BREACHED ITS CONTRACTUAL, FIDUCIARY, AND STATUTORY DUTIES

#### A.   Deutsche Bank Failed to Provide Notice of the Sponsors' and Originators' Pervasive Representation and Warranty Breaches

64.   Deutsche Bank failed to give notice of defaults that occurred when the Sponsors

or Originators breached representation and warranty provisions providing that all loans met

applicable loan origination guidelines.  In reality, during the 2005 to 2007 time period, the

Sponsors and Originators regularly disregarded their underwriting guidelines and the

representations and warranties made to securitization trusts.

65.   For example, in Schedule IV to the PSA for the Morgan Stanley Trust, the

Originator made the following representations and warranties:

> (a) Mortgage Loans as Described. The information set forth in the related Mortgage Loan Schedule is complete, true and correct;
>
> (b) Payments Current. Except with respect to First NLC Mortgage Loans representing approximately 0.166% of the aggregate principal balance of First NLC Mortgage Loans as of the Cut-off Date, as of the Servicing Transfer Date, all payments required to be made up to the related Closing Date for the mortgage Loan under the terms of the Mortgage Note, other than payments not yet 30-days delinquent, have been made and credited. No payment required under the Mortgage Loan is 30-days or more delinquent nor has any payment under the Mortgage Loan been 30-days or more delinquent at any time since the origination of the Mortgage Loan. The first Monthly Payment shall be made with respect to the Mortgage Loan on its related Due Date or within the grace period, all in accordance with the terms of the related Mortgage Note;
>
> (c) No Outstanding Charges. Except with respect to First NLC Mortgage Loans representing approximately 0.166% of the aggregate principal balance of First NLC Mortgage Loans as of the Cut-off Date, as of the Servicing Transfer Date, there are no defaults in complying with the terms of the Mortgage . . . ;

(d) Original Terms Unmodified. As of the Servicing Transfer Date, the terms of the Mortgage Note and Mortgage have not been impaired, waived, altered or modified in any respect, from the date of origination except by a written instrument which has been recorded, if necessary to protect the interests of the Sponsor, and which has been delivered to the Trustee . . . ;

(e) No Defenses. The Mortgage Loan is not subject to any right of rescission, set-off, counterclaim or defense . . . ;

(f) Hazard Insurance. As of the Servicing Transfer Date, pursuant to the terms of the Mortgage, all buildings or other improvements upon the Mortgaged Property are insured by a generally acceptable insurer against loss by fire, hazards of extended coverage and such other hazards as are provided for in the Fannie Mae Guides . . . ;

(g) Compliance with Applicable Laws. Any and all requirements of any federal, state or local law including, without limitation, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity, disclosure and all predatory and abusive lending laws applicable to the Mortgage Loan, including, without limitation, any provisions relating to prepayment penalties, have been complied with . . .

(i) Type of Mortgaged Property. The Mortgaged Property is a fee simple estate, or a leasehold estate located in a jurisdiction in which the use of a leasehold estate for residential properties is a widely-accepted practice . . .

(j) Valid First or Second-Lien. The Mortgage is a valid, subsisting, enforceable and perfected, first lien (with respect to a First-Lien Loan) or Second-Lien (with respect to a Second-Lien Loan) on the Mortgaged Property . . .

(o) LTV. No Mortgage Loan has an LTV greater than 100% . . . ;

(p) Title Insurance. The Mortgage Loan is covered by an ALTA lender's title insurance policy, or with respect to any Mortgage Loan for which the related Mortgage Property is located in California a CLTA lender's title insurance policy, or other generally acceptable form of policy or insurance acceptable to Fannie Mae or Freddie Mac and each title insurance policy is issued by a title insurer acceptable to Fannie Mae or Freddie Mac . . . ;

(q) No Defaults. Except with respect to First NLC Mortgage Loans representing approximately 0.166% of the aggregate principal

31

balance of First NLC Mortgage Loans as of the Cut off Date, as of the Servicing Transfer Date, other than payments due but not yet 30-days or more delinquent, there is no default, breach, violation or event which would permit acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event which would permit acceleration, and neither the Seller nor any of its affiliates nor any of their respective predecessors, have waived any default, breach, violation or event which would permit acceleration; . . .

(v) Conformance with Agency and Underwriting Guidelines. The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines (a copy of which is attached to each related Assignment and Conveyance Agreement). The Mortgage Note and Mortgage are on forms acceptable to Freddie Mac or Fannie Mae and no representations have been made to a Mortgagor that are inconsistent with the mortgage instruments used;

(w) Occupancy of the Mortgaged Property. As of the related Closing Date the Mortgaged Property is lawfully occupied under applicable law. All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities. Unless otherwise specified on the related Mortgage Loan Schedule, the Mortgagor represented at the time of origination of the Mortgage Loan that the Mortgagor would occupy the Mortgaged Property as the Mortgagor's primary residence; . . .

(aa) Delivery of Mortgage Documents. As of the Servicing Transfer Date, the Mortgage Note, the Mortgage, the Assignment of Mortgage and any other documents required to be delivered under the Custodial Agreement for each Mortgage Loan have been delivered to the Trustee. The Seller is in possession of a complete, true and accurate Mortgage File in compliance with Exhibit A to the Purchase Agreement, except for such documents the originals of which have been delivered to the Trustee;

(cc) Transfer of Mortgage Loans. The Assignment of Mortgage with respect to each Mortgage Loan is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located. The transfer, assignment and

32

conveyance of the Mortgage Notes and the Mortgages by the Seller are not subject to the bulk transfer or similar statutory provisions in effect in any applicable jurisdiction;

(nn) Appraisal. The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan application by a Qualified Appraiser, duly appointed by the Seller, who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan, and the appraisal and appraiser both satisfy the requirements of Fannie Mae or Freddie Mac . . .

(tt) Prior Servicing. As of the Servicing Transfer Date , each Mortgage Loan has been serviced in all material respects in strict compliance with Accepted Servicing Practices . . .

(uu) No Default Under First-Lien. As of the Servicing Transfer Date, with respect to each Second-Lien Loan, the related First-Lien Loan related thereto is in full force and effect, and there is no default, breach, violation or event which would permit acceleration existing under such first Mortgage . . .

(aaa) Predatory Lending Regulations. No Mortgage Loan is a High Cost Loan or Covered Loan, as applicable, and no Mortgage Loan originated on or after October 1, 2002 through July 6, 2003 is governed by the Georgia Fair Lending Act. No Mortgage Loan is covered by the Home Ownership and Equity Protection Act of 1994 and no Mortgage Loan is in violation of any comparable state or local law; . . .

(eee) Origination. No predatory or deceptive lending practices, including, without limitation, the extension of credit without regard to the ability of the Mortgagor to repay and the extension of credit which has no apparent benefit to the Mortgagor, were employed in the origination of the Mortgage Loan; . . .

(kkk) Underwriting Methodology. The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective mathematical principles which relate the related Mortgagor's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the related Mortgagor's equity in the collateral as the principal determining factor in approving such credit extension. Such underwriting methodology confirmed that at the time of origination

33

> (application/approval) the related Mortgagor had a reasonable ability to make timely payments on the Mortgage Loan; . . .
>
> (fff) Recordation. Each original Mortgage was recorded and all subsequent assignments of the original Mortgage (other than the assignment to the Sponsor) have been recorded in the appropriate jurisdictions wherein such recordation is necessary to perfect the lien thereof as against creditors of the Seller, or is in the process of being recorded . . .
>
> (jjj) Mortgagor Selection. No Mortgagor was encouraged or required to select a Mortgage Loan product offered by the Originator which is a higher cost product designed for less creditworthy mortgagors, unless at the time of the Mortgage Loan's origination, such Mortgagor did not qualify taking into account credit history and debt-to-income ratios for a lower-cost credit product then offered by the Originator or any Affiliate of the Originator.

Morgan Stanley PSA, Schedule IV.  The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts contain substantially similar provisions.  *See* Ex. C § XI.

66.      As noted in Section II(B), each party, including the Trustee, had an obligation to provide notice of breaches of these representations and warranties and such notice triggered the Sponsors' or Originators' obligation to repurchase or substitute the defective loans.  *See also* Ex. C § VI.

67.     Deutsche Bank knew that the Sponsors and Originators regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long before certificateholders learned of such problems.

68.     Deutsche Bank served as trustee for hundreds, if not thousands, of RMBS trusts from 2004 to 2007, including for many transactions involving the Sponsors and Originators.  In the course of administering these trusts, Deutsche Bank learned that the Sponsors and Originators had departed from their underwriting guidelines, engaged in predatory lending, and

failed to ensure mortgage loans complied with state and federal laws.

69.     For example, while serving as trustee for various RMBS trusts, Deutsche Bank was presented with a large number of defaulted loans that were originated by the Sponsors and Originators here, and foreclosures were commenced often in Deutsche Bank's name.

70.     Indeed, Deutsche Bank commenced foreclosure actions from 2005 to 2008 for numerous loans in which the Sponsors or Originators were at issue, including, for example, foreclosure actions in which:

> (a) Ameriquest Mortgage Company served as Originator.  *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. El-shabazz*, No. 2006-09-5831 (C.P. Summit Cnty. 2006); Compl., *Deutsche Bank Nat'l Trust Co. v. Moore*, No. 2008-02-1459 (C.P. Summit Cnty. 2008); Compl., *Deutsche Bank Nat'l Trust Co. v. Wilt*, No. 2006-10-6953 (C.P. Summit Cnty. 2006);

> (b) First Franklin Financial Corporation served as Originator.  *See, e.g.*,Compl., *Deutsche Bank Nat'l Trust Co. v. Morris*, No. 08-cv-1590 (C.P. Medina Cnty. 2008) (initiating action for loan included in the FFML Trust 2006-FF13); Compl., *Deutsche Bank Nat'l Trust Co. v. Garnes*, No. 08-cv-0693 (C.P. Medina Cnty. 2008) (initiating action for loan included in the FFML Trust 2006-FF9); Compl., *Deutsche Bank Nat'l Trust Co. v. Schmidt*, No. 08-cv-0312 (C.P. Medina Cnty. 2008) (initiating action for loan included in the FFML Trust 2006-FF13); Compl., *Deutsche Bank Nat'l Trust Co. v. Buehler*, No. 06-cv-7589 (C.P. Montgomery Cnty. 2006) (initiating action for loan included in the FFML Trust 2005-FFH3); Compl., *Deutsche Bank Nat'l Trust Co. v. Haverdill*, No. 08-cv-2233 (C.P. Medina Cnty. 2008) (initiating action for loan included in the FFML Trust 2006-FF9); Compl., *Deutsche Bank Nat'l Trust Co. v. Chaney*, No. 07-cv-1413 (C.P. Medina Cnty. 2007) (initiating action for loan included in the FFML Trust 2005-FFH3);

