**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

PHOENIX LIGHT SF DAC, BLUE HERON
FUNDING V LTD., BLUE HERON FUNDING VI
LTD., BLUE HERON FUNDING VII LTD., BLUE
HERON FUNDING IX LTD., C-BASS CBO XIV
LTD., C-BASS CBO XVII LTD., KLEROS
PREFERRED FUNDING V PLC, SILVER ELMS                      No. 14-cv-10103-JGK
CDO PLC and SILVER ELMS CDO II LIMITED,

                                            Plaintiffs,

                    -against-

DEUTSCHE BANK NATIONAL TRUST COMPANY
and DEUTSCHE BANK TRUST COMPANY
AMERICAS,

                                            Defendants.

---------------------------------------------------------------

COMMERZBANK AG,

                                            Plaintiff,

                    -against-

                                                         No. 15-cv-10031-JGK
DEUTSCHE BANK NATIONAL TRUST COMPANY
and DEUTSCHE BANK TRUST COMPANY
AMERICAS,

                                            Defendants.

---------------------------------------------------------------x

**PLAINTIFFS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT**

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

FACTUAL BACKGROUND ................................................................ 5

    A.  The Trusts at Issue ................................................................ 5

    B.  The Nature of RMBS ............................................................ 6

    C.  The Role of the Trustee......................................................... 6

    D.  The Structure of the Governing Agreements ................................ 9

    E.  The Defendants .................................................................. 11

    F.  The Plaintiffs..................................................................... 12

ARGUMENT .............................................................................. 13

    I.   Legal Standard.................................................................. 13

    II.   The Undisputed Material Facts Establish that EODs Occurred in 73 Trusts ................ 14

        A.  For 18 Trusts, EODs were triggered by exceeding numerical thresholds ................. 15

        B.  For 7 Trusts, EODs occurred when Servicers were downgraded ............................... 17

        C.  For 8 Trusts, EODs were triggered by untimely compliance documents .................. 18

        D.  In 73 Trusts, DB failed to declare EODs triggered by Servicer misconduct relating to REO properties and foreclosures ............................................... 24

    III.   DB Breached Its Prudent Person Obligations, Because DB's Contentions as to How It Satisfied those Duties Fail as a Matter of Law .............................................. 32

        A.  Merely sending notice of EODs cannot satisfy DB's post-EOD duties .................... 33

B.  DB's contention that doing nothing besides providing notice of EOD was prudent fails as a matter of law ............................................................................... 35

C.  DB's "consultation with counsel" cannot justify its failure to act because DB waived the "advice of counsel" affirmative defense ............................................... 41

IV.  DB Knew that the Sellers Failed to Cure Mortgage File Exceptions for the Loans Identified in the Document Exception Reports Linked to Exhibit 583 ......................... 41

V.  DB Had Pre-EOD Duties to Enforce Repurchase of Loans that Breached R&Ws and that Lacked Required Mortgage File Documents .......................................... 44

A.  For 40 Trusts, DB had the pre-EOD duty to enforce the repurchase protocol for loans with R&W violations of which DB had knowledge .................................... 45

B.  DB cannot disclaim its pre-EOD duty to enforce repurchase remedies where DB was required, but failed, to notify the Depositor of R&W breaches ................................ 47

C.  In 8 Trusts, DB had a pre-EOD duty to enforce repurchase where DB was required, but failed, to notify the Depositor of loans with Mortgage File defects .................... 48

D.  For 3 Trusts on which DB's enforcement duty for loans with Mortgage File defects is established as a matter of law, Plaintiffs are also entitled to summary judgment that DB breached its duty ............................................................................... 51

VI.  For 21 Trusts, DB Breached Its Contractual Duty to Monitor Servicers ...................... 54

CONCLUSION ........................................................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*

    477 U.S. 242 (1986) .................................................................................................. 13

*Beck v. Mfrs. Hanover Trust Co.,*

    218 A.D.2d 1, 632 N.Y.S.2d 520 (1st Dep't 1995) ........................................... 14

*Braun v. City of N.Y.,*

    284 F. Supp. 3d 572 (S.D.N.Y. 2018) ......................................................... 47, 48

*Fay v. Oxford Health Plan,*

    287 F.3d 96 (2d Cir. 2002) ................................................................................ 13

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.,*

    104 F. Supp. 3d 441 (S.D.N.Y. 2015), *aff'd* 873 F.3d 85 (2d Cir. 2017) ......................... 33

*In re Bankers Tr. Co.,*

    450 F.3d 121 (2d Cir. 2006) ............................................................................... 23

*In re Lincoln First Bank,*

    223 A.D.2d 20, 27, 643 N.Y.S.2d 972 (4th Dep't 1996) .................................. 35

*LNC Invs., Inc. v. First Fid. Bank, Nat'l Ass'n,*

    935 F. Supp. 1333 (S.D.N.Y. 1996) ...................................................... 14, 32, 35

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.,*

    906 F.2d 884, 890 (2d Cir. 1990) ..................................................................... 23

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.,*

    172 F. Supp. 3d 700 (S.D.N.Y. 2016) ............................................................... 23

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,

    2016 WL 439020 (S.D.N.Y. Feb. 3, 2016)..................................................... 44, 46, 47, 48

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*,

    2017 WL 9802844 (S.D.N.Y. Sept. 15, 2017).................................................. 41

*Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l Ass'n*,

    2017 WL 945099 (S.D.N.Y. Mar. 10, 2017) ................................................... 32

*Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l Ass'n*,

    2017 WL 9538170 (S.D.N.Y. May 8, 2017) ................................................... 41

*Stark v. U.S. Trust Co. of N.Y.*,

    445 F. Supp. 670 (S.D.N.Y.1978)...................................................................... 35

## Statutes

15 U.S.C.A. § 77ooo(c) ........................................................................................ 10

15 U.S.C.A. § 78o (West 2006) ............................................................................ 56

17 CFR §§ 240.13a-18, 240.15d-18....................................................................... 55

N.Y. Real Property Law § 126(1) ......................................................................... 10

Plaintiffs Phoenix Light SF DAC, Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding VII Ltd., Blue Heron Funding IX Ltd., C-BASS CBO XIV Ltd., C-BASS CBO XVII Ltd., Kleros Preferred Funding V PLC, Silver Elms CDO PLC, and Silver Elms CDO II Limited (collectively, "PL") and Commerzbank AG ("CB"; together with PL, "Plaintiffs") respectfully submit this Memorandum of Law, Local Rule 56.1 statement of undisputed facts ("SUF"), declaration of Jay S. Handlin dated December 7, 2018, exhibits thereto, and proposed orders in support of Plaintiffs' Joint Motion for Partial Summary Judgment against Defendants Deutsche Bank National Trust Company ("DBNTC") and Deutsche Bank Trust Company Americas ("DBTCA") (together, "DB" or the "Trustee"). Plaintiffs' grounds for summary judgment on behalf of both Phoenix Light and Commerzbank are addressed in one brief; Plaintiffs' proposed orders specify the relief requested for each case.

## PRELIMINARY STATEMENT

These cases, combined, represent one of the largest sets of claims now being litigated against residential mortgage-backed securities ("RMBS") trustees, and thus is critically important in reinforcing the obligation of such trustees to protect investors—which is a crucial issue for investor confidence in the financial markets. The fundamental underpinning of the RMBS structure is that the securities marketed to investors are, in fact, "mortgage-backed." To be mortgage-backed, the loans underlying RMBS trusts must be what they were represented and warranted to be, and must have been transferred legally to the trusts—and some independent party to the transaction (the trustee) must ensure that those basic things are true. If other parties shirked their obligations, the only protection for investors is an independent trustee stepping in and carrying out specified duties; otherwise, investors simply would not have received the investment they were promised. This principle is not new. In the 1930s, the SEC investigated the

causes of the Great Depression, and specifically the role securitization trustees should have served, but did not: "And for honest, faithful and efficient operation of the provisions of the indenture, reliance is placed upon the trustee as representative of the security holders under the terms of the indenture." Securities and Exchange Commission, *Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective and Reorganization Committees,* Part VI, Trustees Under Indentures, at 2-4 (June 18, 1936). The Depression-era trustees claimed they were being scapegoated for others' wrongdoing and did not have to exercise any of their powers—arguments echoed today by DB. The SEC scorned such excuses: "[T]ypically the trustees do not exercise the elaborate powers which are the bondholders' only protection; . . . they have taken virtually all of the powers designed to protect the bondholders, but have rejected any duty to exercise them; and they have shorn themselves of all responsibilities which normally trusteeship imports." *Id.* The trustees' position was wrong then, and it remains wrong now.

Today, RMBS-related litigation has proceeded in two main waves. The first involved "putback" claims for some RMBS trusts, often brought by trustees against sellers and originators of flawed mortgage loans that were packaged and sold as premium investments. When investors like Plaintiffs later learned that RMBS trustees had failed to act, letting putback claims expire for large swaths of other trusts, a second wave of cases against trustees followed.

Discovery has revealed that DB's abandonment of its trustee duties, and of Plaintiffs, was staggering. The undisputed facts prove that defined Events of Default ("EODs") occurred in 73 of the trusts at issue in these cases. After an EOD, DB was contractually transformed into a traditional fiduciary obligated to act prudently on behalf of investors. This is the duty that the SEC commanded be placed on Great Depression securitization trustees after defaults:

Unless the obligations of active trusteeship are imposed, these subtle influences of
friendship and business relations [with other parties to the securitization] are almost
certain to condition the quality of the trustees' performance and to make the trustee
a timid and ineffective representative of the security holders. In any event, the
requirement is for an independent and aggressive champion of the interests of
security holders. Accordingly, the trustee should be required to act with that
vigilance and thoroughness which it could be expected to exercise if it were
protecting its own investment.

*Id*. at 61. Contrary to its legal duties, however, DB was timid and ineffective, not vigilant and
thorough. DB long concealed its failures as trustee, but discovery has proven that instead of
protecting investors, DB reverted to the do-nothing approach of its Depression-era predecessors.

DB was expressly required to carry out its responsibilities for the benefit of investors. To
do so, DB was contractually mandated to provide, and act upon, essential information. For some
trusts, even before an EOD occurred, DB was obligated to enforce repurchase remedies for loans
that breached representations and warranties ("R&Ws") or that lacked required documents. DB
was obligated to give notice to other transaction parties upon discovering that key characteristics
of the mortgage loans underlying the trusts were not as represented. DB was obligated to monitor
objective metrics in the trusts' performance. DB was obligated to determine if EODs occurred,
and, if so, to declare them. When EODs occurred, DB was obligated to perform as a fiduciary,
using all available means to maximize investor recoveries. DB did none of these things.

Given the guidance from this Court's prior rulings, and in light of DB's revelations in
discovery, substantial aspects of these complex cases are destined for trial. Recognizing that,
Plaintiffs present a narrowly tailored motion, based only on facts that are genuinely undisputed,

3

and on principles of law that are settled. As to certain trusts, specific claims are amenable to disposition in Plaintiffs' favor in their entirety. For other issues, essential elements of Plaintiffs' claims can be established as a matter of law, while other elements are more properly decided at trial. Granting the relief requested herein will streamline the cases significantly.

