**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| PHOENIX LIGHT SF DAC, BLUE HERON FUNDING V LTD., BLUE HERON FUNDING VI LTD., BLUE HERON FUNDING VII LTD., BLUE HERON FUNDING IX LTD., C-BASS CBO XIV LTD., C-BASS CBO XVII LTD., KLEROS PREFERRED FUNDING V PLC, SILVER ELMS CDO PLC and SILVER ELMS CDO II LIMITED, | |
| Plaintiffs, | No. 14-cv-10103-JGK |
| -against- | |
| DEUTSCHE BANK NATIONAL TRUST COMPANY and DEUTSCHE BANK TRUST COMPANY AMERICAS, | |
| Defendants. | |
| COMMERZBANK AG, | |
| Plaintiff, | |
| -against- | |
| DEUTSCHE BANK NATIONAL TRUST COMPANY and DEUTSCHE BANK TRUST COMPANY AMERICAS, | No. 15-cv-10031-JGK |
| Defendants. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

I.     DB Relies on Plain Errors Regarding Its Duties .............................................. 2

II.    The Undisputed Material Facts Prove EODs Occurred in 73 Trusts ............................. 3

    A.  EODs triggered by exceeding numerical thresholds in 18 Trusts ..................................... 3

    B.  EODs triggered by Servicer downgrades in 7 Trusts ......................................................... 4

    C.  EODs triggered by late compliance documents in 8 Trusts ............................................. 4

    D.  DB failed to declare EODs in 73 Trusts triggered by Servicer
        misconduct relating to REO properties and foreclosures .................................................. 9

III.   DB Breached Its Post-EOD Prudent Person Duties ....................................................... 18

    A.  DB's admissions establish its liability for failing to act prudently post-EOD ................ 18

    B.  DB's attacks on Plaintiffs' proof are baseless .................................................................. 21

    C.  Plaintiffs identified what DB should have done post-EOD ............................................. 22

    D.  Here, prudence is not a fact issue .................................................................................... 22

    E.  DB cannot avoid summary judgment by asserting "good faith" ...................................... 24

    F.  DB's "response" to Servicers' REO misconduct and late
        compliance documents was unreasonable as a matter of law ......................................... 25

IV.   DB Knew of the Uncured Document Defects Identified in Its Last 2% Letters .......... 27

V.     For 40 Trusts, the "Rights Referred to Above" Provision

      Obligated DB to Enforce Repurchase Remedies ........................................................... 29

VI.    For 16 Trusts, DB Was Required to Enforce Repurchase Pre-EOD

      Where It Failed to Notify the Depositor of Mortgage File Defects ............................. 33

VII.   DB Had a Pre-EOD Duty to Enforce Repurchase of Loans with

      Mortgage File Defects for 8 Trusts, and Breached that Duty for 3 Trusts.................... 33

VIII.  For 21 Trusts, DB Breached Its Duty to Monitor Servicers.......................................... 35

CONCLUSION.................................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*82-90 Broadway Realty Corp. v. N.Y. Supermarket, Inc.*,

    154 A.D.3d 797 (2d Dep't 2017) ........................................................................8

*Akorn, Inc. v. Fresenius Kabi AG*,

    2018 WL 4719347 (Del. Ch. Oct. 1, 2018),

    *aff'd*, 2018 WL 6427137 (Del. Dec. 7, 2018) (en banc) ............................10, 11

*Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*,

    100 A.D.3d 100 (1st Dep't 2012) ....................................................................36

*Bank of N.Y. Mellon v. Commerzbank Capital Funding Trust II*,

    65 A.3d 539 (Del. 2013) ....................................................................................8

*BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*,

    2017 WL 3610511 (S.D.N.Y. Aug. 21, 2017) ............................................5, 10

*Brady v. Wal-Mart Stores, Inc.*,

    455 F. Supp. 2d 157 (E.D.N.Y. 2006), *aff'd*, 531 F.3d 127 (2d Cir. 2008) .......................16

*Cameo-Parkway Records, Inc. v. Premier Albums, Inc.*,

    43 F.R.D. 400 (S.D.N.Y. 1967) .......................................................................14

*City of Amsterdam v. Daniel Goldreyer, Ltd.*,

    882 F. Supp. 1273 (E.D.N.Y. 1995) ................................................................31

*CFIP Master Fund, Ltd. v. Citibank N.A.*,

    738 F. Supp. 2d 450 (S.D.N.Y. 2010) .........................................................25, 32

iii

*Cruz v. Coach Stores, Inc.*,

    202 F.3d 560 (2d Cir. 2000)...............................................................................5

*Curry v. States Marine Corp. of Del.*,

    16 F.R.D. 376 (S.D.N.Y. 1954) .........................................................................14

*Dent v. U.S. Tennis Ass'n*,

    2008 WL 2483288 (E.D.N.Y. June 17, 2008) .................................................16

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,

    873 F.3d 85 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 2679 (2018),

    and 138 S. Ct. 2697 (2018) ................................................................................7

*Fixed Income Shares v. Citibank N.A.*,

    314 F. Supp. 3d 552 (S.D.N.Y. 2018).................................................................2

*Flood v. Just Energy Mktg. Corp.*,

    904 F.3d 219 (2d Cir. 2018).......................................................................30, 31

*FMS Bonds, Inc. v. Bank of N.Y. Mellon*,

    2016 WL 4059155 (S.D.N.Y. July 28, 2016) .................................................22

*Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc.*,

    2013 WL 342693 (S.D.N.Y. Jan. 29, 2013) ...................................................36

*Guilbert v. Gardner*,

    480 F.3d 140 (2d Cir. 2007)..............................................................................28

*Highland Capital Mgmt., L.P. v. Schneider*,

    379 F. Supp. 2d 461 (S.D.N.Y. 2005)...............................................................24

*Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*,

    2016 WL 1267781 (S.D.N.Y. Mar. 30, 2016) ..................................................5

*Hill v. City of N.Y.*,

    45 F.3d 653 (2d Cir. 1995)........................................................................................31

*Hubbard v. Port Auth. of N.Y. & N.J.*,

    2008 WL 464694 (S.D.N.Y. Feb. 20, 2008)..........................................................5

*In re Fosamax Prods. Liab. Litig.*,

    707 F.3d 189 (2d Cir. 2013)....................................................................................13

*In re GM LLC Ignition Switch Litig.*,

    2015 WL 8578945 (S.D.N.Y. Dec. 9, 2015) .....................................................12, 15

*Jund v. Town of Hempstead*,

    941 F.2d 1271 (2d Cir. 1991)....................................................................................5

*Leviton Mfg. Co. v. Greenberg Traurig LLP*,

    2010 WL 4983183 (S.D.N.Y. Dec. 6, 2010) .........................................................25

*Lituchy v. Guinan Lithographic Co.*,

    60 A.D.2d 622 (2d Dep't 1977)..............................................................................28

*LNC Invs., Inc. v. First Fid. Bank, Nat'l Ass'n*,

    1997 WL 528283 (S.D.N.Y. Aug. 27, 1997)......................................................20, 22

*Lummus Co. v. Commonwealth Oil Ref. Co.*,

    297 F.2d 80 (2d Cir. 1961)....................................................................................29, 30

*MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entm't Corp.*,

    80 F. Supp. 3d 507 (S.D.N.Y. 2015)........................................................................6

*Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.*,

    906 F.2d 884 (2d Cir. 1990)....................................................................................8

*New Windsor Volunteer Ambulance Corps. v. Meyers*,

    442 F.3d 101 (2d Cir. 2006)................................................................29

*Penguin Books U.S.A. Inc. v. New Christian Church of Full Endeavor, Ltd.*,

    262 F. Supp. 2d 251 (S.D.N.Y. 2003)........................................12, 15

*Perma Research & Dev. Co. v. Singer Co.*,

    410 F.2d 572 (2d Cir. 1969)................................................................14

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,

    2017 WL 3973951 (S.D.N.Y. Sept. 7, 2017)...........................1, 23

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*,

    172 F. Supp. 3d 700 (S.D.N.Y. 2016).................................7, 28

*Pu v. Russell Publ'g Grp.*,

    2016 WL 9021990 (S.D.N.Y. Sept. 2, 2016), *aff'd*, 683 F. App'x 96 (2d Cir. 2017).......16

*Rosenthal v. Prudential Prop. & Cas. Co.*,

    928 F.2d 493 (2d Cir. 1991)................................................................11

*Rowley v. City of N.Y.*,

    2005 WL 2429514 (S.D.N.Y. Sept. 30, 2005)..................................3

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,

    2016 WL 439020 (S.D.N.Y. Feb. 3, 2016)..................................29, 30, 31, 33

*Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l Ass'n*,

    2017 WL 945099 (S.D.N.Y. Mar. 10, 2017)..................................11

*SEC v. Credit Bancorp, Ltd.*,

    147 F. Supp. 2d 238 (S.D.N.Y. 2001)................................................22

*Serdarevic v. Centex Homes, LLC,*

    2012 WL 4054161 (S.D.N.Y. Sept. 5, 2012) ....................................................8

*Star City Sportswear, Inc. v. Yasuda Fire & Marine Ins. Co. of Am.,*

    2 N.Y.3d 789 (2004) .......................................................................................11

*TM Patents, L.P. v. IBM Corp.,*

    72 F. Supp. 2d 370 (S.D.N.Y. 1999) ...............................................................29

*United States v. Walker,*

    239 F. Supp. 3d 738 (S.D.N.Y. 2017) .............................................................29

*Western & Southern Life Ins. Co. v. Bank of N.Y. Mellon,*

    2019 WL 495581 (Ohio Ct. App. Feb. 8, 2019) ........................................ 31-32

*Wills v. RadioShack Corp.,*

    981 F. Supp. 2d 245 (S.D.N.Y. 2013) .............................................................31

*Wyly v. Weiss,*

    697 F.3d 131 (2d Cir. 2012) ............................................................................29

*Zev v. Merman,*

    73 N.Y.2d 781 (1988) ......................................................................................28

**Statutes and Regulations**

17 C.F.R. § 240.13a-18(b) ............................................................................................8

28 U.S.C. § 1291 .........................................................................................................29

