**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| PHOENIX LIGHT SF DAC, BLUE HERON FUNDING V LTD., BLUE HERON FUNDING VI LTD., BLUE HERON FUNDING VII LTD., BLUE HERON FUNDING IX LTD., C-BASS CBO XIV LTD., C-BASS CBO XVII LTD., KLEROS PREFERRED FUNDING V PLC, SILVER ELMS CDO PLC and SILVER ELMS CDO II LIMITED, | : : : : : : : : : | No. 14-cv-10103-JGK |
| Plaintiffs, | : : | |
| -against- | : : | |
| DEUTSCHE BANK NATIONAL TRUST COMPANY and DEUTSCHE BANK TRUST COMPANY AMERICAS, | : : : : : | |
| Defendants. | : : | |
| COMMERZBANK AG, | : : : | |
| Plaintiff, | : : | |
| -against- | : : : | |
| DEUTSCHE BANK NATIONAL TRUST COMPANY and DEUTSCHE BANK TRUST COMPANY AMERICAS, | : : : : | No. 15-cv-10031-JGK |
| Defendants. | : : | |
| | x | |

**PLAINTIFFS' REVISED RESPONSES TO DEFENDANTS'**
**RULE 56.1 COUNTER-STATEMENT OF UNDISPUTED FACTS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

NOTE REGARDING REVISIONS TO REDUCE VOLUME OF SUMMARY
JUDGMENT SUBMISSION .............................................................................. 2

PRELIMINARY STATEMENT .......................................................................... 3

FACTUAL BACKGROUND ............................................................................... 4

    A.     RMBS Securitization Process ................................................... 4

    B.     The Role of the Trustee ............................................................ 8

    C.     The Structure of the Governing Agreements .......................... 75

    D.     Defendants ............................................................................... 94

    E.     Plaintiffs' structure .............................................................. 130

          1.     Phoenix Light ............................................................ 130

          2.     Commerzbank ("CB") ............................................... 185

I.     Legal Standard ................................................................................. 205

II.    The Undisputed Material Facts Establish that EODs Occurred in 73 Trusts ................ 206

    A.     For 18 Trusts, EODs were triggered by exceeding numerical thresholds .......... 206

    B.     For 7 Trusts, EODs occurred when Servicers were downgraded ...................... 370

    C.     For 8 Trusts, EODs were triggered by untimely compliance documents ........... 444

    D.     In 73 Trusts, DB failed to declare EODs triggered by Servicer misconduct
         relating to REO properties and foreclosures ....................... 506

III.   DB Breached Its Prudent Person Obligations, Because DB's Contentions as to
How It Satisfied those Duties Fail as a Matter of Law ................................... 579

    A.     Merely sending notice of EODs cannot satisfy DB's post-EOD duties ............. 586

    B.     DB's contention that doing nothing besides providing notice of EOD was
         prudent fails as a matter of law ............................................ 593

    C.     DB's "consultation with counsel" cannot justify its failure to act because
         DB waived the "advice of counsel" affirmative defense ....................... 597

IV.    DB Knew that the Sellers Failed to Cure Mortgage File Exceptions for the Loans Identified in the Document Exception Reports Linked to Exhibit 583 ......................... 600

V.    DB Had Pre-EOD Duties to Enforce Repurchase of Loans that Breached R&Ws and that Lacked Required Mortgage File Documents .................................................... 681

    A.    For 40 Trusts, DB had the pre-EOD duty to enforce the repurchase protocol for loans with R&W violations of which DB had knowledge..............681

    B.    DB cannot disclaim its pre-EOD duty to enforce repurchase remedies where DB was required, but failed, to notify the Depositor of R&W breaches...............................................................................................................754

    C.    In 8 Trusts, DB had a pre-EOD duty to enforce repurchase where DB was required, but failed, to notify the Depositor of loans with Mortgage File defects ...........................................................................................................756

    D.    For 3 Trusts on which DB's enforcement duty for loans with Mortgage File defects is established as a matter of law, Plaintiffs are also entitled to summary judgment that DB breached its duty.....................................................764

VI.    For 21 Trusts, DB breached Its Contractual Duty to Monitor Servicers ........................ 777

Part II: Additional Material Facts As To Which There Is No Genuine Dispute......................... 832

BACKGROUND .................................................................................................................... 832

    A.    RMBS Transactions Generally .......................................................................... 832

    B.    Overview of the Governing Agreements .............................................................835

        i.    Defendant Has Limited Duties Under the Governing Agreements ........ 835

        ii.    Servicers' Duties Under the Governing Agreements............................... 841

        iii.    Investors' Rights Under the Governing Agreements............................... 844

I.    THE EVIDENCE DOES NOT ESTABLISH DEFENDANT'S POST-EOD PRUDENT PERSON DUTY WAS TRIGGERED IN 73 OF THE 85 TRUSTS .......... 850

    A.    Purported Servicing Breaches Relating to REO Properties  Did Not Trigger Defendant's Post-EOD Duties in 73 Trusts ...........................................850

        i.    Background .......................................................................................... 850

      ii.    Under the 73 GAs, an EOD would Require the Relevant Servicer or Master Servicer to Materially Breach its Contractual Duties and then Fail to Cure After Knowledge/Notice ............................................. 858

      iii.   The Documents Cited by Plaintiffs Do Not Establish the Relevant Servicers Materially Breached their Duties and Failed to Cure After Knowledge/Notice ..................................................................... 859

      iv.   The Documents Cited by Plaintiffs Do Not Address All of the Facts Necessary to Determine Whether an EOD Occurred under the 73 GAs ............................................................................. 866

      v.    The Documents Cited by Plaintiffs Do Not Establish a Material Breach by any Servicer .......................................................... 867

  B.   The Documents Cited by Plaintiffs Do Not Establish that Late Servicer Compliance Documents Triggered Defendant's Post-EOD Duties in Eight Trusts................................................................................................871

      i.    Plaintiffs' Pleadings Do Not Assert a Claim Based on Alleged EODs Triggered by Late Servicer Compliance Documents .................. 871

      ii.   Fremont Was Not the Servicer for FHLT 2006-1 at the Time of the Alleged Late ASOC ................................................................. 872

      iii.   The Documents Cited by Plaintiffs Do Not Establish any EODs Resulting From Late ASOCs as to the Other Seven Trusts ................... 872

      iv.   Any EOD Potentially Resulting from Late ASOCs Was Cured ............. 882

II.  DEFENDANT DID NOT BREACH ANY POST-EOD PRUDENT PERSON DUTY .................................................................................................... 883

  A.   There Is No Evidence That Defendant Was Supposedly Required to Respond to EODs Differently............................................................887

  B.   With Respect to the Declared EODs, the Evidence Confirms Defendant's Decision to Provide Notice and Await Investor Direction Was Prudent............890

  C.   Assessing Prudence Is a Fact-Intensive Process....................................897

  D.   Defendant's Post-EOD Practices Did Not Consist of "Doing Nothing" and Defendant Took Appropriate Steps ..................................................911

  E.   Defendant Had a Good Faith Belief It Complied with any Post-EOD Obligations.......................................................................................917

F.      Defendant's Response to Alleged REO Servicing Matters and Late ASOCs was Reasonable and Prudent ..................................................................919

III.     DEFENDANT'S AGREEMENT TO "HOLD THE TRUST FUND AND EXERCISE THE RIGHTS REFERRED TO ABOVE FOR THE BENEFIT OF . . . CERTIFICATEHOLDERS" DOES NOT CREATE A PRE-EOD DUTY TO ENFORCE R&W REPURCHASE OBLIGATIONS ....................................................... 921

A.      The GAs at Issue in this Action Are Not the Same As the Governing Agreement at Issue in *RPI v. DB* ..........................................................922

B.      The Evidence Does Not Support Plaintiffs' Proposed Interpretation..................924

IV.    THE DOCUMENTS CITED BY PLAINTIFFS DO NOT  SUPPORT ANY CONCLUSIONS ABOUT THE DEFENDANT'S  DUTIES WITH REGARD TO 16 GAS WHERE DEFENDANT IS  NOT OBLIGATED TO ENFORCE REPURCHASE OBLIGATIONS  ABSENT DIRECTION FROM THE DEPOSITOR................................................................................................... 925

V.     THE DOCUMENTS CITED BY PLAINTIFFS DO NOT SUPPORT A CONCLUSION THAT DEFENDANT BREACHED ANY DUTIES CONCERNING DOCUMENT EXCEPTIONS ........................................................... 927

A.      Document Exceptions and 2% Letters ................................................................927

B.      The Document Exception Reports for the Trusts Were Delivered More than Six Years Ago ......................................................................................931

C.      The Evidence Does Not Establish that Any Purported Document Exception Was Material.........................................................................................931

D.      The Evidence Establishes that Defendant Notified the Depositor of any Document Exceptions ..........................................................................938

VI.    THE EVIDENCE DOES NOT ESTABLISH THAT DEFENDANT OWED OR BREACHED ANY DUTY TO MONITOR SERVICERS............................................. 940

# INTRODUCTION

In moving for summary judgment, Plaintiffs submitted a 372-page statement of 1,022 undisputed material facts in support of the motion ("Plaintiffs' Statement"), as required by Local Rule 56.1(a). Under that same rule, DB was required to respond to each statement and authorized to submit a "short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." DB took this as license to submit its own, separate, affirmative "statement of facts" with over 150 paragraphs of additional "facts," most of which are unsupported assertions and/or legal arguments DB could not fit in its opposing brief, or irrelevancies that are immaterial to DB's motion. Many are not even cited in DB's opposing brief. DB's CSUF, which seeks to introduce numerous new substantive arguments skirting the page limit for its Opposition, violates Rule 56.1, and the Court should disregard it.

The problems with DB's CSUF do not stop at its (remarkable) length. DB includes half-page discursive paragraphs mixing alleged facts and legal arguments or conclusions, such that it is nearly impossible to discern what fact (if any) DB even claims is undisputed. (*See*, *e.g.*, ¶¶ 1111, 1134, 1135, 1147, 1152, 1160.) DB also includes several duplicative paragraphs asserting the same facts multiple times. (*See*, *e.g.*, ¶¶ 1137, 1148, 1180, 1185.)

In sum, DB's CSUF concerns hundreds of purported additional facts that are immaterial to Plaintiffs' motion, many of which are neither "facts" nor "additional." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). It "ignore[s] both the letter and the spirit of the rule." *Deleon v. Putnam Valley Bd. of Educ.*, 2006 WL 236744, at *2 (S.D.N.Y. Jan. 26, 2006) (disregarding large numbers of paragraphs in a "counterstatement of

facts that [was] not keyed to defendant's statement, and that in many instances cite[d] to nothing whatsoever in the record").

Plaintiffs respond, paragraph by paragraph, to DB's CSUF, despite its global defects, and note on a paragraph-by-paragraph basis those instances where DB (a) improperly seeks to insert immaterial facts, (b) improperly seeks to assert additional legal argument in violation of the word limit for its Opposition brief, or (c) otherwise violates Rule 56.1. First, Plaintiffs demonstrate that DB has failed to controvert any of the undisputed facts in Plaintiffs' Rule 56.1 Statement. Then, Plaintiffs address each of DB's asserted "facts" in turn. To the extent Plaintiffs state below that a statement of material fact proffered by DB is disputed or undisputed, Plaintiffs do so for purposes of this Motion only. Plaintiffs preserve all potential evidentiary objections and do not hereby agree that any fact proffered by DB or evidence offered by it in support of a fact is either admissible or may properly be considered by the Court.

## NOTE REGARDING REVISIONS TO REDUCE VOLUME OF SUMMARY JUDGMENT SUBMISSIONS

In accordance with the parties' joint proposal so-ordered by the Court on June 24, 2019 (PL ECF No. 346; CB ECF No. 229), the parties have submitted this revised version of their respective Local Rule 56.1 statements, counterstatements, and replies to reduce the volume of the parties' summary judgment submissions before the Court. As contemplated in the June 24, 2019 Order, the parties revised (among other things) certain statements, responses, and replies in their Local Rule 56.1 submissions "to replace statements about the provisions of the agreements at issue with references to either summary exhibits concerning the agreements or the relevant provisions of the agreements themselves." Similarly, the parties replaced statements characterizing the contents of deposition transcripts or other materials with simple references to

the exhibits that the citing party says support certain propositions in its brief. The parties intend

such references to be considered by the Court as citations to the material cited, and not

statements of purported fact. For this reason, a "response" to such a paragraph in the Local Rule

56.1 submissions that does not rebut the corresponding proposition in the party's brief for which

the paragraph is cited (including a "reserved" response or a response referencing additional

material) is not an admission that the corresponding proposition in the party's brief is supported

by the cited material. Each party also removed certain paragraphs from its Local Rule 56.1

submissions (including responses and replies thereto) that concern facts such party believes

ultimately are not material to the Court's resolution of its motion, and marked those paragraphs

as "reserved." In certain cases, the non-moving party disputed the removed paragraphs. For this

reason, the "reserved" paragraphs are not an admission by the other party that the corresponding

proposition in the citing party's brief is accurate or supported by any material that would be

admissible. The parties respectfully refer the Court to their memoranda of law for their legal

arguments.

## PRELIMINARY STATEMENT[1]

1.      Reserved.

2.      Reserved.

3.      Reserved.

4.      Reserved.

5.      Reserved.

6.      Reserved.

---

[1]      Plaintiffs make a number of assertions in the headings of their 56.1 Statement.  As those are not
factual assertions supported by evidence, Defendant is not responding to the assertions in the headings.

3

7.     Reserved.

8.     Reserved.

## FACTUAL BACKGROUND

### A.     RMBS Securitization Process

9.     RMBS are created by pooling large numbers of residential mortgage loans into a trust. *See, e.g.*, Handlin Ex. 377 (NHEL 2006-5 Prospectus Supplement) at S-2.

Defendant's Response:  Undisputed that pooling residential mortgage loans into a

trust is one element of residential mortgage backed securitization.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted. *See* Local Rule 56.1(c).**

10.     RMBS certificates and notes are securities that pay principal and interest based on the cash flows from the home loans held in the trusts. Handlin Ex. 378 (Reyes) 154:5-10 ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮s

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding whether particular RMBS certificates or notes constitute

"securities" in any specific context, no response is required.

Disputed to the extent this paragraph purports to state that cash flows from home

loans held in trusts are the only factor upon which RMBS principal and interest payments

are based.  That proposition is contrary to evidence in the record.  For example, principal

and interest payments on certain Certificates were guaranteed by a monoline insurance

company.  *See, e.g.*, Goff Ex. 137 (IMM 2007-A Offering Circular) at S-1; Handlin Ex.

102 (IMM 2007-A Indenture) at DBNTC_COMMERZBANK_00000070924, -932.

Other Certificates had the benefit of an interest rate swap agreement and/or similar

derivative agreements.  *See, e.g.*, Goff Ex. 138 (SVHE 2006-EQ1 Prospectus

Supplement) at S-1; Handlin Ex. 42 (SVHE 2006-EQ1 PSA) at Ex. Q.

Further, the deposition testimony Plaintiffs cite does not support this paragraph.

The question posed was to ask a layman's understanding of a contractual provision and

did not relate to the general structure of RMBS transactions.  Handlin Ex. 378 at 153:23 –

154:4 (R. Reyes Dep. (Jan. 18, 2018).[2]

**Plaintiffs' Reply: DB does not specifically controvert the material fact. The**

**additional statements and additional evidence proffered by DB do not specifically**

**controvert this material fact. Therefore, it should be deemed admitted.** *See* **Local Rule**

**56.1(c). DB's attempt to evade the material fact by mischaracterizing it as a legal**

**conclusion is unavailing.**

11.    Reserved.

12.    Reserved.

13.    Reserved.

14.    Reserved.

15.    Reserved.

16.    Reserved.

17.    Reserved.

18.    If the sponsor or seller breaches these representations and warranties or fails to
deliver complete mortgage files for the loans, the pooling and servicing agreement obligates the
seller to repurchase the affected loans. *See, e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03.

---

[2]    Plaintiffs distort cited deposition testimony by, at minimum, failing to include the questions that

give rise to the answers and the appropriate page and line designations of those questions and answers to

give the Court needed context for the cited testimony.

5

<u>Defendant's Response</u>:  To the extent this paragraph purports to state a legal conclusion that "the pooling and servicing agreement obligates the seller to repurchase the affected loans," no response is required.

Disputed.  To the extent Plaintiffs purport to characterize the GAs, the materials Plaintiffs cite do not support Plaintiffs' characterization.  *See* Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03.  Each Trust is governed by unique GAs, and Plaintiffs' citation to a GA for a single Trust does not support any generalization about other Trusts.

Moreover, Plaintiffs' purported characterization is not consistent with the terms of the GAs.  The protocols in each GA that may ultimately require a sponsor or seller to "repurchase" mortgage loans establish detailed conditions on each party's obligations. For example, Section 2.03(e) of the MSIX 2006-2 PSA addresses certain obligations to provide notice of breaches of representations and warranties. Handlin Ex. 34 (MSIX 2006-2 PSA) § 2.03(e).  The provision distinguishes between (i) any party's obligations to provide notice to a responsible party "[u]pon *discovery* by any of the parties hereto of a breach of a representation or warranty . . . *that materially and adversely affects the value of any Mortgage Loan or the interests of the Trustee or the Certificateholders therein,*" and (ii) Defendant's potential obligation to "*in turn notify*" a responsible party if Defendant "*receiv[es] written notice* of [any] breach of a representation and warranty."  *Id.* (emphasis added).  Other provisions in the MSIX 2006-2 GAs establish detailed conditions on a responsible party's obligations (if any) to actually repurchase mortgage loans.  *E.g., id.* §§ 2.03(g), 2.03(h), 2.03(i).  These provisions provide responsible parties opportunities to "cure [a] breach in all material respects" as well as to "substitute" mortgage loans under specified circumstances.  *Id.* §§

2.03(g), 2.03(h), 2.03(i).  Critically, they also limit cure, substitution, and repurchase obligations to circumstances where a breach of a representation or warranty "*materially and adversely affects* the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein." *Id.* §§ 2.03(g), 2.03(h), 2.03(i) (emphasis added).

Similarly, under the NHEL 2006-5 PSA, which Plaintiffs cite in this paragraph, repurchase may be required only if similar conditions are met, including (i), the breach "materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders," and (ii) the Sponsor fails to "deliver such missing document or cure such defect or breach in all material aspects" within 90 days of "discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File."  Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(a).  Further, the requirement to cure or repurchase is only triggered after a party "discover[s] or recei[ves]" written notice of the material defect or missing document and "the party making such discovery or receiving such notice" gives the Sponsor written notice of the material defect or missing document.  *Id.*

The other GAs contain similar requirements.  *See, e.g.*, Biron PL Ex. 55 & Biron CB Ex. 55 (Charts: Trusts for Which GAs Provide Defendant Must Provide Notice of R&W Breaches Upon Discovery or Receipt of Written Notice); Biron PL Ex. 54 & Biron CB Ex. 54 (Charts: Trusts for Which GAs Provide Defendant Must Provide Notice of R&W Breaches Only Upon Discovery).

**Plaintiffs' Reply: DB's statements and purported evidence do not controvert Plaintiffs' material fact. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). DB's attempt to evade the material fact by mischaracterizing it as a**

legal conclusion is unavailing; the document speaks for itself. **Further, DB's assertions concerning DB's repurchase obligations are contrary to the Governing Agreements. As explained in Plaintiffs' briefing, DB was obligated, prior to an EOD, to enforce the repurchase protocol for loans that breached R&Ws or lacked required Mortgage File documents.** *See* **Pltfs.Mem. 44-54.**

19.     Reserved.

**B.      The Role of the Trustee**

20.     RMBS certificateholders' returns depend on the performance of the underlying mortgage loans. Handlin Ex. 377 (NHEL 2006-5 Prospectus Supplement) at S-16.

<u>Defendant's Response</u>:  Disputed.  The materials Plaintiffs cite do not support this paragraph.  *See* Handlin Ex. 377 (NHEL 2006-5 Prospectus Supplement) at S-16.  Each RMBS transaction is governed by unique contracts, and Plaintiffs' citation to an offering document for a single Trust does not support any generalization about other RMBS.

Indeed, even the sole document Plaintiffs cite in support of this paragraph reflects that RMBS certificateholders' returns depend on many factors.  *See id.* at S-12–S-21 (*e.g.*, "The yield to maturity on the certificates will also depend on the related certificate interest rate and the purchase price for such certificates," *id.* at S-17).  For example, principal and interest payments on certain Certificates were guaranteed by a monoline insurance company.  *See, e.g.*, Goff Ex. 137 (IMM 2007-A Offering Circular) at S-1; Handlin Ex. 102 (IMM 2007-A Indenture) at DBNTC_COMMERZBANK_00000070924, -932.  Other Certificates had the benefit of an interest rate swap agreement and/or similar derivative agreements.  *See, e.g.*, Goff Ex. 138 (SVHE 2006-EQ1 Prospectus Supplement) at S-1; Handlin Ex. 42 (SVHE 2006-EQ1 PSA) at Ex. Q.

8

**Plaintiffs' Reply: DB's purported evidence does not controvert the fact that RMBS certificateholders' returns depend on the performance of the underlying mortgage loans. The additional statements and evidence proffered by DB are consistent with Plaintiffs' material fact. Therefore, this material fact should be admitted.** *See* **Local Rule 56.1(c).**

21.    Plaintiffs and other Certificateholders could not confirm the creditworthiness of the borrowers or the sufficiency of the collateral, because they did not have access to loan documentation. *See* Handlin Ex. 380 (Collins) 91:19–21, Aug. 30, 2017, *Phoenix Light v. U.S. Bank*, No. 14-cv-10116 (S.D.N.Y. Mar. 22, 2016) ("Privacy laws don't allow you to get the loan files. We are an investor in a pool, not the servicer.").

<u>Defendant's Response</u>:  To the extent this paragraph purports to state a legal conclusion related to "privacy laws," no response is required.

Disputed.  Plaintiffs support this statement with inadmissible evidence.  The cited testimony is hearsay and lacks foundation.  Further, Plaintiffs cite only to vague deposition testimony about "privacy laws" by a fact witness, given in response to a question to which Plaintiffs lodged a form objection.  *See* Goff Ex. 35 at 91:19–21 (P. Collins Dep. (Aug. 30, 2017), PL/USB).  Moreover, ███████████████████ ██████████████████████████████ *See* Goff Ex. 36 at 250:9–18, errata (CDO Pltfs 30(b)(6) Dep. (May 8, 2018)) ████████████████████████ ████████████████████████████████████████ Goff Ex. 35 at 8:4–19 (P. Collins Dep. (Aug. 30, 2017), PL/USB) (████████████████ ███████████████████████████████).

Moreover, the statements in this paragraph are contrary to overwhelming material in the record.  On certain occasions, RMBS investors requested loan origination and underwriting files to investigate potential breaches of representations and warranties and Defendant assisted those investors with their efforts to obtain those files.  *See* Biron CB Ex. 102 (Jan. 31, 2012 letter from investor group to Defendant); Goff Ex. 125 (MSAC

2007-HE5 notice and request for direction); *see also* Reyes Opp. Exs. 4 & 5 (▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮) at rows 40 (FFML 2006-FF11), 65 (FFML 2006-FF9), and

88 (MSAC 2007-NC4); Goff Ex. Handlin Ex. 387 at 95:15 – 96:9 (R. Reyes 30(b)(6)

(Apr. 19, 2018); Reyes PL Decl. ¶ 36; Reyes CB Decl. ¶ 36.



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Goff Ex. 39 at 38:7 – 22 (I. Halpern Dep. (May 25,

2018)), testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

Goff Ex. 39 at 137:17-138:10 (I. Halpern Dep. (May 25, 2018)); *see also* Goff Ex. 75

(Mar. 22, 2007 email) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮.



[REDACTED]

[REDACTED] [3] Goff Ex. 40 at 82:5 – 83:3 (K.

Smith Dep. (June 20, 2017), BR/DB). [REDACTED]

[REDACTED]

[REDACTED]   Kent Smith, a portfolio manager at PIMCO, testified:

*Id.* at 74:5 - 12.

[3] [REDACTED]

Biron PL Ex. 101 (Phoenix Collateral Management Agreement); Biron PL Ex. 97 (Phoenix Trust

Agreement); Biron PL Ex. 150 at 74:10-74:14 (Phoenix 30(b)(6) Dep. (Sep. 22, 2016), PL/HSBC).

[REDACTED]

[REDACTED]   Biron CB Ex. 82 at PIMCO-

DB000888 – PIMCO-DB000907; *see* Biron CB Ex. 19 at PIMCO-DB000527; Biron CB Ex. 83 at

CB_DB02938573, -592; Goff Ex. 48 at 145:17 - 157:3 (V. Radhakishun Dep. (May 18, 2017), CB/WF).



*Id.* at 92:23 – 94:21.

**Plaintiffs' Reply:** DB's purported evidence and statements do not controvert the material fact that Plaintiffs and other Certificateholders could not confirm the creditworthiness of the borrowers or the sufficiency of the collateral, because they did not have access to loan documentation. Therefore, this material fact should be admitted. *See* Local Rule 56.1(c). DB's assertion that "[o]n certain occasions, RMBS investors requested loan origination and underwriting files to investigate potential breaches of representations and warranties and Defendant assisted those investors with their efforts to obtain those files" is immaterial and irrelevant to the fact, and also completely unsupported by the evidence cited by DB and the entire evidentiary record. Tellingly, despite asserting that "Defendant assisted those investors with their efforts to obtain those files," DB points only

to letters and requests sent by investors, not any evidence of DB actually working to obtain the requested files. DB's attempt to evade the fact by mischaracterizing it as a legal conclusion is unavailing.

Further, DB's objection regarding hearsay is incorrect. The deposition testimony meets the requirements of Rule 32(a) of the FRCP. The deposition was taken in a previous action and is "allowed by the Federal Rules of Evidence." The statement concerned a judicially-recognized fact that federal law prohibits investors from gaining access to loan files. *See* 15 U.S.C. § 1601; *Willey v. J.P. Morgan Chase, N.A.*, 2009 WL 1938987, at *1 (S.D.N.Y. July 7, 2009). Judicially-recognized facts do not require evidence to prove their truth.

22.     The Trustee had the ability, in the event borrowers on loans underlying the Trusts were unable to satisfy their payment obligations, to vindicate Certificateholders' rights, by forcing the banks that originated or acquired the loans included in the Trusts (the "Sellers") to repurchase the defective loans or by causing the Servicers to foreclose on the properties as quickly and inexpensively as possible. *See, e.g.,* Handlin Ex. 35 (NHEL 2006-5 PSA) §§ 2.03, 3.01.

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion relating to the Trustee's rights and responsibilities under the GAs with respect to breaches of representations and warranties and servicing activities, no response is required.

Disputed.  To the extent Plaintiffs purport to characterize the GAs, the materials Plaintiffs cite do not support Plaintiffs' characterization. *See* Handlin Ex. 35 (NHEL 2006-5 PSA) §§ 2.03, 3.01.  Each GA is a unique contract, and Plaintiffs' citation to a single GA does not support any generalization about other GAs.

This paragraph is vague and ambiguous, including for example because Plaintiffs do not explain the phrase "defective loans."

13

Defendant does not dispute that certain Trusts' GAs provide Defendants certain rights relating to breaches of R&Ws about mortgage loans and breaches by servicers. *See, e.g.*, Handlin Ex. 23 (MSAC 2006-HE6 PSA) §§ 2.01, 2.02, 2.03, 7.01. But the GAs are explicit that "[t]he rights of the Trustee to perform any discretionary act enumerated in this Agreement shall not be construed as a duty." *E.g.*, Handlin Ex. 44 (SAST 2006-3 Indenture) § 6.02(g); *see also* Biron PL Ex. 35 & Biron CB Ex. 35 (Charts: Defendant Has Only the Duties Expressly Set Forth in the GAs).

Moreover, regardless of Defendant's rights under the GAs, the materials cited by Plaintiffs do not support Plaintiffs' propositions that any borrower's inability to pay was caused by a defect in the mortgage loan, or that Defendant had the *ability* to "forc[e] the banks that originated or acquired the loans included in the Trusts . . . to repurchase the defective loans." *See* Handlin Ex. 35 (NHEL 2006-5 PSA) at §§ 2.03, 3.01. And those propositions are contrary to overwhelming material in the record.

Rather, as set forth below, the record evidence demonstrates that the viability and benefit of any repurchase depends on numerous factors including the materiality of the "defect"; the solvency of the warrantor; the costs associated with identifying the "defect"; the willingness of the warrantor to repurchase the loan absent litigation; the costs and risks associated with any litigation; and many others.



Biron CB Ex. 90 at CB_HSBC000479509 – 10 (Feb. 16, 2007 email).



*Id.*; *see also* Biron CB Ex. 127 at 215:24 – 216:6 (J. Reid Dep. (Mar. 15, 2017), CB/WF)



Goff Ex. 41 at 179:17 – 180:11 (V. Radhakishun Dep. (Jan. 19, 2018)) Goff Ex. 42 at 148:9 – 149:7 (L. Medema Dep. (Jan. 11, 2018)) Goff Ex. 37 at 58:4 – 7 (I. Halpern Dep. (Jul. 19, 2018), PL/USB).



*Id.* at 58:17 – 24; *see also* Goff Ex. 38 at 183:24 – 188:6 (C. Mace Dep. (Apr. 23, 2018))

Cynthia Mace, a vice president of the same collateral manager testified,

Goff Ex. 38 145:7 – 13 (C. Mace Dep. (Apr. 23, 2018)), and

*Id.* at 72:10 – 75:19.

Ms. Mace testified:

*Id.* at 72:24 – 73:9; *also id.* at 93:1 – 25

.

16

In 2011, 

Goff Ex. 76 at PL_DB008134790 (October 19, 2011 email chain).

David Gault, the Head Portfolio Manager and a member of the investment committee for the group within WestLB assigned to manage the collateral for the Blue Heron Plaintiffs (*see* Goff Ex. 77 (Curriculum Vitae of David R. Gault)), testified that



17



Goff Ex. 43 at 47:14 – 48:19 (D. Gault Dep. (June 8, 2018)).

Ivan Halpern, ████████████████████████████████████████

████████████ (Goff Ex. 39 at 33:4 – 34:13 (I. Halpern Dep. (May 25, 2018)), testified

that ████████████████████████████████████████████████

████████████████████████████████████████ and ████████████

████████████████████████████████████ *Id.* at 233:14 – 234:12 (I. Halpern

Dep. (May 25, 2018)).

Substantial expert evidence in the record also disputes Plaintiffs' contention that

Defendant had the ability to "forc[e] the banks that originated or acquired the loans

included in the Trusts . . . to repurchase the defective loans." *See* Goff Ex. 5 (Richard

Report) at JR0015 – 16, ¶ 33 (*PL/DB*) & JR0035 – 36, ¶ 33 (*CB/DB*) ████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████ ; Goff Ex. 31 at 549:9–550:9 ████████████████████

████████████████████████████████

████████████████████████████████████████

████████████████████████████████

18



); Goff Ex. 3 (Schwarcz Report) at SS0030, ¶ 4.11 (*PL/DB*) & SS0041, ¶ 4.11 (*CB/DB*)

); Goff Ex. 2 (Ryan Report) at LR0081 – 82, § VIII.B (*PL/DB*) & LR0342 – 43, § VIII.B (*CB/DB*)

); *see* Goff Ex. 5 (Richard Rebuttal) at JR0053, ¶ 21 (*PL/DB*) & JR0071, ¶ 21 (*CB/DB*)

Goff Ex. 2 (Ryan Report) at LR0027, Table 2

Further, to the extent the Defendant has an obligation to enforce the repurchase of loans with breaching R&Ws, that obligation is only triggered when the Defendant has actual knowledge of the breach. *See, e.g.*, Handlin Ex. 31 (MSAC 2007-NC4 PSA) § 2.07 ("Upon discovery by any of the parties hereto of a breach of a representation or warranty made by the Sponsor pursuant to the Representations and Warranties Agreement, the party discovering such breach shall give prompt written notice thereof to the other parties to this Agreement and the Sponsor.  The Trustee shall pursue such legal remedies available to the Trustee with respect to such breach under the Representations

and Warranties Agreement, as may be necessary or appropriate to enforce the rights of

the Trust with respect thereto, in accordance with customary industry practices or if such

asset were its own property."); Handlin Ex. 89 (GSAMP 2005-HE4 PSA) § 2.07 ("Upon

discovery by any of the parties hereto of a breach of a representation or warranty made by

EquiFirst pursuant to the EquiFirst Agreements, Fremont pursuant to the Fremont

Agreements or the Purchaser pursuant to the Representations and Warranties Agreement,

the party discovering such breach shall give prompt written notice thereof to the other

parties to this Agreement EquiFirst, Fremont or the Purchaser, as applicable.  The Trustee

shall take such action with respect to such breach under the EquiFirst Agreements, the

Fremont Agreements or the Representations and Warranties Agreement, as applicable, as

may be necessary or appropriate to enforce the rights of the Trust with respect thereto.");

*Royal Park Invs. SA/NV v. HSBC Bank USA N.A.*, No. 14-CV-08175, 2017 WL 945099,

at *6 (S.D.N.Y. Mar. 10, 2017) (Netburn, M.J.) ("The Court, however, reads 'discovery'

as used in Section 2.03 to mean <u>actual knowledge</u>"); *Royal Park Invs. SA/NV v. Deutsche

Bank Nat'l Tr. Co.*, No. 14-CV-4394, 2016 WL 439020, at *6 (S.D.N.Y. Feb. 3, 2016)

(Nathan, J.) ("Without <u>actual knowledge</u> of non-conforming loans, [Defendant] would

have no obligation to require a Seller to substitute or repurchase the defective loan.");

*Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587, 603 (S.D.N.Y.

2015) (Scheindlin, J.) ("If, after discovery, plaintiffs cannot prove that HSBC had <u>actual

knowledge</u> regarding the loans at issue here, HSBC may move for summary judgment.");

*W&S v. BNYM II*, 2017 WL 3392855, at *9 ("discovery as used in [RMBS governing

agreements] means <u>actual knowledge</u>"); *see also Royal Park Invs.*, 2018 WL 4682220, at

*9 (Moses, M.J.) (recognizing that "discovery" in PSAs means "<u>actual knowledge</u>" and

20

observing that "no such case has interpreted the term 'discovery,' as used in the PSAs, to mean either constructive knowledge or inquiry notice").  Plaintiffs have not cited in this paragraph any evidence that demonstrates Defendant had actual knowledge of any loan-by-loan breach.

The materials cited by Plaintiffs also do not support Plaintiffs' proposition that Defendant had the ability to "caus[e] the Servicers to foreclose on the properties as quickly and inexpensively as possible."  *See* Handlin Ex. 35 (NHEL 2006-5 PSA) at §§ 2.03, 3.01.  And, this proposition is contrary to overwhelming material in the record.

For example, 

Biron CB Ex. 19 at PIMCO-DB000533 (October 2008 PIMCO Report); *see also* Biron CB Ex. 83 at CB_DB02938595 (December 2008 PIMCO Report).



Biron CB Ex. 83 at CB_DB02938596; Biron CB Ex. 19 at PIMCO-DB000534 (same).





Biron CB Ex. 19 at PIMCO-DB000533; Biron CB Ex. 83 at CB_DB02938596 (same).



Biron CB Ex. at 83 CB_DB02938598 – 99; *see also* Biron CB Ex. 19 at PIMCO-

DB000536 (same).



Biron CB Ex. 83 at CB_DB02938599.



Biron CB Ex. 19 at PIMCO-DB000533; Biron CB Ex. 83 at CB_DB02938595 (same).



Biron CB Ex. 19 at PIMCO-DB000534; Biron CB Ex. 83 at CB_DB02938597 (same).

Lalantika Medema, who worked on surveillance of non-agency RMBS in the

portfolio management group of PIMCO, testified that ████████████████

████████████████████████████





Goff Ex. 42 at 26:8 – 18, 75:25 – 78:2 (L. Medema Dep. (Jan. 11, 2018)); *see also id.* at

93:3 - 20

Expert evidence in the record further contradicts Plaintiffs' position.  *See* Goff Ex.

1 (Bryar Report) at MB0021 – 24, ¶¶ 55–64 (*PL/DB*) & MB0141 – 45, ¶¶ 55–64

(*CB/DB*)

        *id.* at MB0025 – 26, ¶ 67 (*PL/DB*) & MB0145 –

46, ¶ 67 (*CB/DB*)

      **Plaintiffs' Reply: DB's statements and additional proffered evidence do not**

**specifically controvert this material fact. DB instead takes issue with Plaintiffs'**

**characterization of the Trustee's ability to vindicate Certificateholders' rights by enforcing**

**repurchases, arguing that the "viability and benefit of any repurchase depends on**

**numerous factors." DB's issue with Plaintiffs' characterization of the Trustee's ability to**

**vindicate Certificateholders' rights by enforcing repurchases is immaterial; the Governing**

**Agreements speak for themselves. Therefore, this material fact should be deemed admitted.**

***See* Local Rule 56.1(c). DB's attempt to evade the fact by mischaracterizing it as vague and**

ambiguous and as a legal conclusion is unavailing. DB's reliance on its expert reports does not create issues of fact because an expert may not provide a legal opinion regarding the interpretation of contractual provisions, including the Trustee's and the Servicer's duties under the Governing Agreements. Additionally, Plaintiffs' intend to move to preclude the testimony of DB's experts at trial.

DB's assertion that "the GAs are explicit that '[t]he rights of the Trustee to perform any discretionary act enumerated in this Agreement shall not be construed as a duty'" is a legal conclusion inappropriate for a Rule 56.1 Statement to which no response is required. But it is nonetheless incorrect. As explained in Plaintiffs' briefing, DB was *obligated*, prior to an EOD, to enforce the repurchase protocol for loans that breached R&Ws or lacked required Mortgage File documents. *See* Pltfs.Mem. 44-54. For 40 Trusts, DB had the pre-EOD duty to enforce the repurchase protocol for loans with R&W violations of which DB had knowledge. *Id.* 45-48. In 8 Trusts, DB had a pre-EOD duty to enforce repurchase where DB was required, but failed, to notify the Depositor of loans with Mortgage File defects. *Id.* 48-51. For 3 Trusts on which DB's enforcement duty for loans with Mortgage File defects is established as a matter of law, Plaintiffs are also entitled to summary judgment that DB breached its duty. *Id.* 51-54.

DB asserts that "Plaintiffs' propositions that any borrower's inability to pay was caused by a defect in the mortgage loan, or that Defendant had the ability to 'forc[e] the banks that originated or acquired the loans included in the Trusts . . . to repurchase the defective loans'….are contrary to overwhelming material in the record," but cites no such materials in support. Therefore, DB's assertion is entitled to no weight. It also is immaterial and irrelevant to Plaintiffs' material fact.

DB's assertion concerning "the viability and benefit of any repurchase" is immaterial and irrelevant to the material fact, as is the additional evidence proffered in relation to this assertion. Further, as explained in Plaintiffs' briefing, DB failed to pursue repurchase claims against solvent entities. *See* Pltfs.Opp. 22-23.

DB's assertion that "to the extent the Defendant has an obligation to enforce the repurchase of loans with breaching R&Ws, that obligation is only triggered when the Defendant has actual knowledge of the breach" is a legal conclusion inappropriate for a Rule 56.1 statement and therefore, no response is required. It is nonetheless incorrect. As explained in Plaintiffs' briefing, Judge Failla held that "the use of two different terms— "discovery" and "actual knowledge"— means the two "must be given different meanings." Pltfs.Opp. 43-49; *see also BlackRock Allocation Target Shares: Series S Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 2017 WL 3610511 (S.D.N.Y. Aug. 21, 2017) (citations omitted). Judge Failla also held that a trustee cannot avoid its repurchase enforcement duty "by willfully blinding itself for the purpose of disclaiming knowledge" or where it has "'implied actual knowledge,' defined as '[k]nowledge of information that would lead a reasonable person to inquire further.'" *Id.*

23.    The Trustee had the ability to enforce, on Certificateholders' behalf, contractual promises made for their benefit that the loans were underwritten in conformance with appropriate underwriting guidelines, were properly documented, and were otherwise of a quality and creditworthiness consistent with the risk profile of the investment as it was marketed to the public. *See, e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(a) ("if the Sponsor does not deliver such missing document or cure such defect or breach in all material respects during such period, the Custodian shall notify the Trustee and the Trustee shall enforce the Sponsor's obligation under the Purchase Agreement and cause the Sponsor to repurchase such Mortgage Loan from the Trust Fund").

Defendant's Response: To the extent this paragraph purports to state a legal conclusion relating to Defendant's rights and responsibilities under the GAs with respect to breaches of representations and warranties, no responses is required.

26

Disputed.  To the extent Plaintiffs purport to characterize the GAs, the materials Plaintiffs cite do not support Plaintiffs' characterization.  *See* Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(a).  Each Trust is governed by unique GAs, and Plaintiffs' citation to a GA for a single Trust does not support any generalization about other Trusts.

Moreover, Plaintiffs' contentions in this paragraph are contrary to overwhelming material in the record.  *See* Goff Ex. 119 (



); Goff Ex. 32 at 394:6-397:5 (M. Adelson Dep. (Oct. 3 – 4, 2018))

.  Defendant restates its response to ¶ 22 and incorporates it by reference.

In addition to the evidence described in Defendant's response to ¶ 22, the expert evidence makes clear that

Goff Ex. 5 (Richard Rebuttal) at JR0053, ¶ 21 (*PL/DB*) & JR0071, ¶ 21 (*CB/DB*)

); Goff Ex. 2 (Ryan Report) at LR0081 – 82, § VIII.B (*PL/DB*) & LR0342 – 43, § VIII.B (*CB/DB*)

██████████████████████████████████████████████

████████████

      The materials cited do not support the contention that Defendant could enforce the repurchase of loans with breaching representations and warranties to ensure conformity "with the risk profile of the investment as it was marketed to the public."  Defendant had no liability or responsibility for the manner in which the investment was "marketed to the public."  *See generally* Handlin Ex. 377 (NHEL 2006-5 Prospectus Supplement); Goff Ex. 3 (Schwarcz Report) at SS0028, ¶ 4.7 (*PL/DB*) & SS0138 – 39, ¶ 4.7 (*CB/DB*) ████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ "); *see also* Goff Ex. 5 (Richard Report) at JR0012, ¶ 22 (*PL/DB*) & JR0032, ¶ 22 (*CB/DB*) ████████████████████████████

████████████████████████████████████████████

████████████

      Whether Defendant "had the ability to enforce" contractual provisions is irrelevant to Plaintiffs' motion because an RMBS trustee only has those duties expressly set forth in the GAs.  Biron PL Ex. 35 & Biron CB Ex. 35 (Charts: Defendant Has Only the Duties Expressly Set Forth in the GAs).  Further, under the GAs for many Trusts, Defendant had no repurchase enforcement obligations.  *See, e.g.*, Biron PL Ex. 56 & Biron CB Ex. 56 (Charts: Trusts For Which Defendant Had No Duty to Enforce Any Repurchase Obligations).  Under others, Defendant had repurchase enforcement obligations only under circumstances that were not met.  *See* Biron PL Ex. 57 & Biron

CB Ex. 57 (Charts: Trusts for which GAs Provide Defendant Has R&W Enforcement

Duty Under Specified Conditions).

The expert evidence about the role of RMBS trustees and investor expectations is

consistent with those provisions of the GAs.  Goff Ex. 3 (Schwarcz Report) at SS0016 –

17, ¶¶ 3.7 – 3.8 (*PL/DB*) & SS0126 – 28, ¶¶ 3.7 – 3.8 (*CB/DB*) 

); *id.* at SS0035, ¶ 4.20 (*PL/DB*) & SS0145 – 46, ¶ 4.20 (*CB/DB*)

.” (alteration original; internal citation omitted)); *See*

Goff Ex. 5 (Richard Report) at JR0014, ¶ 29 (*PL/DB*) & JR0034, ¶ 29 (*CB/DB*)

Goff Ex. 5

(Richard Rebuttal) at JR0053, ¶ 21 (*PL/DB*) & JR0071, ¶ 21 (*CB/DB*)

**Plaintiffs' Reply: DB's statements and purported evidence do not controvert this**

**material fact. Therefore, this material fact should be deemed admitted.** *See* **Local Rule**

**56.1(c). DB instead argues that "Defendant had no liability or responsibility for the manner**

**in which the investment was 'marketed to the public.'" But that fact, which Plaintiffs**

dispute, is immaterial to Plaintiffs' Motion because Plaintiffs did not move for summary judgment on whether DB had liability or responsibility for the manner in which investments were marketed to the public. Rather, Plaintiffs Motion concerns, in relevant part, DB's breach of its duty to enforce repurchase obligations pre-EOD. *See* Pltfs.Mem. 44-54. DB's attempt to evade the fact by mischaracterizing it as a legal conclusion is unavailing. DB's reliance on its expert reports does not create issues of fact because an expert may not provide a legal opinion regarding the interpretation of contractual provisions, including the Trustee's duties under the Governing Agreements. Additionally, Plaintiffs intend to move to preclude the testimony of DB's experts at trial.

DB's assertion that "[w]hether Defendant 'had the ability to enforce' contractual provisions is irrelevant to Plaintiffs' motion because an RMBS trustee only has those duties expressly set forth in the GAs" is a legal conclusion inappropriate for a Rule 56.1 Statement to which no response is required. It nonetheless is incorrect. As explained in Plaintiffs' briefing, the prudent person standard resulting from every EOD, regardless of how that EOD was triggered, required DB to pursue repurchase remedies, without getting direction or indemnity from Certificateholders. *See* Pltfs.Mem. 32-41.

DB's assertions that "under the GAs for many Trusts, Defendant had no repurchase enforcement obligations" and "Defendant had repurchase enforcement obligations only under circumstances that were not met" are legal conclusion inappropriate for a Rule 56.1 Statement to which no response is required. DB nonetheless is incorrect. As explained in Plaintiffs' briefing, after an EOD, DB had to prudently pursue remedies, including the repurchase of loans that breached R&Ws or lacked required Mortgage File documents. *See* Pltfs.Mem. 32-41.

**Plaintiffs restate their reply to DBCSUF ¶ 22 and incorporate it by reference.**

24.    Reserved.

25.    Reserved.

26.    Reserved.

27.    Reserved.

28.    Reserved.

29.    Second, if required Mortgage File documents are missing or defective, a party needs to ensure that the defects are cured, or, if not, that the affected loans are substituted or repurchased by the Seller. Each Governing Agreement spells out its own repurchase protocol. The repurchase protocols are not dependent upon the occurrence of an Event of Default. *See infra* ¶¶ 887-911; *see also infra* ¶¶ 47-49.

> Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the obligations for "missing or defective" documents pursuant to the GAs, no response is required.
>
> Disputed.  To the extent Plaintiffs purport to characterize the GAs, the materials Plaintiffs cite do not support Plaintiffs' characterization.  *See* Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(a).  Plaintiffs have failed to proffer sufficient evidence to demonstrate that all of the GAs impose this obligation.  Plaintiffs also omit significant elements of the obligation, including, but not limited to, the fact that the "missing or defective" document must be material.  Defendant restates its response to ¶ 18 and incorporates it by reference.
>
> Indeed, Plaintiffs' first statement in this paragraph—"if required Mortgage File documents are missing or defective, a party needs to ensure that the defects are cured, or, if not, that the affected loans are substituted or repurchased by the Seller."—is contrary to the evidence Plaintiffs cite in this paragraph.  *See infra* ¶¶ 47 – 49, 887 – 911; *see also, e.g.*, Goff Ex. 45 at 35:15 – 36:1 (R. Reyes Dep. (Apr. 27, 2017), RP/DB) ██████████

31

███████████████████████████████████████████████

████████████████████████████████   Goff Ex. 46 at 105:8 – 106:25 (J.

Campbell Dep. (June 8, 2017), RP/DB).

For example, the GA Plaintiffs cite in ¶¶ 47–49 specifies that repurchase may be required only if the Sponsor fails to "deliver such missing document or cure such defect or breach in all material aspects" within 90 days of "discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File." Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(a) (emphasis added). Further, the requirement to cure or repurchase is only triggered after a party "discover[s] or recei[ves]" written notice of the material defect or missing document and "the party making such discovery or receiving such notice" gives the Sponsor written notice of the material defect or missing document. *Id.*

The evidence cited in the other paragraphs Plaintiffs reference here is irrelevant to Plaintiffs' motion because they are not entitled to pursue any claims based upon incomplete or nonconforming mortgage files. *PL/DB* Dkt. #70 at 15 ("Claims for document delivery failures are barred by the statute of limitations."); *CB/DB* Dkt. #88, ¶ 35 ("Commerzbank's claims do not include claims against Deutsche Bank for breaching its document delivery-related duties.").

**Plaintiffs' Reply: DB does not specifically controvert the material facts. DB's issue with Plaintiffs' characterization of the repurchase protocols is immaterial; the referenced Governing Agreements speak for themselves. *See infra* ¶¶ 887-911. Therefore, these material facts should be deemed admitted. *See* Local Rule 56.1(c).**

DB's assertion that "the 'missing or defective' document must be material" is a legal conclusion inappropriate for a Rule 56.1 Statement to which no response is required. It is nonetheless incorrect. As explained in Plaintiffs' briefing, not all Trusts limit repurchase of defective documents to those that are material, and no Trust places a materiality requirement on the repurchase of missing documents. *See* Pltfs.Mem. 48-54; Pltfs.Reply 33-34.

DB's assertion that "the requirement to cure or repurchase is only triggered after a party 'discover[s] or recei[ves]' written notice of the material defect or missing document and 'the party making such discovery or receiving such notice' gives the Sponsor written notice of the material defect or missing document" is a legal conclusion inappropriate for a Rule 56.1 Statement to which no response is required. It is nonetheless incorrect. As explained in Plaintiffs' briefing, ample evidence in the record demonstrates that DB discovered, was willfully blind to, had implied actual knowledge, or had actual knowledge of the asserted breaches, triggering its repurchase enforcement obligations. *See* Pltfs.Opp. 38-67.

DB's argument that Plaintiffs are not entitled to pursue any claims based upon incomplete or nonconforming mortgage files is a legal conclusion inappropriate for a Rule 56.1 Statement, and therefore no response is required. It is nonetheless incorrect and immaterial to Plaintiffs' Motion because Plaintiffs did not move for summary judgment on the issue of document delivery failures. As explained in Plaintiffs' briefing, Plaintiffs are not suing DB for breaching duties to review Mortgage Files upon receipt, and generate the required initial and final certifications. Plaintiffs are suing DB for breaching its duty, pre-EOD for certain Trusts and post-EOD for all, to enforce repurchase of loans with defective

33

Mortgage Files. **The Court's prior order did not dismiss, and Plaintiffs never relinquished,**

**this separately pled claim.** *See* **Pltfs.Opp. 55-59.**

**Plaintiffs restate their reply to DBCSUF ¶ 18 and incorporates it by reference.**

30.     The Sellers made representations and warranties ("R&Ws") concerning the loans'
quality and the Sellers' underwriting process, and agreed to repurchase loans that did not comply
with R&Ws or have complete documentation. *See, e.g.,* Handlin Ex. 377 at S-22 (NHEL 2006-5
Prospectus Supplement) ("The sponsor will make various representations and warranties
regarding the mortgage loans under the purchase agreement and will have repurchase or
substitution obligations if those representations or warranties are breached and such breach has a
material adverse impact on the value of the mortgage loan or the certificateholders' interest
therein.").

> <u>Defendant's Response</u>:  To the extent this paragraph purports to state a legal
>
> conclusion regarding the Sellers' contractual obligations under the GAs, no response is
>
> required.
>
> Disputed.  The material cited by Plaintiffs' does not support their contention.  To
>
> the extent Plaintiffs purport to characterize the GAs, the materials Plaintiffs cite do not
>
> support Plaintiffs' characterization.  *See* Handlin Ex. 377, at S-22.  Plaintiffs have failed
>
> to proffer sufficient evidence to demonstrate that all of the GAs impose this obligation.
>
> The Seller is not always the party to make representations and warranties concerning the
>
> loans' qualities or effectuate repurchase of loans that did not comply with R&Ws or have
>
> complete documentation.
>
> The overwhelming record evidence is clear that the Sellers did not categorically
>
> agree "to repurchase loans that did not comply with R&Ws or have complete
>
> documentation."  Rather, each GA contains certain representations and warranties
>
> concerning the characteristics of the loans, the breach of which may give rise to
>
> repurchase obligations by the Seller, Servicer, Originator, or other Responsible Party
>
> upon their gaining the requisite knowledge of the breach.  *See, e.g.,* Biron PL Ex. 1 at S-

62 – S-66 (Excerpts of HASC 2006-HE1 Prospectus Supplement); Biron PL Ex. 3 §

2.03(d), (k) (Excerpts of FFML 2006-FF11 PSA).

With respect to "complete documentation," even if the Seller, Servicer,

Originator, or other Responsible Party has the contractually-specified knowledge of a

missing or defective mortgage loan document, the defect must be material or materially

impair the value of the Mortgage Loan before any repurchase obligation can be triggered.

*See, e.g.*, Handlin Ex. 8 (FFML 2006-FF11 PSA) §§ 2.01 ("[I]n the event that the

Mortgage Loan Seller does not cure such failure within 30 days of discovery or receipt of

written notification of such failure from the Depositor, the related Mortgage Loan shall,

upon the request of the Depositor, be repurchased by the Mortgage Loan Seller."),

2.03(d) ("Within 30 days of the earlier of either discovery by or notice to the Mortgage

Loan Seller that any Mortgage Loan does not conform to the requirements as determined

in the Custodian's review of the related Custodial File or within 60 days of the earlier of

either discovery by or notice to the Mortgage Loan Seller of any breach of a

representation or warranty referred to in Section 2.03(b) that *materially and adversely*

*affects* the value of any Mortgage Loan or the interest of the Trustee or the

Certificateholders therein, the Mortgage Loan Seller shall use its best efforts to cause to

be remedied a material defect in a document constituting part of a Mortgage File or

promptly to cure such breach *in all material respects* and, if such defect or breach cannot

be remedied, the Mortgage Loan Seller shall, at the Depositor's option as specified in

writing and provided to the Mortgage Loan Seller and the Trustee, (i) if such 30- or 60-

day period, as applicable, expires prior to the second anniversary of the Closing Date,

remove such Mortgage Loan (a 'Deleted Mortgage Loan') from the Trust Fund and

substitute in its place a Substitute Mortgage Loan, in the manner and subject to the

conditions set forth in this Section 2.03; or (ii) repurchase such Mortgage Loan at the

Repurchase Price, provided, however, that any such substitution pursuant to clause (i)

above shall not be effected prior to the delivery to the Custodian of a Request for Release

substantially in the form of Exhibit J, and the delivery of the Mortgage File to the

Custodian for any such Substitute Mortgage Loan. . . ."); Handlin Ex. 38 (SAST 2007-1

PSA) § 3(d) ("If at any time [the Purchaser] or the Trustee (or its Custodian) discovers or

receives notice that any Mortgage Loan Document is missing or defective *in any material*

*respect* with respect to any Mortgage Loan, [the Seller] shall correct or cure any such

omission or defect or, if such omission or defect *materially impairs* the value of the

Mortgage Loan, repurchase the defective Mortgage Loan or substitute for such defective

Mortgage Loan a Substitute Mortgage Loan in accordance with and if permitted by the

terms of Section 7 hereof."); Handlin Ex. 95 (HASC 2006-OPT 4 PSA) § 2.03(d)

("Within 30 days of the earlier of either discovery by or notice to the Originator that any

Mortgage Loan does not conform to the requirements as determined in the Custodian's

review of the related Custodial File or within 60 days of the earlier of either discovery by

or notice to the Originator of any breach of a representation or warranty referred to in

Section 2.03(b) that *materially and adversely affects* the value of any Mortgage Loan or

the interest of the Trustee or the Certificateholders therein, the Originator shall use its

best efforts to cause to be remedied a material defect in a document constituting part of a

Mortgage File or promptly to cure such breach *in all material respects* and, if such defect

or breach cannot be remedied, the Originator shall, at the Depositor's option as specified

in writing and provided to the Originator and the Trustee, (i) if such 30- or 60-day period,

as applicable, expires prior to the second anniversary of the Closing Date, remove such

Mortgage Loan (a 'Deleted Mortgage Loan') from the Trust Fund and substitute in its

place a Substitute Mortgage Loan, in the manner and subject to the conditions set forth in

this Section 2.03; or (ii) repurchase such Mortgage Loan at the Repurchase Price;

provided, however, that any such substitution pursuant to clause (i) above shall not be

effected prior to the delivery to the Custodian of a Request for Release substantially in

the form of Exhibit J, and the delivery of the Mortgage File to the Custodian for any such

Substitute Mortgage Loan. . . ."); *see also* Handlin Ex. 116 (NHEL 2007-2 PSA) § 3.01

("Upon discovery by the Sponsor or upon notice from the Depositor, the Trustee, or the

Custodian, as applicable, of a breach of any representation or warranty in subsection (a)

of this Section which *materially and adversely affects* the interests of the

Certificateholders the Sponsor shall, within 45 days of its discovery or its receipt of

notice of such breach, either (i) cure such breach *in all material respects* or (ii) to the

extent that such breach is with respect to a Mortgage Loan or a Related Document, either

(A) repurchase such Mortgage Loan from the Trustee at the Repurchase Price, or (B)

substitute one or more Eligible Substitute Mortgage Loans for such Mortgage Loan, in

each case in the manner and subject to the conditions and limitations set forth below.").

Plaintiffs statement is also overbroad because it omits several conditions that need

to exist for the Seller to have the obligation to repurchase, including, but not limited to,

the materiality of the missing or defective documents.  For example, Plaintiffs' statement

in this paragraph is not even consistent with the language they quoted in support of this

paragraph.  Among other failures, Plaintiffs' statement in this paragraph fails to take into

account the phrases "*or substitution obligations*" and "*if . . . such breach has a material*

*adverse impact on the value of the mortgage loan or the certificateholders' interest therein*," which are included in the quotation in Plaintiffs' citation.

Each Trust's GAs set out any representations and warranties made by any parties as to characteristics of mortgage loans securitized in that Trust and the obligations any party may have with respect to breaches of representations and warranties or incomplete mortgage files. *See, e.g.*, Handlin Ex. 8 (FFML 2006-FF11) § 2.03(b) ("FFFC, in its capacity as Mortgage Loan Seller, makes the representations and warranties set forth in Schedule III and Schedule IV hereto, to the Depositor, the Master Servicer, the Securities Administrator and the Trustee as of the date specified therein."); *id.* at Schedules III & IV; *id.* § 2.03 (d); Goff Ex. 135 (FFML 2006-FF11 MLPA) § 4.

Undisputed that the NHEL 2006-5 Prospectus Supplement contains the quoted language.

**Plaintiffs' Reply: DB does not specifically controvert the material fact. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). DB proffers additional PSA provisions but fails to explain how these additional PSA provisions negate affects the material fact. Further, DB's attempt to evade the material facts by mischaracterizing them as legal conclusions is unavailing; the cited document speaks for itself.**

**DB's assertions that "the 'missing or defective' document must be material" and that there are "several conditions that need to exist for the Seller to have the obligation to repurchase, including, but not limited to, the materiality of the missing or defective documents" are legal conclusions inappropriate for a Rule 56.1 Statement to which no response is required. DB nonetheless is incorrect. As explained in Plaintiffs' briefing, not**

all Trusts limit repurchase of defective documents to those that are material, and no Trust places a materiality requirement on the repurchase of missing documents. *See* Pltfs.Mem. 48-54; Pltfs.Reply 33-34.

DB's assertions that "[w]ith respect to "complete documentation," even if the Seller, Servicer, Originator, or other Responsible Party has the contractually-specified knowledge of a missing or defective mortgage loan document, the defect must be material or materially impair the value of the Mortgage Loan before any repurchase obligation can be triggered" is a legal conclusion inappropriate for a Rule 56.1 Statement to which no response is required. DB nonetheless is incorrect. As explained in Plaintiffs' briefing, DB's characterization of the conditions necessary to trigger repurchase obligations are incorrect. Pltfs.Opp. 38-67.

Further, with regard to the materiality of missing Mortgage Loan File documents, DB has asserted that ensuring that "[f]or each Mortgage Loan, the related Mortgage File contains a true, accurate and correct copy of each of the documents and instruments required to be included therein" is "material to the value of the mortgage loans and interests of the Certificateholders and the Trustee" because it relates to "criteria and characteristics that directly impact the quality and value of the Mortgage Loans." Lucht Ex. 158 (Amended Complaint, *DB v. Novation Companies f/k/a NovaStar Financial*, Case No. 650693/2013 (N.Y. Sup. Ct.)) ¶¶ 28-29.

31.    Reserved.

32.    In 62 of the Trusts, at least two deal parties (usually the Depositor and Seller) were affiliated with one another. *See Phoenix Light v. DB* ECF No. 189-1; *Commerzbank v. DB* ECF No. 89-1. *See also* Handlin Exs. 1-7; 16-17; 21; 24-36; 44; 38-39; 75; 78; 82-87; 89-94; 99-100; 102-104; 107-121 (PSAs/Trust Agreements for (1) AABST 2006-1; (2) AHM 2006-1; (3) AMSI 2006-R1; (4) ARSI 2006-M1; (5) ARSI 2006-M3; (6) ARSI 2006-W2; (7) ARSI 2006-W3; (8) IMM 2005-7; (9) IMM 2005-8; (10) MLMI 2007-MLN1; (11) MSAC 2006-HE6; (12) MSAC 2006-NC2; (13) MSAC 2006-NC5; (14) MSAC 2006-WMC2; (15) MSAC 2007-HE1;

(16) MSAC 2007-HE2; (17) MSAC 2007-HE5; (18) MSAC 2007-NC1; (19) MSAC 2007-NC4;
(20) MSHEL 2006-3; (21) MSHEL 2007-1; (22) MSIX 2006-2; (23) NHEL 2006-5; (24) NHEL
2006-6; (25) SAST 2006-3 (26) SAST 2007-1; (27) SAST 2007-2; (28) ECR 2005-3; (29) FFML
2005-FF2; (30) FFML 2006-FF13; (31) FFML 2006-FF11; (32) GSAA 2005-10; (33) GSAA
2006-15; (34) GSAA 2006-16; (35) GSAA 2006-17; (36) GSAA 2007-4; (37) GSAMP 2005-
HE4; (38) GSAMP 2005-WMC1; (39) GSAMP 2005-WMC2; (40) GSAMP 2005-WMC3; (41)
GSAMP 2006-FM3; (42) GSAMP 2006-S4; (43) HVMLT 2006-3; (44) HVMLT 2007-2; (45)
IMM 2007-A; (46) IMSA 2006-3; (47) IMSA 2006-4; (48) MSAC 2005-HE7; (49) MSAC
2005-NC2; (50) MSAC 2006-HE5; (51) MSAC 2006-HE7; (52) MSAC 2006-HE8; (53) MSAC
2006-NC3; (54) MSHEL 2005-4; (55) MSHEL 2007-2; (56) MSIX 2006-1; (57) NHEL 2007-2;
(58) SAST 2005-2; (59) SVHE 2005-OPT3; (60) SVHE 2005-OPT4; (61) SVHE 2006-OPT5;
(62) WAMU 2005-AR13).

        <u>Defendant's Response</u>:  To the extent this paragraph purports to state a legal

conclusion with respect to the legal affiliation of separate entities, no response is

required.

        Disputed.  Plaintiffs' statement in this paragraph is not supported by Plaintiffs'

evidence.  Plaintiffs' citation to allegations in their own complaints does not constitute

support by material that would be admissible in evidence.  Moreover, none of the

materials Plaintiffs cite in this paragraph provide any evidentiary support for Plaintiffs'

contention that "[i]n 62 of the Trusts, at least two deal parties (usually the Depositor and

Seller) were affiliated with one another."  *See PL/DB* TAC Ex. A, *PL/DB* Dkt. #189-1;

*CB/DB* SAC Ex. A, *CB/DB* Dkt. # 89-1; Handlin Exs. 1 – 7, 16 – 17, 21, 24 – 36, 44, 38

– 39, 75, 78, 82 – 87, 89 – 94, 99 – 100, 102 – 104 & 107 – 121.  The fact that entities in

a contract have similar names is not admissible evidence establishing that they are

affiliates.  Their affiliation must be demonstrated by other means.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact**

**that in 62 of the Trusts, at least two deal parties (usually the Depositor and Seller) were**

**affiliated with one another. Therefore, this material fact should be deemed admitted.** ***See***

**Local Rule 56.1(c). Further, DB's attempt to mischaracterize the fact as a legal conclusion is unavailing.**

33.    Further, in 25 of the Trusts, three or more deal parties to the Governing Agreements, including the Sponsor/Seller, Originator, and Servicer, were affiliated with one another, leaving DB as the only independent party to protect Certificateholders' interests and ensure that Sellers honored their obligations. *See Phoenix Light v. DB*, ECF No. 189 ¶¶ 113, 149; *Commerzbank v. DB*, ECF No. 89 ¶¶ 93, 129. *See also* Handlin Exs. 1-8; 35-36; 38-39; 44; 75; 102-104; 116-119; 121 (PSAs/Indentures for (1) ECR 2005-3; (2) IMM 2007-A; (3) IMSA 2006-3; (4) IMSA 2006-4; (5) NHEL 2006-5; (6) NHEL 2007-2; (7) SAST 2005-2; (8) SAST 2006-3; (9) SVHE 2005-OPT3; (10) SVHE 2005-OPT4; (11) SVHE 2006-OPT5; (12) WAMU 2005-AR13; (13) AABST 2006-1; (14) AHM 2006-1; (15) AMSI 2006-R1; (16) ARSI 2006-M1; (17) ARSI 2006-M3; (18) ARSI 2006-W2; (19) ARSI 2006-W3; (20) FFML 2006-FF11; (21) IMM 2005-7; (22) IMM 2005-8; (23) NHEL 2006-6; (24) SAST 2007-1; (25) SAST 2007-2).

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion with respect to the legal affiliation of separate entities and with respect to Defendant's contractual obligations under the GAs, no response is required.

Disputed.  Plaintiffs' citation to allegations in their own complaints does not constitute support by material that would be admissible in evidence.  Moreover, none of the materials Plaintiffs cite in this paragraph provide any evidentiary support for Plaintiffs' contention that "in 25 of the Trusts, three or more deal parties to the Governing Agreements, including the Sponsor/Seller, Originator, and Servicer, were affiliated with one another."  *See PL/DB* TAC ¶¶ 113, 149, *PL/DB* Dkt. #189; *CB/DB* SAC ¶¶ 93, 129, *CB/DB* Dkt. #89; Handlin Exs. 1 – 8, 35 – 36, 38 – 39, 44, 75, 102 – 104, 116 – 119 & 121.  The fact that entities in a contract have similar names is not admissible evidence establishing that they are affiliates.  Their affiliation must be demonstrated by other means.

Likewise, none of the materials Plaintiffs cite in this paragraph provide any evidentiary support for Plaintiffs' contention that Defendant was "the only independent

party to protect Certificateholders' interests and ensure that Sellers honored their obligations."  *See* Handlin Exs. 1 – 8, 35 – 36, 38 – 39, 44, 75, 102 – 104, 116 – 119, 121. To the contrary, the record evidence is clear that investors do not rely on the Defendant to "protect Certificateholders' interests and ensure that Sellers honored their obligations." *See, e.g.,* Biron CB Ex. 102 (Group of investors, including Commerzbank, requesting Defendant look into a servicer); Goff Ex. 120 (Notice to certificateholders updating them on lawsuit against Plaza Home Mortgage brought by FHFA); *Commerzbank AG London Branch v. UBS AG*, No. 654464/2013, 2015 WL 3857321, at *1 (N.Y. Sup. Ct. N.Y. Cty. June 17, 2015) ("*Commerzbank v. UBS*") (Commerzbank commenced a lawsuit against the depositors, sponsors, and underwriters for 51 of the 74 Certificates, based on allegations that, inter alia, the depositors/sponsors/originators had made false R&Ws).

Indeed, investors have a mechanism under the GAs to direct the Trustee to take certain actions. ███████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████  Goff Ex. 48 at 139:5 – 25, 140:12 – 141:14, 144:12 – 145:5, 184:10 – 187:24 (V. Radhakishun Dep. (May 18, 2017), CB/WF); Biron CB Ex. 123 at 270:23 – 271:23, 282:6 – 18 (V. Radhakishun Dep. (Apr. 27, 2018),

CB/HSBC); Biron CB Ex. 121 at 266:23 – 268:2, 307:10 – 25 (Commerzbank 30(b)(6)

Dep. (June 7, 2017), CB/WF); Biron CB Ex. 120 at 54:2 – 13, 58:8 – 11, 67:20-69:4,

72:20 – 73:13 (Commerzbank 30(b)(6) Dep. (Mar. 9, 2018)); Biron CB Ex. 102 at

DBNTC_COMMERZBANK_000000876758 – 766 (Jan. 31, 2012 letter from Gibbs &

Bruns).

     Plaintiffs' contentions in this paragraph are further refuted by the expert evidence

in the record:



Goff Ex. 3 (Schwarcz Report) at SS0017, ¶ 3.8 (*PL/DB*) & SS0127 – 28, ¶ 3.8 (*CB/DB*).



*Id.* at SS0014, ¶ 3.2 (*PL/DB*) & SS0125, ¶ 3.2 (*CB/DB*).



*Id.* at SS0023 – 25, ¶ 3.14 (*PL/DB*) & SS0134 – 36, ¶ 3.14 (*CB/DB*).



Goff Ex. 31 at 492:2–14 (J. Richard Dep. Oct. 4, 2018); *see also id.* at 473:4 – 474:3,

491:2 – 496:4; Goff Ex. 41 at 152:18 – 154:3 (V. Radhakishun Dep. (Jan. 19, 2018));

Goff Ex. 49 at 140:10 – 141:20 (Phoenix 30(b)(6) Dep. (May 31, 2018)); Goff Ex. 50 at

62:22 – 63:9 (A. Murata Dep. (June 28, 2017), BR/DB).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact**

**that in 25 of the Trusts, three or more deal parties to the Governing Agreements, including**

**the Sponsor/Seller, Originator, and Servicer, were affiliated with one another, leaving DB**

**as the only independent party to protect Certificateholders' interests and ensure that**

**Sellers honored their obligations. Therefore, this material fact should be deemed admitted.**

***See*** **Local Rule 56.1(c). The evidence proffered by DB** ████████████████████████

████████████████████████████████████████ **is relevant only insofar as it provides**

**evidence of DB's failure to protect Certificateholders' interests. DB's reliance on its expert**

**report does not create an issue of fact because an expert may not provide a legal opinion**

**regarding the trustee's duties under the Governing Agreements. Additionally, Plaintiffs**

**intend to move to preclude the testimony of DB's expert at trial. The additional purported**

**evidence and statements proffered by DB are irrelevant to the material fact. Further, DB's**

**attempt to mischaracterize the fact as a legal conclusion is unavailing.**

34.    Plaintiffs, like other Certificateholders, are not parties to the Governing
Agreements, and played no role in negotiating them. Handlin Exs. 1-44; 78-121.

Defendant's Response:  Disputed to the extent this paragraph purports to state that

no Certificateholders are parties to any Governing Agreement or played any role in

negotiating any Governing Agreement.  The evidence cited by Plaintiffs does not support

that contention, and that contention is contrary to evidence in the record.  *See, e.g.*, Biron

CB Ex. 1 (Excerpts of HASC 2006-HE1 Prospectus Supp) at 1 (noting that Countrywide

Securities Corporation was one of the underwriters); *id.* at S2 ("Approximately 40.68%

and 58.74% of the Mortgage Loans were originated or acquired by Countrywide Home

Loans, Inc. and WMC Mortgage Corp., respectively, while approximately 0.58% of the

Mortgage Loans were originated or acquired by various other originators.").

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert Plaintiffs'**

**material fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Further, the**

**purported evidence proffered by DB does not support its contentions under DB's own**

**reasoning: "The fact that entities in a contract have similar names is not admissible**

**evidence establishing that they are affiliates. Their affiliation must be demonstrated by**

**other means." ¶¶ DBCSUF 32, 33. Thus, these contentions are entitled to no weight.**

35.   Certificateholders are third-party beneficiaries to the Governing Agreements, and the Governing Agreements emphasize that the Trustee is to act "for the benefit of," and/or "on behalf of," Certificateholders. *See*, *e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.01 ("The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey in trust to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to (i) each Mortgage Loan identified on the Mortgage Loan Schedule . . . ."); Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(b) ("It is understood and agreed that the obligation of the Sponsor to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a document is missing, a material defect in a constituent document exists or as to which such a breach has occurred and is continuing shall constitute the sole remedy against the Sponsor respecting such omission, defect or breach available to the Trustee on behalf of the Certificateholders.").

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding the status of the Certificateholders and/or the obligations and

responsibilities of Defendant as set forth in the GAs, no response is required.

Disputed.  Plaintiffs' purported characterization of the GAs in this paragraph is

not supported by the material cited by Plaintiffs.  As an initial matter, each Trust is

governed by unique GAs, and Plaintiffs' citation to a GA for one Trust does not support

any generalization about other Trusts.  Indeed, the two quotations Plaintiffs cite in

support of this paragraph do not support Plaintiffs' contention that the GAs "emphasize

that the Trustee is to act 'for the benefit of,' and/or 'on behalf of,' Certificateholders."
*See* Handlin Ex. 35 (NHEL 2006-5 PSA) §§ 2.01, 2.03(b).

The GAs for the Trusts describe an investor-driven process whereby Plaintiffs can direct Defendant to act, provided they fulfill the necessary conditions set forth in the GAs. *E.g.*, Handlin Ex. 23 (MSAC 2006-HE6 PSA) §§ 8.02(b), 10.08; Handlin Ex. 8 (FFML 2006-FF11 PSA) § 8.01 ("The Trustee, before the occurrence of a Master Servicer Event of Default and after the curing of all Master Servicer Events of Default that may have occurred, shall undertake to perform such duties and only such duties as are specifically set forth in this Agreement. . . . Unless an Event of Default known to the Trustee has occurred and is continuing: (a) the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of the duties and obligations specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee, and the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Agreement which it believes in good faith to be genuine and to have been duly executed by the proper authorities respecting any matters arising hereunder; (b) the Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it is finally proven that the Trustee was negligent in ascertaining the pertinent facts; and (c) the Trustee shall not be liable with respect to any action taken, suffered, or omitted to be taken by it in good faith in accordance with the direction of the Holders of Certificates evidencing not less than

46

25.00% of the Voting Rights of Certificates relating to the time, method, and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee under this Agreement."); *see* Biron PL Ex. 35 & Biron CB Ex. 35 (Charts: Defendant Has Only the Duties Expressly Set Forth in the GAs); Biron PL Ex. 36 & Biron CB Ex. 36 (Charts: No GA Provides That Defendant Has a Duty to Investigate Any Facts or Matters Absent Direction and Indemnity from a Contractually Specified Percentage of Investors); Biron PL Ex. 45 & Biron CB Ex. 45 (Charts: If an EOD is Continuing and Defendant has the Contractually Specified Knowledge Thereof, Defendant Has a Duty to Act as a Prudent Person Under the Circumstances); *see also* Biron CB Ex. 136 at 211:10 – 15 (B. Jetter Dep. (Jan. 23, 2018)) ██████████████████████████████████████████

████████████████████████████████████████████

███████████

        In addition, the evidence in the record reflects that the interests of investors in different tranches (or even different investors in the same tranche) are not always aligned:



Biron CB Ex. 134 at 89:20-90:16 (R. Boelstler Dep. (June 12, 2017), CB/HSBC); *see also* Goff Ex. 51 at 52:15 – 54:5, 56:20 – 58:12 (R. Boelstler Dep. (Feb. 24, 2017), CB/WF); Goff Ex. 41 at 149:2 – 151:12 (V. Radhakishun Dep. (Jan. 19, 2018)); Biron CB Ex. 121 at 273:24 – 275:13 (Commerzbank 30(b)(6) Dep. (June 7, 2017), CB/WF); Goff Ex. 52 at 278:15 – 279:8 (P. Collins Dep. (Mar. 1, 2017), PL/HSBC); Goff Ex. 35 at 97:4 – 98:16 (P. Collins Dep. (Aug. 30, 2017), PL/USB); Goff Ex. 53 at 295:16 – 297:8 (T. Mark Dep. (Aug. 24, 2017)); Goff Ex. 54 at 49:10 – 50:15 (C. Kennedy Dep. (Feb. 17, 2017), PL/WF); Goff Ex. 43 at 83:11 – 84:2 (D. Gault Dep. (June 8, 2018)); Goff Ex. 50 at 36:3 – 38:17 (A. Murata Dep. (June 28, 2017), BR/DB); Goff Ex. 42 at 38:22 – 39:14, 60:12 – 62:25 (L. Medema Dep. (Jan. 11, 2018)); Goff Ex. 55 at 322:19 – 327:6 (L. Medema Dep. (Jan. 25, 2017), BR/WF); Goff Ex. 56 at 322:18 – 325:15 (L. Medema Dep. (Mar. 17, 2017), BR/HSBC).

Other evidence concerning disagreement among investors confirms that investors did not always want Defendant to act. ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Biron PL Ex. 113 (Notice and Request for Direction) at DBNTC Phoenix Light 00002721208 – 210. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Biron PL Ex. 136 (Notice of Results Regarding Request for Direction). ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ▮▮▮▮▮

████████████████████████████████████

████████████████████████████████████

████████████.[4]  Goff Ex. 57 at 122:2 – 17, 198:11 – 199:16, 214:21 – 215:14 (E.

Balz Dep. (Dec. 7, 2017)); Biron PL Ex. 130 at PEL_DB_00030766 – 767 (PEL

September 2009 Email); Biron CB Ex. 19 at PIMCO-DB000527 (PEL email attaching

October 2008 PIMCO Report on Dresdner Portfolio); Biron CB Ex. 95 at

CB_WFB003206450 – 55 (Sep. 27, 2010 email forwarding news article); Goff Ex. 48 at

139:5 – 25, 140:12 – 141:14, 144:12 – 145:5, 184:10 – 187:24 (V. Radhakishun Dep.

(May 18, 2017), CB/WF); Biron CB Ex. 123 at 270:23 – 271:23, 282:6 – 18 (V.

Radhakishun Dep. (Apr. 27, 2018), CB/HSBC); Biron CB Ex. 121 at 307:10 – 25

(Commerzbank 30(b)(6) Dep. (June 7, 2017), CB/WF); Biron CB Ex. 120 at 54:2 – 13,

58:8 – 11 (Commerzbank 30(b)(6) Dep. (Mar. 9, 2018)).

       The expert evidence is also clear that ████████████████████████████

---

[4]    ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Goff Ex. 48 at 139:5 – 25, 140:12 – 141:14, 144:12 – 145:5, 184:10 – 187:24 (V. Radhakishun Dep. (May

18, 2017), CB/WF); Biron CB Ex. 123 at 270:23 – 271:23, 282:6 – 18 (V. Radhakishun Dep. (Apr. 27,

2018), CB/HSBC); Biron CB Ex. 121 at 266:23 – 268:2, 307:10 – 25 (Commerzbank 30(b)(6) Dep. (June

7, 2017), CB/WF); Biron CB Ex. 120 at 54:2 – 13, 58:8 – 11, 67:20 – 69:4, 72:20 – 73:13 (Commerzbank

30(b)(6) Dep. (Mar. 9, 2018)); Biron CB Ex. 102 at DBNTC_COMMERZBANK_000000876758 – 766

(Jan. 31, 2012 letter from Gibbs & Bruns).



Goff Ex. 5 (Richard Report) at JR0014, ¶ 28 (*PL/DB*) & JR0034, ¶ 28 (*CB/DB*).



Goff Ex. 5 (Richard Rebuttal) at JR0054, ¶ 24 (*PL/DB*) & JR0072, ¶ 24 (*CB/DB*).



Goff Ex. 3 (Schwarcz Report) at SS0014 – 15, ¶ 3.3 – 3.4 (*PL/DB*) & SS0125 – 26, ¶ 3.3

– 3.4 (*CB/DB*) (footnote omitted).



*Id.* at SS0016 – 17, ¶ 3.7 (*PL/DB*) & SS0126 – 27, ¶ 3.7 (*CB/DB*).

**Plaintiffs' Reply: DB does not specifically controvert the fact that Certificateholders**

**are third-party beneficiaries to the Governing Agreements, and the Governing Agreements**

50

emphasize that the Trustee is to act "for the benefit of," and/or "on behalf of,"
Certificateholders. Therefore, the material fact should be deemed admitted. *See* Local Rule
56.1(c). DB instead cites PSA provisions that state DB's duties and rights after the
occurrence of EOD. However, DB does not explain how those provisions in any way relate
to the fact that the Governing Agreements provide that the Trustee is to act on behalf of or
for the benefit of Certificateholders. DB also cites deposition testimony and purported
expert evidence ████████████████████ but that, too, is immaterial and irrelevant
to the material fact. DB's reliance on its expert reports does not create an issue of fact
because an expert may not provide a legal opinion regarding the interpretation and
meaning of contractual provisions. Additionally, Plaintiffs' intend to move to preclude the
testimony of DB's expert at trial. Further, DB's attempt to evade these facts by
mischaracterizing them as legal conclusions is unavailing; the cited documents speak for
themselves.

36.     Certificateholders are not permitted to sue Sellers directly; the Governing
Agreements require Certificateholders to rely on the Trustee to vindicate their rights. *See*, *e.g.*,
Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(b) ("It is understood and agreed that the obligation
of the Sponsor to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a
document is missing, a material defect in a constituent document exists or as to which such a
breach has occurred and is continuing shall constitute the sole remedy against the Sponsor
respecting such omission, defect or breach available to the Trustee on behalf of the
Certificateholders.").

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding Certificateholder's rights under the GAs and/or Defendant's

obligations under the GAs, no response is required.

Disputed.  Plaintiffs' purported characterization of the GAs in this paragraph is

not supported by the material cited by Plaintiffs.  As an initial matter, each Trust is

governed by unique GAs, and Plaintiffs' citation to a GA for one Trust does not support

any generalization about other Trusts.  Indeed, even the quotation Plaintiffs cite in

support of this paragraph does not support Plaintiffs' contention.

In fact, the GAs for all Trusts provide that certificateholders representing a

contractually specified percentage of "Voting Rights" have the right to initiate legal

actions under the GAs if, upon request, Defendant fails to do so – including the GA

Plaintiffs cite in this paragraph:

> No Certificateholder shall have any right by virtue of any provision
> of this Agreement to institute any suit, action or proceeding in
> equity or at law upon or under or with respect to this Agreement,
> unless such Holder previously shall have given to the Trustee a
> written notice of default and of the continuance thereof, as
> hereinbefore provided, and unless also the Holders of Certificates
> entitled to at least 25% of the Voting Rights shall have made
> written request upon the Trustee to institute such action, suit or
> proceeding in its own name as Trustee hereunder and shall have
> offered to the Trustee such indemnity as it may reasonably require
> against the costs, expenses and liabilities to be incurred therein or
> thereby, and the Trustee for 15 days after its receipt of such notice,
> request and offer of indemnity, shall have neglected or refused to
> institute any such action, suit or proceeding. . . .

Handlin Ex. 35 (NHEL 2006-5 PSA) § 12.03; Biron CB Ex. 52 & Biron PL Ex. 52

(Charts: Investors May Initiate Legal Action If Defendant Fails to Do So).

The GAs provide that investors representing a contractually specified percentage

of "Voting Rights" (often 25%) have other control rights, as well, such as the right,

depending on the Trust, to: (i) notify a servicer that it has materially breached its

contractual obligations and demand cure, (ii) terminate a servicer following an EOD, (iii)

direct Defendant to appoint a new servicer, (iv) direct Defendant to conduct an

investigation, and (v) remove the trustee and appoint a replacement.  Biron PL Ex. 48 &

Biron CB Ex. 48 (Charts: Investors May Notify Parties of Breaches and Demand Cure);

Biron PL Ex. 49 & Biron CB Ex. 49 (Charts: Investors May Terminate Servicers); Biron

PL Ex. 50 & Biron CB Ex. 50 (Charts: Investors May Direct Appointment of New

Servicers); Biron PL Ex. 51 & Biron CB Ex. 51 (Charts: Investors May Direct Defendant

to Conduct an Investigation); Biron PL Ex. 53 & Biron CB Ex. 53 (Charts: Investors May

Remove Defendant).



The record is clear that

Biron CB Ex. 136 at 211:10 – 15 (B. Jetter Dep. (Jan. 23, 2018)).



Goff Ex. 79 at PEL_DB_00517058 (Aug. 19, 2009 email) (emphasis added).





Goff Ex. 41 at 177:11 – 20 (V. Radhakishun Dep. (Jan. 19, 2018)).



Goff Ex. 49 at 140:10-141:20 (Phoenix 30(b)(6) Dep. (May 31, 2018)).



Goff Ex. 58 at 57:2-57:20 (E. Balz Dep. (Nov. 16, 2017), PL/USB).



*Id.* at 118:6–14.

Goff Ex. 48 at 140:12 – 141:14 (V. Radhakishun Dep. (May 18, 2017), CB/WF).



Biron CB Ex. 19 at PIMCO-DB00000527 (October 2008 PIMCO Report); Biron CB Ex.

83 at CB_DB02938592 (December 2008 PIMCO Report).



Goff Ex. 41 at 177:11 – 20 (V. Radhakishun Dep. (Jan. 19, 2018)).

In 2012 and 2013, EAA caused Phoenix and other Plaintiffs to independently

commence legal actions against the sponsors, originators, and underwriters for hundreds

of RMBS trusts, including 33 of the Trusts (relating to 46 of the Certificates), seeking to

"vindicate their rights" rather than relying on or waiting for the respective Trustee to

bring lawsuits on their behalf.  *See Phoenix Light SF Ltd. v. Ace Sec. Corp.*, No. 12-

650422 (N.Y. Sup. Ct.); *Phoenix Light SF Ltd. v. J.P. Morgan Sec. LLC*, No. 12-651755

(N.Y. Sup. Ct.); *Phoenix Light SF Ltd. v. Goldman Sachs Grp.*, No. 13-652356 (N.Y.

Sup. Ct.); *Phoenix Light SF Ltd. v.JP Morgan Chase & Co.*, No. 13-652921 (N.Y. Sup.

Ct.); *Phoenix Light SF Ltd. v. Morgan Stanley*, No. 13-652986 (N.Y. Sup. Ct.); *Phoenix

Light SF Ltd. v. Royal Bank of Scotland Grp.*, No. 13-653060 (N.Y. Sup. Ct.); *Phoenix

Light SF Ltd. v. Credit Suisse AG*, No. 13-653123 (N.Y. Sup. Ct.); *Phoenix Light SF Ltd.*

*v. Merrill Lynch Co.*, No. 13-653235 (N.Y. Sup. Ct.); Biron PL Ex. 75 (Chart: Overlapping Certificates with Prior Litigation); Goff Ex. 49 at 60:2 – 65:25 (Phoenix 30(b)(6) Dep. (May 31, 2018)).

Similarly, Commerzbank commenced a lawsuit in December 2013 against the depositors, sponsors, and underwriters for 51 of the 74 Certificates, based on allegations that the depositors/sponsors/originators had made false R&Ws, among other things.  *See Commerzbank v. UBS*, 2015 WL 3857321, at *1; *see also* Goff Ex. 120 (Notice to certificateholders updating them on lawsuit against Plaza Home Mortgage brought by FHFA).

Defendant only has limited administrative and ministerial duties under the GAs, which may include: (i) maintaining a certificate registrar; (ii) maintaining specified trust accounts; (iii) distributing funds collected from servicers to certificate holders; and (iv) distributing information to certificate holders based on servicer data.  Reyes PL Decl. ¶ 6; Reyes CB Decl. ¶ 6.

No GA provides that Defendant has a duty to investigate any facts or matters absent direction and indemnity from a contractually specified percentage of investors. Biron PL Ex. 36 & Biron CB Ex. 36 (Charts: No GA Provides That Defendant Has a Duty to Investigate Any Facts or Matters Absent Direction and Indemnity from a Contractually Specified Percentage of Investors).  The GAs for all the Trusts further provide in substance that Defendant may rely upon and shall be protected in acting or refraining from acting upon any certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.  Biron PL

Ex. 37 & Biron CB Ex. 37 (Charts: Defendant May Rely On Any Statement, Opinion or Document It Believes to Be Genuine); Biron PL Ex. 38 & Biron CB Ex. 38 (Charts: Defendant Is Not Responsible for the Accuracy or Content of Any Certificate, Statement, or Other Instrument Furnished to It).

For example, the HASC 2006-HE1 PSA provides:

> the Trustee may rely upon and shall be protected in acting or refraining from acting upon any resolution, Officer's Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties and the Trustee shall have no responsibility to ascertain or confirm the genuineness of any signature of any such party or parties.

Biron PL Ex. 2 § 8.02(a) (HASC 2006-HE1 PSA).

Defendant also has broad exculpations under the GAs. The GAs for all the Trusts provide that Defendant shall not be liable with respect to actions taken, suffered, or omitted to be taken by it in good faith at the direction of holders of a specified percentage of certificates, relating to Defendant's powers under the GAs. Biron PL Ex. 39 & Biron CB Ex. 39 (Charts: Defendant Is Not Liable for Following Direction from Specified Percentage of Holders in Good Faith). For example, the HASC 2006-HE1 PSA provides:

> [T]he Trustee shall not be liable with respect to any action taken, suffered, or omitted to be taken by it in good faith in accordance with the direction of the Holders of Certificates evidencing not less than 25.00% of the Voting Rights of Certificates relating to the time, method, and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee under this Agreement.

Biron PL Ex. 2 § 8.01(c) (HASC 2006-HE1 PSA).

The GAs for all the Trusts provide Defendant shall not be liable with respect to any action taken, suffered or omitted by it in good faith that it believes to be authorized or

within its discretion under the GA.  Biron PL Ex. 40 & Biron CB Ex. 40 (Charts:

Defendant Is Not Liable for Any Action or Omission It Takes in Good Faith).  For

example, the HASC 2006-HE1 PSA provides:

> the Trustee shall not be liable for any action taken, suffered or
> omitted by it in good faith and believed by it to be authorized or
> within the discretion or rights or powers conferred upon it by this
> Agreement.

Biron PL Ex. 2 (HASC 2006-HE1 PSA)§ 8.02(c).

Expert evidence concerning the role of RMBS trustees and investor expectations

is consistent with the other evidence described in this response:



Goff Ex. 3 (Schwarcz Report) at SS0020 – 23, ¶ 3.13 (*PL/DB*) & SS0131 – 34, ¶ 3.13

(*CB/DB*).



*Id.* at SS0030, ¶ 4.11 (*PL/DB*) & SS0141, ¶ 4.11 (*CB/DB*).





Goff Ex. 5 (Richard Rebuttal) at JR0053 – 54, ¶ 21 – 22 (*PL/DB*) & JR0071 – 72, ¶ 21 – 22 (*CB/DB*).



Goff Ex. 31 at 473:9 – 473:12 (J. Richard Dep. (Oct. 4, 2018)).



*Id.* at 492:2 – 494:8.

**Plaintiffs' Reply: DB's purported evidence does not controvert the material fact. DB's issue with Plaintiffs' characterization of the contractual provisions of the Governing Agreements is immaterial; the documents speak for themselves. Therefore, Plaintiffs' material fact is deemed admitted by operation of law.** *See* **Local Rule 56.1(c). DB's attempt to evade this fact by mischaracterizing it as a legal conclusion is unavailing; the cited document speaks for itself.**

**DB's assertion that "[n]o GA provides that Defendant has a duty to investigate any facts or matters absent direction and indemnity from a contractually specified percentage of investors" is a legal conclusion inappropriate for a Rule 56.1 Statement to which no response is required. It is also incorrect. As explained in Plaintiffs' briefing, based on facts**

**DB knew, for many Trusts, it was required to "investigate" without direction and indemnity.** *See* **Pltfs.Opp. 40-42.**

**DB's proffered evidence concerning prior lawsuits by investors against Sellers is immaterial and irrelevant to the material fact because those actions involve suits in which Plaintiffs sued Sellers directly for common law securities fraud in connection with the securitization process and certificates that each defendant marketed and sold to Plaintiffs.** *See, e.g., Commerzbank AG London Branch v. UBS AG*, **No. 654464/2013, Dkt. #28 (N.Y. Sup. Ct. May 20, 2014) at 1-6. The additional purported evidence proffered by DB fails to demonstrate that Certificateholders had the ability to directly sue the Sellers to enforce repurchase obligations and otherwise is immaterial and irrelevant to the material fact.**

37.    Under the Governing Agreements, Certificateholders are unable to direct the Trustee to take action unless they control 25% or more of the voting rights in a Trust. *See, e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 12.03 ("No Certificateholder shall have any right by virtue of any provision of this Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Agreement, unless such Holder previously shall have given to the Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holders of Certificates entitled to at least 25% of the Voting Rights shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee hereunder . . . .").

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding rights and duties under any contract, no response is required.

Defendant does not dispute that the GAs generally require investors to hold certificates representing a certain percentage of "voting rights" in order to direct Defendant to take certain actions.  But, Plaintiffs' purported characterization of the GAs in this paragraph is not supported by the material cited by Plaintiffs.

As an initial matter, each Trust is governed by unique GAs, and Plaintiffs' citation to a GA for a single Trust does not support any generalization about other Trusts.

In addition, even within one GA, certificateholders' rights to direct Defendant (and the conditions on those rights) depend on the action being directed.

For example, the GAs for 80 Trusts (including the GA cited by Plaintiffs in this paragraph) provide that certificateholders representing a contractually specified percentage of "Voting Rights" have the right to direct Defendant to conduct an investigation, without any requirement that the certificateholders "provide written notice of default."  Biron PL Ex. 51 & Biron CB Ex. 51 (Charts: Investors May Direct Defendant To Conduct An Investigation).

The GAs for all Trusts also provide that certificateholders representing a contractually specified percentage of "Voting Rights" have the right to terminate, or direct another deal party to terminate, a servicer under specified circumstances.  Biron PL Ex. 49 & Biron CB Ex. 49 (Charts: Investors May Terminate Servicers).  Those specified circumstances generally require that a contractually defined event (for example, an "Event of Default") must have occurred and must not have been remedied.  *Id.*

The provision cited by Plaintiffs in this paragraph does not concern certificateholders' rights to give directions.  Rather that provision, and similar provisions in other GAs, provide that certificateholders representing a contractually specified percentage of voting rights have the right to initiate legal actions under the GAs if (i) certain conditions are satisfied (such as the certificateholders "provid[ing] written notice of default"), (ii) the certificateholders have requested that Defendant initiate legal action, and (iii) Defendant has failed to do so.  Biron PL Ex. 52 & Biron CB Ex. 52 (Charts: Investors May Initiate Legal Action If Defendant Fails to Do So).

 Goff Ex. 48 at 139:5

– 25, 140:12 – 141:14, 144:12 – 145:5, 184:10 – 187:24 (V. Radhakishun Dep. (May 18,

2017), CB/WF); Biron CB Ex. 123 at 270:23 – 271:23, 282:6 – 18 (V. Radhakishun Dep.

(Apr. 27, 2018), CB/HSBC); Biron CB Ex. 121 at 266:23 – 268:2, 307:10 – 25

(Commerzbank 30(b)(6) Dep. (June 7, 2017), CB/WF); Biron CB Ex. 120 at 54:2 – 13,

58:8 – 11, 67:20-69:4, 72:20 – 73:13 (Commerzbank 30(b)(6) Dep. (Mar. 9, 2018));

Biron CB Ex. 102 at DBNTC_COMMERZBANK_000000876758 – 766 (Jan. 31, 2012

letter from Gibbs & Bruns).

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs'**

**characterization of the contractual provisions of the Governing Agreements is immaterial;**

**the documents speak for themselves. Therefore, it is deemed admitted by operation of law.**

***See* Local Rule 56.1(c). The additional purported evidence and statements proffered by DB**

do not controvert the material fact, nor are they relevant. DB's attempt to evade the

material fact by mischaracterizing it as a legal conclusion is unavailing.

38.     No public source identifies investors in a given Trust, and ███████████████████ ██████████████     Ronaldo Reyes, a Team Leader in DB's TAG and DB's Rule 30(b)(6) designee, testified as follows:



Handlin Ex. 387 (Reyes 30(b)(6)) 96:5-97:19.

Defendant's Response:  Disputed.  Plaintiffs statement in the first sentence of this

paragraph – that "No public source identifies investors in a given Trust, and DB does not

disclose investors' identities, even when asked by Certificateholders seeking to assemble sufficient voting rights to direct it." – is false, not supported by the material cited by Plaintiffs in this paragraph, and contrary to material in the record and in the public domain.  Plaintiffs' contention is based upon a false premise.  Defendant does not have information about "investors' identities."  Goff Ex. 59 at 123:16 –24 (K. Wannenmacher Dep. (June 13, 2017), RP/DB).  DTC is the entity that may have that information, and Plaintiffs' cite no evidence that they contacted DTC for "investors' identities."  Handlin Ex. 406 at 45:1-24 (R. Vieta Dep. (Nov. 13, 2017) PL/DB) ███████████████

███████████████████████████████████

██████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

███████████

Further, investors, including Commerzbank, have found ways to identify other investors to direct trustees to act.  *See* Handlin Ex. 387 at 96:5 – 97:8 (R. Reyes Dep. (Apr. 19, 2018)); Goff Ex. 125 (MSAC 2007-HE5 notice and request for direction); Biron CB Ex. 102 (Jan. 31, 2012 letter).

Moreover, the deposition testimony cited by Plaintiffs does not support the contention that ███████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████ Handlin Ex. 387 at 97:2 – 8 (R. Reyes 30(b)(6) Dep. (Apr. 19, 2018)).

Finally, court documents filed publicly months or years before Plaintiffs ever sued Defendant readily identify numerous other investors in the same Trusts at issue here. *See, e.g.*, Summons With Notice, Exs. 1-11 *Royal Park Invs. SA/NV v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 652607/2012, Doc. 1 (N.Y. Sup. Ct. July 27, 2012), (identifying another investor in 26 Trusts at issue:  (1) AHM 2006-1; (2) ARSI 2006-M1; (3) ARSI 2006-M3; (4) ARSI 2006-W3; (5) FFML 2006-FF13; (6) FFML 2006-FF8; (7) GSAA 2006-16; (8) GSAA 2006-17; (9) HVMLT 2007-2; (10) IXIS 2006-HE2; (11) MSAC 2006-HE5; (12) MSAC 2006-HE6; (13) MSAC 2006-HE7; (14) MSAC 2006-HE8; (15) MSAC 2006-NC2; (16) MSAC 2006-WMC2; (17) MSAC 2007-HE1; (18) MSAC 2007-HE2; (19) MSAC 2007-HE5; (20) MSAC 2007-NC1; (21) MSHEL 2006-3; (22) MSHEL 2007-2; (23) MSIX 2006-2; (24) SAST 2007-1; (25) SAST 2007-2; & (26) SVHE 2006-OPT5); *see also, e.g.*, Derivative Complaint Against Deutsche Bank National Trust Company And Deutsche Bank Trust Company Americas For Breach Of Contract; Violation Of The Trust Indenture Act Of 1939; Breach Of Fiduciary Duty; Breach Of Duty Of Independence; And Negligence, Ex. 1, *BlackRock Balanced Capital Portfolio (FI) v. Deutsche Bank Nat'l Trust Co.*, No. 651685/2014, Doc. 3 (N.Y. Sup. Ct. June 18, 2014) (identifying other investors in 64 Trusts at issue:  (1) AHM 2006-1; (2)

AMSI 2006-R1; (3) ARSI 2006-M1; (4) ARSI 2006-M3; (5) ARSI 2006-W3; (6) FFML 2005-FF2; (7) FFML 2005-FFH3; (8) FFML 2006-FF13; (9) FHLT 2005-2; (10) FHLT 2006-1; (11) FHLT 2006-2; (12) FHLT 2006-3; (13) GSAA 2006-16; (14) GSAA 2007-4; (15) GSAMP 2005-WMC1; (16) GSAMP 2005-WMC2; (17) GSAMP 2005-WMC3; (18) GSAMP 2005-HE4; (19) GSAMP 2006-FM3; (20) HASC 2006-HE1; (21) HASC 2006-OPT4; (22) HASC 2007-OPT1; (23) HVMLT 2006-3; (24) IMM 2005-7; (25) IMM 2005-8; (26) IMM 2007-A; (27) IMSA 2006-3; (28) IMSA 2006-4; (29) IXIS 2005-HE3; (30) IXIS 2006-HE1; (31) IXIS 2006-HE2; (32) IXIS 2006-HE3; (33) IXIS 2007-HE1; (34) MLMI 2007-MLN1; (35) MMLT 2005-2; (36) MSAC 2005-HE7; (37) MSAC 2005-NC2; (38) MSAC 2006-HE5; (39) MSAC 2006-HE7; (40) MSAC 2006-HE8; (41) MSAC 2006-NC3; (42) MSAC 2006-NC5; (43) MSAC 2007-HE1; (44) MSAC 2007-HE2; (45) MSAC 2007-HE5; (46) MSHEL 2005-4; (47) MSHEL 2006-3; (48) MSHEL 2007-1; (49) MSHEL 2007-2; (50) MSIX 2006-1; (51) MSIX 2006-2; (52) NHEL 2006-5; (53) NHEL 2006-6; (54) NHEL 2007-2; (55) SABR 2007-NC2; (56) SAST 2006-3; (57) SAST 2007-2; (58) SVHE 2005-3; (59) SVHE 2005-OPT3; (60) SVHE 2005-OPT4; (61) SVHE 2006-1; (62) SVHE 2006-EQ1; (63) SVHE 2006-NLC1; & (64) SVHE 2006-OPT5.

Had they looked at only the two filings cited above, Plaintiffs could have identified other investors in 72 of the 85 Trusts at issue.

**Plaintiffs' Reply: DB's purported evidence does not controvert the material fact. DB's issue with Plaintiffs' characterization of the deposition testimony is immaterial; the testimony speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c). The supplemental testimony DB provides is consistent with**

Plaintiffs' material fact that investor identities are not publicly available and DB does not provide a challenge based on record evidence. Moreover, DB's proffered evidence that "investors, including Commerzbank, have found ways to identify other investors to direct trustees to act" is irrelevant to Plaintiffs' material fact that "no public source identifies investors in a given Trust." DB's assertion that "[h]ad they looked at only the two filings cited above, Plaintiffs could have identified other investors in 72 of the 85 Trusts at issue" is irrelevant and immaterial, and further fails to cite any evidence or otherwise explain how knowledge of those investors would have established control of 25% or more of the voting rights in any Trust necessary to direct the Trustee.

39.     As Trustee, DB is obligated to act for the benefit of all Certificateholders—not just 25% holders. *See, e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.01 ("the Trustee, on behalf of the Certificateholders, hereby acknowledges its acceptance of all right, title, and interest to the Mortgage Loans"); *id.* § 2.03(b) ("It is understood and agreed that the obligation of the Sponsor to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a document is missing, a material defect in a constituent document exists or as to which such a breach has occurred and is continuing shall constitute the sole remedy against the Sponsor respecting such omission, defect or breach available to the Trustee on behalf of the Certificateholders."); Handlin Ex. 388 (MSAC 2005-HE7 Prospectus Supplement) at S-82 ("The trustee will perform administrative functions on behalf of the trust fund and for the benefit of the certificateholders pursuant to the terms of the pooling and servicing agreement.").

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the Trustees' duties under the GAs, no response is required.

Disputed.  Plaintiffs' purported characterization of the GAs in this paragraph is not supported by the material cited by Plaintiffs.  As an initial matter, each Trust is governed by unique GAs, and Plaintiffs' citation to a GA for one Trust and an offering document for another Trust does not support any generalization about other Trusts. Indeed, even the quotations Plaintiffs cite in support of this paragraph do not support Plaintiffs' contention that "As Trustee, DB is obligated to act for the benefit of all Certificateholders—not just 25% holders."  *See* Handlin Ex. 35 (NHEL 2006-5 PSA) §§

2.01, 2.03(b); Handlin Ex. 388 (MSAC 2005-HE7 Pro-Supp) S-82.  None of the cited provisions state that Defendant must act for "all Certificateholders."  Moreover, Plaintiffs cite to the Pro-Supp for a Trust, which does not bind the Trustee or define any rights or responsibilities of the trustee.  Defendant was not a party to the Pro-Supp and did not negotiate or endorse it in any way.

The GAs for the Trusts describe an investor-driven process whereby certificateholders can direct Defendant to act, provided they fulfill the necessary conditions set forth in the GAs.  *E.g.*, Handlin Ex. 8 (FFML 2006-FF11 PSA) § 8.01 ("The Trustee, before the occurrence of a Master Servicer Event of Default and after the curing of all Master Servicer Events of Default that may have occurred, shall undertake to perform such duties and only such duties as are specifically set forth in this Agreement. . . . Unless an Event of Default known to the Trustee has occurred and is continuing: (a) the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of the duties and obligations specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee, and the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any certificates or opinions furnished to the Trustee and conforming to the requirements of this Agreement which it believes in good faith to be genuine and to have been duly executed by the proper authorities respecting any matters arising hereunder; (b) the Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless it is finally proven that the Trustee was negligent in ascertaining the

68

pertinent facts; and (c) the Trustee shall not be liable with respect to any action taken, suffered, or omitted to be taken by it in good faith in accordance with the direction of the Holders of Certificates evidencing not less than 25.00% of the Voting Rights of Certificates relating to the time, method, and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee under this Agreement."); *see* Biron PL Ex. 35 & Biron CB Ex. 35 (Charts: Defendant Has Only the Duties Expressly Set Forth in the GAs); Biron PL Ex. 36 & Biron CB Ex. 36 (Charts: No GA Provides That Defendant Has a Duty to Investigate Any Facts or Matters Absent Direction and Indemnity from a Contractually Specified Percentage of Investors); Biron PL Ex. 45 & Biron CB Ex. 45 (Charts: If an EOD is Continuing and Defendant has the Contractually Specified Knowledge Thereof, Defendant Has a Duty to Act as a Prudent Person Under the Circumstances); *see also* Biron CB Ex. 136 at 211:10 – 15 (B. Jetter Dep. (Jan. 23, 2018))

In addition, the evidence in the record reflects that



Biron CB Ex. 134 at 89:20 – 90:16 (R. Boelstler Dep. (June 12, 2017), CB/HSBC); *see also* Goff Ex. 51 at 52:15 – 54:5, 56:20 – 58:12 (R. Boelstler Dep. (Feb. 24, 2017), CB/WF); Goff Ex. 41 at 149:2 – 151:12 (V. Radhakishun Dep. (Jan. 19, 2018)); Biron CB Ex. 121 at 273:24 – 275:13 (Commerzbank 30(b)(6) Dep. (June 7, 2017), CZB/WF); Goff Ex. 52 at 278:15 – 279:8 (P. Collins Dep. (Mar. 1, 2017), PL/HSBC); Goff Ex. 35 at 97:4 – 98:16 (P. Collins Dep. (Aug. 30, 2017), PL/USB); Goff Ex. 53 at 295:16 – 297:8 (T. Mark Dep. (Aug. 24, 2017)); Goff Ex. 54 at 49:10 – 50:15 (C. Kennedy Dep. (Feb. 17, 2017), PL/WF); Goff Ex. 43 at 83:11 – 84:2 (D. Gault Dep. (Jun. 8, 2018)); Goff Ex. 50 at 36:3 – 38:17 (A. Murata Dep. (June 28, 2017), BR/DB); Goff Ex. 42 at 38:22 – 39:14, 60:12 – 62:25 (L. Medema Dep. (Jan. 11, 2018)); Goff Ex. 55 at 322:19 – 327:6 (L. Medema Dep. (Jan. 25, 2017), BR/WF); Goff Ex. 56 at 322:18 – 325:15 (L. Medema Dep. (Mar. 17, 2017), BR/HSBC).



Biron PL Ex. 113 (Notice and Request for Direction) at DBNTC Phoenix Light 00002721208 – 210. Biron PL Ex. 136 (Notice of Results Regarding Request for Direction).

████████████████████████████████████████████████ *Id.* ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████.[5]  Goff Ex. 57 at 122:2 – 17, 198:11 – 199:16, 214:21 – 215:14 (E.

Balz Dep. (Dec. 7, 2017)); Biron PL Ex. 130 at PEL_DB_00030766 – 767 (PEL

September 2009 Email); Ex. 19 at PIMCO-DB000527 (PEL email attaching October

2008 PIMCO Report on Dresdner Portfolio); Biron CB Ex. 95 at CB_WFB003206450 –

55 (Sep. 27. 2010 email forwarding news article); Goff Ex. 48 at 139:5 – 25, 140:12 –

141:14, 144:12 – 145:5, 184:10 – 187:24 (V. Radhakishun Dep. (May 18, 2017),

CB/WF); Biron CB Ex. 123 at 270:23 – 271:23, 282:6 – 18 (V. Radhakishun Dep. (Apr.

27, 2018), CB/HSBC); Biron CB Ex. 121 at 307:10 – 25 (Commerzbank 30(b)(6) Dep.

(June 7, 2017), CB/WF); Biron CB Ex. 120 at 54:2 – 13, 58:8 – 11 (Commerzbank

30(b)(6) Dep. (Mar. 9, 2018)).

---

[5]  ██████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

Goff Ex. 48 at 139:5 – 25, 140:12 – 141:14, 144:12 – 145:5, 184:10 – 187:24 (V. Radhakishun Dep. (May

18, 2017), CB/WF); Biron CB Ex. 123 at 270:23 – 271:23, 282:6 – 18 (V. Radhakishun Dep. (Apr. 27,

2018), CB/HSBC); Biron CB Ex. 121 at 266:23 – 268:2, 307:10 – 25 (Commerzbank 30(b)(6) Dep. (June

7, 2017), CB/WF); Biron CB Ex. 120 at 54:2 – 13, 58:8 – 11, 67:20-69:4, 72:20 – 73:13 (Commerzbank

30(b)(6) Dep. (Mar. 9, 2018)); Biron CB Ex. 102 at DBNTC_COMMERZBANK_000000876758 – 766

(Jan. 31, 2012 letter from Gibbs & Bruns).

The expert evidence is also clear that



Goff Ex. 5 (Richard Report) at JR0014, ¶ 28 (*PL/DB*) & JR0034, ¶ 28 (*CB/DB*).



Goff Ex. 5 (Richard Rebuttal) at JR0054, ¶ 24 (*PL/DB*) & JR0072, ¶ 24 (*CB/DB*).



Goff Ex. 3 (Schwarcz Report) at SS0017, ¶ 3.8 (*PL/DB*) & SS0127 – 28, ¶ 3.8 (*CB/DB*)

(footnote omitted).



*Id.* at SS0016 – 17, ¶ 3.7 (*PL/DB*) & SS0126 – 27, ¶ 3.7 (*CB/DB*).

Indeed, certain GAs expressly address Defendant's rights and obligations if it receives conflicting directions from two or more groups of certificateholders representing more than 25% of the "voting rights."  For example, the IMM 2005-8 indenture provides:

> Subject to the last paragraph of Section 5.11 herein, in the event the Indenture Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of Bonds, each representing less than a majority of the Bond Principal Balances or Notional Amounts of the Bonds, the Indenture Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

Handlin Ex. 17 (IMM 2005-8 Indenture) § 5.06 (emphasis added); *see, e.g.*, Goff Ex. 32 at 394:6 – 397:5 (M. Adelson Dep. (Oct. 3 – 4, 2018)) ███████████████

████████████████████████████████████████████████████

███████ ); *see also, e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) §§ 8.02, 12.03; Biron PL Ex. 51 & Biron PL Ex. 51 (Charts: Investors May Direct Defendant to Conduct an Investigation).].

**Plaintiffs' Reply: DB does not specifically controvert this material fact with record evidence. DB's issue with Plaintiffs' characterization of the Governing Agreements is immaterial; the documents speak for themselves. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). DB fails to explain how the purported evidence it proffers concerning the ability of investors with 25% or more control of Certificates to direct the Trustee, and the interests of investors in different tranches, relates to the Trustee's obligations under the Governing Agreements.** ████████████████

██████████████████████████████████████████████████████ **; the Trustee acts on behalf of all Certificateholders, not just 25%. DB also cites deposition testimony and purported expert evidence that discusses investors' interests but that, too, is immaterial and irrelevant to the material fact. DB's reliance on its expert reports does not**

create an issue of fact because an expert may not provide a legal opinion regarding the interpretation and meaning of contractual provisions. Additionally, Plaintiffs' intend to move to preclude the testimony of DB's expert at trial. Further, DB's attempt to evade this fact by mischaracterizing it as a legal conclusion is unavailing.

40.   Plaintiffs refer the Court to Handlin Ex. 389 (Pilapil) 183:21-184:7.

   Defendant's Response:  Reserved.

**Plaintiffs' Reply:  Reserved.**

41.   For example, Plaintiffs refer the Court to Handlin Ex. 35 (NHEL 2006-5) § 8.01(a)(i) ("Except during the continuance of a Servicing Default: (i) the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Agreement. . . .").

   Defendant's Response:  Reserved.

**Plaintiffs' Reply:  Reserved.**

42.   For example, Plaintiffs refer the Court to Handlin Ex. 35 (NHEL 2006-5 PSA) § 8.01 ("If a Servicing Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Agreement and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."). *See also* Handlin Ex. 390; *infra* ¶¶ 576-80.

   Defendant's Response: Defendant refers the Court to Biron PL Ex. 35 & Biron

CB Ex. 35 (Charts: Defendant Has Only the Duties Expressly Set Forth in the GAs);

Biron PL Ex. 45 & Biron CB Ex. 45 (Charts: If an EOD is Continuing and Defendant has

the Contractually Specified Knowledge Thereof, Defendant Has a Duty to Act as a

Prudent Person Under the Circumstances); Biron PL Ex. 141 at 14 (*The Bank of N.Y.*

*Mellon v. Walnut Place LLC*, No. 11-cv-5988, ECF No. 124, (S.D.N.Y. Oct. 31, 2011))

(court filing in which institutional investors including PIMCO, the collateral manager for

the Phoenix Light transaction and an advisor to Dresdner (Commerzbank's alleged

assignor), state that an RMBS trustee "*does not have, and will never have, an obligation*

*to investigate facts to determine whether an Event of Default has occurred unless 25% of*

*the Certificateholders instruct it to do so.*" (emphasis added)).

**Plaintiffs' Reply: Reserved.**

**C.      The Structure of the Governing Agreements**

43.      Reserved.

44.      For example, Plaintiffs refer the Court to Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.01 ("the following documents or instruments (with respect to each Mortgage Loan, a 'Mortgage File'): (i) the original Mortgage Note endorsed to 'Deutsche Bank National Trust Company, as Trustee for the NovaStar Home Equity Loan Asset-Backed Certificates, Series 2006-5' or in blank; (ii) the original Mortgage with evidence of recording thereon, or, if the original Mortgage has not yet been returned from the public recording office, a copy of the original Mortgage certified by the Sponsor or the public recording office in which such original Mortgage has been recorded, and if the Mortgage Loan is registered on the MERS System, such Mortgage shall include thereon a statement that it is a MOM Loan and shall include the MIN for such Mortgage Loan; (iii) unless the Mortgage Loan is registered on the MERS System, an original assignment (which may be included in one or more blanket assignments if permitted by applicable law) of the Mortgage endorsed to 'Deutsche Bank National Trust Company, as Trustee for the NovaStar Home Equity Loan Asset-Backed Certificates, Series 2006-5', and otherwise in recordable form; (iv) originals of any intervening assignments of the Mortgage showing an unbroken chain of title from the originator thereof to the Person assigning it to the Trustee (or to MERS, if the Mortgage Loan is registered on the MERS System), and noting the presence of a MIN (if the Mortgage Loan is registered on the MERS System), with evidence of recording thereon, or, if the original of any such intervening assignment has not yet been returned from the public recording office, a copy of such original intervening assignment certified by the Sponsor or the public recording office in which such original intervening assignment has been recorded; (v) the original policy of title insurance (or a commitment for title insurance, if the policy is being held by the title insurance company pending recordation of the Mortgage); and (vi) a true and correct copy of each assumption, modification, consolidation or substitution agreement, if any, relating to the Mortgage Loan.").

Defendant's Response:  Reserved.

**Plaintiffs' Reply: Reserved.**

45.      For example, Plaintiffs refer the Court to Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.02(b) ("No later than 180 days after the Closing Date, the Custodian, on behalf of the Trustee, will review, for the benefit of the Certificateholders, the Mortgage Files and will execute and deliver or cause to be executed and delivered to the Sponsor, the Depositor and the Trustee, a final certification. . . .").

Defendant's Response:  First, Defendant refers the Court to Biron PL Ex. 42 &

Biron CB Ex. 42 (Charts: Within a Specified Time-Period, Defendant or a Custodian

Was Required to Issue a Final Certification).  Second, Defendant refers the Court to

Biron PL Ex. 38 & Biron CB Ex. 38 (Charts: Defendant Is Not Responsible for the

Accuracy of Content of Any Certificate, Statement, or Other Instrument Furnished to It);

Handlin Ex. 396 at 71:12–20 (C. Corcoran Dep. (Mar. 21, 2018)) ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ ").

Third, Defendant refers the Court to, *e.g.*, Handlin Ex. 8 (FFML 2006-FF11 PSA) § 2.02

(Neither the Trustee nor the Custodian shall be responsible to verify the validity,

sufficiency or genuineness of any document in any).  Fourth, Defendant refers the Court

to *PL/DB* Dkt. #70 at 15 ("Claims for document delivery failures are barred by the statute

of limitations."); *CB/DB* Dkt. #88, ¶ 35 ("Commerzbank's claims do not include claims

against Deutsche Bank for breaching its document delivery-related duties.").

**Plaintiffs' Reply: Reserved.**

46.    Article II further requires that defects in the Mortgage Files be cured, and, if they
are not, provides a protocol by which Mortgage Files with missing or defective documents, or
that suffer from a material breach of R&W, must be substituted or repurchased. *See*, *e.g.*,
Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(a) ("[T]he Sponsor shall thereupon be required to
deliver such missing document or cure such defect or breach no later than 90 days from the date
of the discovery or receipt of written notice of such missing document, defect or breach, and if
the Sponsor does not deliver such missing document or cure such defect or breach in all material
respects during such period, the Custodian shall notify the Trustee and the Trustee shall enforce
the Sponsor's obligation under the Purchase Agreement and cause the Sponsor to repurchase
such Mortgage Loan from the Trust Fund.").

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding the obligations of the parties to the GAs, no response is required.

76

Disputed.  Plaintiffs' purported characterization of the GAs in this paragraph is not supported by the material cited by Plaintiffs.  As an initial matter, each Trust is governed by unique GAs, and Plaintiffs' citation to a GA for one Trust does not support any generalization about other Trusts.

Moreover, Plaintiffs' purported characterization is not consistent with the terms of the GAs.  The protocols in each GA that may ultimately require a party to "repurchase" mortgage loans establish detailed conditions on each party's obligations.  Defendant restates its response to ¶ 18 and incorporates it by reference.

Plaintiffs' contention is not supported by the evidence, because in some GAs, substitution or repurchase must only be effectuated if the missing or non-conforming document is "material."  *See, e.g.*, Handlin Ex. 9 (FHLT 2005-1 PSA) § 2.01 ("Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, a Mortgage File, the Trustee shall notify the Servicer and the Servicer . . . Shall enforce the obligations of the Originator . . . To cure such defect or deliver such missing document to the Trustee or the Custodian within 90 days.").

In addition, Plaintiffs' contention is irrelevant to Plaintiffs' motion because they are not entitled to pursue any claims based upon incomplete or nonconforming mortgage files.  *PL/DB* Dkt. #70 at 15 ("Claims for document delivery failures are barred by the statute of limitations."); *CB/DB* Dkt. #88, ¶ 35 ("Commerzbank's claims do not include claims against Deutsche Bank for breaching its document delivery-related duties.").

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the Governing Agreements is immaterial; the documents speak for themselves. DB's attempt to evade these facts by**

mischaracterizing them as legal conclusions is unavailing; the Governing Agreements speak for themselves. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c).

DB's assertion that "in some GAs, substitution or repurchase must only be effectuated if the missing or non-conforming document is 'material'" is a legal conclusion inappropriate for a Rule 56.1 Statement to which no response is required. It is nonetheless incorrect. As explained in Plaintiffs' briefing, not all Trusts limit repurchase of defective documents to those that are material, and no Trust places a materiality requirement on the repurchase of missing documents. *See* Pltfs.Mem. 48-54; Pltfs.Reply 33-34.

DB's argument that Plaintiffs are not entitled to pursue any claims based upon incomplete or nonconforming mortgage files is a legal conclusion inappropriate for a Rule 56.1 statement, and therefore no response is required. It is nonetheless incorrect and immaterial to Plaintiffs' Motion because Plaintiffs did not move for summary judgment on the issue of document delivery failures. As explained in Plaintiffs' briefing, Plaintiffs are not suing DB for breaching duties to review Mortgage Files upon receipt, and generate the required initial and final certifications. Plaintiffs are suing DB for breaching its duty, pre-EOD for certain Trusts and post-EOD for all, to enforce repurchase of loans with defective Mortgage Files. The Court's prior order did not dismiss, and Plaintiffs never relinquished, this separately pled claim. *See* Pltfs.Opp. 55-59.

Plaintiffs restate their reply to DBCSUF ¶ 18 and incorporates it by reference.

47.    This repurchase protocol in Article II generally identifies the part(y/ies) responsible, before the occurrence of any Event of Default, for enforcing the repurchase rights, and the party responsible to repurchase the breaching or defective loans. *See*, *e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(a).

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the obligations of the parties to the GAs, no response is required.

Disputed.  Plaintiffs' purported characterization of the GAs in this paragraph is not supported by the material cited by Plaintiffs.  As an initial matter, each Trust is governed by unique GAs, and Plaintiffs' citation to a GA for one Trust does not support any generalization about other Trusts.  In fact, in many Trusts' GAs, Article II does not specify "the part(y/ies) responsible . . . for enforcing the repurchase rights."  *See, e.g.*, Handlin Ex. 8 (FFML 2006-FF11 PSA) Art. II; Handlin Ex. 14 (HASC 2006-HE1 PSA) Art. II.  Further, the cited material makes no reference that these obligations are limited to the time "before the occurrence of any Event of Default."  And, the protocols in each GA that may ultimately require a party to "repurchase" mortgage loans establish detailed conditions on each party's obligations.  Defendant restates its response to paragraph 18 and incorporates it by reference.

In addition, Plaintiffs' contention is irrelevant to Plaintiffs' motion because they are not entitled to pursue any claims based upon incomplete or nonconforming mortgage files.  *PL/DB* Dkt. #70 at 15 ("Claims for document delivery failures are barred by the statute of limitations."); *CB/DB* Dkt. #88, ¶ 35 ("Commerzbank's claims do not include claims against Deutsche Bank for breaching its document delivery-related duties.").

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the Governing Agreements is immaterial; the Governing Agreements speak for themselves. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). Further, DB's attempt to evade these facts by mischaracterizing them as legal conclusions is unavailing.**

79

**DB's argument that Plaintiffs are not entitled to pursue any claims based upon incomplete or nonconforming mortgage files is a legal conclusion inappropriate for a Rule 56.1 statement, and therefore no response is required. It is nonetheless incorrect and immaterial to Plaintiffs' Motion because Plaintiffs did not move for summary judgment on the issue of document delivery failures. As explained in Plaintiffs' briefing, Plaintiffs are not suing DB for breaching duties to review Mortgage Files upon receipt, and generate the required initial and final certifications. Plaintiffs are suing DB for breaching its duty, pre-EOD for certain Trusts and post-EOD for all, to enforce repurchase of loans with defective Mortgage Files. The Court's prior order did not dismiss, and Plaintiffs never relinquished, this separately pled claim.** *See* **Pltfs.Opp. 55-59.**

**Plaintiffs restate their reply to DBCSUF ¶ 18 and incorporates them by reference.**

48.   Article II also identifies repurchase by the designated party as a "remedy . . . available to the Trustee on behalf of the Certificateholders." *See, e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(b).

<u>Defendant's Response</u>:  To the extent this paragraph purports to state a legal conclusion regarding the obligations of Defendant under the GAs, no response is required.

Disputed.  Plaintiffs' purported characterization of the GAs in this paragraph is not supported by the material cited by Plaintiffs.  As an initial matter, each Trust is governed by unique GAs, and Plaintiffs' citation to a GA for one Trust does not support any generalization about other Trusts.

Plaintiffs' quotation is misleading because it omits relevant adjacent language (italics indicate Plaintiffs' omission):

> *It is understood and agreed that the obligation of the Sponsor to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a document is missing, a material defect in a constituent*

> *document exists or as to which such a breach has occurred and is*
> *continuing shall constitute the sole remedy against the Sponsor*
> *respecting such omission, defect or breach available to the Trustee*
> on behalf of the Certificateholders.

Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(b).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the Governing Agreements is immaterial; the Governing Agreements speak for themselves. Therefore, this material fact should be deemed admitted. See Local Rule 56.1(c). Further, DB's attempt to evade these facts by mischaracterizing them as legal conclusions is unavailing.**

49.      Finally, Article II obligates any party that discovers a breach of R&W—including the Trustee—to give all deal parties notice of each such breach. *See, e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(a) ("Upon discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by the Sponsor of any representation, warranty or covenant under the Purchase Agreement in respect of any Mortgage Loan which materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the party making such discovery or receiving such notice shall promptly notify the other parties hereto. . . .").

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the obligations of "all deals parties," no response is required.

Disputed.  Plaintiffs' purported characterization of the GAs in this paragraph is not supported by the material cited by Plaintiffs.  As an initial matter, each Trust is governed by unique GAs, and Plaintiffs' citation to a GA for one Trust does not support any generalization about other Trusts.

Moreover, Plaintiffs' purported characterization of the GAs in this paragraph is contrary to evidence in the record.  Indeed, Plaintiffs' characterization of the GAs is not even consistent with Plaintiffs' quotation from the only GA Plaintiffs cite in this paragraph.  Among other deficiencies, Plaintiffs ignore the materiality requirements in the quoted language.  *See* Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(a).

Under the GAs for the Trusts on Biron PL Ex. 54 and Biron CB Ex. 54 (the "Discovery-Only Trusts"), if Defendant or another enumerated party "discovers" a material loan-level R&W breach, it is required to provide notice to other specified parties. Biron PL Ex. 54 & Biron CB Ex. 54 (Charts: Trusts for Which GAs Provide Defendant Must Provide Notice of R&W Breaches Only Upon Discovery); *see, e.g.*, Biron PL Ex. 6 (SAST 2006-3 SSA Excerpts) § 2.3(d) ("Upon discovery by any of the parties hereto of a breach of a representation or warranty made by the applicable Seller in respect of any of the Mortgage Loans that [] materially and adversely affects the interests of the Noteholders in any such Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties.").

Under the GAs for the Trusts on Biron PL Ex. 55 and Biron CB Ex. 55 (the "Discovery/Notice Trusts"), if Defendant or another enumerated party "discovers" or receives written notice of a material loan-level R&W breach, it is required to provide notice to other specified parties.  Biron PL Ex. 55 & Biron CB Ex. 55 (Charts: Trusts for Which GAs Provide Defendant Must Provide Notice of R&W Breaches Upon Discovery or Receipt of Written Notice); *see, e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 2.03(a) ("Upon discovery or receipt of written notice of any materially defective document in, or that a document is missing from, a Mortgage File or of the breach by the Sponsor of any representation, warranty or covenant under the Purchase Agreement in respect of any Mortgage Loan which materially adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders, the party making such discovery or receiving such notice shall promptly notify the other parties hereto … .").

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the Governing Agreements is immaterial; the Governing Agreements speak for themselves. Therefore, this material fact should be deemed admitted.** *See* **Local Rule 56.1(c). Further, DB's attempt to evade these facts by mischaracterizing them as legal conclusions is unavailing.**

50.    Article III (Administration and Servicing of the Mortgage Loans) describes the role of the Servicer, which services the mortgage loans—including collecting mortgage payments, conveying collections and data about loan status to the Trustee, and, where necessary, carrying out foreclosures and maintaining properties acquired by the Trust through foreclosure. *See, e.g.,* Handlin Ex. 35 (NHEL 2006-5 PSA) § 3.01 ("The Servicer shall supervise, or take such actions as are necessary to ensure, the servicing and administration of the Mortgage Loans and any REO Property in accordance with all applicable requirements of the Servicing Criteria, with this Agreement and with its normal servicing practices, which generally shall conform to the standards of an institution prudently servicing mortgage loans for its own account and shall have full authority to do anything it reasonably deems appropriate or desirable in connection with such servicing and administration. . . . [T]he authority of the Servicer, in its capacity as Servicer, and any Subservicer acting on its behalf, shall include, without limitation, the power to . . . effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing a related Mortgage Loan, including the employment of attorneys, the institution of legal proceedings, the collection of deficiency judgments, the acceptance of compromise proposals and any other matter pertaining to a delinquent Mortgage Loan.").

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the obligations of the Servicer under the GAs, no response is required.

Disputed.  Plaintiffs' purported characterization of the GAs in this paragraph is not supported by the material cited by Plaintiffs.  As an initial matter, each Trust is governed by unique GAs, and Plaintiffs' citation to a GA for one Trust does not support any generalization about other Trusts.  Indeed, the quotation cited by Plaintiffs in support of this paragraph does not support their contention that servicing the mortgage loans includes "conveying collections and data about loan status to the Trustee" even with respect to the NHEL 2006-5 Trust, let alone any other Trust.

Undisputed that each Trust's GAs provide that the servicers' duties include collecting payments on the loans, and, upon borrower default, enforcing the terms of the loan, which may include foreclosing on the real property securing the loan.  Reyes PL Decl. ¶ 13; Reyes CB Decl. ¶ 13; Biron PL Ex. 43 & Biron CB Ex. 43 (Charts: Servicer Duties).

Plaintiffs' quotation omits relevant adjacent language (italics indicate Plaintiffs' omission):

> (a) The Servicer shall supervise, or take such actions as are necessary to ensure, the servicing and administration of the Mortgage Loans and any REO Property in accordance with all applicable requirements of the Servicing Criteria, with this Agreement and with its normal servicing practices, which generally shall conform to the standards of an institution prudently servicing mortgage loans for its own account and shall have full authority to do anything it reasonably deems appropriate or desirable in connection with such servicing and administration. The Servicer may perform its responsibilities relating to servicing through other agents or independent contractors, but shall not thereby be released from any of its responsibilities as hereinafter set forth. Subject to Section 3.06(b), the authority of the Servicer, in its capacity as Servicer, and any Subservicer acting on its behalf, shall include, without limitation, the power to (i) consult with and advise any Subservicer regarding administration of a related Mortgage Loan, (ii) approve any recommendation by a Subservicer to foreclose on a related Mortgage Loan, (iii) supervise the filing and collection of insurance claims and take or cause to be taken such actions on behalf of the insured Person thereunder as shall be reasonably necessary to prevent the denial of coverage thereunder, and (iv) effectuate foreclosure or other conversion of the ownership of the Mortgaged Property securing a related Mortgage Loan, including the employment of attorneys, the institution of legal proceedings, the collection of deficiency judgments, the acceptance of compromise proposals and any other matter pertaining to a delinquent Mortgage Loan. *The authority of the Servicer shall include, in addition, the power on behalf of the Certificateholders, the Trustee, or any of them to (i) execute and deliver customary consents or waivers and other instruments and documents, (ii) consent to transfer of any related Mortgaged Property and assumptions of the related Mortgage Notes and*

> *Mortgages (in the manner provided in this Agreement) and (iii)*
> *collect any Insurance Proceeds and Liquidation Proceeds. Without*
> *limiting the generality of the foregoing, the Servicer and any*
> *Subservicer acting on its behalf may, and is hereby authorized, and*
> *empowered by the Trustee when the Servicer believes it is*
> *reasonably necessary in its best judgment in order to comply with*
> *its servicing duties hereunder, to execute and deliver, on behalf of*
> *itself, the Certificateholders, the Trustee, or any of them, any*
> *instruments of satisfaction, cancellation, partial or full release,*
> *discharge and all other comparable instruments, with respect to*
> *the related Mortgage Loans, the insurance policies and the*
> *accounts related thereto, and the Mortgaged Properties. The*
> *Servicer may exercise this power in its own name or in the name of*
> *a Subservicer.*

Handlin Ex. 35 (NHEL 2006-5 PSA) § 3.01(a).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the Governing Agreements is immaterial; the Governing Agreements speak for themselves. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). Further, DB's attempt to evade these facts by mischaracterizing them as legal conclusions is unavailing.**

51.     Article III also identifies reporting obligations regarding Servicers, including Servicers' obligations to provide annual statements of compliance in which an Officer attests to the Trustee that the Servicer has complied with its obligations under the PSAs, and, for Trusts that closed after December 31, 2005, certifications by the Servicers—and, in many Trusts, also by the Trustee—and independent accountants' attestations of compliance with the servicing criteria identified in SEC Regulation AB. *See, e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 3.16 ("Within 75 days after December 31 of each year, beginning in 2007, the Servicer at its own expense shall deliver to the Trustee, the Depositor and the Rating Agencies, an Officer's Certificate of the Servicer (an 'Annual Statement of Compliance'). . . ."); Handlin Ex. 35 (NHEL 2006-5 PSA) § 3.17 ("The Servicer shall service and administer the Mortgage Loans in accordance with all applicable requirements of the Servicing Criteria. Pursuant to Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB, each of the Servicer and the Trustee (each, an 'Attesting Party') shall deliver to the Trustee and the Depositor on or before March 15th of each calendar year in which the Issuing Entity is required to file a Form 10-K beginning in 2007, a report regarding such Attesting Party's assessment of compliance (an 'Assessment of Compliance') with the Servicing Criteria during the preceding calendar year.").

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the obligations of the Servicers under the GAs, no response is required.

Disputed.  Plaintiffs' purported characterization of the GAs in this paragraph is not supported by the material cited by Plaintiffs.  As an initial matter, each Trust is governed by unique GAs, and Plaintiffs' citation to a GA for one Trust does not support any generalization about other Trusts.  Indeed, the quotations cited by Plaintiffs in support of this paragraph do not support their purported characterizations even with respect to the NHEL 2006-5 Trust, let alone any other Trust.  For example, among other deficiencies, the materials Plaintiffs quote do not support Plaintiffs purported characterization that an Officer of the Servicer is obligated to "attest[] *to the Trustee* that the Servicer has complied with its obligations under the PSAs … ."  The materials Plaintiffs quoted also do not support Plaintiffs' reference to "certifications . . . also by the Trustee."

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the Governing Agreements is immaterial; the Governing Agreements speak for themselves. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). Further, DB's attempt to evade these facts by mischaracterizing them as legal conclusions is unavailing.**

52.     Article VII (Default) defines the circumstances triggering Events of Default—sometimes dubbed "Servicer Events of Termination," "Servicer Defaults," etc. (collectively, "EODs")—that give rise to the Trustee's heightened, fiduciary obligations described in Article VIII. *See, e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.01(a) (defining "Servicing Defaults"); Handlin Ex. 27 (MSAC 2007-HE1 PSA) § 7.01 (defining "Events of Default"); Handlin Ex. 41 (SVHE 2006-1 PSA) § 7.01(a) (defining "Servicer Events of Termination").

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the interpretation of the GAs, no response is required.

Disputed.  Plaintiffs' purported characterization of the GAs in this paragraph is not supported by the material cited by Plaintiffs.  As an initial matter, each Trust is governed by unique GAs, and Plaintiffs' citation to the GAs for three Trusts does not support any generalization about other Trusts.  Indeed, Plaintiffs' purported characterization of the GAs is not even consistent with the 3 GAs Plaintiffs cite in this paragraph.  For example, nowhere do Plaintiffs' quoted GAs purport to impose upon Defendant any so-called "heightened" or "fiduciary" obligations.  *See generally*, Handlin Ex. 35 (NHEL 2006-5 PSA); Handlin Ex. 27 (MSAC 2007-HE1 PSA); Handlin Ex. 41 (SVHE 2006-1 PSA).

Moreover, Plaintiffs' purported characterization of the GAs in this paragraph is contrary to evidence in the record.

The cited evidence does not support Plaintiffs' contention, because the GAs provide that unless, depending on the Trust, Defendant has contractually specified "actual knowledge" and/or "written notice" that a contractually-defined event (referred to herein as an "EOD") has occurred and is continuing, Defendant's duties are limited to those "specifically set forth in the Agreement with respect to the Trustee and no implied covenants or obligations shall be read into this Agreement."  Biron PL Ex. 35 & Biron CB Ex. 35 (Charts: Defendant Has Only the Duties Expressly Set Forth in the GAs); Biron PL Ex. 45 & Biron CB Ex. 45 (Charts: If an EOD is Continuing and Defendant has the Contractually Specified Knowledge Thereof, Defendant Has a Duty to Act as a Prudent Person Under the Circumstances).  The GAs provide in substance that if an EOD

is continuing *and* Defendant has the contractually specified knowledge thereof (*e.g.*, "actual knowledge" or "written notice"), Defendant "shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstance in the conduct of such person's own affairs."  Biron PL Ex. 45 & Biron CB Ex. 45 (Charts: If an EOD is Continuing and Defendant has the Contractually Specified Knowledge Thereof, Defendant Has a Duty to Act as a Prudent Person Under the Circumstances).

Some GAs define different types of "events" (*e.g.*, "Master Servicer Event of Default" and "Servicer Event of Default") that have different consequences.  *See, e.g.*, Handlin Ex. 8 (FFML 2006-FF11 PSA) §§ 9.06 ("Master Servicer Event of Default"), 7.01 ("Event of Default").  For example, under many of those GAs, only a "Master Servicer Event of Default" can trigger Defendant's "prudent person" duty.  Biron PL Ex. 45 & Biron CB Ex. 45 (Charts: If an EOD is Continuing and Defendant has the Contractually Specified Knowledge Thereof, Defendant Has a Duty to Act as a Prudent Person Under the Circumstances).  As used herein, "EOD" only refers to those events defined under each GA that can trigger Defendant's "prudent person" duty.

Contrary to Plaintiffs' purported characterization of the GAs, for many Trusts, EODs are not defined in Article VII of the respective GAs.  *See* Biron PL Ex. 45 & Biron CB Ex. 45 (Charts: If An EOD Is Continuing And Defendant Has The Contractually Specified Knowledge Thereof, Defendant Has A Duty To Act As A Prudent Person Under The Circumstances); Biron PL Ex. 46 & Biron CB Ex. 46 (Charts: EODs Triggered By Servicer Breach).  Likewise, the provision describing Defendant's obligations if an EOD is continuing and Defendant has the contractually specified

knowledge is not contained in Article VIII of the respective GAs for certain Trusts.

Biron PL Ex. 45 & Biron CB Ex. 45 (Charts: If An EOD Is Continuing And Defendant

Has The Contractually Specified Knowledge Thereof, Defendant Has A Duty To Act As

A Prudent Person Under The Circumstances).

**Plaintiffs' Reply: DB purported evidence does not specifically controvert the**

**material fact. DB's issue with Plaintiffs' characterization of the Governing Agreements is**

**immaterial; the Governing Agreements speak for themselves. Therefore, this material fact**

**should be deemed admitted.** *See* **Local Rule 56.1(c). Further, DB's attempt to evade these**

**facts by mischaracterizing them as legal conclusions is unavailing.**

53.     Article VII also requires a party, usually the Trustee, to give Certificateholders
written notice of EODs within a specified period after the EOD's occurrence (and sometimes
also of circumstances that, with time, would constitute EODs). *See*, *e.g.*, Handlin Ex. 35 (NHEL
2006-5 PSA) § 7.04(b) ("No later than 60 days after the occurrence of any event which
constitutes or which, with notice or a lapse of time or both, would constitute a Servicing Default
for five Business Days after a Responsible Officer of the Trustee obtains actual knowledge or
written notice of the occurrence of such an event, the Trustee shall transmit by mail to the Hedge
Counterparties, if prior to the Class I Termination Date, and all Certificateholders notice of such
occurrence unless such default or Servicing Default shall have been waived or cured.").

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding the obligations of Defendant or any other party, no response is

required.

Disputed.  Plaintiffs' purported characterization of the GAs in this paragraph is

not supported by the material cited by Plaintiffs.  As an initial matter, each Trust is

governed by unique GAs, and Plaintiffs' citation to the GA for one Trust does not support

any generalization about other Trusts.  Indeed, Plaintiffs' purported characterization of

the GAs is not even consistent with the quotation cite in support of this paragraph.

Among other deficiencies, Plaintiffs' purported characterization ignores the quoted

language "after a Responsible Officer of the Trustee obtains actual knowledge or written notice of the occurrence of such an event."

Moreover, Plaintiffs' purported characterization of the GAs in this paragraph is contrary to evidence in the record.

The GAs for 62 Trusts provide in substance that if an EOD is continuing *and* Defendant has the contractually specified knowledge thereof (*e.g.*, "actual knowledge" or "written notice"), Defendant must provide notice of the EOD to contractually specified recipients. *See, e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.04(b) ("No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicing Default for five Business Days *after a Responsible Officer of the Trustee obtains actual knowledge or written notice of the occurrence of such an event*, the Trustee shall transmit by mail to the Hedge Counterparties, if prior to the Class I Termination Date, and all Certificateholders notice of such occurrence unless such default or Servicing Default shall have been waived or cured.") (emphasis added); *see* Goff Ex. 10 (Chart: For Certain Trusts, If An EOD Is Continuing And Defendant Has The Contractually Specified Knowledge Thereof, Defendant Has A Duty To Provide Notice To The Contractually Specified Recipients).

The GAs for 23 Trusts do not require Defendant to provide notice of EODs. Goff Ex. 11 (Chart: Trusts For Which Defendant Has No Duty To Provide Notice Of EODs).

**Plaintiffs' Reply: DB purported evidence does not specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the Governing Agreements is immaterial; the Governing Agreements speak for themselves. Therefore, this material fact**

should be deemed admitted. *See* Local Rule 56.1(c). Further, DB's attempt to evade these facts by mischaracterizing them as legal conclusions is unavailing.

DB's assertion that "[t]he GAs for 62 Trusts provide in substance that if an EOD is continuing and Defendant has the contractually specified knowledge thereof (e.g., 'actual knowledge' or 'written notice'), Defendant must provide notice of the EOD to contractually specified recipients" is a legal conclusion inappropriate for a Rule 56.1 statement and therefore, no response is required. It is nonetheless immaterial to Plaintiffs' Motion. As explained in Plaintiffs' briefing, DB had actual knowledge and/or written notice of each of the EODs set forth in Plaintiffs' Motion, as well as actual knowledge and/or written notice of additional EODs included in Plaintiffs' Opposition. Pltfs.Mem. 14-41; Pltfs.Opp. 67-91. DB's assertion also is incorrect. As explained in Plaintiffs' briefing, the requirement that DB send notices of EODs, typically found in Article VII, is distinct from DB's separately stated prudent person duty, which typically appears in § 8.01 of the Governing Agreements. Pltfs.Mem. 33-34.

Further, DB's argument that the Governing Agreementss for 23 trusts do not require Defendant to provide notice of EODs, is immaterial to Plaintiffs' Motion because Plaintiffs did not move for summary judgment on the issue of whether any or all Governing Agreements require the Defendant to provide notice of EODs. Plaintiffs assert claims for DB's failure to comply with its prudent person obligations resulting from EODs that occurred and existed regardless of whether DB provided notice of them or should have provided notice of them but failed to do so. *See* Pltfs.Mem. 14-41.

54.    Article VIII (Duties of the Trustee) provides that, upon occurrence of an EOD that has not been cured, the Trustee shall exercise the rights and powers vested in it by the PSA and use the same degree of care and skill in their exercise as a prudent person would under the circumstances in the conduct of that person's own affairs—a clause that appears in all Governing

Agreements. *See*, *e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 8.01 ("If a Servicing Default has occurred and is continuing, the Trustee shall exercise the rights and powers vested in it by this Agreement and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."). *See also* Handlin Ex. 390.

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the obligations of Defendant under the GAs, no response is required.

Disputed.  Plaintiffs' purported characterization of the GAs in this paragraph is contrary to overwhelming material in the record, including the PSA Plaintiffs cite in support of this paragraph.

The GAs provide that unless, depending on the Trust, Defendant has contractually specified "actual knowledge" and/or "written notice" that a contractually-defined event of default (an EOD) has occurred and is continuing, Defendant's duties are limited to those "specifically set forth in the Agreement with respect to the Trustee and no implied covenants or obligations shall be read into this Agreement."  Biron PL Ex. 35 & Biron CB Ex. 35 (Charts: Defendant Has Only the Duties Expressly Set Forth in the GAs); Biron PL Ex. 45 & Biron CB Ex. 45 (Charts: If an EOD is Continuing and Defendant has the Contractually Specified Knowledge Thereof, Defendant Has a Duty to Act as a Prudent Person Under the Circumstances).

Defendant does not dispute that the GAs provide, in substance, that if an EOD is continuing *and* Defendant has the contractually specified knowledge thereof (*e.g.*, "actual knowledge" or "written notice"), Defendant "shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstance in the conduct of such person's own affairs."  Biron PL Ex. 45 & Biron CB Ex. 45 (Charts: If an EOD is

Continuing and Defendant has the Contractually Specified Knowledge Thereof, Defendant Has a Duty to Act as a Prudent Person Under the Circumstances).

**Plaintiffs' Reply: DB purported evidence does not specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the Governing Agreements is immaterial; the Governing Agreements speak for themselves. Therefore, this material fact should be deemed admitted.** *See* **Local Rule 56.1(c). Further, DB's attempt to evade these facts by mischaracterizing them as legal conclusions is unavailing.**

**DB's statement that "[t]he GAs provide that unless, depending on the Trust, Defendant has contractually specified 'actual knowledge' and/or 'written notice' that a contractually-defined event (an EOD) has occurred and is continuing, Defendant's duties are limited to those 'specifically set forth in the Agreement with respect to the Trustee and no implied covenants or obligations shall be read into this Agreement'" is a legal conclusion inappropriate for a Rule 56.1 Statement to which no response is required. But DB is nonetheless incorrect. No Governing Agreement requires written notice before the trustee is required to exercise rights and remedies as a prudent person would after the occurrence of an EOD.** *See* **PL Response to DBSUF ¶ 10; CB Response to DBSUF ¶ 12.**

**DB's statement that "the GAs provide, in substance, that if an EOD is continuing and Defendant has the contractually specified knowledge thereof (e.g., "actual knowledge" or "written notice"), Defendant "shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstance in the conduct of such person's own affairs" is a legal conclusion inappropriate for a Rule 56.1 Statement to which no response is required. But DB is nonetheless incorrect. No Governing Agreement requires written**

**notice before the trustee is required to exercise rights and remedies as a prudent person
would after the occurrence of an EOD. *See* PL Response to DBSUF ¶ 10; CB Response to
DBSUF ¶ 12.**

### D.  Defendants

55.  Plaintiffs refer the Court to Handlin Ex. 391 (Rodriguez) 175:21-176:9.

Defendant's Response:  Reserved.

**Plaintiffs' Reply:  Reserved.**

56.  Plaintiffs refer the Court to Handlin Ex. 384 (Co) 207:24-208:9 and Handlin Ex.
392 (listing officers of DB as of March 15, 2006).

Defendant's Response:  Reserved.

**Plaintiffs' Reply:  Reserved.**

57.  Further, Hang Luu, Amy McNulty, and Melissa Rossiter, all Trust Administrators
in TAG, testified that ▇▇▇▇▇▇▇▇▇▇▇▇▇

Defendant's Response:  Disputed.  Plaintiffs cite no evidence in support of this

paragraph. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇. *See* Handlin Ex. 398 at 20:12-22, 133:13-24 (M. Rossiter

Dep. (Aug. 16, 2017)).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**facts.** ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. *See*

**¶¶ 58-60. Therefore, they should be deemed admitted. *See* Local Rule 56.1(c).**

58.  Plaintiffs refer the Court to Handlin Ex. 404 (Luu) 64:9-65:12.

Defendant's Response:  Defendant refers the court, for example, to Handlin Ex.

23 (MSAC 2006-HE6 PSA) Art. I (defining "Responsible Officer": "When used with

respect to the Trustee, any managing director, any vice president, any assistant vice

president, any assistant secretary, any assistant treasurer, any associate, or any other

officer of the Trustee customarily performing functions similar to those performed by any

of the above designated officers who at such time shall be officers to whom, with respect

to a particular matter, such matter is referred because of such officer's knowledge of and

familiarity with the particular subject *and who shall have direct responsibility for the*

*administration of this Agreement*." (emphasis added)) and Handlin Ex. 35 (NHEL 2006-5

PSA), Appendix A-41 (defining "Responsible Officer": "With respect to the Trustee, any

officer working in the Corporate Trust Office *with direct responsibility for the*

*administration of this Agreement* and also, with respect to a particular matter, any other

officer to whom such matter is referred because of such officer's knowledge of and

familiarity with the particular subject.").

**Plaintiffs' Reply: Reserved.**

59.    Ms. McNulty testified that ████████████████████████████
████████████████████████



Handlin Ex. 405 (McNulty) 21:10-25.

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding the applicability of contractual language in the GAs to a witness, no

response is required.

Disputed.  Plaintiffs fail to support this paragraph with material that would be admissible in evidence.  Plaintiffs cite only deposition testimony of a fact witness that includes responses to questions requesting legal opinions, following timely objections by counsel.

Moreover, "Responsible Officer" is a contractually defined term under each of the GAs.  *Compare* Handlin Ex. 23 (MSAC 2006-HE6 PSA) Art. I, Definition of "Responsible Officer" ("When used with respect to the Trustee, any managing director, any vice president, any assistant vice president, any assistant secretary, any assistant treasurer, any associate, or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers who at such time shall be officers to whom, with respect to a particular matter, such matter is referred because of such officer's knowledge of and familiarity with the particular subject *and who shall have direct responsibility for the administration of this Agreement*.") (emphasis added) with Handlin Ex. 35 (NHEL 2006-5 PSA), Appendix A-41, Definition of "Responsible Officer" ("With respect to the Trustee, any officer working in the Corporate Trust Office *with direct responsibility for the administration of this Agreement* and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject."). ■

■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

**Plaintiffs' Reply:** DB proffers no evidence to specifically controvert the material fact. Therefore, this material fact should be deemed admitted. See Local Rule 56.1(c). DB's issue with Plaintiffs' characterization of the cited testimony is immaterial; the testimony speaks for itself. DB's attempt to evade these facts by mischaracterizing them as legal conclusions is unavailing. DB's argument that the cited evidence is inadmissible is incorrect. The testimony does not involve a legal question, and Ms. Luu has personal knowledge of her job title and duties as an employee of DB. DB's assertion that ▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇

60.    Ms. Rossiter testified that s▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇

Handlin Ex. 398 (Rossiter) 143:14-144:2.

Defendant's Response: To the extent this statement is a legal conclusion regarding the applicability of contractual language in the GAs to a witness, no response is required.

Disputed.  Plaintiffs fail to support this paragraph with material that would be admissible in evidence.  Plaintiffs cite only deposition testimony of a fact witness that includes responses to questions requesting legal opinions.

Moreover, "Responsible Officer" is a contractually defined term under each of the GAs.  *Compare* Handlin Ex. 23 (MSAC 2006-HE6 PSA) Art. I, Definition of "Responsible Officer" ("When used with respect to the Trustee, any managing director, any vice president, any assistant vice president, any assistant secretary, any assistant treasurer, any associate, or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers who at such time shall be officers to whom, with respect to a particular matter, such matter is referred because of such officer's knowledge of and familiarity with the particular subject *and who shall have direct responsibility for the administration of this Agreement*.") (emphasis added) *with* Handlin Ex. 35 (NHEL 2006-5 PSA), Appendix A-41, Definition of "Responsible Officer" ("With respect to the Trustee, any officer working in the Corporate Trust Office *with direct responsibility for the administration of this Agreement* and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.").  The testimony Plaintiffs quote does not support their statement ██████████

███████████████████████████

████████████████████████████████████

████████████████████████

Plaintiffs' purported characterization of the witness's testimony in this paragraph is not supported by the testimony cited.  Among other deficiencies, ████████████

██████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

Further, the testimony cited by Plaintiffs includes no foundation establishing whether the witness's testimony applied specifically to her employment by Deutsche Bank National Trust Company or to Deutsche Bank Trust Company Americas. Accordingly, Plaintiffs have failed to support any statement in this paragraph relating to "DB," as that term is defined by Plaintiffs.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, this material fact should be deemed admitted. See Local Rule 56.1(c). DB's issue with Plaintiffs' characterization of the cited testimony is immaterial; the testimony speaks for itself. DB's attempt to evade these facts by mischaracterizing them as legal conclusions is unavailing. DB's argument that the cited evidence is inadmissible is incorrect. The testimony does not involve a legal question, and Ms. Luu has personal knowledge of** ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███

61.     Plaintiffs refer the Court to Handlin Ex. 378 (Reyes) 16:6-19.

Defendant's Response:  Reserved.

**Plaintiffs' Reply:  Reserved.**

62.     ████████████████████████████████

██████████████████████████ss██████████████████

██████  Ronaldo Reyes, a Team Leader in TAG, testified as follows:

███████████████████



Handlin Ex. 378 (Reyes) 31:8-22, 48:1-11.

  <u>Defendant's Response</u>:  Disputed.  Plaintiffs' cited testimony does not support

Plaintiffs' proposition that 

      Plaintiffs' cited testimony does not

**Plaintiffs Reply: DB proffers no evidence to specifically controvert the material fact.**

**DB's issue with Plaintiffs' characterization of the testimony is immaterial; the testimony**

**speaks for itself. Therefore, it should be deemed admitted. See Local Rule 56.1(c).**

  63. Plaintiffs refer the Court to Handlin Ex. 384 (Co) 36:16-23.

  <u>Defendant's Response</u>:  Reserved.

**Plaintiffs' Reply:  Reserved.**

  64. Plaintiffs refer the Court to Handlin Ex. 393 (Vaughan) 86:6-12.

  <u>Defendant's Response</u>:  Reserved.

**Plaintiffs' Reply:  Reserved.**

  65.



Handlin Ex. 394 at DBNTC PHOENIX LIGHT 00002569692.

<u>Defendant's Response</u>: Disputed.



*See* Handlin Ex. 395 at 15:18 – 25, 16:1 – 9 (M. Kaprelyan

Dep. (Mar. 22, 2018)).

**Plaintiffs' Reply: DB's proffered evidence does not specifically controvert Plaintiffs' material facts. Therefore, these facts should be deemed admitted. *See* Local Rule 56.1(c).**

66.    Plaintiffs refer the Court to Handlin Ex. 395 (Kaprelyan) 15:18-18:1.

<u>Defendant's Response</u>:  Reserved.

**Plaintiffs' Reply:  Reserved.**

67.



Christopher Corcoran, a Team Leader in Custody, testified as follows:



Handlin Ex. 396 (Corcoran) 18:20-19:22.

Defendant's Response:  Disputed.  Plaintiffs' cited testimony does not support

Plaintiffs' proposition that Although the cited testimony states that the testimony does not state that Nor does the cited testimony state that

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the testimony is immaterial; the testimony speaks for itself. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c).**

68.    Barbara Campbell, a Team Leader in TAG before transferring to Custody, testified as follows:





nts; receiving the collateral and setting up the review process for the collateral.

Handlin Ex. 401 (Campbell) 28:25-30:3.

Defendant's Response:  Undisputed that Handlin Ex. 401 contains the quoted

language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

69. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ Karlene Benvenuto, a Trust Administrator in TAG and an officer of DB who previously worked in Core Services, testified as follows:

Handlin Ex. 397 (Benvenuto) 20:9-20.

Defendant's Response: Undisputed that Handlin Ex. 397 contains the quoted

language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

70.     Additionally, Timothy Avakian, a Trust Administrator in TAG, testified as follows:



Handlin Ex. 383 (Avakian) 28:14-29:3.

Defendant's Response: Undisputed that Handlin Ex. 383 contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted. *See* Local Rule 56.1(c).**

71.     Melissa Rossiter, a Team Leader in DB's TAG, testified as follows:



Handlin Ex. 398 (Rossiter) 27:25-28:7.

Defendant's Response: Undisputed that Handlin Ex. 398 contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted. *See* Local Rule 56.1(c).**

72. ████████████████████████████████s
████████████ Ronaldo Reyes, a Team Leader in DB's TAG, testified as follows:



Handlin Ex. 378 (Reyes) 48:1-11.



Defendant's Response: Disputed. Plaintiffs' cited testimony does not support Plaintiffs' proposition that [REDACTED]

[REDACTED] " Nowhere does Plaintiffs' cited testimony state that [REDACTED]

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the testimony is immaterial; the testimony speaks for itself. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c).**

73.    Additionally, Kellie Rodriguez, the former Director of TMG, testified as follows:





Handlin Ex. 378 (Rodriguez) 54:18-55:24, 74:5-14.

   <u>Defendant's Response</u>:  Undisputed that Handlin Ex. 399 contains the quoted

language.[6]

  **Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted. *See* Local Rule 56.1(c). The cited testimony appears at Handlin Ex. 399.**

  74. Reserved.

  75. Reserved.

  76. Reserved.

  77. Reserved.

  78. ███████████████████████████████████

██████████████████████████████████████. See Handlin

Ex. 583.

   <u>Defendant's Response</u>:  To the extent this paragraph purports to state a legal

conclusion regarding ██████████████████████ no response is

required.  Further, Plaintiffs' reference to ██████ is ambiguous. To the extent

Plaintiffs are referring to ████████████████

---

[6] Plaintiffs cite Handlin Ex. 378 to support this contention, but it appears to be Handlin Ex. 399.

█████████      To the extent Plaintiffs are referring to ████████████████████

████ that is a legal conclusion, and no response is required.

Disputed.  The documents cited in Handlin Ex. 583 do not support Plaintiffs'

assertion that ███████████████████████████████████████████████

████████████████████████████████████████████████████

█████████      Plaintiffs' cited documents do not establish that █████████████

████████████████████████████████████████████████████

███████████████████████████████████████████  *See, e.g.,*

Handlin Ex. 499 (████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████

Indeed, with respect to ████████████████████████████████████

██████████████████████████████████████████  *See* Goff Ex.

3 (Schwarcz Report) at SS0038, ¶ 5.4 (*PL/DB*) & SS0149, ¶ 5.4 (*CB/DB*) ██████

████████████████████████████████████████████████████

██████████████████████  ); Goff Ex. 1 (Bryar Report) at MB0050, ¶ 121 (*PL/DB*) &

MB0170, ¶ 121 (*CB/DB*) ████████████████████████████

████████████████████████████████████████████████

████████████████████████  ; *see also* PL/DB Beckles Report ¶ 137 & CB/DB Beckles

Report ¶ 88 ████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████



███████████████████████████████████ Goff Ex. 1 (Bryar Report)

at MB0018, ¶ 44 (*PL/DB*) & MB0138, ¶ 44 (*CB/DB*). ████████████████████

███████████████████████████████████████████

█████████████ Goff Ex. 1 (Bryar Report) at MB0055, ¶ 131 (*PL/DB*) & MB0176,

¶ 131 (*CB/DB*) ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████; *also id.* at MB0059, ¶ 136 (*PL/DB*) & MB0180, ¶ 136 (*CB/DB*)

██████████████████████████████████

█████████████████ *see also* Goff Ex. 45 at 35:15 – 36:1 (R. Reyes Dep. (Apr. 27,

2017), RP/DB).

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████ Goff Ex. 1 (Bryar Report) at MB0057, ¶ 133 (*PL/DB*) & MB0178,

¶ 133 (*CB/DB*); *see also id.* at MB0059, ¶ 136 (*PL/DB*) & MB0180, ¶ 136 (*CB/DB*)

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████ Goff Ex. 3 (Schwarcz Report) at SS0047,

¶ 5.16 (*PL/DB*) & SS0159 – 60, ¶ 5.16 (*CB/DB*) ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████



 .); Goff Ex. 33 at 221:6–222:3 (I. Beckles Dep.

(Jul. 26, 2018))

 

 

 

     In addition, Plaintiffs' contention is irrelevant to Plaintiffs' motion because they

are not entitled to pursue any claims based upon

 

 

 

     In addition, Goff Ex. 13 identifies errors and inaccuracies in Plaintiffs' Handlin

Ex. 583.

     **Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. DB's issue with Plaintiffs' characterization of the referenced documents is immaterial;**

**the documents speak for themselves. DB's attempt to evade the fact by mischaracterizing it**

**as vague and ambiguous and as a legal conclusion is unavailing. Therefore, the material**

**fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

███████ not DB's self-serving and unsupported statements. DB's reliance on its expert

reports does not create issues of fact because an expert may not provide a legal opinion

regarding the interpretation of contractual provisions, including the Servicer's duties

under the Governing Agreements. DB proffers expert testimony concerning the

███████████████████ but that is irrelevant to the material fact. Additionally, Plaintiffs

intend to move to preclude the testimony of DB's experts at trial.

      DB's argument that Plaintiffs ████████████████████████████

██████████████████████ is a legal conclusion inappropriate for a Rule

56.1 statement, and therefore no response is required. It is nonetheless incorrect and

immaterial to Plaintiffs' Motion because Plaintiffs did not move for summary judgment on

the issue of document delivery failures. As explained in Plaintiffs' briefing, Plaintiffs

are not suing DB for breaching duties to review Mortgage Files upon receipt, and generate

the required initial and final certifications. Plaintiffs are suing DB for breaching its duty,

pre-EOD for certain Trusts and post-EOD for all, to enforce repurchase of loans with

defective Mortgage Files. The Court's prior order did not dismiss, and Plaintiffs never

relinquished, this separately pled claim. *See* Pltfs.Opp. 55-59.

      79.



*See* Handlin Ex. 394 at DBNTC PHOENIX LIGHT 00002569599

      Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding whether ███████████████████ no response is

required.

Disputed.  The evidence cited at Handlin Ex. 583 does not support Plaintiffs'

contention that █████████████████████████ or required to be in each

Mortgage File.  Further, Plaintiffs' reference to ████████████ is ambiguous. To the

extent Plaintiffs are referring to ███████████████████, that is a matter

of public record.  To the extent Plaintiffs are referring to ███████████████████

█████ that is a legal conclusion, and no response is required.

Moreover, the documents cited in Handlin Ex. 583 do not support Plaintiffs'

assertion that █████████████████████████████████████

████████████████████████████████████████

██████████ Plaintiffs' cited documents do not establish that █████████████

████████████████████████████████████████

█████████████████████████████████ *See, e.g.*,

Handlin Ex. 499 (Document Exception Report for MSAC 2006-HE6 Trust), Line 311

████████████████████████████████████████

██████████████████████████

With respect to ██████████████████████████████████

████████████████████████████████████████

██████████ Defendant restates its response to ¶ 78 and incorporates it here by reference.

In addition, Plaintiffs' contention is irrelevant to Plaintiffs' motion because ████

████████████████████████████████████████

█████ *PL/DB* Dkt. #70 at 15 ████████████████████████████

███████████████████; *CB/DB* Dkt. #88, ¶ 35 █████████████████

████████████████████████████████████

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the referenced documents is immaterial; the documents speak for themselves. DB's attempt to evade the fact by mischaracterizing it as vague and ambiguous and as a legal conclusion is unavailing. Therefore, the material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**



**not DB's self-serving and unsupported statements. DB's reliance on its expert reports does not create issues of fact because an expert may not provide a legal opinion regarding the interpretation of contractual provisions, including the Servicer's duties under the Governing Agreements. DB proffers expert testimony concerning the**

**but that is irrelevant to the material fact. Additionally, Plaintiffs intend to move to preclude the testimony of DB's experts at trial.**

**DB's argument that Plaintiffs**

**is a legal conclusion inappropriate for a Rule 56.1 statement, and therefore no response is required. It is nonetheless incorrect and immaterial to Plaintiffs' Motion because Plaintiffs did not move for summary judgment on the issue of document delivery failures. As explained in Plaintiffs' briefing, Plaintiffs**

are not suing DB for breaching duties to review Mortgage Files upon receipt, and generate the required initial and final certifications. Plaintiffs are suing DB for breaching its duty, pre-EOD for certain Trusts and post-EOD for all, to enforce repurchase of loans with defective Mortgage Files. The Court's prior order did not dismiss, and Plaintiffs never relinquished, this separately pled claim. *See* Pltfs.Opp. 55-59.

Plaintiffs restate their replies to DBCSUF ¶ 78 and incorporates it by reference.

80.   Ronaldo Reyes testified ███████████████████ as follows:



Handlin Ex. 378 (Reyes) 143:23-144:7.

Defendant's Response:  Undisputed that Handlin Ex. 378 contains the quoted language.

The cited testimony is irrelevant to Plaintiffs' motion because ██████████

██████████████████████

███████████████████

███████████████████████

████████████████

Plaintiffs' Reply: DB does not dispute this material fact. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). DB's argument that Plaintiffs ████

████████████████████████████████

is a legal conclusion inappropriate for a Rule 56.1 statement, and therefore no response is required. It is nonetheless incorrect and immaterial to Plaintiffs' Motion because Plaintiffs

did not move for summary judgment on the issue of document delivery failures. As explained in Plaintiffs' briefing, Plaintiffs are not suing DB for breaching duties to review Mortgage Files upon receipt, and generate the required initial and final certifications. Plaintiffs are suing DB for breaching its duty, pre-EOD for certain Trusts and post-EOD for all, to enforce repurchase of loans with defective Mortgage Files. The Court's prior order did not dismiss, and Plaintiffs never relinquished, this separately pled claim. *See* Pltfs.Opp. 55-59.

81. ███████████████████████████████

████████████ *See* Handlin Exs. 407-556 (███████).

Defendant's Response: Undisputed during the period in which ███████ ████ approximately from 2006 to 2013.

In addition, Plaintiffs' contention is irrelevant to Plaintiffs' motion because ██



Plaintiffs' Reply: DB does not dispute this material fact. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). DB's argument that Plaintiffs ███

████████████████████████████████████████

is a legal conclusion inappropriate for a Rule 56.1 statement, and therefore no response is required. It is nonetheless incorrect and immaterial to Plaintiffs' Motion because Plaintiffs did not move for summary judgment on the issue of document delivery failures. As explained in Plaintiffs' briefing, Plaintiffs are not suing DB for breaching duties to review Mortgage Files upon receipt, and generate the required initial and final certifications.

Plaintiffs are suing DB for breaching its duty, pre-EOD for certain Trusts and post-EOD for all, to enforce repurchase of loans with defective Mortgage Files. The Court's prior order did not dismiss, and Plaintiffs never relinquished, this separately pled claim. *See* Pltfs.Opp. 55-59.

82.     Reserved.

83.     ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████     *See* Handlin Ex. 557; Handlin Ex. 558.

        <u>Defendant's Response</u>:  Disputed.  ████████████████████████████
████████████████████████     *See, e.g.*, Goff Ex. 121 (██████████); Goff Ex.
122 at DBNTC PHOENIX LIGHT 00002686580) (██████████); Goff Ex. 123 (████
██████; Goff Ex. 124 at DBNTC PHOENIX LIGHT 00002698827) (██████████).
Further, ████████████████████████████████████████████████████
████████████████████████████████████████████.  Reyes PL Decl. ¶ 21; Reyes CB Decl.
¶ 21.  Moreover, Plaintiffs cite no evidence that ████████████████████████████
████████████████████.

        **Plaintiffs' Reply**: DB proffers no evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the repurchase demands is immaterial; ████████████████████████████████████████████████  Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c).

84.     ████████████████████████████████████████████████
█████████████     *See* Handlin Ex. 557; Handlin Ex. 558.

        <u>Defendant's Response</u>:  To the extent this paragraph purports to state a legal conclusion regarding ██████████████████, no response is required.

Disputed.  The cited evidence does not support Plaintiffs' characterization of



Reyes PL Exs. D, E.  Moreover, in many instances, Defendant was not required ████████████████████████ (Biron PL Ex. 56) ████████

████████████████████████ (Biron PL Ex. 57).  Further, Defendant was not required to ████████████████████████████

████████████████ Goff Ex. 32 at 391:15 – 25, 392:1 – 9 (M. Adelson Dep. (Oct. 3 – 4, 2018)).

Plaintiffs' contention is irrelevant with respect to repurchase demands received after Plaintiffs had sold their certificates.

**Plaintiffs' Reply: DB's proffered evidence does not controvert the material facts and DB's issue with Plaintiffs' characterization is immaterial. DB's attempt to evade these facts by mischaracterizing them as legal conclusions is unavailing; the cited documents speak for themselves. Therefore, these material facts should be deemed admitted.** *See* **Local Rule 56.1(c).**



**DB asserts** ████████████████████████████████████

████████████ **but Plaintiffs stated** ████████████████████████

████████████ **DB's assertion that** ████████████████████

████████████████████████████████████████

████████████████ **is belied by the record. DB was required to notify other transaction parties upon discovering "a breach" of any R&Ws for the Trusts' loans. Fitzgerald Ex. 10;**

Kane Ex. 363. DB did not do that. As explained in Plaintiffs' briefing, ███████████

███████████████████████████████████████████████ *See* Pltfs.Opp.

49-51. Thus, ████████████████████████████████████████████████

████████████████████████████████████

     DB's assertion that ██████████████████████████████████████

███████████████████████████████████████████ As explained in

Plaintiffs' briefing, ██████████████████████████████ Pltfs.Opp. 2-8.

85.    Ronaldo Reyes, DB's main Rule 30(b)(6) witness, testified as follows:





Handlin Ex. 387 (Reyes 30(b)(6)) 69:18-70:10, 91:20-93:13, 112:1-5.

> **Defendant's Response**:  The cited testimony is irrelevant to Plaintiffs' motion
> because ████████████████████████
> ██████████████████████████████
> ██████████████████████████
> ███████████████████████████████
> ████████████████

> Undisputed that Handlin Ex. 387 contains the quoted language.

**Plaintiffs' Reply: DB does not dispute the material fact.  It should be deemed**

**admitted.** *See* **Local Rule 56.1(c). DB's argument that Plaintiffs** ████████████

████████████████████████████ **is a legal conclusion**

**inappropriate for a Rule 56.1 statement, and therefore no response is required. It is**

**nonetheless incorrect and immaterial to Plaintiffs' Motion because Plaintiffs did not move**

**for summary judgment on the issue of document delivery failures. As explained in**

Plaintiffs' briefing, Plaintiffs are not suing DB for breaching duties to review Mortgage

Files upon receipt, and generate the required initial and final certifications. Plaintiffs are

suing DB for breaching its duty, pre-EOD for certain Trusts and post-EOD for all, to

enforce repurchase of loans with defective Mortgage Files. The Court's prior order did not

dismiss, and Plaintiffs never relinquished, this separately pled claim. *See* Pltfs.Opp. 55-59.

86.     Additionally, David Co, business head of MBS, testified regarding



Handlin Ex. 384 (Co) 98:1-99:3.

> Defendant's Response:  Undisputed that Handlin Ex. 384 contains the quoted
language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted. *See* Local Rule 56.1(c).**

87.

*See* Handlin Ex. 387 (Reyes 30(b)(6))

201:3-8; Handlin Ex. 557; Handlin Ex. 558.

<u>Defendant's Response</u>:  To the extent this statement is a legal conclusion

regarding the ███████████████████████████, no response is required.

Disputed. ████████████████████████████████

████████████████  *See, e.g.*, Goff Ex. 125 ████████████████████

██████); Goff Ex. 126 ████████████████████████████

██████████).  The cited evidence does not support Plaintiffs' contention because

████████████████████████████████████████████

██████████████████████. *See* Handlin Exs. 557 – 558.

**Plaintiffs' Reply: DB's statements do not specifically controvert the material fact.**

**DB cites** ████████████████████████████████

███████████████████████████████ **Moreover, the**

**purported evidence DB proffers is consistent with Plaintiffs' material fact;** ████████

████████████████████████████████████████

███████████████████████████ ***See, e.g.*, Goff Ex. 126 at**

**DBNTC PHOENIX LIGHT 00000022046** ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ **Therefore, the material fact should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

88.   ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████████████
█████████████████████████████    *See* Handlin Exs. 559-598.

      <u>Defendant's Response</u>:  Disputed.  Plaintiffs' cited documents do not support

Plaintiffs' proposition that ████████████████████████████████

███████████████████████████████████████████████████

███████████████    Many of Plaintiffs' cited documents ████████████████████████

██████████████████    *See, e.g.*, Handlin Ex. 563 (███████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████; Handlin Ex. 570

███████████████████████████████████████████████

██████████████████████████████████████████); Handlin Ex.

585 (███████████████████████████████████████████

██████████████████████████████████████

      The documents do not state whether ████████████████████████████████

█████████████████████████████████████████████

████████████████    Indeed, one of Plaintiffs' cited documents explicitly states that

█████████████████████████████████████████████████

████████████████████████████████    Handlin Ex. 595 at

DBNTC_COMMERZBANK_0000894765 ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████



Further, many of Plaintiffs' cited documents

*See, e.g.*, Handlin Ex. 561 at DBNTC_COMMERZBANK_00000894784

; Handlin Ex. 584 at

DBNTC_COMMERZBANK_00000894739

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████;

Handlin Ex. 594 at DBNC_COMMERZBANK_00001148914 ███████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████████

Plaintiffs' cited documents also do not support Plaintiffs' proposition that ██████

██████████████████████████████████ Indeed, one of Plaintiffs'

cited documents ████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

█████████████████████████████████ Handlin Ex. 559. ██████████████

███████████████████████████████████████████ Handlin Ex. 559.

███████████████████████████████████████████████

██████████████

Moreover, no document cited by Plaintiffs states or demonstrates that ████████

█████████████████████████

Plaintiffs assert ████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

█████████████████ the latter of which is not supported by any citation to

the record. ████████ These assertions are inaccurate.

████████████████████████████████████

██████████████████████████████████

███████████████████████████ Co Opp. Decl. ¶ 5; Reyes

Opp. Decl. ¶ 6; Goff Ex. 72 at 150:21-151:22 (A. McNulty Dep. (Apr. 10, 2017) RP/DB)

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

██████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████



Co Opp. Decl. ¶

5; Reyes Opp. Decl. ¶¶ 6-12; Goff Ex. 72 at 150:21-151:22 (A. McNulty Dep. (Apr. 10,

2017) RP/DB).

Handlin Ex. 791.

Co Opp. Decl.

¶ 11; *see also* Goff Ex. 1 (Bryar Report) at MB0068, ¶ 162 (*PL/DB*) & MB0190, ¶ 164

(*CB/DB*)

. Biron PL Ex. 37 & Biron CB Ex. 37 (Charts:

Defendant May Rely On Any Statement, Opinion or Document It Believes to Be

Genuine); Biron PL Ex. 36 & Biron CB Ex. 36 (Charts: No GA Provides That Defendant

Has a Duty to Investigate Any Facts or Matters Absent Direction and Indemnity from a Contractually Specified Percentage of Investors); Biron PL Ex. 35 & Biron CB Ex. 35 (Charts: Defendant Has Only the Duties Expressly Set Forth in the GAs); Biron PL Ex. 38 & Biron CB Ex. 38 (Charts: Defendant Is Not Responsible for the Accuracy or Content of Any Certificate, Statement, or Other Instrument Furnished to It). *BlackRock*, 2017 WL 953550, at *7 (S.D.N.Y. Mar. 10, 2017) (the "PSAs did not obligate Wells Fargo to investigate until it received notice or obtained actual knowledge of a Servicer EOD (rather than constructive notice of potential breaches)"); *Royal Park Investments SA/NV v. HSBC Bank USA Nat'l Ass'n*, No. 14CV08175LGSSN, 2017 WL 945099 (S.D.N.Y. Mar. 10, 2017), *aff'd, Royal Park Investments SA/NV v. HSBC Bank USA Nat'l Ass'n* ("*RPI/HSBC*"), 2018 U.S. Dist. LEXIS 31157 (S.D.N.Y. Feb. 23, 2018).



Reyes Opp. Decl. ¶ 9.



Reyes Opp. Decl. ¶¶ 10-12.

Although Plaintiffs have pointed to testimony by David Co as purported evidence that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Mr. Co has executed a declaration confirming:



Co Opp. Decl. ¶ 11.



, *see* Goff Ex. 3 (Schwarcz Report) at SS0033 – 34, ¶ 4.18 (*PL/DB*) & SS0144 – 45 ¶ 4.18 (*CB/DB*)

*See Commerce Bank v. Bank of New York Mellon*, 35 N.Y.S.3d 63, 65 (1st Dep't 2016) ("[T]he trustee of an RMBS . . . trust does not have a duty to 'nose to the source'"); *see also* Goff Ex. 3 (Schwarcz Report) at SS0032 – 33, ¶ 4.16 (*PL/DB*) & SS0143 – 44, ¶ 4.16 (*CB/DB*)

); Goff Ex. 5 (Richard Rebuttal) at JR0058, ¶ 31 (*PL/DB*) & JR0076, ¶ 31 (*CB/DB*)

.

Plaintiffs distort

127

████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

**Plaintiffs' Reply: DB's purported evidence does not controvert the material fact. DB's issues with Plaintiffs' characterization of the cited documents is immaterial; the documents speak for themselves. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c).**

**DB asserts that** ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

██████████████████

**DB's assertion that** ███████████████████████████████████

████████████████████████████████████████ **strains credulity.**

**For support, DB offers** █████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████ **See Pltfs.Opp. 68-84. DB's assertion that** ██████████████████

█████████████████████████████████████████████

 simply is untrue. Further, contrary to DB's contention, and as explained in Plaintiffs' briefing, ███████████████████. *See* Pltfs.Mem. 24-32; Pltfs.Opp. 69-71.

DB's assertion that ███████████████████ ███████████████ is a legal conclusion inappropriate for a Rule 56.1 Statement to which no response is required. It is also incorrect. As explained in Plaintiffs' briefing,

███████████████████████████

███████████ *See* Pltfs.Opp. 40-42.

David Co's Declaration offered in support of DB's Opposition to Plaintiffs' Motion is inadmissible evidence as it is inconsistent with the witness's sworn deposition testimony, and DB provides no basis for the witness changing his prior sworn testimony. Mr. Co's changed testimony should be given no weight.

89.    Ronaldo Reyes, DB's Rule 30(b)(6) witness, testified as follows:



███████████████████████

Handlin Ex. 387 (Reyes 30(b)(6) 142:21-144:6).

Defendant's Response:  Undisputed that Handlin Ex. 387 contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

### E.   Plaintiffs' structure

#### 1.   Phoenix Light

90.     The Phoenix Light Plaintiffs are Phoenix Light SF DAC ("Phoenix Light"), Blue Heron Funding V LTD. ("Blue Heron V"), Blue Heron Funding VI LTD. ("Blue Heron VI"), Blue Heron Funding VII LTD. ("Blue Heron VII"), Blue Heron Funding IX LTD. ("Blue Heron IX"), C-BASS CBO XIV LTD. ("C-BASS XIV"), C-BASS CBO XVII LTD. ("C_BASS XVII"), Kleros Preferred Funding V PLC ("Kleros V"), Silver Elms CDO PLC ("Silver Elms"), and Silver Elms CDO II Limited ("Silver Elms II"). They are special purpose vehicles existing under the laws of Ireland (Phoenix Light, Kleros V, Silver Elms, Silver Elms and Silver Elms II) and the Cayman Islands (Blue Heron V, Blue Heron VI, Blue Heron VII, C-BASS XIV, C-BASS XVII). *See* Handlin Ex. 599 (Phoenix Light Trust Agreement) at Schedule I (Definition of "Issuer"); Handlin Ex. 600 (Blue Heron V Indenture) at Article I (Definition of "Issuer"); Handlin Ex. 601 (Blue Heron VI Amended and Restated Indenture) at Article I (Definition of "Issuer"); Handlin Ex. 602 (Blue Heron VII Amended and Restated Indenture) at Article I (Definition of "Issuer"); Handlin Ex. 603 (Blue Heron IX Indenture) at Article I (Definition of "Issuer"); Handlin Ex. 57 (Kleros V Indenture) at Article I (Definition of "Issuer"); Handlin Ex. 604 (Silver Elms Indenture) at Article I (Definition of "Issuer"); Handlin Ex. 605 (Silver Elms II Indenture) at Article I (Definition of "Issuer"); Handlin Ex. 56 (C-BASS XIV Indenture) at Article I (Definition of "Issuer"); Handlin Ex. 606 (C-BASS XVII Indenture) at Article I (Definition of "Issuer"); Handlin Ex. 607 (Certificate of Incorporation of Phoenix Light); Handlin Ex. 608 (Certificate of Incorporation of Kleros V) at PhoenixLight000007228; Handlin Ex. 609 (Certificate of Incorporation of Blue Heron Funding V); Handlin Ex. 610 (Certificate of Incorporation of Blue Heron Funding VI); Handlin Ex. 611 (Certificate of Incorporation of Blue Heron Funding VII); Handlin Ex. 612 (Certificate of Incorporation of Blue Heron Funding IX); Handlin Ex. 613 (Certificate of Incorporation of Silver Elms) at PhoenixLight000008167; Handlin Ex. 614 (Certificate of Incorporation of Silver Elms II) at PhoenixLight000008341; Handlin Ex. 615 (Certificate of Incorporation of C-BASS XIV) at PhoenixLight000006351; Handlin Ex. 616 (Certificate of Incorporation of C-BASS XVII) at PhoenixLight000006620.

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion about any PL Plaintiff, no response is required.

Disputed that Handlin Ex. 609 is the Certificate of Incorporation of BH-5.  The document is illegible.  Disputed that Handlin Ex. 611 is the Certificate of Incorporation of BH-7.  The document is illegible.  Disputed that Handlin Ex. 612 is the Certificate of Incorporation of BH-9.  The document is illegible.

Goff Ex. 36 at 62:3 – 62:18, 73:3 – 74:15 (CDO Pltfs 30(b)(6) Dep. (May 8, 2018)); Biron PL Ex. 24 at Nos. 57-58 (Phoenix's Supp. 1st RFA R&O).

See Biron PL Ex. 87 (BH-5 Indenture) at PhoenixLight000001450 – 51; Biron PL Ex. 88 (BH-6 Indenture) at PL_DB008158277 – 79; Biron PL Ex. 89 (BH-7 Indenture) at PL_DB008159120 – 22; Biron PL Ex. 90 at (BH-9 Indenture) PhoenixLight000001203 – 04; Biron PL Ex. 91 at (C-Bass 14 Indenture) PL_DB008160095 – 97; Biron PL Ex. 92 (C-Bass 17 Indenture) at PL_DB008161777 – 79 (C-Bass 17 Indenture); Biron PL Ex. 93 (SE Indenture) at PhoenixLight000002237 – 38; Biron PL Ex. 94 (SE 2 Indenture) at PhoenixLight000000752 – 54; Biron PL Ex. 95 (Kleros Indenture) at PL_DB008164272 – 74; Biron PL Ex. 96 (Phoenix Security Agreement) at PL_DB007912401 – 02; Biron PL Ex. 97 (Phoenix Trust Agreement); Biron PL Ex. 22 at Ex. A (Pltfs' Supp. 1st Interr. R&O).

Biron PL Ex. 98 (Phoenix Collateral Acquisition Agreement).



████████████████████████████████████ Biron PL Ex. 89 (BH 7 Indenture); Biron PL Ex. 94 (SE 2

Indenture). ████████████████████████████████

████████████████████████████████ Biron PL Ex. 95 (Kleros Indenture);

Biron PL Ex. 97 (Phoenix Trust Agreement); Ex. 93 (SE Indenture). ████████████

████████████████████████████████████

████████████████████████████████████

Biron PL Ex. 87 (BH-5 Indenture); Biron PL Ex. 88 (BH-6 Indenture); Biron PL Ex. 90

(BH-9 Indenture); Biron PL Ex. 91 (C-Bass 14 Indenture); Biron PL Ex. 92 (C-Bass 17

Indenture).

**Plaintiffs' Reply: DB does not dispute the material fact that "the Phoenix Light**

**Plaintiffs . . . are special purpose vehicles existing under the laws of Ireland (Phoenix Light,**

**Kleros V, Silver Elms, Silver Elms and Silver Elms II) and the Cayman Islands (Blue**

**Heron V, Blue Heron VI, Blue Heron VII, C-BASS XIV, C-BASS XVII)." It should be**

**deemed admitted.** *See* **Local Rule 56.1(c). DB's statement that** ████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████ **" is a legal conclusion and irrelevant to the fact asserted.**

91.     Peter Collins, who served as the Rule 30(b)(6) witness for Blue Heron V, Blue
Heron VI, Blue Heron VII, Blue Heron IX, Kleros V, C-BASS XIV, C-BASS XVII, Silver Elms,
and Silver Elms II (the "PL non-Phoenix Light Plaintiffs"), testified as follows:

> Q. Okay. Thank you for that clarification. The C-BASS plaintiffs and the Blue
> Heron plaintiffs are special purpose companies incorporated under the laws of the
> Cayman Islands, correct?
> A. Yes.

Q. The Silver Elms plaintiffs and Kleros are special purpose companies incorporated under Irish law, correct?
A. Yes.
. . .
Q. Prior to the closing date of the respective CDO transactions, WestLB caused the Blue Heron plaintiffs and the C-BASS plaintiffs to be incorporated in the Cayman Islands, right?
MR. PAREKH: Hold on one second. Objection to form.
A. With counsel, yes.
Q. And prior to the closing date of the respective CDO transactions, WestLB caused the Silver Elms plaintiffs and Kleros to be incorporated in Ireland, right?
MR. PAREKH: Same objection.
A. With respective counsel, yes.

Handlin Ex. 617 (Collins PL non-Phoenix Light Plaintiffs 30(b)(6)) 61:25-62:11, 73:3-16.

      <u>Defendant's Response</u>: Disputed. The material cited is inadmissible as evidence because it is hearsay.

      Undisputed that Peter Collins testified on behalf of BH-5, BH-6, BH-7, BH-9, Kleros, C-Bass 14, C-Bass 17, SE and SE 2 under Rule 30(b)(6).

      Undisputed that Handlin Ex. 617 contains the quoted language.

      **Plaintiffs' Reply: DB does not dispute the quoted language contained in Peter Collins's 30(b)(6) deposition. The material fact should be deemed admitted. *See* Local Rule 56.1(c). DB's objection regarding hearsay is incorrect. Sworn deposition testimony may be submitted in support of a motion for summary judgment. *See* Fed.R.Civ.P. 56(c)(1)(A). *See also Lizarra v. Figueroa*, 2014 WL 1224539, at \*4 (S.D.N.Y. Mar. 21, 2014) ("Contrary to the defendants' assertion, Rule 32(a) of the Federal Rules does not impose any impediment to the use of Lizarra's sworn deposition testimony. By its terms, that rule applies to the use of depositions at a 'hearing or trial.' Fed.R.Civ.P. 32(a)(1). The plaintiffs' use of Lizarra's deposition in support of their motion does not constitute use at such a proceeding. Accordingly, Lizarra's sworn deposition testimony may be considered by the Court."); *Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 200 n. 3 (E.D.N.Y. 2007).**

92.     Plaintiffs' principal places of business are in the same jurisdictions in which they
are incorporated. *See* Handlin Ex. 618 (Blue Heron Funding V Ltd. Offering Memorandum) at
PL_DB008944587; Handlin Ex. 619 (Blue Heron Funding VI Ltd. Offering Memorandum) at
PhoenixLight000005807; Handlin Ex. 620 (Blue Heron Funding VII Ltd. Offering
Memorandum) at PL_DB008818619; Handlin Ex. 621 (Blue Heron Funding IX Ltd. Offering
Memorandum) at PL_DB008866735; Handlin Ex. 622 (C-BASS CBO XIV LTD Offering
Memorandum) at PL_DB008263199; Handlin Ex. 623 (C-BASS CBO XVII LTD Offering
Memorandum) at PL_DB008714260; Handlin Ex. 624 (Kleros Preferred Funding V PLC
Offering Memorandum) at PL_DB008283605; Handlin Ex. 625 (Silver Elms CDO PLC Offering
Memorandum) at PL_DB008283150; Handlin Ex. 626 (Silver Elms CDO II Offering
Memorandum) PL_DB008831162; Handlin Ex. 627 (Phoenix Light Information Memorandum)
at PhoenixLight000003299.

   <u>Defendant's Response</u>:  To the extent this paragraph purports to state a legal

conclusion regarding Plaintiffs' "principal places of business," no response is required.

   Undisputed to the extent this paragraph states that Commerzbank's principal place

of business is in Germany, where it is incorporated.

   Disputed, to the extent this paragraph relates to the PL Plaintiffs.

   Plaintiffs' statement that the PL Plaintiffs' "principal places of business are in the

same jurisdictions in which they are incorporated" is contrary to evidence in the record.



Goff Ex. 36 at 62:3-62:18, 73:3-74:15 (CDO Pltfs

30(b)(6) Dep. (May 8, 2018)); Biron PL Ex. 24 at Nos. 57-58 (Phoenix's Supp. 1st RFA

R&O).

*See* Biron PL Ex. 87 (BH-5 Indenture) at

PhoenixLight000001450 – 51; Biron PL Ex. 88 (BH-6 Indenture) at PL_DB008158277 –

79; Biron PL Ex. 89 (BH-7 Indenture) at PL_DB008159120 – 22; Biron PL Ex. 90 (BH-9

Indenture) at PhoenixLight000001203 – 04; Biron PL Ex. 91 (C-Bass 14 Indenture) at PL_DB008160095 – 97; Biron PL Ex. 92 (C-Bass 17 Indenture) at PL_DB008161777 – 79; Biron PL Ex. 93 (SE Indenture) at PhoenixLight000002237 – 38 (SE Indenture); Biron PL Ex. 94 (SE 2 Indenture) at PhoenixLight000000752 – 54 (SE 2 Indenture); Biron PL Ex. 95 (Kleros Indenture) at PL_DB008164272 – 74; Biron PL Ex. 96 (Phoenix Security Agreement) at PL_DB007912401 – 02; Biron PL Ex. 97 (Phoenix Trust Agreement); Biron PL Ex. 22 (Pltfs' Supp. 1st Interr. R&O) at Ex. A.

WestLB acquired most of the notes issued in the securitizations involving the PL Plaintiffs.  Biron PL Ex. 98 (Phoenix Collateral Acquisition Agreement); Biron PL Ex. 81 at 119-21 (2008 WestLB Annual Report); Biron PL Ex. 152 at 253:5 – 253:22 (WestLB 30(b)(6) Dep. (June 20, 2018)); Biron PL Ex. 98 (Phoenix Collateral Acquisition Agreement); Biron PL Ex. 97 (Phoenix Trust Agreement); Biron PL Ex. 96 (Phoenix Security Agreement); Biron PL Ex. 99 (Phoenix Custody Agreement); Goff Ex. 49 at 26:18 – 30:7 (Phoenix 30(b)(6) Dep. (May 31, 2018)); Biron PL Ex. 24 at No. 60 (Phoenix's Supp. 1st RFA R&O); Biron PL Ex. 81 at 119 – 21 (2008 WestLB Annual Report); Biron PL Ex. 152 at 253:5 – 253:22 (WestLB 30(b)(6) Dep. (June 20, 2018)); Biron PL Ex. 24 at No. 60 (Phoenix's Supp. 1st RFA R&O); Goff Ex. 36 at 295:19 – 23 (CDO Pltfs 30(b)(6) Dep. (May 8, 2018)) █████████████████████

████████████████████████████████████████████████████

████████████████████████

With respect to Phoenix: █████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████ *Id.* at

Nos. 50-56.

When the financial crisis started to unfold in 2007, the value of RMBS and other

asset classes to which WestLB had exposure sharply declined.  Goff Ex. 57 56:19 – 57:19

(E. Balz Dep. (Dec. 7, 2017)); Goff Ex. 49 at 17:9 – 18:6 (Phoenix 30(b)(6) Dep. (May

31, 2018)); Biron PL Ex. 80 at 6 (2007 WestLB Annual Report); Biron PL Ex. 152 at

249:19 – 249:23 (WestLB 30(b)(6) Dep. (June 20, 2018)).  The severe decline in the

value of WestLB's assets jeopardized its ability to meet its regulatory capital

requirements.  Goff Ex. 57 at 56:19 – 57:19 (E. Balz Dep. (Dec. 7, 2017)); Goff Ex. 49 at

17:9 – 18:6 (Phoenix 30(b)(6) Dep. (May 31, 2018)); Biron PL Ex. 116 at

PL_DB006491587 – 89 (European Commission Decision dated April 30, 2008).  In an

attempt to stabilize WestLB, its German owners agreed to provide a EUR 5 billion "risk

shield" that would insulate WestLB from losses on its RMBS and other high risk assets.

Biron PL Ex. 24 (Phoenix's Supp. 1st RFA R&O) at Nos. 48 – 60; Biron PL Ex. 81 at 48

– 49, 119 – 21 (2008 WestLB Annual Report); Biron PL Ex. 152 at 245:11 – 246:12,

253:5 – 253:22 (WestLB 30(b)(6) Dep. (June 20, 2018)).  The WestLB "risk shield"

transaction was structured as follows:

- ████████████████████████████ (Phoenix's Supp. 1st RFA

  R&O) at Nos 57 – 58.

- WestLB caused a portfolio of its distressed assets (including Phoenix Certificates and notes issued in the pre-financial crisis securitizations involving other Plaintiffs) with a nominal value of approximately EUR 23 billion to be transferred to Phoenix, which simultaneously issued notes to WestLB and transferred the asset portfolio to an indenture trustee to hold for the benefit of the noteholder.  Biron PL Ex. 81 (2008 WestLB Annual Report) at 119 – 21; Biron PL Ex. 152 at 253:5 – 253:22 (WestLB 30(b)(6) Dep. (June 20, 2018)); Biron PL Ex. 98 (Phoenix Collateral Acquisition Agreement); Biron PL Ex. 97 (Phoenix Trust Agreement); Biron PL Ex. 96 (Phoenix Security Agreement); Biron PL Ex. 99 (Phoenix Custody Agreement); Goff Ex. 49 at 26:18 – 30:7 (Phoenix 30(b)(6) Dep. (May 31, 2018)); Biron PL Ex. 24 (Phoenix's Supp. 1st RFA R&O) at No. 60.



_See id._

Goff Ex. 57 at 53:4 – 56:18 (E. Balz Dep. (Dec. 7, 2017)); Biron PL Ex. 100 (Phoenix Guarantee Provision Agreement);

Biron PL Ex. 24 (Phoenix's Supp. 1st RFA R&O) at Nos. 50 – 52, 58 – 59.

- ████████████████████████████████████████████████ ████████████████████████████████ Biron PL Ex. 101 (Phoenix Collateral Management Agreement); Biron PL Ex. 97 (Phoenix Trust Agreement); Biron PL Ex. 150 at 74:10-74:14 (Phoenix 30(b)(6) Dep. (Sep. 22, 2016), PL/HSBC).

- WestLB, as noteholder, and its German owners, as the Guarantors, had various rights concerning the management of the asset portfolio (including the Phoenix Certificates). Biron PL Ex. 101 at Ex. A (Phoenix Collateral Management Agreement); Biron PL Ex. 84 at 15 (2010 EAA Annual Report).

████████████████████████████████████████████ Biron PL Ex. 98 (Collateral Acquisition Agreement). The European Commission, which supervises EU banks, determined that the risk shield transaction constituted state aid to WestLB from the German government and ultimately required that WestLB be wound up. Biron PL Ex. 116 (European Commission Decision dated April 30, 2008); Biron PL Ex. 82 (2009 WestLB Annual Report) at 48 – 51; Biron PL Ex. 152 at 253:24 – 255:14 (WestLB 30(b)(6) Dep. (June 20, 2018)). ███████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████ Biron PL Ex. 24 (Phoenix's Supp. 1st RFA R&O) at Nos. 63-66; Biron PL Ex. 137 (Letter from EAA's Counsel to SEC). ██████████████████████████████████████████

███████████████████████████ Biron PL Ex. 24 (Phoenix's Supp. 1st

RFA R&O) at Nos. 61 – 62. ████████████████████████████

██████████████ Biron PL Ex. 24 at Nos. 63-64 (Phoenix's Supp. 1st RFA

R&O). ████████████████████

Put differently, ███████████████████████

████████████████████████████████████

██████ Biron PL Ex. 24 (Phoenix's Supp. 1st RFA R&O) at Nos. 50 – 56, 59, 67.  EAA

recognized that "[a]s the owner of the Phoenix notes, the EAA alone bears the economic

risk of [the Phoenix asset] portfolio in the event that the actual losses exceed the

guarantee commitments provided by the [German] federal state and the savings banks."

Biron PL Ex. 84 (2010 EAA Annual Report) at 16.

█████████████████████████

███████████████████████████

██████████████████████ *See* Biron PL

Ex. 128 at PL_DB000142487 (Dec. 17, 2011 email attaching, inter alia, Directors'

Report and Financial Statements for Phoenix for year ended December 31st, 2010).

███████████████████████

█████████████████████████

██████████████████████████

███████████████████████████

███████████████████████████████

████████████████████████████████

███████████████████████████████



Biron PL Ex. 101 (Phoenix Collateral Management Agreement) § 2.2, Ex. A §§ 2.1, 2.6; Goff Ex. 57 at 112:20 – 113:22 (E. Balz Dep. (Dec. 7, 2017)); Goff Ex. 63 at 91:23 – 92:7, 122:6 – 14 (Plaintiffs' 30(b)(6) Dep. (Jan. 22, 2018), PL/USB).

. Biron PL Ex. 118 at PL_DB007144133

Goff Ex 57 at 77:18 – 22 (E. Balz Dep. (Dec. 7, 2017)); Biron PL Ex. 101 Ex. A (Phoenix Collateral Management Agreement) §§ 2.1, 2.6.

Goff Ex. 57 at 113:23 – 114:25 (E. Balz Dep. (Dec. 7, 2017)).

*Id.* at 89:2 – 101:16 (E. Balz Dep. (Dec. 7, 2017)).

████████████████████████████████████████████ Biron PL Ex. 101 Ex. A

(Phoenix Collateral Management Agreement) § 2.6.  EAA was heavily involved with the

management of the Phoenix asset portfolio and, in consultation with PEL, was

responsible for pursuing litigation relating to RMBS certificates in that portfolio.  After

acquiring the Phoenix notes, EAA retained WestLB, which ultimately changed its name

to Portigon AG, as an external services provider to assist EAA and PEL in the

management of the Phoenix asset portfolio.  WestLB provided EAA with a team of "70

experts who exclusively work on behalf of the EAA."  Biron PL Ex. 83 (2009/2010 EAA

Annual Report) at 15; Biron PL Ex. 117 (EAA Structured Credit Portfolio Strategy,

August 2012) at PL_DB000726137.  EAA also executed its own agreement with PEL

providing ███████████████████████████████████████████████████████

████████████████████ Biron PL Ex. 102 (PEL/EAA Advisory Agreement); Biron

PL Ex. 154 at 137:9 – 138:8 (E. Balz Dep. (Feb. 16, 2017), PL/WF).  ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ Goff Ex. 57 at 199:18 – 21 (E. Balz Dep. (Dec. 7, 2017)); Biron PL Ex. 117

(EAA Structured Credit Portfolio Strategy, August 2012) at PL_DB000726133.  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ Biron PL Ex. 122 at PL_DB009117409 (Deed of Indemnity and Consent

between Phoenix and EAA).

In December 2014 – while Plaintiffs' previously filed lawsuits against sponsors, originators, and underwriters were still pending – EAA caused Phoenix and other Plaintiffs to sue Defendant in this action, and other RMBS trustees.  *See PL/DB Complaint, PL/DB* Dkt. #1; *Phoenix Light SF Ltd. v. BNYM*, No. 14-cv-10104 (Caproni, J.) (S.D.N.Y.) (hereinafter "PL/BNYM"); *Phoenix Light SF Ltd. v. U.S. Bank N.A.*, No. 14-cv-10116 (Broderick, J.) (S.D.N.Y.) (hereinafter "PL/USB" or "*Phoenix v. USB*"); *Phoenix Light SF Ltd. v. Wells Fargo Bank*, N.A., No. 14-cv-10102 (Failla, J.) (S.D.N.Y.) (hereinafter "PL/WF"); *Phoenix Light SF Ltd. v. HSBC Bank USA, N.A.*, No. 14-cv-10101 (Schofield, J.) (S.D.N.Y.) (hereinafter "PL/HSBC"); Goff Ex. 49 at 88:4 – 19 (Phoenix 30(b)(6) Dep. (May 31, 2018)); Biron PL Ex. 122 (Deed of Indemnity and Consent between Phoenix and EAA).  In December 2014, EAA caused Plaintiffs to sue Defendant and other RMBS trustees.  *E.g.*, *PL/DB* Complaint, *PL/DB* Dkt. #1.

Further, Phoenix testified that



Goff Ex. 49 at 31:7 – 15 (Phoenix 30(b)(6) Dep. (May 31, 2018)).

*Id.* at 38:4 – 39:19



North Rhine-Westphalia is also the largest shareholder of EAA.  *See, e.g.*, Goff Ex. 139 at 43 (EAA Annual Report 2010).

Goff Ex. 49 at 39:20 – 40:4 (Phoenix 30(b)(6) Dep. (May 31, 2018))

For example, Alan Geraghty, a Phoenix director, testified that

Goff Ex. 60 at 53:23 – 54:16 (A. Geraghty Dep. (Aug. 9, 2017))

Roger McGreal, the other Phoenix director, testified that

Goff Ex. 61 at 26:24 – 29:14, 53:9 – 56:18 (R. McGreal Dep. (Feb. 20, 2017), PL/WF)



With respect to the Blue Heron Plaintiffs:

See Biron PL Ex. 87 (BH5 Indenture) § 1.01 ); Biron PL Ex. 88 (BH-6 Indenture) § 1.01 ( Biron PL Ex. 89 (BH 7 Indenture) § 1.01 ( ; Biron PL Ex. 90 (BH-9 Indenture) §1.01 Goff Ex. 36 at 13:11 – 14:6 (CDO Pltfs 30(b)(6) Dep. (May 8, 2018)) ; *id.* at 16:9 – 13 . Biron PL Ex. 24 (Phoenix's Supp. 1st RFA R&O) at Nos. 48 – 49.

144



Goff Ex. 80 (BH-5 AMA) §§ 2.01, 2.03; *see also* Goff Ex. 81 (BH-6 AMA) §§ 2.01, 2.03; Goff Ex. 82 (BH-7 AMA) §§ 2.01, 2.03; Goff Ex. 83 (BH-9 AMA) §§ 2.01, 2.03.

With respect to the C-BASS Plaintiffs:

See Biron PL Ex. 91 (C-Bass 14 Indenture) § 1.01 (

; Biron PL Ex. 92 (C-Bass 17 Indenture) § 1.01

Goff Ex. 36 at 15:14 – 17 (CDO Pltfs 30(b)(6) Dep. (May 8, 2018))

). See Goff Ex. 84 (C-Bass 14 CMA) at PhoenixLight000000577; Goff Ex. 85 (C-Bass 17 CMA) at PhoenixLight000000612.

*See* Goff Ex. 62 at 21:9-24:21 (M. McLoughlin Dep. (May 4, 2018) PL/USB); Goff Ex. 86 (Feb. 10, 2011 Assignment And Assumption Agreement); Goff Ex. 87 (Nov. 9, 2010 Asset Purchase Agreement); Goff Ex. 88 (Nov. 11, 2010 Am'd Asset Purchase Agreement). See Goff Ex. 86 at USB2017_00000001 (Feb. 10, 2011 Assignment And Assumption Agreement).



Goff Ex. 84

(C-Bass 14 CMA) § 1; Goff Ex. 85 (C-Bass 17 CMA) § 1.

<u>With respect to Kleros:</u>

*See* Biron

PL Ex. 95 (Kleros Indenture) § 1. 1 (

); Goff Ex. 36 at 14:7 –12 (CDO Pltfs 30(b)(6) Dep. (May 8, 2018))

See Goff Ex. 89 (Kleros CMA) at

PhoenixLight000000645.

Ex. 36 at 15:7 – 10 (CDO Pltfs 30(b)(6) Dep.

(May 8, 2018)) ████████████████████████████████████████

████████████████████); Goff Ex. 90 at PhoenixLight000002653 (Jul.

23, 2014 notice, attaching Kleros Am'd CMA). ████████████████████

████████████████████████████████. *Id.* at

PhoenixLight000002664.



See Goff Ex. 89 (Kleros CMA) § 2; Goff Ex. 90 at Ex. B § 2 (Jul. 23, 2014 notice,

attaching Kleros Am'd CMA).

<u>With respect to the Silver Elms Plaintiffs</u>: █████████████████

████████████████████████████████████████

███████████████████████████████████████ *See* Biron PL Ex.

93 (SE Indenture) § 1.01 (████████████████████████████████████

████████████████████); Biron PL Ex. 94 (SE 2 Indenture) § 1.01 (███████

██████████████████████████████████████ Goff Ex. 36 at 15:22 –

25 (CDO Pltfs 30(b)(6) Dep. (May 8, 2018)) ███████████████████

████████████████████████████████████████████████

███████████████████████████████████████ See

Goff Ex. 91 (SE AMA) at PhoenixLight000000074; Goff Ex. 92 (SE 2 CMA) at

PhoenixLight000000693.



███████████████████████████████ Goff Ex. 91 (SE AMA) § 1(a)

(SE AMA); *see also* Goff Ex. 92 (SE 2 CMA) § 2.

     **Plaintiffs' Reply: DB does not dispute the material fact that Commerzbank's**

**principal place of business is in Germany, where it is incorporated. This material fact**

should be deemed admitted. *See* Local Rule 56.1(c). Further, DB's purported evidence does not controvert the material fact that the PL Plaintiffs all act through a board of directors located in the jurisdiction in which it is domiciled. *Infra* ¶¶ 93-95. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). ████████████████████████

████████████████████████████████████ **Handlin Ex. 628**

**(Geraghty Rule 30(b)(6)) 63:12-65:25, 76:2-18; Handlin Reply Ex. 26 (Kennedy) 41:13-43:17; Handlin Reply Ex. 27 (Wright) 163:8-14, 200:3-8; Biron Ex. 101 at PL_DB007911415, 428-29; Fitzgerald Ex. 40 at PhoenixLight000000062; Goff Ex. 81 at PhoenixLight000000007; Goff Ex. 82 at PhoenixLight000000025; Goff Ex. 83 at PhoenixLight000000044; Goff Ex. 84 at PhoenixLight000000580-81; Goff Ex. 85 at PhoenixLight000000615-15; Goff Ex. 89 at PhoenixLight000000646** ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████ **); Goff Ex. 91 at PhoenixLight000000074** ████████████

████████████████████████████████████

████████████████████████████████ **)** *id.* **at**

**PhoenixLight000000082** ████████████████████████████

████████████████████████████████ **Goff**

**Ex. 92 at PhoenixLight000000694, 713.**

93.     Alan Geraghty, Phoenix Light's Rule 30(b)(6) witness, testified as follows:

Q. And your employer?
A. Wilmington Trust.
Q. And you're also a director for Plaintiff Phoenix Light?
A. Correct.
Q. And can you provide your business address, please.

A. Fourth Floor, 3 Georgia's Dock, I.F.S.C., Dublin 1.

Handlin Ex. 628 (Geraghty Rule 30(b)(6)) 5:11–19.

          <u>Defendant's Response</u>:  Undisputed that Handlin Ex. 628 contains the quoted language.  However, the material cited is inadmissible as evidence because it is hearsay.

**Plaintiffs' Reply: DB does not dispute the quoted language contained in Alan Geraghty's deposition. It should be deemed admitted. *See* Local Rule 56.1(c). DB's objection regarding hearsay is incorrect. Sworn deposition testimony may be submitted in support of a motion for summary judgment. *See* Fed.R.Civ.P. 56(c)(1)(A). *See also Lizarra v. Figueroa*, 2014 WL 1224539, at \*4 (S.D.N.Y. Mar. 21, 2014) ("Contrary to the defendants' assertion, Rule 32(a) of the Federal Rules does not impose any impediment to the use of Lizarra's sworn deposition testimony. By its terms, that rule applies to the use of depositions at a 'hearing or trial.' Fed.R.Civ.P. 32(a)(1). The plaintiffs' use of Lizarra's deposition in support of their motion does not constitute use at such a proceeding. Accordingly, Lizarra's sworn deposition testimony may be considered by the Court.");**
***Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 200 n. 3 (E.D.N.Y. 2007).**

    94.    Alan Geraghty testified that he is a director for Kleros V, Silver Elms, and Silver Elms II:

    Q. Are you familiar with the entities Kleros V, Silver Elms and Silver Elms II?
    A. Yes.
    Q. And what are those entities?
    A. They're SPVs, as well as CDOs.
    Q. And do you serve as a director for those entities?
    A. Yes.

Handlin Ex. 629 (Geraghty) 24:2-10.

          <u>Defendant's Response</u>:  Undisputed that Handlin Ex. 629 contains the quoted language.  However, the material cited is inadmissible as evidence because it is hearsay.

**Plaintiffs' Reply:** DB does not dispute the quoted language contained in Alan Geraghty's deposition. The material fact should be deemed admitted. *See* Local Rule 56.1(c). DB's objection regarding hearsay is incorrect. Sworn deposition testimony may be submitted in support of a motion for summary judgment. *See* Fed.R.Civ.P. 56(c)(1)(A). *See also Lizarra v. Figueroa*, 2014 WL 1224539, at *4 (S.D.N.Y. Mar. 21, 2014) ("Contrary to the defendants' assertion, Rule 32(a) of the Federal Rules does not impose any impediment to the use of Lizarra's sworn deposition testimony. By its terms, that rule applies to the use of depositions at a 'hearing or trial.' Fed.R.Civ.P. 32(a)(1). The plaintiffs' use of Lizarra's deposition in support of their motion does not constitute use at such a proceeding. Accordingly, Lizarra's sworn deposition testimony may be considered by the Court."); *Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 200 n. 3 (E.D.N.Y. 2007).

95.     Christopher Kennedy, who serves as a director for Blue Heron V, Blue Heron VI, Blue Heron VII, Blue Heron IX, C-BASS XIV, and C-BASS XVII, testified as follows:

> Q. And can you please state your business address.
> A. It is Rawlinson & Hunter. That is at Windward 1, the Regatta Office Park in Grand Cayman, Cayman Islands.
> . . .
> Q. What are the administrative duties that you are required to fulfill with regard to the Blue Heron Plaintiffs and C-Bass Plaintiffs?
> A. They are reasonably minimal. The role of a director in these structured finance vehicles is really governed by the indenture. The primary purpose is really to act as a corporate representative with all -- well, not all, but certainly the large majority of the day-to-day management being undertaken by the trustee.

Handlin Ex. 630 (Kennedy) 8:9-13, 41:13-23.

Defendant's Response:  Defendant responds that Plaintiffs' quotation is misleading because it cites two separate sections of testimony as if they are one.

Undisputed that Handlin Ex. 630 contains the quoted language.  However, the material cited is inadmissible as evidence because it is hearsay.

**Plaintiffs' Reply:** DB does not dispute the quoted language contained in Christopher Kennedy's deposition. The material fact should be deemed admitted. *See* Local Rule 56.1(c). DB's objection regarding hearsay is incorrect. Sworn deposition testimony may be submitted in support of a motion for summary judgment. *See* Fed.R.Civ.P. 56(c)(1)(A). *See also Lizarra v. Figueroa*, 2014 WL 1224539, at *4 (S.D.N.Y. Mar. 21, 2014) ("Contrary to the defendants' assertion, Rule 32(a) of the Federal Rules does not impose any impediment to the use of Lizarra's sworn deposition testimony. By its terms, that rule applies to the use of depositions at a 'hearing or trial.' Fed.R.Civ.P. 32(a)(1). The plaintiffs' use of Lizarra's deposition in support of their motion does not constitute use at such a proceeding. Accordingly, Lizarra's sworn deposition testimony may be considered by the Court."); *Patsy's Italian Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 200 n. 3 (E.D.N.Y. 2007).

96.    Plaintiffs were created from 2005 to 2007 to house various assets and issue certificates to investors. Indentures. *See* Handlin Ex. 618 (Blue Heron Funding V Ltd. Offering Memorandum) at PL_DB008944529-PL_DB008944531; Handlin Ex. 619 (Blue Heron Funding VI Ltd. Offering Memorandum) at PhoenixLight000005744-PhoenixLight000005745; Handlin Ex. 620 (Blue Heron Funding VII Ltd. Offering Memorandum) at PL_DB008818555-PL_DB008818556; Handlin Ex. 621 (Blue Heron Funding IX Ltd. Offering Memorandum) at PL_DB008866677-PL_DB008866678; Handlin Ex. 622 (C-BASS CBO XIV LTD Offering Memorandum) at PL_DB008263216-PL_DB008263217; Handlin Ex. 623 (C-BASS CBO XVII LTD Offering Memorandum) at PL_DB008714177-PL_DB008714178; Handlin Ex. 624 (Kleros Preferred Funding V PLC Offering Memorandum) at PL_DB008283365; Handlin Ex. 625 (Silver Elms CDO PLC Offering Memorandum) at PL_DB008283148-PL_DB008283150; Handlin Ex. 626 (Silver Elms CDO II Offering Memorandum) at PL_DB008831115 PL_DB008831130-PL_DB008831131; Handlin Ex. 627 (Phoenix Light Information Memorandum) at PhoenixLight000003418.

Defendant's Response: Disputed.

Plaintiffs have not cited any material concerning Commerzbank in support of this paragraph. Moreover, this paragraph, to the extent it relates to Commerzbank, is false and contrary to material in the record and the public domain. Commerzbank is a banking entity organized under the laws of Germany. *CB/DB* SAC ¶ 16; *see also* Goff Ex. 140

(2007 Commerzbank Annual Report) at "About Commerzbank" ("Commerzbank was

founded in Hamburg in 1870."); Biron CB Ex. 77 at 71 (2011 Commerzbank Annual

Report) ("Commerzbank Aktiengesellschaft is Germany's second largest bank.").

As this paragraph specifically relates to Phoenix Light, it is inaccurate and

contrary to other material in the record.  See, e.g., Biron PL Ex. 96 (Phoenix U.S.

Security Agreement); *see also PL/DB* SAC ¶ 16.

As this paragraph relates to the PL Plaintiffs, it is inaccurate and contrary to other

material in the record, including the material cited in Defendant's responses to ¶¶ 92 and

97 reflecting (i) ███████████████████████████████████

████████████████████████████████████████████

████████████████████████   (ii) that WestLB acquired most of the notes

issued in the securitizations involving the PL Plaintiffs, and (iii) that to the extent any PL

Plaintiff ever acquired any asset, such PL Plaintiff simultaneously granted all of its right,

title and interest in and to such asset to an indenture trustee.  Defendant restates its

responses to ¶¶ 92 and 97 and incorporates them by reference.

**Plaintiffs' Reply: DB's purported evidence does not specifically controvert the**

**material fact that the PL Plaintiffs were created from 2005 to 2007 to house various assets**

**and issue certificates to investors. This fact should be deemed admitted.** *See* **Local Rule**

**56.1(c). The evidence offered by DB regarding Commerzbank's organization location is**

**immaterial and irrelevant and not disputed by Plaintiffs.** *See infra* **¶ 117. Further, the**

**evidence proffered by DB concerning Commerzbank is irrelevant and immaterial to the**

**fact asserted; this paragraph clearly is included under a subsection of "Plaintiffs'**

**Structure" entitled "Phoenix Light."**

**Plaintiffs restate their replies to DBCSUF ¶¶ 92 and 97, and incorporate them by reference.**

97.    PL acquired its Certificates in the Trusts either through direct market purchases after the CDO closing, or pursuant to asset purchase agreements or similar agreements with WestLB AG (n/k/a Portigon AG) ("WestLB") and related subsequent assignments from WestLB. *See* Handlin Exs. 46-74.

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the acquisition of "Certificates in the Trusts," no response is required.

Disputed.  Plaintiffs have no evidence that the IXIS 2007-HE1 M2 Certificate was ever held by any PL Plaintiff or the subject of any securitization transaction involving any PL Plaintiff.  *See* Biron PL Ex. 28 (Chart: Certificate Plaintiffs Never Held).

Further, Plaintiffs have no evidence that the Certificates listed on Goff Ex. 6 were ever acquired or held by any PL Plaintiff.  To the contrary, the evidence in the record demonstrates they were not.  Each Certificate identified on Goff Ex. 6 was acquired for a securitization transaction involving a CDO Plaintiff after the closing date of the respective securitization transaction.  *See* Goff Ex. 6 (Chart: Certificates Acquired by CDO Plaintiffs After CDO Closing Dates).  The indenture governing each securitization transaction involving a CDO Plaintiff ███████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████ Biron PL Ex. 87

(BH-5 Indenture) §§ 3.03(c), 3.03(f), 10.02(a), 10.02(b), 10.02(f); Biron PL Ex. 88 (BH-6 Amended and Restated Indenture) §§ 3.03(c), 3.03(f), 10.02(a), 10.02(b), 10.02(f); Biron

PL Ex. 89 (BH-7 Amended and Restated Indenture) §§ 3.3(c), 3.3(f), 10.2(h); Biron PL

Ex. 90 (BH-9 Indenture) §§ 3.03(c), 3.03(f), 10.02(a), 10.02(b), 10.02(f); Biron PL Ex.

91 (C-Bass 14 Indenture) §§ 3.3, 10.2(i), 10.2(j); Biron PL Ex. 92 (C-Bass 17 Indenture)

§§ 3.3, 10.2(i), 10.2(j); Biron PL Ex. 93 (SE Indenture) §§ 3.03(c), 3.04(h), 10.02(a),

10.02(b), 10.02(f), 10.02(h); Biron PL Ex. 94 (SE 2 Indenture) §§ 3.3(a), 3.3(b), 10.2(d),

10.3, 10.4; Biron PL Ex. 95 (Kleros Indenture) §§ 3.3(b), 10.2(a), 10.2(c), 10.2(i),

10.5(a), 10.5(c).



Biron PL Ex. 96 (Phoenix Amended and

Restated U.S. Security Agreement) § 2.1; Biron PL Ex. 87 (BH-5 Indenture) at

PhoenixLight000001450-51 (                    ); Biron PL Ex. 88 (BH-6 Amended and

Restated Indenture) at PL_DB008158277-78 (                    ); Biron PL Ex. 89 (BH-7

Amended and Restated Indenture) at PL_DB008159120-21 (                    ); Biron PL

Ex. 90 (BH-9 Indenture) at PhoenixLight000001203-04 (                    ); Biron PL Ex.

91 (C-Bass 14 Indenture) at 1-3 (                    ); Biron PL Ex. 92 (C-Bass 17

Indenture) at 1-3                    ); Biron PL Ex. 93 (SE Indenture) at 1-2 (

         ); Biron PL Ex. 94 (SE 2 Indenture) at 1-3 (                    ); Biron PL Ex. 95

(Kleros Indenture) at 1-2 (                    ).

**Plaintiffs' Reply: DB's purported evidence does not controvert the fact asserted.**



**Pltfs.Opp. 7;**

**Fitzgerald Ex. 39.**

*See* **Handlin Ex. 59 at PL_DB000639486 (April 19, 2006 Blue Heron V Trustee Report,** **); Handlin Ex. 60 at PL_DB007719638 (April 18, 2006 Blue Heron VI Trustee Report,** **); Handlin Ex. 61 at PL_DB000109590 (April 24, 2006 Blue Heron VII Trustee Report,** **); Handlin Ex. 65 at PL_DB000007052, PL_DB000007054 (July 30, 2007 Kleros V Trustee Report,** **); Handlin Ex. 58 at PL_DB000039918 (December 19, 2005 Blue Heron IX Trustee Report,** **t); Handlin Ex. 68 at PL_DB000148355 (March 14, 2007 Silver Elms Trustee Report,** **); Handlin Ex. 67 at PL_DB000674024-25 (September 24, 2007 Silver Elms II Trustee Report,** **).**

98.     Peter Collins, in his capacity as the Rule 30(b)(6) witness for Blue Heron V, Blue Heron VI, Blue Heron VII, Blue Heron IX, Kleros V, C-BASS XIV, C-BASS XVII, Silver Elms, and Silver Elms II, testified as follows:

Q. Your current employer is the German bank Portigon AG; is that correct?
A. Yes.
Q. And Portigon AG was formerly called WestLB AG, right?
. . .
Q. Under the CDO transaction documents governing the CDO plaintiffs, was WestLB the initial purchaser of the notes issued by all the CDO plaintiffs?
A. I believe so.

Handlin Ex. 617 (PL non-Phoenix Light Pltfs. 30(b)(6)) 13:11-15, 295:19-23.

<u>Defendant's Response</u>:  Undisputed that Handlin Ex. 617 contains the quoted language.  However, the material cited is inadmissible as evidence because it is hearsay. Further, the cited testimony is incomplete.  The second question does not contain an answer.

**Plaintiffs' Reply: DB does not dispute the quoted language contained in Peter Collins's 30(b)(6) deposition. The material fact should be deemed admitted.** *See* **Local Rule 56.1(c). DB's objection regarding hearsay is incorrect. Sworn deposition testimony may be submitted in support of a motion for summary judgment.** *See* **Fed.R.Civ.P. 56(c)(1)(A).** *See also Lizarra v. Figueroa***, 2014 WL 1224539, at \*4 (S.D.N.Y. Mar. 21, 2014) ("Contrary to the defendants' assertion, Rule 32(a) of the Federal Rules does not impose any impediment to the use of Lizarra's sworn deposition testimony. By its terms, that rule applies to the use of depositions at a 'hearing or trial.' Fed.R.Civ.P. 32(a)(1). The plaintiffs' use of Lizarra's deposition in support of their motion does not constitute use at such a proceeding. Accordingly, Lizarra's sworn deposition testimony may be considered by the Court.");** *Patsy's Italian Rest., Inc. v. Banas***, 508 F. Supp. 2d 194, 200 n. 3 (E.D.N.Y. 2007).**

**Finally, for clarification, in response to the second question: "Q. And Portigon AG was formerly called WestLB AG, right?" Peter Collins answered "Yes."**

99.    Peter Collins, Portigon's Rule 30(b)(6) witness, further testified as follows:

A. The other plaintiffs, Kleros and Silver Elms I and II, I don't recall if there was a lot of German -- other German bank exposure or, you know, investors.
Q. Is that because WestLB retained all the senior exposure in those deals?
A. They retained the senior exposure and they sold some subordinated tranches, but they also retained some subordinated tranches also.
. . .
Q. And at a certain point in time, the Blue Herons were amended and the issuance of short-term commercial paper stopped and the Blue Herons funded their balance sheet with long-term notes. Is that correct?
A. Yes.
Q. And those long-term notes were issued to German banks, right?

157

A. WestLB, yes.

. . .

Q. All right. And you believe WestLB held the senior notes issued by Kleros, Silver Elms I and Silver Elms II?

A. Yes.

. . .

Q. And WestLB held notes issued by Blue Heron VI from 2006 forward; is that correct?

A. Yes.

. . .

Q. And you're aware that WestLB held notes issued by Blue Heron VII as well?

A. Yes.

. . .

Q. And you're aware that in the time period 2006 forward, WestLB also held notes issued by Blue Heron IX, right?

MR. PAREKH: Objection to form.

A. Yes.

Handlin Ex. 632 (Portigon 30(b)(6)) 100:10-19; 101:16-24;104:17-20; 105:3-5; 105:15-19.

<u>Defendant's Response</u>:  Undisputed that Handlin Ex. 632 contains the quoted language.  However, the material cited is inadmissible as evidence because it is hearsay.

**Plaintiffs' Reply**: **DB does not dispute the quoted language contained in Peter Collins's 30(b)(6) deposition. The material fact should be deemed admitted.** *See* **Local Rule 56.1(c). DB's objection regarding hearsay is incorrect. Sworn deposition testimony may be submitted in support of a motion for summary judgment.** *See* **Fed.R.Civ.P. 56(c)(1)(A).** *See also Lizarra v. Figueroa***, 2014 WL 1224539, at \*4 (S.D.N.Y. Mar. 21, 2014) ("Contrary to the defendants' assertion, Rule 32(a) of the Federal Rules does not impose any impediment to the use of Lizarra's sworn deposition testimony. By its terms, that rule applies to the use of depositions at a 'hearing or trial.' Fed.R.Civ.P. 32(a)(1). The plaintiffs' use of Lizarra's deposition in support of their motion does not constitute use at such a proceeding. Accordingly, Lizarra's sworn deposition testimony may be considered by the Court.");** *Patsy's Italian Rest., Inc. v. Banas***, 508 F. Supp. 2d 194, 200 n. 3 (E.D.N.Y. 2007).**

158

100.     As part of the winding up of WestLB during and after the financial crisis, the entity of Phoenix Light was created and certain structured finance assets owned by WestLB were deposited into Phoenix Light. Phoenix Light issued certificates, 100% of which are owned by the German government regulatory agency Erste Abwicklungsanstalt, or "EAA." Enno Balz, the Managing Director of EAA, testified as follows:

Q. And EAA was created to take over and wind up certain assets formerly held by the German bank WestLB AG; is that correct?

A. Partially, assets and liabilities.
Q. So would it be more correct to say EAA was created to take over and wind up certain assets and liabilities formerly held by the German bank WestLB AG?
A. Yes.
. . .
Q. And the assets transferred from WestLB to EAA included all the notes issued by Phoenix Light, correct?
A. Yes

Handlin Ex. 633 (Balz) 15:22-16:6; 24:3-6.

> Defendant's Response:  To the extent this paragraph purports to state a legal
>
> conclusion regarding the winding up of a legal entity, no response is required.
>
> Disputed to the extent this paragraph does not fully and accurately describe the
>
> relationship between WestLB, EAA, and Phoenix. Defendant restates its response to ¶ 92
>
> and incorporates it by reference.
>
> Undisputed that Handlin Ex. 633 contains the quoted language and that Mr. Balz
>
> is a managing director of EAA.  However, the material cited is inadmissible as evidence
>
> because it is hearsay.

**Plaintiffs' Reply**: **DB's purported evidence does not controvert the material facts regarding the relationship between WestLB, EAA, and Phoenix. Therefore, these facts should be deemed admitted.** *See* **Local Rule 56.1(c). DB's attempt to evade these material facts by alleging they are legal conclusions is unavailing.** *See* **Pltfs.Mem. 12. DB's objection regarding hearsay is incorrect. Sworn deposition testimony may be submitted in support of a motion for summary judgment.** *See* **Fed.R.Civ.P. 56(c)(1)(A).** *See also Lizarra v. Figueroa*,

2014 WL 1224539, at *4 (S.D.N.Y. Mar. 21, 2014) ("Contrary to the defendants' assertion,

Rule 32(a) of the Federal Rules does not impose any impediment to the use of Lizarra's

sworn deposition testimony. By its terms, that rule applies to the use of depositions at a

'hearing or trial.' Fed.R.Civ.P. 32(a)(1). The plaintiffs' use of Lizarra's deposition in

support of their motion does not constitute use at such a proceeding. Accordingly,

Lizarra's sworn deposition testimony may be considered by the Court."); *Patsy's Italian*

*Rest., Inc. v. Banas*, 508 F. Supp. 2d 194, 200 n. 3 (E.D.N.Y. 2007).

**Plaintiffs restate their reply to DBCSUF ¶ 92 and incorporate it by reference.**

101.    Section 3.2(a) of the Amended Trust Agreement between Phoenix Light SF
Limited and DBTCA controls "contingent claims." Pursuant to that clause, PL granted a pledge
to DB creating "a security interest in all of the assets or claims held by the Issuer at any time . . .
." Handlin Ex. 599 (Amended Trust Agreement between Phoenix Light SF Limited and
DBNTC) at § 3.2(a). That grant was subject to Section 3.7 of the Amended Trust Agreement,
which authorizes Phoenix Light to "to collect or have collected in the ordinary course of business
or otherwise exercise or deal with (*which terms shall, for the avoidance of doubt, include the
enforcement of any security*) the rights pledged under Clause 3.2." *Id.* at § 3.7 (emphasis added).
The CDO Indentures that govern the other Plaintiffs contain substantially similar granting
clauses. Handlin Ex. 600 (Blue Heron V Indenture) at PhoenixLight000001450-
PhoenixLight000001451; Handlin Ex. 601 (Blue Heron VI Amended and Restated Indenture) at
PhoenixLight000001745-PhoenixLight000001746; Handlin Ex. 602 (Blue Heron VII Amended
and Restated Indenture) at PL_DB008923753-PL_DB008923755; Handlin Ex. 603 (Blue Heron
IX Indenture) at PhoenixLight000001203-PhoenixLight000001204; Handlin Ex. 57 (Kleros V
Indenture) at PhoenixLight000001981-PhoenixLight000001983; Handlin Ex. 604 (Silver Elms
Indenture) at PhoenixLight000002237-PhoenixLight000002238; Handlin Ex. 605 (Silver Elms II
Indenture) at PL_DB008657062-PL_DB008657064; Handlin Ex. 56 (C-BASS XIV Indenture) at
PhoenixLight000009459-PhoenixLight000009461; Handlin Ex. 606 (C-BASS XVII Indenture)
at PhoenixLight000009771-PhoenixLight000009773.

        Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion concerning the agreements cited in this paragraph, no response is required.

        Disputed. ███████████████████████

███████████████████████████████

██████████████████████████████████

█████████████████████



Biron PL Ex. 96 (Phoenix Security Agreement) § 2.1 at PL_DB007912401–402.

Biron PL Ex. 87 (BH-5 Indenture) at PhoenixLight000001450-51 (

Biron PL Ex. 88 (BH-6 Amended and Restated Indenture) at PL_DB008158277 (

).

" Biron PL Ex. 89 (BH-7 Amended and Restated Indenture) at PL_DB008159120-21 (

).



Biron PL Ex. 90 (BH-9 Indenture) at PhoenixLight000001203 (████████).

Biron PL Ex. 91 (C-Bass 14 Indenture) at 1 (██████).

Biron PL Ex. 92 (C-Bass 17 Indenture) at 1 (████).



Biron PL Ex. 93 (SE Indenture) at 1 (                    ).

Biron PL Ex. 94 (SE 2 Indenture) at 1 (                    ).

Biron PL Ex. 95 (Kleros Indenture) at 1 – 2 (

The Second Circuit has held that such clauses effect a "complete transfer" to an indenture trustee and thus any claims relating to RMBS certificates in the securitized asset portfolio are held by the indenture trustee in trust for the trust beneficiaries. *See*,

*e.g.*, *Nat'l Credit Union Admin. Bd. v. U.S. Bank N.A.*, 898 F.3d 243, 253 (2d Cir. 2018) (affirming dismissal of claims by securitization SPE for lack of standing because "[the indenture trustee] currently holds the RMBS Trust certificates and any claims based on those certificates"); *Triaxx Prime CDO 2006-1, Ltd. v. Bank of New York Mellon*, No. 16 Civ. 1597, 2018 WL 1417850, at *4 (S.D.N.Y. Mar. 8, 2018) (dismissing claims by SPE for lack of standing), *aff'd*, 741 F. App'x 857 (2d Cir. 2018); *see also Phoenix v. USB*, 2015 WL 2359358, at *2 (dismissing pre-assignment claims brought by Phoenix for lack of standing).

Contrary to Plaintiffs' characterization in this paragraph, the express terms of Section 3.2(a) of the Amended Trust Agreement between Phoenix and DBTCA (cited by Plaintiffs in this paragraph) are clear that ████████████████████████████ ███████████████████████████████████████████████████ Handlin Ex. 599 (Amended Trust Agreement between Phoenix Light SF Limited and DBNTC) § 3.2(a).  Rather, Section 3.2(a) of the Amended Trust Agreement concerns ████████████████████████████████████████ ███████████████████████████████████ █████████████████████████████ ███████████████████████████████████████████ ██████████  *Id.*  The language in Section 3.7 of the Amended Trust Agreement that Plaintiffs quote and italicize in this paragraph does not have the meaning Plaintiffs purport to ascribe to it.  *Id.* § 3.7.  (Specifically, ████████████████████████ ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

Undisputed that Handlin Ex. 599 contains the language quoted by Plaintiffs above, except that the phrase "a security interest in all of the assets or claims held by the Issuer at any time . . ." appears in Section 3.1, not 3.2(a), as stated by Plaintiffs.  Disputed that "[t]he CDO Indentures that govern the other Plaintiffs contain substantially similar granting clauses."

**Plaintiffs' Reply:  DB's purported evidence does not controvert the material fact that Section 3.2(a) of the Amended Trust Agreement between Phoenix Light SF Limited and DBTCA controls "contingent claims." This material fact should be deemed admitted.** *See* **Local Rule 56.1(c). Further, DB's purported evidence does not dispute the fact that** ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ **This material fact should be deemed admitted.** *See* **Local Rule 56.1(c). Additionally, DB proffers no evidence to specifically controvert the fact that the CDO Indentures that govern the other Plaintiffs contain substantially similar granting clauses. Therefore, this material fact should be deemed admitted.** *See* **Local Rule 56.1(c). DB's attempt to evade these material facts by mischaracterizing them as a legal conclusion is unavailing; the documents speak for themselves. Plaintiffs do not dispute that the phrase** ████████████████████

████████████████████████████ **appears in Section 3.1.**

102.   The CDO indentures provide that Phoenix Light, as holder of the requisite percentage of the "Controlling Class[,] shall have the right to cause the institution of and direct the time, method and place of . . . exercising any trust, right, remedy or power conferred on the Indenture Trustee." Handlin Ex. 602 (Blue Heron VII Amended and Restated Indenture) § 5.13.

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion concerning the indentures governing the securitization transactions involving the CDO Plaintiffs, no response is required.

Disputed.  Plaintiffs' purported characterization of the indentures governing the securitization transactions involving the CDO Plaintiffs is contrary to the terms of those indentures.  For example, Plaintiffs' quotation of § 5.13 of the BH-7 Indenture is misleading and omits relevant restrictions on the right Plaintiffs purport to characterize. Section 5.13 of the BH-7 Indenture provides (italics identify Plaintiffs' omission):

> *The Holders of at least 25% of the then Aggregate Outstanding Amount of Notes of the* Controlling Class shall have the right to cause the institution of and direct the time, method and place of *conducting any Proceeding for any remedy available to the Indenture Trustee or* exercising any trust, right, remedy or power conferred on the Indenture Trustee*; provided that: (a) such direction shall not be in conflict with any rule of law or with this Indenture; (b) the Indenture Trustee may take any other action deemed proper by the Indenture Trustee that is not inconsistent with such direction; provided that, subject to Section 6.01, the Indenture Trustee need not take any action that it  determines might involve it in liability (unless the Indenture Trustee has received satisfactory indemnity against such liability); (c) the Indenture Trustee shall have been provided with indemnity satisfactory to it; and (d) any direction to the Indenture Trustee to undertake a Sale of the Collateral shall be in accordance with Section 5.05(a).*

Handlin Ex. 602 (BH-7 Amended and Restated Indenture) § 5.13.

In addition, Plaintiffs' citation to the BH-7 indenture does not support any purported statement regarding the securitization transactions involving the other CDO Plaintiffs, each of which is governed by a unique indenture.  *See* Handlin Ex. 600 (BH-5

Indenture) § 5.13; Handlin Ex. 601 (BH-6 Amended and Restated Indenture) § 5.13;

Handlin Ex. 603 (BH-9 Indenture) § 5.13; Handlin Ex. 604 (SE Indenture) § 5.13;

Handlin Ex. 605 (SE 2 Indenture) § 5.13; Handlin Ex. 56 (C-Bass 14 Indenture) § 5.13;

Handlin Ex. 606 (C-Bass 17 Indenture) § 5.13; Handlin Ex. 57 (Kleros Indenture) § 5.13.

**Plaintiffs' Reply: DB's purported evidence does not controvert the fact that under the Blue Heron VII Amended and Restated Indenture, Phoenix Light, as holder of the requisite percentage of the "Controlling Class[,] shall have the right to cause the institution of and direct the time, method and place of ...exercising any trust, right, remedy or power conferred on the Indenture Trustee." Handlin Ex. 602 (Blue Heron VII Amended and Restated Indenture) § 5.13. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). Further, DB proffers no evidence to specifically controvert the fact that other CDO indentures contain substantially similar provisions. Therefore this material fact should be deemed admitted. *See* Local Rule 56.1(c). DB's attempt to evade these material facts by mischaracterizing them as legal conclusions is unavailing; the documents speak for themselves.**

103.   One of the "power[s] conferred" on the Indenture Trustees is the "full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer with respect to the Collateral held for the benefit and security of the Secured Parties." *Id.* at PL_DB008923754 (Granting Clause); *id.* § 5.13.

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding "'power[s] conferred' on the Indenture Trustees," no response is required.

Disputed.  To the extent Plaintiffs' purport to characterize the quoted language from the Granting Clauses of the BH-7 indenture as anything other than a portion of those provisions taken out of context, such characterization is inconsistent with the cited

167

agreement.  Handlin Ex. 602 (BH-7 Amended and Restated Indenture) § 5.13.  The

███████████████ and the agreement generally, must be read as a whole.  Defendant

restates its response to ¶ 101 and incorporates it by reference.

To the extent this paragraph purports to make any statement regarding any

indenture other than the BH-7 Indenture, the materials cited by Plaintiffs do not support

any such statement.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the fact that**

**under the Blue Heron VII Amended and Restated Indenture, "[o]ne of the 'power[s]**

**conferred' on the Indenture Trustees is the 'full power (in the name of the Issuer or**

**otherwise), to exercise all rights of the Issuer with respect to the Collateral held for the**

**benefit and security of the Secured Parties.'" Handlin Ex. 602 (Blue Heron VII Amended**

**and Restated Indenture) § 5.13.  DB's issue with Plaintiffs' characterization of the**

**document is immaterial as the document speaks for itself. Further, DB proffers no evidence**

**to specifically controvert the fact that other CDO indentures contain substantially similar**

**provisions. These material facts should be deemed admitted.** *See* **Local Rule 56.1(c). DB's**

**attempt to evade these material facts by mischaracterizing them as legal conclusions is**

**unavailing; the document speaks for itself. Plaintiffs restate their reply to DBCSUF ¶ 101**

**and incorporate it by reference.**

104.    Accordingly, Phoenix Light, as Controlling Class holder of each of the Plaintiff
CDOs, could direct each indenture trustee to assign its rights to the appropriate Plaintiff to
pursue claims "in the name of the Issuer or otherwise." Handlin Ex. 602 (Blue Heron VII
Amended and Restated Indenture) at PL_DB008923753-PL_DB008923755 (Granting Clause);
*id.* § 5.13.

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding the contractual rights and obligations of the "Controlling Class

holder," no response is required.

Disputed.  Plaintiffs' purported characterization of the BH-7 Indenture is contrary to the terms of that agreement.  *See, e.g.*, Handlin Ex. 602 (BH-7 Amended and Restated Indenture) at PL_DB008923753 – 755 (████████████); *see also* Handlin Ex. 600 (BH-5 Indenture) at PhoenixLight000001450 – 51 (████████████), § 5.13; Handlin Ex. 601 (BH-6 Amended and Restated Indenture) at PhoenixLight000001745 - 46 (████████, § 5.13; Handlin Ex. 603 (BH-9 Indenture) at PhoenixLight000001203 – 04 (████████████ § 5.13; Handlin Ex. 57 (Kleros Indenture) at PhoenixLight000001981 – 83 (████████), § 5.13; Handlin Ex. 604 (SE Indenture) at PhoenixLight000002237 – 38 (████████████), § 5.13; Handlin Ex. 605 (SE 2 Indenture) at PL_DB008657062 – 64 (████████████), § 5.13; Handlin Ex. 56 (C-Bass 14 Indenture) at PhoenixLight000009459 – 61 (████████████), § 5.13; Handlin Ex. 606 (C-Bass 17 Indenture) at PhoenixLight000009771 – 73 (████████████), § 5.13.

Defendant restates its responses to ¶¶ 101 – 103 and incorporates them by reference.

Disputed to the extent this paragraph purports to make any statement regarding any indenture other than the BH-7 Indenture.  Plaintiffs' cited document does not support any assertion as to any other transaction.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the fact that under the Blue Heron VII Amended and Restated Indenture, "Phoenix Light, as Controlling Class holder of each of the Plaintiff CDOs, could direct each indenture trustee to assign its rights to the appropriate Plaintiff to pursue claims 'in the name of the Issuer or otherwise.'" Handlin Ex. 602 (Blue Heron VII Amended and Restated Indenture) § 5.13. DB's issue with Plaintiffs' characterization of the document is immaterial as the document**

speaks for itself. Further, DB proffers no evidence to specifically controvert the fact that other CDO indentures contain substantially similar provisions. These material facts should be deemed admitted. *See* Local Rule 56.1(c). DB's attempt to evade these material facts by mischaracterizing them as legal conclusions is unavailing; the document speaks for itself. Plaintiffs restate their replies to DBCSUF ¶¶ 101-103, and incorporate them by reference.

105.     The other non-Phoenix Light indentures similarly provide that the Controlling Class can direct the CDO Trustee. Handlin Ex. 600 (Blue Heron V Indenture) at PhoenixLight000001450-PhoenixLight000001451 (Granting Clause); Handlin Ex. 600 (Blue Heron V Indenture) § 5.13; Handlin Ex. 601 (Blue Heron VI Amended and Restated Indenture) at PhoenixLight000001745-PhoenixLight000001746 (Granting Clause); Handlin Ex. 601 (Blue Heron VI Amended and Restated Indenture) § 5.13; Handlin Ex. 603 (Blue Heron IX Indenture) at PhoenixLight000001203-PhoenixLight000001204 (Granting Clause); Handlin Ex. 603 (Blue Heron IX Indenture) § 5.13; Handlin Ex. 57 (Kleros V Indenture) PhoenixLight000001981-PhoenixLight000001983 (Granting Clause); Handlin Ex. 57 (Kleros V Indenture) § 5.13; Handlin Ex. 604 (Silver Elms Indenture) at PhoenixLight000002237-PhoenixLight000002238 (Granting Clause); Handlin Ex. 604 (Silver Elms Indenture) § 5.13; Handlin Ex. 605 (Silver Elms II Indenture) PL_DB008657062-PL_DB008657064 (Granting Clause); Handlin Ex. 605 (Silver Elms II Indenture) § 5.13; Handlin Ex. 56 (C-BASS XIV Indenture) at PhoenixLight000009459-PhoenixLight000009461 (Granting Clause); Handlin Ex. 56 (C-BASS XIV Indenture) § 5.13; Handlin Ex. 606 (C-BASS XVII Indenture) PhoenixLight000009771-PhoenixLight000009773 (Granting Clause); Handlin Ex. 606 (C-BASS XVII Indenture) § 5.13.

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the contractual rights and obligations of the "Controlling Class," no response is necessary.

Disputed.  Plaintiffs' characterization of the indentures governing the securitization transactions involving the CDO Plaintiffs is inconsistent with the terms of those indentures. *See, e.g.*, Handlin Ex. 600 (BH-5 Indenture) at PhoenixLight000001450 – 51 (Granting Clause), § 5.13; Handlin Ex. 601 (BH-6 Amended and Restated Indenture) at PhoenixLight000001745 - 46 (Granting Clause), § 5.13; Handlin Ex. 603 (BH-9 Indenture) at PhoenixLight000001203 – 04 (Granting Clause), § 5.13; Handlin Ex. 57 (Kleros Indenture) at PhoenixLight000001981 – 83

(Granting Clause), § 5.13; Handlin Ex. 604 (SE Indenture) at PhoenixLight000002237 –

38 (Granting Clause), § 5.13; Handlin Ex. 605 (SE 2 Indenture) at PL_DB008657062 –

64 (Granting Clause), § 5.13; Handlin Ex. 56 (C-Bass 14 Indenture) at

PhoenixLight000009459 – 61 (Granting Clause), § 5.13; Handlin Ex. 606 (C-Bass 17

Indenture) at PhoenixLight000009771 – 73 (Granting Clause), § 5.13.

Defendant restates its responses to ¶¶ 101 – 104 and incorporates them by

reference.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the fact that**

**"[t]he other non-Phoenix Light indentures similarly provide that the Controlling Class can**

**direct the CDO Trustee." DB's issue with Plaintiffs' characterization of the documents is**

**immaterial as the documents speak for themselves. This material fact should be deemed**

**admitted.** *See* **Local Rule 56.1(c). DB's attempt to evade these material facts by**

**mischaracterizing them as legal conclusions is unavailing; the documents speak for**

**themselves. Plaintiffs restate their replies to DBCSUF ¶¶ 101-104, and incorporate them by**

**reference.**

106.    The Plaintiffs wrote to their Indenture Trustees to direct it to execute an
Assignment of Claims Agreement due to those trustees suffering from "manifest, disabling
conflict of interest[s]" that required them "to step aside." Handlin Ex. 634; Handlin Ex. 635;
Handlin Ex. 636; Handlin Ex. 637.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the trustees' "suffering from 'manifest, disabling conflicts of

interest[s]' that required them 'to step aside,'" no response is necessary.

Disputed.

Plaintiffs' cited documents do not support Plaintiffs' assertion that "[t]he

Plaintiffs wrote to their Indenture Trustees to direct it *[sic]* to execute an Assignment of

Claims Agreement due to those trustees suffering from 'manifest, disabling conflict of interest[s]' that required them 'to step aside.'"  *See* Handlin Exs. 634 – 637.  The evidence in the record demonstrates that the letters to the indenture trustees for the transactions involving the PL Plaintiffs *alleged* that those trustees suffered from conflicts of interest, and *requested* that those trustees assign to Phoenix Light certain rights.

In December 2014, EAA caused the PL Plaintiffs to sue Defendant and other RMBS trustees.  *E.g.*, *PL/DB* Complaint, Dkt. #1.  Defendant and other RMBS trustees established that the PL Plaintiffs lacked standing because the claims at issue belonged to the indenture trustees.  *PL/DB* Memorandum of Law in Support of Motion to Dismiss the Amended Complaint at 13 – 16, *PL/DB* Dkt. #29; *Phoenix v. USB*, 2015 WL 2359358, at *2 (dismissing action for lack of standing because "such claims belong to the indenture trustees," not Plaintiffs).  At EAA's direction, the indenture trustees—to the extent permitted under the contracts governing the WestLB securitizations—assigned the claims to the PL Plaintiffs in early 2015.  Biron PL Ex. 123 (June 17, 2015 Assignment Agreement concerning Phoenix); Biron PL Ex. 124 (June 19, 2015 Assignment Agreement concerning C-Bass 14, C-Bass 17, BH-2, BH-5, BH-6, and BH-9); Biron PL Ex. 125 (June 26, 2015 Assignment Agreement concerning BH-7 and SE 2); Biron PL Ex. 126 (April 16, 2015 Assignment Agreement concerning Kleros and SE); *see also* Goff Ex. 57 at 269:10 – 274:15 (E. Balz Dep. (Dec. 7, 2017)); Goff Ex. 58 at 214:17 – 216:13 (E. Balz Dep. (Nov. 16, 2017), PL/USB); Handlin Ex. 638 at PL_DB007129571



Goff Ex. 60 at 24:2 – 25:5, 268:10 – 269:23 (A. Geraghty Dep. (Aug. 9, 2017)); *id.* at

147:9 – 148:8

); *id.* at 188:7 – 189:21; *also* Goff Ex. 63 at 323:9 – 324:9

(Pltfs 30(b)(6) Dep. (Jan. 22, 2018), PL/USB).

To the extent this paragraph purports to make any statement concerning

Commerzbank, such statement is unsupported by material cited by Plaintiffs.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the fact that**

**"[t]he Plaintiffs wrote to their Indenture Trustees to direct it to execute an Assignment of**

**Claims Agreement due to those trustees suffering from 'manifest, disabling conflict of**

**interest[s]' that required them 'to step aside.' DB's issue with Plaintiffs' characterization of**

**the documents is immaterial as the documents speak for themselves. This material fact**

**should be deemed admitted. *See* Local Rule 56.1(c). DB's statement regarding**

**Commerzbank is irrelevant and immaterial to the fact asserted; this paragraph clearly is**

**included under a subsection of "Plaintiffs' Structure" entitled "Phoenix Light."**

107.   DBTCA, the Indenture Trustee for Plaintiff Phoenix Light, executed an agreement
assigning rights to Phoenix Light SF Limited, providing that:

> The Directing Holder hereby authorizes, instructs and directs the Trustee to assign
> to Phoenix, and the Trustee hereby assigns, any and all rights that the Trustee may
> have to pursue and enforce the claims set forth in the Complaints, and/or provide
> any directions necessary to enforce the claims (the "Assigned Rights") in the
> Lawsuits, including any claims which may be added to the Lawsuits by virtue of an
> amendment to the Complaints or otherwise. . . .

Handlin Ex. 638 at PL_DB007129571.

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding "an agreement assigning rights to Phoenix Light SF Limited" and any effect of that agreement, no response is necessary.

Undisputed that Handlin Ex. 638 contains the quoted language.

Defendant restates its response to ¶ 106 and incorporates it by reference.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the document speaks for itself. The material fact should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs restate their reply to DBCSUF ¶ 106 and incorporate it by reference.**

108.    Additionally, as Indenture Trustee for Plaintiffs Kleros Preferred Funding V PLC and Silver Elms CDO PLC, DBTCA executed an agreement assigning rights to Phoenix Light SF Limited, providing that it:

> The Directing Holder hereby authorizes, instructs and directs the Trustee to assign to Phoenix, and the Trustee hereby assigns, any and all rights that the Trustee may have to pursue and enforce the claims set forth in the Complaints (the "Assigned Rights" in the Lawsuits, including any claims which may be added to the Lawsuits by virtue of an amendment to the Complaints or otherwise . . . .

Handlin Ex. 639 at PhoenixLight000005013.

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the execution of "an agreement assigning rights to Phoenix Light SF Limited" and any effect of that agreement, no response is necessary.

Undisputed that Handlin Ex. 639 at PhoenixLight000005013 contains the quoted language.

Defendant restates its response to ¶ 106 and incorporates it by reference.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the document**

speaks for itself. The material fact should be deemed admitted. *See* Local Rule 56.1(c).

Plaintiffs restate their reply to DBCSUF ¶¶ 106 and incorporate it by reference.

109.   The Bank of New York Trust Company, National Association, the CDO Indenture Trustee for Plaintiffs Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., Blue Heron Funding IX Ltd., C-BASS CBO XIV, and C-BASS CBO XVII executed an agreement assigning rights to C-BASS CBO XVII Ltd., C-BASS CBO XIV Ltd., Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., and Blue Heron Funding IX Ltd., respectively, stating that it:

> The Directing Holder hereby authorizes, instructs and directs the Indenture Trustee to assign to C-BASS CBO XVII Ltd., C-BASS CBO XIV Ltd., Blue Heron Funding II Ltd., Blue Heron Funding V Ltd., Blue Heron Funding VI Ltd., and Blue Heron Funding IX Ltd., respectively, and the Indenture Trustee hereby assigns, conveys, transfers and sets over all right, title and interest in, to and under, in each case, that the Trustee may have with respect to the claims asserted or which may hereafter be asserted on behalf of each CDO Issuer, respectively, set forth in the Complaints or otherwise in the Lawsuits (the "Assigned Rights"), including any claims which may be added to the Lawsuits by virtue of an amendment to the Complaints or otherwise. . . .

Handlin Ex. 639 at PhoenixLight000005003.

> Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the execution of "an agreement assigning rights" to certain Plaintiffs and any effect of that agreement, no response is necessary.
>
> Undisputed that Handlin Ex. 639 at PhoenixLight000005003 contains the quoted language.
>
> Defendant restates its response to ¶ 106 and incorporates it by reference.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the document speaks for itself. Therefore, the material fact should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs restate their reply to DBCSUF ¶¶ 106 and incorporate it by reference.**

110.   Wells Fargo, the CDO Indenture Trustee for Plaintiffs Blue Heron Funding VII Ltd. and Silver Elms CDO II Ltd., executed an agreement assigning rights to Blue Heron Funding VII Ltd. and Silver Elms CDO II Ltd., respectively, stating that it:

Each of the CDO Issuers hereby authorizes, instructs and directs the Blue Heron Trustee and the Silver Elms Trustee, respectively, to assign to Blue Heron Funding VII Ltd. and Silver Elms CDO II Ltd., respectively, and the Blue Heron Trustee and the Silver Elms Trustee hereby assigns, conveys, transfers and sets over all right, title and interest that each of the Blue Heron Trustee and the Silver Elms Trustee may have, if any, with respect to the claims asserted by each CDO Issuer or which may hereafter be asserted by each CDO Issuer, respectively, solely as set forth in the Complaints in the Lawsuits (the "Assigned Rights"), including any claims which may be added to the Lawsuits by virtue of an amendment to the Complaints that arise out of the same transactions and occurrences at issue in the Lawsuits. . . .

Handlin Ex. 639 at PhoenixLight000005020.

   Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding the execution of "an agreement assigning rights" to certain

Plaintiffs and any effect of that agreement, no response is necessary.

   Undisputed that Handlin Ex. 639 at PhoenixLight000005020 contains the quoted

language.

   Defendant restates its response to ¶ 106 and incorporates it by reference.

   **Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by mischaracterizing it as a legal conclusion is unavailing; the document**

**speaks for itself. It should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs restate**

**their reply to DBCSUF ¶¶ 106 and incorporate them by reference.**

   111.   In its capacity as Trustee for Silver Elms CDO PLC and Kleros V, DBTCA
executed an assignment to Phoenix Light SF Limited. *See* Handlin Ex. 639 at
PhoenixLight000005013 ("The Directing Holder hereby authorizes, instructs and directs the
Trustee to assign to Phoenix, and the Trustee hereby assigns, any and all rights that the Trustee
may have. . . .").

   Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding the execution of "an assignment to Phoenix Light SF Limited" and

any effect of that agreement, no response is necessary.

176

Undisputed that Handlin Ex. 639 at PhoenixLight000005013 contains the quoted language. Plaintiffs' quotation is misleading because it omits additional relevant language that Plaintiffs themselves quoted in ¶ 108 (italics identify Plaintiffs' omission): "The Directing Holder hereby authorizes, instructs and directs the Trustee to assign to Phoenix, and the Trustee hereby assigns, any and all rights that the Trustee may have *to pursue and enforce the claims set forth in the Complaints (the "Assigned Rights" in the Lawsuits, including any claims which may be added to the Lawsuits by virtue of an amendment to the Complaints or otherwise . . . .*"

Defendant restates its response to ¶ 106 and incorporates it by reference.

**Plaintiffs' Reply: DB does not dispute this material fact. The assertion that Plaintiffs' quotations are misleading is immaterial as the document speaks for itself. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing. This material fact should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs restate their reply to DBCSUF ¶ 106 and incorporate it by reference.**

112. The assignments further provide that "the Indenture Trustee shall have no duties or obligations with respect to the Assigned Rights, other than to distribute the net recoveries on receipt by the CDO Issuers, or by other plaintiffs in the Lawsuits relating to the Notes, pursuant to the terms of the Indentures." Handlin Ex. 639 at PhoenixLight000005003. The assignments by the other CDO Trustees contain substantially similar language. *See* Handlin Ex. 639 at PhoenixLight000005013; Handlin Ex. 638 at PL_DB007129571; Handlin Ex. 639 at PhoenixLight000005021.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding certain agreements Plaintiffs characterize as "assignments" or any effect of those agreements, no response is necessary.

Undisputed that Handlin Ex. 639 contains the quoted language at PhoenixLight000005003, and that Handlin Ex. 638 at PL_DB007129571 and Handlin

Ex. 639 at PhoenixLight000005013 and PhoenixLight000005021 have different, but

similar, language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by mischaracterizing it as a legal conclusion is unavailing; the documents**

**speak for themselves. The material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

113.    The CDO Indenture for Silver Elms provides that "[i]f an Event of Default shall have occurred and be continuing . . . the Indenture Trustee shall retain the Collateral intact as a whole, collect *and cause the collection of the proceeds thereof. . . .*" Handlin Ex. 604 § 5.05(a) (emphasis added). Each of the CDO Indentures for the other three CDOs that experienced an Event of Default contains a substantially similar provision. Handlin Ex. 57 § 5.5(a); Handlin Ex. 605 § 5.5(a); Handlin Ex. 606 § 5.5(a).

    Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the contractual obligations under the "CDO Indenture for Silver

Elms," the CDO indentures any other CDO transaction, or that three CDOs "experienced

an Event of Default," no response is necessary.

    Undisputed that Handlin Ex. 604 contains the quoted language.  Plaintiffs'

quotation is misleading because it omits additional relevant language (italics identify

Plaintiffs' omission):

> (a) If an Event of Default shall have occurred and be continuing, *and a declaration of acceleration pursuant to Section 5.02 has been made*, the Indenture Trustee shall retain the Collateral intact as a whole, collect and cause the collection of the proceeds thereof *and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes in accordance with the Priority of Payments and the relevant provisions of Article X, Article XI, Article XII, and Article XIII, unless:*
>
> *(i)      (x) the Indenture Trustee determines in accordance with Section 5.05(c) that the anticipated proceeds of a sale or liquidation of the Collateral (after deducting the reasonable expenses of such sale or liquidation) would be sufficient to pay in full the sum of: (A) the amounts then due and unpaid upon the Class A-1 Notes, Class A-2 Notes, Class A-3 Notes, Class B Notes, Class C Notes and Class D Notes for principal and interest*

*(including any Defaulted Interest and Class C Deferred Interest and Class D Deferred Interest), (B) any unpaid Administrative Expenses as limited by clauses (2) and (3) of Section 11.01(a)(i), and (C) any principal, interest or other amounts then due and unpaid under the Collateral Administration Agreement and any Hedge Agreement (including any unpaid termination payments with respect to any Hedge Agreement), and (y) the Holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Notes of the Controlling Class agree with such determination, or*

*(ii) the Holders of at least 66-2/3% of the Aggregate Outstanding Amount of each of the Class A-la Notes, Class A-lb Notes, Class A-2 Notes, Class A-3 Notes, Class B Notes, Class C Notes and Class D Notes voting as separate Classes (and, in each case, unless each Hedge Counterparty will be paid in full the amounts due and unpaid to such Hedge Counterpart), (assuming, for this purpose, that each Hedge Agreement has been terminated by reason of the occurrence of an event of default thereunder by the Issuer), such Hedge Counterparty) direct the sale and liquidation of the Collateral.*

Handlin Ex. 604 (SE Indenture) § 5.05(a) (Plaintiffs' alteration removed for clarity).

Undisputed that Handlin Exs. 57, 605 and 606 each contain different, but similar, language.

**Plaintiffs' Reply: DB does not dispute this material fact. The assertion that Plaintiffs' quotations are misleading is false and immaterial as the document speaks for itself. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing.The material fact should be deemed admitted. *See* Local Rule 56.1(c).**

114.   The assignments are an effort to "cause the collection" of contingent claims that the CDO Indenture Trustees could not otherwise pursue because of their conflict as RMBS trustees being sued on similar claims. Handlin Exs. 634-37.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the agreements plaintiffs characterize as "assignments," or any effect of those agreements, no response is necessary.

Disputed.  The documents Plaintiffs' cite in this paragraph do not contain the quoted language; nor do they or any other document support Plaintiffs' proposition.

Moreover, Plaintiffs' cited documents, letters written by Plaintiffs' counsel in December 2014, cannot and do not explain the purpose of the agreements attached as Handlin Exs. 638 and 639.  Indeed, the agreements that EAA, Plaintiffs, and the CDO indenture trustees ultimately executed in June 2015 differed significantly from the agreements Plaintiffs proposed in December 2014, which is evidence that the other parties signing those agreements disagreed with Plaintiffs' assertions in their December 2014 letters.  *Compare* Handlin Ex. 635 at PhoenixLight 000003281 – 89 (Plaintiffs' proposed agreement concerning Kleros) *with* Handlin Ex. 639 at PhoenixLight000005012 – 18 (executed agreement concerning SE and Kleros).

**Plaintiffs' Reply: DB's purported evidence does not controvert the fact that "[t]he assignments are an effort to "cause the collection" of contingent claims that the CDO Indenture Trustees could not otherwise pursue because of their conflict as RMBS trustees being sued on similar claims." DB's issue with Plaintiffs' characterization of the document is immaterial as the document speaks for itself. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing. Further, the language quoted by Plaintiffs can be found in the Indentures cited above. *Supra* ¶ 113. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c).**

115.    The assignment letters provide that the Plaintiffs agree to fund the litigations and can be reimbursed based on any net recoveries obtained. For example, the June 19, 2015 assignment letter states:

> [T]he Indenture Trustee hereby assigns, conveys, transfers and sets over all right, title and interest in, to an under, in each case that the Trustee may have with respect to the claims asserted or which may hereafter be asserted on behalf of each CDO Issuer . . . with any net recovers obtained by the CDO Issuers . . . in or in connection with the Lawsuits or the Assigned Rights . . . after payment . . . of the costs and

expenses of prosecution . . . . It is solely the responsibility of the CDO Issuers' and/or the Directing Holder to prosecute the Assigned Rights in the Lawsuits.

Handlin Ex. 639 at PhoenixLight000005003 (typos in original).

<u>Defendant's Response</u>:  To the extent this paragraph purports to state a legal conclusion regarding the agreements Plaintiffs characterize as "assignment letters," or any effect of those agreements, no response is required.

Disputed.  This paragraph does not accurately describe the terms of agreements Plaintiffs purport to characterize.  As an initial matter, Plaintiffs quotation of the cited document omits relevant terms and limitations.  That document states in relevant part (italics identify Plaintiffs' omissions):

> [T]he Indenture Trustee hereby assigns, conveys, transfers and sets over all right, title and interest in, to and under, in each case that the Trustee may have with respect to the claims asserted or which may hereafter be asserted on behalf of each CDO Issuer, *respectively, set forth in the Complaints or otherwise in the Lawsuits (the "<u>Assigned Rights</u>"), including any claims which may be added to the Lawsuits by virtue of an amendment to the Complaints or otherwise,* with any net recoveries obtained by the CDO Issuers, *or by other plaintiffs in the Lawsuits relating to the Notes,* in or in connection with the Lawsuits or the Assigned Rights, after payment *(subject to any applicable restrictions set forth in the Indentures, including the Priority of Payments)* of the costs and expenses of prosecution, *pursuant to an order of a court of competent jurisdiction that has not been modified, amended, reversed, vacated, or stayed, and as to which the time to appeal has expired and no appeal is pending (a "<u>Final Order</u>"), or pursuant to a settlement agreement among Persons against whom the Assigned Rights may be asserted, to be distributed by the Indenture Trustee pursuant to the terms of the Indentures (the "<u>Instruction</u>").  The Directing Holder acknowledges that, once the Instruction has been effected by the Indenture Trustee, (a)* it is solely the responsibility of the CDO Issuers' *[sic]* and/or the Directing Holder to prosecute the Assigned Rights in the Lawsuits, *and (b) the Indenture Trustee shall have no duties or obligations with respect to the Assigned Rights, other than to distribute the net recoveries on receipt by the CDO Issuers, or by other plaintiffs in the Lawsuits relating to the Notes, pursuant to the terms of the Indentures. … .*

Plaintiffs' cited document does not support Plaintiffs' assertion as to any transaction other than C-Bass 14, C-Bass 17, Blue Heron Funding II Ltd., BH-5, BH-6, and BH-9.

**Plaintiffs' Reply:** DB proffers evidence to specifically controvert the fact that the assignment letter relating to CBASS XIV, CBASS XVII, Blue Heron V, and Blue Heron IX provides "that the Plaintiffs agree to fund the litigations and can be reimbursed based on any net recoveries obtained." Further, DB proffers no evidence to specifically controvert the fact that the assignment letters relating to the other CDO indentures contain substantially similar provisions. DB's issue with Plaintiffs' characterization of the document is immaterial as the document speaks for itself. DB's attempt to evade the material facts by mischaracterizing them as legal conclusions is unavailing. This material fact should be deemed admitted. *See* Local Rule 56.1(c).

116.    The other assignment letters contain substantially similar provisions. Handlin Ex. 639 at PhoenixLight000005013; Handlin Ex. 638 at PL_DB007129571; Handlin Ex. 639 at PhoenixLight000005020.

> Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the agreements Plaintiffs characterize as "assignment letters," no response is required.
>
> Disputed.  Defendant restates its response to ¶ 115 and incorporates it by reference.
>
> Handlin Ex. 639 contains a letter dated April 16, 2015, to Deutsche Bank Trust Company Americas, as Trustee in respect of the SE Indenture and the Kleros Indenture, from Roger McGreal (on behalf of Phoenix)





Handlin Ex. 639 at PhoenixLight000005013 – 14.

Handlin Ex. 638 contains a letter dated June 17, 2015, to Deutsche Bank Trust Company Americas, as Trustee for Phoenix, from Alan Geraghty (on behalf of Phoenix), and Enno Balz and Tobias Tillman (each on behalf of EAA) with the subject line:





Handlin Ex. 638 at PL_DB007129571.

Handlin Ex. 639 contains a letter dated June 26, 2015, to Wells Fargo Bank, N.A. from Alan Geraghty (on behalf of Phoenix and SE 2), Matthew J. Wright (on behalf of BH-7), and Enno Balz and Gregor Garten (each on behalf of EAA) with the subject line:



Handlin Ex. 639 at PhoenixLight000005020 – 21.

**Plaintiffs' Reply: DB's purported evidence does not controvert the material fact that "[t]he other assignments contain a substantially similar provision." DB's attempt to evade the material facts by mischaracterizing them as legal conclusions is unavailing; the documents speak for themselves. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs restate their reply to DBCSUF ¶ 115 and incorporate them by reference.**

### 2. Commerzbank ("CB")

117.    CB is an entity organized under the laws of Germany. Handlin Ex. 665 (Articles of Association of Commerzbank Aktiengesellschaft).

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding the organization of a legal entity, no response is required.

Undisputed.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade this fact by mischaracterizing it as a legal conclusion is unavailing; the cited document speaks for itself. It should be deemed admitted. *See* Local Rule 56.1(c).**

118.    CB succeeded to all of the interests of Dresdner Bank AG ("Dresdner") by way of merger as of May 2009, effected by way of universal succession under the German Transformation Act, with CB as the entity resulting from such merger. Handlin Dec. Ex. 666 (CB Press Release dated May 11, 2009).

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding a "merger as of May 2009" or the effect of the German

Transformation Act, no response is required.

Undisputed that, in May 2009, Commerzbank merged with Dresdner and acquired

Dresdner's portfolio.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade this**

**material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document**

**speaks for itself. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

119.   Dresdner's London Branch ("Dresdner London Branch") purchased and held 30
Certificates prior to the time of the merger. Handlin Exs. 133, 141, 161, 168, 173, 177, 181, 202,
206, 215, 227, 231, 236, 238, 242, 246, 250, 254, 269, 272, 280, 302, 306, 310, 317, 327, 334,
336, 358, 562 (Trade Certificates).

Defendant's Response:  Disputed.  Plaintiffs' cited documents do not support

Plaintiffs' proposition that "Dresdner's London Branch . . . purchased and held 30

Certificates prior to the time of the merger."

First, "Dresdner London Branch" is not a legal entity so it could not and did not

acquire or hold any Certificates.  *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234

F. Supp. 3d 462, 470–71 (S.D.N.Y. 2017); *see* Goff Ex. 51 at 22:12 – 14 (R. Boelstler

Dep. (Feb. 24, 2017), CB/WF) (testifying that █████████████████████████

████████; Goff Ex. 142 at 21 (Dresdner Annual Report 2005) (identifying Dresdner's

London office).  Plaintiffs provide no evidence to the contrary.

In addition, none of the documents cited by Plaintiffs in this paragraph (which

Plaintiffs describe as "Trade Certificates") refers to "Dresdner."  *See* Handlin Exs. 133,

141, 161, 168, 173, 177, 181, 202, 206, 215, 227, 231, 236, 238, 242, 246, 250, 254, 269,

272, 280, 302, 306, 310, 317, 327, 334, 336, 358 & 562 (Trade Certificates).

186

Finally, two of the purported "trade certificates" Plaintiffs cite in this paragraph

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████        *See* Handlin Exs. 231 & 562.  Plaintiffs have

provided no evidence that (or if it did, when) Dresdner (or any other entity that allegedly

assigned Certificates to Commerzbank) acquired the two RMBS certificates reflected on

Handlin Exs. 231 and 562:  (1) ███████████ nominal value certificate in HASC 2007-

OPT1, ███████████████ (Handlin Ex. 231); and (2) ███████████ nominal value

certificate in WAMU 2005-AR13, ████████████████ (Handlin Ex. 562).

**Plaintiffs' Reply:  DB's purported evidence does not controvert the material fact**
**that Dresdner through its London Branch purchased and held 30 Certificates prior to the**
**time of the merger. Therefore, this material fact should be deemed admitted. *See* Local**
**Rule 56.1(c). DB does not dispute that Dresdner acquired 20 Certificates from Palmer 3**
**before transferring those Certificates to CB. *See* DBSUF ¶ 40.2 (admitting that CB**
**acquired them (which Dresdner merged into)). With respect to the remaining 10**
**Certificates, DB admits that Dresdner held these Certificates and transferred them to CB**
**through the 2009 merger. *See* DBSUF ¶ 40.3.  Further, DB's statement that "Dresdner**
**London Branch is not a legal entity so it could not and did not acquire or hold any**
**Certificates" is a legal conclusion inappropriate for a Rule 56.1 statement. DB misconstrues**
**the facts which are that Dresdner acquired the 30 certificates acting through its London**
**Branch.  DB admits that Dresdner was capable of acquiring and holding, and did in fact**
**acquire and hold, Certificates. *See* DBSUF ¶¶ 40.3, 40.3.2.**

187

**With respect to Handlin Ex. 231, CB inadvertently cited the incorrect trade ticket. The correct trade ticket evidencing Dresdner's purchase of HASC 2007-OPT1 M6 is located at Handlin Ex. 233.**

**With respect to Handlin Ex. 562, CB inadvertently cited the incorrect Certificate. The correct trade ticket evidencing Dresdner's purchase of WAMU 2005-AR13 A1C3 is located at Handlin Reply Ex. 28.**

120.    Twenty of the Certificates held by Dresdner at the time of merger were acquired by Dresdner London Branch on August 29, 2008 from Palmer Square 3 Limited ("Palmer 3"). *See* Handlin Exs. 133, 141, 161, 168, 173, 177, 181, 227, 231, 238, 242, 246, 250, 254, 280, 302, 306, 310, 327, 336 (Trade Certificates).

<u>Defendant's Response</u>:  Disputed.  Plaintiffs' cited documents do not support Plaintiffs' assertion that "[t]wenty of the Certificates held by Dresdner at the time of merger were acquired by Dresdner London Branch on August 29, 2008 from Palmer Square 3 Limited."

First, "Dresdner London Branch" is not a legal entity so it could not and did not acquire or hold any Certificates.  *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462, 470–71 (S.D.N.Y. 2017); *see* Goff Ex. 51 at 22:12 - 14 (R. Boelstler Dep. (Feb. 24, 2017), CB/WF) (testifying that ███████████████ ████); Goff Ex. 142 at 21 (Dresdner Annual Report 2005) (identifying Dresdner's London office).  Plaintiffs provide no evidence to the contrary.

In addition, none of the documents cited by Plaintiffs in this paragraph (which Plaintiffs describe as "Trade Certificates") refers to "Dresdner."  Handlin Exs. 133, 141, 161, 168, 173, 177, 181, 227, 231, 238, 242, 246, 250, 254, 280, 302, 306, 310, 327 & 336 (Trade Certificates).

Moreover, one of the purported "trade certificates" Plaintiffs cite in this paragraph

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████   *See* Handlin Ex. 231.

**Plaintiffs' Reply: DB's purported evidence does not controvert the fact that**

**"Twenty of the Certificates held by Dresdner at the time of merger were acquired by**

**Dresdner London Branch on August 29, 2008 from Palmer Square 3 Limited." Therefore,**

**this material fact should be deemed admitted. *See* Local Rule 56.1(c). DB does not dispute**

**that Dresdner acquired 20 Certificates from Palmer 3 before transferring those**

**Certificates to CB. *See* DBSUF ¶ 40.2 (admitting that CB acquired them (which Dresdner**

**merged into)).  Further, DB's statement that "Dresdner London Branch is not a legal entity**

**so it could not and did not acquire or hold any Certificates" is a legal conclusion**

**inappropriate for a Rule 56.1 statement. DB misconstrues the facts which are that**

**Dresdner acquired the 20 certificates acting through its London Branch. DB admits that**

**Dresdner was capable of acquiring and holding, and did in fact acquire and hold,**

**Certificates. *See* DBSUF ¶¶ 40.3, 40.3.2.**

**To the extent that DB takes issue with whether Dresdner or CB acquired the 20**

**Certificates the issue is immaterial as Dresdner and CB merged together and DB does not**

**dispute that CB acquired the Certificates. *See* DBSUF ¶ 40.2. With respect to Handlin Ex.**

**231, CB inadvertently cited the incorrect trade ticket. The correct trade ticket evidencing**

**Dresdner's purchase of HASC 2007-OPT1 M6 is located at Handlin Ex. 233.**

121.    Palmer 3 was a private limited liability company organized under the laws of
Ireland. *See* Handlin Ex. 672 at CB_DB03090457.

      <u>Defendant's Response</u>:  To the extent this paragraph purports to state a legal

conclusion regarding Palmer 3, no response is required.

      Undisputed.

      **Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade this**

**material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document**

**speaks for itself. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

      122.    By letter dated December 10, 2013, the liquidator of Palmer 3 provided CB a
letter confirmation stating:

> With regard to the [unwinding of Palmer 3], this letter confirmation further
> memorializes the fact that is it my understanding that it was the Company's intent
> to effectuate the transfer of all assets of value, as provided in the Deed of Unwind,
> to the Sole Noteholder [Dresdner] on the terms set forth in the Deed of Unwind,
> and that such assets included the [Collateral Assets], and all legal rights and claims
> whether in tort or otherwise associated with the Collateral Assets.
>
> It is my understanding and belief that such legal rights, and claims include, but are
> not limited to, the Company's interest and control over any and all legal claims
> sounding in tort, contract, trust, or otherwise concerning any of the Collateral
> Assets, whether arising before or after the date of their acquisition or the date of
> this confirmation.

Handlin Ex. 675.

      <u>Defendant's Response</u>:  To the extent this paragraph purports to state a legal

conclusion regarding the effect of the unwinding of Palmer 3 or the transfer of any asset,

legal right, or claim, no response is required.

      Undisputed that Handlin Ex. 675 contains the quoted language.

      **Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material facts by mischaracterizing them as legal conclusions is unavailing; the cited**

**document speaks for itself. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

      123.    Twenty-two Certificates originally were acquired and held in New York by
Eurohypo AG New York Branch (now known as Hypothekenbank Frankfurt AG New York
Branch) ("Eurohypo"). *See* Handlin Exs. 355, 359, 360, 361, 361 at CB_DB00004042, 362 at

CB_DB00004026, 362 at CB_DB00004030, 362 at CB_DB00004033, 363-373, 373 at CB_DB00004087, 374, 376.

Defendant's Response: Disputed. "Eurohypo AG New York Branch" is not a legal entity so it could not and did not acquire or hold any Certificates. *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462, 470–71 (S.D.N.Y. 2017); *see* Goff Ex. 141 at 172 – 174 (listing fully consolidated, and non-consolidated entities, which did not include Eurohypo AG New York Branch). Plaintiffs provide no evidence to the contrary.

Moreover, for thirteen of the Certificates Plaintiffs reference, the cited documents

███████████████████████████████████████████████████ *See* Handlin Exs. 359 (MSAC 2006-HE6, M1), 364 (GSAMP 2005-WMC3, M5), 365 (GSAMP 2005-WMC3, M4), 366 (FFML 2005-FFH3, M6), 367 (FFML 2005-FFH3, M5), 368 (GSAMP 2005-HE4, M5), 371 (GSAA 2005-10, M5), 372 (GSAA 2005-10, M6), 373 (GSAMP 2005-WMC1, M3), 374 (GSAMP 2005-WMC1, M4), 375 (GSAMP 2005-WMC2, M4), 376 (GSAMP 2005-WMC2, M3). Plaintiffs cite no evidence that any of the 22 referenced securities were "held in New York."

**Plaintiffs' Reply: DB's purported evidence does not specifically controvert the fact that "Twenty-two Certificates originally were acquired and held in New York by Eurohypo AG New York Branch." Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c).**

**DB's assertion that "'Eurohypo AG New York Branch' is not a legal entity so it could not and did not acquire or hold any Certificates" is a legal conclusion inappropriate for a Rule 56.1 statement. DB misconstrues the facts which are the Eurohypo acquired the 22 certificates acting through its New York Branch. Further, DB admits that Eurohypo**

was capable of acquiring and holding, and did in fact acquire and hold, Certificates.
DBSUF ¶ 40.4.3.

Further, DB's assertion that "Plaintiffs cite no evidence that any of the 22
referenced securities were 'held in New York'" is incorrect. For example, the trade tickets
for Eurohypo's purchase ███████████████████████████ *See, e.g.*,
Handlin Exs. 359 (MSAC 2006-HE6, M1), 364 (GSAMP 2005-WMC3, M5), 365 (GSAMP
2005-WMC3, M4), 366 (FFML 2005-FFH3, M6), 367 (FFML 2005-FFH3, M5), 368
(GSAMP 2005-HE4, M5) . Additionally the assignment agreement entered into between
Eurohypo and CB ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████

Handlin Ex. 674 at Schedule A.

124.    Eurohypo was the New York Branch of a wholly-owned subsidiary of CB.
Handlin Ex. 670 at 289, Handlin Ex. 671 at 21.

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding (a) whether a branch constitutes a separate entity or financial base

or (b) the legal affiliation of Eurohypo and Commerzbank, no response is required.

Disputed.  Plaintiffs' cited documents do not support Plaintiffs' proposition that

"Eurohypo was the New York Branch of a wholly-owned subsidiary of CB."  To the

contrary, Handlin Ex. 670 at 289 lists "Eurohypo Aktiengesellschaft" as a subsidiary of

CB with its registered office in *Eschborn, Germany*.  Handlin Ex. 671 at 21 is silent as to

CB or Eurohypo.  Handlin Ex. 671 at 20 lists both "Commerzbank Aktiengesellschaft"

and "Eurohypo Aktiengesellschaft" as having offices in New York. But that document

does not suggest that Eurohypo's New York office was a separate entity from Eurohypo.

Defendant restates its response to ¶ 123 and incorporates it by reference.

**Plaintiffs' Reply: DB's purported evidence does not controvert the fact that "Eurohypo was the New York Branch of a wholly-owned subsidiary of CB." Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). DB's attempt to evade the fact by mischaracterizing it as a legal conclusion is unavailing; the cited documents speak for themselves. Handlin Ex. 670 specifically lists "Eurohypo Aktiengesellschaft" as a subsidiary of CB—a fact DB admits. *See* Handlin Ex. 670 at 289; DBSUF ¶ 40.4.1. Further, Handlin Ex. 671 demonstrates that Eurohypo AG had a New York State chartered branch. Handlin Ex. 671 at 20.**

**Further, Plaintiffs restate their reply to DBCSUF ¶ 123 and incorporate it by reference.**

125.   The 22 Certificates that were acquired by Eurohypo were subsequently transferred from Eurohypo to Commerzbank AG London Branch ("London Branch") in November 2009. Handlin Exs. Handlin Exs. 123, 125, 129, 131, 153, 155, 187, 189, 191, 193, 195, 197, 199, 266, 278, 314, 342, 344, 346, 348, 350, 352 (Trade Certificates).

Defendant's Response:  Disputed. "Eurohypo," which Plaintiffs define to mean "Eurohypo AG New York Branch," is not a legal entity so it could not and did not purchase or hold any Certificates. *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462, 470–71 (S.D.N.Y. 2017); *see* Goff Ex. 141 at 172 – 174 (listing fully consolidated, and non-consolidated entities, which did not include Eurohypo AG New York Branch). Plaintiffs provide no evidence to the contrary. Likewise, "Commerzbank AG London Branch" is not a legal entity so it could not and did not purchase or hold any Certificates. *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462,

470–71 (S.D.N.Y. 2017); Goff Ex. 64 at 290:16 – 291:23 (A. Holsten Dep. (Mar. 17, 2017), CB/WF) ████████████████████████████ *see* Goff Ex. 140 (2007 Commerzbank Annual Report) at 147 – 148 (listing consolidated entities Commerzbank's financial reports, which did not include Commerzbank AG London Branch). Plaintiffs provide no evidence to the contrary.

**Plaintiffs' Reply: DB's purported evidence does not controvert the fact that "[t]he 22 Certificates that were acquired by Eurohypo were subsequently transferred from Eurohypo to Commerzbank AG London Branch ("London Branch") in November 2009." Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c). DB admits that CB acquired the 22 Certificates from Eurohypo. DBSUF ¶ 40.4. DB's assertion that "'Eurohypo,' which Plaintiffs define to mean 'Eurohypo AG New York Branch,' is not a legal entity so it could not and did not purchase or hold any Certificates" and that "'Commerzbank AG London Branch' is not a legal entity so it could not and did not purchase or hold any Certificates " are legal conclusions inappropriate for a Rule 56.1 Statement and therefore no response is required. DB misconstrues the facts, which are that Eurohypo, acting through its New York Branch, transferred the 22 certificates to CB, acting through its London Branch. Further, DB admits that Eurohypo was capable of acquiring and holding, and did in fact acquire and hold, Certificates, DBSUF ¶ 40.4.3, and that CB was capable of acquiring and holding, and did in fact acquire and hold, Certificates. *See* DBSUF ¶¶40.1.2, 40.2, 40.4.**

126.    On December 11, 2013, Eurohypo and London Branch entered into a Confirmation of Assignment with respect to the Eurohypo Certificates, which provided:

In exchange for good and valuable consideration, at the time that Eurohypo transferred the Securities to Commerzbank, it was Eurohypo's intent to transfer all litigation rights, causes of action and claims arising out of, in connection with, and/or relating to (1) the Securities, whether known or unknown, whether arising



Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the Confirmation of Assignment or its effect, no response is

required.

Disputed. "Eurohypo," which Plaintiffs define to mean "Eurohypo AG New

York Branch," is not a legal entity so it could not and did not purchase or hold any

Certificates. *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462,

470–71 (S.D.N.Y. 2017); *see* Goff Ex. 141 (2007 Eurohypo Annual Report) at 172 – 174

(listing fully consolidated, and non-consolidated entities, which did not include Eurohypo

AG New York Branch). Plaintiffs provide no evidence to the contrary. Likewise,

"London Branch," which Plaintiffs define to mean "Commerzbank AG London Branch,"

is not a legal entity so it could not and did not purchase or hold any Certificates.

*Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462, 470–71

(S.D.N.Y. 2017); *see* Goff Ex. 140 (2007 Commerzbank Annual Report) at 147 – 148

(listing consolidated entities, which did not include Commerzbank AG London Branch);

Goff Ex. 64 at 290:16 – 291:23 (A. Holsten Dep. (Mar. 17, 2017), CB/WF)

██████████████████████████████). Plaintiffs provide no evidence to the

contrary.

Undisputed that Handlin Ex. 674 contains the quoted language.

**Plaintiffs' Reply: DB does not dispute the material facts. Therefore, they should be**

**deemed admitted.** *See* **Local Rule 56.1(c). In response to DB statements about Eurohypo's**

**New York Branch and CB's London Branch, CB incorporates its reply to Paragraph 125.**

127.   London Branch acquired 20 of the Certificates from Barrington II CDO Ltd.
("Barrington 2") between May and August 2012, and some in 2015. Handlin Exs. 137, 145, 149,
157, 165, 210, 217, 221, 223, 258, 262, 274, 284, 288, 292, 296, 300, 319, 323, 331 (Trade
Certificates).

<u>Defendant's Response</u>:  Disputed.  "London Branch," which Plaintiffs define to

mean "Commerzbank AG London Branch," is not a legal entity so it could not and did

not purchase or hold any Certificates.  *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*,

234 F. Supp. 3d 462, 470–71 (S.D.N.Y. 2017); *see* Goff Ex. 140 (2007 Commerzbank

Annual Report) at 147 – 148 (listing consolidated entities, which did not include

Commerzbank AG London Branch); Goff Ex. 64 at 290:16 – 291:23 (A. Holsten Dep.

(Mar. 17, 2017), CB/WF) ████████████████████

███████████. Plaintiffs provide no evidence to the contrary.

**Plaintiffs' Reply: DB does not dispute that CB acquired 20 Certificates from**

**Barrington 2 between May and August 2012, and some in 2015. Further, DB has admitted**

**that "Commerzbank acquired 20 Certificates…from the Barrington II CDO Ltd…asset**

**portfolio."** *See* **DBSUF ¶ 40.1.  Therefore, this material fact should be deemed admitted.**

*See* **Local Rule 56.1(c). In response to DB statements about CB's London Branch, CB**

**incorporates its reply to Paragraph 125.**

128.   Barrington II was a Cayman Islands limited company. Handlin Ex. 669 at
CB_DB02954492.

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the legal status of Barrington II, no response is required.

Undisputed that Barrington 2 was "an exempted company incorporated under the laws of the Cayman Islands."  Handlin Ex. 669 at CB_DB02954491.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade this material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document speaks for itself. It should be deemed admitted. *See* Local Rule 56.1(c).**

129.    On December 24, 2013, London Branch entered into an Assignment Agreement with various parties, including Barrington 2 and the Bank of New York Mellon Trust Co., N.A., which provided:

> With respect to all assets of the Issuer and the Co-Issuer acquired since their respective formations (including, without limitation, any Collateral now owned or previously owned by the Issuer or Co- Issuer under the Indenture, the "Assets"), the Issuer and the Co- Issuer, effective as of the date hereof, hereby transfer and assign to CB, and the Trustee releases its lien against, any and all litigation rights, causes of action and claims arising out of, in connection with, and/or relating to (1) the Assets, whether known or unknown, whether arising before, on or after the date of this Agreement, including, without limitation, all claims related to and/or arising out of the initial purchase of the Assets, any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims and (2) to the extent not included in the foregoing, any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims arising under other contracts to which the Issuer and/or the Co-Issuer is a party (clauses (1) and (2), collectively, the "Transferred Rights") and all rights and powers necessary to invoke and enforce the Transferred Rights, including, without limitation, the right and authority to commence, prosecute and resolve any legal actions.

Handlin Ex. 673 at CB_DB02745506.

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the Assignment Agreement or its legal effect, no response is required.

Disputed.  "London Branch," which Plaintiffs define to mean "Commerzbank AG London Branch," is not a legal entity so it could not and did not enter into any agreement. *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462, 470–71 (S.D.N.Y. 2017); *see* Goff Ex. 140 (2007 Commerzbank Annual Report) at 147 – 148 (listing consolidated entities, which did not include Commerzbank AG London Branch); Goff Ex. 64 at 290:16 – 291:23 (A. Holsten Dep. (Mar. 17, 2017), CB/WF) ("████████ ████████████████████████████).  Plaintiffs provide no evidence to the contrary.

Undisputed that Handlin Ex. 673 contains the quoted language, except that Plaintiffs replaced the word "Commerzbank" with the abbreviation "CB" above.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted. *See* Local Rule 56.1(c). In response to DB statements about CB's London Branch, CB incorporates its reply to Paragraph 125.**

130.    CB was also assigned legal claims in connection with two Certificates that Barrington sold to third parties. Handlin Ex.673 at CB_DB02745516; Handlin Exs. 126-27; 184–85 (purchase and transfer Certificates for FFML 2005-FF2 M2 and GSAMP 2005-HE4 M2).

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding the purported assignment of "legal claims," no response is required.

Disputed. ████████████████████████████████████ ██████████████████████████████████████ According to Commerzbank's own interrogatory responses:

(1) ████████████████████████████████████ ████████████████████████████████████

(Pltf's Supp. 1st Interr. R&O));

198



(2) ████████████████████████████████████████████

████████████ (*see* Biron CB Ex. 22 at 5-10 and Exhibit A thereto, Line 7 (Pltf's Supp. 1st Interr. R&O)); and

(3) ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ Plaintiffs have not, and cannot, establish that Barrington 2 retained any legal claims as to those Certificates when Barrington 2 sold them. *See, e.g.*, New York General Obligations Law § 13-107(1) ("Unless expressly reserved in writing, a transfer of any bond shall vest in the transferee all claims or demands of the transferrer, whether or not such claims or demands are known to exist, . . . (b) for damages against the trustee or depositary under any indenture under which such bond was issued or outstanding . . . .").

Moreover, even if Barrington 2 *had* retained legal claims relating to the two Certificates, any assignment of those legal claims to Commerzbank would have been void because it was champertous under New York Judiciary Law § 489. *See Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160, 170-71 (2016).

**Plaintiffs' Reply: DB has not disputed that the Assignment Agreement entered into between Barrington 2 and CB transfers Barrington 2's legal claims in connection with the FFML 2005-FF2 M2, and GSAMP 2005-HE4 M2 Certificates. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c).** ████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████   **Further, DB's assertion that "[m]oreover, even if Barrington 2 had retained legal claims relating to the two Certificates, any assignment of those legal claims to Commerzbank would have been void because it was champertous under New York Judiciary Law § 489" are legal conclusions inappropriate for a Rule 56.1 statement and therefore no response is required. They are nonetheless incorrect. As explained in Plaintiffs' briefing, CB received all preexisting legal claims held by Barrington II for certificates CB purchased as well as for the certificates Barrington sold to third parties. _See_ Pltfs.Opp. 6-7.**

131.   CB, acting through its London Branch, subsequently sold certain of the Certificates. Handlin Exs. 122, 124, 128, 130, 134, 142, 152, 154, 158, 186, 188, 192, 201, 207, 214, 243, 259, 268, 271, 277, 281, 316, 333, 341, 343, 354, 357.

Defendant's Response:  Disputed.  Commerzbank's "London Branch," which Plaintiffs define to mean "Commerzbank AG London Branch," is not a legal entity, so Commerzbank could not have "act[ed] through" it when it sold any Certificates. *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462, 470–71 (S.D.N.Y. 2017); *see* Goff Ex. 140 (2007 Commerzbank Annual Report) at 147 – 148 (listing consolidated entities, which did not include Commerzbank AG London Branch); Goff Ex. 64 at 290:16 – 291:23 (A. Holsten Dep. (Mar. 17, 2017), CB/WF) ███████████ ████████████████████████████.  Plaintiffs provide no evidence to the contrary.

Undisputed that Commerzbank sold the Certificates listed on Biron CB Ex. 27 (Chart: Sold Certificates) prior to commencing this lawsuit.

200

**Plaintiffs' Reply:** DB does not dispute this material fact. It should be deemed admitted. *See* **Local Rule 56.1(c). In response to DB statements about CB's London Branch, CB incorporates its reply to Paragraph 125. Further, to the extent that DB disputes that the sales took place in London, the undisputed evidence is that the sales took place in London. CB's ownership of its sold Certificates was managed by employees at CB's London Branch located in London. R. Boelstler Decl. ¶ 3. The sold Certificates were held in a trading book overseen in London.** *Id*. **at ¶ 4. London employees solicited all bids.** *Id*. **London employees executed the sales, and ensured proper settlement.** *Id*. **London employees accounted for the sales on the books and records of CB London Branch, also in London.** *Id*. **The buyers of sold Certificates were either located in London or had London offices that were involved in and essential to the sales.** *Id*. **at ¶ 5. The business records of CB concerning the sale of sold Certificates are located at CB London Branch.** *Id*. **at ¶ 7.** *See also*, **Pltfs.Mem. at 12;** *CB/DB* **Pl.CSUF ¶44; Handlin Ex. 668 (CB 30(b)(6)) at 141:13-141:22; 147:22-148:5; 210:23-211:2. Therefore, this fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

132.    CB's acquisitions, sales, and other activities related to its Certificates were conducted at and through London Branch.

Defendant's Response: Disputed. "London Branch," which Plaintiffs define to mean "Commerzbank AG London Branch," is not a legal entity, so "CB's acquisitions, sales, and other activities related to its certificates" could not have been, and were not, conducted "through" it. *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462, 470–71 (S.D.N.Y. 2017); *see* Goff Ex. 140 (2007 Commerzbank Annual Report) at 147 – 148 (listing consolidated entities, which did not include Commerzbank AG London Branch); Goff Ex. 64 at 290:16 – 291:23 (A. Holsten Dep. (Mar. 17, 2017),

CB/WF) ████████████████████████████████████ Moreover,
Plaintiffs cite no evidence in support of the proposition that "CB's acquisitions, sales, and
other activities related to its Certificates were conducted at" or "through" its branch in
London.

In fact, Ian Smith, the Chief Financial Officer of Commerzbank for non-U.S. and
non-German financial reporting, testified that ██████████████████████████████
████████ Goff Ex. 65 at 51:24 – 52:16, 315:23 – 317:5 (I. Smith Dep. (May 10, 2017),
CB/WF).  And further, evidence in the record clearly shows that ████████████████
██████████████████████████████████ Goff Ex. 66 at 34:15 – 35:9
(A. Holsten Dep. (June 8, 2017), CB/HSBC)█████████████████████████████
████████████████████████████████████████████████████
Goff Ex. 64 at 46:25 – 47:22 (A. Holsten Dep. (Mar. 17, 2017), CB/WF); Goff Ex. 67 at
16:16 – 17:9, 39:13 – 40:10, 46:6 – 46:14 (A. Holsten Dep. (Dec. 8, 2017)); Goff Ex. 68
at 169:7 – 170:4 (B. Jetter Dep. (Feb. 2, 2017), CB/WF); Goff Ex. 48 at 85:7 – 86:12 (V.
Radhakishun Dep. (May 18, 2017), CB/WF) (testifying that █████████████████
████████████████████████████████████████████████████
████

Moreover, even Vijay Radhakishun and Andreas Holsten—who were responsible
for Commerzbank's RMBS during the relevant period—█████████████████████
████████ Goff Ex. 41 at 202:22 – 203:14 (V. Radhakishun Dep. (Jan. 19, 2018)); Goff
Ex. 64 at 280:24 – 281:6 (A. Holsten Dep. (Mar. 17, 2017), CB/WF)█████████████
████████████████████████████████████████████
████████████████████████████████████████████████

██████ *see also* Goff Ex. 69 at 117:8 – 118:13 (I. Smith Dep. (Jan. 18, 2018)) (testifying

that ██████████████████████████████████████████

**Plaintiffs' Reply: DB's purported evidence does not controvert the fact that "CB's**

**acquisitions, sales, and other activities related to its Certificates were conducted at and**

**through London Branch." CB has presented ample evidence demonstrating that activities**

**relating to the Certificates were conducted at and through London Branch. CB's**

**ownership of its sold Certificates was managed by employees at CB's London Branch**

**located in London. R. Boelstler Decl. ¶ 3. The sold Certificates were held in a trading book**

**overseen in London.** *Id***. at ¶ 4. London employees solicited all bids.** *Id***. London employees**

**executed the sales, and ensured proper settlement.** *Id***. London employees accounted for the**

**sales on the books and records of CB London Branch, also in London.** *Id***. The buyers of**

**sold Certificates were either located in London or had London offices that were involved in**

**and essential to the sales.** *Id***. at ¶ 5. The business records of CB concerning the sale of sold**

**Certificates are located at CB London Branch.** *Id***. at ¶ 7.** *See also***, Pltfs.Mem. at 12;**

***CB/DB* Pl.CSUF ¶44; Handlin Ex. 668 (CB 30(b)(6)) at 141:13-141:22; 147:22-148:5;**

**210:23-211:2.  Therefore, this fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

**In addition, the testimony cited by DB has nothing to do with whether "CB's**

**acquisitions, sales, and other activities related to its Certificates were conducted at and**

**through London Branch."**

**DB's reliance on Andreas Holsten's testimony does not contradict that the sales took**

**place in London. Holsten is not a trader. Goff Ex. 66 at 34:20 (A. Holsten Dep. (June 8,**

**2017), CB/HSBC)** ██████████████████ **Holsten stated that** ████████████████

████████████████████████████████████████████

████████████████████████████████████████████ *Id.* at 34:10-14. ████████

███████████████████████████████████ *See* Kane Ex. 461 at 25:15-26:19 (A. Holsten

Dep. (Dec. 8, 2017), CB/DB). **Therefore, any testimony from Holsten regarding RMBS**

**predates the sales.**

Ian Smith's testimony is taken completely out of context and does not contradict

that the sales took place in London. Smith was not a trader, but rather is in finance. Kane

Ex. 455 at 51:24-52:16 (I. Smith Dep. (May 10, 2017), CB/WF. The cited deposition

testimony has nothing to do with the sales, but rather ███████████████████████

████████████████████████████████████. Additionally, Smith's

deposition testimony ██████████████████████████████████████████████████

██████████████████████████████████

Similarly, DB's reliance on Brett Jetter's testimony does not contradict that the

sales took place in London. Jetter was not a trader, but rather was in risk management.

Kane Ex. 454 at 28:10-30:21 (B. Jetter Dep. (Apr. 20, 2017), CB/HSBC. His testimony

concerns ████████████████████████████████████████████████████

████████████████████. Goff Ex. 68 at 169:7 – 170:4 (B. Jetter Dep. (Feb. 2, 2017),

CB/WF).

Lastly, Vijay Radhakishun's testimony also does not contradict that the sales took

place in London. His testimony that he reported to a supervisor in Germany is irrelevant to

where the sales took place. Goff Ex. 48 at 85:7 – 86:12 (V. Radhakishun Dep. (May 18,

2017), CB/WF).

133. Robert Boelstler, CB's Rule 30(b)(6) witness, testified as follows:

Q. And where did the auction take place?
A. In London.

> Q. And the assets that were placed for sale, where were the assets located? I know that the assets were not physical assets like this pad of paper, but where were they—on whose books were they located at the time of the sale?
> A. On my books in London.

Handlin Ex. 668 (CB 30(b)(6)) 141:13-141:22.

> Q. And those—and that was booked at Commerzbank in Germany, correct?
> A. Commerzbank in London.
> Q. Okay. And after the assets were sold by Dynamic to Commerzbank, where were the purchased assets booked within Commerzbank?
> A. They were again, booked in Commerzbank London.

*Id.* at 147:22-148:5.

> Q. Is this Commerzbank in London branch or Commerzbank AG in Germany?
> A. The assets and notes were always held in London.

*Id.* at 210:23-211:2.

  <u>Defendant's Response</u>: To the extent this paragraph purports to state any legal conclusion about whether the "London Branch" of Commerzbank constitutes a separate legal entity or financial base, no response is required. In any event, this Court has already decided it does not. *Commerzbank AG v. Deutsche Bank Nat'l Tr. Co.*, 234 F. Supp. 3d 462, 470–71 (S.D.N.Y. 2017); Goff Ex. 140 (2007 Commerzbank Annual Report) at 147 – 148 (listing consolidated entities, which did not include Commerzbank AG London Branch); Goff Ex. 64 at 290:16 – 291:23 (A. Holsten Dep. (Mar. 17, 2017), CB/WF) ██████████████████████████████ Undisputed that Handlin Ex. 639 contains the quoted language.

  **Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade this fact by mischaracterizing it as a legal conclusion is unavailing; the cited document speaks for itself. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

**I.**  **Legal Standard**

  [Intentionally omitted]

II.     **The Undisputed Material Facts Establish that EODs Occurred in 73 Trusts**

134.    Reserved.

135.    Reserved.

136.    Reserved.

A.      **For 18 Trusts, EODs were triggered by exceeding numerical thresholds**

137.    In 18 of the Trusts at issue in these cases, exceedance of one or more objective, numerical thresholds is defined to constitute an EOD triggering Deutsche Bank's fiduciary, "prudent person" duty of care. *See* Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.01(vi); Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.01(vi); Handlin Ex. 5 (ARSI 2006-M3 PSA) § 7.01(vi); Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.01(vi); Handlin Ex. 7 (ARSI 2006-W3 PSA) § 7.01(vi); Handlin Ex. 9 (FHLT 2005-1 PSA) § 7.01(a)(v); Handlin Ex. 10 (FHLT 2005-2 PSA) § 7.01(a)(v); Handlin Ex. 90 (GSAMP 2005-WMC1 PSA) § 7.01(g); Handlin Ex. 91 (GSAMP 2005-WMC2 PSA) § 7.01(g); Handlin Ex. 92 (GSAMP 2005-WMC3 PSA) § 7.01(g); Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.01(a)(v)-(vii); Handlin Ex. 36 (NHEL 2006-6 PSA) § 7.01(a)(v)-(vii); Handlin Ex. 116 (NHEL 2007-2 PSA) § 7.01(a)(v)-(vii); Handlin Ex. 40 (SVHE 2005-3 PSA) § 7.01(a)(v); Handlin Ex. 117 (SVHE 2005-OPT3 PSA) § 7.01(a)(v); Handlin Ex. 118 (SVHE 2005-OPT4 PSA) § 7.01(a)(v); Handlin Ex. 41 (SVHE 2006-1 PSA) § 7.01(a)(v); and Handlin Ex. 119 (SVHE 2006-OPT5 PSA) § 7.01(a)(v). *See also* Handlin Ex. 692.

<u>Defendant's Response</u>: To the extent this paragraph purports to state a legal conclusion regarding the duties and obligations of Defendant under the GAs, no response is required.

Disputed. Plaintiffs' summary does not accurately describe the terms of each GA. Each Trust's GAs provide in substance that if an EOD is continuing *and* Defendant has the contractually-specified knowledge thereof (*e.g.*, "actual knowledge" or "written notice"), Defendant "shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstance in the conduct of such person's own affairs." *See* Handlin Ex. 23 (MSAC 2006-HE6 PSA) §§ 8.01, 8.02; Biron PL Ex. 45 & Biron CB Ex. 45 (Charts: If an EOD is Continuing and Defendant has the Contractually Specified Knowledge Thereof, Defendant Has a Duty to Act as a Prudent Person Under the Circumstances).

To the extent Plaintiffs' purported characterization of the GAs in this paragraph refers to a "fiduciary" standard, that characterization is not supported by the material cited by Plaintiffs.

Nowhere do the cited GAs purport to require Defendant to satisfy a so-called "fiduciary" duty of care.

Further, Plaintiffs' Handlin Ex. 692 contains the errors and inaccuracies identified in Goff Ex. 14. For example, the cited GSAMP 2005-WMC3 PSA in line 10 does not contain the quoted percentages in the definition of "Cumulative Loss Event." Rather, the "Loss Percentage" for the "Distribution Date Occurring In . . . January 2010 through December 2010" should be

"5.80%," and the "Loss Percentage" for the "Distribution Date Occurring In . . . January 2012 and thereafter" should be "7.90%."

Plaintiffs' Reply: DB's statements do not specifically controvert the fact that "[i]n 18 of the Trusts at issue in these cases, exceedance of one or more objective, numerical thresholds is defined to constitute an EOD triggering Deutsche Bank's fiduciary, 'prudent person' duty of care." DB's issue with Plaintiffs' characterization of the document is immaterial as the document speaks for itself. While Plaintiffs agree that "the 'Loss Percentage' for the 'Distribution Date Occurring In . . . January 2010 through December 2010' should be '5.80%,' [instead of 5.85%] and the 'Loss Percentage' for the 'Distribution Date Occurring In . . . January 2012 and thereafter' should be '7.90%' [instead of 8.00%]," such discrepancies do not controvert the material fact. Therefore, it is deemed admitted by operation of law. *See* Local Rule 56.1(c). DB's attempt to evade the fact by mischaracterizing it as a legal conclusion is unavailing. Pltfs.Mem. 15-17.

Further, DB's statement that "[e]ach Trust's GAs provide in substance that if an EOD is continuing and Defendant has the contractually-specified knowledge thereof (e.g., 'actual knowledge' or 'written notice'), Defendant 'shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstance in the conduct of such person's own affairs" is a legal conclusion inappropriate for a Rule 56.1 Statement to which no response is required. But DB is nonetheless incorrect. No Governing Agreement requires written notice before the trustee is required to exercise rights and remedies as a prudent person would after the occurrence of an EOD. *See* PL Response to DBSUF ¶ 10; CB Response to DBSUF ¶ 12.

138.    Reserved.

139.    Reserved.

140.    Reserved.

### a.   ARSI 2006-M1

141.    Section 7.01(a)(vi) of the ARSI 2006-M1 PSA provides that a Master Servicer Event of Default occurs upon "any failure by the Master Servicer of the Master Servicer Termination Test." Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.01(a)(vi).

Defendant's Response:  Undisputed that the cited ARSI 2006-M1 PSA contains

the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted. *See* Local Rule 56.1(c).**

142.    The Master Servicer Termination Test is failed if the Cumulative Loss Percentage exceeds the specified thresholds as set forth below:

| Months (following the Closing Date) | Cumulative Loss (%) |
|---|---|
| 37-48 | 4.75 |
| 49-60 | 6.25 |
| 61-72 | 7.50 |
| 73 and thereafter | 8.00 |

Handlin Ex. 4 (ARSI 2006-M1) § 1.01, definition of "Master Servicer Termination Test".

    Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding when the "Master Servicer Termination Test is failed," no response

is required.

    Undisputed that the cited ARSI 2006-M1 PSA contains the cited chart.

**Plaintiffs' Reply: DB does not dispute the material fact. DB's attempt to evade the**

**material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document**

**speaks for itself. Therefore, this material fact should be deemed admitted. *See* Local Rule**

**56.1(c).**

    143.    Under the ARSI 2006-M1 PSA, a Master Servicer Event of Default would occur in July 2009, 37 months after closing, if the Cumulative Loss Percentage exceeded 4.75%. *See* Handlin Ex. 4 (ARSI 2006-M1 PSA) §§ 1.01, 7.01(a)(vi) (definitions of "Closing Date" and "Master Servicer Termination Test").

    Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding when a "Master Servicer Event of Default would occur," no

response is required.

    Undisputed that the ARSI 2006-M1 PSA provides that a Master Servicer Event of

Default may occur if the contractually-defined Cumulative Loss Percentage exceeded

4.75% in July 2009.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document**

speaks for itself. Therefore, the material fact should be deemed admitted. *See* **Local Rule**

**56.1(c).**

144.     Section 7.03(b) of the ARSI 2006-M1 PSA requires DB to provide notice to
Certificateholders within "60 days after the occurrence of any event, which constitutes or which,
with notice or lapse or time or both, would constitute a Master Servicer Event of Default."
Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b).

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the contractual duties and obligations of Defendant under the GAs,

no response is required.

Undisputed that the cited ARSI 2006-M1 PSA contains the quoted language.

Plaintiffs' quotation is misleading because it omits immediately preceding and

succeeding language (italics indicate Plaintiffs' omission):

Not later than the later of 60 days after the occurrence of any
event, which constitutes or which, with notice or lapse of time or
both, would constitute a Master Servicer Event of Default or *five
days after a Responsible Officer of the Trustee becomes aware of
the occurrence of such an event,* the Trustee shall transmit by mail
to the NIMS Insurer and to all Holders of Certificates notice of
each such occurrence, unless such default or Master Servicer Event
of Default shall have been cured or waived.

Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b).

**Plaintiffs' Reply: DB does not dispute this material fact and DB's assertion that**

**"Plaintiffs' quotation is misleading" is immaterial to Plaintiffs' material fact. DB's attempt**

**to evade the material fact by mischaracterizing it as a legal conclusions is unavailing; the**

**document speaks for itself. Therefore, it fact should be deemed admitted.** *See* **Local Rule**

**56.1(c).**

145.     ███████████████████████████████████

███████████████ Handlin Ex. 693 at DBNTC PHOENIX LIGHT 00000027686.

<u>Defendant's Response</u>: Disputed.  The cited document does not support the contention made because the document does not cite a Cumulative Loss Percentage.  The ARSI 2006-M1 remittance report for the July 27, 2009 distribution date states that the "Realized Loss Percentage" was 13.6970%.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Further, DB's assertion that the document does not cite a Cumulative Loss Percentage is inaccurate.** *See* **Handlin Ex. 693 at DBNTC PHOENIX LIGHT 00000027658** ███████ ████████████████████████████████████████████**;** *id.* **at DBNTC PHOENIX LIGHT 00000027657** ███████████████████████████ ██████████████████████████████████████████████████ ███████████. **Therefore, Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

146. ████████ N████████████████████████████████ Handlin Ex. 693 at DBNTC PHOENIX LIGHT 00000027659.

<u>Defendant's Response</u>:  Undisputed that on July 29, 2009, ████████████ ████████████████████████████████████████████████████ ████████████████████████ Handlin Ex. 693 at DBNTC PHOENIX LIGHT 00000027659. ████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████



*Id.* at DBNTC PHOENIX LIGHT 000000027659 – 60.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

### b.  ARSI 2006-M3

147.    Section 7.01(a)(vi) of the ARSI 2006-M3 PSA provides that a Master Servicer Event of Default occurs upon "any failure by the Master Servicer of the Master Servicer Termination Test." Handlin Ex. 5 (ARSI 2006-M3 PSA) § 7.01(a)(vi).

Defendant's Response:  Undisputed that the cited ARSI 2006-M3 PSA contains

the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

148.    The Master Servicer Termination Test is failed if the Cumulative Loss Percentage exceeds the specified thresholds as set forth below:

| Months (following the Closing Date) | Cumulative Loss (%) |
|---|---|
| 37-48 | 4.75 |
| 49-60 | 6.25 |
| 61-72 | 7.50 |
| 73 and thereafter | 8.00 |

Handlin Ex. 5 (ARSI 2006-M3) § 1.01, definition of "Master Servicer Termination Test".

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding when the "Master Servicer Termination Test is failed," no response is required.

Undisputed that the cited ARSI 2006-M3 PSA contains the cited chart.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document speaks for itself. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c).**

149.    Under the ARSI 2006-M3 PSA, a Master Servicer Event of Default would occur in October 2009, 37 months after closing, if the Cumulative Loss Percentage exceeded 4.75%. *See* Handlin Ex. 5 (ARSI 2006-M3 PSA) §§ 1.01, 7.01(a)(vi) (definitions of "Closing Date" and "Master Servicer Termination Test").

Defendant's Response:  To the extent this paragraph purports to state a legal conclusion regarding when a "Master Servicer Event of Default would occur," no response is required.

Undisputed that the ARSI 2006-M3 PSA provides that a Master Servicer Event of Default may occur if the contractually-defined Cumulative Loss Percentage exceeded 4.75% in October 2009.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document speaks for itself. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c).**

150.    Section 7.03(b) of the ARSI 2006-M3 PSA requires DB to provide notice to Certificateholders within "60 days after the occurrence of any event, which constitutes or which, with notice or lapse or time or both, would constitute a Master Servicer Event of Default." Handlin Ex. 5 (ARSI 2006-M3 PSA) § 7.03(b).

<u>Defendant's Response:</u> To the extent this paragraph purports to state a legal

conclusion regarding the contractual duties and obligations of Defendant under the GAs,

no response is required.

Undisputed that the cited ARSI 2006-M3 PSA contains the quoted language.

Plaintiffs' quotation is misleading because it omits immediately preceding and

succeeding language (italics indicate Plaintiffs' omission):

> *Not later than the later of* 60 days after the occurrence of any
> event, which constitutes or which, with notice or lapse *of* time or
> both, would constitute a Master Servicer Event of Default *or five
> days after a Responsible Officer of the Trustee becomes aware of
> the occurrence of such an event, the Trustee shall transmit by mail
> to the NIMS Insurer and to all Holders of Certificates notice of
> each such occurrence, unless such default or Master Servicer
> Event of Default shall have been cured or waived.*

Handlin Ex. 5 (ARSI 2006-M3 PSA) § 7.03(b).

**Plaintiffs' Reply: DB does not dispute this material fact and DB's assertion that**

**"Plaintiffs' quotation is misleading" is immaterial to Plaintiffs' material fact. DB's attempt**

**to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the**

**cited document speaks for itself. Therefore, this material fact should be deemed admitted.**

***See* Local Rule 56.1(c).**

151.  ████████████████████████  ss ████████
████████████. Handlin Ex. 694 at 67.

<u>Defendant's Response:</u> To the extent this paragraph purports to state a legal

conclusion, no response is required.

Disputed. The cited document does not support the contention made because the

document does not cite a Cumulative Loss Percentage. The ARSI 2006-M3 remittance

report for the October 26, 2009 distribution date states that the "Realized Loss

Percentage" was 17.6131%.

**Plaintiffs' Reply:** DB proffers no evidence to controvert Plaintiffs' material fact. Further, DB's assertion that the document does not cite a Cumulative Loss Percentage is inaccurate. *See* Handlin Ex. 694 at 67 ███████████████████████ ███████████████████████████████. **Additionally,** ██████████ ████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████ *See* Handlin Ex. 856 at DBNTC PHOENIX LIGHT 00000008589. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document speaks for itself. Therefore, the material fact should be deemed admitted. *See* Local Rule 56.1(c).

152. ███████ N ██████████████████████████ N █████ ████ Handlin Ex. 856 at DBNTC PHOENIX LIGHT 00000008589.

<u>Defendant's Response:</u> Undisputed that on November 30, 2009, Defendant ████ ████████████████████████████████████████████ ████████████████████████████████████████ Handlin Ex. 856 at DBNTC PHOENIX LIGHT 00000008589. ███████████ ██████████



*Id.* at DBNTC PHOENIX LIGHT 00000008589 – 90.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

### c.  ARSI 2006-W2

153.    Section 7.01(a)(vi) of the ARSI 2006-W2 PSA provides that a Master Servicer
Event of Default occurs upon "any failure by the Master Servicer of the Master Servicer
Termination Test." Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.01(a)(vi).

Defendant's Response:  Undisputed that the cited ARSI 2006-W2 PSA contains

the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

154.    The Master Servicer Termination Test is failed if the Cumulative Loss Percentage
exceeds the specified thresholds as set forth below:

| Months (following the Closing Date) | Cumulative Loss (%) |
|---|---|
| 37-48 | 4.75 |
| 49-60 | 6.25 |
| 61-72 | 7.50 |
| 73 and thereafter | 8.00 |

Handlin Ex. 6 (ARSI 2006-W2) § 1.01 (definition of "Master Servicer Termination Test").

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding when the "Master Servicer Termination Test is failed," no response

is required.

Undisputed that the cited ARSI 2006-W2 PSA contains the cited chart.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the document speaks for itself. The material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

155.    Under the ARSI 2006-W2 PSA, a Master Servicer Event of Default would occur in March 2009, 37 months after closing, if the Cumulative Loss Percentage exceeded 4.75%. *See* Handlin Ex. 6 (ARSI 2006-W2 PSA) §§ 1.01, 7.01(a)(vi) (definitions of "Closing Date" and "Master Servicer Termination Test").

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding when a "Master Servicer Event of Default would occur," no

response is required.

Undisputed that the ARSI 2006-W2 PSA provides that a Master Servicer Event of

Default may occur if the contractually-defined Cumulative Loss Percentage exceeded

4.75% in March 2009.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document speaks for itself. Therefore, this material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

156.    Section 7.03(b) of the ARSI 2006-W2 PSA requires DB to provide notice to Certificateholders within "60 days after the occurrence of any event, which constitutes or which, with notice or lapse or time or both, would constitute a Master Servicer Event of Default." Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b).

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding the contractual duties and obligations of Defendant under the GAs,

no response is required.

Undisputed that the cited ARSI 2006-W2 PSA contains the quoted language.

Plaintiffs' quotation is misleading because it omits immediately preceding and

succeeding language (italics indicate Plaintiffs' omission):

> *Not later than the later of* 60 days after the occurrence of any
> event, which constitutes or which, with notice or lapse *of* time or
> both, would constitute a Master Servicer Event of Default *or five
> days after a Responsible Officer of the Trustee becomes aware of
> the occurrence of such an event, the Trustee shall transmit by mail
> to the NIMS Insurer and to all Holders of Certificates notice of
> each such occurrence, unless such default or Master Servicer
> Event of Default shall have been cured or waived.*

Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b).

**Plaintiffs' Reply: DB does not dispute this material fact and DB's assertion that**

**"Plaintiffs' quotation is misleading" is immaterial to Plaintiffs' material fact. DB's attempt**

**to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the**

**cited document speaks for itself. Therefore, this material fact should be deemed admitted.**

***See* Local Rule 56.1(c).**

157.   As of March 25, 2009, the Cumulative Loss Percentage for the ARSI 2006-W2
Trust was 9.4092%. Handlin Ex. 695 at 56.

Defendant's Response:  Disputed.  The cited document does not support the

contention made because the document does not cite a Cumulative Loss Percentage.  The

ARSI 2006-W2 remittance report for the March 25, 2009 distribution date states that the

"Realized Loss Percentage" was 9.4092%.

**Plaintiffs' Reply: DB proffers no evidence to controvert the material fact. Further,**

**DB's assertion that the document does not cite a Cumulative Loss Percentage is inaccurate.**

***See* Handlin Ex. 695 at 56 ("Master Servicer Termination Test Failed? (When Cumulative**

**Realized loss % exceeds Threshold %)"). Therefore, Plaintiffs' material fact should be**

**deemed admitted. *See* Local Rule 56.1(c).**

217

158. ██████████ s N███████████████████████████████
██████ Handlin Ex. 696; Handlin Ex. 697.

_Defendant's Response:_

Undisputed that on March 25, 2009, Defendant ████████████████

████████████████████████████████████████████████████████

███████████████ Handlin Ex. 696 at DBNTC PHOENIX LIGHT 000002251345.

████████████████



_Id._ at DBNTC PHOENIX LIGHT 000002251345 – 46 (emphasis in original).

Undisputed that on March 26, 2009, Defendant sent a ███████████

████████████████████████████████████████████████████

████████████████████ " Handlin Ex. 697 at DBNTC PHOENIX LIGHT

00001853941.



*Id.* at DBNTC PHOENIX LIGHT 00001853941 - 42 (emphasis in original).

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

### d.   ARSI 2006-W3

159.    Section 7.01(a)(vi) of the ARSI 2006-W3 PSA provides that a Master Servicer
Event of Default occurs upon "any failure by the Master Servicer of the Master Servicer
Termination Test." Handlin Ex. 7 (ARSI 2006-W3 PSA) § 7.01(a)(vi).

Defendant's Response: Undisputed that the cited ARSI 2006-W3 PSA contains

the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

160.    The Master Servicer Termination Test is failed if the Cumulative Loss Percentage
exceeds the specified thresholds as set forth below:

| Months (following the Closing Date) | Cumulative Loss (%) |
|---|---|
| 37-48 | 4.75 |
| 49-60 | 6.25 |
| 61-72 | 7.50 |
| 73 and thereafter | 8.00 |

Handlin Ex. 7 (ARSI 2006-W3) § 1.01 (definition of "Master Servicer Termination Test").

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding when the "Master Servicer Termination Test is failed," no response

is required.

Undisputed that the cited ARSI 2006-W3 PSA contains the cited chart.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document**

**speaks for itself. Therefore, this material fact should be deemed admitted.** *See* **Local Rule**

**56.1(c).**

161.    Under the ARSI 2006-W3 PSA, a Master Servicer Event of Default would occur
in April 2009, 37 months after closing, if the Cumulative Loss Percentage exceeded 4.75%. See
Handlin Ex. 7 (ARSI 2006-W3 PSA) §§ 1.01, 7.01(a)(vi) (definitions of "Closing Date" and
"Master Servicer Termination Test").

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding when a "Master Servicer Event of Default would occur," no

response is required.

Undisputed that the ARSI 2006-W3 PSA provides that a Master Servicer Event of

Default may occur if the contractually-defined Cumulative Loss Percentage exceeded

4.75% in April 2009.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document**

**speaks for itself. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c).**

162.    Section 7.03(b) of the ARSI 2006-W3 PSA requires DB to provide notice to
Certificateholders within "60 days after the occurrence of any event, which constitutes or which,
with notice or lapse or time or both, would constitute a Master Servicer Event of Default."
Handlin Ex. 7 (ARSI 2006-W3 PSA) § 7.03(b).

Defendant's Response:  To the extent this paragraph purports to state a legal

conclusion regarding the contractual duties and obligations of Defendant under the GAs,

no response is required.

Undisputed that the cited ARSI 2006-W3 PSA contains the quoted language.

Plaintiffs' quotation is misleading because it omits immediately preceding and

succeeding language (italics indicate Plaintiffs' omission):

> *Not later than the later of* 60 days after the occurrence of any
> event, which constitutes or which, with notice or lapse *of* time or
> both, would constitute a Master Servicer Event of Default *or five*
> *days after a Responsible Officer of the Trustee becomes aware of*
> *the occurrence of such an event, the Trustee shall transmit by mail*
> *to the NIMS Insurer and to all Holders of Certificates notice of*
> *each such occurrence, unless such default or Master Servicer*
> *Event of Default shall have been cured or waived.*

Handlin Ex. 7 (ARSI 2006-W3 PSA) § 7.03(b).

**Plaintiffs' Reply: DB does not dispute this material fact and DB's assertion that**

**"Plaintiffs' quotation is misleading" is immaterial to Plaintiffs' material fact. DB's attempt**

**to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the**

cited document speaks for itself. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c).

163. ███████████████████████████

███████████ Handlin Ex. 698 at 59.

> Defendant's Response: Disputed.  The cited document does not support the contention made because the document does not cite a Cumulative Loss Percentage.  The ARSI 2006-W3 remittance report for the April 27, 2009 distribution date states that the "Realized Loss Percentage" was 13.0053%.

**Plaintiffs' Reply: DB proffers no evidence to controvert Plaintiffs' material fact. Further, DB's assertion that the document does not cite a Cumulative Loss Percentage is inaccurate. *See* Handlin Ex. 698 at 59 ("Master Servicer Termination Test Failed? (When Cumulative Realized loss % exceeds Threshold %) Yes"). Additionally, DB sent Notice of Event of Default for ARSI 2006-W3 on April 28, 2009 because "[a]s of the April 27, 2009 Distribution Date, the Cumulative Loss Percentage equal[ed] 13.0053%, which exceed[ed] the 4.75% threshold." *See* Handlin Ex. 699 at DBNTC PHOENIX LIGHT 00001902798. Therefore, Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c).**

164. ██████████ N████████████████

██████████ Handlin Ex. 699.

> Defendant's Response:  Undisputed that ███████████████████



████████████████████████████████

████████████████████████████████

███████ Handlin Ex. 699 at DBNTC PHOENIX LIGHT 00001902798. ███████

█████████████

██████████████████████████████████



*Id.* at DBNTC PHOENIX LIGHT 00001902798 - 99 (emphasis in original).

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

### e.   GSAMP 2005-WMC1

165.    Under PSA § 7.01(g), an "Event of Default" occurs "if a Cumulative Loss Event occurs." Handlin Ex. 90 (GWSAMP 2005-WMC1 PSA) § 7.01(g).

Defendant's Response: Undisputed that the cited GSAMP 2005-WMC1 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

166.    A "Cumulative Loss Event" is defined as follows:

With respect to any Distribution Date, a Cumulative Loss Event occurs if the Cumulative Loss Percentage exceeds the applicable percentage set forth below with respect to such Distribution Date:

| Distribution Date Occurring In | Loss Percentage |
|---|---|
| October 2008 through September 2009 | 4.00% of the Cut-off Date Pool Principal Balance |
| October 2009 through September 2010 | 5.75% of the Cut-off Date Pool Principal Balance |
| October 2010 through September 2011 | 7.25% of the Cut-off Date Pool Principal Balance |
| October 2011 and thereafter | 7.75% of the Cut-off Date Pool Principal Balance |

Handlin Ex. 90 (GSAMP 2005-WMC1 PSA) § 1.01 (Definition of Cumulative Loss Event).

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding when "a Cumulative Loss Event occurs," no response is required.

Undisputed that the cited GSAMP 2005-WMC1 PSA contains the cited chart.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document**

**speaks for itself. Therefore, this material fact should be deemed admitted. *See* Local Rule**

**56.1(c).**

167.    Pursuant to § 7.03(b), "[w]ithin 60 days after the occurrence of any Event of
Default, the Trustee shall transmit by mail to all Certificateholders and each Rating Agency
notice of each such Event of Default hereunder known to the Trustee, unless such Event of
Default shall have been cured or waived." Handlin Ex. 90 (GSAMP 2005-WMC1 PSA) §
7.03(b).

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the contractual duties and obligations of Defendant under the GAs,

no response is required.

Undisputed that the cited GSAMP 2005-WMC1 PSA contains the quoted

language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document**

**speaks for itself. Therefore, this material fact should be deemed admitted. *See* Local Rule**

**56.1(c).**

168.    As of October 27, 2008, the Cumulative Loss Percentage for the GSAMP 2005-WMC1 Trust was 7.490000%. Handlin Ex. 700 at 26.

Defendant's Response: Disputed.  The cited document does not support the

contention made because the document does not cite to a Cumulative Loss Percentage.

The GSAMP 2005-WMC1 remittance report for the October 27, 2008 distribution date

states that the "Trigger Event Loss %" was 7.490000%.

**Plaintiffs' Reply: DB proffers no evidence to controvert Plaintiffs' material fact.**

**Further, DB's assertion that the document does not cite a Cumulative Loss Percentage is**

**inaccurate.** *See* **Handlin Ex. 700 at 26 ("Event of Default due to Cumulative Loss % Yes").**

**Additionally, DB sent Notice of Event of Default for GSAMP 2005-WMC1 on December 9,**

**2008 because "[a]n Event of Default [was] in effect under Section 7.01(g) of the Agreement,**

**which states that a Cumulative Loss Event is in existence if the Cumulative Loss**

**Percentage exceeds the applicable percentage set forth in the Agreement."** *See* **Handlin Ex.**

**701 at DBNTC_COMMERZBANK_00002475652. Therefore, Plaintiffs' material fact**

**should be deemed admitted.** *See* **Local Rule 56.1(c).**

169.    ███████ N████████████████████
███████████         Handlin Ex. 701.

Defendant's Response:  Undisputed that on December 9, 2008, Defendant ████

██████████████████████████████████████████████

██████████████████████████████████████████

Handlin Ex. 701 at DBNTC_COMMERZBANK_00002475652.





*Id.* at DBNTC_COMMERZBANK_00002475652

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

### f.   AMSI 2006-R1

170.    Section 7.01(vi) of the AMSI 2006-R1 PSA provides that a Master Servicer Event of Default occurs upon "any failure by the Master Servicer of the Master Servicer Termination Test." Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.01(vi).

Defendant's Response: Undisputed that the cited AMSI 2006-R1 PSA contains

the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

171.    The Master Servicer Termination Test is failed if the Cumulative Loss Percentage exceeds the specified thresholds as set forth below:

| Months (following the Closing Date) | Cumulative Loss (%) |
|---|---|
| 37-48 | 4.75 |
| 49-60 | 6.25 |
| 61-72 | 7.5 |
| 73 and thereafter | 8.00 |

Handlin Ex. 3 (AMSI 2006-R1) § 1.01 (definition of "Master Servicer Termination Test").

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding when the "Master Servicer Termination Test is failed," no response

is required.

Undisputed that the cited AMSI 2006-R1 PSA contains the cited chart.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document speaks for itself. Therefore, this material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

172.    Section 7.03(b) of the AMSI 2006-R1 PSA requires DB to provide notice to Certificateholders within "60 days after the occurrence of any event, which constitutes or which, with notice or lapse or time or both, would constitute a Master Servicer Event of Default. . . ." Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b).

<u>Defendant's Response:</u>  To the extent this paragraph purports to state a legal conclusion regarding the contractual duties and obligations of Defendant under the GAs, no response is required.

Undisputed that the cited AMSI 2006-R1 PSA contains the quoted language. Plaintiffs' quotation is misleading because it omits immediately preceding and succeeding language (italics indicate Plaintiffs' omission):

> *Not later than the later of* 60 days after the occurrence of any event, which constitutes or which, with notice or lapse *of* time or both, would constitute a Master Servicer Event of Default *or five days after a Responsible Officer of the Trustee becomes aware of the occurrence of such an event, the Trustee shall transmit by mail to the NIMS Insurer and to all Holders of Certificates notice of each such occurrence, unless such default or Master Servicer Event of Default shall have been cured or waived.*

Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b).

**Plaintiffs' Reply: DB does not dispute this material fact and DB's assertion that "Plaintiffs' quotation is misleading" is immaterial to Plaintiffs' material fact. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document speaks for itself. Therefore, this material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

173.   ██████████████████████ ss █████████████████
████████████. Handlin Ex. 702 at 47.

Defendant's Response: Disputed.  The cited document does not support the

contention made because the document does not cite a Cumulative Loss Percentage.  The

AMSI 2006-R1 remittance report for the May 26, 2009 distribution date states that the

"Realized Loss Percentage" was 4.9309%.

**Plaintiffs' Reply: DB proffers no evidence to controvert Plaintiffs' material fact.**

**Further, DB's assertion that the document does not cite a Cumulative Loss Percentage is**

**inaccurate.** *See* **Handlin Ex. 702 at 47 ("Master Servicer Termination Test Failed? (When**

**Cumulative Realized loss % exceeds Threshold %) Yes"). Additionally, DB sent Notice of**

**Event of Default for AMSI 2006-R1 on June 26, 2009 because "[a]s of the May 26, 2009**

**Distribution Date, the Cumulative Loss Percentage equal[ed] 4.9309%, which exceed[ed]**

**the threshold of 4.75%."** *See* **Handlin Ex. 703 at DBNTC PHOENIX LIGHT 00000018910.**

**Therefore, Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

174.   ████████ N ██████████████████████████████
Handlin Ex. 703.

Defendant's Response: Undisputed that on June 26, 2009, Defendant ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████   Handlin Ex. 703 at DBNTC PHOENIX LIGHT 00000018910.





*Id.* at DBNTC PHOENIX LIGHT 00000018910 – 911 (emphasis in original).

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

### g. GSAMP 2005-WMC3

175.     Under PSA § 7.01(g), an "Event of Default" occurs "if a Cumulative Loss Event occurs." Handlin Ex. 92 (GSAMP 2005-WMC3 PSA).

Defendant's Response: Undisputed that the cited GSAMP 2005-WMC3 PSA

contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. Plaintiffs' material fact**

**should be deemed admitted.** *See* **Local Rule 56.1(c).**

176.     A "Cumulative Loss Event" is defined as follows:

With respect to any Distribution Date, a Cumulative Loss Event occurs if the Cumulative Loss Percentage exceeds the applicable percentage set forth below with respect to such Distribution Date:

| Distribution Date Occurring In | Loss Percentage |
|---|---|
| January 2009 through December 2009 | 4.10% of the Cut-off Date Pool Principal Balance |
| January 2010 through December 2010 | 5.80% of the Cut-off Date Pool Principal Balance |
| January 2011 through December 2011 | 7.25% of the Cut-off Date Pool Principal Balance |
| January 2012 and thereafter | 7.90% of the Cut-off Date Pool Principal Balance |

Handlin Ex. 92 (GSAMP 2005-WMC3 PSA) § 1.01 (Definition of "Cumulative Loss Event").

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding when a "Cumulative Loss Event" occurs, no response is required.

Undisputed that the cited GSAMP 2005-WMC3 PSA contains the cited chart.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document**

**speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted. *See* Local**

**Rule 56.1(c).**

177.    Pursuant to § 7.03(b), "[w]ithin 60 days after the occurrence of any Event of
Default, the Trustee shall transmit by mail to all Certificateholders and each Rating Agency
notice of each such Event of Default hereunder known to the Trustee, unless such Event of
Default shall have been cured or waived." Handlin Ex. 92 (GSAMP 2005-WMC3 PSA) §
7.03(b).

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the contractual duties and obligations of Defendant under the GAs,

no response is required.

Undisputed that the cited GSAMP 2005-WMC3 PSA contains the quoted

language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document speaks for itself. Therefore, this material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

178.    As of January 26, 2009, the Cumulative Loss Percentage for the GSAMP 2005-WMC3 Trust was 11.196529%. Handlin Ex. 704 at 31.

> Defendant's Response: Disputed.  The cited document does not support the
>
> contention made because the document does not cite a Cumulative Loss Percentage.  The
>
> GSAMP 2005-WMC3 remittance report for the January 26, 2009 distribution date states
>
> that the "Trigger Event Loss %" was 11.196529%.

**Plaintiffs' Reply: DB proffers no evidence to controvert Plaintiffs' material fact. Further, DB's assertion that the document does not cite a Cumulative Loss Percentage is inaccurate.** *See* **Handlin Ex. 704 at 31 ("Trigger Event Loss % (1)/(2)…(1) Aggregate Cumulative Realized Loss…(2) Cutoff Date Pool Principal Balance"). Additionally, DB sent Notice of Event of Default for GSAMP 2005-WMC3 on March 4, 2009 because "an Event of Default [was] in effect under Section 7.01(g) of the Agreement, which states that an Event of Default is in existence if a Cumulative Loss Event occurs. A Cumulative Loss Event is in effect if the Cumulative Loss Percentage exceeds 4.10% of the Cut-off Date Pool Principal Balance as of the January 26, 2009 Distribution Date"** *See* **Handlin Ex. 705 at DBNTC_COMMERZBANK_00000064152. Therefore, Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

179.    ███████████  N███████████████████████████
███████  Handlin Ex. 705.

> Defendant's Response:  Undisputed that on March 4, 2009, Defendant ████

████████████████████████████████████████████████████████████



Handlin Ex. 705 at DBNTC_COMMERZBANK_00000064152.

*Id.* at DBNTC_COMMERZBANK_00000064152 – 53.

**Plaintiffs' Reply: DB does not dispute this material fact. Plaintiffs' material fact**

**should be deemed admitted. *See* Local Rule 56.1(c).**

180.    As set out in detail below, in 11 of the Trusts, at least 14 separate EODs occurred
that DB declared late and for which its notices of EODs were untimely, often years beyond the
contractually mandated time within which DB was required to give notice to Certificateholders.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the timeliness of notices of EODs, no response is required.

Disputed.  Defendant restates its responses to ¶¶ 181 – 366 and incorporates them by reference.  Further, Plaintiffs do not provide admissible evidence with respect to this contention.

**Plaintiffs' Reply: DB proffers no evidence to controvert Plaintiffs' material fact. Plaintiffs' incorporate by reference their replies to ¶¶ 181-366 and the evidence provided therein. Therefore, Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c). DB's attempt to evade the material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document speaks for itself.**

181.   Reserved.

182.   Reserved.

183.   Reserved.

184.   ███████████████████████████████████████
████████████████████████████████████████████
███████████████████████, Handlin Ex. 849.

Defendant's Response: Disputed.  The evidence cited does not support Plaintiffs' contention. ███████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████

Further, Plaintiffs' contention is based on a false premise.  Defendant does not have the duty to model the triggers unless otherwise stated in the GAs.  *See, e.g.*, Handlin Ex. 35 (NHEL 2006-5 PSA) § 4.03(a) (listing required elements of remittance reports, which do not include whether a Trigger Event is in effect); Handlin Ex. 116 (NHEL 2007-2 PSA) § 4.03(a) (same); Biron PL Ex. 35 & Biron CB Ex. 35 (Charts: Defendant Has Only The Duties Expressly Set Forth In The GAs); Handlin Ex. 707 at 39:25 – 40:21

(T. Perez Dep. (Apr. 20, 2018)).  Accordingly, Defendant only is contractually required to model and report those items explicitly delineated in the GAs.

Undisputed that on November 21, 2005, █████████████████



Handlin Ex. 849 at DBNTC PHOENIX LIGHT 00001711127.

**Plaintiffs' Reply: DB does not proffer evidence to specifically controvert this material fact. DB's issue with Plaintiffs' characterization of the document is immaterial as the document speaks for itself. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

185.    Reserved.

186.    In addition, Tony Perez, a Modeling Manager in Analytics and another DB Rule 30(b)(6) witness, Handlin Ex. 707 (Perez 30(b)(6)) at 6:6-7, who authored the 2005 email proposing ▬▬▬▬▬ testified that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬



*Id.* at 40:7-13.

   Defendant's Response: Undisputed that Handlin Ex. 707 contains the quoted

language.

**Plaintiffs' Reply: DB does not dispute this material fact. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

187.    Further, in its extensive document productions in discovery in these cases, DB did not produce any such monthly file identifying all deals with mandatory threshold percentages sent by Analytics to TAG. Handlin Decl. ¶ 861.

   Defendant's Response:  Undisputed that Defendant did not produce a monthly file

in the form of the attachment to Handlin Ex. 707.  However, at some point during the

relevant period, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

*See, e.g.*, Handlin Ex. 405 at 35:14 – 39:7 (A. McNulty Dep. (Nov. 16, 2017)).

   Undisputed that Defendant complied with its discovery obligations with respect to

document productions.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

188.    Reserved.

189.    Mr. Reyes further testified that ███████████████████████████
█████████████ █ ███████████████████████████████████
Handlin Ex. 378 (Reyes) 98:15-18. █████████████████████████████████
████████████████████████████████████████

> Defendant's Response: Undisputed that Mr. Reyes testified as cited.  However, the deponent cited by Plaintiffs lacks foundation for this testimony because ███████████
>
> ████████████████████████████████████████████████
>
> ████████████████████████████████████████████████
>
> ███████████ *See* Handlin Ex. 378 at 36:6 – 14, 47:15 – 25, 96:24 – 97:4 (R. Reyes Dep. (Jan. 18, 2018)).
>
> Further, Plaintiffs' contention is incorrect with respect to the Trusts for which Defendant is not the calculation agent or paying agent.  In those Trusts, another party is responsible for modeling the information set forth in the GAs.  When it is calculation agent, ██████████████████████████████████████ *See* Handlin Ex. 707 at 39:25 – 40:21 (T. Perez Dep. (Apr. 20, 2018)).

**Plaintiffs' Reply: The supplemental testimony DB provides is consistent with Plaintiffs' material fact and DB does not provide a challenge based on record evidence. Plaintiffs' material fact is deemed admitted by operation of law.** *See* **Local Rule 56.1(c). DB's issue with Plaintiffs' characterization of the document is immaterial as the document speaks for itself. DB has not identified any language that is not quoted accurately.**

190.    Plaintiffs refer the Court to Handlin Ex. 378 (Reyes) at 96:24-98:18.

Defendant's Response:  Defendant refers the court to Handlin Ex. 378 at 36:6 –

14, 47:15 – 25, 96:24 – 97:4 (R. Reyes Dep. (Jan. 18, 2018)) and Handlin Ex. 707 at

39:25 – 40:21 (T. Perez Dep. (Apr. 20, 2018)).

**Plaintiffs' Reply: Reserved.**

191.    Plaintiffs refer the Court to Handlin Ex. 706 (Reyes) at 220:18-221:17.

Defendant's Response:  Reserved.

**Plaintiffs' Reply:  Reserved.**

192.    For the following 11 Trusts, DB provided notice of the EOD resulting from
exceedance of the CL% or RD%, but it was late, as follows:

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the timeliness of Defendant's notice, no response is required.

Disputed as to the lateness of any notice of EOD.  Plaintiffs do not cite any

evidence to support this contention.

Undisputed that Plaintiffs sent notices of EODs resulting from exceedance of the

Cumulative Loss Percentages or Rolling Delinquency Percentages.

Defendant restates its responses to ¶¶ 181 – 366 and incorporate them by

reference.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert this material**

**fact. Plaintiffs' statement incorporates by reference their material facts and replies to ¶¶**

**193-366, *infra*, and the evidence provided therein. Plaintiffs' material fact should be**

**deemed admitted. *See* Local Rule 56.1(c). DB's attempt to evade the material facts by**

**claiming they contain legal conclusions is unavailing; the cited document speaks for itself.**

### a. SVHE 2006-OPT5

193.     Under § 7.01(a)(v) of the SVHE 2006-OPT5 PSA, a "Servicer Event of Termination" occurs if "[a] Delinquency Servicer Termination Trigger has occurred and is continuing[.]" Handlin Ex. 119 (SVHE 2006-OPT5 PSA) § 7.01(a)(v).

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the occurrence of a "Servicer Event of Termination," no response is

required.

Undisputed that the cited SVHE 2006-OPT5 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade this**

**material fact by mischaracterizing it as a legal conclusion is unavailing; the cited document**

**speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted. *See* Local**

**Rule 56.1(c).**

194.     The "Delinquency Servicer Termination Trigger" is defined as follows:

A Delinquency Servicer Termination Trigger will have occurred with respect to the Certificates on a Distribution Date if the Three Month Rolling Delinquency Percentage for the Mortgage Loans exceeds 18.00%.

Handlin Ex. 119 (SVHE 2006-OPT5 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the definition of "Delinquency Servicer Termination Trigger," no

response is required.

Undisputed that the cited SVHE 2006-OPT5 PSA contains the quoted language.

However, Plaintiffs' definition of "Delinquency Servicer Termination Trigger" is

incomplete because it fails to include the definition of other capitalized terms which may

or may not impact the manner in which the Delinquency Servicer Termination Trigger is

calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs' characterization of the quoted language is immaterial as the document speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c). DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself.**

195.    "Three Month Rolling Delinquency Percentage" is defined as follows:

With respect to the Mortgage Loans and any Distribution Date, the average for the three most recent calendar months of the fraction, expressed as a percentage, the numerator of which is (x) the sum (without duplication) of the aggregate of the Stated Principal Balances of all Mortgage Loans that are (i) 60 or more days Delinquent, (ii) in bankruptcy and 60 or more days Delinquent, (iii) in foreclosure and 60 or more days Delinquent, or (iv) REO Properties, and the denominator of which is (y) the sum of the Stated Principal Balances of the Mortgage Loans, in the case of both (x) and (y), as of the Close of Business on the last Business Day of each of the three most recent calendar months.

Handlin Ex. 119 (SVHE 2006-OPT5 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the definition of "Three Month Rolling Delinquency Percentage," no response is required.

Undisputed that the cited SVHE 2006-OPT5 PSA contains the quoted language. However, Plaintiffs' definition of "Three Month Rolling Delinquency Percentage" is incomplete because it fails to include the definition of other capitalized terms which may or may not impact the manner in which the Three Month Rolling Delinquency Percentage is calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs' characterization of the quoted language is immaterial as the document speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c).**

**DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself.**

196.    DB's monthly Distribution Reports for SVHE 2006-OPT5 quantify "delinquency" in two places. The "Delinquency Report" page identifies, as a percentage of the balance of the trust and a percentage of the number of loans in the trust, the total number of loans that are delinquent, in foreclosure, in bankruptcy, and real-estate owned ("REO"), and further shows what percentage of the Trust's balance is delinquent by one payment, two payments, and three or more payments. *See, e.g.,* Handlin Ex. 708 at 11. The "Trigger Events" box for the relevant period lists a single line item, "Delinquency Percentage." *See, e.g.,* Handlin Ex. 708 at 50.

Defendant's Response: Disputed.  Plaintiffs' characterization of the SVHE 2006-OPT5 remittance reports is inaccurate, and the materials Plaintiffs cite do not support this paragraph.

Each remittance report is a unique document, which speaks for itself.  Plaintiffs citation to a single remittance report does not support any generalization about the remittance reports generally.

Indeed, Plaintiffs' statement that the remittance reports "quantify 'delinquency' in two places" is not even consistent with the only remittance report Plaintiffs cite in support of this paragraph because delinquencies are also quantified at least on pages 12 and 13 of Handlin Ex. 708.

Second, Plaintiffs' characterization of the Delinquency Report section of the remittance report as a "page" is not consistent with the SVHE 2006-OPT5 remittance report for the August 27, 2007 distribution date because the Delinquency Report is three pages.  Handlin Ex. 708 at 11 – 13.

Also, Plaintiffs' statement "The 'Trigger Events' box for the relevant period lists a single line item, 'Delinquency Percentage'" is not consistent with the SVHE 2006-OPT5 remittance report for the August 27, 2007 distribution date because the "Trigger Events" box on page 50 of Handlin Ex. 708 lists multiple line items.

**Plaintiffs' Reply:  DB does not proffer evidence to specifically controvert Plaintiffs'**

**material fact. DB's issue with Plaintiffs' characterization of the document is immaterial as**

**the document speaks for itself. Therefore, Plaintiffs' material fact is deemed admitted by**

**operation of law.** *See* **Local Rule 56.1(c).**

197.    In DB's August 27, 2007 Distribution Report for SVHE 2006-OPT5, (a) the Delinquency Report identifies the percentage balance of loans (i) delinquent, (ii) in foreclosure, (iii) in bankruptcy, and (iv) REO for 2 payments as 3.00% and for 3+ payments as 14.04%, totaling 17.04% sixty or more days delinquent, and (b) the Delinquency Percentage is stated to be 17.3222%. Handlin Ex. 708 at 11, 50.

Defendant's Response: Undisputed that Handlin Ex. 708 contains the identified information.

**Plaintiffs' Reply: DB does not dispute this material fact. Plaintiffs' material fact**

**should be deemed admitted.** *See* **Local Rule 56.1(c).**

198.    In DB's September 25, 2007 Distribution Report for SVHE 2006-OPT5, (a) the Delinquency Report identifies the percentage balance of loans (i) delinquent, (ii) in foreclosure, (iii) in bankruptcy, and (iv) REO for 2 payments as 3.23% and for 3+ payments as 15.53%, totaling 18.76% sixty or more days delinquent, and (b) the Delinquency Percentage is stated to be 19.0114%. Handlin Ex. 709 at 11, 49.

Defendant's Response: Undisputed that Handlin Ex. 709 contains the identified information.

**Plaintiffs' Reply: DB does not dispute this material. Plaintiffs' material fact should**

**be deemed admitted.** *See* **Local Rule 56.1(c).**

199.    In DB's October 25, 2007 Distribution Report for SVHE 2006-OPT5, (a) the Delinquency Report identifies the percentage balance of loans (i) delinquent, (ii) in foreclosure, (iii) in bankruptcy, and (iv) REO for 2 payments as 3.89% and for 3+ payments as 17.31%, totaling 21.20% sixty or more days delinquent, and (b) the Delinquency Percentage is stated to be 21.4677%. Handlin Ex. 710 at 11, 54.

Defendant's Response: Undisputed that Handlin Ex. 710 contains the identified information.

241

**Plaintiffs' Reply: DB does not dispute this material fact. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

200.    The average of the total percentage balance sixty days or more delinquent as reported in the Delinquency Reports of DB's August, September, and October 2007 Distribution Reports for SVHE 2006-OPT5 is 19.00%. The average of the Delinquency Percentages reported in the August, September, and October 2007 Distribution Reports for SVHE 2006-OPT5 is 19.2671%.

Defendant's Response: Undisputed that Plaintiffs accurately calculated the

mathematical averages based on the information they provided.

**Plaintiffs' Reply: DB does not dispute this material fact. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

201.    Mr. Reyes testified, in his capacity as a fact witness, that



Handlin Ex. 378 (Reyes) at 101:20-102:14.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding

██████████████████████████████████████████

████████ no response is required.

Disputed.  Plaintiffs' statement that ███████████████████

██████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████

████████████████

Plaintiffs' statement "Thus, because, as of DB's October 25, 2007 Distribution Report, the three-month rolling delinquency percentage was higher than the 18.00% threshold for the defined Servicer Event of Termination, the Servicer Event of Termination was triggered on October 25, 2007" is disputed to the extent it lacks evidentiary support.  Plaintiffs' assertion is not supported by the cited material because Plaintiffs have not established that the methodology utilized by Plaintiffs is the same methodology required by the GAs.  *See* Handlin Ex. 119 (SVHE 2006-OPT5 PSA) § 1.01 (definition of "Three Month Rolling Delinquency Percentage": "With respect to the Mortgage Loans and any Distribution Date, the average for the three most recent calendar months of the fraction, expressed as a percentage, the numerator of which is (x) the sum (without duplication) of the aggregate of the Stated Principal Balances of all Mortgage Loans that are (i) 60 or more days Delinquent, (ii) in bankruptcy and 60 or more days Delinquent, (iii) in foreclosure and 60 or more days Delinquent or (iv) REO Properties, and the denominator of which is (y) the sum of the Stated Principal Balances of the Mortgage Loans, in the case of both (x) and (y), as of the Close of Business on the last Business Day of each of the three most recent calendar months.").

Undisputed that Handlin Ex. 378 contains the quoted language.  However, the

witness only testified ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████

**Plaintiffs' Reply: DB does not dispute the material fact. Therefore, this material fact**

**should be deemed admitted. *See* Local Rule 56.1(c). DB's issue with Plaintiffs'**

**characterization of the document and Plaintiffs' assertion that "[t]hus, because, as of DB's**

**October 25, 2007 Distribution Report, the three-month rolling delinquency percentage was**

**higher than the 18.00% threshold for the defined Servicer Event of Termination, the**

**Servicer Event of Termination was triggered on October 25, 2007" is immaterial as the**

**document speaks for itself. DB's attempt to evade the material facts by claiming they**

**contain legal conclusions is unavailing; the cited document speaks for itself.**

202.   Under PSA § 7.04(b), "Notification to Certificateholders":

No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicer Event of Termination for five Business Days after a Responsible Officer of the Trustee becomes aware of the occurrence of such an event, the Trustee shall transmit by mail to all Certificateholders and to the NIMS Insurer notice of such occurrence unless such default or Servicer Event of Termination shall have been waived or cured.

Handlin Ex. 119 (SVHE 2006-OPT5 PSA) § 7.04(b).

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the contractual rights and duties of Defendant under the GA, no

response is required.

Undisputed that the cited SVHE 2006-OPT5 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by claiming it contains a legal conclusion is unavailing; the cited document**

speaks for itself. **Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c).**

203.    Plaintiffs refer the Court to Handlin Ex. 378 (Reyes) at 80:8-82:3.

Defendant's Response:  Reserved.

**Plaintiffs' Reply:  Reserved.**

204.    The "occurrence of [the] event which constitutes . . . a Servicer Event of Termination" is, as shown above, the exceedance of the Three Month Rolling Delinquency Percentage on October 25, 2007.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the exceedance of the Three Month Rolling Delinquency

Percentage as defined by the GA or the occurrence of an event that constitutes a

"Servicer Event of Termination" as defined by the GA, no response is required.

Disputed.  Plaintiffs' contention lacks evidentiary support.  Further, it is vague

and ambiguous as to the phrase "as shown above."  Defendant restates its responses to the

paragraphs to which Plaintiffs refer with the phrase "as shown above," and incorporates

them by reference.  Defendant is unable to respond further to this contention due to the

ambiguity and the absence of evidence or clarification.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement**

**incorporates by reference their material facts and replies to ¶¶ 193-203, *supra*, and the**

**evidence provided therein. DB's attempt to evade the material fact by claiming it contains a**

**legal conclusion is unavailing; the cited document speaks for itself.**

205.    Thus, DB was required to send notice of this Servicer Event of Termination to Certificateholders no later than 60 days after the October 25, 2007 occurrence of the event that constituted the Servicer Event of Termination, *i.e.*, no later than December 24, 2007.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual duties and obligations of Defendant under the GA, no response is required.

Disputed.

Plaintiffs' purported characterization of the SVHE 2006-OPT5 PSA as requiring Defendant "to send notice of [a] Servicer Event of Termination to Certificateholders no later than 60 days after the . . . occurrence of the event that constituted the Servicer Event of Termination" is contrary to the terms of that agreement.  The SVHE 2006-OPT5 PSA provides:

> No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicer Event of Termination *for five Business Days after a Responsible Officer of the Trustee becomes aware of the occurrence of such an event*, the Trustee shall transmit by mail to all Certificateholders and to the NIMS Insurer notice of such occurrence unless such default or Servicer Event of Termination shall have been waived or cured.

Handlin Ex. 119 (SVHE 2006-OPT5 PSA) § 7.04(b) (emphasis added).  Plaintiffs' purported characterization ignores the italicized language above.  Before any 60-day period contemplated in the provision quoted above may begin to run, the event at issue must occur for five business days after a Responsible Officer (as defined in the GA) of Defendant becomes aware of the occurrence of the event.

Disputed to the extent this paragraph lacks evidentiary support.

Disputed that Plaintiffs accurately calculated the date of the occurrence of the event because they did not account for any "applicable grace period," Handlin Ex. 119 (SVHE 2006-OPT5 PSA) § 7.01(b), or whether the event had been cured, thus obviating the notice requirement, Handlin Ex. 119 (SVHE 2006-OPT5 PSA) § 7.04(b).

      **Plaintiffs' Reply:** DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted. *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies the preceding ¶¶ 193-203 and the evidence provided therein.**

      **In Handlin Ex. 119 (SVHE 2006-OPT5 PSA) § 7.04(b), the notice provision that contains "for" should be interpreted to be read as "or" because of a typographical error. This provision is a "boilerplate" provision and the court should interpret it to be consistent with all of the other similar notice provisions, and in particular, all other notice provisions that make reference to five business days. Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b); Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b); Handlin Ex. 5 (ARSI 2006-M3 PSA) § 7.03(b); Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b); Handlin Ex. 7 (ARSI 2006-W3 PSA) § 7.03(b); Handlin Ex. 79 (FFML 2005-FFH3 PSA) § 7.04(b). Furthermore, DB should not be absolved from its obligations because of a typographical error. Therefore, the court should interpret this provision to require the trustee to provide notice within sixty days from the occurrence of an Event of Default *or* within five business days from when a responsible officer becomes aware of events that rise to an Event of Default. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A*., 691 F.2d 1039, 1048 (2d Cir. 1982); *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1539 (S.D.N.Y. 1983); *Beyene v. Irving Tr. Co.*, 762 F.2d 4, 6 (2d Cir. 1985); *E & H Partners v. Broadway Nat'l Bank*, 39 F. Supp. 2d 275, 280 (S.D.N.Y. 1998). *See* Pltfs.Reply 7-8.**

      **Further, while Plaintiffs do not concede that the PSA provided for "an applicable grace period," such period would only extend the date by which DB was required to send notice to December 30, 2007 and would not make DB's notice of this Servicer Termination**

timely. *See infra* ¶ 285. Finally, DB's attempt to evade the material facts by claiming they contain legal conclusions is unavailing; the cited document speaks for itself.

206. ██████████████████████████████████

████████████████████ Handlin Ex. 711 at DBNTC_COMMERZBANK_00000032794-95.

<u>Defendant's Response:</u>  Undisputed that █████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ Handlin Ex. 711 at

DBNTC_COMMERZBANK_00000032794.



*Id*. at DBNTC_COMMERZBANK_00000032794 – 95.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**
**admitted.** *See* **Local Rule 56.1(c).**

207.   Because the notice was due no later than December 24, 2007, ███████

██████████████████████████████████████████

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding ███████████████████████████████████

███████████████████

Disputed.  Plaintiffs fail to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to controvert the material fact. It should**
**be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference**
**their material facts and replies to preceding ¶¶ 202-206 and the evidence provided therein.**
**DB's attempt to evade the material fact by claiming it contains a legal conclusion is**
**unavailing; the cited document speaks for itself.**

208.   ████████████████████████████████████████

███████████s█████████ Handlin Ex. 711 at
DBNTC_COMMERZBANK_00000032794-95.

Defendant's Response: Undisputed.

**Plaintiffs' Reply: DB does not dispute this material fact. Plaintiffs' material fact**
**should be deemed admitted.** *See* **Local Rule 56.1(c).**

### b.  SVHE 2006-1

209.   Under § 7.01(a)(v) of the SVHE 2006-1 PSA, "Any failure by the Servicer of the
Servicer Termination Test" is a "Servicer Event of Termination." Handlin Ex. 41 (SVHE 2006-1
PSA) § 7.01(a)(v).

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the occurrence of a "Servicer Event of Termination," no response is

required

Undisputed that the cited SVHE 2006-1 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c). DB's attempt to evade the material fact by claiming it**

**contains a legal conclusion is unavailing; the cited document speaks for itself.**

210.    The "Servicer Termination Test" is defined as follows:

With respect to any Distribution Date, the Servicer Termination Test will be failed if the Cumulative Loss Percentage exceeds the applicable percentages set forth below with respect to such Distribution Date:

| Distribution Date Occurring In | Loss Percentage |
|---|---|
| February 2008 through January 2009 | 3.05% for the first month, plus an additional 1/12th of 2.50% for each month thereafter |
| February 2009 through January 2010 | 5.55% for the first month, plus an additional 1/12th of 1.95% for each month thereafter |
| February 2010 through January 2011 | 7.50% for the first month, plus an additional 1/12th of 1.25% for each month thereafter |
| February 2011 through January 2012 | 8.75% for the first month, plus an additional 1/12th of 0.50% for each month thereafter |
| February 2012 and thereafter | 9.25% |

Handlin Ex. 41 (SVHE 2006-1 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the definition of "Servicer Termination Test," no response is

required.

Undisputed that the cited SVHE 2006-1 PSA contains the quoted language.

However, Plaintiffs' definition of "Servicer Termination Test" is incomplete because it

fails to include the definition of other capitalized terms which may or may not impact the

manner in which the Servicer Termination Test is calculated or determined.

250

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs' quoted language is immaterial as the document speaks for itself. Further, DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

211.    Under this definition, the Servicer Termination Test would be failed in April 2008 if the Cumulative Loss Percentage was 3.4667%, and would be failed in May 2008 if the Cumulative Loss Percentage was 3.675%.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the interpretation of the definition of "Servicer Termination Test," no response is required.

Disputed.  Plaintiffs fail to cite admissible evidence for this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 209-210 and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself.**

212.    "Cumulative Loss Percentage" is defined as follows: "With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the aggregate amount of Realized Losses incurred from the Cut-off Date to the last day of the preceding calendar month and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date." Handlin Ex. 41 (SVHE 2006-1 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the definition of "Cumulative Loss Percentage," no response is required.

Undisputed that the cited SVHE 2006-1 PSA contains the quoted language. Plaintiffs' quotation is misleading because it omits that the definition applies only under

251

the SVHE 2006-1 PSA.  Further, Plaintiffs' definition of "Cumulative Loss Percentage"

is incomplete because it fails to include the definition of other capitalized terms which

may or may not impact the manner in which the Cumulative Loss Percentage is

calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs'**

**characterization of the quoted language is immaterial as the document speaks for itself.**

**DB's attempt to evade the material facts by claiming it contains a legal conclusion is**

**unavailing. Therefore, Plaintiffs' material fact should be deemed admitted. *See* Local Rule**

**56.1(c).**

213.    "Realized Loss Percentage" is defined (within the PSA's definition of "Trigger
Event") as "the aggregate amount of Realized Losses incurred since the Cut-off Date through the
last day of the related Due Period (reduced by the aggregate amount of Subsequent Recoveries
received since the Cut-off Date through the last day of the related Due Period) divided by the
aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date." Handlin Ex.
41 (SVHE 2006-1 PSA) § 1.01. Thus, with respect to SVHE 2006-1, "Cumulative Loss
Percentage" and "Realized Loss Percentage" mean the same thing.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the definition of "Realized Loss Percentage," no response is

required.

Disputed.  Plaintiffs fail to cite admissible evidence with respect to the contention

that "with respect to SVHE 2006-1, 'Cumulative Loss Percentage' and 'Realized Loss

Percentage' mean the same thing."

Undisputed that the cited SVHE 2006-1 PSA contains the quoted language.

However, Plaintiffs' definition of "Realized Loss Percentage" is incomplete because it

fails to include the definition of other capitalized terms which may or may not impact the

manner in which the Realized Loss Percentage is calculated or determined.

**Plaintiffs' Reply: DB does not dispute the material facts. DB's issue with Plaintiffs' characterization of the quoted language is immaterial. DB's attempt to evade the material facts by claiming they contain legal conclusions is unavailing; the cited document speaks for itself. Therefore, Plaintiffs' material facts should be deemed admitted.** *See* **Local Rule 56.1(c).**

214.    Although the Distribution Reports for SVHE 2006-1 do not use the term "Cumulative Loss Percentage," in the reporting of "Trigger Events," the Distribution Reports do report the equivalent "Realized Loss Percentage." *See, e.g.*, Handlin Ex. 712.

<u>Defendant's Response:</u> To the extent this paragraph purports to state a legal conclusion regarding whether the Cumulative Loss Percentage and the Realized Loss Percentage are "equivalent," no response is required.

Disputed.  Plaintiffs fail to cite admissible evidence with respect to the contention that "Cumulative Loss Percentage" and "Realized Loss Percentage" are "equivalent.

Undisputed that Handlin Ex. 712 reports the Realized Loss Percentage.

**Plaintiffs' Reply: DB does not dispute the material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 212-213 and the evidence cited therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself.**

215.    In the April 25, 2008 Distribution Report for SVHE 2006-1, the Realized Loss Percentage (which is the same thing as the Cumulative Loss Percentage) was 3.1590%, which was still below the Servicer Termination Test threshold. *Id.* at 32.

<u>Defendant's Response:</u> To the extent this paragraph purports to state a legal conclusion regarding whether the Cumulative Loss Percentage and the Realized Loss Percentage are "equivalent," no response is required.

Disputed. Plaintiffs fail to cite admissible evidence with respect to the contention

that the Realized Loss Percentage "is the same thing as the Cumulative Loss Percentage."

Undisputed that Handlin Ex. 712 contains the identified information.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 212-213 and the evidence cited therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself.**

216. ███████████████████████████████████████

████████████████████████████    ██████████████

████████    Handlin Ex. 713.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding whether the Cumulative Loss Percentage and the Realized Loss

Percentage are "equivalent," no response is required.

Disputed. Plaintiffs fail to cite admissible evidence with respect to the contention

that the Realized Loss Percentage "is the same thing as the Cumulative Loss Percentage."

Further, Plaintiffs fail to cite admissible evidence to support their contention that the

Realized Loss Percentage exceeding the stated threshold means "the Trust failed the

Servicer Termination Test." Such interpretation is at odds with the stated definition of

Servicer Termination Test under the GA, which requires the Cumulative Loss Percentage

to exceed the specified threshold. Handlin Ex. 41 (SVHE 2006-1 PSA) § 1.01 (definition

of Servicer Termination Test).

Undisputed that Handlin Ex. 713 reported that the Realized Loss Percentage was

3.7293%.

**Plaintiffs' Reply: DB does not dispute the material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 212-213 and the evidence cited therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself.**

217.   Under PSA § 7.04(b), "Notification to Certificateholders":

No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicer Event of Termination for five Business Days after a Responsible Officer of the Trustee becomes aware of the occurrence of such an event, the Trustee shall transmit by mail to all Certificateholders notice of such occurrence unless such default or Servicer Event of Termination shall have been waived or cured.

Handlin Ex. 41 (SVHE 2006-1 PSA) § 7.04(b).

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual rights and duties of Defendant under the GA, no response is required.

Undisputed that the cited SVHE 2006-1 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

218.   The "occurrence of [the] event which constitutes . . . a Servicer Event of Termination" is, as shown above, the exceedance of the Cumulative Loss Percentage on May 27, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the exceedance of the Cumulative Loss Percentage as defined by the GA, no response is required.

Disputed.  Plaintiffs' contention lacks evidentiary support.  Further, it is vague and ambiguous as to the phrase "as shown above."  Defendant restates its responses to the paragraphs to which Plaintiffs refer with the phrase "as shown above," and incorporates them by reference.  Defendant is unable to respond further to this contention due to the ambiguity and the absence of evidence or clarification.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to ¶¶ 209-217, *supra*, and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself.**

219.  Thus, DB was required to send notice of the Servicer Event of Termination to Certificateholders no later than 60 days after the May 27, 2008 occurrence of the event that constituted the Servicer Event of Termination, *i.e.*, no later than July 26, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual duties and obligations of Defendant under the GA, no response is required.

Disputed.

Plaintiffs' purported characterization of the SVHE 2006-1 PSA as requiring Defendant "to send notice of [a] Servicer Event of Termination to Certificateholders no later than 60 days after the . . . occurrence of the event that constituted the Servicer Event of Termination" is contrary to the terms of that agreement.  The SVHE 2006-1 PSA provides:

> No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicer Event of Termination *for five Business Days after a Responsible Officer of the Trustee becomes aware of the occurrence of such an event*, the Trustee shall transmit by mail to

256

> all Certificateholders notice of such occurrence unless such default
> or Servicer Event of Termination shall have been waived or cured.

Handlin Ex. 41 (SVHE 2006-1 PSA) § 7.04(b) (emphasis added).  Plaintiffs' purported

characterization ignores the italicized language above.  Before any 60-day period

contemplated in the provision quoted above may begin to run, the event at issue must

occur for five business days after a Responsible Officer (as defined in the GA) of

Defendant becomes aware of the occurrence of the event.

Disputed to the extent this paragraph lacks evidentiary support.

Disputed that Plaintiffs accurately calculated the date of the occurrence of the

event because they did not account for any "applicable grace period," Handlin Ex. 41

(SVHE 2006-1 PSA) § 7.01(b), or whether the event had been cured, thus obviating the

notice requirement, Handlin Ex. 41 (SVHE 2006-1 PSA) § 7.04(b).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement**

**incorporates by reference their material facts and replies to the preceding ¶¶ 209-218 and**

**the evidence provided therein.**

**In Handlin Ex. 41 (SVHE 2006-1 PSA) § 7.04(b), the notice provision that contains**

**"for" should be interpreted to be read as "or" because of a typographical error. This**

**provision is a "boilerplate" provision and the court should interpret it to be consistent with**

**all of the other similar notice provisions, and in particular, all other notice provisions that**

**make reference to five business days. Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b);**

**Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b); Handlin Ex. 5 (ARSI 2006-M3 PSA) §**

**7.03(b); Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b); Handlin Ex. 7 (ARSI 2006-W3**

**PSA) § 7.03(b); Handlin Ex. 79 (FFML 2005-FFH3 PSA) § 7.04(b). Furthermore, Deutsche**

Bank should not be absolved from its obligations because of a typographical error.

Therefore, the court should interpret this provision to require the trustee to provide notice

within sixty days from the occurrence of an Event of Default *or* within five business days

from when a responsible officer becomes aware of events that rise to an Event of Default.

*See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982);

*Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1539 (S.D.N.Y.

1983); *Beyene v. Irving Tr. Co.*, 762 F.2d 4, 6 (2d Cir. 1985); *E & H Partners v. Broadway

Nat'l Bank*, 39 F. Supp. 2d 275, 280 (S.D.N.Y. 1998). *See* Pltfs.Reply 7-8.

Further, while Plaintiffs do not concede that the PSA provided for "an applicable

grace period," such period would only extend the date by which DB was required to send

notice to July 31, 2008 and would not make DB's notice of this Servicer Termination

timely. *See infra* ¶ 220. Finally, DB's attempt to evade the material facts by claiming they

contain legal conclusions is unavailing.

220.    Because the notice was due no later than July 26, 2008, ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Handlin Ex. 719 at

DBNTC PHOENIX LIGHT 00001790981-DBNTC PHOENIX LIGHT 00001790982.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the timeliness of the notice of EOD, no response is required.

Disputed to the extent Plaintiffs' statement "the notice was due no later than July

26, 2008" lacks evidentiary support.

Disputed, to the extent Plaintiffs' statement ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ lacks evidentiary support.

Disputed that Plaintiffs accurately calculated the date of the occurrence of the

event because they did not account for any "applicable grace period," Handlin Ex. 41

(SVHE 2006-1 PSA) § 7.01(b), or whether the event had been cured, thus obviating the notice requirement, Handlin Ex. 41 (SVHE 2006-1 PSA) § 7.04(b).

Disputed that Handlin Ex. 719 contains pages marked DBNTC PHOENIX LIGHT 00001790981-DBNTC PHOENIX LIGHT 00001790982 or any bates numbered pages.

To the extent Plaintiffs intended to cite Handlin Ex. 714 (which has those Bates numbered pages), undisputed that



Handlin Ex. 714 at DBNTC PHOENIX LIGHT 00001790981.

*Id*. at DBNTC PHOENIX LIGHT 00001790981 – 82.



Handlin Ex. 714

at DBNTC PHOENIX LIGHT 00001790985.

*Id*. at DBNTC PHOENIX LIGHT 00001790985 – 86 (emphasis in original).

**Plaintiffs' Reply: DB proffers no evidence to specifically dispute the material fact.**

**Further DB does not dispute that Handlin Ex. 714 (which Plaintiffs intended to cite)**

**contains the cited language. Therefore, the material fact should be deemed admitted.** *See*

**Local Rule 56.1(c). DB's attempt to evade the material facts by claiming they contain legal conclusions is unavailing; the cited document speaks for itself.**

221.    DB's March 18, 2011 notice of this Servicer Event of Termination did not identify the date on which the Servicer Event of Termination first occurred. *Id.*

Defendant's Response:

Disputed that Handlin Ex. 719 contains pages marked DBNTC PHOENIX LIGHT 00001790981-DBNTC PHOENIX LIGHT 00001790982 or any bates numbered pages.

To the extent Plaintiffs intended to cite Handlin Ex. 714, undisputed that on March 18, 2011, Defendant ████████████████████████████

████████████████████████████████████████

████████ Handlin Ex. 714 at DBNTC PHOENIX LIGHT 00001790981.

Additionally, on March 15, 2011, Defendant ████████████████████

████████████████████████████████████████

████████ Handlin Ex. 714 at DBNTC PHOENIX LIGHT 00001790985.

**Plaintiffs' Reply: DB does not dispute the material fact. DB does not dispute that Handlin Ex. 714 (which Plaintiffs intended to cite) contains the cited language. It should be deemed admitted. *See* Local Rule 56.1(c).**

### c.   NHEL 2006-5

222.    Under § 7.01(a) of the NHEL 2006-5 PSA, a "Servicing Default" occurs:

If any one of the following events . . . shall occur and be continuing:

. . .

(v)    The Cumulative Loss Percentage exceeds (a) with respect to the first 12 Distribution Dates, 1.90%, (b) with respect to the next 12 Distribution Dates, 3.00% (c) with respect to the next 12 Distribution Dates, 4.25%, (d) with respect to the next 12 Distribution Dates, 5.25%, (e) with respect to the next 12 Distribution Dates, 6.25%, (f) and with respect to all Distribution Dates thereafter, 7.50%; or

(vi)     Realized Losses on the Mortgage Loans over any twelve-month period exceeds 2.70% of the sum of the aggregate Principal Balance of the Initial Mortgage Loans as of the Cutoff Date and the Original Pre-Funded Amount; or
(vii)    The Rolling 90 Day Delinquency Percentage exceeds 22%.

Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.01(a).

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the occurrence of a "Servicing Default," no response is required.

Undisputed that the cited NHEL 2006-5 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by claiming it contains a legal conclusion is unavailing; the cited document**

**speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted.** *See* **Local**

**Rule 56.1(c).**

223.    "Rolling 90 Day Delinquency Percentage" is defined as follows: "For any Distribution Date, the average of the 90-Day Delinquency Percentages for the Mortgage Loans as of the last day of each of the three (or 1 and 2 in the case of the first two Distribution Dates, as applicable) most recently ended Due Periods." Handlin Ex. 35 (NHEL 2006-5 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the definition of "Rolling 90 Day Delinquency Percentage," no

response is required.

Undisputed that the cited NHEL 2006-5 PSA contains the quoted language.

However, Plaintiffs' definition of "Rolling 90 Day Delinquency Percentage" is

incomplete because it fails to include the definition of other capitalized terms which may

or may not impact the manner in which the Rolling 90 Day Delinquency Percentage is

calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs'**

**characterization of the quoted language is immaterial as the document speaks for itself.**

**DB's attempt to evade the material fact by claiming it contains a legal conclusion is**

unavailing; the document speaks for itself. Plaintiffs' material fact should be deemed

admitted. *See* Local Rule 56.1(c).

224.   "90-Day Delinquency Percentage" is defined as follows:

As of the last day of any Due Period, the percentage equivalent of a fraction, (i) the numerator of which equals the aggregate Principal Balance of the Mortgage Loans that are 90 or more days contractually delinquent, in foreclosure or converted to REO Properties and (ii) the denominator of which is the Pool Balance as of the last day of such Due Period.

Handlin Ex. 35 (NHEL 2006-5 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the definition of "90-Day Delinquency Percentage," no response is

required.

Undisputed that the cited NHEL 2006-5 PSA contains the quoted language.

However, Plaintiffs' definition of "90-Day Delinquency Percentage" is incomplete

because it fails to include the definition of other capitalized terms which may or may not

impact the manner in which the 90-Day Delinquency Percentage is calculated or

determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs'**

**characterization of the quoted language is immaterial as the document speaks for itself.**

**DB's attempt to evade the material fact by claiming it contains a legal conclusion is**

**unavailing; the document speaks for itself. Therefore, Plaintiffs' material fact should be**

**deemed admitted.** *See* **Local Rule 56.1(c).**

225.   DB's monthly Distribution Reports for NHEL 2006-5 quantify 90-day delinquency in only one place, on the "Delinquency Report" page. That page identifies, as a percentage of the balance of the trust and a percentage of the number of loans in the trust, the total of loans that are delinquent, in foreclosure, and REO, and further shows what percentage of the Trust's balance is delinquent by one payment, two payments, and three or more payments. *See, e.g.*, Handlin Ex. 715 at 14 (The Delinquency Report also provides this information as to loans that are in bankruptcy; however, because the definition of 90-Day Delinquency Percentage

includes only loans that are "contractually delinquent, in foreclosure or converted to REO Properties," and does not mention bankruptcy, the data regarding bankruptcy is irrelevant for present purposes.).

> Defendant's Response:
>
> Disputed.  Plaintiffs' characterization of the NHEL 2006-5 remittance reports is inaccurate, and the materials Plaintiffs cite do not support this paragraph.  Each remittance report is a unique document, which speaks for itself.  Plaintiffs citation to a single remittance report does not support any generalization about the remittance reports for the Trust generally.
>
> Indeed, Plaintiffs' statement that the remittance reports "quantify 90-day delinquency in only one place" is not even consistent with the only remittance report Plaintiffs cite in support of this paragraph because page 14 of Handlin Ex. 715 does not quantify "90-day delinquency."

**Plaintiffs' Reply: DB does not proffer evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the document is immaterial as the document speaks for itself. The "Delinquency Report" beginning on page 14 of Handlin Exhibit 715 includes an entry for percentage of loans that are delinquent by "3+ payments." Plaintiffs' material fact is deemed admitted by operation of law.** *See* **Local Rule 56.1(c).**

226.    In DB's December 26, 2007 Distribution Report for NHEL 2006-5, the Delinquency Report identifies the percentage balance of loans delinquent, in foreclosure, and REO for 3+ payments as 3.65%, 7.97%, and 8.55%, respectively, totaling 20.17%. *Id.*

> Defendant's Response: Undisputed that Handlin Ex. 715 contains the identified information.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

227.    In DB's January 25, 2008 Distribution Report for NHEL 2006-5, the Delinquency Report identifies the percentage balance of loans delinquent, in foreclosure, and REO for 3+ payments as 6.66%, 6.96%, and 9.38%, respectively, totaling 23%. Handlin Ex. 716 at 14.

Defendant's Response:

Undisputed that Handlin Ex. 716 contains the identified information.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted. *See* Local Rule 56.1(c).**

228.    In DB's February 25, 2008 Distribution Report for NHEL 2006-5, the Delinquency Report identifies the percentage balance of loans delinquent, in foreclosure, and REO for 3+ payments as 10.15%, 6.23%, and 9.46%, respectively, totaling 25.84%. Handlin Ex. 717 at 14.

Defendant's Response: Undisputed that Handlin Ex. 717 contains the identified information

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted. *See* Local Rule 56.1(c).**

229.    The average of the total percentage balance ninety days or more delinquent as reported in the Delinquency Reports of DB's December 2007 and January and February 2008 Distribution Reports for NHEL 2006-5 is 23.0033%.

Defendant's Response:

Disputed to the extent that the NHEL 2006-5 remittance reports for distribution dates in December 2007, January 2008, and February 2008 did not report "the total percentage balance ninety days or more delinquent."  *See* Handlin Exs. 715, 716 & 717.

Undisputed that Plaintiffs accurately calculated the mathematical average based on the information they provided.

**Plaintiffs' Reply: DB does not dispute the material fact. DB's issue with Plaintiffs' characterization of the document is immaterial as the document speaks for itself. Plaintiffs' material fact is deemed admitted by operation of law. *See* Local Rule 56.1(c).**

230.    Because, as of DB's February 25, 2008 Distribution Report, the Rolling 90 Day Delinquency Percentage was higher than the 22% threshold for the defined Servicing Default, this Servicing Default was triggered on February 25, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the calculation of the defined "Rolling 90 Day Delinquency Percentage" or whether a "Servicing Default was triggered," no response is required.

Disputed to the extent Plaintiffs fail to cite evidence to support their contention. The NHEL 2006-5 remittance reports for distribution dates in December 2007, January 2008, and February 2008 did not report the "Rolling 90 Day Delinquency Percentage." See Handlin Exs. 715, 716 & 717.

**Plaintiffs' Reply: DB does not proffer evidence to specifically controvert the material fact. DB's issue with Plaintiffs characterization of the documents is immaterial as the documents speak for themselves. Plaintiffs' material fact is deemed admitted by operation of law. See Local Rule 56.1(c).**

231.    Because the NHEL 2006-5 Trust closed on September 28, 2006, Handlin Ex. 717 at 1, under the definition in § 7.01(a)(v) of the NHEL 2006-5 PSA, a separate Servicing Default would occur if, in mid-2008, the Cumulative Loss Percentage exceeded 3.00%.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the occurrence of a "Servicing Default," no response is required.

Disputed that the closing date of the NHEL 2006-5 Trust is relevant to determine when a Servicing Default would occur under § 7.01(a)(v).

Plaintiffs fail to provide evidence to support this contention.

Undisputed that § 7.01(a) of the NHEL 2006-5 PSA states in relevant part:

If any one of the following events (a "Servicing Default") shall occur and be continuing:

. . .

266

> (v)      The Cumulative Loss Percentage exceeds (a) with respect
> to the first 12 Distribution Dates, 1.90%, (b) with respect to the
> next 12 Distribution Dates, 3.00% . . .

Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.01(a).

**Plaintiffs' Reply: DB does not dispute the material fact. DB's issue with Plaintiffs'**

**characterization of the documents is immaterial as the documents speak for themselves.**

**DB's attempt to evade the material facts by claiming they contain legal conclusions is**

**unavailing. Plaintiffs' material fact is deemed admitted by operation of law. *See* Local Rule**

**56.1(c).**

232.    In the April 25, 2008 Distribution Report for NHEL 2006-5, the Cumulative Loss Percentage was 2.73366171%, which was still below the threshold for a Servicing Default. Handlin Ex. 718 at 53.

> Defendant's Response: To the extent this paragraph purports to state a legal
>
> conclusion regarding "the threshold for a Servicing Default," no response is required.
>
> Undisputed that Handlin Ex. 718 contains the identified information regarding the
>
> Cumulative Loss Percentage.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by claiming it contains a legal conclusion is unavailing; the cited document**

**speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted. *See* Local**

**Rule 56.1(c).**

233.    In the May 27, 2008 Distribution Report for NHEL 2006-5, the Cumulative Loss Percentage was 3.84754965%, Ex. 458 at 53, exceeding the threshold of 3.00%, meaning this Servicing Default occurred as of May 27, 2008. Handlin Ex. 719 at 53.

> Defendant's Response: To the extent this paragraph purports to state a legal
>
> conclusion regarding the occurrence of a Servicing Default, no response is required.

Disputed that the event described in this paragraph would necessarily cause a Servicer Default under § 7.01(a)(v) of the NHEL 2006-5 PSA.  Handlin Ex. 35 (NHEL 2006-5 PSA) at § 7.01.

Disputed that Handlin Ex. 458 is "the May 27, 2008 Distribution Report for NHEL 2006-5."  *See* Handlin Ex. 458 (2% Letter for GSAMP 2005-WMC1).  Handlin Ex. 719, which has a deposition exhibit sticker indicating Exhibit 458, is the May 27, 2008 Distribution Report for NHEL 2006-5.  Undisputed that Handlin Ex. 719 at 53 contains the identified information regarding the Cumulative Loss Percentage.

**Plaintiffs' Reply: DB does dispute the material fact nor does it dispute that Handlin Ex. 719 (which Plaintiffs intended to, and did in fact, cite) contains the cited language. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c).**

234.    Under § 7.04(b) of the NHEL 2006-5 PSA titled "Notification to Certificateholders":

> No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicing Default for five Business Days after a Responsible Officer of the Trustee obtains actual knowledge or written notice of the occurrence of such an event, the Trustee shall transmit by mail to the Hedge Counterparties, if prior to the Class I Termination Date, and all Certificateholders notice of such occurrence unless such default or Servicing Default shall have been waived or cured.

Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.04(b).

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual rights and duties of Defendant under the GA, no response is required.

Undisputed that the cited NHEL 2006-5 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

235.   The "occurrence of [the] event which constitutes . . . a Servicing Default" is, as shown above, first, the exceedance of the Rolling 90 Day Delinquency Percentage on February 25, 2008, and, second, the exceedance of the Cumulative Loss Percentage on May 27, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the occurrence of a Servicing Default, no response is required.

Disputed.  Plaintiffs' contention lacks evidentiary support.  Further, it is vague and ambiguous as to the phrase "as shown above."  Defendant restates its responses to the paragraphs to which Plaintiffs refer with the phrase "as shown above," and incorporates them by reference.  Defendant is unable to respond further to this contention due to the ambiguity and the absence of evidence or clarification.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to ¶¶ 222-234,** *supra,* **and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.**

236.   Thus, with respect to the Servicing Default triggered by exceedance of the Rolling 90 Day Delinquency Percentage, DB was required to send notice of the Servicing Default to Certificateholders no later than 60 days after the February 25, 2008 occurrence of the event that constituted the Servicing Default, *i.e.,* no later than April 25, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual duties and obligations of Defendant under the GA, no response is required.

269

Disputed.  This paragraph lacks evidentiary support and mischaracterizes the NHEL 2006-5 PSA.  Under § 7.04(b) of the NHEL 2006-5 PSA titled "Notification to Certificateholders":

> No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicing Default *for five Business Days after a Responsible Officer of the Trustee obtains actual knowledge or written notice of the occurrence of such an event*, the Trustee shall transmit by mail to the Hedge Counterparties, if prior to the Class I Termination Date, and all Certificateholders notice of such occurrence unless such default or Servicing Default shall have been waived or cured.

Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.04(b) (emphasis added).  Before any 60-day period contemplated in the provision quoted above may begin to run, the event at issue must occur for five business days after a Responsible Officer (as defined in the GA) of Defendant obtains actual knowledge or written notice of the occurrence of the event.

Disputed that Plaintiffs accurately calculated the date of the occurrence of any event because they did not account for any "applicable grace period," Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.01(b), or whether the event had been cured, thus obviating the notice requirement, Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.04(b).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to ¶¶ 222-235, *supra*, and the evidence provided therein.**

**In Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.04(b), the notice provision that contains "for" should be interpreted to be read as "or" because of a typographical error. This provision is a "boilerplate" provision and the court should interpret it to be consistent with all of the other similar notice provisions, and in particular, all other notice provisions that**

make reference to five business days. Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b);

Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b); Handlin Ex. 5 (ARSI 2006-M3 PSA) §

7.03(b); Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b); Handlin Ex. 7 (ARSI 2006-W3

PSA) § 7.03(b); Handlin Ex. 79 (FFML 2005-FFH3 PSA) § 7.04(b). **Furthermore, Deutsche**

**Bank should not be absolved from its obligations because of a typographical error.**

**Therefore, the court should interpret this provision to require the trustee to provide notice**

**within sixty days from the occurrence of an Event of Default** *or* **within five business days**

**from when a responsible officer becomes aware of events that rise to an Event of Default.**

*See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982);

*Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1539 (S.D.N.Y.

1983); *Beyene v. Irving Tr. Co.*, 762 F.2d 4, 6 (2d Cir. 1985); *E & H Partners v. Broadway*

*Nat'l Bank*, 39 F. Supp. 2d 275, 280 (S.D.N.Y. 1998). *See* **Pltfs.Reply 7-8.**

 **Further, while Plaintiffs do not concede that the PSA provided for "an applicable**

**grace period," such period would only extend the date by which DB was required to send**

**notice to April 30, 2008 and would not make DB's notice of this Servicer Termination**

**timely.** *Infra* **¶ 238. Finally, DB's attempt to evade the material fact by claiming it contains**

**a legal conclusion is unavailing.**

 237. Separately, with respect to the Servicing Default triggered by exceedance of the Cumulative Loss Percentage, DB was required to send notice of the Servicing Default to Certificateholders no later than 60 days after the May 27, 2008 occurrence of the event that constituted the Servicing Default, *i.e.*, no later than July 26, 2008.

 <u>Defendant's Response:</u> To the extent this paragraph purports to state a legal

conclusion regarding the contractual duties and obligations of Defendant under the GA,

no response is required.

Disputed.  This paragraph lacks evidentiary support and mischaracterizes the

NHEL 2006-5 PSA.  Under § 7.04(b) of the NHEL 2006-5 PSA titled "Notification to

Certificateholders":

> No later than 60 days after the occurrence of any event which
> constitutes or which, with notice or a lapse of time or both, would
> constitute a Servicing Default *for five Business Days after a*
> *Responsible Officer of the Trustee obtains actual knowledge or*
> *written notice of the occurrence of such an event*, the Trustee shall
> transmit by mail to the Hedge Counterparties, if prior to the Class I
> Termination Date, and all Certificateholders notice of such
> occurrence unless such default or Servicing Default shall have
> been waived or cured.

Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.04(b) (emphasis added).  Before any 60-day

period contemplated in the provision quoted above may begin to run, the event at issue

must occur for five business days after a Responsible Officer (as defined in the GA) of

Defendant obtains actual knowledge or written notice of the occurrence of the event.

Disputed that Plaintiffs accurately calculated the date of the occurrence of any

event because they did not account for any "applicable grace period," Handlin Ex. 35

(NHEL 2006-5 PSA) § 7.01(b), or whether the event had been cured, thus obviating the

notice requirement, Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.04(b).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, it should be deemed admitted.** ***See*** **Local Rule 56.1(c). Plaintiffs' statement**

**incorporates by reference their material facts and replies to ¶¶ 222-236,** *supra*, **and the**

**evidence provided therein. DB's issue with Plaintiffs' characterization of Handlin Ex. 35**

**(NHEL 2006-5 PSA) § 7.04(b) is immaterial as the document speaks for itself.**

**In Handlin Ex. 35 (NHEL 2006-5 PSA) § 7.04(b), the notice provision that contains**

**"for" should be interpreted to be read as "or" because of a typographical error. This**

**provision is a "boilerplate" provision and the court should interpret it to be consistent with**

all of the other similar notice provisions, and in particular, all other notice provisions that make reference to five business days. Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b); Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b); Handlin Ex. 5 (ARSI 2006-M3 PSA) § 7.03(b); Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b); Handlin Ex. 7 (ARSI 2006-W3 PSA) § 7.03(b); Handlin Ex. 79 (FFML 2005-FFH3 PSA) § 7.04(b). Furthermore, Deutsche Bank should not be absolved from its obligations because of a typographical error. Therefore, the court should interpret this provision to require the trustee to provide notice within sixty days from the occurrence of an Event of Default *or* within five business days from when a responsible officer becomes aware of events that rise to an Event of Default. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982); *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1539 (S.D.N.Y. 1983); *Beyene v. Irving Tr. Co.*, 762 F.2d 4, 6 (2d Cir. 1985); *E & H Partners v. Broadway Nat'l Bank*, 39 F. Supp. 2d 275, 280 (S.D.N.Y. 1998). *See* Pltfs.Reply 7-8.

Further, while Plaintiffs do not concede that the PSA provided for "an applicable grace period," such period would only extend the date by which DB was required to send notice to July 31, 2008 and would not make DB's notice of this Servicer Termination timely. *Infra* ¶ 238. Finally, DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.



238. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ Handlin Ex. 720 at DBNTC PHOENIX LIGHT 00000012294-DBNTC PHOENIX LIGHT 00000012295.

Defendant's Response: Undisputed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Handlin Ex. 720 at DBNTC PHOENIX LIGHT 00000012294.



*Id.* at DBNTC PHOENIX LIGHT 00000012294 – 95 (emphasis in original).

**Plaintiffs' Reply: DB does not dispute this material fact. Plaintiffs' material fact**

**should be deemed admitted.** *See* **Local Rule 56.1(c).**

239.   Because the notice of the Servicing Default triggered by exceedance of the
Rolling 90 Day Delinquency Percentage was due no later than April 25, 2008, ███ 's ███████
███████████████████████████

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the timeliness of the notice of Servicing Default, no response is

required.

Disputed.  Plaintiffs fail to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 222-238, *supra,* and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.**

240.    Because the notice of the Servicing Default triggered by exceedance of the Cumulative Loss Percentage was due no later than July 26, 2008, ███████████████████
████████████████████

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the timeliness of the notice of Servicing Default, no response is required.

Disputed.  Plaintiffs fail to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 222-238, *supra*, and the evidence provided therein. DB's attempt to evade the material facts by claiming they contain legal conclusions is incorrect. Pltfs.Mem. 15-17.**

241.    ███████████████████████████████
████████████████ Handlin Ex. 720 at DBNTC PHOENIX LIGHT 00000012294-DBNTC PHOENIX LIGHT 00000012295.

Defendant's Response: Undisputed.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted. *See* Local Rule 56.1(c).**

### d.  NHEL 2006-6

242.    Under § 7.01(a) of the NHEL 2006-6 PSA, a "Servicing Default" occurs:

If any one of the following events . . . shall occur and be continuing:

. . .

(v)     The Cumulative Loss Percentage exceeds (a) with respect to the first 12 Distribution Dates, 1.85%, (b) with respect to the next 12 Distribution Dates, 3.10% (c) with respect to the next 12 Distribution Dates, 4.35%, (d) with respect to the next 12 Distribution Dates, 5.35%, (e) with respect to the next 12 Distribution Dates, 6.15%, (f) and with respect to all Distribution Dates thereafter, 7.40%; or

(vi)     Realized Losses on the Mortgage Loans over any twelve-month period exceeds 2.60% of the sum of the aggregate Principal Balance of the Initial Mortgage Loans as of the Cutoff Date and the Original Pre-Funded Amount; or

(vii)     The Rolling 90 Day Delinquency Percentage exceeds 22%.

Handlin Ex. 36 (NHEL 2006-6 PSA) § 7.01(a).

> Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the occurrence of a "Servicing Default," no response is required.

> Undisputed that the cited NHEL 2006-6 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c).**

243.     "Rolling 90 Day Delinquency Percentage" is defined as follows: "For any Distribution Date, the average of the 90-Day Delinquency Percentages for the Mortgage Loans as of the last day of each of the three (or 1 and 2 in the case of the first two Distribution Dates, as applicable) most recently ended Due Periods." Handlin Ex. 36 (NHEL 2006-6 PSA) § 1.01.

> Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the definition of "Rolling 90 Day Delinquency Percentage," no response is required.

> Undisputed that the cited NHEL 2006-6 PSA contains the quoted language. However, Plaintiffs' definition of "Rolling 90 Day Delinquency Percentage" is incomplete because it fails to include the definition of other capitalized terms which may

or may not impact the manner in which the Rolling 90 Day Delinquency Percentage is calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs' characterization of the quoted language is immaterial as the document speaks for itself. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

244.   "90-Day Delinquency Percentage" is defined as follows:

As of the last day of any Due Period, the percentage equivalent of a fraction, (i) the numerator of which equals the aggregate Principal Balance of the Mortgage Loans that are 90 or more days contractually delinquent, in foreclosure or converted to REO Properties and (ii) the denominator of which is the Pool Balance as of the last day of such Due Period.

Handlin Ex. 36 (NHEL 2006-6 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the definition of 90-Day Delinquency Percentage, no response is required.

Undisputed that the cited NHEL 2006-6 PSA contains the quoted language. However, Plaintiffs' definition of "90-Day Delinquency Percentage" is incomplete because it fails to include the definition of other capitalized terms which may or may not impact the manner in which the 90-Day Delinquency Percentage is calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs' characterization of the quoted language is immaterial as the document speaks for itself. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing. Therefore, Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

245.    DB's monthly Distribution Reports for NHEL 2006-6 quantify 90-day delinquency in only one place, on the "Delinquency Report" page. That page identifies, as a percentage of the balance of the trust and a percentage of the number of loans in the trust, the total of loans that are delinquent, in foreclosure, and REO, and further shows what percentage of the Trust's balance is delinquent by one payment, two payments, and three or more payments. *See, e.g.,* Handlin Ex. 721 at 14. (The Delinquency Report also provides this information as to loans that are in bankruptcy; however, because the definition of 90-Day Delinquency Percentage includes only loans that are "contractually delinquent, in foreclosure or converted to REO Properties," and does not mention bankruptcy, the data regarding bankruptcy is irrelevant for present purposes.).

Defendant's Response: Disputed.  Plaintiffs' characterization of the NHEL 2006-6 remittance reports is inaccurate, and the materials Plaintiffs cite do not support this paragraph.

Each remittance report is a unique document, which speaks for itself.  Plaintiffs citation to a single remittance report does not support any generalization about the remittance reports generally.

Indeed, Plaintiffs' statement that the remittance reports "quantify 90-day delinquency in only one place" is not even consistent with the only remittance report Plaintiffs cite in support of this paragraph because page 14 of Handlin Ex. 721 does not quantify "90-day delinquency."

**Plaintiffs' Reply: DB does not proffer evidence that specifically controverts the material fact. DB's issue with Plaintiffs' characterization of the document is immaterial as the document speaks for itself. The "Delinquency Report" beginning on page 14 of Handlin Exhibit 721 includes an entry for percentage of loans that are delinquent by "3+ payments." Plaintiffs' material fact is deemed admitted by operation of law. *See* Local Rule 56.1(c).**

246.    In DB's January 25, 2008 Distribution Report for NHEL 2006-6, the Delinquency Report identifies the percentage balance of loans delinquent, in foreclosure, and REO for 3+ payments as 7.63%, 5.66%, and 7.40%, respectively, totaling 20.69%. *Id.*

Defendant's Response:

Undisputed that Handlin Ex. 721 contains the identified information regarding the

"percentage balance of loans delinquent, in foreclosure, and REO for 3+ payments."

Undisputed that Plaintiffs accurately calculated the total of the three numbers.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

247.   In DB's February 25, 2008 Distribution Report for NHEL 2006-6, the
Delinquency Report identifies the percentage balance of loans delinquent, in foreclosure, and
REO for 3+ payments as 11.45%, 4.99%, and 7.84%, respectively, totaling 24.28%. Handlin Ex.
722.

Defendant's Response: Undisputed that Handlin Ex. 722 contains the identified

information regarding "the percentage balance of loans delinquent, in foreclosure, and

REO for 3+ payments."

Undisputed that Plaintiffs accurately calculated the total of the three numbers.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

248.   In DB's March 25, 2008 Distribution Report for NHEL 2006-6, the Delinquency
Report identifies the percentage balance of loans delinquent, in foreclosure, and REO for 3+
payments as 11.84%, 7.42%, and 7.62%, respectively, totaling 26.88%. Handlin Ex. 723.

Defendant's Response: Undisputed that Handlin Ex. 723 contains the identified

information regarding "the percentage balance of loans delinquent, in foreclosure, and

REO for 3+ payments."

Undisputed that Plaintiffs accurately calculated the total of the three numbers.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

249.   The average of the total percentage balance ninety days or more delinquent as reported in the Delinquency Reports of DB's January, February, and March 2008 Distribution Reports for NHEL 2006-6 is 23.95%.

Defendant's Response: Disputed to the extent that the NHEL 2006-6 remittance

reports for distribution dates in January, February, and March 2008 did not report "the

total percentage balance ninety days or more delinquent." *See* Handlin Exs. 721, 722 &

723.

Undisputed that Plaintiffs accurately calculated the mathematical average based

on the information they provided.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs'**

**characterization of the document is immaterial as the document speaks for itself. Plaintiffs'**

**material fact is deemed admitted by operation of law. *See* Local Rule 56.1(c).**

250.   Because, as of DB's March 25, 2008 Distribution Report, the Rolling 90 Day Delinquency Percentage was higher than the 22% threshold for the defined Servicing Default, this Servicing Default was triggered on March 25, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the occurrence of a "Servicing Default," no response is required.

Disputed that the singular occurrence of such an event triggers a "Servicer

Default" under the GA.  Handlin Ex. 36 (NHEL 2006-6 PSA) § 7.01(a) ("shall occur *and*

*be continuing*").

Plaintiffs' statement lacks evidentiary support.  Further, Plaintiffs' assertion is not

supported by the cited material because Plaintiffs have not established that the

methodology utilized by Plaintiffs is the same methodology required by the GAs.  *See*

Handlin Ex. 36 (NHEL 2006-6 PSA) § 1.01, Appendix A-42 (Definition of "Rolling 90-

Day Delinquency Percentage": "For any Distribution Date, the average of the 90-Day

Delinquency Percentages for the Mortgage Loans as of the last day of each of the three

280

(or 1 and 2 in the case of the first two Distribution Dates, as applicable) most recently

ended Due Periods.")

**Plaintiffs' Reply: DB does not specifically controvert the material fact. DB's issue**

**with Plaintiffs' characterization of the documents is immaterial as the documents speak for**

**themselves. DB's attempt to evade the material facts by claiming they contain legal**

**conclusions is unavailing. Therefore, Plaintiffs' material fact is deemed admitted by**

**operation of law.** *See* **Local Rule 56.1(c).**

251.    Because the NHEL 2006-6 Trust closed on November 30, 2006, Handlin Ex. 36
(NHEL 2006-6 PSA) § 1.01 (Definition of "Closing Date"), under the definition in § 7.01(a)(v)
of the NHEL 2006-6 PSA, a separate Servicing Default would occur if, in mid-2008, the
Cumulative Loss Percentage exceeded 3.10%.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the occurrence of a "Servicing Default," no response is required.

Disputed that the singular occurrence of such an event triggers a "Servicer

Default" under the GA.  Handlin Ex. 36 (NHEL 2006-6 PSA) § 7.01(a) ("shall occur *and*

*be continuing*"), and disputed that the closing date of the NHEL 2006-6 Trust is relevant

to determine when a Servicing Default would occur under § 7.01(a)(v).

Plaintiffs fail to provide evidence to support this contention.

Undisputed that § 7.01(a) of the NHEL 2006-5 PSA states in relevant part:

If any one of the following events (a "Servicing Default") shall
occur and be continuing:

. . .

(v)    The Cumulative Loss Percentage exceeds (a) with respect
to the first 12 Distribution Dates, 1.85%, (b) with respect to the
next 12 Distribution Dates, 3.10% . . .

Handlin Ex. 36 (NHEL 2006-6) § 7.01(a).

281

**Plaintiffs' Reply: DB does not specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the documents is immaterial as the documents speak for themselves. DB's attempt to evade the material facts by claiming they contain legal conclusions is unavailing. Plaintiffs' material fact is deemed admitted by operation of law. *See* Local Rule 56.1(c).**

252.    In the May 27, 2008 Distribution Report for NHEL 2006-6, the Cumulative Loss Percentage was 2.90468775%, which was still below the threshold for a Servicing Default. Handlin Ex. 724.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding "the threshold for a Servicing Default," no response is required.

Undisputed that Handlin Ex. 724 contains the identified information regarding the Cumulative Loss Percentage.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c).**

253.    In the June 25, 2008 Distribution Report for NHEL 2006-6, the Cumulative Loss Percentage was 3.45992768%, exceeding the threshold of 3.10%, meaning this Servicing Default occurred as of June 25, 2008. Handlin Ex. 725.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the occurrence of a Servicing Default, no response is required.

Disputed that the event described in this paragraph would necessarily cause a Servicer Default under § 7.01(a)(v) of the NHEL 2006-6 Trust.  Handlin Ex. 36 at § 7.01.

Undisputed that Ex. 725 contained the information identified regarding the Cumulative Loss Percentage.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

254.    Under § 7.04(b) of the NHEL 2006-6 PSA titled "Notification to Certificateholders":

> No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicing Default for five Business Days after a Responsible Officer of the Trustee obtains actual knowledge or written notice of the occurrence of such an event, the Trustee shall transmit by mail to the Hedge Counterparties, if prior to the Class I Termination Date, and all Certificateholders notice of such occurrence unless such default or Servicing Default shall have been waived or cured.

Handlin Ex. 36 (NHEL 2006-6 PSA) § 7.04(b).

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual rights and duties of Defendant under the GA, no response is required.

Undisputed that the cited NHEL 2006-6 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

255.    The "occurrence of [the] event which constitutes . . . a Servicing Default" is, as shown above, first, the exceedance of the Rolling 90 Day Delinquency Percentage on March 25, 2008, and, second, the exceedance of the Cumulative Loss Percentage on June 25, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the occurrence of a Servicing Default, no response is required.

Disputed.  Plaintiffs' contention lacks evidentiary support.  Further, it is vague and ambiguous as to the phrase "as shown above."  Defendant restates its responses to the paragraphs to which Plaintiffs refer with the phrase "as shown above," and incorporates them by reference.  Defendant is unable to respond further to this contention due to the ambiguity and the absence of evidence or clarification.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to ¶¶ 242-254, *supra*, and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.**

256.  Thus, with respect to the Servicing Default triggered by exceedance of the Rolling 90 Day Delinquency Percentage, DB was required to send notice of the Servicing Default to Certificateholders no later than 60 days after the March 25, 2008 occurrence of the event that constituted the Servicing Default, *i.e.*, no later than May 24, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual duties and obligations of Defendant under the GA, no response is required.

Disputed.  This paragraph lacks evidentiary support and mischaracterizes the NHEL 2006-6 PSA.  Under § 7.04(b) of the NHEL 2006-6 PSA titled "Notification to Certificateholders":

No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicing Default *for five Business Days after a Responsible Officer of the Trustee obtains actual knowledge or written notice of the occurrence of such an event*, the Trustee shall transmit by mail to the Hedge Counterparties, if prior to the Class I Termination Date, and all Certificateholders notice of such occurrence unless such default or Servicing Default shall have been waived or cured.

Handlin Ex. 36 (NHEL 2006-6 PSA) § 7.04(b) (emphasis added).  Before any 60-day period contemplated in the provision quoted above may begin to run, the event at issue must occur for five business days after a Responsible Officer (as defined in the GA) of Defendant obtains actual knowledge or written notice of the occurrence of the event.

Disputed that Plaintiffs accurately calculated the date of the occurrence of any event because they did not account for any "applicable grace period," Handlin Ex. 36 (NHEL 2006-6 PSA) § 7.01(b), or whether the event had been cured, thus obviating the notice requirement, Handlin Ex. 36 (NHEL 2006-6 PSA) § 7.04(b).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to ¶¶ 242-255,** *supra,* **and the evidence provided therein.**

**In Handlin Ex. 36 (NHEL 2006-6 PSA) § 7.04(b), the notice provision that contains "for" should be interpreted to be read as "or" because of a typographical error. This provision is a "boilerplate" provision and the court should interpret it to be consistent with all of the other similar notice provisions, and in particular, all other notice provisions that make reference to five business days. Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b); Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b); Handlin Ex. 5 (ARSI 2006-M3 PSA) § 7.03(b); Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b); Handlin Ex. 7 (ARSI 2006-W3 PSA) § 7.03(b); Handlin Ex. 79 (FFML 2005-FFH3 PSA) § 7.04(b). Furthermore, Deutsche Bank should not be absolved from its obligations because of a typographical error. Therefore, the court should interpret this provision to require the trustee to provide notice within sixty days from the occurrence of an Event of Default** *or* **within five business days**

285

from when a responsible officer becomes aware of events that rise to an Event of Default. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982); *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1539 (S.D.N.Y. 1983); *Beyene v. Irving Tr. Co.*, 762 F.2d 4, 6 (2d Cir. 1985); *E & H Partners v. Broadway Nat'l Bank*, 39 F. Supp. 2d 275, 280 (S.D.N.Y. 1998). *See* Pltfs.Reply 7-8.

Further, while Plaintiffs do not concede that the PSA provided for "an applicable grace period," such period would only extend the date by which DB was required to send notice to May 30, 2008 and would not make DB's notice of this Servicer Termination timely. *Infra* ¶ 258. Finally, DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.

257.   Separately, with respect to the Servicing Default triggered by exceedance of the Cumulative Loss Percentage, DB was required to send notice of the Servicing Default to Certificateholders no later than 60 days after the June 25, 2008 occurrence of the event that constituted the Servicing Default, *i.e.*, no later than August 24, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual duties and obligations of Defendant under the GA, no response is required.

Disputed.  This paragraph lacks evidentiary support and mischaracterizes the NHEL 2006-6 PSA.  Under § 7.04(b) of the NHEL 2006-6 PSA titled "Notification to Certificateholders":

> No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicing Default *for five Business Days after a Responsible Officer of the Trustee obtains actual knowledge or written notice of the occurrence of such an event*, the Trustee shall transmit by mail to the Hedge Counterparties, if prior to the Class I Termination Date, and all Certificateholders notice of such occurrence unless such default or Servicing Default shall have been waived or cured.

Handlin Ex. 36 (NHEL 2006-6 PSA) § 7.04(b) (emphasis added).  Before any 60-day

period contemplated in the provision quoted above may begin to run, the event at issue

must occur for five business days after a Responsible Officer (as defined in the GA) of

Defendant obtains actual knowledge or written notice of the occurrence of the event.

Disputed that Plaintiffs accurately calculated the date of the occurrence of any

event because they did not account for any "applicable grace period," Handlin Ex. 36

(NHEL 2006-6 PSA) § 7.01(b), or whether the event had been cured, thus obviating the

notice requirement, Handlin Ex. 36 (NHEL 2006-6 PSA) § 7.04(b).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement**

**incorporates by reference their material facts and replies to ¶¶ 242-255, *supra*, and the**

**evidence provided therein.**

**In Handlin Ex. 36 (NHEL 2006-6 PSA) § 7.04(b), the notice provision that contains**

**"for" should be interpreted to be read as "or" because of a typographical error. This**

**provision is a "boilerplate" provision and the court should interpret it to be consistent with**

**all of the other similar notice provisions, and in particular, all other notice provisions that**

**make reference to five business days. Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b);**

**Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b); Handlin Ex. 5 (ARSI 2006-M3 PSA) §**

**7.03(b); Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b); Handlin Ex. 7 (ARSI 2006-W3**

**PSA) § 7.03(b); Handlin Ex. 79 (FFML 2005-FFH3 PSA) § 7.04(b). Furthermore, Deutsche**

**Bank should not be absolved from its obligations because of a typographical error.**

**Therefore, the court should interpret this provision to require the trustee to provide notice**

**within sixty days from the occurrence of an Event of Default *or* within five business days**

from when a responsible officer becomes aware of events that rise to an Event of Default. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982); *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1539 (S.D.N.Y. 1983); *Beyene v. Irving Tr. Co.*, 762 F.2d 4, 6 (2d Cir. 1985); *E & H Partners v. Broadway Nat'l Bank*, 39 F. Supp. 2d 275, 280 (S.D.N.Y. 1998). *See* Pltfs.Reply 7-8.

Further, while Plaintiffs do not concede that the PSA provided for "an applicable grace period," such period would only extend the date by which DB was required to send notice to August 29, 2008 and would not make DB's notice of this Servicer Termination timely. *Infra* ¶ 258. Finally, DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.

258. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆ Handlin Ex. 726 at DBNTC PHOENIX LIGHT 00000029375-
DBNTC PHOENIX LIGHT 00000029376.

Defendant's Response: Undisputed that ▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Handlin
Ex. 726 at DBNTC PHOENIX LIGHT 00000029375.





*Id*. at DBNTC PHOENIX LIGHT 00000029375 – 76 (emphasis in original).

**Plaintiffs' Reply: DB does not dispute this material fact. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

259.   Because the notice of the Servicing Default triggered by exceedance of the Rolling 90 Day Delinquency Percentage was due no later than May 24, 2008, ███████████

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the timeliness of the notice of Servicing Default, no response is required.

Disputed.  Plaintiffs fail to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 242-258,** *supra*, **and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.**

260.   Because the notice of the Servicing Default triggered by exceedance of the Cumulative Loss Percentage was due no later than August 24, 2008, ████████████████ ████████████████████████████████████

> Defendant's Response: To the extent this paragraph purports to state a legal
>
> conclusion regarding ████████████████████████████
>
> ██████
>
> Disputed.  Plaintiffs fail to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 242-258, *supra,* and the evidence provided therein.**

261.   ████████████████████████████████████ ████████████ Handlin Ex. 726 at DBNTC PHOENIX LIGHT 00000029375-DBNTC PHOENIX LIGHT 00000029376.

> Defendant's Response: Undisputed.

**Plaintiffs' Reply: DB does not dispute this material fact. Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c).**

### e.   FHLT 2005-2

262.   Under § 7.01(a)(v) of the FHLT 2005-2 PSA, "Any failure by the Servicer of the Servicer Termination Test" is a "Servicer Event of Termination." Handlin Ex. 10 (FHLT 2005-2 PSA) § 7.01(a)(v).

> Defendant's Response: To the extent this paragraph purports to state a legal
>
> conclusion regarding the occurrence of a "Servicer Event of Termination," no response is
>
> required.
>
> Undisputed that the cited FHLT 2005-2 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

263. The "Servicer Termination Test" is defined as follows:

With respect to any Distribution Date, the Servicer Termination Test will be failed if the Cumulative Loss Percentage exceeds the applicable percentages set forth below with respect to such Distribution Date:

| Distribution Date Occurring In | Percentage |
|---|---|
| August 2008 through July 2009 | 4.55% for the first month, plus an additional 1/12th of 2.05% for each month thereafter |
| August 2009 through July 2010 | 6.60% for the first month, plus an additional 1/12th of 1.60% for each month thereafter |
| August 2010 through July 2011 | 8.20% for the first month, plus an additional 1/12th of 0.85% for each month thereafter |
| August 2011 and thereafter | 9.05% for each month |

Handlin Ex. 10 (FHLT 2005-2 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the definition of "Servicer Termination Test," no response is required. To the extent a response is required, disputed.

Undisputed that the cited FHLT 2005-2 PSA contains the quoted language. However, Plaintiffs' definition of "Servicer Termination Test" is incomplete because it fails to include the definition of other capitalized terms which may or may not impact the manner in which the Servicer Termination Test is calculated or determined.

**Plaintiffs' Reply: DB does not dispute the material fact. DB's issue with Plaintiffs' characterization is immaterial as the document speaks for itself. DB's attempt to evade the**

material fact by claiming it contains a legal conclusion is unavailing. **Plaintiffs' material**

**fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

264.    Under this definition, the Servicer Termination Test would be failed in August
2008 if the Cumulative Loss Percentage was 4.55%, and would be failed in September 2008 if
the Cumulative Loss Percentage was 4.720833%.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the definition of "Servicer Termination Test," no response is

required.

Disputed.  Plaintiffs have failed to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement**

**incorporates by reference their material facts and replies to the preceding ¶¶ 262-263 and**

**the evidence provided therein. DB's attempt to evade the material fact by claiming it**

**contains a legal conclusion is unavailing.**

265.    In the August 25, 2008 Distribution Report for FHLT 2005-2, the Cumulative
Loss Percentage was 4.447474%, which was still below the Servicer Termination Test threshold.
Handlin Ex. 727 at 30.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding whether application of the contractually defined "Servicer

Termination Test threshold," no response is required.

Undisputed that Handlin Ex. 727 contains the identified information regarding the

Cumulative Loss Percentage.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by claiming it contains a legal conclusion is unavailing; the cited document**

**speaks for itself. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

266.     In the September 25, 2008 Distribution Report for FHLT 2005-2, the Cumulative Loss Percentage was 4.834981%, exceeding the threshold of 4.720833%, meaning the Trust failed the Servicer Termination Test as of September 25, 2008. Handlin Ex. 728 at 30.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding whether application of the contractually defined "Servicer Termination Test threshold," no response is required.

Disputed that the event described in this paragraph would necessarily cause a Servicer Event of Termination under § 7.01(a)(v) of the FHLT 2005-2 PSA. Handlin Ex. 10 (FHLT 2005-2 PSA) § 7.01.

Undisputed that Handlin Ex. 727 contains the identified information regarding the Cumulative Loss Percentage.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c).**

267.     Under § 7.04(b) of the FHLT 2005-2 PSA titled "Notification to Certificateholders":

> No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicer Event of Termination for five Business Days after a Responsible Officer of the Trustee becomes aware of the occurrence of such an event, the Trustee shall transmit by mail to all Certificateholders and to the NIMS Insurer notice of such occurrence unless such default or Servicer Event of Termination shall have been waived or cured.

Handlin Ex. 10 (FHLT 2005-2 PSA) § 7.04(b).

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual rights and duties of Defendant under the GA, no response is required.

Undisputed that the cited FHLT 2005-2 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

268.   The "occurrence of [the] event which constitutes . . . a Servicer Event of Termination" is, as shown above, the exceedance of the Cumulative Loss Percentage on September 25, 2008.

Defendant's Response: To the extent this purports to state a legal conclusion regarding the exceedance of the Cumulative Loss Percentage as defined by the GA, no response is required.

Disputed.  Plaintiffs' contention lacks evidentiary support.  Further, it is vague and ambiguous as to the phrase "as shown above."  Defendant restates its responses to the paragraphs to which Plaintiffs refer with the phrase "as shown above," and incorporates them by reference.  Defendant is unable to respond further to this contention due to the ambiguity and the absence of evidence or clarification.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to ¶¶ 262-267,** *supra***, and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.**

269.   Thus, DB was required to send notice of this Servicer Event of Termination to Certificateholders no later than 60 days after the September 25, 2008 occurrence of the event that constituted the Servicer Event of Termination, *i.e.*, no later than November 24, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual duties and obligations of Defendant under the GA, no response is required.

Disputed.  This paragraph lacks evidentiary support and mischaracterizes the

FHLT 2005-2 PSA.  Under § 7.04(b) of the FHLT 2005-2 PSA titled "Notification to

Certificateholders":

> No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicer Event of Termination *for five Business Days after a Responsible Officer of the Trustee becomes aware of the occurrence of such an event*, the Trustee shall transmit by mail to all Certificateholders and to the NIMS Insurer notice of such occurrence unless such default or Servicer Event of Termination shall have been waived or cured.

Handlin Ex. 10 (FHLT 2005-2 PSA) § 7.04(b) (emphasis added).  Before any 60-day

period contemplated in the provision quoted above may begin to run, the event at issue

must occur for five business days after a Responsible Officer (as defined in the GA) of

Defendant becomes aware of the occurrence of the event.

Disputed that Plaintiffs accurately calculated the date of the occurrence of any

event because they did not account for any "applicable grace period," Handlin Ex. 10

(FHLT 2005-2 PSA) § 7.01(b), or whether the event had been cured, thus obviating the

notice requirement, Handlin Ex. 10 (FHLT 2005-2 PSA) § 7.04(b).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement**

**incorporates by reference their material facts and replies to ¶¶ 262-268, *supra*, and the**

**evidence provided therein.**

**In Handlin Ex. 10 (FHLT 2005-2 PSA) § 7.04(b), the notice provision that contains**

**"for" should be interpreted to be read as "or" because of a typographical error. This**

**provision is a "boilerplate" provision and the court should interpret it to be consistent with**

**all of the other similar notice provisions, and in particular, all other notice provisions that**

make reference to five business days. **Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b); Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b); Handlin Ex. 5 (ARSI 2006-M3 PSA) § 7.03(b); Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b); Handlin Ex. 7 (ARSI 2006-W3 PSA) § 7.03(b); Handlin Ex. 79 (FFML 2005-FFH3 PSA) § 7.04(b). Furthermore, Deutsche Bank should not be absolved from its obligations because of a typographical error. Therefore, the court should interpret this provision to require the trustee to provide notice within sixty days from the occurrence of an Event of Default *or* within five business days from when a responsible officer becomes aware of events that rise to an Event of Default. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982); *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1539 (S.D.N.Y. 1983); *Beyene v. Irving Tr. Co.*, 762 F.2d 4, 6 (2d Cir. 1985); *E & H Partners v. Broadway Nat'l Bank*, 39 F. Supp. 2d 275, 280 (S.D.N.Y. 1998). *See* Pltfs.Reply 7-8.**

**Further, while Plaintiffs do not concede that the PSA provided for "an applicable grace period," such period would only extend the date by which DB was required to send notice to November 29, 2008 and would not make DB's notice of this Servicer Termination timely. *Infra* ¶ 270. Finally, DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.**

270.

<span style="background:black;color:black">████████</span>   Handlin Ex. 729 at DBNTC PHOENIX LIGHT 00000289769-DBNTC PHOENIX LIGHT 00000289770.

  Defendant's Response: Undisputed that on July 22, 2010 Defendant <span style="background:black;color:black">████</span>

<span style="background:black;color:black">████████████████████████████████████</span>

<span style="background:black;color:black">████████████████████████</span>"  Handlin Ex. 729 at DBNTC

PHOENIX LIGHT 00000289769.

<span style="background:black;color:black">████████████</span>



*Id*. at DBNTC PHOENIX LIGHT 00000289769 (emphasis in original).

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted. *See* Local Rule 56.1(c).**

271.   Because the notice was due no later than November 24, 2008, ███████████████

███████████████

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding ████████████████████████████

████████████████

Disputed.  Plaintiffs fail to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement**

**incorporates by reference their material facts and replies to the preceding ¶¶ 262-270 and**

the evidence provided therein. DB's attempt to evade the material fact by claiming it

contains a legal conclusion is unavailing.

272. ███████████████████████████████████████████ Handlin Ex. 729 at DBNTC

PHOENIX LIGHT 00000289769-DBNTC PHOENIX LIGHT 00000289770.

Defendant's Response: Undisputed.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

### f. SVHE 2005-3

273.   Under § 7.01(a)(v) of the SVHE 2005-3 PSA, "Any failure by the Servicer of the
Servicer Termination Test" is a "Servicer Event of Termination." Handlin Ex. 40 (SVHE 2005-3
PSA) § 7.01(a)(v).

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the occurrence of a "Servicer Event of Termination," no response is

required.

Undisputed that the cited SVHE 2005-3 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by claiming it contains a legal conclusion is unavailing; the cited document**

**speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted.** *See* **Local**

**Rule 56.1(c).**

274.   The "Servicer Termination Test" is defined as follows:

With respect to any Distribution Date, the Servicer Termination Test will be failed if the
Cumulative Loss Percentage exceeds the applicable percentages set forth below with respect to
such Distribution Date:

| Distribution Date Occurring In | Percentage |
|---|---|
| August 2007 through July 2008 | 2.50% for the first month, plus an additional 1/12th of 1.75% for each month thereafter |
| August 2008 through July 2009 | 4.25% for the first month, plus an additional 1/12th of 1.75% for each month thereafter |
| August 2009 through July 2010 | 6.00% for the first month, plus an additional 1/12th of 1.25% for each month thereafter |
| August 2010 through July 2011 | 7.25% for the first month, plus an additional 1/12th of 0.75% for each month thereafter |
| August 2011 and thereafter | 8.00% |

Handlin Ex. 40 (SVHE 2005-3 PSA) § 1.01.

> Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the definition of "Servicer Termination Test," no response is required.

> Undisputed that the cited SVHE 2005-3 PSA contains the cited chart, except that the SVHE 2005-3 PSA states that for the Distribution Date Occurring in "August 2011 and thereafter," the applicable percentage is "8.00% for each month." Further, Plaintiffs' definition of "Servicer Termination Test" is incomplete because it fails to include the definition of other capitalized terms which may or may not impact the manner in which the Servicer Termination Test is calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs' characterization of the quoted language is immaterial as the document speaks for itself. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing. Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c).**

275.    Under this definition, the Servicer Termination Test would be failed in October 2008 if the Cumulative Loss Percentage was 4.541667%, and would be failed in November 2008 if the Cumulative Loss Percentage was 4.6875%.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the definition of "Servicer Termination Test," no response is required.

Disputed.  Plaintiffs have failed to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 273-274 and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is incorrect. Pltfs.Mem. 15-17.**

276.   "Cumulative Loss Percentage" is defined as follows:

With respect to any Distribution Date, the percentage equivalent of a fraction, the numerator of which is the aggregate amount of Realized Losses incurred from the Cut-off Date to the last day of the preceding calendar month and the denominator of which is the aggregate Stated Principal Balance of the Mortgage Loans as of the Cut-off Date.

Handlin Ex. 40 (SHVE 2005-3 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the definition of "Cumulative Loss Percentage, no response is required.

Undisputed that the cited SVHE 2005-3 PSA contains the quoted language. However, Plaintiffs' definition of "Cumulative Loss Percentage" is incomplete because it fails to include the definition of other capitalized terms which may or may not impact the manner in which the Cumulative Loss Percentage is calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs' characterization of the quoted language is immaterial as the document speaks for itself.**

**DB's attempt to evade the material fact by claiming it contains a legal conclusion is**

**unavailing. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

277.    Although the Distribution Reports for SVHE 2005-3 do not use the term "Cumulative Loss Percentage," in the reporting of "Trigger Events," the Distribution Reports use the term "Trigger Event Loss %," which is defined therein as the percentage equivalent of a fraction, the numerator of which is the "Aggregate Cumulative Realized Loss" and the denominator of which is the "Cutoff Date Pool Principal Balance." *See, e.g.*, Handlin Ex. 730 at 27.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding whether the Cumulative Loss Percentage and the Trigger Event

Loss % are the same, no response is required.

Disputed.  Plaintiffs fail to cite admissible evidence with respect to the contention

that the Cumulative Loss Percentage and the Trigger Event Loss % are the same.

Further, each remittance report is a unique document, which speaks for itself.

Plaintiffs citation to a single remittance report does not support any generalization about

the remittance reports generally.

Undisputed that Handlin Ex. 730 contains the quoted language and that Handlin

Ex. 730 does not reference "Cumulative Loss Percentage" in the "Trigger Event" section.

**Plaintiffs' Reply: DB does not dispute the material fact. DB's attempt to evade the**

**material fact by claiming it contains a legal conclusion is unavailing; the cited document**

**speaks for itself. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

278.    Jenny Pilapil, a Trust Administrator in TAG, agreed that





Handlin Ex. 389 (Pilapil) at 106:11-107:16.

        <u>Defendant's Response:</u> To the extent this paragraph purports to state a legal

conclusion regarding ███████████████████████████

███████████████ " no response is required.

        Disputed.  Ms. Pilapil did not ████████████████████

████████████████████████████████████

████████████████████

        Further, Ms. Pilapil did not ████████████████████

████████████████████

        Moreover, Ms. Pilapil ████████████████████

██████████████████████████

████████████████

Undisputed that Handlin Ex. 389 contains the quoted language.  Plaintiffs'
quotation is misleading because it omits additional relevant testimony:



Handlin Ex. 389 at 107:25 – 108:25.  Plaintiffs' omitted language is material because it



**Plaintiffs' Reply: DB does not dispute the material fact. DB's issue with Plaintiffs'
characterization of the testimony is immaterial as the document speaks for itself. DB's
attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.
This material fact should be deemed admitted. *See* Local Rule 56.1(c).**

279.    In the October 27, 2008 Distribution Report for SVHE 2005-3, the Cumulative Loss Percentage was 4.502701%, which was still below the Servicer Termination Test threshold. Handlin Ex. 731 at 27.

> Defendant's Response: Disputed.  The SVHE 2005-3 remittance report for the
>
> October 27, 2008 distribution date did not report "the Cumulative Loss Percentage."

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the document is immaterial as the document speaks for itself. Plaintiffs' material fact is deemed admitted by operation of law. *See* Local Rule 56.1(c). Plaintiffs restate their reply to DBCSUF ¶ 278 and incorporate it by reference.**

280.    In the November 25, 2008 Distribution Report for SVHE 2005-3, the Cumulative Loss Percentage was 5.359189%, exceeding the threshold of 4.6875%, meaning the Trust failed the Servicer Termination Test as of November 25, 2008. Handlin Ex. 732 at 29.

> Defendant's Response: Disputed.  The SVHE 2005-3 remittance report for the
>
> November 25, 2008 distribution date did not report "the Cumulative Loss Percentage."
>
> Further, the event described in this paragraph would not necessarily cause a
>
> Servicer Event of Termination under § 7.01(a)(v) of the SVHE 2005-3 PSA.  Handlin Ex.
>
> 40 (SVHE 2005-3 PSA) § 7.01.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the document is immaterial as the document speaks for itself. Plaintiffs' material fact is deemed admitted by operation of law. *See* Local Rule 56.1(c). Plaintiffs restate their reply to DBCSUF ¶ 278 and incorporate it by reference.**

281.    Under § 7.04(b) of the SVHE 2005-3 PSA ("Notification to Certificateholders"):

No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicer Event of Termination for five Business Days after a Responsible Officer of the Trustee

becomes aware of the occurrence of such an event, the Trustee shall transmit by mail to all Certificateholders notice of such occurrence unless such default or Servicer Event of Termination shall have been waived or cured.

Handlin Ex. 40 (SVHE 2005-3 PSA) § 7.04(b).

> Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual rights and duties of Defendant under the GA, no response is required.

> Undisputed that the cited SVHE 2005-3 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Therefore, Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c).**

282.   The "occurrence of [the] event which constitutes . . . a Servicer Event of Termination" is, as shown above, the exceedance of the Cumulative Loss Percentage on November 25, 2008.

> Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the exceedance of the Cumulative Loss Percentage as defined by the GA, no response is required.

> Disputed.  Plaintiffs' contention lacks evidentiary support.  Further, it is vague and ambiguous as to the phrase "as shown above."  Defendant restates its responses to the paragraphs to which Plaintiffs refer with the phrase "as shown above," and incorporates them by reference.  Defendant is unable to respond further to this contention due to the ambiguity and the absence of evidence or clarification.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to ¶¶ 273-281, *supra*, and the**

**evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.**

283.    Thus, DB was required to send notice of the Servicer Event of Termination to Certificateholders no later than 60 days after the November 25, 2008 occurrence of the event that constituted the Servicer Event of Termination, *i.e.*, no later than January 24, 2009.

<u>Defendant's Response:</u> To the extent this paragraph purports to state a legal

conclusion regarding the contractual duties and obligations of Defendant under the GA,

no response is required.

Disputed.  This paragraph lacks evidentiary support and mischaracterizes the

SVHE 2005-3 PSA.  Under § 7.04(b) of the SVHE 2005-3 PSA ("Notification to

Certificateholders"):

> No later than 60 days after the occurrence of any event which
> constitutes or which, with notice or a lapse of time or both, would
> constitute a Servicer Event of Termination *for five Business Days*
> *after a Responsible Officer of the Trustee becomes aware of the*
> *occurrence of such an event*, the Trustee shall transmit by mail to
> all Certificateholders notice of such occurrence unless such default
> or Servicer Event of Termination shall have been waived or cured.

Handlin Ex. 40 (SVHE 2005-3 PSA) § 7.04(b) (emphasis added).  Before any 60-day

period contemplated in the provision quoted above may begin to run, the event at issue

must occur for five business days after a Responsible Officer (as defined in the GA) of

Defendant becomes aware of the occurrence of the event.

Disputed that Plaintiffs accurately calculated the date of the occurrence of any

event because they did not account for any "applicable grace period," Handlin Ex. 40

(SVHE 2005-3 PSA) § 7.01(b), or whether the event had been cured, thus obviating the

notice requirement, Handlin Ex. 40 (SVHE 2005-3 PSA) § 7.04(b).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement**

incorporates by reference their material facts and replies to the preceding ¶¶ 273-282 and the evidence provided therein.

In Handlin Ex. 40 (SVHE 2005-3 PSA) § 7.04(b), the notice provision that contains "for" should be interpreted to be read as "or" because of a typographical error. This provision is a "boilerplate" provision and the court should interpret it to be consistent with all of the other similar notice provisions, and in particular, all other notice provisions that make reference to five business days. Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b); Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b); Handlin Ex. 5 (ARSI 2006-M3 PSA) § 7.03(b); Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b); Handlin Ex. 7 (ARSI 2006-W3 PSA) § 7.03(b); Handlin Ex. 79 (FFML 2005-FFH3 PSA) § 7.04(b). Furthermore, Deutsche Bank should not be absolved from its obligations because of a typographical error. Therefore, the court should interpret this provision to require the trustee to provide notice within sixty days from the occurrence of an Event of Default *or* within five business days from when a responsible officer becomes aware of events that rise to an Event of Default. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982); *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1539 (S.D.N.Y. 1983); *Beyene v. Irving Tr. Co.*, 762 F.2d 4, 6 (2d Cir. 1985); *E & H Partners v. Broadway Nat'l Bank*, 39 F. Supp. 2d 275, 280 (S.D.N.Y. 1998). *See* Pltfs.Reply 7-8.

Further, while Plaintiffs do not concede that the PSA provided for "an applicable grace period," such period would only extend the date by which DB was required to send notice to January 29, 2009 and would not make DB's notice of this Servicer Termination timely. *Infra* ¶ 284. Finally, DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.

284. █████ Handlin Ex. 733 at DBNTC PHOENIX LIGHT 00000058991-DBNTC PHOENIX LIGHT 00000058992.

<u>Defendant's Response:</u> Undisputed that on July 29, 2010, Defendant ████

████████████████████████████████████

████████████████████████████████████

Handlin Ex. 733 at DBNTC PHOENIX LIGHT 00000058991.



*Id.* at DBNTC PHOENIX LIGHT 00000058991 – 92 (emphasis in original).

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

285.   Because the notice was due no later than January 24, 2009, ████████

> Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the timeliness of the notice of Servicer Event of Termination, no response is required.

> Disputed.  Plaintiffs fail to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 273-284 and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.**

286.  ███████████████████████████████████████████
████████████████████████████████████████  Handlin Ex. 733 at DBNTC PHOENIX LIGHT 00000058991-DBNTC PHOENIX LIGHT 00000058992.

> Defendant's Response: Undisputed.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted. *See* Local Rule 56.1(c).**

### g.  NHEL 2007-2

287.    Under § 7.01(a)(v)-(vii) of the NHEL 2007-2 PSA, a "Servicing Default" occurs:

If any one of the following events . . . shall occur and be continuing:

. . .
(v)     The Cumulative Loss Percentage exceeds (a) with respect to the first 12 Distribution Dates, 3.75%, (b) with respect to the next 12 Distribution Dates, 5.00% (c) with respect to the next 12 Distribution Dates, 7.00%, (d) with respect to the next 12 Distribution Dates, 8.75%, (e) with respect to the next 12 Distribution Dates, 9.75%, (f) and with respect to all Distribution Dates thereafter, 12.25%; or
(vi)    Realized Losses on the Mortgage Loans over any twelve-month period exceeds 4.25% of the sum of the aggregate Principal Balance of the Initial Mortgage Loans as of the Cutoff Date and the Original Pre-Funded Amount; or
(vii)   The Rolling 90 Day Delinquency Percentage exceeds 24.00%.

Handlin Ex. 116 (NHEL 2007-2 PSA) § 7.01(a)(v)-(vii).

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the occurrence of a "Servicing Default," no response is required.

Undisputed that the cited NHEL 2007-2 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c).**

288. "Rolling 90-Day Delinquency Percentage" is defined as follows: "For any Distribution Date, the average of the 90-Day Delinquency Percentages for the Mortgage Loans as of the last day of each of the three (or 1 and 2 in the case of the first two Distribution Dates, as applicable) most recently ended Due Periods." Handlin Ex. 116 (NHEL 2007-2 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the definition of "Rolling 90-Day Delinquency Percentage," no response is required.

Undisputed that the cited NHEL 2007-2 PSA contains the quoted language. However, Plaintiffs' definition of "Rolling 90-Day Delinquency Percentage" is incomplete because it fails to include the definition of other capitalized terms which may or may not impact the manner in which the Rolling 90-Day Delinquency Percentage is calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs' characterization of the quoted language is immaterial as the document speaks for itself. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing. Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c).**

289. "90-Day Delinquency Percentage" is defined as follows:

As of the last day of any Due Period, the percentage equivalent of a fraction, (i) the numerator of which equals the aggregate Principal Balance of the Mortgage Loans

310

that are 90 or more days contractually delinquent, in foreclosure or converted to REO Properties and (ii) the denominator of which is the Pool Balance as of the last day of such Due Period.

Handlin Ex. 116 (NHEL 2007-2 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the definition of "90-Day Delinquency Percentage," no response is required.

Undisputed that the cited NHEL 2007-2 PSA contains the quoted language. However, Plaintiffs' definition of "90-Day Delinquency Percentage" is incomplete because it fails to include the definition of other capitalized terms which may or may not impact the manner in which the 90-Day Delinquency Percentage is calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs' characterization of the quoted language is immaterial as the document speaks for itself. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing. Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c).**

290.   DB's monthly Distribution Reports for NHEL 2007-2 quantify 90-day delinquency in only one place, on the "Delinquency Report" page. That page identifies, as a percentage of the balance of the trust and a percentage of the number of loans in the trust, the total of loans that are delinquent, in foreclosure, and REO, and further shows what percentage of the Trust's balance is delinquent by one payment, two payments, and three or more payments. *See, e.g.,* Handlin Ex. 734 at 12. (The Delinquency Report also provides this information as to loans that are in bankruptcy; however, because the definition of 90-Day Delinquency Percentage includes only loans that are "contractually delinquent, in foreclosure or converted to REO Properties," and does not mention bankruptcy, the data regarding bankruptcy is irrelevant for present purposes.).

Defendant's Response: Disputed.  Plaintiffs' characterization of the NHEL 2007-2 remittance reports is inaccurate, and the materials Plaintiffs cite do not support this paragraph.

Each remittance report is a unique document, which speaks for itself.  Plaintiffs

citation to a single remittance report does not support any generalization about the

remittance reports generally.

Indeed, Plaintiffs' statement that the remittance reports "quantify 90-day

delinquency in only one place" is not even consistent with the only remittance report

Plaintiffs cite in support of this paragraph because page 12 of Handlin Ex. 734 does not

quantify "90-day delinquency."

**Plaintiffs' Reply: DB does not proffer evidence that specifically controverts the**

**material fact. DB's issue with Plaintiffs' characterization of the document is immaterial as**

**the document speaks for itself. The "Delinquency Report" beginning on page 12 of Handlin**

**Exhibit 734 includes an entry for percentage of loans that are delinquent by "3+**

**payments." Plaintiffs' material fact is deemed admitted by operation of law.** *See* **Local Rule**

**56.1(c).**

291.    In DB's July 25, 2008 Distribution Report for NHEL 2007-2, the Delinquency
Report identifies the percentage balance of loans delinquent, in foreclosure, and REO for 3+
payments as 6.49%, 13.24%, and 2.42%, respectively, totaling 22.15%. *Id.*

Defendant's Response: Undisputed that Handlin Ex. 734 contains the identified

information.

Undisputed that Plaintiffs accurately calculated the total of the three numbers.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

292.    In DB's August 25, 2008 Distribution Report for NHEL 2007-2, the Delinquency
Report identifies the percentage balance of loans delinquent, in foreclosure, and REO for 3+
payments as 8.31%, 13.61%, and 2.33%, respectively, totaling 24.25%. Handlin Ex. 735 at 12.

Defendant's Response: Undisputed that Handlin Ex. 735 contains the identified

information.

Undisputed that Plaintiffs accurately calculated the total of the three numbers.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

293.    In DB's September 25, 2008 Distribution Report for NHEL 2007-2, the Delinquency Report identifies the percentage balance of loans delinquent, in foreclosure, and REO for 3+ payments as 9.98%, 14.40%, and 2.23%, respectively, totaling 26.61%. Handlin Ex. 736 at 12.

Defendant's Response: Undisputed that Handlin Ex. 736 contains the identified

information.

Undisputed that Plaintiffs accurately calculated the total of the three numbers.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

294.    The average of the total percentage balance ninety days or more delinquent as reported in the Delinquency Reports of DB's July, August, and September 2008 Distribution Reports for NHEL 2007-2 is 24.3367%.

Defendant's Response: Disputed to the extent that the NHEL 2007-2 remittance

reports for distribution dates in July, August, and September 2008 did not report "the

total percentage balance ninety days or more delinquent." *See* Handlin Exs. 734, 735 &

736.

Undisputed that Plaintiffs accurately calculated the mathematical average based

on the information they provided.

**Plaintiffs' Reply: DB does not dispute the material fact. DB's issue with Plaintiffs' characterization of the document is immaterial as the document speaks for itself. Plaintiffs' material fact is deemed admitted by operation of law.** *See* **Local Rule 56.1(c).**

295.    Because, as of DB's September 25, 2008 Distribution Report, the Rolling 90 Day Delinquency Percentage was higher than the 24.00% threshold for the defined Servicing Default, this Servicing Default was triggered on September 25, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the occurrence of a "Servicing Default," no response is required.

Disputed.

Plaintiffs' statement lacks evidentiary support.  Further, Plaintiffs' assertion is not supported by the cited material because Plaintiffs have not established that the methodology utilized by Plaintiffs is the same methodology required by the GAs.  *See* Handlin Ex. 116 (NHEL 2007-2 PSA) § 1.01, Appendix A at 41 (definition of "Rolling 90 Day Delinquency Percentage": "For any Distribution Date, the average of the 90-Day Delinquency Percentages for the Mortgage Loans as of the last day of each of the three (or 1 and 2 in the case of the first two Distribution Dates, as applicable) most recently ended Due Periods.").

**Plaintiffs' Reply: DB does not proffer evidence that specifically controverts the material fact. DB's issue with Plaintiffs' characterization of the documents is immaterial as the documents speak for themselves. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing. Plaintiffs' material fact is deemed admitted by operation of law. *See* Local Rule 56.1(c).**

296.   Because the NHEL 2007-2 Trust closed on June 1, 2007, Handlin Ex. 116 (NHEL 2007-2 PSA) § 1.01 (Definition of "Closing Date"), under the definition in § 7.01(a)(v) of the NHEL 2007-2 PSA, a separate Servicing Default would occur if, in the second half of 2009, the Cumulative Loss Percentage exceeded 7.00%.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the occurrence of a "Servicing Default," no response is required.

Disputed that the closing date of the NHEL 2007-2 Trust is relevant to determine when a Servicing Default would occur under § 7.01(a)(v).

Plaintiffs fail to provide evidence to support this contention.

Undisputed that § 7.01(a) of the NHEL 2007-2 PSA states in relevant part:

If any one of the following events (a "Servicing Default") shall
occur and be continuing:

. . .

(v)      The Cumulative Loss Percentage exceeds (a) with respect
to the first 12 Distribution Dates, 3.75%, (b) with respect to the
next 12 Distribution Dates, 5.00%, (c) with respect to the next 12
Distribution Dates, 7.00%. . .

Handlin Ex. 116 § 7.01(a).

**Plaintiffs' Reply: DB does not specifically controvert the material fact. DB's issue
with Plaintiffs' characterization of the documents is immaterial as the documents speak for
themselves. Plaintiffs' material fact is deemed admitted by operation of law. *See* Local Rule
56.1(c). DB's attempt to evade the material fact by claiming it contains a legal conclusion is
unavailing.**

297.     In the August 25, 2009 Distribution Report for NHEL 2007-2, the Cumulative
Loss Percentage was 6.60044385%, which was still below the threshold for a Servicing Default.
Handlin Ex. 737 at 72.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding "the threshold for a Servicing Default," no response is required.

Undisputed that Handlin Ex. 737 contains the identified information regarding the

Cumulative Loss Percentage.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the
material fact by claiming it contains a legal conclusion is unavailing; the cited document
speaks for itself. Therefore, this material fact should be deemed admitted. *See* Local Rule
56.1(c).**

298.     In the September 25, 2009 Distribution Report for NHEL 2007-2, the Cumulative
Loss Percentage was 7.02480217%, exceeding the threshold of 7.00%, meaning this Servicing
Default occurred as of September 25, 2009. Handlin Ex. 738 at 71.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the occurrence of a Servicing Default, no response is required.

Disputed that the event described in this paragraph would necessarily cause a

Servicer Default under § 7.01(a)(v) of the NHEL 2007-2 Trust.  Handlin Ex. 116 (NHEL

2007-2 PSA) at § 7.01.

Undisputed that Ex. 738 contains the information identified regarding the

Cumulative Loss Percentage.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs'**

**characterization that "the event described in this paragraph would necessarily cause a**

**Servicer Default under § 7.01(a)(v) of the NHEL 2007-2 Trust" is immaterial as the**

**document speaks for itself. DB's attempt to evade the material fact by claiming it contains**

**a legal conclusion is unavailing. Plaintiffs' material fact should be deemed admitted. *See***

**Local Rule 56.1(c).**

299.    Under § 7.04(b) of the NHEL 2007-2 PSA titled "Notification to
Certificateholders":

> No later than 60 days after the occurrence of any event which constitutes or which,
> with notice or a lapse of time or both, would constitute a Servicing Default for five
> Business Days after a Responsible Officer of the Trustee obtains actual knowledge
> or written notice of the occurrence of such an event, the Trustee shall transmit by
> mail to the Hedge Counterparties, if prior to the Class I Termination Date, and all
> Certificateholders notice of such occurrence unless such default or Servicing
> Default shall have been waived or cured.

Handlin Ex. 116 (NHEL 2007-2 PSA) § 7.04(b).

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the contractual rights and duties of Defendant under the GA, no

response is required.

Undisputed that the cited NHEL 2006-6 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Therefore, this material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

300.    The "occurrence of [the] event which constitutes . . . a Servicing Default" is, as shown above, first, the exceedance of the Rolling 90 Day Delinquency Percentage on September 25, 2008, and, second, the exceedance of the Cumulative Loss Percentage on September 25, 2009.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the occurrence of a Servicing Default, no response is required.

Disputed.  Plaintiffs' contention lacks evidentiary support.  Further, it is vague and ambiguous as to the phrase "as shown above."  Defendant restates its responses to the paragraphs to which Plaintiffs refer with the phrase "as shown above," and incorporates them by reference.  Defendant is unable to respond further to this contention due to the ambiguity and the absence of evidence or clarification.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, this material fact should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to ¶¶ 287-299,** *supra,* **and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is immaterial. Pltfs.Mem. 15-17.**

301.    Thus, with respect to the Servicing Default triggered by exceedance of the Rolling 90 Day Delinquency Percentage, DB was required to send notice of the Servicing Default to Certificateholders no later than 60 days after the September 25, 2008 occurrence of the event that constituted the Servicing Default, *i.e.,* no later than November 24, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual duties and obligations of Defendant under the GA, no response is required.

317

Disputed.  This paragraph lacks evidentiary support and mischaracterizes the

NHEL 2007-2 PSA.  Under § 7.04(b) of the NHEL 2007-2 PSA titled "Notification to

Certificateholders":

> No later than 60 days after the occurrence of any event which constitutes or which, with notice or a lapse of time or both, would constitute a Servicing Default *for five Business Days after a Responsible Officer of the Trustee obtains actual knowledge or written notice of the occurrence of such an event*, the Trustee shall transmit by mail to the Hedge Counterparties, if prior to the Class I Termination Date, and all Certificateholders notice of such occurrence unless such default or Servicing Default shall have been waived or cured.

Handlin Ex. 116 (NHEL 2007-2 PSA) § 7.04(b) (emphasis added).  Before any 60-day

period contemplated in the provision quoted above may begin to run, the event at issue

must occur for five business days after a Responsible Officer (as defined in the GA) of

Defendant obtains actual knowledge or written notice of the occurrence of the event.

Disputed that Plaintiffs accurately calculated the date of the occurrence of any

event because they did not account for any "applicable grace period," Handlin Ex. 116

(NHEL 2007-2 PSA) § 7.01(b), or whether the event had been cured, thus obviating the

notice requirement, Handlin Ex. 116 (NHEL 2007-2 PSA) § 7.04(b).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement**

**incorporates by reference their material facts and replies to ¶¶ 287-299,** *supra***, and the**

**evidence provided therein.**

**In Handlin Ex. 116 (NHEL 2007-2 PSA) § 7.04(b), the notice provision that contains**

**"for" should be interpreted to be read as "or" because of a typographical error. This**

**provision is a "boilerplate" provision and the court should interpret it to be consistent with**

**all of the other similar notice provisions, and in particular, all other notice provisions that**

make reference to five business days. Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b);

Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b); Handlin Ex. 5 (ARSI 2006-M3 PSA) §

7.03(b); Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b); Handlin Ex. 7 (ARSI 2006-W3

PSA) § 7.03(b); Handlin Ex. 79 (FFML 2005-FFH3 PSA) § 7.04(b). **Furthermore, Deutsche**

**Bank should not be absolved from its obligations because of a typographical error.**

**Therefore, the court should interpret this provision to require the trustee to provide notice**

**within sixty days from the occurrence of an Event of Default *or* within five business days**

**from when a responsible officer becomes aware of events that rise to an Event of Default.**

**See *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982);**

***Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1539 (S.D.N.Y.**

**1983); *Beyene v. Irving Tr. Co.*, 762 F.2d 4, 6 (2d Cir. 1985); *E & H Partners v. Broadway***

***Nat'l Bank*, 39 F. Supp. 2d 275, 280 (S.D.N.Y. 1998). *See* Pltfs.Reply 7-8.**

    **Further, while Plaintiffs do not concede that the PSA provided for "an applicable**

**grace period," such period would only extend the date by which DB was required to send**

**notice to November 29, 2008 and would not make DB's notice of this Servicer Termination**

**timely. *Infra* ¶ 303. Finally, DB's attempt to evade the material fact by claiming it contains**

**a legal conclusion is unavailing.**

302.    Separately, with respect to the Servicing Default triggered by exceedance of the Cumulative Loss Percentage, DB was required to send notice of the Servicing Default to Certificateholders no later than 60 days after the September 25, 2009 occurrence of the event that constituted the Servicing Default, *i.e.*, no later than November 24, 2009.

    <u>Defendant's Response:</u> To the extent this paragraph purports to state a legal

conclusion regarding the contractual duties and obligations of Defendant under the GA,

no response is required.

Disputed.  This paragraph lacks evidentiary support and mischaracterizes the

NHEL 2007-2 PSA.  Under § 7.04(b) of the NHEL 2007-2 PSA titled "Notification to

Certificateholders":

> No later than 60 days after the occurrence of any event which
> constitutes or which, with notice or a lapse of time or both, would
> constitute a Servicing Default *for five Business Days after a*
> *Responsible Officer of the Trustee obtains actual knowledge or*
> *written notice of the occurrence of such an event*, the Trustee shall
> transmit by mail to the Hedge Counterparties, if prior to the Class I
> Termination Date, and all Certificateholders notice of such
> occurrence unless such default or Servicing Default shall have
> been waived or cured.

Handlin Ex. 116 (NHEL 2007-2 PSA) § 7.04(b) (emphasis added).  Before any 60-day

period contemplated in the provision quoted above may begin to run, the event at issue

must occur for five business days after a Responsible Officer (as defined in the GA) of

Defendant obtains actual knowledge or written notice of the occurrence of the event.

Disputed that Plaintiffs accurately calculated the date of the occurrence of any

event because they did not account for any "applicable grace period," Handlin Ex. 116

(NHEL 2007-2 PSA) § 7.01(b), or whether the event had been cured, thus obviating the

notice requirement, Handlin Ex. 116 (NHEL 2007-2 PSA) § 7.04(b).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement**

**incorporates by reference their material facts and replies to ¶¶ 287-299, *supra*, and the**

**evidence provided therein.**

**In Handlin Ex. 116 (NHEL 2007-2 PSA) § 7.04(b), the notice provision that contains**

**"for" should be interpreted to be read as "or" because of a typographical error. This**

**provision is a "boilerplate" provision and the court should interpret it to be consistent with**

**all of the other similar notice provisions, and in particular, all other notice provisions that**

make reference to five business days. **Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b);**

**Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b); Handlin Ex. 5 (ARSI 2006-M3 PSA) §**

**7.03(b); Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b); Handlin Ex. 7 (ARSI 2006-W3**

**PSA) § 7.03(b); Handlin Ex. 79 (FFML 2005-FFH3 PSA) § 7.04(b). Furthermore, Deutsche**

**Bank should not be absolved from its obligations because of a typographical error.**

**Therefore, the court should interpret this provision to require the trustee to provide notice**

**within sixty days from the occurrence of an Event of Default *or* within five business days**

**from when a responsible officer becomes aware of events that rise to an Event of Default.**

*See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982);

*Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1539 (S.D.N.Y.

1983); *Beyene v. Irving Tr. Co.*, 762 F.2d 4, 6 (2d Cir. 1985); *E & H Partners v. Broadway*

*Nat'l Bank*, 39 F. Supp. 2d 275, 280 (S.D.N.Y. 1998). *See* Pltfs.Reply 7–8.

**Further, while Plaintiffs do not concede that the PSA provided for "an applicable**

**grace period," such period would only extend the date by which DB was required to send**

**notice to November 29, 2009 and would not make DB's notice of this Servicer Termination**

**timely. *Infra* ¶ 303. Finally, DB's attempt to evade the material fact by claiming it contains**

**a legal conclusion is unavailing.**

303.    Handlin Ex. 739 at DBNTC_COMMERZBANK_00000057551-
DBNTC_COMMERZBANK_00000057552.

Defendant's Response: Undisputed that on March 9, 2010, Defendant

Handlin
Ex. 739 at DBNTC_COMMERZBANK_00000057551.



*Id.* at DBNTC_COMMERZBANK_00000057551 – 52 (emphasis in original).

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

304.   Because the notice of the Servicing Default triggered by exceedance of the Rolling 90 Day Delinquency Percentage was due no later than November 24, 2008, ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ no response is required.

Disputed.  Plaintiffs fail to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 287-303 and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.**

305.   Because the notice of the Servicing Default triggered by exceedance of the Cumulative Loss Percentage was due no later than November 24, 2009, ███████████████ ████████████████████████████████████████████████

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion ████████████████████████████████████████████████████

███████

Disputed.  Plaintiffs fail to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 287-303 and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.**

306.   DB's March 9, 2010 notice of Servicing Defaults did not identify the dates on which any of the discrete Servicing Defaults first occurred. Handlin Ex. 739 at DBNTC_COMMERZBANK_00000057551-DBNTC_COMMERZBANK_00000057552.

Defendant's Response: Undisputed.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

### h.  SVHE 2005-OPT4

307.   Under § 7.01(a)(v) of the SVHE 2005-OPT4 PSA, a "Servicer Event of Termination" occurs if "[a] Delinquency Servicer Termination Trigger has occurred and is continuing[.]" Handlin Ex. 118 (SVHE 2005-OPT4 PSA) § 7.01(a)(v).

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the occurrence of a "Servicer Event of Termination," no response is required.

Undisputed that the cited SVHE 2005-OPT4 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

308.    The "Delinquency Servicer Termination Trigger" is defined as follows:

A Delinquency Servicer Termination Trigger will have occurred with respect to the Certificates on a Distribution Date if the Three Month Rolling Delinquency Percentage for the Mortgage Loans exceeds 18.00%.

Handlin Ex. 118 (SVHE 2005-OPT4 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the definition of "Delinquency Servicer Termination Trigger," no response is required.

Undisputed that the cited SVHE 2005-OPT4 PSA contains the quoted language. However, Plaintiffs' definition of "Delinquency Servicer Termination Trigger" is incomplete because it fails to include the definition of other capitalized terms which may or may not impact the manner in which the Delinquency Servicer Termination Trigger is calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs' characterization of the quoted language is immaterial as the document speaks for itself. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

324

309.    "Three Month Rolling Delinquency Percentage" is defined as follows:

> With respect to the Mortgage Loans and any Distribution Date, the average for the three most recent calendar months of the fraction, expressed as a percentage, the numerator of which is (x) the sum (without duplication) of the aggregate of the Stated Principal Balances of all Mortgage Loans that are (i) 60 or more days Delinquent, (ii) in bankruptcy and 60 or more days Delinquent, (iii) in foreclosure and 60 or more days Delinquent or (iv) REO Properties, and the denominator of which is (y) the sum of the Stated Principal Balances of the Mortgage Loans, in the case of both (x) and (y), as of the Close of Business on the last Business Day of each of the three most recent calendar months.

Handlin Ex. 118 (SVHE 2005-OPT4 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the definition of "Three Month Rolling Delinquency Percentage," no response is required.

Undisputed that the cited SVHE 2005-OPT4 PSA contains the quoted language. However, Plaintiffs' definition of "Three Month Rolling Delinquency Percentage" is incomplete because it fails to include the definition of other capitalized terms which may or may not impact the manner in which the Three Month Rolling Delinquency Percentage is calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs' characterization of the quoted language is immaterial as the document speaks for itself. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing. Plaintiffs' material fact should be deemed admitted. _See_ Local Rule 56.1(c).**

310.    DB's monthly Distribution Reports for SVHE 2005-OPT4 quantify "delinquency" in two places. The "Delinquency Report" page identifies, as a percentage of the balance of the trust and a percentage of the number of loans in the trust, the total of loans that are (i) delinquent, (ii) in foreclosure, (iii) in bankruptcy, and (iv) REO, and further shows what percentage of the Trust's balance is delinquent by one payment, two payments, and three or more payments. _See_, _e.g._, Handlin Ex. 740 at 22. The "Trigger Events" box for the relevant period lists a single line item, "Delinquency Percentage." _See_, _e.g._, _id._ at 39.

Defendant's Response: Disputed.  Plaintiffs' characterization of the SVHE 2005-OPT4 remittance reports is inaccurate, and the materials Plaintiffs cite do not support this paragraph.  Each remittance report is a unique document, which speaks for itself. Plaintiffs citation to a single remittance report does not support any generalization about the remittance reports generally.

Indeed, Plaintiffs' statement that "The 'Delinquency Report' page identifies, as a percentage of the balance of the trust and a percentage of the number of loans in the trust, the total of loans that are (i) delinquent, (ii) in foreclosure, (iii) in bankruptcy, and (iv) REO, and further shows what percentage of the Trust's balance is delinquent by one payment, two payments, and three or more payments" is not even consistent with the only remittance report Plaintiffs cite in support of this paragraph because page 22 of Handlin Ex. 740 contains none of that information.

To the extent Plaintiffs intended to cite page 12 for the proposition that the remittance reports "quantify 'delinquency' in two places," this is also inconsistent with the SVHE 2005-OPT4 remittance report for the October 25, 2007 distribution date because delinquencies are also quantified at least on pages 12 and 13 of Handlin Ex. 740.

Third, Plaintiffs' characterization of the Delinquency Report section of the remittance report as a "page" is not consistent with the SVHE 2005-OPT4 remittance report for the October 25, 2007 distribution date because the Delinquency Report is three pages.  Handlin Ex. 740 at 11 – 13.

Finally, Plaintiffs' statement "The 'Trigger Events' box for the relevant period lists a single line item, 'Delinquency Percentage'" is not consistent with the remittance

report for the October 25, 2007 distribution date because the "Trigger Events" box on page 39 of Handlin Ex. 740 lists multiple line items.

**Plaintiffs' Reply: DB does not proffer evidence that specifically controverts the material fact. DB's issue with Plaintiffs' characterization of the document is immaterial as the document speaks for itself. Plaintiffs' material fact is deemed admitted by operation of law.** *See* **Local Rule 56.1(c).**

311.    In DB's October 25, 2007 Distribution Report for SVHE 2005-OPT4, (a) the Delinquency Report identifies the percentage balance of loans (i) delinquent, (ii) in foreclosure, (iii) in bankruptcy, and (iv) REO for 2 payments as 2.86% and for 3+ payments as 13.14%, totaling 16.00% sixty or more days delinquent, and (b) the Delinquency Percentage is stated to be 16.358243%. *Id.* at 11, 39.

Defendant's Response: Undisputed that Handlin Ex. 740 contains the identified information.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

312.    In DB's November 26, 2007 Distribution Report for SVHE 2005-OPT4, (a) the Delinquency Report identifies the percentage balance of loans (i) delinquent, (ii) in foreclosure, (iii) in bankruptcy, and (iv) REO for 2 payments as 2.49% and for 3+ payments as 15.26%, totaling 17.75% sixty or more days delinquent, and (b) the Delinquency Percentage is stated to be 18.126459%. Handlin Ex. 741 at 11, 41.

Defendant's Response: Undisputed that Handlin Ex. 741 contains the identified information.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed admitted.** *See* **Local Rule 56.1(c).**

313.    In DB's December 26, 2007 Distribution Report for SVHE 2005-OPT4, (a) the Delinquency Report identifies the percentage balance of loans (i) delinquent, (ii) in foreclosure, (iii) in bankruptcy, and (iv) REO for 2 payments as 3.24% and for 3+ payments as 16.68%, totaling 19.92% sixty or more days delinquent, and (b) the Delinquency Percentage is stated to be 20.177674%. Handlin Ex. 742 at 11, 39.

Defendant's Response: Undisputed that Handlin Ex. 742 contains the identified

information.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

314.    In DB's January 25, 2008 Distribution Report for SVHE 2005-OPT4, (a) the
Delinquency Report identifies the percentage balance of loans (i) delinquent, (ii) in foreclosure,
(iii) in bankruptcy, and (iv) REO for 2 payments as 4.27% and for 3+ payments as 18.38%,
totaling 22.65% sixty or more days delinquent, and (b) the Delinquency Percentage is stated to
be 22.732616%. Handlin Ex. 743 at 11, 39.

Defendant's Response: Undisputed that Handlin Ex. 743 contains the identified

information.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

315.    The average of the total percentage balance sixty days or more delinquent as
reported in the Delinquency Reports of DB's October, November, and December 2007
Distribution Reports for SVHE 2005-OPT4 is 17.89%. The average of the Delinquency
Percentages reported in the October, November, and December 2007 Distribution Reports for
SVHE 2005-OPT4 is 18.220792%.

Defendant's Response: Undisputed that Plaintiffs accurately calculated the

mathematical averages based on the information they provided.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

316.    The average of the total percentage balance sixty days or more delinquent as
reported in the Delinquency Reports of DB's November and December 2007 and January 2008
Distribution Reports for SVHE 2005-OPT4 is 20.04%. The average of the Delinquency
Percentages reported in the November and December 2007 and January 2008 Distribution
Reports for SVHE is 2005-OPT4 is 20.345583%.

Defendant's Response: Disputed.  The numerical average of 17.75%, 19.92%, and

22.65 % is not 20.04%.

Undisputed that Plaintiffs accurately calculated the mathematical averages of

"average of the Delinquency Percentages reported in the November and December 2007

and January 2008 Distribution Reports" based on the information they provided.

**Plaintiffs' Reply: DB does not dispute the material fact. This material fact should be**

**deemed admitted.** *See* **Local Rule 56.1(c). The average of the total percentage balance sixty**

**days or more delinquent as reported in the Delinquency Reports of DB's November and**

**December 2007 and January 2008 Distribution Reports for SVHE 2005-OPT4 is actually**

**higher than originally noted—20.11% rather than 20.04%.**

317.    Using the three-month average of the reported Delinquency Percentages, the
18.00% threshold for the defined Servicer Event of Termination was exceeded on December 26,
2007. Using the three-month average of the total percentage balances sixty days or more
delinquent as reported in the Delinquency Reports, the 18.00% threshold for the defined Servicer
Event of Termination was exceeded on January 25, 2008. Even using the latter date to be
conservative, the Servicer Event of Termination for SVHE 2005-OPT4 was triggered no later
than January 25, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the occurrence of a "Servicer Event of Termination," no response is

required.

Disputed.  Plaintiffs fail to provide evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement**

**incorporates by reference their material facts and replies to the preceding ¶¶ 307-316. DB's**

**attempt to evade the material fact by claiming it contains a legal conclusion is immaterial.**

**But even if the statement contains a legal conclusion, DB is nonetheless mistaken.**

318.    Under § 7.04(b) of the SVHE 2005-OPT4 PSA titled "Notification to
Certificateholders":

No later than 60 days after the occurrence of any event which constitutes or which,
with notice or a lapse of time or both, would constitute a Servicer Event of

Termination for five Business Days after a Responsible Officer of the Trustee becomes aware of the occurrence of such an event, the Trustee shall transmit by mail to all Certificateholders and to the NIMS Insurer notice of such occurrence unless such default or Servicer Event of Termination shall have been waived or cured.

Handlin Ex. 118 (SVHE 2005-OPT4 PSA) § 7.04(b).

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the contractual rights and duties of Defendant under the GA, no response is required.

Undisputed that the cited SVHE 2005-OPT4 PSA contains the quoted language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Therefore, this material fact should be deemed admitted. *See* Local Rule 56.1(c).**

319.    The "occurrence of [the] event which constitutes . . . a Servicer Event of Termination" is, as shown above, the exceedance of the Three Month Rolling Delinquency Percentage on January 25, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the exceedance of the Three Month Rolling Delinquency Percentage as defined by the GA, no response is required.

Disputed.  Plaintiffs' contention lacks evidentiary support.  Further, it is vague and ambiguous as to the phrase "as shown above."  Defendant restates its responses to the paragraphs to which Plaintiffs refer with the phrase "as shown above," and incorporates them by reference.  Defendant is unable to respond further to this contention due to the ambiguity and the absence of evidence or clarification.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement**

incorporates by reference their material facts and replies to ¶¶ 307-318 and the evidence

provided therein. DB's attempt to evade the material fact by claiming it contains a legal

conclusion is unavailing.

320.    Thus, DB was required to send notice of this Servicer Event of Termination to Certificateholders no later than 60 days after the January 25, 2008 occurrence of the event that constituted the Servicer Event of Termination, *i.e.*, no later than March 25, 2008.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the contractual duties and obligations of Defendant under the GA,

no response is required.

Disputed.  Plaintiffs' purported characterization of the SVHE 2005-OPT4 PSA as

requiring Defendant "to send notice of [a] Servicer Event of Termination to

Certificateholders no later than 60 days after the . . . occurrence of the event that

constituted the Servicer Event of Termination" is contrary to the terms of that agreement.

The SVHE 2005-OPT4 PSA provides:

> No later than 60 days after the occurrence of any event which
> constitutes or which, with notice or a lapse of time or both, would
> constitute a Servicer Event of Termination *for five Business Days*
> *after a Responsible Officer of the Trustee becomes aware of the*
> *occurrence of such an event*, the Trustee shall transmit by mail to
> all Certificateholders and to the NIMS Insurer notice of such
> occurrence unless such default or Servicer Event of Termination
> shall have been waived or cured.

Handlin Ex. 118 (SVHE 2005-OPT4 PSA) § 7.04(b) (emphasis added).  Plaintiffs'

purported characterization ignores the italicized language above.  Before any 60-day

period contemplated in the provision quoted above may begin to run, the event at issue

must occur for five business days after a Responsible Officer (as defined in the GA) of

Defendant becomes aware of the occurrence of the event.

Disputed to the extent this paragraph lacks evidentiary support.

Disputed that Plaintiffs accurately calculated the date of the occurrence of the event because they did not account for any "applicable grace period," Handlin Ex. 118 (SVHE 2005-OPT4 PSA) § 7.01(b), or whether the event had been cured, thus obviating the notice requirement, Handlin Ex. 118 (SVHE 2005-OPT4 PSA) § 7.04(b).

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and replies to the preceding ¶¶ 307-319 and the evidence provided therein.**

**In Handlin Ex. 118 (SVHE 2005-OPT4 PSA) § 7.04(b), the notice provision that contains "for" should be interpreted to be read as "or" because of a typographical error. This provision is a "boilerplate" provision and the court should interpret it to be consistent with all of the other similar notice provisions, and in particular, all other notice provisions that make reference to five business days. Handlin Ex. 3 (AMSI 2006-R1 PSA) § 7.03(b); Handlin Ex. 4 (ARSI 2006-M1 PSA) § 7.03(b); Handlin Ex. 5 (ARSI 2006-M3 PSA) § 7.03(b); Handlin Ex. 6 (ARSI 2006-W2 PSA) § 7.03(b); Handlin Ex. 7 (ARSI 2006-W3 PSA) § 7.03(b); Handlin Ex. 79 (FFML 2005-FFH3 PSA) § 7.04(b). Furthermore, Deutsche Bank should not be absolved from its obligations because of a typographical error. Therefore, the court should interpret this provision to require the trustee to provide notice within sixty days from the occurrence of an Event of Default *or* within five business days from when a responsible officer becomes aware of events that rise to an Event of Default. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982); *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1539 (S.D.N.Y.**

1983); *Beyene v. Irving Tr. Co.*, 762 F.2d 4, 6 (2d Cir. 1985); *E & H Partners v. Broadway Nat'l Bank*, 39 F. Supp. 2d 275, 280 (S.D.N.Y. 1998). *See* Pltfs.Reply 7-8.

Further, while Plaintiffs do not concede that the PSA provided for "an applicable grace period," such period would only extend the date by which DB was required to send notice to March 30, 2008 and would not make DB's notice of this Servicer Termination timely. *Infra* ¶ 321. Finally, DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.

321.      Handlin Ex. 744.

Defendant's Response:   Undisputed that on March 5, 2009, Defendant

Handlin Ex. 744 at

DBNTC_COMMERZBANK_00000057907.





*Id.* at DBNTC_COMMERZBANK_00000057907 – 08 (emphasis in original).

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

322.   Because the notice was due no later than March 25, 2008, ███████████
███████████████████

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the timeliness of the notice of Servicer Event of Termination, no

response is required.

Disputed.  Plaintiffs fail to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, it should be deemed admitted.** *See* **Local Rule 56.1(c). Plaintiffs' statement**

**incorporates by reference their material facts and replies to the preceding ¶¶ 307-321 and**

**the evidence provided therein. DB's attempt to evade the material fact by claiming it**

**contains a legal conclusion is unavailing.**

323.   ████████████████████████
███████████████ Handlin Ex. 744.

Defendant's Response: Undisputed.

**Plaintiffs' Reply: DB does not dispute this material fact. It should be deemed**

**admitted.** *See* **Local Rule 56.1(c).**

### i.   GSAMP 2005-WMC2

324.   Under § 7.01(g) of the GSAMP 2005-WMC2 PSA, "a Cumulative Loss Event"
constitutes an "Event of Default." Handlin Ex. 91 (GSAMP 2005-WMC2 PSA) § 7.01(g).

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the occurrence of an EOD, no response is required.

Undisputed that the cited GSAMP 2005-WMC2 PSA contains the quoted

language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the**

**material fact by claiming it contains a legal conclusion is unavailing; the cited document**

**speaks for itself. The material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

325.    "Cumulative Loss Event" is defined as follows:

With respect to any Distribution Date, a Cumulative Loss Event occurs if the
Cumulative Loss Percentage exceeds the applicable percentage set forth below with
respect to such Distribution Date:

| Distribution Date Occurring In | Percentage |
|---|---|
| December 2008 through November 2009 | 4.10% of the Cut-off Date Pool Principal Balance |
| December 2009 through November 2010 | 5.85% of the Cut-off Date Pool Principal Balance |
| December 2010 through November 2010 | 7.25% of the Cut-off Date Pool Principal Balance |
| December 2011 and thereafter | 8.00% of the Cut-off Date Pool Principal Balance |

Handlin Ex. 91 (GSAMP 2005-WMC2 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the definition of a "Cumulative Loss Event," no response is

required.  To the extent a response is required, disputed.

Undisputed that the cited GSAMP 2005-WMC2 PSA contains the quoted

language, except that the third row under "Distribution Date Occurring In" should read

"December 2010 through November *2011*."  Further, Plaintiffs' definition of

"Cumulative Loss Event" is incomplete because it fails to include the definition of other

335

capitalized terms which may or may not impact the manner in which the Cumulative Loss

Event is calculated or determined.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert this material**

**fact. DB's issue with Plaintiffs' characterization of the quoted language is immaterial as the**

**document speaks for itself. DB's attempt to evade the material fact by claiming it contains**

**a legal conclusion is unavailing. Plaintiffs' material fact should be deemed admitted. *See***

**Local Rule 56.1(c).**

326.   "Cumulative Loss Percentage" is defined as follows:

As of any date of determination, the percentage equivalent of a fraction, the
numerator of which is the aggregate amount of Realized Losses on the Mortgage
Loans for the period from the Cut-off Date to the date of determination and the
denominator of which is the Stated Principal Balance of the Mortgage Loans as of
the Cut-off Date.

Handlin Ex. 91 (GSAMP 2005-WMC2 PSA) § 1.01.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the definition of "Cumulative Loss Percentage," no response is

required.

Undisputed that the cited GSAMP 2005-WMC2 PSA contains the quoted

language.  However, Plaintiffs' definition of "Cumulative Loss Percentage" is incomplete

because it fails to include the definition of other capitalized terms which may or may not

impact the manner in which the Cumulative Loss Percentage is calculated or determined.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's issue with Plaintiffs'**

**characterization of the quoted language is immaterial as the document speaks for itself.**

**DB's attempt to evade the material fact by claiming it contains a legal conclusion is**

**unavailing. Plaintiffs' material fact should be deemed admitted. *See* Local Rule 56.1(c).**

327.    Under the definition of Cumulative Loss Event in this Trust, the earliest a Cumulative Loss Event could occur was December 2008.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding the interpretation of the contractually defined "Cumulative Loss Event," no response is required.

Disputed.  Plaintiffs fail to cite evidence to support this contention.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material fact. Therefore, it should be deemed admitted. *See* Local Rule 56.1(c). Plaintiffs' statement incorporates by reference their material facts and reply to ¶ 326, *supra*, and the evidence provided therein. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing.**

328.    Although the Distribution Reports for GSAMP 2005-WMC2 do not use the term "Cumulative Loss Percentage" in the reporting of "Trigger Events," the Distribution Reports use the term "Trigger Event Loss %," which is defined therein as the percentage equivalent of a fraction, the numerator of which is the "Aggregate Realized Losses Since Cutoff Date" and the denominator of which is the "Cutoff Date Pool Principal Balance." *See*, *e.g.*, Handlin Ex. 745 at 31.

Defendant's Response: To the extent this paragraph purports to state a legal conclusion regarding whether the Cumulative Loss Percentage and the Trigger Event Loss % are the same, no response is required

Disputed.  Plaintiffs fail to cite admissible evidence with respect to the contention that the Cumulative Loss Percentage and the Trigger Event Loss % are the same.

Further, each remittance report is a unique document, which speaks for itself. Plaintiffs citation to a single remittance report does not support any generalization about the remittance reports generally.

Undisputed that Handlin Ex. 745 contains the quoted language and that Handlin Ex. 745 does not reference "Cumulative Loss Percentage" in the "Trigger Event" section.

**Plaintiffs' Reply: DB does not dispute the material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document speaks for itself. Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

329.     Katie Wannenmacher, a Team Leader in Core Services, agreed that





Handlin Ex. 746 (Wannenmacher) at 193:11-195:6.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding ████████████████████████████

████████████████████ no response is required.

Disputed that Ms. Wannenmacher ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████ Handlin Ex. 746 (Wannenmacher) at 193:11-195:6. ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████ *See* Handlin Ex. 746 at 202:9 – 203:1 (K. Wannenmacher Dep.

(Dec. 18, 2017)) (███████████); *id.* at 205:4 – 206:14 (same); *id.* at 161:10 – 21

(███████████████████████████████); *id.* at 162:16 – 163:4

(same).

Further, Plaintiffs asserction is not supported by the cited material because

Plaintiffs have not established that ███████████████████████████

███████████████████████ *See* Handlin Ex. 91 (GSAMP 2005-WMC2 PSA) §

1.01 (definition of "Trigger Event").

Moreover, Ms. Wannenmacher lacks foundation to calculate the "Trigger Event

Loss %." 

**Plaintiffs' Reply: DB's statements and cited evidence do not specifically controvert the material facts. DB's issue with Plaintiffs' characterization of the testimony is immaterial as the document speaks for itself. DB's attempt to evade the material facts by claiming they contain legal conclusions is unavailing. Therefore, these material facts should be deemed admitted.** *See* **Local Rule 56.1(c).**

330.   Wannenmacher also agreed that



Handlin Ex. 746 (Wannenmacher) at 195:8-197:21.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding ███████████████████," no response is

required.

Disputed that ███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████

███████████████████ Handlin Ex. 746 (Wannenmacher)

at 195:8-197:21.

Further, Plaintiffs assertion is not supported by the cited material because

Plaintiffs have not established that ████████████████████

████████████ *See* Handlin Ex. 91 (GSAMP 2005-WMC2 PSA) §

1.01 (definition of "Trigger Event").

Further, Ms. Wannenmacher lacks foundation to testify ███████████

███████████████████████████

██████ Handlin Ex. 746 at 197:22 – 199:21.

Moreover, Ms. Wannenmacher lacks foundation ██████████████

███████████████████████████

█████████████████████

Moreover, the testimony cited by Plaintiffs is misleading because it omits

immediately succeeding testimony:





Handlin Ex. 746 at 197:22 – 199:21.  Plaintiffs' omitted language is material because it

shows that Ms. Wannenmacher ███████████████████████

████████████

**Plaintiffs' Reply: DB's statements do not specifically controvert the material fact. DB's issue with Plaintiffs' characterization of the testimony as "misleading" is false and immaterial as the document speaks for itself. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing. This material fact should be deemed admitted. *See* Local Rule 56.1(c).**

331.    Under § 7.03(b)[7] of the GSAMP 2005-WMC2 PSA titled "Notification to Certificateholders":

> Within 60 days after the occurrence of any Event of Default, the Trustee shall transmit by mail to all Certificateholders and each Rating Agency notice of each such Event of Default hereunder known to the Trustee, unless such Event of Default shall have been cured or waived.

Handlin Ex. 91 (GSAMP 2005-WMC2 PSA) § 7.03.

Defendant's Response: To the extent this paragraph purports to state a legal

conclusion regarding the contractual rights and duties of Defendant under the GA, no

response is required.

Undisputed that the cited GSAMP 2005-WMC2 PSA contains the quoted

language.

**Plaintiffs' Reply: DB does not dispute this material fact. DB's attempt to evade the material fact by claiming it contains a legal conclusion is unavailing; the cited document**

---

[7]    Following the first subsection of § 7.03, which is correctly marked as 7.03(a), the second

subsection, quoted above and identified as 7.03(b), is incorrectly identified in the PSA as 7.03(a).

speaks for itself. **Plaintiffs' material fact should be deemed admitted.** *See* **Local Rule**

**56.1(c).**

332.     Because, under § 7.01(g) of the GSAMP 2005-WMC2 PSA, the occurrence of a Cumulative Loss Event is an Event of Default, an Event of Default had occurred as of December 26, 2008.

> Defendant's Response: To the extent this paragraph purports to state a legal
>
> conclusion regarding the occurrence of a Cumulative Loss Event or an Event of Default,
>
> no response is required.
>
> Disputed.  Plaintiffs contention lacks evidentiary support.

**Plaintiffs' Reply: DB proffers no evidence to specifically controvert the material**

**fact. Therefore, this material fact should be deemed admitted.** *See* **Local Rule 56.1(c).**

**Plaintiffs' statement incorporates by reference their material facts and replies to the**

**preceding ¶¶ 326-330 and the evidence provided therein. DB's attempt to evade the**

**material fact by claiming it contains a legal conclusion is incorrect.** *See* **Pltfs.Mem. 15-17.**

333.     Thus, DB was required to send notice of the Event of Default to Certificateholders no later than 60 days after December 26, 2008, *i.e.*, no later than February 24, 2009.

> Defendant's Response: To the extent this paragraph purports to state a legal
>
> conclusion regarding the contractual duties and obligations of Defendant under the GA,
>
> no response is required.
>
> Disputed.  Plaintiffs' purported characterization of the GSAMP 2005-WMC2
>
> PSA is contrary to the terms of that agreement.  The GSAMP 2005-WMC2 PSA
>
> provides:
>
> > Within 60 days after the occurrence of any Event of Default, the
> > Trustee shall transmit by mail to all Certificateholders and each
> > Rating Agency notice of each such Event of Default hereunder
> > *known to the Trustee*, unless such Event of Default shall have been
> > cured or waived.