# EXHIBIT A

L83WphoO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    PHOENIX LIGHT SF LIMITED,
3   *et al.*,

4                Plaintiffs,

5        v.                          14 Civ. 10103 (JGK)

6   DEUTSCHE BANK NATIONAL TRUST
    COMPANY, *et al.*,
7
                 Defendants.
8                                    Oral Argument
    ------------------------------x
9   COMMERZBANK AG,

10               Plaintiff,

11       v.                          15 Civ. 10031 (JGK)

12  DEUTSCHE BANK NATIONAL TRUST
    COMPANY, *et al.*,
13
                 Defendants.
14  ------------------------------x
                                     New York, N.Y.
15                                   August 3, 2021
                                     10:00 a.m.
16  Before:
                      HON. JOHN G. KOELTL,
17                                   District Judge

18                      APPEARANCES

19  WOLLMUTH MAHER & DEUTSCH LLP
         Attorneys for Plaintiffs
20  BY:  DAVID H. WOLLMUTH
         JOHN R. HEIN
21       -and-
    CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO
22  BY:  JAY S. HANDLIN

23  MORGAN LEWIS & BOCKIUS LLP
         Attorneys for Defendants
24  BY:  KEVIN J. BIRON
         MICHAEL S. KRAUT
25       BRYAN P. GOFF

L83WphoO

1          (Case called; appearances noted)

2          THE COURT:  Good morning, all.  Please be seated.

3          All right.  I have two sets of motions.  There are the

4    defendants' motions for summary judgment, and I have the

5    plaintiffs' motion for partial summary judgment.  I'm familiar

6    with the papers.  I'll listen to argument.

7          Because of these conditions, we're asked to have

8    everyone masked.  But if everyone is vaccinated, they don't

9    have to be six feet away from each other in the well of the

10   courtroom.  Please keep your voices up.  It's not so easy to

11   hear you all, so keep your voices up.  Speak distinctly.  Do

12   the best you can with the masks.  If at any time anyone can't

13   hear me, just raise your hand.

14         Let's start with the defendants' motion for summary

15   judgment.

16         MR. BIRON:  From the podium, your Honor?

17         THE COURT:  Yes, you can speak from the podium.

18         MR. BIRON:  Good morning.

19         THE COURT:  Good morning.

20         MR. BIRON:  Your Honor, these lawsuits are the most

21   recent wave --

22         THE COURT:  Make sure to speak somewhat slowly for the

23   court reporter.

24         If at any time the court reporter can't hear or is

25   bothered by how quickly the lawyers are speaking, just let me

L83WphoO

1    know.

2              Mr. Goff.

3              MR. BIRON:  Mr. Biron.

4              THE COURT:  Mr. Biron.  OK.

5              MR. BIRON:  In these cases, plaintiffs attempt to hold

6    the RMBS trustees responsible for losses on mortgage loans in

7    the RMBS trusts that arose in connection with the financial

8    crisis.  Courts have now decided summary judgment motions in

9    seven of these cases.  In each decision, the court granted the

10   trustee's motion, in whole or in part, and denied any motion

11   filed by plaintiffs in its entirety.  The same result is

12   compelled here.

13             For example, in Commerzbank's case against U.S. Bank,

14   the court granted the trustee's summary judgment motion in

15   part.  The court held that all claims subject to Germany's

16   three-year statute of limitations --

17             THE COURT:  That was Judge Pauley's decision?

18             MR. BIRON:  Yes, your Honor.

19             THE COURT:  OK.  By the way, are the seven cases

20   listed somewhere in your brief?

21             MR. BIRON:  I'm not sure if they're listed in one

22   place, but I'm happy to list them now if that would be helpful.

23   I mean I believe they're all cited in the brief or in the

24   notices of supplemental authority, your Honor.

25             THE COURT:  Yes, I know.  I've been serially gifted

L83WphoO

1   with notices of supplemental authority over the years, so list

2   them now with the cites.  I know Judge Pauley's decision.

3        What are the others?

4        MR. BIRON:  So, the others are *American Fidelity*

5   *Assurance Company v. Bank of New York-Mellon,* 2020 WL 3790710.

6   That decision's from the Tenth Circuit affirming *American*

7   *Fidelity Assurance Company v. Bank of New York-Mellon* and the

8   cite for the lower court, district court decision is 2018 WL

9   6582381.

10       The next case is the one that I just referenced, which

11  is *Commerzbank v. U.S. Bank*.  The cite for that is 2020 WL

12  2036723.  In addition, reconsideration of that decision was

13  denied at 2021 WL 603045.

14       The next decision is *Phoenix Light v. U.S. Bank*.  The

15  cite for that is 2020 WL 1285783, and reconsideration of that

16  decision was denied at 2020 WL 4699043.

17       The next decision is *Fixed Income Shares Series M v.*

18  *Citibank, N.A.*  The cite for that is 314 F.Supp.3d 552.

19       The next decision is *Phoenix Light v. Bank of New*

20  *York-Mellon*.  The cite for that is 2017 WL 3973951.

21       The next cite is *Policemen's Annuity and Benefit Fund*

22  *of the City of Chicago v. Bank of America*.  The cite for that

23  is 2013 WL 5328181.

24       And finally, the seventh decision is *Oklahoma Police*

25  *Pension and Retirement v. U.S. Bank*.  The cite for that is 986

L83WphoO

1    F.Supp.2d 412.

2          THE COURT:  OK.

3          MR. BIRON:  As I was noting, in Judge Pauley's

4    decision in Commerzbank's case against U.S. Bank, he held all

5    claims subject to Germany's statute of limitations were

6    time-barred.  He held plaintiffs had no standing with respect

7    to certificates that had been sold before the case was

8    commenced, and he also held that absent explicit language in

9    the governing agreement, the trustee had no pre-EOD duty to

10   enforce any repurchase claims.  These holdings are equally

11   applicable here.

12         Similarly, in Phoenix Light's case against Bank of New

13   York, the court denied plaintiff's motion in its entirety and

14   granted the trustee's motion as to most of plaintiff's claim.

15   The court held that plaintiffs had failed to adduce the

16   necessary loan-by-loan and trust-by-trust evidence to survive

17   summary judgment, and again, plaintiffs' claims here suffer

18   from those same fatal flaws.

19         As we mentioned at the outset, your Honor, my partner

20   Michael Kraut and I are going to be walking through the

21   specific reasons why the Court should grant the defendants'

22   summary judgment motion.

23         THE COURT:  By the way, when you're on loan by loan

24   and trust by trust, could you explain to me in greater detail

25   what the difference is between phase 1 discovery and phase 2

L83WphoO

discovery.  Isn't some of the material that would relate to

loan-by-loan and trust-by-trust issues reserved for phase 2

discovery?

          MR. BIRON:  No, your Honor, I don't believe so.  And

the reason is because for pre-EOD claims, plaintiffs need to

show that the trustee had loan-specific notice and knowledge of

an alleged representation and warranty breach.  And so in phase

2 is where we're going to do loan re-underwriting, and that's

to go get discovery about loans that are in the trust and see

if they violated the rep and warranty, the representations and

warranties that were made about them by the warrantors.

However, for plaintiffs to survive summary judgment, they need

to come forward with loan-specific evidence not only that there

was a breach of a representation and warranty of trust but that

the trustee actually had notice of the breach.

          And so that's part of discovery that took place in

phase 1.  And similarly, for the trust by trust, which is

normally related to event-of-default issues, again, that was

the subject of phase 1 discovery.  And for plaintiffs to

survive summary judgment, they need to come forward with

trust-specific evidence that the trustee had actual knowledge

or, under some governing agreements, written notice of an event

of default.  And as we'll show today, your Honor, in the vast

majority of cases, plaintiffs have failed to meet that burden.

          So as we were saying, is that Mr. Kraut and I will be

L83WphoO

1  walking through the specific reasons why the Court should grant

2  defendants' motion and deny plaintiffs' motion.  To the extent

3  we don't address a particular issue raised in the briefing, our

4  intention is to rest on the papers.  I will first be addressing

5  certain of the gating legal issues, such as standing and

6  statute of limitations, before I move on to plaintiffs'

7  pre-event-of-default claims, and Mr. Kraut will then address

8  plaintiffs' post-event-of-default claims.

9          So, to start with standing, plaintiffs have not

10  presented evidence sufficient to raise a triable issue of fact

11  as to their standing to assert claims concerning certificates

12  they sold before these lawsuits.

13          THE COURT:  I'm sorry.  Concerning what?

14          MR. BIRON:  The certificates that were sold --

15          THE COURT:  Oh, all right.

16          MR. BIRON:  -- before the lawsuits.

17          THE COURT:  Got it.

18          MR. BIRON:  There is no dispute that none of the

19  buyers agreed that the plaintiffs would retain any litigation

20  claims.  Thus, to survive summary judgment, plaintiffs were

21  required to present evidence that raises a triable issue on

22  whether the sales were governed by the laws of a jurisdiction

23  under which claims against a trustee do not automatically

24  transfer to the buyer.  Plaintiffs have not met that burden.

25  If anything, the evidence plaintiffs presented shows the sales

L83WphoO

1    were governed by New York law under which claims against the

2    trustee automatically transfer to the buyer.  To determine

3    governing law --

4              THE COURT:  Wait.  Could I just stop you for a moment

5    there.

6              The thrust of your argument, as I understand it, is

7    the plaintiffs have not provided sufficient information about

8    the purchasers of the sold certificates so that the conflict of

9    law, choice-of-law analysis to be applied under New York law

10   simply can't be done.  So because it's a standing issue and the

11   plaintiffs haven't established the residence of the purchasers,

12   the plaintiff group, Judge Pauley appears, in his decision, to

13   have said that because the certificates were registered with

14   the DTC in New York, New York law would apply and the

15   plaintiffs therefore lacked standing.  So my question is what

16   position do you want me to take: the position that I got from

17   your papers or Judge Pauley's decision?

18             MR. BIRON:  Your Honor, I believe the positions are

19   consistent with one another, and I do believe that the absence

20   of information and evidence about who the actual buyers are is

21   sufficient.  But that being said, is that the evidence

22   presented by plaintiffs here, again, shows that all the

23   securities are registered in the name of the DTC in New York.

24   And so, yes, your Honor, I would ask for a finding that in

25   light of the evidence presented here, either is insufficient to

L83WphoO

demonstrate that they retain standing, and the reason for that

is because it appears it is governed by New York law under

which claims were automatically transferred -- I'm sorry.

THE COURT:  I'm sorry.  You said two separate things,

which are not the same.  You said that the certificates are

governed by New York law and we don't know the residence of the

purchasers.  Those are two somewhat different positions, and I

saw from your papers that not all of the certificates that were

sold were registered with the DTC.  Some of them are, most of

them are, but not all.

MR. BIRON:  That's incorrect, your Honor.

THE COURT:  Hold on one second, please.

OK.

MR. BIRON:  So, to respond to your question, your

Honor, the evidence shows that all sold certificates were

registered with the DTC in New York, and I refer the Court to

plaintiffs' responses to paragraph 41 of our Phoenix Light 56.1

and paragraph 44 of our Commerzbank 56.1, including the trade

tickets that are cited in those paragraphs which show the sales

settled to the DTC in New York.

And so in response to your question, your Honor, is

that yes, I would like a finding consistent with the ruling by

Judge Pauley in *Commerzbank v. U.S. Bank* that given the DTC's

involvement, identical involvement as in Commerzbank, this

meant that the transactions occurred in New York and were

L83WphoO

1   governed by New York law.

2           THE COURT:  OK.  Am I right that that is not the

3   position that you had taken in your original papers?  Because

4   those papers were drafted before Judge Pauley's decision.

5           MR. BIRON:  Correct, although I do believe that the

6   general position that we took, that plaintiffs could not come

7   forward with evidence showing that the sales were governed by

8   the law of a jurisdiction where the claims didn't automatically

9   transfer --

10          THE COURT:  Yes, I know.

11          MR. BIRON:  But yes, your Honor.

12          THE COURT:  I thought it was a simple question.

13          In your papers, you took the position the plaintiffs

14  have not shown the residence of the purchasers, and because we

15  don't know that, the plaintiffs haven't borne their burden, and

16  they lack standing with respect to the sold certificates.

17          Could you put your mask up.

18          MR. BIRON:  Sorry, your Honor.  Yes.

19          THE COURT:  Thank you.

20          And then along came Judge Pauley's decision, and you

21  would rather have me follow Judge Pauley, rather than the

22  position that you had taken in your brief.

23          MR. BIRON:  Yes, your Honor.

24          THE COURT:  OK.  Fair enough.

25          MR. BIRON:  The next category of claims where

L83WphoO

1   plaintiffs do not have standing relates to certain certificates

2   at issue that plaintiffs never held.  I would just simply refer

3   the Court to pages 4 through 6 of our reply brief with respect

4   to that argument.

5        And the last category of claims relates to

6   certificates that were issued by the IMM 2005-7 trust.  And

7   what that trust agreement provides is that investors such as

8   plaintiffs do not have standing to bring any claims absent

9   consent of the insurer of the senior certificates, which was

10   *Ambac*.

11        There is no dispute that *Ambac* never consented to this

12   action, and in response, plaintiffs assert that under the

13   relevant agreement that consent condition was eliminated when

14   *Ambac* filed for bankruptcy.  However, your Honor, that argument

15   fails because the court overseeing *Ambac*'s receivership held

16   that those contract clauses were unenforceable *ipso facto*

17   clauses.

18        THE COURT:  Did the decision from the Wisconsin court

19   mean that the clause was forever invalid or was stayed until

20   the conclusion of the bankruptcy or reorganization for *Ambac*?

21        MR. BIRON:  My understanding --

22        THE COURT:  Could I just finish.

23        MR. BIRON:  I apologize.

24        THE COURT:  Because it seems unusual for a

25   reorganization court to say that a provision that required

L83WphoO

1  approval was invalid rather than that it was simply stayed

2  until the conclusion of the reorganization.  That's my

3  question.

4  MR. BIRON:  So, my understanding is that as part of

5  the receivership, the Wisconsin court held that those

6  provisions are invalid, and I believe that they remain invalid,

7  and my understanding is that because *Ambac* continues to have

8  obligations on the monoline insurance policy, that, you know, I

9  believe when it comes out of the reorganization --

10  THE COURT:  Keep your voice up.

11  MR. BIRON:  -- those provisions will continue to be

12  inapplicable.  I would ask the Court that -- I would be happy

13  to go and revisit the *Ambac* docket to see if there's further

14  guidance at this point because I do have to admit that I have

15  not reviewed the docket in preparation for this argument today.

16  THE COURT:  OK.  You cited, I think, several other

17  courts that have recognized the decision of the reorganization

18  court.  Do those decisions give any light on the question of

19  whether that provision that we're talking about was stayed or

20  rendered forever invalid?

21  MR. BIRON:  I do not believe that those decisions

22  speak at that level of specificity, but I do believe that they

23  all held that they were invalid, and I just don't think that

24  they placed a time limit as to how long, you know, they would

25  be invalid, based on my recollection of that.

L83WphoO

1      THE COURT:  OK.  Because the answer to that question,

2   it seems to me, may determine whether, if it simply stayed, the

3   claims that you're talking about should be dismissed or stayed.

4      MR. BIRON:  Your Honor, again, my understanding is

5   that because *Ambac* remains liable on the policy, and the whole

6   concept behind this is that because *Ambac* has that exposure,

7   they should be allowed to either essentially control whether

8   the litigation's commenced with respect to that trust -- I

9   believe that they were not only stayed; I believe that they

10  were essentially read out of the contract.  But again, with

11  your Honor's -- I would seek an opportunity to go and look at

12  the docket, because I don't want to speak out of turn.

13      THE COURT:  Thank you.  Sure.

14      There may be other issues that come up in the course

15  of the argument, and anyone can give me a letter, no longer

16  than two pages, on an issue that I bring up that's left open.