> (c) Goldman Sachs Mortgage Company served as Sponsor.  *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. Ozanick*, No. 08-cv-0075 (C.P. Medina Cnty. 2008) (initiating action for loan included in the GSAMP 2005-HE4 Trust); Compl., *Deutsche Bank Nat'l Trust Co. v. Lev*, No. 07-cv-1711 (C.P. Medina Cnty. 2007) (initiating action for loan included in the FFML Trust 2006-FF13); Compl., *Deutsche Bank Nat'l Trust Co. v. Chaney*, No. 07-cv-1413 (C.P. Medina Cnty. 2007) (initiating action for loan included in the FFML Trust 2006-FF13); Compl., *Deutsche Bank Nat'l Trust Co. v. Mlckovsky*, No. 08-cv-2053 (C.P. Medina Cnty. 2007) (initiating action for loan included in the FFML Trust 2006-FF13); Compl., *Deutsche Bank Nat'l Trust Co. v. Hicks*, No. 2007-01-0638 (C.P. Summit Cnty. Jan. 24, 2007)

35

(initiating action for loan included in the GSAMP Trust 2005-WMC2 Trust); Compl., *Deutsche Bank Nat'l Trust Co. v. McCahan*, No. 2006-10-6692 (C.P. Summit Cnty. Oct. 19, 2006); Compl., *Deutsche Bank Nat'l Trust Co. v. Diehl*, No. 2006-09-6112 (C.P. Summit Cnty. Sept. 27, 2006);

(d) Greenwich Capital Financial Products, Inc. served as Sponsor. *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. Daniels*, No. 08-cv-2080 (C.P. Medina Cnty. 2008) (initiating action for loan included in the FMML Trust 2006-FF8);

(e) HSBC Bank USA, National Association served as Sponsor. *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. Andrews*, No. 08-cv-1150 (C.P. Medina Cnty. 2008) (initiating action for loan included in the FFML Trust 2006-FF11); Compl., *Deutsche Bank Nat'l Trust Co. v. Sharon*, No. 08-cv-0687 (C.P. Medina Cnty. 2008) (initiating action for loan included in the FFML Trust 2006-FF11);

(f) Impac Mortgage Holdings, Inc. served as Originator. *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. Tomes*, No. 07-cv-1880 (C.P. Medina Cnty. 2007) (initiating action for loan included in the IMM 2007-A Trust);

(g) NC Capital Corporation served as Originator. *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. Anthony*, No. 08-cv-1611 (C.P. Medina Cnty. 2008) (initiating action for loan included in the MSAC 2006-NC3); and

(h) Option One Mortgage Corporation served as Originator. *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. Smith*, No. 2006-10-6858 (C.P. Summit Cnty. 2006).

71. Sometimes the defaults and foreclosures occurred just months after the loan was originated or securitized. In each foreclosure, the Trustee had a duty to examine foreclosure filings. In each foreclosure, Deutsche Bank was the named plaintiff and real party in interest as it held title to the notes and mortgage as trustee for the benefit of the certificateholders. As the real party in interest, it had knowledge of the contents of the foreclosure filings.

72. Through its review of these filings, Deutsche Bank knew that the borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply

36

with state or federal law.

73.     In fact, several municipalities have brought actions alleging Deutsche Bank's predatory lending resulted in significant levels of foreclosures causing an "urban blight" as the properties fell into disrepair diminishing their value.  In one case, *People v. Deutsche Bank National Trust Company*, No. 11-460878 (Sup. Ct. Los Angeles Cnty. 2011), the city of Los Angeles sued Deutsche Bank as trustee of RMBS seeking cost of property repair alleging that Deutsche Bank bought more than 2,200 properties through foreclosure and let the vacant properties fall into disrepair.  A Los Angeles City Attorney described Deutsche Bank as one of the city's "major slumlords."  *See* Thom Weidlich, *Foreclosures Prompt Cities to Sue Banks Over Mowing, Repairs* (May 12, 2011 12:00 AM), http://www.bloomberg.com/ news/articles/2011-05-12/foreclosures-prompt-four-u-s-cities-to-sue-banks-for-mowing-home-repairs.  Deutsche Bank later settled the lawsuit with the city of Los Angeles.  *See* Evard Pettersson, *Deutsche Bank Settles Los Angeles 'Slumlord' Lawsuit* (June 19, 2013 12:01 AM), http://www.bloomberg.com/news/articles/2013-06-18/deutsche-bank-settles-los-angeles-slumlord-lawsuit.

74.     Further, the Department of Housing Preservation and Development of the City of New York ("HPD") brought suit against Deutsche Bank, as trustee, seeking civil penalties for failure to maintain defaulted properties in accordance with the New York City Administrative Code.  *Dep't of Hous. Pres. & Dev. of City of New York v. Deutsche Bank Nat'l Trust Co.*, 41 Misc. 3d 1202(A), 977 N.Y.S.2d 666 (Civ. Ct. 2013).  The court denied Deutsche Bank's motion to dismiss finding that Deutsche Bank, as trustee, was a fiduciary in relation to property maintenance under New York's Real Property Actions and Proceedings Law ("RAPL") Section 1307 when read together with New York's banking law.

75.     Additionally, the court noted that the mortgages at issue were originally assigned to "Deutsche Bank Trust Company Americas formerly known as Banker's Trust Company for Saxon Mortgage Services, Inc. f/k/a Meritech Mortgage Services, Inc.," but the foreclosures were brought by a different Deutsche Bank entity without any explanations in the foreclosure actions whether there was an assignment from one Deutsche Bank arm to another. *Id.* Deutsche Bank attempted to escape liability by asserting in its motion to the HPD action that its correct name was "Deutsche Bank National Trust Company, as Trustee for Saxon Asset Securities Trust 2007-3, Mortgage Loan Asset Backed Certificates, Series 2007-3," and not "Deutsche Bank National Trust Co." as the HPD had listed in the caption. *Id.* The court's response to this argument was, "you've got to be kidding," and stated how this name change leads one to question whether "this corporate structure is the mortgage financing world equivalent of 'Sybil' and different 'personalities' of the same entity or is there an unrecorded or undocumented assignment of the mortgage." *Id.*

76.     Beginning in 2009 or 2010, facts began to emerge publicly demonstrating that the Sponsors and Originators had violated the representations and warranties provided in connection with the Covered Trusts. These facts, some of which are detailed in Exhibit F, demonstrated that the Sponsors and Originators regularly included loans in securitizations that did not comply with applicable underwriting guidelines, made predatory loans, and failed to meet state and federal lending guidelines. While investors such as Commerzbank lacked the ability to determine whether the publicly reported misconduct by the Sponsors and Originators impacted specific loans backing the Covered Trusts, Deutsche Bank had knowledge of specific problems with specific loans, as well as access to the mortgage loan files. At a minimum, in its role as trustee to hundreds of RMBS trusts, Deutsche Bank was

38

privy to information that would have provided the "scent" of a problem with the loans underlying the Covered Trusts. Having caught wind of the problem, Deutsche Bank had statutory and common law duties requiring them to "nose to the source."

77.     For instance, in or around August 2009, Deutsche Bank, as trustee, filed a complaint and proof of claim against the Federal Deposit Insurance Company (the "FDIC"), as receiver for Washington Mutual Bank, for representation and warranty violations and servicing misconduct related to securitization trusts sponsored by Washington Mutual Bank. This demonstrates Deutsche Bank's knowledge of misconduct by Washington Mutual Bank as well as the widespread breaches and systemic misconduct of the other Sponsors and Originators at issue, which Deutsche Bank failed to address.

78.     Deutsche Bank also commenced repurchase actions against the Sponsors or Originators at issue here (concerning trusts other than the Covered Trusts). For example, at the direction of certain certificateholders, Deutsche Bank, in its role as trustee, commenced actions against, among others, HSBC Bank USA, National Association ("HSBC") (the Sponsor of loans for six of the Covered Trusts) and WMC Mortgage, LLC (the Originator of loans for eleven of the Covered Trusts) to compel repurchase of loans that breached representations and warranties. *See, e.g.*, Compl., *Deutsche Bank Nat'l Trust Co. v. WMC Mortg., LLC*, No. 12-cv-00933 (D. Conn. Mar. 31, 2014); Compl., *Deutsche Bank Nat'l Trust Co., solely as Trustee for HSI Asset Securitization Corp. Trust 2007-NC1 v. HSBC Bank USA, N.A.*, No. 6520013/2013 (N.Y. Sup. Ct. Nov. 12, 2013). In each of the repurchase actions brought by Deutsche Bank, loan level reviews were conducted that identified breach rates in excess of 80 percent with respect to loans originated during the same period as the loans in the Covered Trusts. Additional repurchase actions brought by

39

Deutsche Bank involving the same Sponsors and Originators at issue here include *Deutsche Bank National Trust Company v. Morgan Stanley Mortgage Capital Holdings LLC*, No. 652877/2014 (N.Y. Sup. Ct. Jan. 23, 2015); *Deutsche Bank National Trust Company, v. Equifirst Corporation*, No. 651957/2013 (N.Y. Sup. Ct. Nov. 18, 2013).

79.    In fact, Deutsche Bank admitted its knowledge of industry wide problems with breaches of representations and warranties for securitized loans as early as 2008. Deutsche Bank stated in a January 2008 court filing in the American Home Mortgage Holdings, Inc. bankruptcy proceeding that, based on Deutsche Bank's knowledge of the mortgage loan securitization market, it estimated that up to 30 percent of American Home securitized loans were subject to repurchase claims based on breaches of representations and warranties.  *See* Proof of Claim ¶ 14, *In re American Mortg. Holdings, Inc.*, No. 07-11047 (Bank. D. Del. Jan. 11, 28).

80.    Deutsche Bank also received written notice of systemic, widespread Sponsor breaches from monoline insurers.

81.    Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults.  Many RMBS trusts were insured by monoline insurers.  The sponsors of the mortgage loans made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS.  The governing agreements for the insured RMBS transactions had a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan sponsor and the parties to the agreement, including the trustee.

82.    Monoline insurers have filed many complaints against Sponsors and Originators of the Covered Trusts for breaches of their representations and warranties in connection with

other RMBS trusts.  Prior to filing suit against the mortgage loan sponsors, the monoline insurers were often able to obtain and carry out a forensic loan level review of the loans at issue.

83.     For example, in *CIFG Assurance N.A., Inc. v. Goldman, Sachs & Co.*, No. 652286/2011 (N.Y. Sup. Ct. Aug. 16, 2011), the monoline insurer CIFG Assurance sued Goldman Sachs and GS Mortgage Securities, reporting that its review of loan files securitized by the defendants revealed breaches of representations and warranties, including an extraordinarily high incidence of material deviations from the underwriting standards that defendants represented would be followed.  Of the 491 loan files that were reviewed by CIFG Assurance, 393, or approximately 80 percent, contained one or more breaches of the mortgage loan representations.  *Id.*  ¶ 67.

84.     Additionally, in *CFIG Assurance North America, Inc. v. Greenpoint Mortgage Funding*, Inc., No. 653449/2012 (N.Y. Sup. Ct. March 4, 2013), CIFG Assurance sued GreenPoint Mortgage Funding Inc. ("GreenPoint") alleging there were widespread and systematic breaches of GreenPoint's representations and warranties in the securitization trust at issue.  After conducting a review of loan files and documentation, CIFG found that of the 110 loans reviewed, 90 of the loans in the sample did not comply with one or more of the representations and warranties made by GreenPoint.