For the reasons explained in detail below, Plaintiffs ask the Court to rule that:

**Existence of EODs and Breach of Post-EOD Duties**

- As to the 18 Trusts for which DB declared EODs because cumulative losses or loan delinquencies exceeded levels specified in the governing agreements, DB was subject to the heightened, prudent person standard of care at least as early as the date DB declared each EOD, and for as long as the EOD remained uncured. *See* Section II.A, *infra*.

- As to 11 Trusts, DB failed to timely declare EODs triggered by exceeding these numerical thresholds, subjecting DB to prudent person duties months or years earlier than the dates on which DB finally declared the EODs. *See* Section II.A, *infra*.

- As to 7 Trusts, DB declared 19 total EODs caused by Servicer downgrades, imposing upon DB the heightened post-EOD standard of care. *See* Section II.B, *infra*.

- As to 8 Trusts, DB improperly failed to declare EODs that occurred when the Servicers did not deliver compliance statements as required, triggering DB's post-EOD duties. *See* Section II.C, *infra*.

- As to 73 Trusts, EODs occurred as a result of Servicers' misconduct relating to real estate owned ("REO") properties and foreclosures, triggering DB's post-EOD duties for those Trusts, but DB improperly failed to declare those EODs. *See* Section II.D, *infra*.

- As to 47 Trusts in which EODs occurred, DB breached its prudent person duties by doing nothing besides (in some instances) sending contractually required notices of EOD to

Certificateholders, and particularly by failing to seek repurchase of loans with a basis for repurchase unless DB received direction and indemnity from investors. *See* Section III, *infra*.

**Pre-EOD Duties and Breaches**

- DB had actual knowledge that the document exceptions identified in the exception reports linked to Exhibit 583 remained uncured as of the dates of correspondence DB sent to transaction parties concerning such exceptions. *See* Section IV, *infra*.

- As to 40 Trusts, the "rights referred to above" provision in the governing agreements creates a pre-EOD obligation to enforce R&W breaches that DB discovered. *See* Section V.A, *infra*.

- As to 16 Trusts, if Plaintiffs prove at trial that DB discovered or had actual knowledge of loans with R&W breaches, but failed to notify the Depositor, DB had a pre-EOD duty to pursue all available legal remedies to enforce repurchase of the loans. *See* Section V.B, *infra*.

- As to 8 Trusts, DB had a pre-EOD duty to enforce repurchase remedies for loans identified with uncured exceptions and, as a matter of law, DB breached that duty as to 3 Trusts. *See* Section V.C, *infra*.

- As to 21 Trusts, DB breached its duty to ensure that it had policies and procedures sufficient to detect the occurrence of an Event of Default. *See* Section VI, *infra*.

## FACTUAL BACKGROUND

### A. The Trusts at Issue

These cases concern 85 RMBS trusts (the "Trusts") for which DB is the Trustee. Phoenix Light acquired certificates issued by 43 Trusts with an original face value over $750 million. ¶ 3

5

(¶ citations are to Plaintiffs' SUF). Commerzbank acquired certificates issued by 50 Trusts with a purchase value of approximately $600 million. ¶ 6. Phoenix Light and Commerzbank both own certificates in 8 of the Trusts. ¶ 7. Seventy-seven Trusts are governed by pooling and servicing agreements, or "PSAs," and 8 by indentures and related agreements. The Trusts' PSAs, indentures, and related agreements are referred to as the "Governing Agreements."[1]

### B.  The Nature of RMBS

RMBS are created by pooling large numbers of residential mortgage loans into a trust. Trusts governed by PSAs issued certificates to be purchased by investors; Trusts governed by indentures and related agreements issued notes. RMBS certificates and notes are securities that pay principal and interest based on the cash flows from the home loans held in the trusts. ¶¶ 9-10. For purposes of this Motion, investors in RMBS trusts are referred to as "Certificateholders."

### C.  The Role of the Trustee

Certificateholders' returns depend on the performance of the underlying mortgage loans. However, Plaintiffs and other Certificateholders did not have access to loan documentation, and so could not confirm the borrowers' creditworthiness or the collateral's sufficiency. ¶¶ 20-21. It was, therefore, critical that Certificateholders (1) receive assurances by the parties structuring the trusts that the loans complied with underwriting guidelines, were properly documented, and were otherwise of a quality and creditworthiness consistent with the risk profile of the investment as marketed; and (2) know that the loans would be properly serviced, including, if homeowners

---

[1] The indenture Trusts are structured using indentures, servicing agreements, trust agreements, and mortgage loan purchase agreements, which together are the functional equivalent of PSAs. Unless noted, "PSA" as used herein includes the Governing Agreements for the indenture Trusts.

ceased making their payments, by foreclosing on properties quickly and efficiently. To provide these protections, RMBS Sellers made representations about the loans' quality and documentation and their own underwriting process, agreeing to repurchase loans that failed to comply with their representations or lacked complete documentation; and Servicers committed to service the loans prudently. The only transaction party with the authority and responsibility to enforce those vital protections on Certificateholders' behalf is the Trustee. ¶¶ 22-23, 36.

Thus, all Governing Agreements mandate that a complete set of specified key documents for each mortgage loan—the "Mortgage File"—be delivered to DB or its Custodian.



Handlin Declaration Exhibit[2] 383 (Avakian) 116:1-9. RMBS are secured instruments;

Handlin Ex. 383 (Avakian) 116:11-17; Ex. 384 (Co) 72:10-14, 73:8-25. For this protection to be meaningful, two things are essential: (1) A party to the Governing Agreement must verify that all Mortgage File documents are received.

Handlin Ex. 383 (Avakian) 120:8-14. (2) If Mortgage File documents are missing or defective, a party must ensure that the defects are cured or, if not, that the affected loans are substituted or repurchased by the Seller. Each Governing Agreement spells out its own

---

[2] Hereinafter, exhibits to the Handlin Declaration are cited as "Handlin Ex. __." Where an exhibit references a deposition transcript or PSA, the deponent or the PSA is identified in parentheses.

repurchase protocol. The repurchase protocols do not depend on occurrence of an EOD. ¶ 29.[3]

Further, the Sellers made R&Ws about the loans' quality and the Sellers' underwriting processes, and agreed to repurchase loans that did not comply with R&Ws or have complete documentation. ¶ 30. In 62 of the Trusts, at least two parties to the transaction (usually the Depositor and Seller) were affiliated with one another, and in 25 Trusts, three or more parties were affiliates. ¶¶ 32-33. That left the Trustee, DB, as the only party across all the Trusts that investors could be sure was unrelated to any other party to the transactions—creating the impression of an independent party to protect Certificateholders' interests and ensure that Sellers honored their obligations.

Plaintiffs, like other Certificateholders, are not parties to the Governing Agreements, and played no role in negotiating them. ¶ 34. Rather, Certificateholders are third-party beneficiaries, and the Governing Agreements emphasize that the Trustee is to act "for the benefit of," and/or "on behalf of," Certificateholders. ¶ 35. Certificateholders are not permitted to sue Sellers directly; the Governing Agreements require Certificateholders to rely on the Trustee to vindicate their rights. ¶ 36. Further, under the Governing Agreements, Certificateholders are unable to direct the Trustee to act unless they control 25% or more of the voting rights in a Trust. ¶ 37. No public source identifies investors in a given Trust, and ███████████████████████████

████████████████████████████████████████████████████ ¶

---

[3] As shown below, **post**-EOD, all Governing Agreements impose upon the Trustee a heightened, "prudent person" fiduciary obligation requiring it to take all available actions to protect investors and to recover what they are owed, including enforcement of repurchase remedies—regardless of whether the Trustee was explicitly assigned that responsibility **pre**-EOD. *See* Handlin Ex. 390.

38. As Trustee, however, DB must act for the benefit of **all** Certificateholders—not just 25%

holders. ¶¶ 39-40.

Before the occurrence of a contractually defined EOD, the Trustee's contractual duties

are as delineated in the Governing Agreements and in applicable law. After the occurrence of an

EOD, and as long as it remains uncured, the Trustee must still comply with its expressly

enumerated duties, and must also satisfy a heightened, "prudent person" fiduciary standard

described in detail below. ¶¶ 41-42.

### D.  The Structure of the Governing Agreements

Overwhelmingly, the PSAs have the same structure and contain substantially similar key

provisions relevant to determining DB's duties as Trustee. The Governing Agreements for the

indenture Trusts have the same characteristics, albeit not always in the same sequence or format.

For purposes of this Motion, the key provisions of the Governing Agreements are as follows:

Article II (Conveyance of Mortgage Loans; Original Issuance of Certificates) first

describes the process for conveying the mortgage loans to the Trusts. Typically, the Seller

conveys the loans to a "Depositor," which then conveys all right, title, and interest in and to the

loans to the Trustee for the benefit of the Certificateholders. Article II identifies the precise

documents/instruments for each mortgage loan, together defined as the "Mortgage File," that are

required to be complete and must be delivered to the Trustee or a Custodian on its behalf. The

Trustee and its Custodian are required to take physical possession of the Mortgage Files and hold

them in trust for the exclusive use and benefit of all current and future Certificateholders. Article

II requires the Trustee, or the Custodian on its behalf, to review each Mortgage File and issue a

final certification of the loans for which the documentation is complete, together with an

exception report identifying Mortgage Files that are missing required documentation. ¶¶ 44-45.

9

Article II also requires that Mortgage File defects be cured, and, if they are not, provides a protocol by which loans with missing or defective Mortgage File documents, or that suffer from a material breach of R&W, must be substituted or repurchased. This repurchase protocol generally identifies the parties responsible, before occurrence of any EOD, for enforcing the repurchase rights, and for repurchasing the breaching or defective loans. Article II states that repurchase is a remedy available to the Trustee on behalf of Certificateholders, and obligates any party discovering a R&W breach (including the Trustee) to give all parties notice. ¶¶ 46-49.

Article III (Administration and Servicing of the Mortgage Loans) describes the role of the Servicer, which services the mortgage loans—*e.g.*, collecting mortgage payments, conveying collections and data about loan status to the Trustee, and, if needed, carrying out foreclosures and maintaining properties the Trust acquires through foreclosure. Article III also identifies Servicers' reporting obligations under the Governing Agreements and applicable law. ¶¶ 50-51.

Article VII (Default) defines the circumstances triggering EODs (sometimes dubbed "Servicer Events of Termination," "Servicing Defaults," etc.) that give rise to the Trustee's heightened, fiduciary obligations described in Article VIII. Article VII also requires a party, usually the Trustee, to give Certificateholders prompt written notice of EODs. ¶¶ 52-53.

Finally, Article VIII (Duties of the Trustee) provides that, upon occurrence of an EOD that has not been cured, the Trustee shall exercise the rights and powers vested in it by the PSA and use the same degree of care and skill in their exercise as a prudent person would under the circumstances in the conduct of that person's own affairs—a clause that appears in all Governing Agreements, whose substance is mandated by federal law, *see* 15 U.S.C. § 77ooo(c), and whose inclusion is required by statute, *see* N.Y. Real Property Law § 126(1). ¶ 54.

**E.  The Defendants**



¶ 55.

¶¶ 56-64.

¶¶ 65-66.

¶¶ 67-68.

¶¶ 69-71.

¶¶ 72-73.

DB performed extensive monitoring that revealed to DB—but not to the outside world—critical deficiencies in the Trusts.

¶¶ 78-80.