Fed. R. Civ. P. 15(b) .....................................................................................................5

Fed. R. Civ. P. 32(a)(3) ...............................................................................................14

Fed. R. Evid. 801(d)(2)(B) ..........................................................................................12

Fed. R. Evid. 803(6) ....................................................................................................12

## INTRODUCTION

Plaintiffs' Motion demonstrated that DB knowingly ignored rampant misconduct by mortgage Sellers and Servicers, in violation of its express duties. Charged with acting for the benefit of Certificateholders, DB protected itself instead. DB's Opposition essentially admits that, for most at-issue Trusts, even after EODs triggering its fiduciary, "prudent person" obligations, DB did **nothing**.

As Plaintiffs' Motion showed, to satisfy its post-EOD duties, a prudent Trustee must—at the very least—deliberate and inform itself about what steps it might, and should, take to protect the Trusts' beneficiaries. No reasonable person conducting its own affairs would heedlessly ignore the problems. Yet, for more than half the 85 Trusts at issue, DB concedes ████████████ ███████████████████████████. Plaintiffs identified specific EODs in 73 specific Trusts. In response, for 43 Trusts, DB offered **no** evidence to show **any** deliberation on **any** particular EOD in **any** particular Trust. Rather, DB makes the remarkable concession that, except where it filed bankruptcy proofs of claim or was directed to commence repurchase litigation, █ ████████████████████████████████████. What's more, because DB agrees EODs occurred in 17 Trusts on which it did nothing post-EOD, DB essentially admits liability, and those Trusts can go straight to Phase 2 to determine the damages DB caused. For 26 more Trusts, if the Court finds any EODs occurred, DB's inaction likewise entitles Plaintiffs to judgment, and those Trusts can go directly to damages. Plaintiffs have proven their entitlement to partial summary judgment, and granting their Motion will greatly streamline the issues for trial.[1]

---

[1] The misrepresentations in DB's Opposition begin early. DBOpp. 3 & n.2. The defendant in *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 2017 WL 3973951 (S.D.N.Y. Sept. 7, 2017) ("*PL*

## I.    DB Relies on Plain Errors Regarding Its Duties

Contending it has "limited duties," DBOpp. 6-8, DB commits plain errors of fact and law.

DB claims that, under each Governing Agreement, it has only those duties "specifically set forth in the Agreement with respect to the Trustee and no implied covenants or obligations shall be read into this Agreement." *Id.* 6. That quotation is misleadingly truncated. The Governing Agreements preface it with: "Unless an Event of Default known to the Trustee has occurred and is continuing," "Except during the continuance of an Event of Default," or similar language. Biron Ex. 35. Thus, **while EODs are pending**, the Trustee's "duties and obligations" shall **not** be "determined solely by the express provisions of this Agreement," the Trustee **shall** be liable for things beyond "performance of the duties and obligations specifically set forth in this Agreement," and "implied covenants and obligations **shall** be read into this Agreement against the Trustee." *Id.* (emphasis added); *see* Handlin Ex. 393 (Vaughan) 49:5-16 (███████ ███████████████████████████████████████████████).

DB's assertion that it "has no duty under any GA to investigate any facts or matters absent direction and indemnity," DBOpp. 6, is wrong as a matter of law. Pltfs.Opp. 40.

The first "good faith" exculpatory clause DB cites, DBOpp. 6, concerns only actions

---

*v. BNYM*"), did not even seek summary judgment on certain claims. For the rest, Judge Caproni: refused to dismiss claims on 5 trusts where evidence showed EODs occurred; found evidence the trustee discovered R&W breaches in 4 other trusts; and sustained Trust Indenture Act claims on 2 more trusts. *Fixed Income Shares v. Citibank N.A.*, 314 F. Supp. 3d 552 (S.D.N.Y. 2018), is on appeal. And Western & Southern Life Insurance Co. defeated summary judgment on all claims. In any event, DB's disastrous record speaks for itself.

taken at Certificateholders' direction. No such acts are at issue, rendering that clause irrelevant.

In 81 of the 85 Trusts, the second good faith clause DB cites, DBOpp. 6, is inapplicable post-EOD. Prefatory language in § 8.02 (or its equivalent) says 8.02 is "subject to Section 8.01." Handlin Reply Ex. 1.[2] Where EODs occur and remain uncured, DB's prudent person duties arise under 8.01, and DB never gets to invoke 8.02. Pltfs.Opp. 41-42.

DB disclaims the duty to "monitor any servicer" under any Governing Agreement. DBOpp. 8. But for 21 Trusts, DB had—and breached—an express duty to monitor Servicers. Pltfs.Mem. 54-58; *infra* 35-37. And, for all Trusts, DB could not disregard Servicer misconduct known to it.

Finally, DB suggests that only investors controlling 25% voting interests had any rights. DBOpp. 8. DB is wrong. The Governing Agreements require DB to act "for the benefit of," and "on behalf of," **all** Certificateholders—not just 25% holders. Pltfs.Mem. 8-9; Pltfs.SUF ¶¶ 34-40.

## II.   The Undisputed Material Facts Prove EODs Occurred in 73 Trusts

DB has not established any disputed issue of material fact or any issue of law overcoming Plaintiffs' showing that EODs occurred in 73 Trusts, triggering DB's prudent person duties.

### A.   EODs triggered by exceeding numerical thresholds in 18 Trusts

Plaintiffs seek judgment that these EODs occurred on the dates Plaintiffs identified. Pltfs.Mem. 15-18. DB declared these EODs, admitting they occurred. DBOpp. 10. Plaintiffs showed that for 14 such EODs in 11 Trusts, DB declared/gave notice late. Pltfs.Mem. 16-17; Pltfs.SUF ¶¶ 192-366. DB responds only in a footnote, claiming when it knew enough to trigger its notice obligation is a fact issue. DBOpp. 10 n.11. A substantive argument asserted solely in a footnote is insufficient. *See Rowley v. City of N.Y.*, 2005 WL 2429514, at *6 (S.D.N.Y. Sept. 30,

---

[2] The exceptions are NHEL 2006-5, 2006-6, 2007-2, and AHM 2006-1. *Id.*

2005). Anyway, DB's cited "evidence" (DSUF ¶ 1026) does not support the proposition; nor does Plaintiffs' Motion concern whether DB gave notice late. The point is that the EODs triggered DB's prudent person duties earlier than DB acknowledged. ██████████████

████████████████████████████████████. Handlin Ex. 706 (Reyes) 337:10-338:1.

████████████████████████████████████████████████████████

████████████████████████████████. Handlin Ex. 707 (Perez 30(b)(6)) 42:21-44:16. At best, this is willful blindness, constituting knowledge. *See* Pltfs.Opp. 76. Plaintiffs are entitled to judgment that these 14 EODs occurred on the dates asserted, triggering DB's prudent person duties.

### B.  EODs triggered by Servicer downgrades in 7 Trusts

For 7 Trusts, DB admits EODs triggered by Servicer downgrades occurred, and does not contest the dates. DBOpp. 10; Pltfs.Mem. 17-18. Plaintiffs are entitled to a ruling that these EODs occurred on the identified dates, triggering DB's prudent person duties.