17  So both sides, no more than two pages.

18      Thank you.

19      MR. BIRON:  I will now turn to plaintiffs' time-barred

20  claims.

21      Under New York's borrowing statute, given that

22  plaintiffs are both nonresidents, they were required to file

23  their claims within the shorter of the applicable New York

24  statute of limitations and the statute of limitations for the

25  jurisdiction where the claims accrued, which is generally the

L83WphoO

1    jurisdiction where the alleged injury was felt.  Most of

2    plaintiffs' claims are untimely under one or both of these

3    statutes of limitation.

4          First, most of plaintiffs' claims are time-barred

5    under Germany's three-year statute of limitations.  Your Honor

6    has already held on our motion to dismiss in the Commerzbank

7    case that most claims asserted by Germany's Commerzbank in this

8    action are governed, are subject to Germany's three-year

9    statute of limitations.  The evidence also establishes that the

10   German statute of limitations applies to the RMBS certificates

11   held by the Phoenix Light securitization, which was created by

12   failed German bank WestLB.

13         To summarize the relevant facts, German bank WestLB

14   originally owned these RMBS certificates.  Due to the financial

15   crisis, WestLB caused those certificates to be transferred to

16   the securitization trustee for the Phoenix Light trust in

17   exchange for all beneficial interests in that trust.

18   Thereafter, WestLB and its German successor EAA and WestLB's

19   owners owned all beneficial interests in that trust and bore

20   all losses on the certificates and assets in that trust,

21   including any losses on the RMBS at issue here.  Thus, any

22   injury related to RMBS certificates held by the Phoenix Light

23   securitization trust occurred in Germany, and thus, that's

24   where the claim accrued.

25         Now, Germany's three-year statute of limitations

L83WphoO

1    begins to run at the end of the calendar year in which the

2    claim arose and plaintiff either has knowledge of the

3    circumstances giving rise to the claim or would have had such

4    knowledge in the absence of gross negligence.

5            Here, the evidence establishes that plaintiffs had

6    knowledge, or were grossly negligent in failing to have such

7    knowledge, of the circumstances giving rise to their claims in

8    the calendar year ending more than three years before the

9    applicable filing date.

10           Now, we have a few applicable filing dates, and I

11   would refer the Court to our papers on that, because we have

12   some claims -- for example, in *Commerzbank*, the action was

13   originally filed in December of 2015, which makes the German

14   statute of limitations date January 1, 2012, meaning that

15   plaintiffs had to be on notice -- or I'm sorry, had to be aware

16   of the factual circumstances prior to that date.  However,

17   Commerzbank amended their complaint in November of 2017 to add

18   additional new claims that do not relate back, and thus, with

19   respect to those claims, the applicable date to test the German

20   statute of limitations is January 1, 2014.

21           THE COURT:  This may be difficult for you, but, and if

22   you want to refer me to the specific pages of your brief,

23   you're welcome to, but could you tell me, assuming that the

24   German statute of limitations applies both to the Commerzbank

25   trust and to the Phoenix Light trust, which claims and which

L83WphoO

1    trusts are barred by the statute of limitations and where I can

2    find that in your brief.

3            MR. BIRON:  Yes, your Honor.

4            In the *Phoenix Light* decision, the claims that would

5    be barred by the German statute of limitations would be all

6    claims related to the Phoenix Light certificates.

7            THE COURT:  I'm sorry.  All claims --

8            MR. BIRON:  Related to the Phoenix Light certificates.

9    And those certificates -- i.e, the RMBS certificates held in

10   the Phoenix Light securitization -- are identified in one of

11   the exhibits we submitted.

12           THE COURT:  Hold on.

13           Could you speak a little more distinctly so that the

14   reporter can get everything.  I know it's difficult with the

15   mask.

16           MR. BIRON:  Yes, your Honor.  I will try.

17           As I said, in *Phoenix Light*, with respect to our

18   German statute of limitation argument, the certificates are

19   defined in our brief as the Phoenix Light certificates, and I

20   will be able to provide your Honor with the exhibit to my

21   affidavit where those certificates are listed.  I do not have

22   it at my fingertips at the moment.

23           THE COURT:  So all the Phoenix Light certificates with

24   respect to all of the claims, including the 2014 downgrade

25   claims?

L83WphoO

1          MR. BIRON:  No, your Honor.  Everything except for the

2     2014 downgrade claims.  We are making no argument on Phoenix

3     Light or Commerzbank relating to the 2014 downgrade claims on

4     this issue.

5          THE COURT:  So at the end of the day, you claim that

6     all claims on the Commerzbank certificates and all claims on

7     the Phoenix Light certificates, except relating to the 2014

8     downgrade claims, are barred under the German statute of

9     limitations.

10          MR. BIRON:  Yes, your Honor.

11          THE COURT:  OK.  All right.  And those are listed in

12     which exhibit?

13          MR. BIRON:  They're listed in the exhibit to my

14     declaration that was submitted in support of our summary

15     judgment motions, and I will have a cite for you, your Honor,

16     once I get back to counsel's table.  I do not have it at my

17     fingertips right now.

18          THE COURT:  OK.  That also depends on your argument

19     that new claims asserted in the subsequent complaints relate

20     back to the time of the original complaint; yes?

21          MR. BIRON:  It is dependent with respect to certain --

22     so, there were additional events of default in 2012.

23     Plaintiffs first added claims alleging that defendants breached

24     their obligations relating to the 2012 events of default when

25     they amended their complaint in 2017.  And yes, our Germany

L83WphoO

1    statute of limitations argument related to the 2012 event of

2    default is dependent on a finding by your Honor that those

3    claims do not relate back to the original --

4             THE COURT:  Do not relate back.  OK.  And the reason

5    that they do not relate back, even though they relate to the

6    same trust, is what?

7             MR. BIRON:  The reason that they don't relate back is

8    because in the earlier complaints, plaintiffs did not even

9    mention any declared events of default.  None of them.  They

10   did not allege that plaintiffs -- I'm sorry, that defendants

11   violated any duty in connection with a declared event of

12   default.  Their only allegation was that defendants had failed

13   to declare events of default based on alleged servicing

14   breaches.  And so this is an entirely new set of circumstances,

15   and we were not on notice of this claim before 2017.

16            THE COURT:  I don't recall that Judge Pauley dealt

17   with a similar argument.  Did he?

18            MR. BIRON:  Judge Pauley did not deal with the

19   relation-back argument, your Honor.

20            THE COURT:  Was this beforehand?

21            MR. BIRON:  I don't -- I don't know the answer to that

22   question, your Honor.  I know that it wasn't dealt with in the

23   opinion.

24            THE COURT:  OK.

25            MR. BIRON:  But again, in connection with the two-page

L83WphoO

1    letter, I can certainly look at the briefing and answer that

2    question, your Honor.

3         THE COURT:  OK.  Judge Pauley plainly agreed with you.

4    Are there any other cases directly on point where other judges

5    have dealt with the statute of limitations, applied the German

6    statute of limitations and found similar claims time-barred?

7         MR. BIRON:  Judge Pauley's the only judge who has

8    addressed this issue in the context of the RMBS trustee

9    lawsuits.

10        THE COURT:  There's also no case that disagrees with

11   Judge Pauley.

12        MR. BIRON:  That's correct, your Honor.

13        THE COURT:  OK.

14        All right.  Thank you.

15        MR. BIRON:  Your Honor, I'd like to move on briefly

16   just to touch on -- then there's also two categories of

17   plaintiffs' claims that are time-barred under New York's

18   six-year statute of limitations.

19        The first category, again --

20        THE COURT:  Could I just stop you for a moment.

21        The issue with the New York statute of limitations is

22   an issue that I wouldn't have to reach if I agreed with you on

23   the German statute of limitations.

24        MR. BIRON:  You would need to reach it because there

25   are some certificates at issue in the Phoenix Light action, for

L83WphoO

1    example, that aren't governed by the German statute of

2    limitations, and so if you decide the German statute of

3    limitations in favor of defendants, that's going to eliminate

4    all claims in the Phoenix Light action relating to the Phoenix

5    Light certificates, but there are other -- I'm sorry, all

6    claims other than those related to the 2014 events of default.

7             But there are other certificates that are at issue in

8    that action, and we don't argue that those claims are governed

9    by the German statute of limitations.  And so for those, we're

10   arguing that there are claims that are time-barred under New

11   York's six-year statute of limitations.

12            THE COURT:  Which claims in the Phoenix Light case are

13   not barred, you claim are not governed by the German statute of

14   limitations?

15            MR. BIRON:  Claims relating to any certificate other

16   than those in the Phoenix Light securitization.

17            THE COURT:  Other than?

18            MR. BIRON:  Other than those in the Phoenix Light

19   securitization.

20            THE COURT:  And are those certificates conveniently

21   listed somewhere?

22            MR. BIRON:  They are, your Honor, and when I provide

23   you with the exhibits -- I'm sorry.  When I provide you with

24   the exhibit number for the Phoenix Light certificate, I will

25   also provide the exhibit number that identifies all the other

L83WphoO

1    certificates as well.

2            THE COURT:  OK.  Thank you.

3            MR. BIRON:  So, with respect to the New York statute

4    of limitations, your Honor, these relate to the same events of

5    default that we were just speaking about that were first

6    identified in the 2017 amendment, and thus, our argument is

7    again dependent on a finding by your Honor that those claims do

8    not relate back.

9            The other claims that we have demonstrated are

10   time-barred under New York law relate to certain notices of

11   representation and warranty, alleged breaches that the trustee

12   received more than six years before these actions were filed.

13   And with respect to any claim that the trustee breached its

14   duties by not taking action with respect to those notices,

15   they're time-barred because, as I said, the notices were

16   received more than six years before plaintiffs filed their

17   actions.

18           I would like to now turn briefly to the topics of

19   bankrupt warrantors and settled repurchase claims.

20           Plaintiffs do not oppose defendants' motion for

21   summary judgment as to any claims arising from defendants'

22   failure to take enforcement action against a warrantor that

23   filed for bankruptcy more than six years before these cases

24   were commenced.  And the reason is, your Honor, anything more

25   than six years before is time-barred, and after they filed for

L83WphoO

1    bankruptcy, the trustees were precluded from doing anything as

2    a result of the automatic stay.

3            I'll briefly touch on settled claims.

4            We've established that with respect to eight of the

5    trusts at issue, defendants settled any claims against one of

6    the warrantors, known as Fremont Investment & Loan, in exchange

7    for millions of dollars.

8            THE COURT:  Could I stop you, before we leave bankrupt

9    warrantors.

10           Is there a difference between the parties as to what

11   trusts this argument goes to?  Is there a difference between

12   whether there are multiple warrantors and only one warrantor

13   goes bankrupt?  And is summary judgment being sought with

14   respect to all trusts with respect to where there are more than

15   one warrantors and only one goes bankrupt?

16           There are some trusts which have a single warrantor

17   and the warrantor goes bankrupt.  So what's the scope of the

18   argument for summary judgment?

19           MR. BIRON:  So, the scope of the argument is that with

20   respect to a trust that has multiple warrantors and one of them

21   went bankrupt, we are only seeking summary judgment as to

22   plaintiffs' argument that defendants should have pursued claims

23   against the bankrupt warrantor.  We are not seeking summary

24   judgment on a trust level.  However, there are eight trusts,

25   and they're identified on Goff Reply Exhibit 10, where the only

L83WphoO

| | |
|---|---|
| 1 | warrantors were entities that went bankrupt more than six years |
| 2 | before the applicable filing date. |
| 3 | THE COURT:  OK.  It is a highly specific claim as to |
| 4 | which you are seeking summary judgment.  I mean we're dealing |
| 5 | with numerous claims with respect to 85 trusts, and you say |
| 6 | there's this little piece, one claim relating to eight trusts |
| 7 | where there's a single bankrupt warrantor and I should grant |
| 8 | summary judgment dismissing that claim even though there are |
| 9 | other claims relating to the same trust. |
| 10 | MR. BIRON:  No, your Honor.  That isn't what I said. |
| 11 | At least I didn't -- let me clarify if it is what I said. |
| 12 | So, there are eight trusts, and they're identified on |
| 13 | Goff Reply Exhibit 10, where the only warrantor -- the only |
| 14 | warrantor -- is an entity that went bankrupt.  And so with |
| 15 | respect to those eight trusts, what I'm seeking is summary |
| 16 | judgment that defendants did not breach any duty by not |
| 17 | pursuing claims against those bankrupt warrantors, and that's |
| 18 | for the entire trust. |
| 19 | THE COURT:  Yes, I understand that, but that's only |
| 20 | one claim being asserted with respect to those eight trusts. |
| 21 | There are other claims that the plaintiffs say they're entitled |
| 22 | to judgment on because the defendant trustee did not pursue |
| 23 | other duties with respect to that trust.  Isn't that right? |
| 24 | MR. BIRON:  Well, the plaintiffs' claims generally |
| 25 | fall into two different categories.  One is a failure, is an |

L83WphoO

1    alleged failure by defendants to put back loans that were

2    allegedly breaching reps and warranties to the warrantor.  And

3    the other claim, as I understand it, is that they allege in

4    certain circumstances that the trustee should have, perhaps,

5    taken action against the servicers to those trusts.  But a

6    finding that the trustee did not violate any obligation to

7    seek, to put back loans with respect to these trusts is a

8    significant ruling in this case and, I think, will have a large

9    impact on the case potentially going forward.

10            THE COURT:  But that's different from a statement

11   that, a finding, let's just say with respect to the eight

12   trusts that there is no claim with respect to claims against,

13   or that the trust should have acted against a bankrupt

14   warrantor.  You're not saying, I don't think, that there would

15   not be other claims on behalf of that trust simply because

16   there are no claims that the trust could have made against the

17   bankrupt warrantor.

18            MR. BIRON:  I mean I think what I'm saying is that

19   with respect to those trusts -- I think we're saying the same

20   thing, your Honor.  From what I understand is that any claim

21   that the trustee failed to pursue some type of a repurchase

22   action against those warrantors --

23            THE COURT:  Let me put it simply.

24            MR. BIRON:  OK.

25            THE COURT:  There are eight trusts where the sole

L83WphoO

1   warrantor on the trust is a bankrupt entity.  Can I enter

2   judgment in favor of the defendants that the plaintiffs have no

3   claim with respect to those eight trusts because there was a

4   bankrupt warrantor?

5            MR. BIRON:  We're not seeking that judgment, your

6   Honor.

7            THE COURT:  OK.  That was my point.  So what actually

8   is the judgment that I'm being asked to enter?  I realize you

9   want me to say, and there doesn't appear to be any opposition,

10  that there is no claim that the eight trusts should have

11  pursued claims against the bankrupt warrantor.  OK.  That, of

12  course, leaves open what other claims the plaintiffs may be

13  asserting on behalf of those eight trusts against others.  Yes?

14           MR. BIRON:  Yes, your Honor.

15           THE COURT:  OK.  And so you all are looking forward to

16  a trial before a jury eventually in which these individual

17  claims are picked apart that way?

18           MR. BIRON:  Eventually, yes, your Honor, but I think

19  probably more to the point of the summary judgment ruling here,

20  I think that to the extent that the case is limited and what I

21  would call right sized, I think that it increases the

22  possibility that the parties may engage in meaningful

23  discussions about the claims, if any, that remain in the case.

24  And so, you know, I think these are significant claims, and if

25  they're found to be out of the case, which, as you know, there

L83WphoO

1  is no opposition, I think it has a meaningful impact on

2  potentially how the parties would value the case.

3         THE COURT:  OK.  That's a little like the plaintiffs'

4  argument on their motion for partial summary judgment, that I

5  should go through the case looking at various issues and give

6  what seem like advisory opinions to parts of issues in order to

7  assist the parties.  It's a long way away from Rule 56 and

8  granting a judgment even if only on liability.  But go ahead.

9  I understand your argument.

10         MR. BIRON:  I would just note I think that this is

11  distinguishable.  I think this is the issue that was before the

12  *Fixed Income v. Citibank* court, where the court granted summary

13  judgment on a similar set of facts.  And again, I would just

14  note that it's unopposed.