85.     Deutsche Bank received notice of the Goldman Sachs and GreenPoint monoline actions as it was the trustee for the respective trusts in those actions.

86.     Because the monoline insurers' findings from loan level reviews set forth both in their breach notices and publicly available lawsuits reflected these common mortgage loan Sponsors', Originators', and Sellers' systemic and pervasive violations of underwriting and securitization guidelines, Deutsche Bank discovered or should have discovered if it was carrying

41

out its duties that these same defective underwriting and securitization practices applied equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors.

87.   Apart from the multiple, highly-publicized RMBS lawsuits and the numerous government investigations on both the state and federal level, there are various other indications that the Covered Trusts' loan pools included large numbers of mortgage loans that materially breached the responsible party's representations and warranties.  For example, the Originators' and Sponsors' systemic abandonment of their underwriting guidelines has had a devastating effect on the performance of the Covered Trusts.  Many of the Certificates acquired by Commerzbank were triple-A or double-A rated at the time of purchase.  *See* Ex. D.  Now, many are "junk" bonds that do not qualify for any investment grade rating.  *See* Ex. D.  These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning the Sponsors' and Originators' systemic abandonment of underwriting guidelines.  *See* Ex. E.  A summary of the Covered Trusts' high default and delinquency rates is attached as Exhibit E.  Deutsche Bank was aware of the high level of defaults and should have carefully investigated these issues, notified certificateholders, including Commerzbank, of the issues, and taken action to address these issues.

88.   If Deutsche Bank had provided the required notices, it would have forced the Sponsors or Originators to repurchase, or substitute if within the period specified in the PSAs, the relevant loans, and the Sponsors would not have been able to issue additional fraudulent RMBS certificates.  Deutsche Bank had a continuing duty to provide such notice but failed to do so throughout its tenure as trustee.  Indeed, Deutsche Bank let the statute of

limitations to bring repurchase claims lapse or otherwise failed to fulfill its obligation to seek repurchases by failing to provide notice or take other action within six years of the closing of each Covered Trust.

### 1. The Originators' and Sponsors' Pervasive Breaches of Representations and Warranties

89.    Either the Sponsor or Originator, and sometimes both, provided representations and warranties to the Covered Trusts.

90.    The failure of the parties to the PSAs to provide notice of breaches of representations and warranties constituted a default that would have ripened into Events of Default had Deutsche Bank provided notice of the defaults.

91.    The chart below identifies each of the entities disclosed to be the Sponsors, Originators, and obligors of the loans included in the Covered Trusts.

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 1 | ECR 2005-3 | ECC Capital Corporation | Bravo Credit Corporation; Encore Credit Corporation | ECC Capital Corporation |
| 2 | FFML 2005-FF2 | Goldman Sachs Mortgage Company | First Franklin Financial Corporation | Goldman Sachs Mortgage Company; GS Mortgage Securities Corporation; First Franklin Financial Corporation |
| 3 | FFML 2005-FFH3 | Greenwich Capital Financial Products, Inc. | First Franklin Financial Corporation | Greenwich Capital Financial Products, Inc. |
| 4 | FFML 2006-FF8 | Greenwich Capital Financial Products, Inc. | First Franklin Financial Corporation | Greenwich Capital Financial Products, Inc. |
| 5 | FFML 2006-FF9 | HSBC Bank USA, National Association | First Franklin Financial Corporation | First Franklin Financial Corporation |
| 6 | FFML 2006-FF11 | HSBC Bank USA, National Association | First Franklin Financial Corporation | First Franklin Financial Corporation |

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 7 | FFML 2006-FF13 | Goldman Sachs Mortgage Company | First Franklin Financial Corporation | First Franklin Financial Corporation; Goldman Sachs Mortgage Company |
| 8 | GSAA 2005-10 | Goldman Sachs Mortgage Company | Ameriquest Mortgage Company; Argent Mortgage Company, LLC | Ameriquest Mortgage Company |
| 9 | GSAA 2006-15 | Goldman Sachs Mortgage Company | M&T Mortgage Corporation; Goldman Sachs Mortgage Company | M&T Mortgage Corporation; Goldman Sachs Mortgage Company |
| 10 | GSAA 2006-16 | Goldman Sachs Mortgage Company | Goldman Sachs Mortgage Company; Countrywide Home Loans, Inc.; GreenPoint Mortgage Funding, Inc.; National City Mortgage Company; Wachovia Mortgage Corporation; Wells Fargo Bank, N.A.; First Horizon Loan Corporation; PHH Mortgage Corporation | Goldman Sachs Mortgage Company; Countrywide Home Loans, Inc.; GreenPoint Mortgage Funding, Inc.; National City Mortgage Company; Wachovia Mortgage Corporation; Wells Fargo Bank, N.A.; First Horizon Loan Corporation; PHH Mortgage Corporation |
| 11 | GSAA 2006-17 | Goldman Sachs Mortgage Company | Countrywide Home Loans, Inc.; Goldman Sachs Mortgage Company; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B. | Goldman Sachs Mortgage Company; Countrywide Home Loans, Inc.; GreenPoint Mortgage Funding, Inc.; IndyMac, F.S.B.; SunTrust Mortgage, Inc.; |
| 12 | GSAA 2007-4 | Goldman Sachs Mortgage Company | GreenPoint Mortgage Funding, Inc.; National City Mortgage Company; IndyMac Bank, F.S.B.; Goldman Sachs Mortgage Company; | Goldman Sach Mortgage Company; GreenPoint Mortgage Funding, Inc.; National City Mortgage Company; IndyMac Bank, |

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| | | | Wells Fargo Bank, N.A. | F.S.B.; Wells Fargo Bank, N.A. |
| 13 | GSAMP 2005-HE4 | Goldman Sachs Mortgage Company | Fremont Investment & Loan; EquiFirst Corporation; Acoustic Home Loans, LLC; Meritage Mortgage Corporation; ResMAE Mortgage Corporation | Goldman Sachs Mortgage Company; Fremont Investment & Loan; EquiFirst Corporation |
| 14 | GSAMP 2005-WMC1 | Goldman Sachs Mortgage Company | WMC Mortgage Corporation | Goldman Sachs Mortgage Company; WMC Mortgage Corporation |
| 15 | GSAMP 2005-WMC2 | Goldman Sachs Mortgage Company | WMC Mortgage Corporation | Goldman Sachs Mortgage Company; WMC Mortgage Corporation |
| 16 | GSAMP 2005-WMC3 | Goldman Sachs Mortgage Company | WMC Mortgage Corporation | Goldman Sachs Mortgage Company; WMC Mortgage Corporation |
| 17 | GSAMP 2006-FM3 | Goldman Sachs Mortgage Company | Fremont Investment & Loan | Goldman Sachs Mortgage Company; Fremont Investment & Loan |
| 18 | GSAMP 2006-S4 | Goldman Sachs Mortgage Company | IndyMac Bank, F.S.B.; American Home Mortgage Corporation; Fremont Investment & Loan | Goldman Sachs Mortgage Company; IndyMac Bank, F.S.B.; American Home Mortgage Corporation; Fremont Investment & Loan |
| 19 | HASC 2006-HE1 | HSBC USA, National Association | WMC Mortgage Corporation; Countrywide Home Loans, Inc. | HSBC USA, National Association |
| 20 | HASC 2006-OPT4 | HSBC USA, National Association | Option One Mortgage Corporation | Option One Mortgage Corporation |
| 21 | HASC 2007-HE1 | HSBC USA, National Association | Accredited Home Lenders, Inc.; Decision One Mortgage | HSBC USA, National Association |

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| | | | Company, LLC | |
| 22 | HASC 2007-OPT1 | HSBC USA, National Association | Option One Mortgage Corporation | Option One Mortgage Corporation |
| 23 | HVMLT 2006-3 | Greenwich Capital Financial Products, Inc. | Countrywide Home Loans, Inc. | Greenwich Capital Financial Products, Inc.; Countrywide Home Loans, Inc. |
| 24 | HVMLT 2007-2 | Greenwich Capital Financial Products, Inc. | American Home Mortgage Corp.; Paul Financial, LLC; Kay-Co Investment Inc. | Greenwich Capital Financial Products, Inc.; American Home Mortgage Corp.; Paul Financial, LLC; Kay-Co Investment Inc. |
| 25 | IMM 2007-A | Impac Mortgage Holdings, Inc. | Impac Mortgage Holdings, Inc. | Impac Mortgage Holdings, Inc. |
| 26 | IMSA 2006-3 | Impac Funding Corporation | Impac Funding Corporation | Impac Funding Corporation |
| 27 | IMSA 2006-4 | Impac Funding Corporation | Impac Funding Corporation; American Home Mortgage Corporation; GMAC Mortgage, LLC | Impac Funding Corporation |
| 28 | IXIS 2005-HE3 | IXIS Real Estate Capital Inc. | NC Capital Corporation; Chapel Mortgage Corporation; Homeowners Loan Corporation; First NLC Financial Services, LLC; Lime Financial Services, Ltd.; First Bank Mortgage; Lenders Direct Capital Corporation; Master Financial, Inc.; First Horizon Home Loan Corporation; FlexPoint Funding Corporation; Accredited Home Lenders, Inc.; ResMae Mortgage Corporation; | IXIS Real Estate Capital Inc. |

46

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| | | | Rose Mortgage Inc.; Impac Funding Corporation; Platinum Capital Group; Encore Credit Corporation; Allstate Home Loans, Inc. | |
| 29 | IXIS 2006-HE3 | IXIS Real Estate Capital Inc. | Accredited Home Lenders, Inc.; Chapel Mortgage Corporation; Encore Credit Corporation; First Bank Mortgage; First Horizon Home Loan Corporation; First NLC Financial Services; FlexPoint Funding Corporation; Funding America Mortgage Warehouse Trust; Lenders Direct Capital Corporation; Lime Financial Services, Ltd.; Mandalay Mortgage, LLC; Master Financial, Inc.; Maxim Mortgage Corporation; NC Capital Corporation; Quick Loan Funding Inc.; Rose Mortgage, Inc. | IXIS Real Estate Capital Inc.; Accredited Home Lenders, Inc.; Chapel Mortgage Corporation; Encore Credit Corporation; First Bank Mortgage; First Horizon Home Loan Corporation; First NLC Financial Services; FlexPoint Funding Corporation; Funding America Mortgage Warehouse Trust; Lenders Direct Capital Corporation; Lime Financial Services, Ltd.; Mandalay Mortgage, LLC; Master Financial, Inc.; Maxim Mortgage Corporation; NC Capital Corporation; Quick Loan Funding Inc.; Rose Mortgage, Inc. |
| 30 | MSAC 2005-HE7 | Morgan Stanley Mortgage Capital, Inc. | NC Capital Corporation; Decision One Mortgage Company; WMC Mortgage Corporation; Fremont Investment & Loan | Morgan Stanley Mortgage Capital Inc.; NC Capital Corporation; Decision One Mortgage Company; |