¶¶ 81-82.

11



¶ 84. DB admits it never

¶¶ 85-86. DB also admits it never

¶ 87. Further,

¶¶ 88-89.

**F.  The Plaintiffs**

The PL Plaintiffs are special purpose vehicles created under Irish or Cayman law with their principal places of business in Ireland or the Cayman Islands. ¶¶ 90-95. Seven PL Plaintiffs were created to issue their own securities in collateralized debt obligation ("CDO") transactions that closed from 2005-2007. ¶ 96. PL acquired its certificates in the Trusts either through direct market purchases after the CDO closing, or pursuant to asset purchase agreements or similar agreements with WestLB AG (n/k/a Portigon AG) ("WestLB") and related subsequent assignments from WestLB. ¶ 97. PL also has received assignments of the right to sue, to the extent such assignments are necessary, from the CDO trustees. ¶¶ 101-116.

CB is an entity organized under the laws of Germany. ¶ 117. CB's acquisitions and other activities related to its certificates were conducted at and through Commerzbank AG London Branch ("London Branch"). ¶¶ 132-133. CB is the legal successor to all of Dresdner Bank AG's

12

("Dresdner") interests by way of merger as of May 2009, effected by universal succession under the German Transformation Act, with CB the resulting entity. ¶ 118. Dresdner purchased and held 30 certificates before the merger, and CB was the legal successor to those certificates. ¶ 119. Twenty of the certificates held by Dresdner were acquired on August 29, 2008 from Palmer Square 3 Limited ("Palmer 3"), which was a private limited liability company organized under the laws of Ireland. ¶ 120. Palmer 3 transferred all its legal claims to Dresdner at the time of the transfers, as confirmed by Palmer 3's liquidator. ¶ 122. Twenty-two certificates originally were acquired and held in New York by Eurohypo AG New York Branch ("Eurohypo"), a CB affiliate. ¶¶ 123-124. Eurohypo transferred the certificates to London Branch in November 2009. ¶ 125. Eurohypo transferred all its legal claims to CB at the time of the transfers, as confirmed in a Confirmation of Assignment Agreement. ¶ 126. Twenty certificates were transferred from Barrington II CDO Ltd. ("Barrington II"), a Cayman limited company, to CB. Certain certificates were transferred in May and August 2012, and others in 2015 as part of Barrington II's final unwind. ¶ 127. Barrington II assigned its legal claims to CB as memorialized in an Assignment Agreement. ¶ 129. CB, acting through London Branch, later sold certain certificates, while retaining its legal claims with respect to the sold certificates. ¶ 131.

## ARGUMENT

### I.   Legal Standard

Summary judgment is required when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002). A fact is material if it "might affect the outcome of the suit under the governing law," and there is no genuine issue for trial where, considering the record as a whole, a "reasonable jury" could not find in favor of the non-moving party. *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

**II.     The Undisputed Material Facts Establish that EODs Occurred in 73 Trusts**

Under the Trusts' Governing Agreements, upon the occurrence of an EOD, and until the

EOD is cured, DB has a fiduciary duty to act prudently to maximize recoveries for investors (like

Plaintiffs) by exercising all of DB's rights as Trustee:

> In case an Event of Default has occurred and remains uncured, the Trustee shall
>
> exercise such of the rights and powers vested in it by this Agreement, and use the
>
> same degree of care and skill in their exercise as a prudent person would exercise
>
> or use under the circumstances in the conduct of such person's own affairs.

Handlin Ex. 78 (FFML 2005-FF2 PSA) § 8.01; Handlin Ex. 390 (listing substantially similar

language in all Trusts' Governing Agreements); *see Beck v. Mfrs. Hanover Trust Co.*, 218

A.D.2d 1, 12, 632 N.Y.S.2d 520, 527 (1st Dep't 1995) (post-default, bond trustee has a

fiduciary-like duty to "assure" to the greatest extent possible that bondholders will "recover what

they are owed"); *LNC Invs., Inc. v. First Fid. Bank, Nat'l Ass'n*, 935 F. Supp. 1333, 1347

(S.D.N.Y. 1996) ("*Beck* requires an indenture trustee to perform prudently even the more general

obligations in the indenture, and applies to any conduct not specifically prohibited by the

indenture which would enable the investors to secure repayment of the trust certificates."). ██

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*See* Handlin Ex. 393 (Vaughan) 90:1-6; Handlin Ex. 384 (Co) 206:18-207:4.

Plaintiffs assert that numerous types of EODs occurred in the Trusts at issue, triggering

DB's heightened, fiduciary duties. This Motion does not address **all** the EODs Plaintiffs believe

occurred, because, in some instances, disputed issues of material fact may exist. However, as

explained below, for 73 of the 85 Trusts at issue, the undisputed facts establish that at least one EOD occurred. Plaintiffs are entitled to a finding that those EODs occurred as of the dates specified below, and that, from at least those dates forward and as long as the EODs remained uncured, DB was obligated to satisfy its post-EOD duty to exercise all of its rights and remedies as a prudent person would do in the exercise of that person's own affairs.

### A. For 18 Trusts, EODs were triggered by exceeding numerical thresholds

For 18 Trusts, EODs occur when losses and delinquencies exceed specified thresholds:

- Cumulative Loss Percentage ("CL%"): EOD triggered where realized losses on the mortgage loans underlying the Trust divided by the aggregate principal balance of mortgage loans at closing exceeds a specified percentage; and

- Rolling Delinquency Percentage ("RD%"): EOD triggered where, for the average of three preceding months, the percentage of the aggregate principal balance of mortgage loans that are delinquent, in foreclosure, or REO status for a designated period exceeds a specified threshold.[4]

The table below sets forth the 18 Trusts with CL% and RD% EODs and the dates on which the thresholds were exceeded. *See* ¶¶ 141-361.

| Trust | Type of Numerical EOD | Date EODs Occurred |
|---|---|---|
| SVHE 2006-OPT5 | RD% EOD | 10/25/2007 |
| SVHE 2005-OPT3 | RD% EOD | 12/26/2007 |
| SVHE 2005-OPT4 | RD% EOD | 1/25/2008 |
| NHEL 2006-5 | RD% EOD | 2/25/2008 |
| NHEL 2006-6 | RD% EOD | 3/25/2008 |

---

[4] In addition, exceeding the "Realized Loss Percentage" is an EOD in 3 Trusts, but DB did not produce sufficient information to establish when that threshold was first exceeded. Handlin Decl. ¶ 862. Plaintiffs reserve the right to seek an adverse inference at trial.

| Trust | Type of Numerical EOD | Date EODs Occurred |
|---|---|---|
| NHEL 2006-5[5] | CL% EOD | 5/27/2008 |
| SVHE 2006-1 | CL% EOD | 5/27/2008 |
| NHEL 2006-6 | CL% EOD | 6/25/2008 |
| FHLT 2005-2 | CL% EOD | 9/25/2008 |
| NHEL 2007-2 | RD% EOD | 9/25/2008 |
| GSAMP 2005-WMC1 | CL% EOD | 10/27/2008 |
| SVHE 2005-3 | CL% EOD | 112/5/2008 |
| GSAMP 2005-WMC2 | CL% EOD | 12/26/2008 |
| GSAMP 2005-WMC3 | CL% EOD | 1/26/2009 |
| ARSI 2006-W2 | CL% EOD | 3/25/2009 |
| ARSI 2006-W3 | CL% EOD | 4/27/2009 |
| AMSI 2006-R1 | CL% EOD | 5/26/2009 |
| ARSI 2006-M1 | CL% EOD | 7/27/2009 |
| NHEL 2007-2 | CL% EOD | 9/25/2009 |
| ARSI 2006-M3 | CL% EOD | 10/25/2009 |
| FHLT 2005-1 | CL% EOD | 1/25/2011 |



For 7 Trusts, there is no dispute that ███████████████████████████████

████████████████████████████████ ¶¶ 141-179. For the other 11 Trusts, however,

██████████████████████████ In these 11 Trusts, ███████████████████████

████████████████████████ Handlin Ex. 384 (Co) 40:13-42:11, 50:14-20;

Handlin Ex. 393 (Vaughan) 55:4-17. ████████████████████████████

██████.[6] According to TAG Team Leader Ronaldo Reyes (who was DB's main Rule 30(b)(6)

witness), ███████████████████████████████████████████



[5] Because the NHEL Trusts contain multiple numerical EOD triggers, multiple EODs, triggered

by exceeding different thresholds, occurred in those Trusts on different dates.

[6] ████████████████████████████████████████████████████

██████████████████ Handlin Ex. 849 (Ex. 478)—████████████████████

████ Handlin Ex. 706 (Reyes) 332:5-333:18, ████████████████████ Handlin Ex. 707

(Perez 30(b)(6)) 40:7-13, ███████████████████ Handlin Decl. ¶ 861.

████████████████ Handlin Ex. 706 (Reyes) 337:10-338:1.

████████████████████████████████████████████████

████████████████. 98:15-18. For each of these 11 Trusts, the monthly reporting that DB

published indicated that cumulative losses or delinquencies exceeded the levels specified in the

PSAs. ¶¶ 193-362. Yet, DB failed to timely declare at least 14 EODs in these 11 Trusts, often

declaring them a year or more late, in violation of DB's duties under the Governing Agreements.

Handlin Ex. 815 (EOD Notice Duty Chart). Comparing when the EODs occurred with when DB

gave Certificateholders notice demonstrates just how much earlier DB's prudent person duties

arose than DB acknowledged:

| Trust | Cumulative Loss % EOD Threshold Exceeded | Rolling Delinquency % EOD Threshold Exceeded | When DB Gave Notice of EOD | How Long Before DB Declared and Gave Notice of EOD Did DB's Prudent Person Duties Arise? | | |
|---|---|---|---|---|---|---|
| SVHE 2006-OPT5 | | 10/25/2007 | █████ | █████████ | | |
| SVHE 2006-1 | 5/27/2008 | | █████ | █████████ | | |
| NHEL 2006-5 | | 2/25/2008 | █████ | █████████ | | |
| NHEL 2006-6 | | 3/25/2008 | █████ | █████████ | | |
| FHLT 2005-2 | 9/25/2008 | | █████ | █████████ | | |
| NHEL 2006-5 | 5/27/2008 | | █████ | █████████ | | |
| NHEL 2006-6 | 6/25/2008 | | █████ | █████████ | | |
| SVHE 2005-3 | 11/25/2008 | | █████ | █████████ | | |
| NHEL 2007-2 | | 9/25/2008 | █████ | █████████ | | |
| SVHE 2005-OPT4 | | 1/25/2008 | █████ | █████████ | | |
| GSAMP 2005-WMC2 | 12/26/2008 | | █████ | █████████ | | |
| SVHE 2005-OPT3 | | 12/26/2007 | █████ | █████████ | | |
| NHEL 2007-2 | 9/25/2009 | | █████ | █████████ | | |
| FHLT 2005-1 | 1/25/2011 | | █████ | █████████ | | |

¶¶ 193-361. The Court should find that these EODs occurred as of the specified dates, triggering

DB's post-EOD duties.