### C.  EODs triggered by late compliance documents in 8 Trusts

Plaintiffs proved untimely compliance documents triggered EODs in 8 Trusts. Pltfs.Mem. 18-24. DB contends Plaintiffs did not plead "any claims relating to late ASOCs." DBOpp. 24. DB's argument fails. Where a cause of action for breach of contract is pled, the pleading need not identify every specific type of breach. Pltfs.Opp. 8-9. Plaintiffs unquestionably pled the claim for breach of contract; the breach was DB's failure to satisfy prudent person duties triggered by EODs. PLTAC ¶¶ 118-147; CBSAC ¶¶ 98-128. At most, DB contends Plaintiffs' pleadings failed to identify late compliance documents as a **type** of EOD trigger. But where the breach claim was pled, Plaintiffs need not have alleged every circumstance leading to that breach, *i.e.*, Plaintiffs' Complaints were not required to parse every EOD theory that triggered

the heightened duties DB failed to satisfy. *See Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 2016 WL 1267781, at *22 (S.D.N.Y. Mar. 30, 2016) (summary judgment motion on unpled veil-piercing theory was proper because "'piercing the corporate veil does not constitute an independent cause of action,' but a 'theory of liability'").

Even if this were an unpled **claim**, it is properly considered on summary judgment because DB is not prejudiced. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 569 (2d Cir. 2000) (citing Fed. R. Civ. P. 15(b)). DB does not claim prejudice, and cannot, as Plaintiffs revealed this theory in discovery. *See Highland*, 2016 WL 1267781, at *22; *Hubbard v. Port Auth. of N.Y. & N.J.*, 2008 WL 464694, at *7 (S.D.N.Y. Feb. 20, 2008); *Jund v. Town of Hempstead*, 941 F.2d 1271, 1287-88 (2d Cir. 1991). DB witnesses were deposed about DB's failure to declare EODs triggered by late compliance documents, Handlin Ex. 746 (Wannenmacher) 123:22-138:1, 232:14-283:7; Handlin Ex. 378 (Reyes) 49:16-50:6, 167:25-178:18; Handlin Ex. 779 (Reyes 30(b)(6)) 233:17-235:7, and Plaintiffs' interrogatory responses identified every EOD, EOD theory, and supporting fact Plaintiffs assert—including all information about the late ASOC EODs. Handlin Reply Exs. 2-3 at Resp. to Interrog. No. 10 (Pltfs. Third Supp. Resps. & Objs.).

Next, DB argues that to trigger EODs, Servicers' late delivery of required compliance documents had to be a "material" breach. DBOpp. 25-27. DB disregards the contractual language. As discussed in detail below, no "breach" is required. Each clause addresses the Servicer's "failure … duly to observe or perform" its "covenants or agreements" under the Governing Agreements. Because these Governing Agreements use the word "breach" elsewhere, Handlin Reply Ex. 4, these clauses' different wording must mean something besides "breach." *See BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 2017 WL 3610511, at *9 (S.D.N.Y. Aug. 21, 2017) ("use of two different terms" means they

"must be given different meanings"); *infra* 9-11. Nor is "materiality" required. These clauses

divide Servicer nonperformance into two categories. Using DB's example, MSAC 2005-HE7,

for **most** Servicer nonperformance, EODs are triggered by "any failure on the part of a Servicer

duly to observe or perform in any **material** respect" that is uncured for 60 days—"**except that**"

for late compliance documents, the trigger is "a failure to observe or perform **any** of the

obligations set forth in Sections 3.22, 3.23 or 8.12" that is uncured for 10 days. Handlin Ex. 107

§ 7.01(b) (emphasis added). For the latter, "materiality" is omitted. Pltfs.Mem. 19-21. Omission

of language typically included in a clause "is deemed intentional." *MeehanCombs Global Credit*

*Opportunities Funds, LP v. Caesars Entm't Corp.*, 80 F. Supp. 3d 507, 518 (S.D.N.Y. 2015).

Because the unambiguous contractual language resolves the issue, DB's discussion of the

"purpose of the requirement that servicers deliver" compliance documents (according to DB,

securities law compliance, DBOpp. 26-27) is irrelevant. It is also wrong. As Mr. Vaughan

testified, ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Handlin Ex. 393 (Vaughan) 50:15-52:12. DB's

discussion of Trusts' securities law duties ending is also irrelevant and misleading, since

Servicers' contractual duty to provide compliance documents continued after the securities filing

obligations ceased.

DB says Plaintiffs have not proven that any other trustee declared EODs in these

circumstances. DBOpp. 27. So what? Under these contracts' plain language, the late compliance

documents triggered EODs, and ███████████████████████████████

████████ Handlin Ex. 393 (Vaughan) 58:14-59:1. If DB suggests it satisfied some unspecified,

unproven industry standard, the Second Circuit has derided "[t]he RMBS industry in the lead up to the financial crisis [as] a textbook example of a small set of market participants racing to the bottom to set the lowest possible standards for themselves." *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 873 F.3d 85, 134 (2d Cir. 2017) (citations omitted), *cert. denied*, 138 S. Ct. 2679 (2018), and 138 S. Ct. 2697 (2018) ("*FHFA*"). Complying with that industry's customs would be no defense. *Id.* at 132.

DB next argues there is no evidence anyone notified Servicers of their lateness. But giving that notice was **DB's** responsibility. *See* Handlin Reply Ex. 5 at 2569070-83. Although DB asserts that the prevention doctrine should not apply to its failure to give notice, DBOpp. 27, this issue was already decided against it. *See* Pltfs.Mem. 23 (quoting *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 715 & n.5 (S.D.N.Y. 2016) ("*PL v. DB*")). That ruling is the law of the case.

Addressing individual Trusts, DB makes no specific challenge to the EODs in MSAC 2006-HE6 and MSHEL 2007-1, DBOpp. 28-29, so those are conceded. Regarding the 3 GSAMP Trusts, DB quotes language about a potential extension by the SEC, *id.*—but because the Trusts "went dark" long before the 2011 compliance documents were untimely, there was no more SEC reporting obligation, so obviously the SEC gave no extension. DB's argument that compliance deadlines were "extended indefinitely" by virtue of **no** SEC extension, *id.* 29, is nonsensical.

Regarding SVHE 2006-1, DB contends no EOD occurred because § 3.20 uses "Event of Default," not "Servicer Event of Termination." DBOpp. 28 n.23. DB cannot avoid summary judgment based on an obvious scrivener's error. This PSA does not define "Event of Default." DB's reading renders meaningless § 3.20's entire third paragraph—an especially impermissible result since its last sentence states: "This paragraph shall supercede [sic] any other provision in

this Agreement or any other agreement to the contrary." Handlin Ex. 41. To avoid reaching

absurd results, courts disregard apparent typographical errors. *See Serdarevic v. Centex Homes,*

*LLC*, 2012 WL 4054161, at *3 n. 6 (S.D.N.Y. Sept. 5, 2012); *82-90 Broadway Realty Corp. v.*

*N.Y. Supermarket, Inc.*, 154 A.D.3d 797, 799 (2d Dep't 2017). And, because DB was involved in

negotiating and drafting the Governing Agreements, Handlin Ex. 399 (Rodriguez) 61:20-64:1,

89:7-11; Handlin Ex. 391 (Rodriguez) 234:10-14, and non-party Certificateholders were not,

ambiguities should be construed against DB. *See Bank of N.Y. Mellon v. Commerzbank Capital*

*Funding Trust II*, 65 A.3d 539, 551 (Del. 2013).

Contrary to DB's argument, DBOpp. 29-30, nothing in the Governing Agreements says

**all** EODs can be cured. DB's cited cases, *id.* 30, are irrelevant, because each concerned an EOD

that could actually be cured. Here, the "triggering event" was not Servicers' failure to satisfy

their compliance obligation, but to do so **by a date certain**. Producing a document beyond the

cure period does not, and cannot, cure the triggering event. Under DB's view, a Servicer

terminated for a late ASOC—as allowed by the Governing Agreements—would be entitled to

reinstatement whenever it finally delivered the document. That would render the cure periods

meaningless. Plaintiffs' citation of *Metropolitan Life Insurance Co. v. RJR Nabisco, Inc.*, 906

F.2d 884, 890 (2d Cir. 1990), is dead on point: cure periods mean what they say, and must be

enforced strictly.

Finally, DB is wrong about FHLT 2006-1. DBOpp. 24-25. Fremont was Servicer until

mid-2006, requiring it to provide a compliance statement by March 1, 2007, and its cure period

expired March 11, 2007. *See* Handlin Ex. 11 (FHLT 2006-1 PSA) §§ 1.01, 3.22; 17 C.F.R.

§ 240.13a-18(b). ███████████████████████████████████ Pltfs.Mem. 21.

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████   Pltfs.SUF ¶¶ 454-459; Handlin

Exs. 11, 778.

### D.  DB failed to declare EODs in 73 Trusts triggered by Servicer misconduct

####    relating to REO properties and foreclosures

DB suggests Plaintiffs are quibbling over the occasional dirty sidewalk or unpaid water

bill. Hardly. The Servicers' misconduct was a vast, rampant societal problem, and ████████

████████████████████████████████████████████████████████████

Handlin Ex. 384 (Co) 111:18-112:12, █████████████████████████████████.