15         THE COURT:  Yes, I know.

16         MR. BIRON:  I'll move on.

17         With respect to the Fremont settlement, these

18  settlements occurred between 2008 and 2010.  They occurred

19  after notice to investors.  Two of them were approved by a

20  super majority of the investors; that's over 66-2/3 percent.

21  The other one was actually approved by a court order that held,

22  and I quote -- I'm sorry -- held that defendants were

23  "exonerated from liability" with a settlement.

24         As set forth in our papers, plaintiffs' attacks on

25  these settlements are unpled, untimely and baseless.  And I

L83WphoO

```
 1    would refer the Court to, you know, the argument particularly
 2    at our reply, pages 21 through 23, where we address this.
 3            I want to touch briefly, your Honor, on time-barred
 4    repurchase claims.
 5            THE COURT:  I'm sorry.  Time-barred?
 6            MR. BIRON:  Time-barred repurchase claims.
 7            So, from time to time defendants would receive a
 8    letter from interested parties that would identify specific
 9    loans that the parties alleged violated representations and
10    warranties.  Plaintiffs allege that defendants breached their
11    duties by not taking action with respect to those loans.  The
12    New York Court of Appeals, in the case Deutsche Bank v.
13    Barclays, has held that for defendant Deutsche Bank National
14    Trust Company in its capacity as RMBS trustee any put-back
15    claims must comply with California's four-year statute of
16    limitations, which begins to run at the closing of the trust.
17    And so what we're seeking a ruling on here is that with respect
18    to any notices that Deutsche Bank National Trust Company in its
19    capacity as RMBS trustee for certain of the trusts at issue, if
20    Deutsche Bank received that notice later than four years after
21    the closing date, Deutsche Bank could not have breached a duty
22    by failing to pursue a repurchase action because under the
23    Court of Appeals ruling any such claim was time-barred.
24            So, I would now like to move on to touch on an issue
25    that is not in our summary judgment briefing.  I would just
```

L83WphoO

1    like to note it briefly.

2            It relates to champerty and it relates to Judge

3    Broderick's decision in Phoenix Light's case against U.S. Bank,

4    where Judge Broderick dismissed the case in its entirety,

5    finding that the assignment of claims to plaintiffs were void

6    as champertous and that plaintiffs lacked both prudential and

7    constitutional standing to pursue their claims.  We submitted

8    that in a notice of supplemental authority at ECF 363.  That

9    case is up on appeal with oral argument scheduled for September

10   23.

11           We believe that as it relates to standing, your Honor

12   could address it *sua sponte*, but absent guidance from your

13   Honor, what we intend to do and what we would like to do is if

14   the Second Circuit affirms that decision, plaintiffs would be

15   collaterally estopped from challenging it in this case, and so

16   at that point we would seek leave from your Honor to move for

17   judgment on that basis.  And again, that's absent any further

18   direction or instruction from your Honor on that issue.

19           THE COURT:  Well, you can certainly address it

20   subsequently, but that would only apply to assigned claims,

21   right?

22           MR. BIRON:  They're all assigned claims.

23           THE COURT:  So it would dispose of the entire case.

24           MR. BIRON:  Yes, your Honor.

25           THE COURT:  You're certainly welcome to make it in a

L83WphoO

1    supplemental motion.

2              MR. BIRON:  Thank you.

3              I'd now like to move on to plaintiffs' claims related

4    to document-delivery failures.

5              As set forth in our papers, these claims are both

6    time-barred and abandoned, and they've already been ruled

7    time-barred by this Court.  By way of summary, in defendants'

8    Phoenix Light motion to dismiss, we specifically moved to

9    dismiss these claims as time-barred because the alleged

10   breaches occurred more than six years before the complaints

11   were filed.

12             THE COURT:  I thought I ruled on that in the motion to

13   dismiss, and I didn't think that the plaintiffs were pursuing

14   those claims.

15             MR. BIRON:  We didn't think so either, your Honor.

16             THE COURT:  OK.

17             MR. BIRON:  So, we have a ruling on these claims from

18   your Honor that they're time-barred.  In the Commerzbank case

19   the plaintiffs amended their complaint, and I refer the Court

20   to the second amended complaint at paragraph 35, to make clear

21   that they were not asserting these claims, and under that

22   assumption is how we litigated the case.  And so we believe

23   this record clearly establishes that these claims are

24   time-barred; they're out of the case.  And so we would, to the

25   extent plaintiffs argue otherwise, we would ask for, I guess,

L83WphoO

1     recognition of the Court's prior decision.

2                 Now, I would like to lastly touch on

3     pre-event-of-default claims related to --

4                 THE COURT:  Could I stop you, because that was an

5     issue I decided on the motion to dismiss.  I also dismissed

6     claims under the Trust Indenture Act and the Street Act.  And I

7     didn't see any arguments -- perhaps I missed them -- on these

8     motions relating to any claims under the Trust Indenture Act or

9     the Street Act.

10                Is it just assumed that those are no longer in the

11    case?

12                MR. BIRON:  Yes, your Honor.

13                With respect to the applicable sections of the Trust

14    Indenture Act that you ruled upon and the Street Act,

15    plaintiffs are not, have not attempted to pursue those claims

16    further, and they're not addressed in the briefing.

17                THE COURT:  OK.  Go ahead.

18                MR. BIRON:  So, I would like to move on to

19    pre-event-of-default claims related to alleged representation

20    and warranty breaches.

21                As a threshold matter, plaintiffs are entitled to

22    summary judgment -- I'm sorry.  Defendants are entitled to

23    summary judgment dismissing plaintiffs' claim that defendants

24    had a pre-event-of-default duty to investigate whether a loan

25    breached representation and warranties absent investor

L83WphoO

direction to do so.  The governing agreement for each trust

provides that defendants' duties are limited to those

"specifically set forth in the agreement with respect to the

trustee and no implied covenants or obligations shall be read

into the agreement."

There is no provision in any governing agreement for

any trust that imposes a duty on defendants to investigate

anything absent direction from a specified percentage of

investors, which is normally 25 percent.  The absence of this

language is dispositive of this issue.  Consistent with that

contract language, New York's First Department has confirmed

that RMBS trustees do not have a duty to "notice to the

source," and that's *Commerzbank v. Bank of New York-Mellon*, 35

N.Y.3d. 363.

In addition, your Honor, numerous witnesses for both

Phoenix Light and Commerzbank testified that it was their

understanding that RMBS trustees had no duty to investigate

absent direction from the requisite percentage of investors.

In light of this, of all this evidence, defendants are entitled

to summary judgment on that issue.

Now I would like to turn to situations -- to the

pre-event-of-default duties relating to alleged representation

and warranty breaches.  So, plaintiffs claim that defendants

breached their duty to provide notice of alleged representation

and warranty breaches and to enforce put-back claims with

L83WphoO

1    respect to those.

2          Under the governing agreements, the trustee and other

3    specified parties have certain duties if they "discover" or

4    under some agreements receive written notice of material

5    loan-level representation and warranty breaches.  The courts

6    that have addressed this issue have uniformly held that to

7    survive summary judgment on a pre-event-of-default

8    representation and warranty claim, a plaintiff cannot rely on

9    generalized proof.  Rather, the plaintiff must come forward

10   with evidence that the trustee received trust- and

11   loan-specific notice of alleged representation and warranty

12   breaches.

13         Thus, the gating question is whether plaintiffs have

14   come forward with evidence with respect to the trust at issue,

15   trust- and loan-specific evidence that defendant received such

16   notice.  As to the 22 trusts identified on Goff Reply Exhibits

17   12 and 13, the answer is no.  Plaintiffs have come forward with

18   no evidence that defendant ever received loan-specific notice

19   of any alleged representation and warranty violation.

20         The next question in this analysis is whether

21   plaintiffs have come forward with any evidence that defendants

22   received trust- and loan-specific notice.

23         THE COURT:  Could I get back to the question that I

24   raised earlier about the difference between phase 1 and phase 2

25   discovery.  Isn't it possible that that evidence would come

L83WphoO

1    forward in phase 2 rather than phase 1?

2          MR. BIRON:  No, your Honor, it is impossible.

3          THE COURT:  I'm sorry?

4          MR. BIRON:  No.  It's impossible.

5          THE COURT:  It isn't possible.

6          MR. BIRON:  So, discovery in phase 1, plaintiffs had

7    an opportunity, and they did take voluminous discovery of

8    defendants, including whether or not defendants received

9    notice, communications from investors.  And again, the issue is

10   not whether there was a rep and warranty violation within, on a

11   loan or trust.  The issue at this stage is whether plaintiffs

12   have any evidence that the trustee received notice of an

13   alleged representation and warranty breach.

14         THE COURT:  OK.  Go ahead.

15         MR. BIRON:  So, as I was saying, the next question in

16   the, or the next stage in the analysis is whether plaintiffs

17   have come forward with evidence that defendant received loan-

18   or trust-specific notice of an alleged representation or

19   warranty breach and then failed to give notice to the

20   contractually specified parties.

21          As to all trusts, the answer to that question is no.

22   The evidence shows that each time defendants received such a

23   notice, defendants notified the specified parties.  That was

24   their practice.  That was their policy.  And defendants have

25   not -- I'm sorry.  Plaintiffs have not come forward with any

L83WphoO

1    evidence to the contrary.  Thus, defendants are entitled to

2    summary judgment on all of plaintiffs' pre-event-of-default

3    notice claims.

4          I refer the Court to paragraphs 93 and 94 of our

5    Phoenix Light 56.1 statement and paragraphs 80 and 81 of the

6    Commerzbank 56.1 statement, where this evidence is set forth.

7          Now, the next question, because there are two claims

8    here, plaintiffs allege that the defendants failed to give

9    notice in the mail, also alleges failed to enforce repurchase

10   obligations against the warrantor.  So the next question is

11   whether the relevant agreements that, with respect to the

12   trusts that remain imposed a duty on defendants to enforce any

13   warrantor's repurchase obligations.

14         As to the 37 trusts on Biron Phoenix Light Exhibit 56

15   and Biron Commerzbank Exhibit 56, there's no provision in the

16   governing agreement providing that defendant had any such duty.

17   For the 23 trusts identified on Biron Phoenix Light Exhibit 57

18   and Biron Commerzbank Exhibit 57, the governing agreements

19   provide that defendants only had such a duty if directed to do

20   so by the depositor of the trust, and there is no evidence in

21   the record that that condition was ever met.  Thus, with

22   respect to those 60 trusts, defendants are entitled to summary

23   judgment that it did not breach, not have or breach any duty to

24   pursue enforcement action against the warrantor.

25         Now, in an attempt to avoid this result, plaintiffs

L83WphoO

1   argue that the language in the governing agreements whereby the

2   trustee agreed to hold the trust fund and "exercise the rights

3   referred to above" for the benefit of the certificate holders

4   somehow imposed an enforcement duty on defendants, that

5   argument fails for several reasons.

6           First, as I noted earlier, the language in all of

7   these governing agreements provides that prior to an event of

8   default, defendants' duties are limited to those specifically

9   set forth in the agreement.  And the language cited by

10  plaintiffs does not specifically impose a duty on the trustee

11  to enforce anything.  Rather, reading the agreement as a whole

12  and taking into account well-settled trust law, it's apparent

13  that the "rights referred to above" language was not intended

14  to impose any specific obligation on the trustee.  Rather, that

15  language was included because to create a common law trust, the

16  trust agreement must include an agreement by the trustee to

17  hold and use the trust property for the benefit of others.

18          I refer the Court to the authority at page 37 of our

19  reply brief, which includes citation to the restatement (third)

20  of trust.

21          THE COURT:  In order to grant you summary judgment on

22  that argument, I would have to determine that the language of

23  the governing agreement is unambiguous.

24          MR. BIRON:  Yes, your Honor.  And that's what Judge

25  Pauley found in the *Commerzbank v. U.S. Bank* decision.

L83WphoO

```
 1              THE COURT:  I'm sorry?

 2              MR. BIRON:  That's what Judge Pauley found in the

 3    Commerzbank v. U.S. Bank decision.  And I will note that other

 4    jurists have come down on the other side of that issue as well.

 5              And just to briefly address, to the extent that

 6    plaintiffs contend that defendant is collaterally estopped from

 7    contesting their interpretation of this language by an order

 8    denying Deutsche Bank's motion to dismiss in another RMBS case,

 9    that argument fails.  Among other reasons, the doctrine of

10    collateral estoppel is inapplicable to an order denying a

11    motion to dismiss, and I would note that in Judge Pauley's

12    decision, which was on summary judgment in Commerzbank v. U.S.

13    Bank, the court found the opposite.  So if anyone here is

14    collaterally estopped, it would be Commerzbank.

15              Your Honor, unless your Honor has any questions about

16    what I just covered, I would turn the podium over to Mr. Kraut

17    to cover the post-event-of-default claims.

18              THE COURT:  All right.

19              MR. KRAUT:  May I begin, your Honor?

20              THE COURT:  Yes.  Go ahead.

21              MR. KRAUT:  Good morning, your Honor.

22              As my partner Mr. Biron said, I will be speaking about

23    plaintiffs' claims relating to the trustee's alleged

24    post-event-of-default duties and whether certain events of

25    default even occurred.  Plaintiffs' post-event-of-default
```

L83WphoO

1    theories fail for many reasons.  I'll walk through three

2    primary points today.

3            No. 1, events of default are specific contractually

4    defined events, and plaintiffs have no admissible evidence that

5    each necessary element of an event of default occurred as to

6    what I'll refer to as the disputed events of default and that

7    the trustee had the requisite knowledge of them;

8            No. 2, even if the Court finds that a disputed event

9    of default occurred, plaintiffs have not proven that the

10   trustee acted imprudently;

11           And No. 3, when undisputed events of default occurred,

12   the trustee acknowledged them and acted as a prudent person.

13           As I'll explain, these points warrant summary judgment

14   for defendants.  At a minimum, there are disputed issues of

15   fact that prevent summary judgment for plaintiffs.  At this

16   stage --

17           THE COURT:  I thought this was your motion for summary

18   judgment.

19           MR. KRAUT:  I was going to be addressing these

20   issues -- the evidence on both motions is effectively similar.

21   I don't know.  Do we want to --

22           THE COURT:  Perhaps I should listen to the plaintiffs'

23   motion for summary judgment, and you can respond if you wish.

24           But go ahead.

25           MR. KRAUT:  We could do this whichever way your Honor

L83WphoO

1    prefers.  I thought it would be efficient to address, and

2    hopefully concisely as I could, the issues that relate to the

3    post-event-of-default claims that attach to both motions.

4               THE COURT:  Keep your voice up.

5               MR. KRAUT:  Your Honor, it was my intent to try to

6    efficiently address the issues relating to plaintiffs'

7    post-event-of-default claims that are attached to both our

8    motions and plaintiffs' motions.  I thought that would be most

9    efficient.

10              THE COURT:  OK.  Just as an overview, I would have

11   thought that the arguments with respect to the

12   post-event-of-default duties that are raised in the plaintiffs'

13   motion for partial summary judgment and that are responded to

14   in your motion also raise issues of fact, as you were just

15   saying for your third point, so that it would not be possible

16   for me to issue summary judgment finding that the evidence was

17   so clear that the defendants breached post-event-of-default

18   duties.  So following that, one would think that it would not

19   be possible to grant summary judgment to the plaintiffs or to

20   the defendants on post-event-of-default duties of the trustees.

21              MR. KRAUT:  Your Honor, I would say --

22              THE COURT:  Your third point, that you were just going

23   to make to me, was there are issues of fact that make it

24   impossible to decide the post-event-of-default issues.  The

25   plaintiffs argue that the trustees did not act as a prudent

L83WphoO

1   person would have acted under all of the circumstances.  The

2   defendants say no, that's not true; even though we didn't do

3   anything, it was actually prudent under the circumstances not

4   to do anything further than what we actually did, because there

5   were costs associated with doing anything further.  We

6   consulted internally.  We took some actions.  We didn't take

7   other actions.  But you can't decide on a motion for summary

8   judgment that what we did, the defendants say, was not what a

9   prudent person would have done under all of the circumstances.