47

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| | | | | WMC Mortgage Corporation |
| 31 | MSAC 2005-NC2 | Morgan Stanley Mortgage Capital, Inc. | NC Capital Corporation; New Century Mortgage Corporation | NC Capital Corporation |
| 32 | MSAC 2006-HE5 | Morgan Stanley Mortgage Capital, Inc. | NC Capital Corporation; WMC Mortgage Corporation; Decision One Mortgage Company, LLC | NC Capital Corporation; WMC Mortgage Corporation; Decision One Mortgage Company, LLC |
| 33 | MSAC 2006-HE6 | Morgan Stanley Mortgage Capital, Inc. | NC Capital Corporation; WMC Mortgage Corporation; Decision One Mortgage Company, LLC | NC Capital Corporation; WMC Mortgage Corporation; Decision One Mortgage Company, LLC |
| 34 | MSAC 2006-HE7 | Morgan Stanley Mortgage Capital, Inc. | NC Capital Corporation; WMC Mortgage Corporation; Decision One Mortgage Company, LLC | NC Capital Corporation; WMC Mortgage Corporation; Decision One Mortgage Company, LLC |
| 35 | MSAC 2006-HE8 | Morgan Stanley Mortgage Capital, Inc. | NC Capital Corporation; WMC Mortgage Corp.; Decision One Mortgage Company, LLC | NC Capital Corporation; WMC Mortgage Corporation; Decision One Mortgage Company, LLC |
| 36 | MSAC 2006-NC3 | Morgan Stanley Mortgage Capital, Inc. | NC Capital Corporation | NC Capital Corporation |
| 37 | MSAC 2007-HE1 | Morgan Stanley Mortgage Capital, Inc. | New Century Mortgage Corporation; Decision One Mortgage Company LLC | New Century Mortgage Corporation; Decision One Mortgage Company LLC |
| 38 | MSAC 2007-HE2 | Morgan Stanley Mortgage Capital, Inc. | NC Capital Corporation, WMC Mortgage Corporation; | NC Capital Corporation; WMC Mortgage |

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| | | | Decision One Mortgage Company, LLC | Corporation; Decision One Mortgage Company, LLC |
| 39 | MSHEL 2005-4 | Morgan Stanley Mortgage Capital, Inc. | First NLC Financial Services, LLC; AIG Federal Savings Bank; Meritage Mortgage Corporation | First NLC Financial Services, LLC; Morgan Stanley ABS Capital I Inc. |
| 40 | MSHEL 2007-2 | Morgan Stanley Mortgage Capital, Inc. | First NLC Financial Services, LLC; Wilmington Finance, Inc.; Accredited Home Lenders, Inc. | First NLC Financial Services, LLC; Morgan Stanley Mortgage Capital, Inc. |
| 41 | MSIX 2006-1 | Morgan Stanley Mortgage Capital, Inc.; IXIS Real Estate Capital Inc. | First NLC Financial Services, LLC; Decision One Mortgage Company, LLC; WMC Mortgage Corporation; Accredited Home Lenders, Inc.; Aegis Mortgage Corporation; AIG Federal Savings Bank; Chapel Mortgage Corporation; Countrywide Home Loans, Inc.; Encore Credit Corporation; First Bank Mortgage, Inc.; First Horizon Home Loan Corporation; FlexPoint Funding Corporation; Fremont Investment & Loan; Funding America Mortgage Warehouse Trust; Lenders Direct Capital Corporation; Lime Financial Services, Ltd.; Mandalay Mortgage, LLC; Master Financial Inc.; Meritage Mortgage | First NLC Financial Services, LLC; Decision One Mortgage Company, LLC; WMC Mortgage Corporation; Morgan Stanley Mortgage Capital, Inc. |

49

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| | | | Corporation; New Century Mortgage Corporation; Quick Loan Funding Inc.; Rose Mortgage, Inc. | |
| 42 | MSIX 2006-2 | Morgan Stanley Mortgage Capital, Inc.; IXIS Real Estate Capital Inc. | First NLC Financial Services, LLC; Accredited Home Lenders, Inc.; Encore Credit Corporation; First Bank Mortgage, Inc.; First Horizon Home Loan Corporation; FlexPoint Funding Corporation; Funding America Mortgage Warehouse Trust; Lenders Direct Capital Corporation; Lime Financial Services, Ltd.; Mandalay Mortgage, LLC; Master Financial Inc.; Maxim Mortgage Corporation; NC Capital Corporation; Quick Loan Funding Inc.; Rose Mortgage, Inc.; Wilmington Finance Inc. | First NLC Financial Services, LLC; Morgan Stanley Mortgage Capital, Inc. |
| 43 | NHEL 2006-5 | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. |
| 44 | NHEL 2007-2 | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. |
| 45 | SAST 2005-2 | Saxon Funding Management, Inc. | Saxon Mortgage, Inc. | Saxon Funding Management LLC |
| 46 | SAST 2006-3 | Saxon Funding Management, Inc. | Saxon Funding Management, Inc.; People's Choice Home Loan, Inc. | Saxon Funding Management LLC |
| 47 | SVHE 2005-OPT3 | Option One Mortgage Corporation | Option One Mortgage Corporation | Option One Mortgage Corporation |
| 48 | SVHE 2005-OPT4 | Option One Mortgage Corporation | Option One Mortgage Corporation | Option One Mortgage Corporation |

| | Trust | Sponsor | Originators | Obligors |
|---|---|---|---|---|
| 49 | SVHE 2006-OPT5 | Option One Mortgage Corporation | Option One Mortgage Corporation | Option One Mortgage Corporation |
| 50 | WAMU 2005-AR13 | Washington Mutual Bank | Washington Mutual Bank | WaMu Asset Acceptance Corporation; Washington Mutual Bank |

92.     As detailed in Exhibit F, in 2009 and 2010 facts began to emerge that demonstrated that the Sponsors and Originators, and Deutsche Bank itself, systematically abandoned applicable underwriting guidelines and therefore breached representations and warranties in all securitizations.

93.     The Sponsors and Originators have been the subject of numerous investigations and lawsuits alleging systematic abandonment of underwriting guidelines in the pursuit of profits.  These investigations and lawsuits contain ample evidence available to Deutsche Bank that mortgage loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.  Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans.  Further, these lawsuits and investigations demonstrate that the Originators originated mortgage loans with the goal of increasing volume, rather than evaluating the borrower's ability to repay the loan, and regularly made exceptions to underwriting guidelines in the absence of sufficient compensating factors.

94.     These lawsuits, in conjunction with the poor performance of the underlying loans (which Deutsche Bank was aware of as it issued regular reports regarding performance) and the public information concerning widespread issues among Originators, were more than sufficient

to provide Deutsche Bank with notice that large numbers of loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

95. Deutsche Bank was aware of these reports, investigations, and lawsuits, and it also had additional information concerning representation and warranty violations that it learned in the course of administering the Covered Trusts. Additionally, Deutsche Bank had access to non-public information regarding the Covered Trusts that would have confirmed the representation and warranty violations if it had conducted even a limited investigation. Thus, Deutsche Bank was aware of the defaults, but failed to provide the required notice and pursue repurchase claims.

**B.   Deutsche Bank Failed to Act Prudently Upon the Occurrence of an Event of Default**

96. When Deutsche Bank learned that the Master Servicers[7] or Servicers failed to provide notice of numerous breaches of representation and warranty provisions as required under the PSAs, Deutsche Bank should have acted like a prudent person would in the exercise of its own affairs and (i) taken action against the Master Servicers or Servicers; (ii) taken steps to require the Sponsors or Originators to repurchase or substitute the loans; and (iii) notified certificateholders of the Master Servicers' or Servicers' defaults and the breaches of representation and warranty provisions. During the period that an Event of Default was in existence, Deutsche Bank had a continuing duty to enforce repurchase rights. As such, it should have, at a minimum, reviewed all defaulted loans as they defaulted and determined whether a responsible party was required to repurchase such loans. Deutsche

---

[7] In the PSAs for the GSAA 2006-16, GSAA 2006-16, GSAMP 2006-FM3, GSAMP 2006-S4, HASC 2006-HE1, HASC 2006-OPT4, HASC 2007-HE1, HVMLT 2007-2, IXIS 2006-HE3, MSAC 2006-8, and MSIX 2006-1 Trusts, the Master Servicer was also the Securities Administrator and was also required to provide notices of breaches by the Master Servicer and Servicers. References to the Master Servicer herein also refer to the Master Servicer as Securities Administrator or Trust Administrator.

Bank continually failed to do so and let the statute of limitations to bring repurchase claims lapse by failing to take sufficient action within six years of the closing of each Covered Trust.

97.    Although certain Events of Default require formal notice and an opportunity to cure, the Trustee cannot escape its duty of care by failing to provide the required notice. As set forth in Section III(A), Deutsche Bank was aware (or would have been aware if it had carried out its duties) that the Master Servicers, Servicers, Depositors, Sponsors, and the Trustee itself, failed to provide notice of the Sponsors' and Originators' representation and warranty violations that occurred in the Covered Trusts.  Deutsche Bank, however, did not provide notice of such breaches as it was required to do.  Because these would have seasoned into Events of Default if notice had been provided, Deutsche Bank had a duty to act prudently to enforce repurchase provisions once it learned of such defaults.

98.    As described below, additional Events of Default occurred under the terms of the PSAs.  Deutsche Bank has engaged in repeated breaches of its duty to exercise due care throughout the life of the Covered Trusts.

### 1.    Events of Default Under the PSAs Relating to Document Delivery Failures in the Covered Trusts

99.    As discussed in Section II(A), Deutsche Bank, or a custodian acting on its behalf,  had a duty to identify in final certifications and exception reports mortgage files that were missing documentation required to be delivered under the PSAs, which typically includes documents sufficient to prove ownership of the note and mortgage or otherwise protect title.  Deutsche Bank knew of numerous instances where it did not receive: (i) the original mortgage note with all intervening endorsements showing a complete chain of endorsement from the Originator to the Sponsor or Depositor, or a lost mortgage note

affidavit and a duly executed assignment of mortgage for each loan that was not a MERS loan; (ii) the original recorded mortgage for each loan that was not a MERS loan; (iii) the original mortgage for those loans that were MERS loans; or (iv) the original recorded assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.

100.    When Deutsche Bank prepared the final exception reports, it provided them to the Sponsors, Depositors, and Master Servicers (or Servicers) indicating many of these missing documents.  When the custodian prepared such reports, it provided them to Deutsche Bank, the Sponsors, Depositors, and Master Servicers or (Servicers) and the reports similarly showed many documents that were required to be delivered under the PSAs were not delivered.  Deutsche Bank was aware that affected loans were not repurchased or substituted.