**B.  For 7 Trusts, EODs occurred when Servicers were downgraded**

Several PSAs specify that an EOD occurs when a Servicer's performance rating is

17

reduced below a specified level. For example, the SABR 2007-NC2 PSA defines as an EOD "Fitch reduc[ing] its servicer rating of the Servicer to 'RPS2-' or lower, Moody's reduc[ing] its servicer rating of the Servicer to 'SQ3' or lower, or Standard & Poor's reduc[ing] its servicer rating of the Servicer to 'Average' or lower." ¶ 367. For 7 Trusts, the Servicers' ratings were downgraded, triggering 19 EODs of which DB gave or received notice:

| Trust | Rating Agency | Downgrade/EOD Date |
|---|---|---|
| MSAC 2005-HE7 | Fitch | 12/20/2011 |
| | Moody's | 10/22/2014 |
| | S&P | 10/28/2014 |
| MSAC 2005-NC2 | Fitch | 12/20/2011 |
| | Moody's | 10/22/2014 |
| | S&P | 10/28/2014 |
| MSAC 2006-HE5 | Fitch | 12/20/2011 |
| | Moody's | 10/22/2014 |
| | S&P | 10/28/2014 |
| MSAC 2006-NC3 | Fitch | 12/20/2011 |
| | Moody's | 10/22/2014 |
| | S&P | 10/28/2014 |
| MSHEL 2005-4 | Fitch | 12/20/2011 |
| | Moody's | 10/22/2014 |
| | S&P | 10/28/2014 |
| MSHEL 2006-3 | Fitch | 12/20/2011 |
| | Moody's | 10/22/2014 |
| | S&P | 10/28/2014 |
| SABR 2007-NC2 | Fitch | 12/20/2011 |

¶¶ 369-427. The Court should find that the EODs occurred as of the specified dates, following which DB was required to satisfy its post-EOD duties.

### C.  For 8 Trusts, EODs were triggered by untimely compliance documents

All Governing Agreements for the Trusts require that, no later than specified deadlines, each Servicer provide (1) its own annual statement of compliance ("ASOC") and (2) an independent public accountant's attestation of the Servicer's compliance. ¶ 428. In the ASOC, an officer of the Servicer must state

> that (i) a review of the activities of such Servicer during the preceding calendar year
> and of performance under this Agreement or a similar agreement has been made
> under such officers' supervision, and (ii) to the best of such officers' knowledge,
> based on such review, such Servicer has fulfilled in all material respects all of its
> obligations under this Agreement throughout such year, or, if there has been a default
> in the fulfillment of any such obligation, specifying each such default known to such
> officers and the nature and status thereof.

*E.g.*, Handlin Ex. 107 (MSAC 2005-HE7 PSA) § 3.22. The accountant must attest that the Servicer's management has asserted compliance "with certain minimum residential mortgage loan servicing standards . . . with respect to the servicing of residential mortgage loans during the most recently completed calendar year," and that, based on the accountant's examination in accordance with accounting industry standards, the Servicer's representation of compliance "is fairly stated in all material respects, subject to such exceptions and other qualifications that may be appropriate." *Id.* § 3.23. ¶ 429.

For 8 Trusts, untimely delivery of these compliance documents, whether "material" or not, is defined as an EOD—yet DB never declared any of these EODs.

In the Governing Agreements for 7 of these Trusts, Article III ("Administration and Servicing of Mortgage Loans") sets the compliance document deadlines, and Article VII ("Default") contains the EOD trigger. For example, under §§ 3.22 and 3.23 of the MSAC 2005-HE7 PSA, the ASOC and attestation must be delivered to DB "on or before March 15th of each calendar year"; and, under § 7.01(b), an EOD is triggered by

> any failure on the part of the Servicer duly to observe or perform in any material
> respect any other of the covenants or agreements on the part of such Servicer set

forth on this Agreement which continues unremedied for a period of sixty (60) days

(except that **such number of days shall be ten in the case of a failure to observe**

**or perform any of the obligations set forth in Sections 3.22, 3.23** or 8.12) after

the earlier of (i) the date on which written notice of such failure, requiring the same

to be remedied, shall have been given to such Servicer by the Depositor or by the

Trustee, or to such Servicer, the Depositor and the Trustee by Certificateholders

entitled to at least 25% of the Voting Rights in the Certificates and (ii) actual

knowledge of such failure by a Servicing Officer of such Servicer.

Handlin Ex. 107 (MSAC 2005-HE7 PSA) § 7.01(b) (emphasis added). Six other Trusts contain

substantially similar language. ¶¶ 433-453. Although other nonperformance triggers an EOD

only if the Servicer fails "to observe or perform in any **material** respect," timely reporting has no

materiality requirement. If a Servicer "fail[s] to observe or perform **any of the obligations set**

**forth in Sections 3.22 [or] 3.23**" (emphasis added)—*i.e.*, if a Servicer or accountant fails to

provide the ASOC required by § 3.22 or attestation required by § 3.23 when due, and the lateness

is not cured within 10 days—an EOD occurs, entitling DB to terminate the Servicer. ¶¶ 433-452.

In an eighth Trust, FHLT 2006-1, PSA § 3.22(i) provides that a Servicer's failure to

deliver a required compliance document, not cured within ten calendar days, results in an EOD:

**Any failure by the Servicer**, any Sub-Servicer or any Subcontractor **to deliver**

**any information, report, certification or accountants' letter when and as**

**required under Section 3.20 or Section 3.21**, including (except as provided

below) any failure by the Servicer to identify any Subcontractor "participating in

the servicing function" within the meaning of Item 1122 of Regulation AB, **which**

**continues unremedied for ten (10) calendar days after the date on which such**

20

**information, report, certification or accountants' letter was required to be delivered shall constitute a Servicer Event of Termination**, and shall entitle the Trustee (at the direction of the Depositor), to terminate the rights and obligations of the Servicer under this Agreement without payment (notwithstanding anything in this Agreement to the contrary) of any compensation to the Servicer; provided that to the extent that any provision of this Agreement expressly provides for the survival of certain rights or obligations following termination of the Servicer as servicer, such provision shall be given effect.

Handlin Ex. 11 (FHLT 2006-1 PSA) § 3.22(i) (emphasis added).

The following untimely deliveries of compliance documents constituted EODs. ¶¶ 429-459.

| Trust & Provision | Servicer | Deadline | Cure Period | Last Date Before EOD Is Triggered | Date Compliance Document Received | # of Days Beyond Deadline | # of Days Beyond Expiration of Cure Period |
|---|---|---|---|---|---|---|---|
| FHLT 2006-1 §§ 3.20 & 3.21 | Fremont Investment & Loan | 3/1/2007 | 10 days | 3/11/2007 | ███ | █ | █ |
| GSAMP 2005-WMC1 § 3.22 | Litton Loan Servicing | 3/15/2011 | 10 days | 3/25/2011 | ███ | █ | █ |
| GSAMP 2005-WMC2 § 3.22 | Litton Loan Servicing | 3/15/2011 | 10 days | 3/25/2011 | ███ | █ | █ |
| GSAMP 2005-WMC3 § 3.22 | Litton Loan Servicing | 3/15/2011 | 10 days | 3/25/2011 | ███ | █ | █ |
| MSAC 2005-HE7 § 3.22 | Countrywide Home Loans Servicing, LP | 3/15/2007 | 10 days | 3/25/2007 | ███ | █ | ███ |
| MSAC 2006-HE6 § 3.22 | Countrywide Home Loans Servicing, LP | 3/5/2009 | 9 days | 3/14/2009 | ███ | █ | ███ |

| Trust & Provision | Servicer | Deadline | Cure Period | Last Date Before EOD Is Triggered | Date Compliance Document Received | # of Days Beyond Deadline | # of Days Beyond Expiration of Cure Period |
|---|---|---|---|---|---|---|---|
| MSHEL 2007-1 § 3.22 | Saxon Mortgage Services, Inc. | 3/15/2009 | 0 days | 3/15/2009 | ███ | ██ | ██ |
| SVHE 2006-1 § 3.20 | Litton Loan Servicing | 3/15/2011 | 10 days | 3/25/2011 | ███ | ██ | ██ |

DB knew the compliance deadlines, and knew when they were missed. ████

████████████████████████████████ *See* Handlin Ex. 779 (Reyes 30(b)(6))

233:7-23; Handlin Ex. 383 (Avakian) 53:3-9; Handlin Ex. 405 (McNulty) 26:20-27:22. ██

████████████████████████████████████ *See*

Handlin Ex. 378 (Reyes) 39:6-19; Handlin Ex. 405 (McNulty) 88:17-89:6; Handlin Ex. 389

(Pilapil) 42:7-43:6, 54:3-7; Handlin Ex. 746 (Wannenmacher) 107:21-108:10, 153:11-154:22. ██

█████████████████████████████████████

█████████████████████████████████ Handlin Ex.

780 (Ex. 135) at DBNTC PHOENIX LIGHT 00000398618; Handlin Ex. 746 (Wannenmacher)

272:11-273:21. █████████████████████████████

████ *See* Handlin Ex. 781 (Ex. 372) at 426824 ("Servicer Event of Default if not delivered

per Section 3.21.").

The clock for when a late ASOC triggers an EOD begins to run from "the earlier of" the

date DB gave the Servicer "written notice of such failure, requiring the same to be remedied,"

and "actual knowledge of such failure by a Servicing Officer of such Servicer." Handlin Ex. 107

(MSAC 2005-HE7 PSA) § 7.01(b). DB had actual knowledge ████████████████

██████, *see* Handlin Ex. 779 (Reyes 30(b)(6)) 245:5-11, 245:25-246:24; Handlin Ex. 378

(Reyes) 171:14-20, starting the EOD clock. If an ASOC was late, ████████████████

22

████████████████████ *See* Handlin Ex. 389 (Pilapil) 43:8-44:15, 67:23-68:14; Handlin Ex. 383 (Avakian) 58:22-59:10. Under the prevention doctrine, DB cannot rely on its own failure to give this notice to claim that no EOD was triggered. *See In re Bankers Tr. Co.*, 450 F.3d 121, 128 (2d Cir. 2006) (prevention doctrine applies where party seeking to rely on nonexistence of condition precedent (i) had a duty to bring about the condition precedent or (ii) actively frustrated its occurrence); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Trust Co.*, 172 F. Supp. 3d 700, 715 & n.5 (S.D.N.Y. 2016) ("Deutsche Bank cannot take advantage of its own failure to give notice to the sponsor of the possible breaches of representations and warranties to argue that no Event of Default occurred. The prevention doctrine precludes such a defense. An RMBS Trustee cannot rely on the lack of notice to excuse its own failure to act."). Likewise, as parties to the Governing Agreements, Servicers had actual knowledge of when their ASOCs were due, and that they were late.[7]

These EODs were not cured when the untimely compliance documents finally arrived. The Governing Agreements set the only cure period (and, for one Servicer, specify a zero-tolerance, "zero days" cure period). When that period passes, the EOD occurs. By definition, an EOD triggered by delivery of an ASOC **after the cure period expired** cannot be undone by eventual delivery **even longer after the cure period expired**. Once Servicer compliance documents were late enough to trigger an EOD, they could not retroactively be rendered timely. *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884, 890 (2d Cir. 1990) ("Where the parties have expressly agreed that the availability of a cure period shall be temporally limited, the court does not give effect to the parties' intention by removing the time limitation."). The Second

---

[7] Officers of the Servicers signed the late ASOCs, so they knew they were in default. ¶ 460.