DB begins by disavowing any "obligation to investigate." DBOpp. 12. Given the

encyclopedic information the municipalities presented, that is legally wrong. Pltfs.Opp. 40. It is

also beside the point. DB spent years wading up to its neck through this swamp; it cannot justify

not declaring EODs by disclaiming any duty to get its feet wet. Nor can it evade responsibility by

citing its October 2010 notice to investors. DBOpp. 12-13. Certificateholders had no obligation

to direct DB to do anything—whereas DB, which actually knew of misconduct, was required to

act without direction. Mr. Co admitted that, ███████████████████████████████

██████████████████████████████████████████████████████

Handlin Ex. 384 (Co) 41:21-42:11, 47:15-20, 48:19-51:3, 56:14-57:9.███████████████

████████████████████████████████████████████████████████████

████████████   Handlin Ex. 387 (Reyes 30(b)(6)) 143:5-144:1; Pltfs.Opp. 17, 76-77.

Having failed to pass the buck, DB misstates the requirements for a Servicer EOD. DB

says EODs triggered by Servicer nonperformance require a "material breach." DBOpp. 13-14,

21. The plain language says otherwise. For all 73 Trusts on which Plaintiffs seek summary

judgment that Servicer nonperformance triggered EODs, every provision (typically PSA § 7.01(a)(ii) or 7.01(b)) defines an EOD to occur upon, in words or substance:

> any failure on the part of the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer set forth in this Agreement which continues unremedied for a period of ____ days … after … the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by … the Trustee.

Handlin Ex. 770. This definition does **not** use the word "breach." These Governing Agreements **do** use "breach" elsewhere, referring to Servicers' conduct. Handlin Reply Ex. 4. In fact, in 22 Governing Agreements, this clause says the EOD is triggered if the "failure **or** breach" is not timely cured. Handlin Ex. 770 (emphasis added); Handlin Reply Decl. ¶ 6. Under basic rules of interpretation, where a contract uses two different terms, they must be given independent meanings. *BlackRock*, 2017 WL 3610511, at *9. The "failure" in § 7.01(a)(ii) must refer to something different, and less than, a breach. This is confirmed by *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347 (Del. Ch. Oct. 1, 2018), *aff'd*, 2018 WL 6427137 (Del. Dec. 7, 2018) (en banc). Fresenius agreed to purchase Akorn, subject to Akorn complying "in all material respects" with conditions. Fresenius refused to close, claiming the conditions were unmet. Akorn contended the phrase "in all material respects" "adopts the common law doctrine of material breach." *Akorn*, 2018 WL 4719347, at *84. The Chancery Court disagreed, ruling that "the plain meaning of 'in all material respects' in the Covenant Compliance Condition and the Ordinary Court Covenant calls for a standard that is **different and less onerous than the common law doctrine of material breach**." *Id.* at *86 (emphasis added). Specifically, "in all material

respects" referred to a substantial likelihood that the party's conduct "would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information." *Id.*

Here, even less triggers EODs based on Servicer failures. In *Akorn*, the termination right was triggered by Akorn's failure to perform in "**all** material respects." Under the 73 Governing Agreements, an EOD is triggered by a Servicer's failure to perform in "**any** material respect." Because "all material respects" "calls for a standard that is different and less onerous than the common law doctrine of material breach," "any material respect" sets an even lower bar. The Court need not define that standard to grant Plaintiffs' Motion, because Plaintiffs have proven that, in fact, the Servicers committed breaches. Servicer misconduct rising to the level of a breach is necessarily material, Pltfs.Mem. 32 (citing *Royal Park Invs. SA/NV v. HSBC Bank USA Nat'l Ass'n*, 2017 WL 945099, at *8 (S.D.N.Y. Mar. 10, 2017))—particularly under a standard triggered by something less than a breach.

Because no material breach is required for EODs to occur, DB's argument that materiality cannot be determined on summary judgment, DBOpp. 21, is irrelevant. It is also wrong. *See Star City Sportswear, Inc. v. Yasuda Fire & Marine Ins. Co. of Am.*, 2 N.Y.3d 789, 790 (2004); *Rosenthal v. Prudential Prop. & Cas. Co.*, 928 F.2d 493, 494 (2d Cir. 1991).

DB next contends Plaintiffs rely on inadmissible evidence. DBOpp. 15-16. In fact, the challenged spreadsheets are admissible as **DB's business records**. ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Handlin Reply Ex. 6. ███████████████████████████████████████████████ Handlin Reply Ex. 7. Once DB turned these into its own documents and used them to negotiate with

municipalities, it rendered them admissible business records under Fed. R. Evid. 803(6). But if they were not, they are admissible as adoptive admissions. Under Fed. R. Evid. 801(d)(2)(B), a statement is admissible where the party against whom it is offered "adopted or acquiesced to the statement"; "adoption or acquiescence may be manifested in any appropriate manner," and "the rules call for 'generous treatment of the avenue of admissibility' for admissions in general." *Penguin Books U.S.A. Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 258-59 (S.D.N.Y. 2003) (quoting advisory committee notes to Rule 8.01(d)(2)(B) and 8.01(d)(2)); *In re GM LLC Ignition Switch Litig.*, 2015 WL 8578945, at *2 (S.D.N.Y. Dec. 9, 2015). "A party may adopt a written statement by using it or taking action in response to or in compliance with it." *Penguin Books*, 262 F. Supp. 2d at 258 (citations omitted). Adoptive admissions are also found "where a party forwards a document to another in response to some request for information contained in the document," *id.* at 259 (citation omitted), and where "'the adoptive party accepted and acted upon the evidence' by, for example, taking an action of some importance," *In re GM*, 2015 WL 8578945, at *2.

Under these standards, the exhibits are admissible.



*Id.* at 501114. ███████████████████████████████ *Id.*

*Id.* at 906450.



███████████████████████████████████

███████████ *Id.* at 906451. ████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████ These are adoptive admissions.

Nor can DB escape the damning admissions of Mr. Co, its Business Head of Mortgage-

Backed Securities, Handlin Ex. 384 (Co) 30:12-31:25, about ██████████████████

██████████████████████████████

███████████████████████████████

████████████████████████████████

███████████████████████████████████

█████████████████████████████████

████████████████████████████████

███████████████████████████████████

██████ Pltfs.Mem. 30-31 (quoting Handlin Ex. 384 (Co) 190:6-191:12). DB's brief never

mentions this fatal admission. █████████████████████████████

███████████████████████████████████

████████ Co's reply declaration does not contradict this testimony—but if it did, "the 'sham

issue of fact' doctrine … prohibits a party from defeating summary judgment simply by

submitting an affidavit that contradicts the party's previous sworn testimony." *In re Fosamax*

*Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013). Under this doctrine, affidavits and

declarations of a party's executive contradicting prior deposition testimony will not defeat

summary judgment. *See Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 577-78 (2d Cir. 1969).

The facts (versus DB's mischaracterizations) about the 4 municipalities confirm DB knew EODs occurred.

**Los Angeles.** This inquiry should start, and end, with another admission from Mr. Co. He was asked: ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Handlin Ex. 384 (Co) 154:1-9 (emphasis added). ██████████████████████████

████████████████████████████████ Period. A senior executive's testimony binds the corporation. *See* Fed. R. Civ. P. 32(a)(3); *Cameo-Parkway Records, Inc. v. Premier Albums, Inc.*, 43 F.R.D. 400, 401 (S.D.N.Y. 1967); *Curry v. States Marine Corp. of Del.*, 16 F.R.D. 376, 377 (S.D.N.Y. 1954). Mr. Co reviewed his transcript, made corrections, but left this testimony untouched. Handlin Reply Ex. 8. That DB now induced Co to swear ███

████████████████████████████ not the question asked—speaks ill of DB and its witness, but, under *In re Fosamax* and *Perma Research*, it cannot defeat summary judgment.

Nor can DB hide behind flimsy hearsay objections. DBOpp. 18-20. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

14

███████████████████████████████████████████████████████████

████████████████████████████████████████ Handlin Ex. 568 at 4359690-

91, 4359693 (italics in original). ████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.*

at 4359680-82. ████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████ *See Penguin Books*, 262 F.

Supp. 2d at 258; *In re GM*, 2015 WL 8578945, at *2.

DB's own court filing also establishes its knowledge of Servicer misconduct triggering

EODs. After the State of California sued DB for this misconduct, DB negotiated a settlement

with Servicers and the State encompassing more than 1,200 trusts (including all 85 Trusts), then

petitioned the Orange County Superior Court to approve it. ████████████████████████

██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████

Handlin Ex. 811 at 3718197. In other words, █████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████ *id.* at 3718199, ██████████████████████████████████████████

████████████ *Id.* at 3717868. ████████████████████████████████████████

████████████████████████ *Id.* at 3717868-69, 3719189. █████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* at 3717868, 3718203.