10          So it's not so clear to me under all of the

11   circumstances why in support of the defendants' motion for

12   summary judgment you want to tell me that there are issues of

13   fact with respect to what the trustees did after events of

14   default and that they failed to act -- that there are issues of

15   fact as to whether they acted as they should have acted, as a

16   prudent person.

17          MR. KRAUT:  Let me try to clarify, your Honor.

18          We agree -- and make no mistake about this; we will be

19   as clear as we can -- that the issue of prudence raises

20   questions of fact.  We cite four or five cases on that point.

21   We don't think there's any serious dispute about that.

22          Towards the end of Mr. Biron's remarks, he identified

23   a few situations where we don't believe this, where trustee --

24   let me come back here.

25          To the extent that the plaintiffs are arguing that

L83WphoO

1    prudence required the trustee to pursue repurchase claims when

2    there are failed warrantors, where there are warrantors who

3    could not have paid and there's evidence that we put in the

4    record from our experts demonstrating which warrantors would

5    not have been able to pay and there's no rebutted evidence on

6    that, to the extent there are time-barred claims, to the extent

7    there are settled claims, to the extent that plaintiffs are

8    arguing that a prudent trustee would have done those things, we

9    don't believe there's any evidence in the record that could

10   possibly support that the trustee failed to act as a prudent

11   person by not pursuing those claims.

12          With the exception of those which we don't know, we

13   don't believe are seriously contested, we agree with your Honor

14   that prudence is an issue.  But we agree with what I believe

15   your Honor was saying that issues of prudence or fact issues

16   are not resolvable on a motion for summary judgment and no

17   court, to our knowledge, has ever found a trustee imprudent as

18   a matter of law at this stage.

19          THE COURT:  OK.

20          MR. KRAUT:  So with that, I'll focus on the first two

21   points.

22          At this stage, plaintiffs need sufficient admissible

23   evidence for each trust that a contractually defined event of

24   default occurred, which for most trusts at issue here means a

25   servicer materially breached its contractual duties with

L83WphoO

1    respect to loans in a particular trust and the servicer

2    received notice of the material breach and failed to cure

3    during a defined cure period;

4            Two, the trustee had actual knowledge or written

5    notice of the event of default, whichever is required under the

6    governing agreement, and the trustee failed to act as a prudent

7    person would have acted under the circumstances before the

8    event of default was cured.

9            THE COURT:  Which courts have been prepared to grant

10   summary judgment on those issues in favor of defendants?

11           MR. KRAUT:  Judge Caproni held that, that there was no

12   evidence of written notice or actual knowledge of breaches.  I

13   believe these issues were -- this is the same ruling in the

14   Tenth Circuit in *American Fidelity*.

15           THE COURT:  I'm sorry?

16           MR. KRAUT:  The Tenth Circuit in *American Fidelity*, I

17   believe, addressed these issues.  Those are the two that come

18   to mind right now.

19           THE COURT:  Which was Judge Caproni's decision?

20           MR. KRAUT:  Judge Caproni was in *Phoenix Light v. Bank*

21   *of New York-Mellon*.

22           THE COURT:  OK.  That was summary judgment?

23           MR. KRAUT:  Yes, your Honor.

24           THE COURT:  OK.

25           MR. KRAUT:  So, I'd like to start with plaintiffs'

L83WphoO

assertion that servicers' property maintenance resulted in

events of default, and I'll make three points which demonstrate

plaintiffs' failure of proof.

First, there's no admissible evidence of actual

trust-specific servicer breaches.  Plaintiffs rely on

spreadsheets that municipalities sent to the trustees.  Besides

being inadmissible hearsay, those spreadsheets don't say what

plaintiffs claim they do.

Deutsche Bank administered approximately 2,000 trusts.

The spreadsheets that are in the record show that across all of

those trusts, a city was claiming unpaid tickets or water

bills, and those spreadsheets, when plaintiffs actually put

them in the record -- and they didn't always -- typically don't

say which trusts were involved.  Sometimes they don't even say

what the violation was.  And servicers frequently told the

trustee that violations were unwarranted, inaccurate, or had

been paid.

THE COURT:  Could you finish up in no more than five

minutes.

Go ahead.

MR. KRAUT:  Just to be clear, your Honor, the entire

post-event of default in five minutes?

THE COURT:  Yes.  Between you and your colleague,

you've gone on for an hour and a half, which is longer than I

usually keep a reporter without a break, and there's a whole

L83WphoO

1    other argument, to say nothing of the response to your

2    arguments.  If you were before the Court of Appeals, you would

3    get 12 minutes.  An hour and a half is certainly generous.

4          MR. KRAUT:  Understood, your Honor.  I'll move as

5    quickly as I can.

6          THE COURT:  No.  Five minutes is as quickly as you

7    will.

8          MR. KRAUT:  Understood, your Honor.

9          So, with the servicers' property maintenance, there's

10   no events -- admissible evidence of actual trust-specific

11   servicer breaches.  At this stage the plaintiffs can't just say

12   there must have been violations in the trust and the trustee

13   had to know about them.  That got them past their motion to

14   dismiss.  That doesn't work at summary judgment, and as Judge

15   Caproni explained in the *Phoenix Light v. Bank of New York*

16   case, the plaintiffs can't rely on generalized proof or

17   evidence of pervasive breaches.  And I'll list these off

18   instead of walking through the argument for time reasons.

19         But even if the spreadsheets reflected property

20   violations, that's not the same thing as showing servicer

21   breaches.  Servicers have to service responsibly, but there are

22   many reasons why municipal tickets could arise without servicer

23   fault.  The condition may have existed before the property

24   became REO.  It may have happened afterwards.  Sometimes the

25   servicer was --

L83WphoO

1        THE COURT:  You're going to have to go slower for the

2    court reporter.

3        MR. KRAUT:  Bottom line, your Honor, plaintiffs took

4    no discovery from cities or from servicers, and they have no

5    idea which property violations actually occurred and whether

6    they resulted from servicer wrongdoing.  They have no idea

7    whether any of these breaches were material, whether the

8    violations, property violations were material servicer

9    breaches.

10        In one instance, the only trust-specific evidence for

11    REO 2006-M3 was one outstanding water bill.  The trust had

12    3,500 loans and over $700 million in principal.  That's plainly

13    not material but, at a minimum, a disputed issue of fact.

14        Briefly, even if the plaintiffs could establish

15    material servicer breaches, there are additional hurdles that

16    the plaintiffs would have to overcome for a servicer breach to

17    write them into an event of default.

18        THE COURT:  You just said that even if the plaintiffs

19    could prove that, there's a plain issue of fact, which was the

20    little introduction that I gave with respect to all of these

21    issues.  But go ahead.

22        MR. KRAUT:  Your Honor, all I meant to say is that

23    there are multiple things the plaintiffs have to show that they

24    haven't shown.  They haven't shown that property violations

25    actually occurred with admissible evidence.  They haven't

L83WphoO

showed that if there were property violations those resulted

from servicer default.  They haven't showed that even if there

were breaches the violations were material, and now I was

saying that they haven't showed that they're cured.  All of

these things, and then after cured, if not cured and that the

trustee received actual knowledge that they had not been cured.

All of these things are requirements for the plaintiffs to

establish an event of default, and there's an absence of proof,

and therefore their claim with respect to property violation

EODs fails.

I'll mention briefly another type of servicer event of

default relating to what plaintiffs refer to as robo-signing.

There's no admissible loan- or trust-specific evidence

of robo-signing of a single loan in any trust, much less the

trustee's actual knowledge of such conduct, whether you're

looking at the testimony -- and I know the plaintiffs pick out

a couple excerpts, but when you read the whole testimony, when

you read the media allegations, it's plain that they were, that

the notices that trustees sent out or anything the trustees

knew about, quote, robo-signing came from media allegations

that were not trust-specific.  And again, as the courts have

emphasized, plaintiffs can't rely on notice of servicing

breaches to support a claim unless they can identify trust- and

loan-specific documents.  Judge Pauley agreed on that point.

I'll make one more point about the disputed events of

L83WphoO

 1   default, and I think I'll be out of time at that point.

 2               Plaintiffs refer to servicers' annual statements of

 3   compliance.  As a threshold matter, this claim is not even

 4   pled -- this theory's not pled in the complaints.  Plaintiffs

 5   amended multiple times, had opportunities to raise it; didn't

 6   do it.  For one trust involving Fremont, plaintiffs say Fremont

 7   failed to deliver a compliance statement.  Fremont wasn't even

 8   a servicer of the trust when those statements were due.  And

 9   they also need to show that the late statement -- as little as

10   one week in some instances -- was a material breach.  We

11   think -- well, I'll hold off on discussions of prudence.

12               Your Honor, those are my remarks with respect to the

13   disputed events of default.

14               THE COURT:  OK.  Thank you.

15               We'll take a five-minute break at this point.

16               (Recess)

17               THE COURT:  All right.  Please be seated.

18               All right.  Plaintiffs.

19               MR. WOLLMUTH:  Good afternoon, your Honor.  May it

20   please the Court.

21               THE COURT:  Good morning.

22               MR. WOLLMUTH:  Still morning.  Good morning, your

23   Honor.

24               Your Honor and madam reporter, I haven't done this

25   before with the mask, so if I'm either too fast or too quiet or

L83WphoO

1    too booming, please let me know, and I'll try to fix it.

2           Your Honor, order of proceedings, I will oppose most

3    of these arguments.  Mr. Handlin will oppose pre-EOD duties and

4    post-EOD duties.  The other arguments I will handle.  And if I

5    may, I'm going to take standing and statute of limitations in

6    the main last, because I think I can hit a few points that your

7    Honor raised and the defendants brought out fairly quickly.

8           First, on the DTC issue, Judge Pauley does not apply

9    here at all in this context because he specifically applied

10   Ohio choice-of-law rules and looked for the place of

11   performance rather than the center of gravity required under

12   New York law.  It was a unique Ohio law decision, and Judge

13   Pauley expressly states that fact in the reconsideration

14   decision.

15          Judge Pauley also states he does not dispute other

16   decisions not considering DTC or not finding it controlling and

17   is not applying DTC to overrule center-of-gravity analysis done

18   in other RMBS cases, such as Judge Failla's decision in *Pacific

19   Life*, which is cited in our opposition at page 7 and is

20   directly on point.

21          THE COURT:  OK.  But why wasn't the defendants'

22   original position that if you apply the center-of-gravity

23   approach under New York choice of law, you have to know who the

24   ultimate purchasers are in order to be able to make that

25   center-of-gravity analysis?  And the plaintiffs concede that

L83WphoO

1   they don't know what the residence was of the purchasers of

2   these certificates to whom they were sold.

3          MR. WOLLMUTH:  Yes, your Honor.

4          Defendants cite no case holding that every factor in a

5   center-of-gravity analysis must be identified and point in one

6   direction to reach a proper conclusion.  Nobody knows who the

7   buyers are, but some law has to apply.  And if I could just go

8   through it very quickly, what counts is the places of

9   contracting, negotiation, performance, the subject matter of

10  the contract and the domicile or place of business of the

11  parties.  No single factor is determinative.

12         And your Honor also asked questions about the scope of

13  this motion, the standing motion.  It's very limited.  There

14  are only 33 sold certificates.

15         THE COURT:  Oh, I know.  This argument with respect to

16  sold certificates relates just to the sold certificates.

17         MR. WOLLMUTH:  And it's only 33 of 128, 27 for Commerz

18  and six for Phoenix Light.

19         Taking first the Commerz sale, we have submitted the

20  uncontradicted sworn declaration of Robert Boelstler, and it

21  demonstrates, which is more than enough to carry our burden at

22  this stage, showing that the claims were not transferred, that

23  the transactions were negotiated in London between Commerzbank

24  London employees and eight specifically identified London

25  buyers.  The certificates were held by Commerzbank in London.

L83WphoO

1    The sales were booked in London by Commerzbank's recordkeeping

2    employees.  Commerzbank solicited bids for the certificates in

3    London via an auction in which it invited only London banks to

4    bid.  All eight London banks were principal purchasers.  We

5    have submitted the trade tickets in support of the

6    transactions.  Grouping the relevant contexts together clearly

7    states that English law governs.

8            THE COURT:  But the location of London branches has

9    been traditionally devalued, if you will.

10           MR. WOLLMUTH:  And we had that conversation, your

11   Honor.  That is when -- not under a grouping-of-context

12   analysis, that is under determining where the place of injury

13   is felt.  This is different.  OK?  The facts occurred in

14   London, and I tried the branch argument regarding where the

15   impact of injury was felt, and your Honor correctly rejected

16   it.  But none of those cases have anything to do with the

17   center-of-gravity analysis.

18           The only argument that Deutsche makes is

19   self-defeating.  The cases they cite are at page 3 of their

20   reply, and they say the residence of brokers is a nonfactor,

21   and we have a similar case as well.  So this was -- the buyers

22   were not brokers, so it's not even relevant, the string cite

23   they have at page 3 of their opposition.  The buyers were

24   banks.

25           Next, as to the three -- six Phoenix Light

L83WphoO

1    certificates, the evidence is that the sales were controlled by

2    Cayman and Irish law, and what we have there is these are Irish

3    and Cayman entities that did the transactions, respectively.

4    That's where the sellers are.  The buyers were brokers.  On

5    both sides there was a collateral manager that brokered the

6    Phoenix Light certificates to receiving brokers, but all the

7    other factors that the Court can look to indicate either Irish

8    law or Cayman law, and that is explained in detail in our

9    papers.

10           But getting back to the, if DTC was even a factor to

11   be weighed in a grouping analysis, that is not even argued by

12   Deutsche Bank, and it cannot be a basis for granting their

13   motion.

14           Second, your Honor asked a couple questions about

15   champerty, and I just wanted to address those briefly.

16           THE COURT:  I didn't think I did.  I thought that the

17   champerty argument was noted by counsel on the other side as

18   not having been raised in these papers and up before the Second

19   Circuit, and I said counsel can make that argument in a

20   supplemental motion after the Second Circuit decides its case.

21           MR. WOLLMUTH:  OK.  Your Honor, champerty is before

22   the Court on three certificates, but they said that your Honor

23   need not consider the issue on reply.  If your Honor didn't ask

24   the question, I apologize.  Maybe it was counsel.

25           THE COURT:  No.  It's OK.  You never need to

L83WphoO

1      apologize.  I don't think I asked the question on champerty,

2      and it seems clear to me that the defendants are not raising an

3      issue of champerty on these motions.

4              MR. WOLLMUTH:  And my point, your Honor, is that they

5      should not get another bite at the apple.  They made the

6      argument as to three certificates.  They withdrew the argument

7      in their reply.  It's over.  Now, if the Court wants to raise

8      it *sua sponte*, we understand.

9              THE COURT:  No, no, no.  I would not raise the issue

10     of champerty *sua sponte* on these motions.  If there's a

11     subsequent decision by the Court of Appeals and a subsequent

12     motion, certainly if there's guidance from the Court of Appeals

13     on the issue, I would have it briefed on a supplemental motion.

14             MR. WOLLMUTH:  Thank you, your Honor.

15             Moving back to a couple of the preliminary issues that

16     have been raised either by the Court or by the defendants'

17     arguments, the defendants always say, and I know your Honor

18     won't be swayed by this, but that the plaintiffs are getting

19     killed in all these cases.  That is absolutely not true.  Judge

20     Pauley took U.S. Bank behind the woodshed for its shocking

21     conduct in the face of vast breach notices, finding events of

22     default in every trust and marveling at the trustee's, his

23     word, "paralysis" in light of the breach notices that it had

24     received.