101.    Rather than take action to ensure the responsible parties cured such defects or substituted or repurchased the affected loans, Deutsche Bank stood by while the Sponsors, Servicers, and Master Servicers of the Covered Trusts engaged in so called "robo-signing" on a widespread basis when the missing documents were needed to foreclose on properties underlying the Covered Trusts.  Deutsche Bank and the Sponsors, Servicers, and Master Servicers of the Covered Trusts have been implicated in numerous governmental reports, court orders and press reports regarding servicing misconduct and the massive cover up of the failure to deliver documentation concerning securitized mortgage loans known as the "robo-signing" scandal.  This is powerful evidence of the systemic document delivery failures and Deutsche Bank's knowledge of such failures.  Section III(C) contains a chart of the relevant Sponsors, Servicers, and Master Servicers for the Covered Trusts.  Deutsche

Bank's and the relevant Sponsors', Servicers', and Master Servicers' involvement in the robo-signing scandal is summarized in Exhibit G.

102.    Events of Default occurred shortly after the final exception reports were delivered for each of the Covered Trusts under multiple provisions of the PSAs.  These Events of Default triggered a continuing duty to review defaulted loans to determine if such loans should be repurchased.

103.    First, each PSA provides that the Servicers' or Master Servicers' failure to adhere to prudent servicing standards ripens into an Event of Default if left uncured within a specified period after notice of such breach.  For example, Section 9.04 of the Morgan Stanley PSA provides that an Event of Default occurs if the Master Servicer fails to prudently service the mortgage loans and such breach is not remedied within 30 days of notice of the breach.  The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Option One, Saxon, and WaMu Trusts contain similar provisions.  *See* Ex. C § IX.

104.    Second, the PSAs for the IXIS and Option One Trusts provide that the Servicer's failure to perform its covenants to prudently service the mortgage loans ripens into an Event of Default if left uncured for a specified period after a servicing officer learns of such failures—no formal notice is required.  *See* Ex. C § IX.  Because the Servicers failed to act prudently and cause the repurchase or substitution of loans with incomplete documentation rather than foreclose, Events of Default were triggered under these PSAs without regard to the notice required to be given by the Trustee.

105.    As set forth above and in Exhibit G, when borrowers defaulted and the Servicers or Master Servicers were required to commence foreclosures, they fabricated the documents necessary to foreclose, rather than cause the Sponsor, Depositor, or Originator to repurchase or

substitute the affected loan.  Deutsche Bank was aware of this fact, as it was aware of the contents of the document exception reports and that loans with exceptions had defaulted and not been repurchased or substituted.  Both the Servicers and Trustee were aware that these loans were not put back to the Sponsors or Originators and, instead, as described in Exhibit G, the Servicers robo-signed the documentation required to foreclose.  These acts of robo-signing were breaches of the applicable prudent servicing standard, as a prudent Servicer would have insisted that the loans be repurchased.  Having failed to provide notice, Deutsche Bank had an obligation to act prudently to address all defaults.

106.    These Events of Default triggered Deutsche Bank's duty to act prudently to protect the interests of the certificateholders in all respects, and such duty continues to this day because the document defects were not cured within the required period and the affected loans were not repurchased.  Deutsche Bank had a continuing obligation to seek repurchase of loans missing required documentation throughout its tenure as trustee, including as loans on the final exception report defaulted.  Deutsche Bank also had a duty to determine whether other defaulted loans should be put back to the responsible parties based on representation and warranty violations because an Event of Default had occurred.  Deutsche Bank has repeatedly breached these duties throughout its tenure as trustee.

### 2.    Events of Default Under the Indentures Relating to Document Delivery Failures in the Covered Trusts

107.    As noted, four of the Covered Trusts were documented using an Indenture rather than a PSA.  While the same type of Events of Default occurred under the Indentures as described in Section III(B)(1), the relevant provisions are slightly different in that the Issuer's (*i.e.*, the Trust's) breach of the Indenture gives rise to an Event of Default, rather than the Master Servicers' or Servicers' breaches.

108.    The Saxon Indenture required the Issuer to protect the collateral of the trust. For example, Section 3.05 of the Saxon Indenture provides in relevant part, "[t]he Issuer will . . . take such other action necessary or advisable to: . . . (iv) enforce any rights with respect to the Collateral; or (iv) preserve and defend title to the Collateral and the rights of the Indenture Trustee and the Noteholders in such Collateral against the claims of all Persons and parties."  The Indenture for the ECR Trust has similar provisions.  *See* Ex. C § VIII.

109.    The failure to do so is an Event of Default.  For example, Section 5.01 of the Saxon Indenture provides that an Event of Default occurs when the Issuer fails in:

> the observance or performance of any covenant or agreement of the Issuer made in this Indenture (other than a covenant or agreement, a default in the observance or performance of which is elsewhere in this Section specifically dealt with), or any representation or warranty of the Issuer made in this Indenture, the Sale and Servicing Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith proving to have been incorrect in any material respect as of the time when the same shall have been made, and such default shall continue or not be cured, or the circumstance or condition in respect of which such representation or warranty was incorrect shall not have been eliminated or otherwise cured, for a period of 60 days after there shall have been given, by registered or certified mail, to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Holders of at least 25% of the Outstanding Amount of the Notes, a written notice specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a notice of Default hereunder.

The Indenture for the ECR Trust contains a substantially similar provision.

*See* Ex. C § IX.

110.    As discussed above, the Trustee provided written notice that the mortgage files were incomplete.  The Issuer under the Indenture failed to protect the trust assets, a fact

57

the Trustee was well aware of.  As a result, an Event of Default occurred under the Indenture in the first year of the existence of the Saxon and ECR Trusts.

111.    In addition, Section 3.06(d) of the Saxon Indenture provides that the Issuer must give notice to the rating agencies and the Trustee of an Event of Default under the Transfer and Servicing Agreement.  Section 6.1(a)(ii) of the Transfer and Servicing Agreement provides that defaults relating to document delivery failures or "the Mortgage File for Delay Delivery Mortgage Loans" are deemed Events of Default as soon as the Final Certification of the Trustee is provided and an obligation to repurchase or substitute arises. The Indenture and related servicing agreement for the ECR Trust has similar provisions. *See* Ex. C § IX.  The Issuer was aware of these Events of Default, but did not give the required notice.  The Trustee was fully aware of this fact, but failed to act.  An Event of Default occurred under this provision as well and the Trustee failed to exercise due care.

112.    As detailed in Section III(A) and Exhibit F, the Trustee became aware of public information indicating that the Issuer failed to protect the trust assets by enforcing the Sponsors' or Originators' repurchase obligations triggered by representation and warranty violations.  Events of Default occurred as a result.  This triggered a continuing obligation to protect the interests of certificateholders that Deutsche Bank breached throughout its tenure as Trustee.

### 3.    Deutsche Bank Received Written Notice of Representation and Warranty Violations Which Ripened into Events of Default

113.    In addition to the Events of Default discussed above, on July 21, 2011, the Association of Mortgage Investors ("AMI") notified all major RMBS trustees, (including Deutsche Bank) that "substantial evidence [] has emerged of abuses in the servicing and monitoring of" RMBS.  The letter set forth in detail the publicly available evidence

58

demonstrating that there was widespread evidence, including some of the evidence referenced in this Complaint, that loan Originators had systemically breached representations and warranties provided to securitization trusts, and that the parties servicing loans underlying securitization trusts had systemically breached their obligations under applicable servicing agreements. The letter cautioned, "[y]ou cannot be negligent in ascertaining the pertinent facts regarding the underlying collateral;" "[u]pon discovery of representation or warranty breaches, you have to notify the appropriate parties;" and "you must comply with your obligations . . . to take action to remedy the servicer Events of Default in the best interests of the certificateholders."

114.    Further, on or about December 16, 2011, a group of major institutional mortgage investors in hundreds of RMBS trusts issued written instructions to Deutsche Bank, as trustee, to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and deficient servicing of those loans. Less than two years later, Deutsche Bank and other trustees were presented with a $4.5 billion settlement offer covering 330 JPMorgan-sponsored RMBS trusts. The JPMorgan putback initiative identified and sought to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Covered Trusts, including Countrywide Home Loans, Inc., and sought recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Covered Trusts, including Wells Fargo Bank, N.A. and Countrywide Home Loan Servicing, LP. Deutsche Bank accepted the settlement with JPMorgan with respect to certain trusts despite the fact that the settlement would reimburse the trusts for only a small fraction of the losses caused by JPMorgan's misconduct. *See* Compl. ¶¶ 9–10, *Blackrock Allocation Target Shares v. Bank of N.Y.*, 651866/2014 (N.Y. Sup. Ct. June 18, 2014); Dawn Kopecki & Alexis Leondis, *JP Morgan Sets Tentative $45 Billion Accord for Mortgage Bonds*,

59

Bloomberg (Nov. 16, 2013 12:00 AM), http://www.bloomberg.com/news/ 2013-11-15/jpmorgan-reaches-4-5-billion-mortgage-bond-deal-with-investors.html.  None of the Covered Trusts are part of this settlement.

115.    Additionally, on January 31, 2012, a group of major institutional mortgage investors in several dozen RMBS trusts sponsored by Morgan Stanley Mortgage Capital Inc. or its affiliates issued written instructions to Deutsche Bank to investigate large numbers of ineligible mortgages in the loan pools securing those trusts and the deficient servicing of those loans.  The Morgan Stanley putback initiative identified and sought to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Covered Trusts, including New Century Mortgage Corporation and American Home Mortgage Corporation, and identified and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Covered Trusts, including Wells Fargo Bank, N.A. and Saxon Mortgage Services, Inc.  *See* Compl. ¶ 397, *Blackrock Allocation Target Shares*, No. 651866/2014 (N.Y. Sup. Ct. June 18, 2014).

116.    To date, Deutsche Bank has not exercised due care to ensure that certificateholders' interests are protected.

117.    Beginning in 2013, Deutsche Bank commenced lawsuits relating to RMBS trusts other than the Covered Trusts against certain Sponsors and Originators (including, among others, HSBC Bank USA, National Association) for breaches of representations and warranties.  *See supra* ¶ 78 (citing cases).  These lawsuits, which alleged pervasive and systemic breaches of representations and warranties, demonstrate that Deutsche Bank was aware of similarly pervasive and systemic breaches of representations and warranties in the Covered Trusts, but failed to exercise due care.

### 4.      Events of Default Concerning False Servicer Certifications

118.    Each PSA obligated the Servicer to certify annually that it met its obligations under the PSAs and applicable federal regulations.  For example, Section 3.22 of the Morgan Stanley PSA requires the Master Servicer and each Servicer to certify, among other things,

> (i) a review of the activities of the Securities Administrator, the Master Servicer, such Servicer or Subservicer, as applicable, during the preceding calendar year and of its performance under this Agreement or the applicable Subservicing Agreement, as the case may be, has been made under such officers' supervision, and
>
> (ii) to the best of such officers' knowledge, based on such review, the Securities Administrator, the Master Servicer, such Servicer or Subservicer, as applicable, has fulfilled all of its obligations under this Agreement or the applicable Subservicing Agreement, as the case may be, in all material respects, throughout such year, or, if there has been a default in the fulfillment of any such obligation in any material respect, specifying each such default known to such officers and the nature and status thereof.