Circuit strictly construes and applies cure periods: "We concede without apology that we believe contract provisions stating 60-day periods mean 60 days rather than 60 days plus an additional period calculated by the length of the chancellor's foot." *Id.* at 891. Accordingly, Plaintiffs are entitled to judgment that EODs were triggered for these 8 Trusts on the dates indicated and were not cured, subjecting DB to its post-EOD duties.

### D.  In 73 Trusts, DB failed to declare EODs triggered by Servicer misconduct relating to REO properties and foreclosures

The overwhelming majority of Trusts define as an EOD a Servicer's or Master Servicer's failure to perform, in any material respect, any of its covenants, obligations, or agreements under the Governing Agreements, which failure continues unremedied for some specified number of days. This definition commonly appears in § 7.01(a)(ii) of PSAs. ███████████████ ████████████████████ Handlin Ex. 387 (Reyes 30(b)(6)) 124:20-23; Handlin Ex. 384 (Co) 55:19-56:1. Based on the undisputed facts, however, such EODs have occurred in at least 73 Trusts. ████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ ¶¶ 486-487. ████████████████████████████ ████████████████████████████████████████████ *See* Handlin Ex. 384 (Co) 108:18-109:3 & Handlin Ex. 850 (Ex. 491); Handlin Ex. 384 (Co) 133:14-22, 151:2-13. █████████████████████████████████████ █████████████████████████████████████████ ██████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████

Handlin Ex. 561 at DBNTC_COMMERZBANK_00000894785 (boldface and underscore in

original). ███████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████

*Id*. at 00000894783 (italics in original).

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████

████████████ As a result, EODs were triggered in at least 73 Trusts, yet DB never declared them.

From the date the EODs occurred, DB had heightened, prudent person duties for these Trusts.

**Chicago.** ███████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

██████████ ¶ 494. ██████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████ ¶ 495. ████████████

████

                ██████████████████████████████

                ██████████████████████████████

                ██████████████████████████████

                ██████████████████████████████

                ██████████████████████████████

                ████████████

                ██████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

Handlin Exs. 563, 565, 566, 567, 582, 590, 592 and 593 (boldface and underscore in original).

█████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████

| Servicer | Trusts Listed on Both Notices | Date of First Notice | Date of Second Notice | Days Between Notices |
|---|---|---|---|---|
| AHMSI | AMSI 2006-R1 | | | |
| | ARSI 2006-M1 | ████ | ████ | ██ |
| | ARSI 2006-M3 | | | |
| Wells Fargo | MSIX 2006-2 | ████ | ████ | ██ |

¶¶ 497-501.

**New York.** ███████████████████████████████████

████████████████████████████████████████

██████████████████████[8]██████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

---

[8] Handlin Exs. 789 and 780 (DBNTC_COMMERZBANK_00001015857 &

DBNTC_COMMERZBANK_00001015865).

| Servicer | Trusts Listed on Both Notices | Date of First Notice | Date of Second Notice | Days Between Notices |
|---|---|---|---|---|
| Ocwen | SABR 2007-NC2 | ███████ | ███████ | ███ |
| Wells Fargo | FFML 2006-FF11 | | | |
| | FHLT 2006-1 | | | |
| | FHLT 2006-3 | ███████ | ███████ | ███ |
| | MSAC 2006-WMC2 | | | |
| | MSHEL 2006-3 | | | |
| | MSIX 2006-1 | | | |
| Impac | IMSA 2006-3 | ███████ | ███████ | ███ |
| | IMSA 2006-4 | | | |
| BAC | FFML 2006-FF13 | ███████ | ███████ | ███ |
| | MSAC 2006-HE6 | | | |
| BAC | FFML 2006-FF13 | | | |
| | MSAC 2006-HE6 | ███████ | ███████ | ███ |
| | MSAC 2007-HE1 | | | |
| | MSAC 2007-HE5 | | | |
| Ocwen | NHEL 2006-5 | ███████ | ███████ | ███ |
| AHMSI | ARSI 2006-M1 | | | |
| | ARSI 2006-M3 | ███████ | ███████ | ███ |
| | ARSI 2006-W3 | | | |
| | SVHE 2006-OPT5 | | | |
| BAC | MSAC 2006-HE7 | | | |
| | MSAC 2007-HE1 | ███████ | ███████ | ██ |
| | SABR 2007-NC2 | | | |

¶¶ 502-519. ███████████████████████████████████████

████████████████████████████████████████████████████ Handlin

Ex. 803 (Ex. 498) at DBNTC_COMMERZBANK_00000873698; Handlin Ex. 384 (Co) 163:17-

164:16.

**Milwaukee.** ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████[9] ██████████

███████████████████████████████████████████████████

███████████████████████████████████████ ¶¶ 521-526.

| Servicer | Trusts listed on both notices | Date of First Notice | Date of Second Notice | Days Between Notices |
|---|---|---|---|---|
| Litton | FHLT 2006-2 | ████ | ████ | ██ |
| AHMSI | ARSI 2006-M1 | | | |
| | ARSI 2006-M3 | ████ | ████ | ██ |
| | ARSI 2006-W2 | | | |

**Los Angeles.** ████████████████████████

████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████

████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

Handlin Ex. 568 at 00004359681 (boldface and underscore in original). On May 4, 2011, the

State of California sued DB for the violations. ¶ 527. ████████████████████

███████████████████████████████

---

[9] Handlin Exs. 804-805 (DBNTC_COMMERZBANK_00000489089,

DBNTC_COMMERZBANK_00000489095).



[redacted] ¶ 529. [redacted] Handlin Ex. 811; ¶¶ 530-531. [redacted] ¶ 532. [redacted] Handlin Ex. 812 (Ex. 496) at 3717868. [redacted] *Id.* at 3717868-69; Handlin Ex. 384 (Co) 154:10-155:9.

[redacted] Handlin Ex. 384 (Co) 154:1-9. [redacted] ¶¶ 527-529.

* * *

[redacted] Handlin Ex. 384 (Co) 111:18-23. [redacted]

[redacted]

Handlin Ex. 384 (Co) 190:6-191:12 (emphasis added).

Under MSAC 2006-HE7 PSA § 7.01(b), an EOD is triggered by

any failure on the part of the Servicer duly to observe or perform in any material

respect any other of the covenants or agreements on the part of the Servicer set forth

in this Agreement which continues unremedied for a period of sixty (60) days

. . . after. . . the date on which written notice of such failure, requiring the same to

be remedied, shall have been given to the Servicer by the Depositor or the Trustee. . . .

¶ 540. The Governing Agreements for 72 other Trusts contain analogous provisions. ¶ 540. 

¶ 541.

¶ 542. The Servicers' violations went uncured between 66 days and 39 months (perhaps longer) after DB gave notice and demanded remediation. ¶ 543. The Servicers' failures to cure exceeded the Governing Agreements' cure periods, which are no longer than 60 days. ¶ 544. Because DB admits that failing to comply with law in connection with REO properties and foreclosures **breaches** the Governing Agreements, the Servicers necessarily failed duly to observe or perform any of their covenants or agreements in a "material respect." *See Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l Ass'n*, 2017 WL 945099, at *8 (S.D.N.Y. Mar. 10, 2017). All requirements for an EOD under this provision are satisfied. Therefore, the Court should rule that these EODs occurred in 73 Trusts, subjecting DB to prudent person duties.

### III.   DB Breached Its Prudent Person Obligations, Because DB's Contentions as to How It Satisfied those Duties Fail as a Matter of Law

Although determining prudence is often fact-intensive, there are times when prudence "will dictate one and only one course." *LNC Invs., Inc. v. First Fid. Bank, Nat'l Ass'n*, 1997 WL 528283, at *17 (S.D.N.Y. Aug. 27, 1997). This is such a time. The question here is not what course among many available DB should have undertaken to discharge its prudent person

duties—but whether DB could satisfy those duties, as DB contends, **by taking no action at all**. Except for certain Trusts as to which DB filed post-bankruptcy proofs of claim (the "Proof of Claim Trusts"), ¶ 545, the facts are undisputed that DB: (i) did not educate or inform its employees about the heightened prudent person duties imposed on DB post-EOD; (ii) took no deliberative action in response to EODs; (iii) sat on its hands after sending out EOD notices; and (iv) did nothing differently after EODs occurred than it did before. ¶¶ 546-549. This was not the result of carefully considering and deciding that doing nothing would best protect Certificateholders' interests and maximize their recoveries. Instead, DB abdicated all responsibility, embracing the previously rejected do-nothing approach of Great Depression-era securitization trustees. *See* Preliminary Statement, *supra*. "A prudent man does not assume a totally passive, willfully blind role in the management of his own property." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 578 (S.D.N.Y. 2015), *aff'd* 873 F.3d 85 (2d Cir. 2017).

DB contends it satisfied its prudent person duties because ██████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████ *See* Handlin Exs. 813-814 at DB Resp. to Interrog. No. 13 (Defs.' Suppl. Objs. & Resps. to Pls.' First Set of Interrogs., Nov. 2, 2018). Each of DB's rationales fails.

### A.  Merely sending notice of EODs cannot satisfy DB's post-EOD duties

DB sent Certificateholders notice of EODs because it was mandated by the "Notification to Certificateholders" PSA provision. *See, e.g.*, Handlin Ex. 78 (FFML 2005-FF2 PSA) § 7.03(b). The Governing Agreements for 60 Trusts contain similar clauses obligating DB to

notify Certificateholders of EODs. ¶ 551. DB's witnesses acknowledged that ████████

████████████████████████████████████ *See* Handlin Ex. 378 (Reyes) 89:2-

7; Handlin Ex. 383 (Avakian) 45:23-46:4. The requirement that DB send notice of EODs,

typically found in Article VII, is distinct from DB's separately stated prudent person duty, which

typically appears in § 8.01 of the Governing Agreements. ¶ 556. Fulfilling one, ministerial

contractual obligation triggered by an EOD (giving notice) does nothing to satisfy a second,

substantive duty created by the EOD (taking the actions a prudent person would to protect its

own affairs).

During the pendency of an EOD, DB is duty bound to "exercise such of the rights and

powers vested in it by [the Governing Agreements], and use the same degree of care and skill in

their exercise as a prudent person would exercise or use under the circumstances in the conduct

of such person's own affairs." ¶ 557. That plain language does not condition DB's duty of

prudence upon receipt of a direction from Certificateholders after notice. Doing so would shift

the prudent person obligation onto Certificateholders, which would be antithetical to the

provision's purpose: to ensure that investors had an "active and executive" advocate during an

EOD. *See* Handlin Ex. 852 § 6-1, at 250 ("under the special conditions which prevail during the

continuance of an event of default, the functions of the Trustee may become active and executive

as circumstances require in order to protect the interests of the debentureholders"). The prudent

person obligation falls on the Trustee, not Certificateholders. When a house is ablaze, a trustee

holding a fire hose cannot refuse to turn on the water until most of the residents have told it to do

so—especially if it hasn't told the residents it intends to let the house burn down if they don't

speak up.