The Superior Court approved DB's petition. Handlin Ex. 810 at 3329699; Handlin Reply Ex. 9. Because DB obtained the result it sought, it is judicially estopped from denying the positions in its court papers submitted in support of its petition. *See Pu v. Russell Publ'g Grp.,* 2016 WL 9021990, at *7 (S.D.N.Y. Sept. 2, 2016), *aff'd*, 683 F. App'x 96 (2d Cir. 2017).

DB incorrectly contends settlement agreements and consent orders are categorically inadmissible. 18-19. Such documents cannot establish the truth of matters not adjudicated, but are admitted for other purposes. As stated in DB's cited case, *Dent v. U.S. Tennis Ass'n*, 2008 WL 2483288, at *2 (E.D.N.Y. June 17, 2008), "various cases have found settlement agreements and consent decrees admissible to prove matters other than the truth of the allegations that led to the settlements, including such issues as knowledge, motive, and intent." *See Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 179 (E.D.N.Y. 2006) (consent decrees are admissible to prove "knowledge and intent"), *aff'd*, 531 F.3d 127 (2d Cir. 2008). ██████████████████ ████████████████████████████████████████████████████ Handlin Ex. 384 (Co) 144:2-25; Handlin Ex. 393 (Vaughan) 194:21-195:7; Handlin Ex. 779 (Reyes 30(b)(6)

215:20-217:11; Handlin Ex. 387 (Reyes 30(b)(6)) 132:7-13, 133:20-134:3. The consent decrees are admissible—indeed, necessary—to show what DB knew.

For **Chicago**, **New York**, and **Milwaukee**, DB trivializes this issue as concerning "dirty sidewalks." DBOpp. 12, 17, 20, 22-23. In fact, DB's overall business was threatened.



The examples Plaintiffs identified are just those for which the limited documents DB produced prove specific violations persisted beyond the cure periods. These close-up snapshots, viewed together, reveal the indisputable bigger picture: for years, the Servicers for these Trusts failed to satisfy their contractual duties regarding foreclosures and REO properties in these municipalities. Plaintiffs proved these systemic abuses for 73 Trusts, and the specific violations

17

were uncured past the cure periods. DB, which negotiated with the municipalities and has all the facts, offers **no** contrary evidence.

DB next argues that, for 19 Trusts, only Master Servicer nonperformance triggers prudent person duties. DBOpp. 20-21. Because Plaintiffs moved for judgment on 73 Trusts, DB admits this argument does not apply to 54 Trusts. Even for the 19, it fails. Those Governing Agreements require the Master Servicer to monitor Servicer performance and cause the Servicer to perform; the Master Servicer's failures to correct Servicer EODs constituted Master Servicer EODs, triggering DB's heightened duties. Pltfs.Opp. 85-86. And, for 1 Trust, the Master Servicer had, and breached, affirmative obligations regarding REO properties and foreclosures. CBCSUF ¶¶ 16, 182-184.

DB's arguments that it would have needed to conduct "expensive investigations" and "re-underwrite tens of thousands of loans," DBOpp. 22-23, are red herrings. As a matter of law, the facts DB knew required it to look further. Pltfs.Opp. 40. Even without doing so, DB knew enough to declare EODs, ███████████; it just didn't. Once EODs occurred, no reunderwriting was necessary. DB filed bankruptcy proofs of claim without reunderwriting. Given DB's witnesses' testimony and conduct, repurchase demands DB received identifying R&W breaches constituted discovery or actual knowledge. Pltfs.Opp. 46-48. Likewise, from exception reports, DB had actual knowledge of document defects warranting repurchase. DB had no excuse for inaction.

## III.   DB Breached Its Post-EOD Prudent Person Duties

### A.   DB's admissions establish its liability for failing to act prudently post-EOD

Stripped of rhetoric, DB's post-EOD arguments make three extraordinary concessions:

(1) **For at least 17 Trusts, DB admits it did literally nothing post-EOD.** Here is the sum total of what DB says it did in response to EODs:



¶ 1135.

DBOpp. 43 (numbering added). That's it. The corresponding DSUF paragraphs say the same, only with evidentiary cites.



DBOpp. 2. That means the **only** actions DB identifies having taken in response to EODs were for 38 Proof of Claim Trusts and 4 additional Trusts where it was directed to commence repurchase litigation. Handlin Reply Decl. ¶¶ 11-13. For the remaining 43 Trusts, DB identifies **nothing** it did to satisfy its heightened duties. DB says it ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ DBOpp. 32; DSUF ¶ 1106.1— but identifies no actual action. As DB asserts, these cases require Trust-by-Trust proof. DBOpp. 10, 32. Plaintiffs' Motion proves specific EODs in 73 specific Trusts. To have been prudent, a trustee's decision must have been "the result 'of careful and informed deliberation.'" *LNC Invs.,*

*Inc. v. First Fid. Bank, Nat'l Ass'n*, 1997 WL 528283, at *17 (S.D.N.Y. Aug. 27, 1997) (citations omitted). DB fails to identify **any** deliberation or **any** action for **any** specific EOD in **any** specific Trust—*i.e.*, it offers no **facts** to avoid summary judgment.

For 17 Trusts, DB declared EODs, there were no bankruptcies, and DB filed no litigation, Handlin Reply Decl. ¶ 14—so DB admits EODs occurred and it did nothing, establishing DB's liability for failing to act prudently. Those Trusts can proceed to Phase 2.

(2) **DB waived the attorney-client privilege.** In claiming to have acted "prudently" post-EOD, DB says it ████████████████████████████████████████████████████ ████████████████████████████████████████████████ DBOpp. 43; DSUF ¶ 1134. Describing DB's "sound process," Mr. Reyes says "trust administrators would escalate issues relating to EODs where Defendant had actual knowledge to their Team Leaders who in turn would consult with Defendant employees in the Transaction Management Group, the Default Group and internal and external counsel to develop an appropriate response and/or course of action." Reyes Opp. Decl. ¶ 16. ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████

Plaintiffs sought discovery of these consultations with counsel. DB refused. Plaintiffs moved to compel. Rather than disclose the communications, DB withdrew its "advice of counsel" defense, forfeiting any right to contend it satisfied its prudent person duties in part by

seeking or following counsel's advice. *See* Handlin Reply Ex. 10 at 57:22-59:18; Pltfs.Mem. 41.
Nonetheless, DB now asserts that defense. This is a clear waiver.

(3) **For EODs in 25 Trusts, DB offers zero proof that it even sent those to be
reviewed**. DB says ███████████████████████████████████████████████████
████████████████████ DBOpp. 43; DSUF ¶ 1133. For the occurrences Plaintiffs contend
triggered EODs that DB never declared, DB offers **no proof**—from TMG, the Default Group, or
anybody else—that anyone assessed anything. Handlin Reply Decl. ¶ 16. If the Court agrees any
such EODs occurred, given DB's evidentiary vacuum, its liability for failing to act prudently
post-EOD is established, and those Trusts can go to Phase 2.

**B.   DB's attacks on Plaintiffs' proof are baseless**

DB accuses Plaintiffs of "cherry-picking" testimony, DBOpp. 32, but it's not cherry-
picking where they all said it. DB claims the witnesses Plaintiffs cited "were not responsible for
addressing EODs." *Id.* 32, 42-43. ██████████████████████████████████████████
██████████████████████ Pltfs.Mem. 37-38. ████████████████████████████████████
████████████████████████████████ Pltfs.SUF ¶¶ 55-56; Handlin Ex.
383 (Avakian) 170:3-22; Handlin Ex. 389 (Pilapil) 68:2-69:1. ██████████████████████
████████████████████████████████████████████████████████████
████████████████ Handlin Ex. 384 (Co) 208:10-18. They didn't.

DB says Plaintiffs "ignore" testimony of witnesses from ██████████████████████
████ DBOpp. 42. Yet DB identifies no deposition testimony, and offers no declarations, from
███████████████████████████████████████████ to show they did
**anything** responsive to any EOD asserted by Plaintiffs. DB's entire description of what TMG
did is quoted above; for most Trusts, it equals nothing. DB doesn't identify what the "Default

Group" does, much less anything it did on these EODs. DB's only source of "proof" about "TMG and/or the Default Group," Mr. Reyes, doesn't say what those groups (or anyone) **did**, only what they "would" do "in general"—unfounded platitudes that are not Trust- or EOD-specific and have no probative value. DB suffers from a complete failure of proof.

### C.  Plaintiffs identified what DB should have done post-EOD

DB says Plaintiffs failed to identify what DB should have done. DBOpp. 32-33. Not so. First, DB had to comply with its obligation to maximize investors' recoveries, using any conduct not specifically prohibited by the Governing Agreements. Pltfs.Mem. 14. To accomplish that, in every instance, DB was required to deliberate. Without deliberation, no action or inaction can be prudent. *Id.* 35. Then, DB should have done what it did for the Proof of Claim Trusts: seek to enforce repurchase of loans with grounds for doing so (R&W breaches, document defects). *Id.* 38-40. At the very least, DB should have gotten tolling agreements preserving repurchase remedies; knowingly allowing the limitations periods for claims to expire cannot be prudent.