25             THE COURT:  No, but defendants raise the fair point

L83WphoO

1   that they say there are seven cases in which courts have

2   dismissed similar claims on summary judgment, and there are no

3   cases, they say, which have granted summary judgment on behalf

4   of parties similar to yours in claims against trustees.  So

5   fair question.  Have there been any?

6        MR. WOLLMUTH:  I'm unaware of any offensive summary

7   judgment motions being granted, but I'm unaware of any being

8   denied.  I do take issue with -- and Mr. Handlin indicates

9   there may be one, but that's really his bailiwick.

10        The cases that are in the Southern District have not

11   poured these cases out by any means.  We have hundreds of

12   millions, a couple hundred million of damages going to trial in

13   Judge Pauley's case, and we have meaningful damages going to

14   trial in Judge Caproni's case.  So I think the defendants are

15   overstating their success a bit.

16        Some of the other cases are outside of this

17   jurisdiction -- *American Fidelity*, *Western and Southern v. Bank*

18   *of New York*, and I'm not at all familiar with *American*

19   *Fidelity* -- but I believe we address all of them in our briefs.

20        Next, the defendants argue that this case must be

21   proven loan by loan and trust by trust, and your Honor asked a

22   number of questions.  Is that phase 1 or phase 2?  And what I

23   took your Honor to be driving at is the difference between

24   liability and damages, and I wanted to speak briefly on this

25   point.

L83WphoO

1              Loan by loan and trust by trust is really a phase 2

2       issue.  The Second Circuit ruling that is mentioned is

3       *Policemen's*, and that ruling is on a class certification

4       motion.  The statement is dicta.  The holding was that the

5       plaintiff there, which owned one RMBS trust, did not have

6       standing to represent many, many -- like 100-plus -- RMBS

7       trusts because it did not have adequate incentive to prove its

8       case loan by loan and trust by trust.  That incentive's needed

9       at the liability phase not very much.  It's needed a great deal

10      at the damages phase, which is why this case is bifurcated, and

11      it fits with the sole remedy.  You have to go loan by loan and

12      trust by trust under the sole-remedy provision to calculate

13      damages.

14              THE COURT:  My question with respect to the difference

15      between phase 1 and phase 2 was not really directed to is phase

16      1 limited to liability and phase 2 limited to damages?  It was

17      all of these arguments that are being made to me about the need

18      to prove liability loan by loan, trust by trust, the question

19      is, is there any discovery that would be available in phase 2

20      discovery that would be relevant even to liability on a

21      decision of liability trust by trust loan by loan.

22              MR. WOLLMUTH:  There may be.  For example, one of the

23      trustees' arguments are the vast number of breach notices it

24      received are just allegations and they don't discover the

25      breach.  If, for example, in their accounting for the trust

L83WphoO

1     they indicated a reserve for those kinds of breaches, it would

2     demonstrate actual knowledge, which is not required; there has

3     to be a discovery of the breach, which is a matter of hot

4     debate.  But yes, I can certainly envision ways in which phase

5     2 discovery -- and that's off the cuff.  I'm sure if I had a

6     little longer, I could come up with many more.

7             THE COURT:  But how did the parties take their

8     depositions?  Were there objections, No, you can't ask that,

9     that's phase 2 discovery?

10            MR. WOLLMUTH:  I think that the parties on both sides,

11    and I don't think Morgan Lewis would disagree, we tried in good

12    faith to hew to phase 1 discovery on issues principally of

13    liability and phase 2 discovery will be broader.  But

14    Mr. Handlin was directly involved in that discovery, and I'd

15    like to defer that question to him if I could, your Honor.

16            THE COURT:  Sure.

17            MR. WOLLMUTH:  OK.

18            Next, your Honor, you asked some questions on a single

19    certificate about an order from the Wisconsin court.  Deutsche

20    Bank contends that Phoenix cannot sue on this certificate

21    because it lacks consent from the bond insurer, but *Ambac*

22    filing for rehabilitation is a defined insurer event of default

23    under the PSA.  The argument that Deutsche makes is that this

24    Wisconsin order somehow negates that contractual provision.

25    That is clearly wrong.

L83WphoO

1            The bond insurer default is that *Ambac* went into

2    rehabilitation, and the order that they cite, and I direct your

3    Honor to the record -- it's Goff Reply Exhibit 3 -- does not

4    even purport to undo the default, nor could it.  It merely

5    prohibits parties from exercising or disregarding the exercise

6    of rights by the *Ambac* rehabilitator.  So that argument, I

7    think, should be put to bed.

8            THE COURT:  In the brief, it did appear that the order

9    prevented the plaintiff from exercising their rights by

10   demanding action from the insurance company that was in

11   rehabilitation, and that appeared to be the effect of the

12   order.  So my questions were really whether that was simply

13   stayed or completely prevented.  If it were completely

14   prevented, it would appear that the defendants had a good

15   argument that they couldn't have been required to get that

16   consent.

17           MR. WOLLMUTH:  Well, I don't think I heard them say

18   that it was permanent, so I won't take that on, but I do

19   question, and I think your Honor should, whether Deutsche Bank

20   has standing to raise that order.  It's put in place so the

21   insurance rehabilitator has the scope of powers it needs to

22   undertake the rehabilitation of *Ambac*.  If it thought its order

23   required an insurance consent in this case and the

24   rehabilitator chose to assert the order, it could.  It does not

25   say the trustee can assert the order.  So I think both: one,

L83WphoO

1    it's not permanent, and two, I think there's a lack of

2    standing.

3           THE COURT:  Why do you say it's not permanent?

4           MR. WOLLMUTH:  Well, it's a question of fact is what I

5    meant, your Honor.  There was not an answer to your question

6    that I heard.

7           THE COURT:  OK.  Your colleagues are going to put in a

8    brief letter on that, no more than two pages.  You're welcome

9    to do the same.

10          MR. WOLLMUTH:  Thank you, your Honor.

11          Next, as to the settled trusts in the Fremont matter,

12   I wanted to make a couple of points very briefly.

13          The facts underlying Deutsche Bank's Fremont argument

14   are material, disputed and complex, and their brief treats them

15   very summarily.  They leave out key details.

16          The warrantor never went bankrupt.  It was named FIL,

17   and it had hundreds of millions of dollars.  They claim the

18   March 2010 settlement settled the repurchase claims for three

19   trusts, but it did not.  The trustee had previously sought

20   authority to settle those trusts, but it could not get

21   authority from certificate holders.  And because it could not,

22   it made a side deal with FIL.

23          The deal was that it would not pursue repurchase

24   claims unless directed by investors.  Deutsche Bank had no

25   right to make that deal under the terms of the PSAs.  They had

L83WphoO

1  already discovered the breach, and by 2010, several events of

2  default had already occurred in each of those three trusts.

3  They were a prudent person bound to exercise their rights and

4  powers, and they could not abandon those by agreeing not to

5  exercise them.  This is a question of fact.

6       THE COURT:  It's a common argument against the motion

7  for summary judgment that there are issues of fact, but there

8  do appear to be settlement agreements that would waive these

9  claims.

10      MR. WOLLMUTH:  Absolutely not, your Honor.  I ask you

11 to examine the discussion of the point in our papers.  The

12 claims are not expunged.  The trustee agrees not to exercise

13 its rights.  They're different.

14      The next five trusts on Fremont, which I will address,

15 the claims were expunged, and if I may, I have a brief answer

16 to those.

17      THE COURT:  Go ahead.

18      MR. WOLLMUTH:  For the other five trusts, Deutsche

19 Bank asserts that it's entitled to summary judgment because of

20 settlements executed in 2008 and 2009.  However, Deutsche Bank

21 cannot use those settlement agreements for summary judgment

22 here.  They obtained the settlements by misrepresenting the

23 facts to investors to obtain their consent.

24      On pages 26 and 27 of our opposition, we cite several

25 cases on point.  One directly on point is the *Birnbaum* case on

L83WphoO

1    page 7 -- 27, which specifically states that which is at issue

2    here.  It says consents procured by a fiduciary are voidable if

3    the fiduciary fails to disclose material facts.

4              THE COURT:  But of course, that case does not deal

5    with these settlements, and all of the arguments with respect

6    to the invalidity of the settlement are certainly not raised in

7    the pleadings.  They're raised in your brief, but they're

8    unsupported, that all of this was essentially fraudulent.

9              MR. WOLLMUTH:  Well, they're not pled for a good

10   reason, and Deutsche makes that point.  The fraudulent

11   obtaining of investor consents is not a claim that we needed to

12   plead.  Plaintiffs had no reason to raise this position until

13   Deutsche Bank asserted the consents it fraudulently procured

14   entitled it to enter into settlements.

15             THE COURT:  But doesn't that claim belong in another

16   case?  Here, we have a settlement agreement approved by the

17   court, and now you say OK, there are those settlement

18   agreements, but they were fraudulently obtained.  OK.  Go back

19   to the court that approved the settlements and get the

20   settlements overturned.

21             MR. WOLLMUTH:  We're not trying to undo the

22   settlements, your Honor.  That ship has long sailed.  The money

23   is gone.  The point is that the trustee should not be allowed

24   to raise the settlement as a defense.  It was a breach of its

25   fiduciary duties to fraudulently obtain consents and execute

L83WphoO

the settlements at a low value.  That is a clear breach of its

prudent-person duties.  It's a breach of its express direction

under the trust to exercise all rights and powers following

events of default for the benefit of certificate holders.  And

the misrepresentations are supported, as the exhibits to our

papers show.

What was not disclosed in the consents -- see,

Deutsche Bank told investors, You'd better settle because FIL

has no money.  What was not disclosed was that the apparent

bankruptcy of an entity known as SGC did not implicate FIL.

FIL, in fact, had hundreds of millions of dollars of cash

because the FDIC had required it to sell its business, and that

cash was just sitting there, able to satisfy repurchase claims.

In fact, it was greater than all the repurchase claims in our

case.

Deutsche Bank was acting as a fiduciary, and it needed

to disclose these facts and it could not omit facts either

given its fiduciary duty to disclose.  And Deutsche Bank has no

answer for these points, which are well supported in the

record.  It only says the notices we sent out speak for

themselves.  That's not persuasive, so I would submit, your

Honor, that a reasonable jury could find that it was a breach

of the trustee's prudent-person duties and a breach of its

obligation to exercise its powers to take a

pennies-on-the-dollar settlement for loans that were -- phase 2

L83WphoO

1    will show –– I know Fremont loans; they're atrocious.  It was a

2    breach of the trustee's duty to settle for pennies on the

3    dollar when there was plenty of cash available to satisfy the

4    repurchase claims.

5           Unless your Honor has questions, I'll move on from

6    Fremont.

7           THE COURT:  Move on to?

8           MR. WOLLMUTH:  Move on from Fremont.

9           THE COURT:  Yes.

10          MR. WOLLMUTH:  Next, I just wanted to clarify.  Your

11   Honor had made a comment on the argument that repurchase claims

12   relating to document-delivery failures are time-barred.

13          THE COURT:  That's what I decided on the motion to

14   dismiss, and I took it from your papers on this motion that you

15   were not contesting that.

16          MR. WOLLMUTH:  Well, we're not contesting what your

17   Honor actually did rule, so if I could walk through it briefly,

18   your Honor?

19          And by the way, their argument regarding the

20   time-barred nature of repurchase claims for these loans is

21   raised only in a footnote in their opening brief: Commerzbank

22   footnote 21 and Phoenix Light footnote 10.

23          One, I think that makes the arguments facially

24   insufficient.

25          THE COURT:  No, because I had already decided that on

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L83WphoO

1    the motion to dismiss, and I really thought that in your

2    briefing on this motion you didn't contest that.

3            MR. WOLLMUTH:  So, your Honor, here's what your Honor

4    said.  The Court dismissed document-delivery claims accruing

5    when the trust closed.  Specifically what was argued at the

6    motion-to-dismiss stage was inventorying of documents on

7    initial delivery and the production of exception reports.

8            We do not make those claims because your Honor did

9    dismiss them.  The Court stated to the extent that claims for

10   breach of contract are based on facts that took place after the

11   loans were in the trust, they are not time-barred.  Breach of

12   repurchase obligations occurred years after the loans were in

13   the trust, and under your Honor's ruling, they are not

14   time-barred at all.

15           Your Honor continued, Deutsche Bank's motion to

16   dismiss on statute of limitations is granted only to the extent

17   that claims based on the failure -- that claims are based on

18   failure of Deutsche Bank to object initially to

19   document-delivery failures, not repurchase claims.  Just as it

20   did at the motion-to-dismiss stage, Deutsche tries to bootstrap

21   those rulings and rehash an argument that the Court expressly

22   rejected at the motion-to-dismiss stage.

23           They argue that the statute of limitations begins to

24   run on the repurchase of document claims when exception reports

25   are delivered.  They made that exact same argument at the

L83WphoO

motion to dismiss, and the Court rejected the argument, and

quoting the Court, that "the claims hinge on allegations that

Deutsche Bank breached its duties to enforce remedies when the

final exception reports were delivered."  That was their

argument then and now, and your Honor rejected it at page 709

in the original motion to dismiss.  And the Court sustained as

timely claims that Deutsche Bank stood idly by, and this is

quoting the Court, "while servicers and master servicers

engaged in so-called robo-signing on a widespread basis when

missing documents were needed to foreclose."

          The claims that the Court found timely at the

motion-to-dismiss stage related to document deliveries are the

exact claims before the Court.  Plaintiffs claim now missing

documents needed to foreclose triggered repurchase obligations

in every trust, and the trustee "stood idly by" and did

nothing, in the Court's words, while servicers robo-signed.

          Second, when documents remained missing for years

after the final exception reports and the initial document

delivery was made, the prudent-person duty kicked in.  So when

documents remained missing after the cure period afforded by

the PSAs, it triggered repurchase obligations for breaches of

reps and warranties in 46 trusts and a separate obligation to

repurchase the document-deficient loans in all trusts.

          And third, in every trust, servicers violated their

prudent servicing duties.

L83WphoO

1          THE COURT:  OK.  I don't think that the defendants are

2    making the argument that what I said on the motion to dismiss

3    with respect to document-delivery claims is broad enough to

4    cover all of the arguments with respect to repurchase claims.

5    And defendants can correct me if I'm wrong.

6          MR. WOLLMUTH:  Well, we have no issue with that, your

7    Honor.  What your Honor ruled was clear.  The initial failure

8    to inventory documents at closing is time-barred.  The failure

9    to produce exception reports is time-barred.

10         THE COURT:  And I also thought that in your papers on

11   the motion, you really didn't dispute that either.

12         MR. WOLLMUTH:  We don't dispute those two rulings,

13   your Honor.  We do dispute that any repurchase claims are

14   time-barred, and your Honor hit that right on the head.  And in

15   fact --

16         John, could you please give to the law clerk and Judge

17   Koeltl our slides, and the other side.

18         THE COURT:  Perhaps you could move on to the statute

19   of limitations.

20         MR. WOLLMUTH:  Yes.  And this is part of the statute

21   of limitations, so if I could just briefly, your Honor, direct

22   the Court to page 15 of the slide deck.

23         Deutsche does not present any facts that would justify

24   your Honor deviating from its ruling on repurchase claims at

25   the motion-to-dismiss stage, including for document-delivery

L83WphoO

1   failures, and I'd just like to show your Honor what I'll refer

2   to today as a 2 percent letter.

3          THE COURT:  Weren't we on to the statute of

4   limitations?

5          MR. WOLLMUTH:  This is the statute of limitations

6   point, your Honor.

7          THE COURT:  OK.

8          MR. WOLLMUTH:  After the cure period ran out, each

9   year, up to and including 2011, which makes all claims under

10  any statute of limitations timely, each year the trustees sent

11  these 2 percent letters to the servicers.  It should have

12  noticed a servicing breach for failure to cause repurchase of

13  the loans, but instead, as you'll see, they just say, "Enclosed

14  please find the current mortgage loan document exceptions" --

15  this is the trustee writing in 2011 -- "exceptions report for

16  Ameriquest"; "We request that you and each party copied on this

17  correspondence review the exceptions report and notify us if

18  you think the reported exceptions are material.  Your response

19  to this inquiry will be used to determine whether or not

20  remedial action is required to be taken."