The PSAs for the ECR, Goldman Sachs, Greenwich, HSBC, Impac, IXIS, NovaStar, Saxon, Option One, and WaMu Trusts contain substantially similar requirements.  *See* Ex. C § XII.

119.    The failure to provide a conforming certification is an Event of Default under each of the PSAs.  *See* Ex. C §§ IX, XII.  Under the PSAs for the IXIS and Option One Trusts, the Event of Default is also triggered by the breach without regard to whether or not notice is provided.  Under the remaining PSAs, Deutsche Bank was not entitled to rely on certifications that it knew to be false and, thus, Deutsche Bank's failure to provide notice of breaches relating to false Servicer certification triggered its post-Event of Default duties.

120.    Deutsche Bank received certifications that it knew to be false because the Servicers were not in fact meeting their obligations under the PSAs and failed to disclose numerous representation and warranty violations.  As discussed in Sections III(B) and III(C), the Servicers breached the PSAs in many ways including by attempting to foreclose

on defective loans rather than tendering loans for repurchase or substitution and by looting trust assets through multiple servicing scams.  As discussed in Section III(A), Deutsche Bank was aware of numerous representation and warranty violations that were not disclosed in the required servicing certifications.  Deutsche Bank was aware of these breaches, and therefore, knew the required servicer certifications did not conform because they were false.  The PSAs only allowed the Trustee to rely upon the certifications if it had a good faith basis to believe the certifications were true.  Events of Default were triggered as a result, and Deutsche Bank had a continuing duty to act prudently to protect the certificateholders' interests.

121.    In addition, under the ECR and Option One PSAs, and many of the Morgan Stanley PSAs, the Servicers and Master Servicers provided a representation and warranty and covenant that all reports provided under the PSA, including servicing compliance certifications, were accurate and complete.  For example, Section 2.05(vii) of the Option One PSA provides: "Neither this Agreement nor any information, certificate of an officer, statement furnished in writing or report delivered to the Trustee by the Servicer in connection with the transactions contemplated hereby contains any untrue statement of material fact."  The PSAs for the ECR 2005-3, IMSA 2006-3, IMSA 2006-4, MSAC 2005-HE7, MSAC 2006-HE5, MSAC 2006-HE6, MSAC 2006-HE7, MSAC 2006-8, MSAC 2007-HE1, MSAC 2007-HE2, MSHEL 2007-2, FFML 2005-FF2, FFML 2005-FFH3, FFML 2006-FF8, FFML 2006-FF9, and GSAMP 2006-FM3 contain substantially similar provisions.  All parties to the PSA had a duty to provide notice of breaches of this representation and warranty.  The Servicer's failure to provide such notice resulted in Events of Default triggering Deutsche Bank's post-Event of Default duties.

122.    The Trustee should have provided notice of breaches of representations and warranties or covenants resulting from the Servicers' or Master Servicers' false certifications.

**C.    Deutsche Bank Failed to Address the Master Servicers' and Servicers' Looting of Trust Assets**

123.    In addition to the servicing related defaults and Events of Default described above, the Servicers and Master Servicers have engaged in a variety of schemes to overcharge borrowers in default.  These scams have dramatically increased loss severities on defaulted mortgages and, as a result, dramatically increased Commerzbank's losses.

124.    The chart below identifies each of the entities disclosed to be the Sponsors, Servicers, and Master Servicers of the loans included in the Covered Trusts.

|  | __Trust__ | __Sponsor__ | __Servicers__ | __Master Servicer__ |
|---|---|---|---|---|
| 1 | ECR 2005-3 | ECC Capital Corporation | ECC Capital Corporation, Subservicer; Option One Mortgage Corporation | CitiMortgage, Inc. |
| 2 | FFML 2005-FF2 | Goldman Sachs Mortgage Company | Countrywide Home Loans Servicing LP; National City Home Loan Services, Inc. | |
| 3 | FFML 2005-FFH3 | Greenwich Capital Financial Products, Inc. | National City Home Loan Services, Inc. | |
| 4 | FFML 2006-FF8 | Greenwich Capital Financial Products, Inc. | National City Home Loan Services, Inc. | |
| 5 | FFML 2006-FF9 | HSBC Bank USA, National Association | National City Home Loan Services, Inc. | Wells Fargo Bank, N.A. |
| 6 | FFML 2006-FF11 | HSBC Bank USA, National Association | Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 7 | FFML 2006-FF13 | Goldman Sachs Mortgage Company | National City Home Loan Services, Inc.; Wells Fargo Bank, N.A. | |
| 8 | GSAA 2005-10 | Goldman Sachs Mortgage Company | Countrywide Home Loans Servicing LP | |
| 9 | GSAA 2006-15 | Goldman Sachs Mortgage Company | Avelo Mortgage, LLC; Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 10 | GSAA 2006-16 | Goldman Sachs Mortgage Company | Countrywide Home Loans Servicing LP; | Wells Fargo Bank, N.A. |

| | Trust | Sponsor | Servicers | Master Servicer |
|---|---|---|---|---|
| | | | GreenPoint Mortgage Funding, Inc.; PHH Mortgage Corporation | |
| 11 | GSAA 2006-17 | Goldman Sachs Mortgage Company | Countrywide Home Loans Servicing LP; Avelo Mortgage, LLC; SunTrust Mortgage, Inc.; GreenPoint Mortgage Funding | Wells Fargo Bank, N.A. |
| 12 | GSAA 2007-4 | Goldman Sachs Mortgage Company | Avelo Mortgage, LLC; GreenPoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.; National City Mortgage Company; Wachovia Mortgage Corporation; Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 13 | GSAMP 2005-HE4 | Goldman Sachs Mortgage Company | JPMorgan Chase Bank, N.A. | |
| 14 | GSAMP 2005-WMC1 | Goldman Sachs Mortgage Company | Litton Loan Servicing LP | |
| 15 | GSAMP 2005-WMC2 | Goldman Sachs Mortgage Company | Litton Loan Servicing LP | |
| 16 | GSAMP 2005-WMC3 | Goldman Sachs Mortgage Company | Litton Loan Servicing LP | |
| 17 | GSAMP 2006-FM3 | Goldman Sachs Mortgage Company | Fremont Investment & Loan | Wells Fargo Bank, N.A. |
| 18 | GSAMP 2006-S4 | Goldman Sachs Mortgage Company | IndyMac Bank, F.S.B.; American Home Mortgage Servicing, Inc.; Ocwen Loan Servicing, LLC | Wells Fargo Bank, N.A. |
| 19 | HASC 2006-HE1 | HSBC USA, National Association | Wells Fargo Bank, N.A.; Countrywide Home Loan Servicing LP | Wells Fargo Bank, N.A. |
| 20 | HASC 2006-OPT4 | HSBC USA, National Association | Option One Mortgage Corporation | Wells Fargo Bank, N.A. |
| 21 | HASC 2007-HE1 | HSBC USA, National Association | Wells Fargo Bank, N.A.; Countrywide Home Loans Servicing LP; Option One Mortgage Corporation | Wells Fargo Bank, N.A. |

| | Trust | Sponsor | Servicers | Master Servicer |
|---|---|---|---|---|
| 22 | HASC 2007-OPT1 | HSBC USA, National Association | Option One Mortgage Corporation | CitiMortgage, Inc. |
| 23 | HVMLT 2006-3 | Greenwich Capital Financial Products, Inc. | Countrywide Home Loans Servicing LP | |
| 24 | HVMLT 2007-2 | Greenwich Capital Financial Products, Inc. | GMAC Mortgage, LLC; American Home Mortgage Servicing Inc.; Residential Funding Company, LLC | Wells Fargo Bank, N.A. |
| 25 | IMM 2007-A | Impac Mortgage Holdings, Inc. | Countrywide Home Loans Servicing LP; GMAC Mortgage Corporation | Impac Funding Corporation |
| 26 | IMSA 2006-3 | Impac Funding Corporation | Countrywide Home Loans Servicing LP; GMAC Mortgage Corporation | Impac Funding Corporation |
| 27 | IMSA 2006-4 | Impac Funding Corporation | Countrywide Home Loans Servicing LP; GMAC Mortgage Corporation | Impac Funding Corporation |
| 28 | IXIS 2005-HE3 | IXIS Real Estate Capital Inc. | Saxon Mortgage Services, Inc.; Countrywide Home Loans Servicing LP | JPMorgan Chase Bank, N.A. |
| 29 | IXIS 2006-HE3 | IXIS Real Estate Capital Inc. | Saxon Mortgage Services, Inc.; Master Financial, Inc. | Wells Fargo Bank, N.A. |
| 30 | MSAC 2005-HE7 | Morgan Stanley Mortgage Capital, Inc. | Countrywide Home Loan Servicing LP; HomEq Servicing Corporation; JPMorgan Chase Bank, National Association | |
| 31 | MSAC 2005-NC2 | Morgan Stanley Mortgage Capital, Inc. | Countrywide Home Loans Servicing LP; HomEq Servicing Corporation | |
| 32 | MSAC 2006-HE5 | Morgan Stanley Mortgage Capital, Inc. | Countrywide Home Loans Servicing LP; HomEq Servicing Corporation; Wells Fargo Bank, N.A. | |

| | Trust | Sponsor | Servicers | Master Servicer |
|---|---|---|---|---|
| 33 | MSAC 2006-HE6 | Morgan Stanley Mortgage Capital, Inc. | Countrywide Home Loans Servicing LP; Wells Fargo Bank, N.A.; New Century Mortgage Corporation | |
| 34 | MSAC 2006-HE7 | Morgan Stanley Mortgage Capital, Inc. | Countrywide Home Loans Servicing LP; New Century Mortgage Corporation | |
| 35 | MSAC 2006-HE8 | Morgan Stanley Mortgage Capital, Inc. | Countrywide Home Loans Servicing LP; Saxon Mortgage Services, Inc.; New Century Mortgage Corporation | Wells Fargo Bank, N.A. |
| 36 | MSAC 2006-NC3 | Morgan Stanley Mortgage Capital, Inc. | HomEq Servicing Corporation; Wells Fargo Bank, N.A. | |
| 37 | MSAC 2007-HE1 | Morgan Stanley Mortgage Capital, Inc. | Saxon Mortgage Services, Inc.; Countrywide Home Loans Servicing LP | |
| 38 | MSAC 2007-HE2 | Morgan Stanley Mortgage Capital, Inc. | Saxon Mortgage Services, Inc.; Countrywide Home Loans Servicing LP; Wells Fargo Bank, N.A.; NC Capital Corporation | |
| 39 | MSHEL 2005-4 | Morgan Stanley Mortgage Capital, Inc. | HomEq Servicing Corporation | |
| 40 | MSHEL 2007-2 | Morgan Stanley Mortgage Capital, Inc. | Wells Fargo Bank, N.A.; Saxon Mortgage Services, Inc.; Countrywide Home Loans Servicing LP | Wells Fargo Bank, N.A. |
| 41 | MSIX 2006-1 | Morgan Stanley Mortgage Capital, Inc.; IXIS Real Estate Capital Inc. | Wells Fargo Bank, N.A.; Saxon Mortgage Services, Inc.; JPMorgan Chase Bank, N.A.; HomEq Servicing Corporation | |
| 42 | MSIX 2006-2 | Morgan Stanley Mortgage Capital, Inc.; | Saxon Mortgage Services, Inc.; | Wells Fargo Bank, N.A. |