**B. DB's contention that doing nothing besides providing notice of EOD was prudent fails as a matter of law**

While DB was under a prudent person standard of care, indisputably, it knew, among other things, that: (i) it received notices that thousands of loans in the Trusts breached their R&Ws, *see* Section V, *infra*; (ii) thousands more Trust loans lacked required documentation, *see* Section IV, *infra*; and (iii) Servicers for the Trusts were breaching their duties, *see* Section II.D, *supra*. "A trustee will not be held liable for a mere error in judgment, so long as the trustee's decision was the result 'of careful and informed deliberation.'" *LNC Invs.*, 1997 WL 528283, at *17 (citing *In re Lincoln First Bank*, 223 A.D.2d 20, 27, 643 N.Y.S.2d 972, 977 (4th Dep't 1996), and quoting *Stark v. U.S. Trust Co. of N.Y.*, 445 F. Supp. 670, 680 (S.D.N.Y.1978)). Here, however, the undisputed facts establish that DB's inaction after declaring EODs was not the result of "careful and informed deliberation" or "an informed judgment." *Id.* To the contrary, DB's employees charged with administration of the Trusts testified unanimously ████████████ ████████████████████████████████████████████████████████████ ¶¶ 560-573.[10]

---

[10] *See* Handlin Ex. 404 (Luu) 126:14-127:14 (████████████████████████████ ████████████████████ ), 184:15-185:18 (████████████████████████████████ ████████████████████ ), 235:22-236:3 (████████████████████████████ ████████ ), 249:12-252:19 (████████████████████████████ ████████████████████████████████████████ ); Handlin Ex. 406 (Vieta) 104:5-16 (████████████████████████████████████████ ████ ), 228:5-229:2 (████████████████████████████████████



Handlin Ex. 384 (Co) 204:9-16, 206:18-207:4; Handlin Ex. 393 (Vaughan) 85:8-14, 90:1-6, 268:1-19.

Handlin Ex. 384 (Co) 208:10-18.

Handlin Ex. 393 (Vaughan) 90:1-91:3.[11]

); Handlin Ex. 405 (McNulty) 122:14-20 ( ), 139:16-21 ( ), 153:10-15 ( ); Handlin Ex. 389 (Pilapil) 27:14-19 ( ); Handlin Ex. 383 (Avakian) 47:7-48:13 ( ); Handlin Ex. 746 (Wannenmacher) 181:10-15 ( ).

[11]

Handlin Ex. 393 (Vaughan) 94:9-14.



Handlin Ex. 378 (Reyes) 124:22-125:15.

Handlin Ex. 779 (Reyes 30(b)(6)) 170:14-171:21 &
Ex. 35 (NHEL 2006-5 PSA) § 8.01.

[12] *See* Handlin Ex. 404 (Luu) 125:11-25

); Handlin Ex. 406 (Vieta) 101:22-102:9

); Handlin Ex. 397 (Benvenuto) 28:8-14, 44:23-45:8
(                                                                                    ),
102:18-21 (

); Handlin Ex. 389 (Pilapil) 27:20-28:1 (

); Handlin Ex. 383 (Avakian) 46:6-16
(

); Handlin Ex. 746 (Wannenmacher) 181:4-9 (

).



Handlin Ex. 779 (Reyes 30(b)(6)) 173:8-174:4; 175:20-176:2.

*Id.* 174:5-175:3.

Handlin Ex. 394 (                              ); Handlin Ex. 393 (Vaughan) 94:16-95:1; Handlin Ex. 384 (Co) 241:2-8.

DB's post-EOD conduct regarding the Proof of Claim Trusts underscores that DB acted imprudently by doing nothing in the other Trusts. In the Proof of Claims Trusts, DB, without first requesting or receiving any direction or indemnity, submitted bankruptcy proofs of claim and pursued repurchase of loans that breached R&Ws. *See* Handlin Ex. 384 (Co) 199:3-11, 201:6-13, 217:24-218:5; Handlin Ex. 393 (Vaughan) 216:19-25, 266:1-20, 267:7-25; Handlin Ex. 823 (Ex. 486) (Co July 25, 2017 dep. tr. from *Royal Park Invs. v. Deutsche Bank*) at 168:6-172:6.

Handlin Ex. 823 (Ex. 486) at 172:2-24 (emphasis added).

Handlin Ex. 384 (Co) 201:14-202:1. Of course, the prudent person standard is not triggered solely by bankruptcy. If an EOD triggered by a bankruptcy filing required DB to pursue repurchase claims without first getting direction or indemnity, so did every other EOD.



Handlin Ex. 384 (Co) 217:24-218:17 (emphasis added). ██████████████████ An

EOD is an EOD, and prudence is prudence. Just as the prudent person standard resulting from a

bankruptcy-triggered EOD required DB to pursue repurchase remedies, without getting direction

or indemnity, so too did that identical standard resulting from every other EOD.

████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████ Handlin Ex. 393 (Vaughan) 217:14-218:1.

████████████████████████████████████████

██████████████████████████████████████ *Id.* at 218:2-25.

In sum, DB's "do-nothing" defense to Plaintiffs' post-EOD claims fails because DB

admittedly did not exercise informed judgment, and its uninformed inaction was inherently

40

imprudent—as confirmed by DB's conduct regarding the Proof of Claims Trusts.

### C. DB's "consultation with counsel" cannot justify its failure to act because DB waived the "advice of counsel" affirmative defense

DB has abandoned its advice of counsel defense. *See Commerzbank* ECF 117 at 2 ("



); Phoenix Light ECF 231 at 2 (same).

Consequently, DB forfeited any right to defend against the claim that it breached its prudent

person duties by asserting that it satisfied those duties by seeking or relying on the advice of

counsel. *See Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.*, 2017 WL 9802844, at *6

(S.D.N.Y. Sept. 15, 2017); *Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l Ass'n*, 2017 WL

9538170, at *2 (S.D.N.Y. May 8, 2017).

On these facts, the Court should rule that DB breached its duty to act as a prudent person

for the 47 Trusts as to which EODs occurred and that are not Proof of Claim Trusts.[13] ¶ 611.

Phase 2 discovery and trial will determine the damages from DB's breaches of its post-EOD

duties.

### IV. DB Knew that the Sellers Failed to Cure Mortgage File Exceptions for the Loans Identified in the Document Exception Reports Linked to Exhibit 583

---

[13] Whether DB breached its post-EOD duties for the Proof of Claim Trusts remains for trial.

██████████████ ¶ 612-629. ████████████████████████████████████

██████████████████████████████████ Handlin Ex. 378 (Reyes) 144:12-17. ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ *Id.*

144:18-145:3. ████████████████████████████████████████████████

██████████████████████████████████ Handlin Ex. 387 (Reyes 30(b)(6)) 52:8-16,

94:6-95:14, 199:11-23. ████████████████████████████████████████,

Handlin Ex. 404 (Luu) 150:16-151:22, ██████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ ¶ 930. ████████████████████████████

██████████████████████████████████████████████████████████

███████ ¶¶ 612-629.

The chart below identifies ████████████████████████████████████████

████ *See also* ¶¶ 630-704. Exhibit 583 lists ████████████████████████████

████████████████████████████[14] Because there is no dispute that DB was aware of these

outstanding exceptions as of the date of the relevant letter, Plaintiffs are entitled to judgment as

to DB's knowledge of the defects. This will streamline the issues to be presented at trial, as the

---

[14] Of these, DB produced ████████████████████████████████████████████ for 7

Trusts in 2010 and 6 Trusts in 2011. ¶¶ 705-707.

factfinder will need to determine only whether DB breached its duties with respect to ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ and the damages resulting from the breaches.[15]

| Trust | Date of Last | | Trust | Date of | |
|---|---|---|---|---|---|
| AABST 2006-1 | | | MLMI 2007-MLN1 | | |
| AHM 2006-1 | | | MMLT 2005-2 | | |
| AMSI 2006-R1 | | | MSAC 2005-HE7* | | |
| ARIS 2006-M1 | | | MSAC 2005-NC2 | | |
| ARSI 2006-M3 | | | MSAC 2006-HE5 | | |
| ARSI 2006-W2 | | | MSAC 2006-HE6 | | |
| ARSI 2006-W3* | | | MSAC 2006-HE7* | | |
| ECR 2005-3 | | | MSAC 2006-HE8 | | |
| FFML 2005-FF2 | | | MSAC 2006-NC2 | | |
| FFML 2005-FFH3 | | | MSAC 2006-NC3 | | |
| FFML 2006-FF8 | | | MSAC 2006-NC5* | | |
| FHLT 2005-1 | | | MSAC 2006-WMC2 | | |
| FHLT 2005-2 | | | MSAC 2007-HE1* | | |
| FHLT 2006-1 | | | MSAC 2007-HE2* | | |
| FHLT 2006-2 | | | MSAC 2007-NC1 | | |
| FHLT 2006-3 | | | MSAC 2007-NC4* | | |
| GSAA 2005-10 | | | MSHEL 2005-4 | | |
| GSAA 2006-15 | | | MSHEL 2006-3 | | |
| GSAA 2006-16 | | | MSHEL 2007-1 | | |
| GSAA 2006-17 | | | MSHEL 2007-2 | | |
| GSAA 2007-4 | | | MSIX 2006-1 | | |
| GSAMP 2005-HE4 | | | MSIX 2006-2* | | |
| GSAMP 2005-WMC1 | | | NHEL 2006-5 | | |
| GSAMP 2005-WMC2 | | | NHEL 2006-6 | | |
| GSAMP 2005-WMC3 | | | NHEL 2007-2 | | |
| GSAMP 2006-FM3 | | | SABR 2007-NC2 | | |
| GSAMP 2006-S4 | | | SAST 2005-2 | | |
| HVMLT 2006-3 | | | SAST 2006-3 | | |
| HVMLT 2007-2 | | | SAST 2007-1 | | |

---

[15] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ This Motion addresses only ▮▮▮▮▮▮▮▮, as indicated, but

Plaintiffs reserve the right at trial to introduce and rely upon ▮▮▮▮▮▮▮▮.

| Trust | Date of | | Trust | Date of | |
|-------|---------|--|-------|---------|--|
| IMM 2005-7 | | | SAST 2007-2 | | |
| IMM 2005-8 | | | SVHE 2005-3 | | |
| IMM 2007-A | | | SVHE 2005-OPT3* | | |
| IMSA 2006-3 | | | SVHE 2005-OPT4 | | |
| IMSA 2006-4 | | | SVHE 2006-1* | | |
| IXIS 2005-HE3* | | | SVHE 2006-EQ1* | | |
| IXIS 2006-HE2 | | | SVHE 2006-NLC1 | | |
| IXIS 2006-HE3 | | | SVHE 2006-OPT5 | | 16 |
| IXIS 2007-HE1* | | | | | |

## V. DB Had Pre-EOD Duties to Enforce Repurchase of Loans that Breached R&Ws and that Lacked Required Mortgage File Documents

As discussed above, after an EOD, DB had to prudently pursue remedies, including the repurchase of loans that breached R&Ws or lacked required Mortgage File documents. Plaintiffs also contend DB was obligated, prior to an EOD, to enforce the repurchase protocol for such loans. For many of the Trusts, DB's duties regarding pre-EOD enforcement can be determined as a matter of law—and already have been, by another Court in this District. In *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 439020 (S.D.N.Y. Feb. 3, 2016), Judge Nathan considered language identical to that at issue in this case—sometimes from the very Trusts on which Plaintiffs are suing—and determined DB's duties. Having previously litigated and lost those issues, DB is collaterally estopped from contesting them here. To streamline the issues for



16

¶¶ 630-707.

trial, this Motion focuses on pre-EOD duties that DB is precluded from contesting.