DB suggests Plaintiffs needed to offer evidence of other Trustees' conduct. DBOpp. 33-34. DB is wrong. In *FHFA*, the Second Circuit made clear that RMBS "industry standards" were a touchstone for inadequacy. Also, Plaintiffs went one better, showing what DB should have done in these Trusts using evidence of what **DB** did in the Proof of Claim Trusts. Pltfs.SUF ¶¶ 576-578; Pltfs.Opp. 88-90.

### D.  Here, prudence is not a fact issue

Contrary to DB's argument, DBOpp. 37-38, prudence is not always a fact question. Although determining prudence is often fact-intensive, sometimes prudence dictates only one course, and can be determined as a matter of law. Pltfs.Mem. 32; *see LNC*, 1997 WL 528283, at *17; *SEC v. Credit Bancorp, Ltd.*, 147 F. Supp. 2d 238, 256 (S.D.N.Y. 2001); *FMS Bonds, Inc.*

*v. Bank of N.Y. Mellon*, 2016 WL 4059155, at *12 (S.D.N.Y. July 28, 2016). Lack of prudence is particularly amenable to summary judgment here because DB admits that for certain Trusts it did nothing.

Any contrary suggestion in *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 2017 WL 3973951, at *15 (S.D.N.Y. Sept. 7, 2017), is unpersuasive. Where PSA Article VII requires a trustee to send investors an EOD notice, merely sending that notice cannot, alone, create a fact question whether the trustee also satisfied its duty of prudence under Article VIII. Absent affirmative evidence that the trustee deliberated and decided for particular reasons that doing nothing else was prudent, fulfilling a mandatory ministerial obligation (sending notice) is no evidence that the trustee did anything to comply with a discrete, substantive obligation (responding to the EOD as a prudent person would in conducting its own affairs). If a trustee can send the post-EOD notice required by Article VII, then do nothing unless directed, *see* DBOpp. 34-37, § 8.01 is meaningless and redundant—violating not just basic contract interpretation principles but federal and state law that impose the prudent person obligations, *see* Pltfs.Mem. 10. (Moreover, in all Trusts where DB never declared EODs, it likewise never sent notices.)

DB's assertion that Plaintiffs ██████████████████████████████████████████

██████   DBOpp. 36-37, ignores that DB would not provide contact information when asked, thwarting investor attempts to assemble the necessary voting rights. Pltfs.Opp. 66-67. And

██████████████████████████████████████████████████████   DBOpp. 40-42, the evidence is that, except for Proof of Claim Trusts or if directed, DB did not even deliberate. As for DB's assertion that "each EOD and its attendant circumstances are different," *id.* 39, DB should look in the mirror. Plaintiffs identified Trust-specific, fact-specific EODs. DB responded with empty generalizations and concessions of inaction. DB's "expert" cannot overcome DB's

23

lack of factual evidence showing it did anything EOD-specific absent bankruptcies or direction.
*See Highland Capital Mgmt., L.P. v. Schneider,* 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005).

DB's statement that, ███████████████████████████ DBOpp. 43, has no
probative value. It is circular and vacuous; a trustee cannot prove it satisfied a duty to act
prudently by saying it acted when doing so was prudent—especially without identifying **when**
that was, and **what** made acting, or not, prudent.

DB says it wasn't required to "investigate," DBOpp. 36, 40—but DB didn't need to
investigate what it already knew. DB filed proofs of claim seeking repurchase of loans for R&W
breaches and document defects without being directed to investigate. DB could have taken
similar actions after every EOD. It offers no factual evidence suggesting not doing so was
prudent.

### E.  DB cannot avoid summary judgment by asserting "good faith"

DB offers no proof of post-EOD deliberation. Without that, it cannot have believed it
satisfied a heightened duty. Key personnel didn't even know DB **had** a heightened duty,



███████████████████████████. DB cites ██████████████████████████

DBOpp. 43—█████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████. Handlin Ex.

746 (Wannenmacher) 165:2-25, 166:18-167:4; Handlin Ex. 384 (Co) 44:2-14, 241:2-8; Handlin

Ex. 393 (Vaughan) 94:16-95:1. ███████████████████████████

███████████████████████████████████████

Handlin Ex. 378 (Reyes) 115:16-117:10; Handlin Ex. 746 (Wannenmacher) 163:5-165:1, 166:2-

167:4; Handlin Ex. 384 (Co) 232:3-11. █████████████████████████

██████████████████████████████████████████████████████████████

████ ,[3] ████████████████████ .

DB also says it demonstrates good faith by ████████████████ . DBOpp. 43-44. DB

again waives the attorney-client privilege. *See Leviton Mfg. Co. v. Greenberg Traurig LLP*, 2010

WL 4983183, at \*3 (S.D.N.Y. Dec. 6, 2010) (because legal advice received may disprove a

claim of good faith, "it would be unfair to allow a party" to rely on its consultation with counsel

to prove good faith "while denying its adversary access to privileged material potentially capable

of rebutting the assertion") (citation omitted). Solely in a footnote, DB cites *CFIP Master Fund,*

*Ltd. v. Citibank N.A.*, 738 F. Supp. 2d 450 (S.D.N.Y. 2010), to dispute waiver, DBOpp. 44 n.38,

but *CFIP*'s unreasoned conclusion is analytically insupportable.

### F. DB's "response" to Servicers' REO misconduct and late compliance documents was unreasonable as a matter of law

Briefly, DB contends its "response" to the EODs Plaintiffs proved "was reasonable and

prudent." DBOpp. 44. To be clear, DB couldn't "respond" to EODs it didn't recognize. DB

"responded" only to bankruptcies and direction. If DB means its ordinary course of conduct

accidentally satisfied the prudent person standard, DB is mistaken. Regarding Servicers' REO

---

[3] ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████ . Handlin Reply Decl. ¶ 17.

misconduct, DB protected itself, not investors. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████ Handlin Ex. 387 (Reyes 30(b)(6)) 28:1-30:5, 34:6-35:12, 47:25-48:9;

Handlin Ex. 384 (Co) 155:23-156:4, 164:7-22. ████████████████████████

████████████████████████████████████████████████████████████

████████████████ Handlin Ex. 387 (Reyes 30(b)(6)) 36:2-23 & Handlin Reply Ex. 11 at

456888. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████. Handlin Ex. 779 (Reyes 30(b)(6)) 203:9-204:20, 205:16-206:4; Handlin Ex.

384 (Co) 114:25-115:21, 171:8-174:6. ████████████████████████████████

████████████████████████████████████. Handlin Ex. 387 (Reyes 30(b)(6))

43:5-44:4; Handlin Ex. 384 (Co) 120:6-24. ████████████████████████████

████████████████████████████████████████████. Handlin Ex. 387

(Reyes 30(b)(6)) 44:5-46:1.

DB constantly says it cannot commence litigation without direction and indemnity.

DBOpp. 2, 13, 32, 34-37, 39, 44. It can, and did—but only to protect its own tail. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████. Handlin Ex. 387 (Reyes 30(b)(6)) 46:16-24; Handlin Ex. 779 (Reyes 30(b)(6)) 168:4-

17; Handlin Ex. 384 (Co) 156:15-157:19. If DB could do that to protect itself, it could and

should have done the same to protect Certificateholders, to whom it owed fiduciary obligations

post-EOD. Yet, despite overwhelming evidence of Servicer misconduct known to it, ███████

████████████████████████████████████████████████████████████████.

Regarding EODs triggered by late compliance documents, DB says it responded

prudently because █████████████████████████████████████████████████████████

█████████████████████████████ DBOpp. 44. Nonsense. ██████

██████████████████████████████████████████████████████████████

███████████████████. Handlin Reply Ex. 4 at 2569071. ██████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████. Handlin Ex. 383 (Avakian) 55:13-56:2;

Handlin Ex. 389 (Pilapil) 46:10-47:6. For the 8 Trusts on which Plaintiffs moved, the cure period

for late compliance documents ranged from 0-10 days. Pltfs.Mem. 21-22. A "policy and

procedure" that guaranteed noncompliance triggering EODs cannot be reasonable. Moreover,

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████.

Handlin Ex. 746 (Wannenmacher) 258:13-259:15, 274:7-275:12; Handlin Ex. 393 (Vaughan)

72:23-73:3, 78:16-22. ██████████████████████████████████████████████████

████████████████████████████████████████████ Handlin Reply Ex. 4 at

2569070. Failing even to know the individual EOD triggers exist is unreasonable.

## IV.    DB Knew of the Uncured Document Defects Identified in Its Last 2% Letters

Although DB contends information about its 2% Letters is irrelevant, DBOpp. 52-53, it

does not contest that it knew of the still-uncured document defects identified in the exception

reports accompanying its last 2% Letters in 2010-2011. Plaintiffs are entitled to judgment that

DB had actual knowledge of those defects on those dates.