21         So, just a couple of statute-of-limitations points

22  there, your Honor.  Under the *BLB* case from the Second Circuit

23  that we cite to the Court, how long the trustee had to take

24  remedial action is a question of fact that can't be decided on

25  summary judgment.

L83WphoO

1          In 2011, it is still stating to the servicers, Hey,

2     let us know if there is a meaningful problem here; we need to

3     evaluate it to take remedial action.

4          That means that all of the repurchase claims as to the

5     document-deficiency notices must fail even under the German

6     statute of limitations.

7          Moving on to the bulk of the statute-of-limitation

8     arguments, they're scattershot in a way, your Honor.  They

9     attack a variety of claims, plaintiffs' trust and limitations

10    period, so I'd like to clarify.

11         THE COURT:  Whoa, whoa, whoa, whoa.  Let's be clear.

12         First of all, with respect to Commerzbank, you don't

13    dispute that I should be applying the German statute of

14    limitations, right?

15         MR. WOLLMUTH:  I do, your Honor.

16         THE COURT:  You do?

17         MR. WOLLMUTH:  As to many, the Barrington II trusts

18    are not -- so the 22 certificates Deutsche Bank -- may I

19    outline for the Court exactly what the German statute of

20    limitations should apply to, because Deutsche has not?

21         THE COURT:  Well, you can outline what you contend the

22    German statute of limitations should apply to both with respect

23    to Commerzbank and Phoenix Light, sure.

24         MR. WOLLMUTH:  Thank you, your Honor.

25         First, none of the limitations periods address the

L83WphoO

1    continuing prudent-person period that arises after an event of

2    default, German or otherwise.  So entitlement as to that is off

3    the table.  But 22 of the Barrington II certificates, the

4    claims accrued first in the Cayman Islands.

5            THE COURT:  I'm sorry.  We're talking now about

6    Commerzbank or Phoenix Light?

7            MR. WOLLMUTH:  Commerzbank.

8            THE COURT:  OK.

9            MR. WOLLMUTH:  Deutsche Bank has no German

10   statute-of-limitations defense for the 22 Barrington II

11   certificates.  The certificates were not transferred to

12   Commerzbank from Barrington until 2012.  Therefore, the

13   earliest possible date that the German statute of limitations

14   could have run is 2016, and this case was filed in 2015, so it

15   cannot apply to Barrington II.

16           The Cayman statute, which is six years, is not even

17   addressed by Deutsche.

18           Third, there's no valid argument that the German

19   statute of limitations applies to any Phoenix Light plaintiff,

20   and your Honor did ask a number of questions about this, unless

21   I missed the point.  There's ten different Phoenix entities

22   that brought suit.  For nine of the ten entities, Deutsche does

23   not even contend that the German statute of limitations

24   applies.  Those are entities like Blue Heron and others.  The

25   plaintiffs for those nine entities assert timely claims on 58

L83WphoO

1   certificates.  Deutsche Bank does raise the German statute of

2   limitations for 29 certificates owned by the entity Phoenix

3   Light.  It is one of ten.

4           But Deutsche does not dispute that Phoenix is an Irish

5   company, incorporated in Ireland, with a board of directors in

6   Ireland.  Under the New York borrowing statute, that means that

7   either New York or Irish law applies.

8           THE COURT:  The ultimate trust beneficiaries are all

9   German.

10           MR. WOLLMUTH:  There is no trust.  They make that

11   appearance in their papers, but no trust is involved in the

12   Phoenix transaction, and I'll walk through it.

13           Phoenix argues -- I mean Deutsche Bank argues that

14   because Phoenix pledged assets as collateral to a trustee for

15   the benefit of German noteholders -- they're not the

16   beneficiaries of the trust -- and there is no trust.  There's

17   just a collateral trustee.

18           THE COURT:  OK.

19           MR. WOLLMUTH:  Pledged assets as collateral for German

20   noteholders, Phoenix should somehow be transformed from being

21   an Irish resident into a German resident.  It's absurd.  It's

22   like saying that if the Mets pledge Citifield --

23           THE COURT:  Well, hold on.

24           MR. WOLLMUTH:  -- as collateral to German noteholders

25   that financed the stadium the Mets are a German entity, and

L83WphoO

1   this exact matter -- and your Honor was about to say something,

2   but I would like to just point this out.  The exact argument

3   under nearly identical facts was made in the *House of Europe*

4   case cited in our briefs to Judge Sullivan, and he summarily

5   rejected the argument when he was a member of this court.

6           In *House of Europe*, like here, plaintiff pledged

7   assets to an indentured trustee to secure certain notes, and

8   the court rejected the argument.  And there's another case to

9   the same point cited in our briefs.  They have no contrary

10  authority.  So the German statute of limitations does not apply

11  to any of the Phoenix Light plaintiffs.  It does not even

12  purport to apply on two-thirds of the certificates, and the one

13  argument as to the remaining 29 certificates fails.  The German

14  statute of limitations is irrelevant to the 22 Barrington II

15  certificates.

16          And next, under clear law, the German statute of

17  limitations is also irrelevant to breaches occurring after

18  2011.  Because our complaint for Commerzbank was filed in 2015,

19  December 31, 2011, is the magic date.

20          THE COURT:  Could I stop you for a moment.

21          MR. WOLLMUTH:  Yes.

22          THE COURT:  With respect to Commerzbank, there are 22

23  Barrington certificates out of how many that Commerzbank is

24  suing for?

25          MR. WOLLMUTH:  It's a good question, your Honor.  I

L83WphoO

 1 | think it's a majority, but I don't have the -- I may have the

 2 | exact number.

 3 | John -- may Mr. Hein give me that number, your Honor,

 4 | while I move on?

 5 | THE COURT:  Sure.

 6 | MR. WOLLMUTH:  Because I don't know off the top.

 7 | THE COURT:  OK.  Do you have any idea how many trusts

 8 | you're dealing with for the 22 Barrington certificates?

 9 | MR. WOLLMUTH:  It's probably close to 22, your Honor.

10 | THE COURT:  OK.

11 | MR. WOLLMUTH:  I would guess 20.

12 | THE COURT:  OK.

13 | MR. WOLLMUTH:  It's probably 20 trusts.  Often they

14 | double up in a couple.

15 | John, do you have the number?  Or Jay, if you do?

16 | Otherwise we'll submit it to the Court after, if you could make

17 | a note, John.

18 | THE COURT:  OK.

19 | MR. WOLLMUTH:  I may run into it.  I think it's in my

20 | outline.

21 | Next, because our complaint for Commerzbank was filed

22 | in 2015, the magic date is December 31, 2011, and for the

23 | original Phoenix trusts, it's December 31, 2010.  Deutsche Bank

24 | does not dispute that plaintiffs seek damages for breaches that

25 | occurred after 2010 and '11 in every trust.  And post-2011

L83WphoO

1    breaches abound, including continuing breaches of Deutsche's

2    prudent-person duties, Deutsche's failure to address ongoing

3    servicing breaches and letting repurchase claims expire without

4    any action in 2012 for 2006 trusts and 2013 for 2007 trusts,

5    whether breaches occurred after 2011 is a question of fact that

6    precludes summary judgment on the German statute of

7    limitations.

8            On the merits of the German statute of limitations,

9    both Judge Pauley, who I was friendly with, and I just think he

10   got it wrong in that decision --

11           THE COURT:  There's no other decision, other than

12   Judge Pauley's, on German statute of limitations, is there?

13           MR. WOLLMUTH:  Actually, there's several that lay out

14   the governing principles, and Judge Pauley did not apply any of

15   them.  Judge Failla described it as one of the silver linings

16   to the financial crisis, that there's now there's a good body

17   of law in the Southern District.

18           THE COURT:  Hold on.  Judge Pauley applied the German

19   statute of limitations and found that claims were barred.  Is

20   there any other judge who applied the German statute of

21   limitations and found that claims were not barred?

22           MR. WOLLMUTH:  At the motion-to-dismiss stage, your

23   Honor did in this case.  Judge Failla did.

24           THE COURT:  No, no, no.  On summary judgment.

25           MR. WOLLMUTH:  No.  I think that's the only case

L83WphoO

1    that's considered it, your Honor.

2              THE COURT:  OK.

3              MR. WOLLMUTH:  I don't believe there's another case,

4    but it's a good point, and if I could refer your Honor to page

5    13 of the slide deck that I handed up to the Court, Judge

6    Pauley -- these are the principles that govern German law in

7    the Southern District, and they're set forth in a trilogy of

8    cases: your Honor's decision, Judge Failla's decision, and a

9    decision we submitted on supplemental authority which you were

10   blessed with called *Deutsche Zentral* from Judge Torres.

11             As your Honor stated, quoting the Second Circuit,

12   knowledge triggering the German statute means knowledge of the

13   facts necessary to commence an action with some prospect of

14   success; must have actual knowledge of the facts -- and this is

15   the one that really calls for the complete rejection of

16   defendants' German statute-of-limitations motion -- that would

17   allow him to conclude as a matter of fact, not suspicion or

18   speculation, which is not allowed under German law, that the

19   defendant trustee was culpable in the way that caused

20   plaintiffs' losses.

21             Most of what Deutsche cites does not go to that at

22   all.  It says there was a lot of press about originators and

23   sellers having breached their duties, but it doesn't say

24   anything about the trustee's duties.  The burden of proof is on

25   the defendant, which has not been sustained here, and gross

L83WphoO

negligence means only that the plaintiff cannot shut its eyes

to what is readily available to the plaintiff without

considerable effort.

        And Deutsche ignores the facts that were prevailing in

2011.  Most striking on this motion is the complete absence of

any evidence unearthed by Deutsche, not one shred, indicating

that plaintiffs had any inkling that Deutsche was significantly

responsible for their losses.  That is not surprising because

the long-term picture in 2011 makes clear that all of

Deutsche's German statute-of-limitations claims are completely

implausible.

        In 2011, only four suits ever had been brought against

RMBS trustees.  Three of those cases were against Bank of New

York-Mellon.  It is public record that in 2011 Bank of New

York-Mellon settled all of the Countrywide trusts for $8-1/2

billion as trustee, and that was very controversial.  Some

investors liked the settlement, like PIMCO and Blackrock.

Other dissatisfied investors filed cases against Bank of New

York.

        THE COURT:  I don't understand that argument.  Here

are all of these other lawsuits, which were outstanding against

other participants in the chain, claiming various fault along

the way, and so no one was really suing the trustees at that

point, but all of the facts were out there, enough to bring all

of the claims against the other intermediaries, but no one was

L83WphoO

1    yet suing the trustees.  That doesn't make all of the facts of

2    all of the bad loans and the robo-signing and all of the other

3    allegations go away.  It just means that no one yet thought,

4    Well, we have another potential defendant out there -- namely,

5    the trustee -- who was holding these assets, so now we should

6    sue the trustee.

7            That doesn't mean that the plaintiffs were unaware or

8    were grossly negligent in not being aware of the potential

9    lawsuit against the trustees.  And in fact, doesn't Commerzbank

10   argue that in its papers; that, in fact, by the end of 2011, it

11   knew that it was being wronged by the trustee?

12           MR. WOLLMUTH:  No, it doesn't, and your Honor ruled

13   that at the motion-to-dismiss stage specifically.  They made

14   the same argument that the allegation in the complaint somehow

15   put us on notice, and what your Honor said is it's not

16   connected to any of the trusts in this case, and your Honor

17   continued with the critical point.

18           See, we don't really dispute that there was widespread

19   knowledge of rep and warranty breaches by originators.  They

20   were getting pilloried.  We don't dispute that there was some

21   evidence very early of robo-signing.  What your Honor wrote at

22   the motion-to-dismiss stage is that there was nothing that

23   Deutsche presented that said we had facts, which is what's

24   required in Germany, not in notice pleading, facts, your

25   Honor's phrase was connect the dots.  There was no evidence

L83WphoO

1  that we have facts sufficient to connect the dots where there

2  was knowledge of these things going on, where there was other

3  lawsuits against other trustees that are not Deutsche Bank,

4  which your Honor also specifically rejected as a factor, to

5  conclude that Deutsche Bank had been breaching its duties on

6  any one of these trusts.

7        We had no facts, and the reason I mentioned the $8-1/2

8  billion settlement is that the evidence before your Honor shows

9  that Commerzbank was far from negligent.  It is undisputed that

10 in January 2012, which is after the date --

11        THE COURT:  Whoa, whoa.  I'm sorry.  Commerzbank was

12 far from negligent?

13        MR. WOLLMUTH:  Far from negligent.  It was trying to

14 get to the bottom of what was happening, and it was work --

15 after the $8-1/2 billion settlement was announced in 2011,

16 Commerzbank began -- joined the PIMCO-Blackrock group that

17 secured that settlement, contacted the Deutsche Bank trustee

18 and said:  Please investigate whether there are any breaches in

19 our trusts.  Please let us know if any repurchase claims should

20 be brought.  And if you don't intend to do either of those

21 things, please let us know.

22        As a matter of law, it is clear and uncontradicted,

23 and this is all on a slide that gives you the cite, your Honor,

24 and it is slide 11, if the Court could refer to it.  And I

25 invite your Honor after the argument to take, and we may have a

L83WphoO

1    copy here if you'd like to see it, a look at Lucht Exhibit 93,

2    which is cited at the bottom.

3          So Commerzbank is part of this group.  It joins in

4    late 2011.  This is at the very end of the relevant period,

5    anyhow, when there could be a trigger.  U.S. Bank was the first

6    trustee other than Deutsche sued in this Court on November 9,

7    2011.  Your Honor didn't even rule on that case on the motion

8    to dismiss until 2013.  Commerz chose a different route.

9          The plaintiffs that sued trustees were outliers.  What

10   the most sophisticated bondholders in the world, PIMCO and

11   Blackrock, were trying to do at this stage was work

12   collaboratively with the trustees to see if they could secure

13   more large settlements, like the Countrywide settlement.  And

14   that's exactly what Commerzbank did.  As Lucht 93 indicates, we

15   contacted Deutsche first in October of 2011.

16         THE COURT:  If sophisticated investors make a decision

17   to try to work out a settlement prior to beginning a litigation

18   and without a tolling agreement, that's on them --

19         MR. WOLLMUTH:  That's their problem.

20         THE COURT:  -- if the statute of limitations passes.

21         MR. WOLLMUTH:  I know, but that's not what we're

22   arguing, your Honor.

23         Just to be clear, if we could look at 11, what this

24   shows, it's objective evidence, uncontradicted in the record,

25   Commerzbank, for the statute to have started, would have had to

L83WphoO

1  have actual knowledge or have been grossly negligent in not

2  obtaining facts as to each trust.

3        THE COURT:  But that's exactly what Judge Pauley

4  found.

5        MR. WOLLMUTH:  Well, Judge Pauley made a couple of

6  errors, and as I said, I regret saying this given recent

7  events, but he did not consider ongoing prudent-person

8  breaches, which would have negated his ruling.  He did not

9  consider other post-2011 breaches, and he didn't look deeply

10  enough at the evidence to see that what Commerzbank was doing

11  in 2012 was asking --

12        THE COURT:  A continuation of the breach, such as a

13  continuation of the failure to act as a prudent person,

14  wouldn't prevent the statute of limitations from running.

15        MR. WOLLMUTH:  No case so holds, your Honor, and in

16  fact, numerous cases note the continuing nature of the

17  trustee's duty.  A statute of limitations for the duty is

18  provided directly in the PSAs.  It says the duty shall continue

19  and the trustee shall exercise its powers until such time as

20  the event of default is cured.