66

| | Trust | Sponsor | Servicers | Master Servicer |
|---|---|---|---|---|
| | | IXIS Real Estate Capital Inc. | Countrywide Home Loans Servicing LP | |
| 43 | NHEL 2006-5 | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. | |
| 44 | NHEL 2007-2 | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc.; Countrywide Home Loans Servicing LP | |
| 45 | SAST 2005-2 | Saxon Funding Management, Inc. | Saxon Mortgage Services, Inc. | Saxon Funding Management, Inc. |
| 46 | SAST 2006-3 | Saxon Funding Management, Inc. | Saxon Mortgage Services, Inc. | Saxon Funding Management, Inc. |
| 47 | SVHE 2005-OPT3 | Option One Mortgage Corporation | Option One Mortgage Corporation | |
| 48 | SVHE 2005-OPT4 | Option One Mortgage Corporation | Option One Mortgage Corporation | |
| 49 | SVHE 2006-OPT5 | Option One Mortgage Corporation | Option One Mortgage Corporation | |
| 50 | WAMU 2005-AR13 | Washington Mutual Bank | Washington Mutual Bank | |

125.    From 2005 until today, the Servicers and Master Servicers have cheated borrowers and the Covered Trusts after default by, *inter alia*, charging improper and excessive fees (including, without limitation, fees for property maintenance prior to foreclosure), failing to properly oversee third-party vendors, failing to adhere to industry benchmarks for foreclosure proceedings, and procuring insurance policies for properties that were already insured.

126.    When a defaulting borrower's home is foreclosed upon and sold, the Servicer or Master Servicer deducts its fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and thus was entitled to

67

the net sale proceeds.

127. These overcharges are unlawful and resulted in breaches under the PSAs because they did not meet the prudent servicing standard and were not disclosed in annual certifications provided by the Master Servicers and Servicers. As noted in Sections III(B)(1) and III(B)(3), servicing related defaults known to the Trustee triggered the Trustee's duty to act prudently. Deutsche Bank was aware of these servicing scams, which have been the subject of high profile government investigations, lawsuits, and press coverage, including articles in banking industry publications like the *American Banker*.

128. In fact, Deutsche Bank repeatedly notified all the mortgage loan servicers for all the RMBS trusts in which it was Trustee of the servicers' breaches of their contractual obligations under the PSAs.

129. On August 30, 2007, Deutsche Bank notified the mortgage loan servicers for the trusts for which Deutsche Bank served as trustee of issues with the servicers' "compliance with laws, rules, and regulations in connection with foreclosures on securitized assets." Deutsche Bank Nat'l Trust Co., as Trustee & Deutsche Bank Nat'l Trust Co. Americas, as Trustee, *Memorandum*, Deutsche Bank (Aug. 30, 2007), *available at* http://www.innercitypress.org/dbntcmemo.pdf.

130. On July 28, 2008, Deutsche Bank sent its securitized mortgage loan servicers an "advisory" notifying them of "issues relating to servicing practices that have come to the attention of the Trustee since the issuance of its [August 30, 2007 notice]." *See* Deutsche Bank Nat'l Trust Co., as Trustee & Deutsche Bank Nat'l Trust Co. Americas, as Trustee, *Memorandum*, Deutsche Bank (July 28, 2008), *available at* http://www.innercitypress.org/dbntcmemo.pdf. Among the servicing problems identified by

68

Deutsche Bank were improper foreclosure procedures and failure to maintain REO

properties in the trusts.  With respect to the latter failure, Deutsche Bank stated:  "The

Trustee has received a number of inquiries and complaints from government officials and

community groups about the physical condition of REO properties. . . . **Under standard**

**securitization documentation, loan servicers are expressly responsible for managing all**

**aspects of the REO disposition process, including appropriate maintenance of REO**

**properties**.  Failure to fulfill these responsibilities may expose the Trusts to financial losses,

potentially depressing the value of Trust property and exposing the Trusts to legal and

financial liability." *Id*.  (emphasis in original).

131.    On October 8, 2010, Deutsche Bank became even more alarmed by the

securitized mortgage loan servicers' breaches of their contractual obligations.  Deutsche

Bank instructed its securitized mortgage loan servicers:  "**This Memorandum concerns an**

**urgent issue requiring your immediate attention.  A copy of this Memorandum and all**

**attachments should be forwarded immediately to your Legal Department or General**

**Counsel's office**." *See* Deutsche Bank Nat'l Trust Co., as Trustee & Deutsche Bank Nat'l

Trust Co. Americas, as Trustee, *Memorandum*, Deutsche Bank (Oct. 8, 2010), *available at*

http://www.innercitypress.org/dbntcmemo.pdf. (emphasis in original).  Deutsche Bank

further notified the mortgage loan servicers: "**We write to express the Trustee's serious**

**concern regarding allegations of potential defects in foreclosure practices, procedures**

**and/or documentation used by certain major loan servicers and their agents** . . ." *Id*.

(emphasis in original). Deutsche Bank added:

> Recent media reports suggest the Alleged Foreclosure
> Deficiencies may include the execution and filing by certain
> Servicers and/or their agents of potentially defective
> documents, possibly containing alleged untrue assertions of

> fact, in connection with certain foreclosure proceedings. . . . Any such actions by a Servicer or its agents would constitute a breach of that Servicer's obligations under the Governing Documents and applicable law.

*Id.*

132. Exhibit H summarizes servicing misconduct involving the relevant Servicers and Master Servicers.

## IV.    DEUTSCHE BANK SUFFERED FROM CONFLICTS OF INTEREST

133. Deutsche Bank failed and unreasonably refused to take action to protect the Covered Trusts and certificateholders against Originator breaches and Servicer violations because it would have revealed that Deutsche Bank was an active participant in various servicing related misconduct and imperiled lucrative business relationships with the Originators and Servicers.

134. If Deutsche Bank had met its obligations, it would have revealed that Deutsche Bank was the named plaintiff in proceedings which forged, perjured, or other improper evidence was introduced by its attorneys on its behalf.  Thus, Deutsche Bank had a powerful incentive to keep secret the Sponsors' and Originators' malfeasance.

135. In at least two of the Covered Trusts included loans originated by an affiliate of Deutsche Bank, MortgageIT, Inc., creating a clear conflict of interest for Deutsche Bank with respect to serving as trustee for those trusts.

136. Additionally, evidence has come to light showing that Deutsche Bank was engaged in the same type of shoddy origination and securitization practices as the Sponsors, Originators and Servicers of the Covered Trusts.  For example, a bipartisan memorandum from Senators Carl Levin and Tom Conburn summarized the overwhelming evidence that Deutsche Bank-controlled originators did not comply with their stated underwriting guidelines:

"Deutsche Bank underwrote securities using loans from subprime lenders known for issuing high risk, poor quality mortgages, and sold risky securities to investors across the United States and around the world.  They also enabled the lenders to acquire new funds to originate still more high risk, poor quality loans."  Permanent Subcomm. on Investigations, Wall Street and the Financial Crisis: Anatomy of a Financial Collapse (2011) ("April 2011 Senate Report").

137.  Further, the April 2011 Senate Report describes how Deutsche Bank's top global CDO trader, Greg Lippmann, repeatedly warned his Deutsche Bank colleagues and clients about the poor quality of RMBS securities underlying many CDOs.  *Id*. at 10. Lippmann referred to the CDO marketing efforts as a "CDO machine" or "ponzi scheme" and predicted the mortgage market as a whole would plummet in value.  *Id*. at 320.

138.  In addition, Clayton Holdings ("Clayton"), a third-party due diligence vendor, revealed in its Trending Reports that from the first quarter of 2006 to the second quarter of 2007, Clayton rejected 34.9 percent of the mortgage loans that Deutsche Bank submitted for Clayton's review as falling outside of the applicable underwriting guidelines.  *See* Clayton, All Clayton Trending Reports 1st Quarter 2006 – 2nd Quarter 2007 (2007), *available at* http://fcic.law.stanford.edu/hearings/testimony/the-impact-of-the-financial-crisissacramento#documents.  Deutsche Bank, however, waived in 50 percent of the loans that Clayton found defective and falling outside the applicable underwriting guidelines.  *Id*.

139.  The obvious result of these poor practices was a spate of lawsuits.  Deutsche Bank Securitized Products ("DBSP"), an affiliate of Deutsche Bank, has been sued by a number of trustees who have sought to enforce DBSP's representations and warranties.  When trustees re-examined the loans securitized by DBSP they found astonishingly high breach rates, sometimes greater than 90 percent.  For instance, between March 2012 and May 2013, HSBC, as trustee,

filed at least 16 complaints against DBSP in its capacity as sponsor of 16 different trusts from the ACE and DBALT shelves.  In each of these actions, HSBC cited forensic reviews of the loan files which revealed that DSBP "dumped into the Trust a massive number of defective loans – loans that blatantly breached DBSP's representations and warranties."  HSBC asserted that Deutsche Bank's "inaccuracies, misrepresentations, omissions, and other breaches were so fundamental and numerous as to preclude any notion that they were the result of mere inadvertence or accident."  *See, e.g.*, Compl., *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2007-OA3, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 13-cv-02999 (S.D.N.Y. Apr. 30, 2013); Compl., *Deutsche Alt-A Sec. Mortg. Loan Trust, Series 2006-OA1, by HSBC Bank USA, N.A. as Trustee v. DB Structured Prods., Inc.*, No. 12-cv-08594 (S.D.N.Y. Nov. 27, 2012); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-ASAP2, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 651936/2013 (N.Y. Sup. Ct. Nov. 4, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-ASAP1, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 650949/2013 (N.Y. Sup. Ct. Aug. 1, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-WM1, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 650310/2013 (N.Y. Sup. Ct. June 3, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-HE1, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 650327/2013 (N.Y. Sup. Ct. Jan. 29, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2007-WM1 by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 650312/2013 (N.Y. Sup. Ct. Jan. 28, 2013); Compl., *ACE Sec. Corp. Home Equity Loan Trust, Series 2006-HE3, by HSBC Bank USA, N.A. v. DB Structured Prods., Inc.*, No. 652231/2012 (N.Y. Sup. Ct. Dec. 21, 2012).