**A.  For 40 Trusts, DB had the pre-EOD duty to enforce the repurchase protocol for loans with R&W violations of which DB had knowledge**

In 40 Trusts, Article II of the Governing Agreements expressly obligates DB to enforce the repurchase protocol pre-EOD. An example of this provision is SAST 2007-2 PSA § 2.5:

> Section 2.5 <u>Execution and Delivery of Certificates</u>.
>
> The Trustee acknowledges the transfer and assignment to it of the Trust Fund and, concurrently with such transfer and assignment, has executed and delivered to or upon the order of the Depositor, the Certificates in authorized Denominations evidencing directly or indirectly the entire ownership of the Trust Fund. **The Trustee agrees to hold the Trust Fund and exercise the rights referred to above for the benefit of all present and future Holders of the Certificates and to perform the duties set forth in this Agreement to the best of its ability, to the end that the interests of the Holders of the Certificates may be adequately and effectively protected.**

Handlin Ex. 39 (SAST 2007-2 PSA) § 2.5 (emphasis added).[17] This provision does not name any rights held by the Trustee. However, preceding subsections of Article II describe the rights assigned to the Trustee by the Depositor and the repurchase protocol, identifying that protocol as a remedy available to the Trustee on behalf of Certificateholders. Section 2.1 says the Mortgage

---

[17] Several variants of this provision conclude after "for the benefit of all present and future Holders of the Certificates," but the obligation to "exercise the rights referred to above" is common to all 40 Trusts. ¶¶ 709-883.

Files for all loans are conveyed to the Trustee "for the benefit of the Certificateholders"; in

§ 2.3(c), the Depositor assigns to the Trustee, "for the benefit of Certificateholders," its rights to

the R&Ws applicable to the loans, then sets out the repurchase protocol for loans with R&W

breaches; § 2.3(c) further states that "the obligation under this Agreement of each Seller to cure,

repurchase or replace any Mortgage Loan as to which a breach has occurred and is continuing

shall constitute the sole remedy respecting such breach available to Certificateholders or the

Trustee on their behalf"; § 2.3(c) ends by stating that the R&Ws made as to the loans "shall

survive delivery of the respective Mortgage Files to the Trustee or the Custodian for the benefit

of the Certificateholders." ¶¶ 879-883. And, § 2.4 ("Delivery of Opinion of Counsel in

Connection with Substitutions"), which immediately precedes the "rights referred to above"

provision, does not describe any rights of the Trustee, so § 2.5 cannot just refer to § 2.4. Thus,

§ 2.5's mandate that the Trustee "exercise the rights referred to above for the benefit of all

present and future Holders of the Certificates" requires DB to enforce the repurchase protocol

articulated in § 2.3.

In *Royal Park*, addressing substantively identical language (from SAST 2006-2), DB

argued that the "rights referred to above" clause should not be read to incorporate the preceding

repurchase obligation. Judge Nathan determined the question against DB, finding that the "rights

referred to above" provision in § 2.5 "must incorporate the rights articulated in § 2.3"—*i.e.*, the

repurchase protocol—because there is a "'direct and evident contextual connection'" between

them, and the intervening text did not describe any rights of the Trustee's. *Royal Park*, 2016 WL

439020, at *4 (quoting *Coley v. Cohen*, 289 N.Y. 365, 369 (N.Y. 1942)). "Under § 2.5 of the

PSA [the 'rights referred to above' clause], then, Defendant has an obligation to 'exercise [its]

rights' to enforce the substitution and repurchasing remedies" described in the prior sections "for

46

the benefit of all present and future Holders of Certificates." *Id.* Judge Nathan further held that "this creates an obligation to enforce" the repurchase remedies for breaches of R&Ws. *Id.* That conclusion applies equally here. Having had a full and fair opportunity to litigate this identical issue in *Royal Park*, and lost, DB is collaterally estopped from relitigating it now. *See Braun v. City of N.Y.*, 284 F. Supp. 3d 572 (S.D.N.Y. 2018). Accordingly, Plaintiffs are entitled to judgment as a matter of law that the "rights referred to above" provision in each of the 40 Trusts "creates an obligation to enforce breaches of R&Ws of which [DB] has knowledge." *Royal Park*, 2016 WL 439020, at *4.[18]

### B. DB cannot disclaim its pre-EOD duty to enforce repurchase remedies where DB was required, but failed, to notify the Depositor of R&W breaches

Where the Trustee has an obligation to enforce breaches of R&Ws upon receipt of written direction from the Depositor to pursue such remedies, DB cannot escape its enforcement duty by failing to give the Depositor required notice. *See Royal Park*, 2016 WL 439020, at *5. In *Royal Park*, DB argued that, under the Governing Agreements for MSIX 2006-1 (which is at issue in *Commerzbank*) and two MSAC trusts, it had no enforcement obligation for loans that breached R&Ws unless the Depositor directed it to enforce those remedies. *See id.* DB relied on a PSA provision that obligates the Trustee to pursue all legal remedies available to it against the applicable Responsible Party under the governing agreements, "if the Trustee has received written notice from the Depositor directing the Trustee to pursue such remedies." *See id.*; Handlin Ex. 115 (MSIX 2006-1 PSA) § 2.03(e). Judge Nathan rejected DB's argument because

---

[18] Which of these 40 Trusts contained loans that breached R&Ws, and whether DB had knowledge of the breaches, will be resolved in Phase 2 discovery and at trial.

the immediately preceding portion of the clause "provides that '[u]pon discovery by any of the parties hereto of a breach of a representation or warranty . . . , the party discovering such breach shall give prompt written notice thereof to the other parties to this Agreement.'" *Royal Park*, 2016 WL 439020, at *5. That language gave DB "an affirmative duty to notify the Depositor of any discovery of breaches of R&Ws." *Id.* If DB failed to give such notice, "the Depositor was unable to direct the Defendant to pursue any remedies." *Id.* Judge Nathan ruled that under the prevention doctrine, "the Defendant cannot rely on the Depositor's failure to direct it to act when Defendant did not inform Depositor of the need to act." *Id.* Therefore, Judge Nathan held that, to the extent DB failed to give the Depositor notice of discovered R&W breaches, "Defendant cannot disclaim its obligation to enforce breaches of R&Ws with respect to these Trusts." *Id.*

The Governing Agreements for 16 Trusts contain substantially identical language to that at issue in *Royal Park*. In 12 of those Trusts, DB is required to notify the other parties (including the Depositor) upon discovering R&W breaches. ¶ 884. The other 4 Trusts require DB to notify the Depositor of R&W breaches of which DB has actual knowledge. ¶¶ 886, 888-889. The *Royal Park* reasoning is wholly applicable here, and DB is collaterally estopped from arguing otherwise. *See Braun*, 284 F. Supp. 3d at 576-78. Plaintiffs are entitled to judgment that, if they prove at trial that (as to 12 Trusts) DB discovered or (as to 4 Trusts) DB had actual knowledge of loans in these Trusts with R&W breaches, but failed to notify the Depositor of them, DB had a duty to pursue all legal remedies available to it to enforce the repurchase of those loans.

## C.  In 8 Trusts, DB had a pre-EOD duty to enforce repurchase where DB was required, but failed, to notify the Depositor of loans with Mortgage File defects

The Governing Agreements for 8 Trusts contain substantially identical language requiring DB to pursue all available legal remedies to enforce repurchase of loans with missing

or defective Mortgage File documents if directed by the Depositor. For example, each of GSAA 2006-15, 2006-16, 2006-17, and 2007-4 (the "GSAA Trusts") is governed by a Master Servicing and Trust Agreement ("MSTA"), which requires that all the following documents, collectively defined as constituting the Mortgage File, be delivered to each Custodian[19] on behalf of DB as Trustee: a properly endorsed original Mortgage Note; the original Mortgage and evidence of its recording; the original Assignment of Mortgage (unless it is a MERS loan); originals of any intervening Mortgage assignments; and any personal endorsement, surety and/or guaranty agreements. *See*, *e.g.*, Handlin Ex. 84 (GSAA 2006-15 MSTA) §§ 1.01, 2.01(b). Section 2.02 requires each Custodian, on behalf of the Trustee, to review each Mortgage File, confirm that the required documents were received without defects, and compile an exception report identifying all loans with missing or non-conforming Mortgage File documents, which list is delivered to the Trustee. ¶¶ 890, 893, 895, and 899. The Governing Agreements for the other Trusts in this category—MSAC 2006-HE8, MSHEL 2007-2, MSIX 2006-1, and MSIX 2006-2—contain the same requirements. ¶¶ 900-911.

For each of these 8 Trusts, DB as Trustee is then obligated to enforce the cure or repurchase of any loan whose Mortgage File documents do not conform to the Governing Agreement's requirements. GSAA 2006-15 MSTA § 2.02 provides:

> Each Custodian shall notify the Trustee of **any Mortgage Loans that do not conform to the requirements of Sections 2.01 and 2.02 hereof** by delivery of the Document Certification and Exception Report. In its capacity as "Assignee" under the Step 2 Assignment Agreements, **the Trustee shall enforce the obligation of**

---

[19] DB was also a Custodian for each GSAA Trust. ¶¶ 888, 891, 894, and 897.

**the Responsible Parties to cure or repurchase Mortgage Loans that do not conform to such requirements as determined in the applicable Custodian's review** . . . by notifying the applicable Responsible Party to correct or cure such default. In its capacity as Assignee under the Step 2 Assignment Agreements, **the Trustee shall also enforce the obligation of the Responsible Parties** under the Sale Agreements . . . **to cure or repurchase Mortgage Loans for which there is a defect** or a breach of a representation or warranty thereunder of which a Responsible Officer of the Trustee has actual knowledge, **by notifying the applicable party to correct or cure such default**. If any Servicer, any **Responsible Party or the Purchaser**, as the case may be, **fails or is unable to correct or cure the defect** or breach within the period set forth in the applicable agreement, **the Trustee shall notify the Depositor of such failure to correct or cure**. **Unless otherwise directed by the Depositor** within five (5) Business Days after notifying the Depositor of such failure by the applicable party to correct or cure, **the Trustee shall notify such party to repurchase the Mortgage Loan**. **If**, within ten (10) Business Days of receipt of such notice by such party, **such party fails to repurchase such Mortgage Loan**, **the Trustee shall notify the Depositor of such failure**. **The Trustee shall pursue all legal remedies available to the Trustee** . . . if the Trustee has received written notice from the Depositor directing the Trustee to pursue such remedies.

Handlin Ex. 84 (GSAA 2006-15 MSTA) § 2.02 (emphasis added). The other 7 Trusts in this category impose these same duties upon DB as Trustee. ¶¶ 893, 896, 899, 902, 905, 908, 911.