DB's limitations argument, DBOpp. 53-56, mischaracterizes Plaintiffs' claims. Plaintiffs are not asserting "document delivery" claims for failures that occurred when the Trusts closed. Plaintiffs' separately pled claims for DB's failures to enforce repurchase, which occurred much later, were never abandoned or dismissed, and, as the Court held, are not time-barred. *See PL v. DB*, 172 F. Supp. 3d at 710; Pltfs.Opp. 55-57. The contractual provisions requiring DB to enforce repurchase obligations do not state a time for performance. When a "contract specifies no date or time of performance, the parties have a reasonable time to perform and … the cause of action accrues and the statute begins to run as soon as the reasonable time has expired." *Lituchy v. Guinan Lithographic Co.*, 60 A.D.2d 622, 622 (2d Dep't 1977); *see Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir. 2007). "What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case." *Zev v. Merman*, 73 N.Y.2d 781, 783 (1988). When it would have been reasonable for DB to enforce repurchase requires reviewing each Governing Agreement's requirements as well as evidence concerning the document defects' nature, each Seller's time to cure, the reasonableness of allowing a Seller additional time to cure, whether the Seller was adequately notified of its repurchase obligation where notice was required, what DB knew, and when it knew it. Those issues require trial, which is why, except for 8 Trusts discussed below, *infra* 33-34, Plaintiffs did not move on DB's failure to enforce repurchase for document defects.

DB says the limitations period should run from its first, not last, 2% Letter. DBOpp. 55-56. However, allowing reasonable time to cure defects, the first letter cannot be the appropriate trigger. DB also ignores its 2% Letters' admission that DB would use responses "in determining whether remedial action is required to be taken with any of the affected loans," *i.e.*, that in 2010-2011, DB could still assert "remedial action" for document defects, meaning it believed the

limitations period had not expired. Pltfs.Opp. 57. DB's "course of conduct" before the

Governing Agreements became "the subject of controversy" is given "great weight" in their

interpretation. *See New Windsor Volunteer Ambulance Corps. v. Meyers*, 442 F.3d 101, 112 (2d

Cir. 2006).

### V.    For 40 Trusts, the "Rights Referred to Above" Provision Obligated DB to Enforce Repurchase Remedies

Plaintiffs showed DB is collaterally estopped from relitigating the ruling in *Royal Park

Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 439020 (S.D.N.Y. Feb. 3, 2016), that the

"rights referred to above" provision in Article II of Governing Agreements requires DB to

enforce the preceding repurchase protocols. Pltfs.Mem. 46-47. DB contends "a 'valid and final

judgment on the merits'" must exist for collateral estoppel to apply. DBOpp. 45. DB misstates

the law. "[E]ver '[s]ince Judge Friendly's seminal opinion in *Lummus Co. v. Commonwealth Oil

Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961), it has been settled that a judgment that is not "final" in

the sense of 28 U.S.C. § 1291 can nonetheless be considered "final" in the sense of precluding

further litigation of issues that were actually determined in such a judgment.'" *United States v.

Walker*, 239 F. Supp. 3d 738, 740 (S.D.N.Y. 2017) (quoting *TM Patents, L.P. v. IBM Corp.*, 72

F. Supp. 2d 370, 375-76 (S.D.N.Y. 1999)).

Issue preclusion has four requirements: "(1) the identical issue was raised in a previous

proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the

part[ies] had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue

was necessary to support a valid and final judgment on the merits." *Wyly v. Weiss*, 697 F.3d 131,

141 (2d Cir. 2012) (citation omitted). The last element does **not** require that a judgment be

"'final' in the sense of 28 U.S.C. § 1291" to "preclude[e] further litigation of the same issue."

29

*Lummus*, 297 F.2d at 89. "'Finality' in the context here relevant may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again," considering "such facts as the nature of the decision (*i.e.*, that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." *Id.* Also, a trial court must "satisfy itself that application of offensive collateral estoppel is fair," and is "accorded 'broad discretion' in determining whether or not collateral estoppel should apply in a given case." *Flood v. Just Energy Mktg. Corp.*, 904 F.3d 219, 236 (2d Cir. 2018).

Having misrepresented the legal standard rather than address the governing law, DB waived its opportunity to satisfy the requirements for avoiding collateral estoppel. The sole factor DB contests is whether the issue here is identical to that in *Royal Park*. DB claims the provision addressed there contained language beyond that in many clauses in these cases, DBOpp. 46—a fact Plaintiffs already noted. Pltfs.Mem. 45 n.17. DB does not explain why the extra language matters—because it doesn't. *Royal Park* held the obligation to "exercise the rights referred to above" relates to the preceding repurchase protocol, and nothing suggests the decision relied on the surplus language. *See* 2016 WL 439020, at *4. The operative language is the same in all 40 Trusts.[4]

DB's cited cases support applying collateral estoppel here. In *Flood*, the Second Circuit upheld a trial court's discretionary decision that applying collateral estoppel would be "unfair" where: the defendant sought, but was denied, interlocutory review; both the ruling for which the plaintiff sought collateral estoppel effect and the Sixth Circuit agreed the issue in question was "uncertain and subject to dispute among courts"; and another court "ha[d] come to a different

---

[4] SAST 2007-1 and 2007-2 have language identical to that in *Royal Park*.

conclusion." 904 F.3d at 237; *see Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 264-65 (S.D.N.Y. 2013) (unfair to apply collateral estoppel where trial court granted request for interlocutory appeal and the same issue was decided differently in other cases). No such considerations exist here. DB did not seek reconsideration or interlocutory appeal;[5] the ruling expressed no doubt and was not "avowedly tentative"; and DB cites no case deciding the issue differently. In *City of Amsterdam v. Daniel Goldreyer, Ltd.*, 882 F. Supp. 1273, 1279 (E.D.N.Y. 1995), the court declined to give another decision collateral estoppel effect because "disputed questions" of fact were unadjudicated, and the other ruling "only addresses the sufficiency of the complaint in that action." Here, DB identifies no disputed facts on the issue, and none exist. This is a question of law. Addressing the same language, *Royal Park* decided what the contract means as a matter of law. *Hill v. City of N.Y.*, 45 F.3d 653 (2d Cir. 1995), did not address collateral estoppel at all.

Even absent collateral estoppel, *Royal Park*'s analysis is persuasive. Pltfs.Mem. 45-47. **DB offers no other interpretation**—and any alternative would impermissibly render the "rights referred to above" language a nullity. Invoking the provision saying the Trustee shall undertake "only such duties as are specifically set forth in this Agreement," DBOpp. 47-48, DB rehashes its prior failed arguments; the SAST 2006-2 PSA construed in *Royal Park* contains that identical language. Handlin Reply Ex. 12 § 8.1. The "rights referred to above" **are** "specifically set forth in" the Governing Agreements. The rights to enforce the repurchase protocol are the **only** "rights referred to above" in Article II. Pltfs.Mem. 45-46. Any contrary conclusion in *Western &*

---

[5] DB sought reconsideration of three other rulings in *Royal Park* since Judge Nathan's February 2016 decision. Handlin Reply Decl. ¶ 19.

*Southern Life Ins. Co. v. Bank of N.Y. Mellon*, 2019 WL 495581 (Ohio Ct. App. Feb. 8, 2019), is

unfounded, as that court's ruling concerning the "rights referred to above" relied on a section of

*Royal Park* discussing entirely different PSAs containing a different repurchase protocol

irrelevant to the "rights referred to above" issue.

DB's reference to language saying Trust property is held "for the benefit of"

Certificateholders (in a separate sentence preceding the "rights referred to above" sentence),

DBOpp. 47, gives no meaning to the "rights referred to above." DB's citation of *CFIP*, *id.* 48,

adds nothing; that case did not address this issue.

DB notes that, besides the "rights referred to above" clause, the GSAA Trusts' Governing

Agreements express DB's repurchase enforcement obligations a second time. DBOpp. 48. (DB

thereby concedes its obligation to enforce repurchase for those Trusts, which it failed to do.) ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Pltfs.Opp. 64. Each

contract must be construed by its own plain meaning. DB has the enforcement obligation

whether it is stated once (for most of these Trusts) or twice (for the GSAAs). Similarly, the fact

that multiple parties—DB and another—may have repurchase enforcement obligations, DBOpp.

46, 48, does not undermine this reading. Other Trusts likewise assign repurchase enforcement

duties to multiple parties. *See*, *e.g.,* Handlin Exs. 3, 5 (AMSI 2006-R1, ARSI 2006-M3)

§§ 2.03(a), 6.06(b).