21        It's a question of fact as to when Deutsche breached

22  that duty, because they have no evidence as to any trust as to

23  when it was breached, but even if they did breach it once, the

24  duty does not go away.  This is the classic continuing duty,

25  which is recognized under law.  It's expressly provided for by

L83WphoO

1    contract, and no case says that the prudent-person duty of the

2    trustee terminates, nor does it address the extra-contractual

3    duties that your Honor found as a matter of tort that continue

4    until the event of default is cured.  The tort concept does not

5    have the ace for Deutsche Bank concept, but I think it would be

6    error to conclude that there was a one-and-done breach of this

7    duty anyhow, your Honor.  There's no evidence of it, and it's

8    not what Deutsche contracted for.

9         Deutsche would have this Court believe that an event

10   of default could occur and it could say, privately, without

11   telling another person on the planet, Well, I'm not going to do

12   anything and that forever cuts off its duty to act, at least

13   triggers the statute of limitations.  That's absurd.  They are

14   the gatekeeper.

15        THE COURT:  Try not to use "absurd."  I haven't

16   counted, but the number of times that that word appears in the

17   briefs is excessive.

18        MR. WOLLMUTH:  I apologize for that, your Honor, and I

19   certainly won't do it again.  I have pet peeves with words too.

20   But it's unfair and inequitable to apply that interpretation.

21        THE COURT:  Better.

22        MR. WOLLMUTH:  Thank you, your Honor.

23        Because the trustees take assignment of every single

24   right that the holders have.  As your Honor noted at the

25   motion-to-dismiss stage, it's very difficult for investors to

L83WphoO

1    find out what's going on because they don't have any access to

2    loan files and they have no right to request information from

3    the trustee beyond what's in the remittance reports.  And

4    Commerzbank did so, and the evidence is uncontradicted that

5    Deutsche Bank didn't give them the information.

6        THE COURT:  I'm sorry.  Isn't there also a decision

7    from the New York State Supreme Court which dismissed the

8    Commerzbank case on the grounds that it knew of the breaches

9    before 2011?

10        MR. WOLLMUTH:  No, your Honor.  Actually, the case

11   you're referring to, and I'm glad you bring it up, because

12   Deutsche tries to conflate it into something it's not.  We had

13   sued.  We, Commerzbank, had sued the securities underwriters,

14   the sellers of the securities, for misselling those securities

15   and misrepresenting loan quality, because that was the first

16   wave of this litigation, and Court may remember there was an

17   avalanche of those cases.  And those could be brought because

18   with statistical analysis through vendors, you could identify,

19   by 2011, 2010, that it was very likely that some of the loans

20   within the trust did not satisfy reps and warranties.  Some of

21   those pleadings got past a motion to dismiss.  Some didn't.

22   CoreLogic was the vendor, and Commerzbank tried to bring one of

23   those cases against the sellers of the securities, saying that

24   they were defrauded, and that was held to be too late.

25        Deutsche tries to suggest that it was a trustee case

L83WphoO

1    or that they brought it because they knew the trustees were not

2    doing their job.  That's not true at all.  The case was brought

3    against the people that sold them the instruments because they

4    thought they were defrauded, and that has absolutely nothing to

5    do with this case.

6                THE COURT:  OK.  All right.

7                MR. WOLLMUTH:  If I could continue for a moment on the

8    statute of limitations, your Honor?

9                Under the facts -- under the standard, I'm sorry, in

10   the Southern District whether they were on motion to dismiss or

11   not, the four things that I showed you on the prior slide have

12   to be present for the statute to be triggered; that is, actual

13   knowledge; the defendant was culpable for your losses; or gross

14   negligence.

15               THE COURT:  I think you've gone on for close to

16   another hour and a half.  Your colleague is shaking his head.

17               I really don't need advice from other lawyers.  All

18   right?

19               MR. WOLLMUTH:  Your Honor, maybe the most productive

20   thing I could do with the remainder of my time, if the Court

21   will allow it, I'd like to run through very quickly the few

22   pieces of evidence that Deutsche does point to on this motion.

23   There's very little, and none of it establishes their

24   entitlement to judgment as a matter of law.

25               First, for the reasons I already discussed,

L83WphoO

Commerzbank was not grossly negligent;

Second, Deutsche Bank states that by 2011, and this is what your Honor was just asking about, Commerzbank was communicating with law firms because it knew --

THE COURT:  Before you do that, could I just ask a couple of other specific questions.

MR. WOLLMUTH:  Sure thing, your Honor.

THE COURT:  One is what are the strongest cases that you rely on that the economic loss doctrine now does not bar your tort claims?  Since I decided the motion to dismiss, there have been some other cases in the Southern District which appear to suggest that the economic loss doctrine would bar the tort claims.  So what are the strongest cases on which you rely?

MR. WOLLMUTH:  Sure.  The case you're referring to, actually, your Honor, is *Triaxx*, and that doesn't do anything but judge the pleading before the court and says that no extra-contractual tort duty is pled.

The other case they rely on is a state case named *Blackrock*, where it's the same; it's confined to its pleading.  And Judge Pauley most recently decided that those cases are meaningless and that the economic loss -- held they're meaningless; they do not control the result in these cases.  I'll try to speak more carefully.  And he struck down the economic loss doctrine defense at summary judgment.

L83WphoO

1          The other case that's important that we cite is

2     *Assured Guaranty*, because that is actually the binding

3     authority.  It is an Appellate Division case from 2010 that was

4     affirmed by the Court of Appeals.  So the two strongest cases

5     we have are Judge Pauley's decision and *Assured Guaranty*, and

6     the two cases they have represent neither a change in law nor

7     are controlling authority on this Court, which is what this

8     Court would require to move from the law of the case that your

9     Honor has already announced.

10          THE COURT:  OK.

11          MR. WOLLMUTH:  All right.  As to the points that they

12    actually do point to, there's that 2011 securities suit, first,

13    and they say that it is brought because it was known defendant

14    and other trustees were not pursuing such actions.  That's

15    absurd.  The trustee -- that is stricken.  That is wrong.  The

16    trustee couldn't have pursued a securities case.  This was a

17    case about the selling of securities that had nothing to do

18    with trustees.

19          Second, in the fall of 2011, Commerzbank joined, and

20    all these, the German statute of limitations doesn't apply to

21    Phoenix Light, which is why I keep mentioning Commerzbank.

22    Commerzbank joined the Gibbs & Bruns group that was working

23    with PIMCO and Blackrock and tried to work collaboratively with

24    trustees to find out if there were breaches in reps and

25    warranties in the trusts or if there were valid repurchase

L83WphoO

claims in these trusts, which was not known despite the
widespread market problems.  Defendants point to joining that
group and being diligent as evidence of knowledge, but it's
shown by the letter I was referring to earlier that in 2012 we
still did not have knowledge of breaches or repurchase claims.

Third, remittance reports are pointed to, and these
are, if you've ever seen one, they're very summary statistical
reports given by the trustees, showed that loans were not being
repurchased, but that's not proof of anything.  The plaintiffs
had no access to loan files and the plaintiffs had no basis to
know if the defective loans were causing loss in their trusts.
They had no basis to know whether repurchase claims are being
worked on, negotiated, investigated.  That's why they were
asking Deutsche Bank.  The remittance reports don't say any of
that.

Fourth, there were no EODs declared.  That's a false
statement.  You'll see from the papers, prior to 2011, Deutsche
Bank had communicated with investors regularly in had a way
that suggested they were doing their job.  On 28 trusts they
did declare EODs, which suggested they were the cop on the beat
looking out for investors.  They sent notices -- we saw the
one -- to the servicers about robo-signing in 2007, '8 and '9.
Those are ministerial acts.  I say that because the trustee
itself says it doesn't do anything not required by its contract
until there's an event of default.  It denies an event of

L83WphoO

1    default, and those acts weren't required by its contract.

2            It also entered into the Fremont settlement that we

3    discussed earlier.  So the information in the marketplace

4    negated the significance that events of default hadn't been

5    declared on these trusts -- well, there were on some, actually.

6    It's not even true.  But 28 events of default occurred and the

7    absence of default only would have suggested the trustees were

8    doing their job and causing the servicers to cure any breaches.

9            Next, they state that the event-of-default notices

10   they did send in those 28 trusts, which kind of contradicts

11   their prior point, state that Deutsche Bank would not take any

12   action unless specifically directed by investors.  That's a

13   false statement.  And we have a slide -- it's No. 14 -- with

14   what was actually said to investors.  It says, and it's in the

15   call-out, line 1 into line 2, "a majority of the voting rights

16   has the right to direct the trustee to terminate the

17   servicing."

18           That's it.  It never says the trustee won't take any

19   action unless directed by investors.  It doesn't say that the

20   trustee will breach its duties or not act as a prudent person

21   or not give notice if it discovers the breach.  It doesn't say

22   it won't take any action.  Same with the -- there's only two

23   more.

24           The October 2010 investor notice that's discussed

25   quite a bit in the briefs, Deutsche falsely states in its

L83WphoO

1    brief, at pages 22 and 23 of the Commerzbank brief, that the

2    letter expressly informed investors that if they wanted

3    Deutsche to take any action investors would have to direct the

4    trustee.

5           The letter says nothing like that, and I invite your

6    Honor to examine the evidence.  The letter says exactly what

7    the default notices say, and I'm quoting from it.  And it's

8    Handlin Exhibit 559, if the Court would like to see it.  I

9    should have put it on a slide.  I apologize.  "Securitization

10   trust typically allowed the requisite percentage and principal

11   amount of securities to direct the trustee."  That's it.  It

12   doesn't say, again, that the trustee will not obey its

13   prudent-person duties.  It does not say that the trustee will

14   not give notice when it discovers a breach.  It does not say

15   that because of this robo-signing we're not going to put back

16   document-deficient loans in repurchase claims.

17          It just says what is the obvious right that investors

18   have under the PSA to direct the trustee if they choose to do

19   so.  And I'd like to say one thing about that, your Honor.

20   Commerzbank and WestLB, like most investors, don't have 25

21   percent in any trust.  That's why we were trying to cooperate

22   with the Gibbs & Bruns group and why we were writing the letter

23   to the trustee, because it's a way to pull back the curtain and

24   say, Have you discovered breaches?  Can we have loan files?

25   Because unless you're a 25 percent investor, you don't have a

L83WphoO

1    right to any of that, and the record is uncontradicted that

2    when Commerzbank asked for the contact information of other

3    investors, Deutsche wouldn't give it to them.

4              THE COURT:  But there's a difference between whether

5    you can force the trustee to do something and whether you have

6    knowledge that the trustee should be doing something and is not

7    doing something.

8              MR. WOLLMUTH:  Right.  And we, at the time, had no

9    knowledge, to use your Honor's formulation of it, that they

10   were not doing what they were supposed to do.  You see, the

11   critical thing here to remember --

12             THE COURT:  It's not hard to know whether the trustee

13   is bringing lawsuits or taking any other actions.  You could,

14   as the saying goes, ask.

15             MR. WOLLMUTH:  We did ask, is my point, and the

16   trustee was bringing lawsuits, the Fremont suit, for example,

17   which it settled in the bankruptcy court.  So as far as we

18   could tell, they were working on it.  And when we asked them,

19   they're not exactly forthcoming, and that's shown in the

20   record.  And moreover, the question -- this is a narrow German

21   statute-of-limitations question, where actual knowledge is

22   required.  It is true that a notice pleading standard doesn't

23   require facts in hand.

24             THE COURT:  Or grossly negligent.

25             MR. WOLLMUTH:  Or grossly negligent, but if you look

L83WphoO

1   at the gross negligence standard, as announced by Judge Torres

2   and Dr. Rohe, their expert, doesn't really contradict it, the

3   information that you can look at regarding trustee culpability,

4   not seller culpability, not originator, not servicer.  The

5   seller is culpable for the loss, must be available to you in

6   information that is readily available and obtainable without

7   significant cost or effort.  That is the German standard for

8   gross negligence, and that is off the table in this case for a

9   host of reasons.

10          And I can just tick through them very quickly, if your

11   Honor will allow me.

12          The last piece of evidence, and that's it, that they

13   present, those seven that I walked through is the allegation in

14   the complaint which your Honor already rejected.

15          Very briefly, on the gross negligence standard, does

16   not contest any of the following raised in 18 and 19 of our

17   opposition, loan- and trust-specific facts showing Deutsche

18   breaches were not in plain sight.  That's the German standard.

19          Commerzbank tried to investigate the breaches on into

20   2012 and was still asking the trustee for information regarding

21   breaching loans and the availability of repurchase claims.

22   When Commerzbank reached out and other investors reached out to

23   Deutsche Bank in 2012, it still did not disclose the

24   information that was sought and would not provide certificate

25   holders information concerning the trusts at issue.  No

L83WphoO

1    investor ever sued Deutsche Bank, who was working with

2    investors, until 2014, when PIMCO and Blackrock gave up on them

3    and sued them.  Phoenix Light also sued them in 2014, and

4    Commerzbank examined those suits and sued them in 2015.  They

5    couldn't have acted much faster.

6            Unless your Honor has further questions regarding

7    either standing, statute of limitations or something else, I

8    sense that I've worn out my welcome.  I have more to say, but I

9    think --

10           THE COURT:  No.  Thank you.  I have to give a break

11   for five minutes, and then I will listen to, briefly,

12   plaintiffs' motion for partial summary judgment and the

13   response.  I've already indicated my overview with respect to

14   that, so I really don't need more than ten minutes a side at

15   most on the plaintiffs' motion for partial summary judgment.

16           The defendants have not had an opportunity to reply,

17   so I'll give them three minutes if there's anything that they

18   wish to say in reply on the defendants' motion for summary

19   judgment.

20           MR. WOLLMUTH:  And your Honor, just on tort claims,

21   there's no effective motion against our tort claims because

22   they don't make any showing as to when they allegedly breached

23   the duties.  They say they didn't breach any duties, so I have

24   a tort claim outline if your Honor would like it, but I don't

25   sense that you would.

L83WphoO

1          THE COURT:  Thank you.

2          MR. WOLLMUTH:  Does your Honor want to hear our

3     opposition on tort claims?

4          THE COURT:  No.  Thank you.

5          MR. WOLLMUTH:  Thank you, your Honor.  Thank you to

6     the Court for all the time.

7          THE COURT:  No problem.  I thank the lawyers.  These

8     are difficult circumstances with all of the masks, and I know

9     it's difficult to argue, so thank you.  See you shortly.

10          (Recess)

11          THE COURT:  OK.  Please be seated.

12          All right.  Plaintiffs' motion for partial summary

13     judgment.  Ten minutes.  It's now 1:12.

14          MR. HANDLIN:  Thank you, your Honor.  Jay Handlin, on

15     behalf of plaintiffs.  May it please the Court.  I'm going to

16     try and limit this to three points.

17          First, the most comprehensive analysis to date of

18     events of default in an RMBS trustee case came from Judge

19     Pauley's 2020 summary judgment decision in *Commerzbank v. U.S.*

20     *Bank*.  Judge Pauley found that events of default had occurred

21     in every trust in that case.  He held events of default were

22     triggered under six different theories:

23          Exceeding numerical thresholds;

24          Downgrades of servicer or master servicer ratings;

25          Late or missing compliance documents;

L83WphoO

1          Failure to maintain REO properties by the servicers;

2          False servicer certifications; and

3          Servicers' and master servicers' disclosures of

4     noncompliance in their annual compliance document.

5          THE COURT:  Could I ask you, even if I agreed that

6     events of default had occurred and were not declared, in order

7     to find liability, I would have to find that the events of

8     default were material, and that after the event of default the

9     trustee failed to act as a prudent person.  Unless I found all

10    of those steps, you would not be entitled to summary judgment,

11    even on the issue of liability, putting aside the issue of

12    damages.  Isn't that right?

13         MR. HANDLIN:  If I can --

14         THE COURT:  That's a simple question.  Yes or no?

15         MR. HANDLIN:  I would say no as to the second part,

16    and I'd like to explain why.

17         THE COURT:  The question was you would not be entitled

18    to summary judgment on liability.  Yes or no?