140. Additionally, DBSP's complete disregard for proper loan underwriting has also spawned numerous private lawsuits where plaintiffs have performed forensic analyses and re-underwritten entire loan files and discovered a staggering number of loans breaching the associated representations and warranties. *See, e.g.*, Compl., *FHFA v. Deutsche Bank AG*, No. 11-cv-06192-DLC (S.D.N.Y. Sept. 2, 2011); Compl., *Sealink Funding Ltd. v. Deutsche Bank AG*, No. 652174/2012 (N.Y. Sup. Ct. May 1, 2013); Compl., *Royal Park Investments v. Merrill Lynch*, No. 652607/2012 (N.Y. Sup. Ct. Dec. 14, 2012); Compl., *Phoenix Light SF Ltd. v. Ace Sec. Corp.*, No. 650422/2012 (N.Y. Sup. Ct. May 14, 2012).

141. Exhibits F, G, and H contain additional details concerning Deutsche Bank's misconduct in servicing and originating residential mortgage loans.

## V. DEUTSCHE BANK'S CONDUCT INJURED COMMERZBANK

142. Deutsche Bank's breaches of its contractual, statutory, and fiduciary duties have caused Commerzbank to suffer hundreds of millions of dollars in losses.

143. If Deutsche Bank had performed its duties as trustee, it would have enforced the obligations of the Sponsors and Originators and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Commerzbank's losses. And if Deutsche Bank had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have retained their market value, as highly rated bonds with similar coupon rates are now trading at a very significant premium.

144. Deutsche Bank's failure to address the Master Servicers' and Servicers' failure to adhere to prudent servicing practices also increased the loss severities (*i.e.*, the amount of principal loss caused by defaults) on defaulted loans dramatically. The extended foreclosure timelines that resulted from document delivery failures and the robo-signing

scandal resulted in increased servicing fees, increased property taxes and utility expenditures, which were borne by the Covered Trusts, a decline in value of the underlying properties, and ultimately less sale proceeds for the Covered Trusts and certificateholders. The overcharging for default related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Master Servicer or Servicer from foreclosure sale proceeds.

145.   If Deutsche Bank had met its contractual, statutory, and fiduciary duties to accept delivery of notes and mortgage loan files, inspect them, give notice as required, and issue accurate certifications, it would have caused the Sponsors or Originators to substitute or repurchase all loans where the Master Servicers, Servicers, Sponsors, Depositors, and Originators failed to deliver required documentation to the Trustee or breached representations and warranties regarding the mortgage loans.  This would have included numerous loans that had already defaulted or would ultimately default.  Moreover, Deutsche Bank's failure to take delivery of complete note and mortgage files or adequately inspect them has placed a cloud over title and has limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts, which has ultimately impacted the market value of the Certificates.  Additionally, Deutsche Bank's failure to commence damages actions against the Master Servicers and Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

146.   Deutsche Bank's breaches with respect to the Sold Certificates significantly reduced the sale price Commerzbank ultimately received when it divested itself of the certificates.  When the sales were made it was apparent that Deutsche Bank had breached its duties and would not take steps to remedy its failures.  The sales of the Sold Certificates were

74

made by London Branch and the economic losses from those sales were experienced in Commerzbank in England and/or in Germany where Commerzbank is located. The sale of the Sold Certificates did not include assignment of any of Commerzbank's legal claims and therefore Commerzbank has retained all its legal claims against Deutsche Bank.

147.    Deutsche Bank's failure to meet its contractual, fiduciary, statutory, and common law duties once it became aware of defaults relating to the numerous representation and warranty breaches by the Sponsors or Originators further caused harm. If Deutsche Bank had provided notice of representation and warranty violations and defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have caused the Sponsors or Originators to repurchase loans and required the Master Servicers and Servicers to replace the assets they have looted from the Covered Trusts.

148.    Many, if not all, of the repurchase or substitution claims described above have lapsed due to Deutsche Bank's inaction as courts have held that the underlying representation and warranty claims that Deutsche Bank failed to pursue accrued for statute of limitations purposes on the date of the closing of the relevant securitizations.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Violations of the TIA)[8]

149.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

150.    The PSAs underlying and establishing the Covered Trusts are "indentures,"

---

[8] Commerzbank acknowledges that the United States Court of Appeals for the Second Circuit has held that the TIA does not apply to RMBS similar to certain of the RMBS at issue here. Plaintiff includes a claim under the TIA with respect to those RMBS to the extent there are any further developments in the law and for purposes of preserving any rights on appeal.

and Deutsche Bank is an "indenture trustee" under the TIA.  15 U.S.C. § 77aaa(7), (10).

151.    As a certificateholder, Commerzbank is a trust beneficiary entitled to the protections afforded under the TIA.

152.    The TIA applies to the PSAs and the related Certificates. 15 U.S.C. § 77ddd(a)(1).

153.    Deutsche Bank violated the TIA in at least three ways.

154.    First, TIA Section 315(b) provides that the indenture trustee must notify certificateholders of "all defaults known to the trustee, within ninety days after the occurrence thereof." 15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  As set forth above, Deutsche Bank failed to carefully investigate serious, known issues with the loans in the Covered Trusts, or to notify certificateholders of numerous defaults, including the failure of the responsible parties to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

155.    Second, in the case of defaults (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c).  Here, as set forth above, Deutsche Bank did not act prudently after learning of numerous serious issues related to material breaches of representations and warranties, servicer defaults, and Events of Default.  A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective mortgage loans.  In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute and deliver mortgage file documents.

156.    Finally, the TIA states that "[n]otwithstanding any other provision of the

indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b).  Deutsche Bank has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment in connection with defective mortgage loans for which it failed to take action to correct.  In addition, Deutsche Bank has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment by failing to enforce the repurchase remedy.

157.    These breaches materially and adversely affected the interests of the certificateholders, including Commerzbank, because they resulted in the Covered Trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties.

158.    Deutsche Bank is liable to Commerzbank for damages incurred as a result of its violations of the TIA in an amount to be determined at trial.

### SECOND CAUSE OF ACTION
### (Breach of Contract)

159.     Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

160.    The PSAs are valid and binding contracts entered into between Deutsche Bank, each Covered Trust, the Sponsors, the Master Servicers, the Servicers, and the Depositors.

161.    The PSAs provide, among other things, the terms under which Deutsche Bank acts as trustee for the Covered Trusts.

162.    As a current holder and/or former holder of Certificates or Notes issued by

each Covered Trust, Commerzbank is or was an express, intended third-party beneficiary under the PSAs entitled to enforce the performance of the Trustee.

163.   Deutsche Bank breached several obligations that it undertook on behalf of Commerzbank as certificateholder including, without limitation, to:

(a) take steps to cause the Sponsors or Originators to repurchase loans eligible for repurchase;

(b) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

(c) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(d) provide notice of and take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(e) enforce the repurchase obligations of the Sponsors and/or Originators.

164.   The specific provisions breached by Deutsche Bank are further detailed herein and in the attached Exhibits hereto.

165.   Deutsche Bank's breach of its duties set forth in the PSAs, as described above, caused Commerzbank's losses on its Certificates and diminished their value.

166.   Commerzbank has performed its obligations under the PSAs.

167.   Deutsche Bank is liable to Commerzbank for the losses it suffered as a direct result of Deutsche Bank's failure to perform its contractual obligations under the PSAs.

### THIRD CAUSE OF ACTION
#### (Breach of Fiduciary Duty)

168.   Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

169.   As set forth in detail above, Deutsche Bank owed certificateholders, including Commerzbank, a duty to exercise all powers under the PSAs to act prudently to protect certificateholders' rights once an Event of Default occurred or payments to certificateholders became impaired.  This included, without limitation, duties to protect the interests of the beneficiaries of the Covered Trusts, make prudent decisions concerning the exercise of appropriate remedies following Events of Default, and enforce the repurchase obligations of the Sponsors and/or Originators.

170.   As set forth in detail above, Deutsche Bank breached its fiduciary obligations by failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest.

171.   The violations by Deutsche Bank of its fiduciary obligations impaired certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in the value of  Commerzbank's Certificates.

### FOURTH CAUSE OF ACTION
**(Negligence—Failure to Avoid Conflicts of Interest and
Perform Ministerial Acts with Due Care**)

172.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

173.   Deutsche Bank owed certificateholders, including Commerzbank, extra-contractual duties to perform ministerial acts with due care and avoid conflicts of interests. As described above, Deutsche Bank performed or failed to perform its responsibilities in a grossly inadequate and negligent manner.

174.   Deutsche Bank's negligence and gross negligence impaired certificateholders' ability to fully collect the principal and interest due on their Certificates and caused losses in

the value of  Commerzbank's Certificates.

## FIFTH CAUSE OF ACTION
### (Violation of the Streit Act)

175.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

176.    As a certificateholder, Commerzbank is a trust beneficiary entitled to the protections afforded under the Streit Act.  The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee must exercise due care in performing its obligations.  N.Y. Real Prop. Law § 124.

177.    The Certificates are "mortgage investments" subject to the Streit Act.  N.Y. Real Prop. Law § 125(1).

178.    The PSAs underlying and establishing the Covered Trusts are "indentures," and Deutsche Bank is a "trustee" under the Streit Act.  N.Y. Real Prop. Law § 125(3).

179.    Section 126(1) of the Streit Act provides that upon an "event of default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

180.    As set forth above, Deutsche Bank failed to exercise its rights under the PSAs after becoming aware of "events of default" by failing to:

> (a) protect the interests of the beneficiaries of the Covered Trusts;
>
> (b) take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;
>
> (c) investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such

80

representations and warranties;

(d) make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(e) provide notice of and take steps to remedy the Master Servicers' and Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(f) enforce the repurchase obligations of the Sponsors and/or Originators.

181.    Deutsche Bank is liable to Commerzbank for damages incurred as a result of its violations of the Streit Act.

## SIXTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith)

182.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

183.    At all relevant times, Deutsche Bank owed Commerzbank, as an express, intended third-party beneficiary under the PSAs, a duty of good faith and fair dealing pursuant to the PSAs that required Deutsche Bank to ensure that it did not, by act or omission, injure the rights of Commerzbank to receive the benefits and protections provided for under the PSAs.

184.    By the conduct described above, Deutsche Bank breached its duty of good faith and fair dealing under the PSAs.

185.    Deutsche Bank's breaches are material.

186.    As a result of these breaches, Commerzbank has suffered damages and will continue to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Commerzbank prays for relief and judgment, as follows:

A.       Awarding compensatory damages and/or equitable relief in favor of

Commerzbank against Deutsche Bank for breaches of its statutory, contractual and fiduciary

duties, its gross negligence, ordinary negligence and negligent misrepresentations, in an

amount to be proven at trial, including interest thereon;

B.       Awarding Commerzbank its reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

C.       Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Commerzbank hereby demands a trial by jury on all issues triable by jury.


Dated:  December 23, 2015

Respectfully submitted,

/s/ David H. Wollmuth
David H. Wollmuth
Steven S. Fitzgerald
Ryan A. Kane
Robert T. Franciscovich
Roselind F. Hallinan
Sean P. McGonigle
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
sfitzgerald@wmd-law.com
rkane@wmd-law.com
rfranciscovich@wmd-law.com
rhallinan@wmd-law.com
smcgonigle@wmd-law.com

*Attorneys for Plaintiff*


82