Thus, DB has five affirmative obligations: (1) DB **shall enforce** the Responsible Parties'

50

obligation to cure or repurchase nonconforming loans **by providing notice** to the Responsible Parties. (2) If any Servicer, Responsible Party, or Purchaser fails or is unable to correct or cure the defect, DB **shall notify the Depositor** of that failure or inability. (3) After giving that notice, unless otherwise directed by the Depositor, DB **shall notify** the Servicer, Responsible Party, or Purchaser **to repurchase the loan**. (4) If the party fails to do so, DB **shall notify the Depositor of that failure to repurchase**. After exhausting all of (1) through (4), (5) DB **shall pursue all available legal remedies** against the Servicers, Responsible Parties, and Purchaser, if it gets written direction from the Depositor to do so. Karlene Benvenuto, a Trust Administrator and ███, ███████████████████████████████, *see* Handlin Ex. 397 (Benvenuto) 137:8-23 & Handlin Ex. 828 (Ex. 151); ¶ 913, and who ████████████████████████████ ████████████████████████████████ Handlin Ex. 397 (Benvenuto) 142:8-23, 156:4-157:6 & Handlin Ex. 829 (Ex. 159); Handlin Ex. 397 (Benvenuto) 166:11-16; Handlin Ex. 827 (Ex. 156) (Benvenuto dep. tr. in *Royal Park*) 136:11-137:12. Therefore, Plaintiffs are entitled to judgment that, for these 8 Trusts, DB had a pre-EOD duty to enforce repurchase of loans with document defects. Any argument that DB's inaction should be excused because it never got direction from the Depositor is again defeated by the *Royal Park* reasoning and ruling.

### D.  For 3 Trusts on which DB's enforcement duty for loans with Mortgage File defects is established as a matter of law, Plaintiffs are also entitled to summary judgment that DB breached its duty

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████ ¶ 914. However, as shown, based upon the undisputed facts and the law—particularly the *Royal Park* ruling and its collateral estoppel effect—DB had a **pre**-EOD **duty**,

without awaiting direction, to enforce repurchase remedies for the 8 Trusts. Five (GSAA 2006-17, GSAA 2007-4, MSAC 2006-HE8, MSIX 2006-1, and MSIX 2006-2) are Proof of Claim Trusts, ¶¶ 598, 916; whether DB breached its duties for those will be addressed at trial. As to the other 3—GSAA 2006-15, GSAA 2006-16, and MSHEL 2007-2—the evidence is undisputed that DB did not pursue repurchase remedies, entitling Plaintiffs to summary judgment that DB breached its duty to enforce repurchase remedies for loans with document defects.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

| Trust | Date of | Number of | Number of |
|-------|---------|-----------|-----------|
| GSAA 2006-15 | ██ | ██ | ██ |
| GSAA 2006-16 | ██ | ██ | ██ |
| MSHEL 2007-2 | ██ | ██ | ██ |

¶¶ 918-920. As quoted, for these Trusts, DB was responsible to enforce repurchase for "any Mortgage Loans that do not conform to the requirements of Sections 2.01 and 2.02 hereof"—unambiguously encompassing ████████████████████████████████████████

████████████████████████████ [20] Nonetheless, as admitted by its two top executives, Messrs. Co and Vaughan, ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[20] By contrast, certain Trusts at issue in these cases require repurchase only where there is "any **materially defective** document in, or . . . a document is missing from," the Mortgage File. ¶ 923 (emphasis added). These 3 Trusts contain no such limitation.

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

Handlin Ex. 384 (Co) 201:6-13.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████

██████████████████████████████████

█████████████████████████████████████

Handlin Ex. 393 (Vaughan) 267:7-16. That testimony is further confirmed by two Trust

Administrators who acknowledged that, ███████████████████████████████████

████████████████████████████████████████████ *See* Handlin Ex. 397 (Benvenuto)

143:11-14 (GSAA 2006-15); Handlin Ex. 383 (Avakian) 273:25-274:14 ██████████████

████████████████████████████████████████████████████

████████████████████████████████████). Instead of "pursu[ing] all legal

remedies available to the Trustee," as required by the Governing Agreements, DB merely

████████████████████████████████. *See* ¶¶ 924-928.

        Nor can DB claim that ██████████████████████████████████████

██████████████████████████████████ As shown, DB was obligated, among other

things, to notify the responsible parties "to repurchase the Mortgage Loan," and, if "such party

fails to repurchase such Mortgage Loan, the Trustee shall notify the Depositor of such failure."

DB's number two executive, Mr. Co, admits ████████████████████████████████████

██████████████████████ Handlin Ex. 384 (Co) 94:24-95:13.[21] Thus, for these Trusts, █████████

███████████████████████████████████████████████████████████████████████,

yet pre-EOD, DB never ██████████████████████████████████████████████████████

Handlin Ex. 397 (Benvenuto) 149:13-152:5 & Handlin Exs. 836-839 (Exs. 154, 155, 157, 158).

Because DB did nothing to satisfy its pre-EOD obligations, Plaintiffs are entitled to judgment

that DB breached its duty to enforce repurchase of the loans with defective Mortgage File

documents in these 3 Trusts. The resulting damages will be determined in Phase 2.

## VI.  For 21 Trusts, DB Breached Its Contractual Duty to Monitor Servicers

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ an

entire category of EODs, typically defined in § 7.01(a)(ii) of Governing Agreements: EODs

triggered by Servicers' failures "duly to observe or perform in any material respect other

covenants or agreements" contained in the Governing Agreements. ¶¶ 932-941. ██████████

---

[21] ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

*E.g.*, Handlin Ex. 835 (Ex. 148) (emphasis added). ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████ Handlin Ex. 387 (Reyes 30(b)(6)) 72:2-78:12 & Handlin Ex. 851 (Ex. 604).





,[22]

 Handlin Ex. 387 (Reyes 30(b)(6)) 122:23-123:14. As to at least 21 Trusts, DB's own words put it in breach of contract.

All RMBS trusts that closed on or after January 1, 2006 are subject to Regulation AB (a set of SEC-promulgated rules governing publicly offered asset-backed securities) ("Reg AB"). Any entity performing activities that address the servicing criteria set out in Item 1122, paragraph (d) of Reg AB, 17 C.F.R. § 1122(d)—including trustees—is a "party participating in the servicing function," and so must provide a separate annual assessment report and accountant's attestation report of its compliance with those criteria.[23] 

---

[22] *See*, *e.g.*, Handlin Ex. 387 (Reyes 30(b)(6)) 120:12-121:5 (



); *id.* at 122:3-14



); *id.* at 138:16-23 (





).

[23] *See* Notes to 17 CFR §§ 240.13a-18, 240.15d-18. An entity charged with reporting compliance with specific servicing criteria is responsible for satisfying those criteria. As the SEC said when implementing Reg AB, "**the performance of the servicing function** is of material importance to

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ ¶ 943.

Under § 15(d) of the Exchange Act as it existed when the Trusts closed, RMBS issuers were required to file a Form 10-K for the year of the offering, but could suspend that obligation, or "go dark," for later years if the securities of each class to which their registration related was held by fewer than 300 persons. 15 U.S.C.A. § 78o (West 2006). Under the Governing Agreements for 14 Trusts, once the Trust goes dark and no Form 10-K is required, the Trustee's obligations to provide assessments of compliance and accountants' attestations as called for by Reg AB cease. ¶ 944. **However**, for 21 Trusts, the Governing Agreements (1) impose on the Trustee an ongoing, purely contractual obligation to continue providing those assessments and attestations after the Trust has gone dark, and (2) specifically require DB to provide assessments and attestations of its compliance with Item 1122(d)(1)(i). ¶ 950. That criterion states:

    **(d)** *Servicing criteria* –

        **(1)** *General servicing considerations.*

            (i) Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements.

17 C.F.R. § 229.1122(d)(1)(i). ███████████████████████████████████

---

the performance of an ABS transaction," and the purpose of having Servicers and other responsible entities assess and report their compliance with the servicing criteria is "to evaluate **servicing responsibilities and performance**." Securities Act Release No. 33-8518, Asset-Backed Securities; Final Rule, 70 Fed. Reg. 1505, 1571-72 (Jan. 7, 2005) (emphasis added).



██████████████████████████████ ¶ 945. █████████████

████████████████████████████████████████████████████

█[24] DB's assertion that it complied with 1122(d)(1)(i), however, is false. These criteria are about "servicing." ██████████████████████████████████████

███████████████████████████████████████ ███████████████

██████████████████████████████████████████

██████████████████████████████ Since these 21 Trusts impose on DB an annual obligation to report truthfully if it complied with the applicable criteria, **after** DB no longer had to file compliance documents with the SEC, that ongoing duty is contractual, not regulatory. DB had **contractual** duties to institute policies and procedures to monitor Servicers' performance triggers and EODs, and to confirm it had such policies and procedures.

DB's admissions that ████████████████████████████████████ █████████████████████████████████████ put DB in breach of its express obligation to monitor Servicer performance-related triggers and Servicer-related EODs. DB

---

[24] ████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████ Handlin Ex. 847 (Exhibit 346). █████████████████████████████, *id.* at DBNTC ROYAL PARK 00000223086-87—████████████████████████████████ ¶ 948.

[25] *See* Handlin Exs. 387, 779 (Reyes 30(b)(6)) 120:12-121:5, 122:11-14, 122:23-123:14, 138:16-23, 218:12-14, 243:2-10; Handlin Ex. 706 (Reyes) 346:8-347:22, 353:11-25.

breached these obligations (and continues breaching them) yearly, with huge consequences. ████

████████████████████████████████████████████████████ *See* Handlin Ex.

393 (Vaughan) 194:21-195:7 (████████████████████████████████████████

████████████████████████████████████████████████

██████████████); Handlin Ex. 384 (Co) 190:22-191:8 (████████████████

████████████████████████████████████████████████████████

██████████████); *see also* Section II.D, *supra*; ¶¶ 486-544. ████████

████████████████████████████████████████ *See*, *e.g.*,

Handlin Ex. 393 (Vaughan) 194:16-20, 195:7-15; Handlin Ex. 384 (Co) 191:22-192:25, 196:12-

20.████████████████████████████████████████████████████

████████████████████████████████████████████████

*See* Handlin Ex. 384 (Co) 193:20-194:11. Because DB admits it knew this Servicer misconduct

occurred, the resultant EODs occurred as well, triggering DB's prudent person duties—yet DB

ignored these obligations. Had DB complied with its contractual duties and monitored Servicer

performance triggers and EODs, it would have declared the EODs and acted to protect

Certificateholders, up to terminating culpable Servicers. ████████████████████

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs'

Joint Motion for Partial Summary Judgment.

Dated:  December 7, 2018

By:      */s/ Jay S. Handlin*

David H. Wollmuth
Jay S. Handlin
Steven S. Fitzgerald
Ryan A. Kane
Philip R. Schatz

58

Christopher J. Lucht
John R. Hein
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
jhandlin@wmd-law.com
sfitzgerald@wmd-law.com
rkane@wmd-law.com
pschatz@wmd-law.com
clucht@wmd-law.com
jhein@wmd-law.com

*Attorneys for Plaintiffs*

**CERTIFICATION**

I hereby certify that Plaintiffs' Joint Motion for Partial Summary Judgment dated December 7, 2018 is 16,863 words in length and complies with all required formatting rules. I further certify that on December 7, 2018, I served a copy of the Plaintiffs' Joint Motion for Partial Summary Judgment, Plaintiffs' Rule 56.1 Statement of Undisputed Facts, the Declaration of Jay S. Handlin, and all related Exhibits on counsel of record via electronic mail.

*/s/ Jay S. Handlin*