In a footnote, DB says "enforce" might mean "notify." DBOpp. 49 n.41. Besides the

insufficiency of footnote-only arguments, the cited language disproves DB's hypothesis. When a

Governing Agreement means "enforce by notifying," it says that. *Id.* Otherwise, when it uses

both "enforce" and "notify," the different words must be given independent meanings. *Supra* 10.

**VI.    For 16 Trusts, DB Was Required to Enforce Repurchase Pre-EOD Where It Failed to Notify the Depositor of Mortgage File Defects**

DB fails to mention, much less refute, that it lost this exact issue in *Royal Park*—including on one Trust at issue here. DBOpp. 49-50; Pltfs.Mem. 47-48. Collateral estoppel should apply.

DB says Plaintiffs seek a "speculative" ruling, DBOpp. 49, but DB's failures of proof on its motion and opposition show otherwise. DB offered no proof that it gave any Depositor the required notice. Pltfs.Opp. 54-55. DB's witnesses testified they were unaware of making these required communications to Depositors. *Id.* 58. Despite raising the issue itself, DB lacks supporting evidence; the undisputed facts show DB gave no notice.

DB's assertion that it lacked the requisite knowledge of R&W breaches has been disproven. Pltfs.Opp. 46-49. Ironically, DB responds with hypotheticals, saying its failure to notify **might** not be fatal **if** evidence shows another party gave notice, or **if** the Depositor otherwise knew of the breach, DBOpp. 50—but DB offers no evidence to support either. Speculation cannot defeat summary judgment.

DB did not satisfy its notice requirements. It relies on DSUF ¶ 1155, DBOpp. 50, which relies on Reyes, who relies on DB's "exemplar" First & Second Letters—which Plaintiffs showed did not provide the required notice of R&W breaches. Pltfs.Opp. 49-51.

**VII.   DB Had a Pre-EOD Duty to Enforce Repurchase of Loans with Mortgage File Defects for 8 Trusts, and Breached that Duty for 3 Trusts**

As a matter of law, 8 Trusts required DB to enforce repurchase for loans with document defects, and it breached that duty for 3 Trusts. Pltfs.Mem. 48-54. DB's statute of limitations arguments, DBOpp. 53-56, are refuted above. *Supra* 28-29. For these Trusts, Plaintiffs are

entitled to judgment that DB had, and breached, the repurchase enforcement obligation. Pltfs.Mem. 51-54. The jury will simply decide when DB should have acted.

Next, DB misreads the Governing Agreements, saying "[g]enerally," responsible parties must cure, substitute, or repurchase loans with "a material missing or nonconforming document." DBOpp. 52. DB insists that to trigger repurchase obligations, document defects must be "material," which it claims is a fact question. *Id.* 57-58. Of 72 Trusts providing for repurchase of loans with missing/defective documents, **none** requires that **missing** Mortgage File documents be "material." Handlin Reply Ex. 13. Forty Trusts require the responsible party to cure, substitute, or repurchase where any Mortgage File document is "missing or materially defective," *i.e.*, the "materiality" requirement applies **solely** to "defective" documents. *Id.* Thirty-two Trusts— including the 8 on which Plaintiffs moved, Pltfs.Mem.48-54—have no materiality requirement even for defective documents. *Id.*[6] For those 8 Trusts, for all loans with missing or defective Mortgage File documents, no fact issue exists, and Plaintiffs are entitled to judgment.



. DBOpp. 59.

. Pltfs.Mem. 49-51.

. Pltfs.Mem. 53-54.

---

[6] DB says "[e]ven as to GAs that do not expressly say so, materiality is required." DBOpp. 57. This ignores the contracts' plain language, and is irreconcilable with DB's insistence that Governing Agreements be strictly limited to their text. *Id.* 47.

### VIII.    For 21 Trusts, DB Breached Its Duty to Monitor Servicers

DB contends Plaintiffs did not plead that DB breached the Governing Agreements by failing to monitor Servicers, and so may not seek summary judgment on such breaches in 21 Trusts whose Governing Agreements required DB to do so. DBOpp. 59-61. DB is wrong. Where a cause of action for breach of contract is pled, the pleading need not identify every specific type of breach. Pltfs.Opp. 8-9; *supra* 4-5. Also, where discovery provides notice that a party is pursuing a claim, even if not expressly pled, it is fairly raised on summary judgment because there is no surprise or prejudice. *Supra* 5.



Handlin Ex. 706 (Reyes) 354:1-20 (emphasis added).

On the merits, DB mischaracterizes Plaintiffs' claim. DBOpp. 63. Plaintiffs are not claiming DB violated Reg AB. DB had, and breached, "**contractual** duties to institute policies and procedures to monitor Servicers' performance triggers and EODs." Pltfs.Mem. 57 (emphasis in original).

Item 1122(d)(1)(i)'s phrase "in accordance with the transaction agreements," DBOpp. 60, 62, does not exonerate DB. DB's obligation is stated in the Governing Agreements, so it is "in accordance with the transaction agreements." Schedules to these 21 Governing Agreements make DB responsible for satisfying this criterion, and DB's duty did not terminate once the Trusts went dark—making the ongoing obligation contractual, not regulatory. A contract's schedules are fully part of the agreement. *See Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*, 100 A.D.3d 100, 105-06 (1st Dep't 2012) (schedules fall within "the four corners of the contract"); *Grocery Haulers, Inc. v. C & S Wholesale Grocers, Inc.*, 2013 WL 342693, at *4 (S.D.N.Y. Jan. 29, 2013) (same).

DB claims it satisfied its contractual obligation merely by "submitt[ing] those certifications." DBOpp. 62. The obligation, however, requires certifications to be true: DB must have had policies and procedures to monitor Servicers' performance and EODs. It had none. If DB believed this criterion addressed something that was not its duty, it should have said the criterion was inapplicable. It didn't.

This is not the claim Plaintiffs withdrew, DBOpp. 61, which was for negligent misrepresentation. DB's motion to dismiss admitted the Trustee's Reg AB report "would only report as to its own conduct," and argued that Reg AB certifications would not address other parties' R&W breaches. *PL* ECF 29, at 39. Here, Plaintiffs are not saying DB's certifications failed to identify others' breaches. DB was obligated to have procedures to monitor Servicers,

and to report accurately on those procedures. DB reported it had such procedures, when it did not.

████████████████████████████. DBOpp. 62-63. DB did not disclaim the duty to monitor Servicers; it falsely averred that it complied. Misleading its auditor is no defense.

DB gets no exculpation for "good faith." DBOpp. 63. DB certified, year after year, that it had policies and procedures to monitor Servicers' performance and EODs—while arguing in legal briefs and testifying under oath to the contrary. The two positions are incompatible; asserting them simultaneously cannot be good faith.

DB concludes: "Plaintiffs have not identified any court decision having found such a duty." *Id.* Neither has DB found any court saying no duty exists. Being the first trustee caught breaching this duty does not excuse DB.

## CONCLUSION

Plaintiffs have proven: undeclared EODs known to DB occurred, triggering prudent person duties that DB breached by its inaction; DB knew of vast uncured Mortgage File exceptions; DB breached pre-EOD duties to enforce repurchase obligations; and DB breached its contractual duty to monitor Servicers. Plaintiffs' Motion should be granted.

Dated:  February 15, 2019

By:      */s/ Jay S. Handlin*

David H. Wollmuth
Jay S. Handlin
Steven S. Fitzgerald
Ryan A. Kane
Philip R. Schatz
Christopher J. Lucht
John R. Hein
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
jhandlin@wmd-law.com
sfitzgerald@wmd-law.com
rkane@wmd-law.com
pschatz@wmd-law.com
clucht@wmd-law.com
jhein@wmd-law.com

*Attorneys for Plaintiffs*

38

**CERTIFICATION**

I hereby certify that Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Joint Motion for Partial Summary Judgment dated February 15, 2019 is 11,193 words in length and complies with all required formatting rules.

/s/ Jay S. Handlin

39

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2019, I caused the following documents to be filed with the Clerk of the Court in redacted form and to be served on counsel of record by secure file transfer: (i) Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Joint Motion for Partial Summary Judgment, (ii) Plaintiffs' Responses to Defendants' Rule 56.1 Counter-Statement of Undisputed Facts, (iii) Plaintiffs' Responses to Defendants' Objections Cited in Plaintiffs' Joint Motion for Partial Summary Judgment, and (iv) the Reply Declaration of Jay S. Handlin, and all related Exhibits on counsel of record via electronic mail. Per the parties' stipulation, approved by Magistrate Judge Freeman (*Phoenix Light* ECF 300, 305; *Commerzbank* ECF 189, 195), these documents are identical to the documents Plaintiffs filed redacted and under seal on February 15, 2019 and lodged with the Court in sealed envelopes in unredacted form on February 19, 2019, except for this additional Certificate of Service.

*/s/ Jay S. Handlin*