19         MR. HANDLIN:  Your Honor stated three things, three

20    parts to establish liability, and respectfully, I think there's

21    a flaw in the second part, as stated.  So I think you've set a

22    threshold that's not needed to be met to establish liability.

23         THE COURT:  OK.  Go ahead.

24         MR. HANDLIN:  And that is what you said about

25    materiality.  And Deutsche Bank talks about this throughout as

L83WphoO

```
1    requiring a material breach by servicers to trigger an event of
2    default.  The clauses in none of these contracts require a
3    material breach.  It doesn't require a breach at all.  It's a
4    failure to observe or perform in any material respect any
5    obligation.
6           THE COURT:  Doesn't that turn on the interpretation of
7    the governing agreement and the question of whether they were
8    unambiguous as a matter of law?  It would be unusual to have an
9    agreement among sophisticated parties that any failure, even if
10   not material, is a breach of the agreement.  But let me put
11   that aside for a moment.
12          It's true, is it not, that you couldn't get liability
13   without showing that, after the event of default, the trustee
14   failed to act as a prudent person?
15          MR. HANDLIN:  Absolutely.
16          THE COURT:  First of all, there's no requirement,
17   under Rule 56, that I even entertain a motion for summary
18   judgment that doesn't ask me to issue summary judgment on any
19   claim.  What you're asking me to do is to provide assistance to
20   the parties for purposes of possible settlement, as I suggested
21   to your colleague not so -- well, quite a while ago -- to
22   assist by deciding parts of claims.  But that's not within a
23   Rule 56 motion for summary judgment, where I would grant
24   judgment, even limited to liability.  Isn't that right?
25          MR. HANDLIN:  Your Honor, if I understand the rules of
```

L83WphoO

1   summary judgment, I think your Honor could order judgment as to

2   liability and leave the question of damages if your Honor --

3           THE COURT:  No, no, no.  But if I accept all of your

4   arguments, you don't get a judgment even on liability unless I

5   decide the issues of fact as to whether the trustee acted as a

6   prudent person.  Right?

7           MR. HANDLIN:  Yes, but if I could have one minute to

8   try and explain why I think you can do that.

9           THE COURT:  Sure.  You have five more.

10          MR. HANDLIN:  OK.  So Deutsche Bank says, and your

11  Honor apparently believes up until now, that whether the

12  trustee acted prudently is necessarily a question of fact.  As

13  Judge Mukasey wrote in *LNC*, sometimes prudence will dictate

14  one -- and only one -- course.  But the important point here is

15  there is a floor for prudence, an absolute minimum requirement,

16  and a trustee that has not done that minimum cannot have been

17  prudent, and that floor is deliberation.

18          Faced with an event of default, the trustee must

19  deliberate about how to respond to it.  It may decide that the

20  response is to do nothing, but it has to decide.  If it doesn't

21  deliberate at all, as a matter of law, it cannot have been

22  prudent.  So for example, a trustee that denies that events of

23  default ever occurred necessarily did not deliberate in

24  response to them because it says it never happened, I don't

25  have to think about this.

L83WphoO

1        So if, in fact, events of default occurred and the

2    trustee didn't deliberate about them, it cannot have been

3    prudent.  The undisputed facts prove Deutsche Bank did not

4    deliberate, and having not declared events of default, didn't

5    deliberate.  We know -- so where events of default occurred,

6    Deutsche Bank did nothing differently, we know that because

7    they told us that across the board.

8        Why did they do nothing differently?  Because their

9    trust administrators, the people who ran these trusts day to

10   day, who dealt with the servicers day to day and the team

11   leaders who supervised that entire group, their 30(b)(6)

12   witness, Mr. Reyes, did not know they had a

13   post-event-of-default duty that was higher than it was before.

14   If you don't know that you have a heightened standard to

15   satisfy, necessarily you didn't deliberate to figure out what

16   to do to satisfy it.  So what do they say that they did to

17   satisfy it?

18       They say they consulted with counsel.  Now your Honor

19   remarked earlier, I think, during Mr. Biron's argument that

20   they consulted internally, but if we look at exactly what they

21   said, they said they consulted with counsel.  And respectfully,

22   your Honor, I don't think they get to say that, because on June

23   27, 2018, Deutsche Bank waived the advice-of-counsel defense.

24   They waived it because they didn't want to disclose those

25   communications.  If they're going to say I was prudent because

L83WphoO

1    I consulted with counsel, we are entitled to the substance of

2    those communications, because it is entirely possible they may

3    have consulted with counsel and counsel may have said to them,

4    You need to take action, and they may have said, Well, I'm not

5    going to do that.

6         So the substance of the communication might actually

7    prove that they were imprudent.  The simple fact of talking to

8    lawyers about something doesn't automatically make them

9    prudent.  But we asked for those communications.  They didn't

10   want to turn them over, so they waived advice of counsel.  So

11   they should not now get to rely on that to say, Oh, we were

12   prudent because we talked to counsel.

13        What else did they say they did?

14        They filed proofs of claim and they commenced

15   litigation.  They filed proofs of claim with respect to 38

16   trusts, commenced lawsuits with respect to six trusts, two of

17   them overlapping with the proof-of-claim trusts.  That's 42

18   trusts.  43 trusts there is nothing else that they say they

19   did.  That is not deliberate -- that is an admission of no

20   deliberation as to those 43 trusts, including 18 trusts where

21   they declared events of default.

22        THE COURT:  Why does that follow?  They took actions

23   with respect to various trusts and they didn't take actions

24   with respect to various other trusts.

25        MR. HANDLIN:  But again, we asked in discovery and in

L83WphoO

1    the papers, what did you do in response to events of default,

2    and they said we consulted with counsel, we filed proofs of

3    claim and we commenced litigation.

4             THE COURT:  Would you finish up.

5             MR. HANDLIN:  Sure.

6             So as to trusts where they didn't file proofs of claim

7    and they didn't commence litigation, the only thing they have

8    said is they consulted with counsel in response to events of

9    default.  But again, having waived that, I think they are

10   estopped from arguing it.  If you had a list of things, I think

11   that gets erased off your list, leaving them, as to those 43

12   trusts, literally nothing that they have done in response.  And

13   since your Honor is asking me to stop, I will stop here.

14            And by the way, I just want to acknowledge for both

15   sides we know these cases have been an enormous burden because

16   of the amount of trusts, the amount of proof, so I just want to

17   thank your Honor for the heavy lifting.

18            THE COURT:  All right.  Thank you.

19            Ten minutes with respect to the plaintiffs' motion for

20   summary judgment.

21            MR. KRAUT:  Yes, your Honor.  And I'll start by

22   joining Mr. Handlin in thanking the Court for working through

23   this with us.

24            We agree with your Honor's point that what the

25   plaintiffs are seeking here is not appropriate for summary

L83WphoO

1    judgment.  It's an advisory opinion on certain provisions, and

2    we believe that that's not appropriate here.

3           In terms of whether prudence can be granted at this

4    stage, as I mentioned earlier, the defendants identified four

5    or five, six cases in our briefs showing that it's not an issue

6    here.  The *LNC* case that Mr. Handlin cited is literally the

7    only case that plaintiffs cited on this point, and what the

8    court said in that case was that determinations of

9    reasonableness and prudence are fact-intensive and, as a

10   result, talking about Judge Mukasey, denied the investors'

11   motion for summary judgment.  So even a case that they cite for

12   their point doesn't hold up there.

13          In terms of evidence of deliberation, plaintiffs point

14   to Ronaldo Reyes's testimony.  They don't point to Kelly

15   Rodriguez's testimony, and this is significant because Kelly

16   Rodriguez was in the trust management group.  Ronaldo Reyes was

17   not.  Ronaldo Reyes was a team leader of the trust

18   administration group.  Ronaldo Reyes's job didn't change very

19   much before and after an event of default.

20          Kelly Rodriguez would be a person who would be

21   involved in this, and when she was asked --

22          THE COURT:  Hold on.  The plaintiffs are right,

23   though, with respect to the fact that you can't rely upon the

24   fact that your clients consulted counsel as part of the defense

25   or as a means of showing that you acted prudently, isn't that

L83WphoO

1    right?

2              MR. KRAUT:  I would disagree, your Honor, for two

3    reasons.

4              One is there's a case, *CFIP v. Citibank*.  I recall it

5    because I was involved in it, your Honor, and in that case,

6    Judge Rakoff concluded that when considering whether a trustee

7    acted in good faith, the fact that it considered -- that it

8    consulted with counsel as part of its process had value for

9    that purpose.  I know that there are other courts that have

10   ruled on that issue, but my main point would be --

11             THE COURT:  No, no.  Why is that right?  If you want

12   to rely upon the fact that you consulted with counsel, then you

13   decide to waive the confidentiality that otherwise applies to

14   that conversation.  But you have affirmatively decided not to

15   waive the protection of the attorney-client privilege, so how

16   can you rely on the fact that you consulted with counsel?

17             MR. KRAUT:  I would say as to that case, your Honor,

18   Judge Rakoff held that there's a difference between advice

19   relying on exculpation for good faith, acting in good faith and

20   reasonable versus advice of counsel, and because the trustee

21   chose not to rely on advice of counsel, like we are not relying

22   on advice of counsel, it would not consider that exculpation,

23   but in that case the court considered it.

24             THE COURT:  What's the name of Judge Rakoff's case?

25             MR. KRAUT:  *CFIP v. Citibank*.  It's from 2010.

L83WphoO

1          But the main point I want to make on this issue, your

2     Honor, is that if the Court decides that it won't consider that

3     the trustee consulted with counsel -- and the testimony is full

4     of references to that, where Kelly Rodriguez said she talked

5     with counsel on a regular basis, we consulted with counsel on

6     all events of default -- I don't think that means that

7     plaintiffs get to stand up and say that the trustee did

8     nothing.  It's one thing to say we can't rely on the advice,

9     but they don't get to stand up and say we did nothing by

10    reading out of all process is an important step in the process.

11    And this is their motion for summary judgment, and they're

12    saying we did nothing, and I don't think they get to go that

13    far.

14          Mr. Handlin says that as to the trusts for which

15    Deutsche Bank does not acknowledge an event of default, that

16    is -- I don't think this was his term; I'll use it -- *per se*

17    evidence that there was no prudent-person standard met.  But if

18    you look at what the trustee actually did in those instances,

19    even if they did not notice an event of default and believe

20    their own prudent-person standard, what the trustee did in most

21    instances, I believe, would meet the prudent-person standard.

22          When there was a servicer attestation of compliance

23    that was late, they had a policy and procedure where they would

24    follow up and go get it.  What would a prudent person do who is

25    expecting a certificate that hasn't come in?  They'd go get it.

L83WphoO

1    If a prudent person heard media allegations of

2  robo-signing, what might they do?  They might write to the

3  servicers.  The plaintiffs' slide deck includes a letter, and

4  they say that the trustee reached out to servicers to try to

5  get information about this.  That supports our case, not

6  theirs.  It also shows that the trustee didn't have trust- and

7  loan-specific evidence of breaches, because it wouldn't have

8  sent the letters.  It sent the letters to learn them, to

9  identify them.

10    So if you look at what the trustee did in each of

11  these instances, when you have instances like the plaintiffs

12  identified about property maintenance, what would a prudent

13  person do there?  They identified the property violations to

14  the servicer by keystroking their own systems.  They let the

15  servicers know about them.  They met with municipalities to try

16  to put the servicers in touch with the, the servicers in touch

17  with the cities.  They ultimately sent notices to holders to

18  let them know about notices that they had sent to servicers.

19    So where prudence is an issue of fact, even as to the

20  disputed events of default, for lack of a better term,

21  plaintiffs can't get summary judgment by saying that the

22  trustee necessarily did nothing in those situations.

23    How am I doing on time?

24    THE COURT:  All right.

25    MR. KRAUT:  I think that's a good place to stop, your

L83WphoO

Honor.

THE COURT:  OK.  I said I would let the defendants
have a reply for three minutes.  Even though your colleague
graciously ceded back three minutes, go ahead.

MR. BIRON:  Thank you, your Honor.

A few points.

First of all, on the lack of standing as to sold
certificates, plaintiffs' counsel represented that Commerzbank
knew the location of the buyer, of the actual buyer.  That's
incorrect.  In Commerzbank's interrogatory response, which is
at our Commerzbank 56.1 --

THE COURT:  No, they said they didn't know.

MR. BIRON:  Correct.  They didn't know who the actual
buyer was.  They admitted that at paragraph 44.1 of the 56.1
statement.

Second of all, with respect to DTC's involvement, it
is equally important under the center-of-gravity test.  Among
the other factors courts consider is the place of performance
and location of the subject matter.

Here, the certificates were registered to the DTC,
which is located in New York, which means, as Judge Pauley
found, that's the location of the subject matter.  Moreover,
the sale and the transfer occurred on the DTC's books, which is
in New York.  That's the place of performance.

Next, with respect to the loan-by-loan trust-by-trust

L83WphoO

1  point, there was some discussion that it only relates to

2  liability.  That is incorrect.  It's an incorrect statement of

3  the law, and I'll quote from Judge Caproni in *Phoenix Light v.*

4  *Bank of New York*, this court joins -- let me start again, your

5  Honor.  "This court joins other courts in this district in

6  holding that plaintiff's lack of loan- or trust-specific proof

7  relative to Bank of New York-Mellon's knowledge of any breach

8  is fatal to their claims."

9         Again, your Honor, the loan-by-loan proof relates to

10  whether or not the trustee was put on notice and had knowledge

11  of a loan-specific breach, and that is not a phase 2 issue.

12         With respect to the document-defect claims, I'd just

13  refer your Honor to our reply brief, starting at page 26, which

14  sets forth the record and makes clear that what we moved on on

15  our motion to dismiss is for any repurchase claim related to a

16  document defect identified in the final exception report

17  delivered at or near the closing of the transaction.  And your

18  Honor, I respectfully submit that's the motion that you

19  granted, and those claims are of this case.  And they're not

20  revived by 2 percent letters that were sent later that

21  identified, at most, that those document defects continued.  If

22  that duty was breached, it was breached the first time the

23  final exception report was received.

24         Finally, the German statute of limitations, with

25  respect to the point about Phoenix Light, that there was no

L83WphoO

1    trust, that's incorrect.  It's clear, and I refer your Honor to

2    page 17 of our moving brief, that Phoenix Light transferred the

3    certificates to the indentured trustee, and the language in the

4    agreement is Phoenix Light transfers/grants, "All of Phoenix's

5    rights, title and interest in and to the asset portfolio

6    whether now owned or existing hereafter arising or acquired."

7    That's at exhibit 96 to our -- it was submitted in connection

8    with our summary -- I'm sorry, with our Phoenix Light summary

9    judgment motion.

10           The Second Circuit has held that such clauses effect a

11   complete transfer to an indentured trustee, and thus, any

12   claims relating to the RMBS certificates in securitized asset

13   portfolio are held by the indentured trustee in trust for the

14   trust beneficiaries.

15           I will cite to two Second Circuit cases.

16           THE COURT:  Finish up.

17           MR. BIRON:  The first one is *NCUA v. U.S. Bank*, 898

18   F.3d 243, pin cite 253.

19           The other case is affirming a lower court decision.

20   It's the *Triaxx v. Bank of New York-Mellon* case, and the

21   citation is 741 F.App'x 751.

22           The last point I would like to make --

23           THE COURT:  I said finish up.

24           MR. BIRON:  OK.

25           Between knowledge of factual circumstances and coming

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L83WphoO

1    up with a legal theory, there's a difference, and the idea that

2    because plaintiffs did not come up with a legal theory that

3    they could pursue claims against a trustee is in any way

4    relevant to the German statute of limitations analysis is

5    completely incorrect.

6             Thank you, your Honor.

7             THE COURT:  OK.  Thank you, all.  I'll take the

8    motions under advisement.  I appreciated the arguments,

9    particularly under the difficult circumstances, and I thank the

10   reporter for all of the time.

11            All right.  Be well.  Stay healthy.

12            (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25